William J. Becker, Jr., Esq. (SBN: 134545)
Bill@FreedomXLaw.com
Jeremiah D. Graham, Esq. (SBN: 313206)
JeremiahDGraham@gmail.com
**FREEDOM X**
11500 Olympic Blvd., Suite 400
Los Angeles, California 90064
Telephone: (310) 636-1018
Facsímile: (310) 765-6328

Counsel for *David M. Kissner*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**DAVID M. KISSNER**, an individual,

vs.

**LOMA PRIETA JOINT UNION SCHOOL DISTRICT**, a California public agency; **LISA FRASER**, former superintendent at Loma Prieta Joint Union School District, in her official and individual capacities; **COREY KIDWELL,** former superintendent at Loma Prieta Joint Union School District, in her official and individual capacities; **KEVIN GRIER**, successor superintendent at Loma Prieta Joint Union School District, in his official capacity; **BILLY MARTIN**, principal of CT English Middle School, in his official and individual capacities; **DEANA A. ARNOLD**, Loma Prieta Joint Union School District trustee, in her official and individual capacities; **BEN ABELN,** Loma Prieta Joint Union School District trustee, in his official and individual capacities; **RON BOURQUE**, Loma Prieta Joint Union

Case No. 22-CV-00949-VKD

**VERIFIED FIRST AMENDED COMPLAINT**

Violations of:

1. First Amendment Free Speech Clause (42 U.S.C. § 1983) (Individual District Defendants)
2. California Constitution Free Speech (Art. I, § 2) (District & Individual District Defendants)
3. Civil Rights Defamation (42 U.S.C. §1983) (Individual District Defendants)
4. Defamation Per Se (Individual District Defendants & Community Defendants)
5. False Light Invasion of Privacy (All Defendants)
6. Public Disclosure of Private Facts (District & Individual District Defendants)
7. Discrimination and Retaliation for Engaging in Protected Activity (Cal. Lab. Code §§ 98.6 & 1101) (District & Individual District Defendants)
8. Discrimination and Retaliation for Engaging in Protected Activity (Cal. Lab. Code §§ 98.6 & 1102) (District & Individual District Defendants)
9. Wrongful Termination (District & Individual District Defendants)

Verified First Amended Complaint                    Case No. 22-CV-00949-VKD

School District trustee, in his official and individual capacities; **CHARLOTTE KHANDELWAL**, Loma Prieta Joint Union School District trustee, in her official and individual capacities; **ERIN ASHEGHIAN**, Loma Prieta Joint Union School District trustee, in her official and individual capacities; **PATRICIA ELLIOT**, an individual; **JOIE GRIMMET**, an individual; **LAWRENCE MCVOY**, an individual, and **DOES 1 through 50**, inclusive,

Defendants.

10. Wrongful Termination in Violation of Public Policy (District & Individual District Defendants)
11. Whistleblower Retaliation (Cal. Lab. Code § 1102.5) (District, Individual District Defendants and District Agent Defendants)
12. Civil Harassment (Cal. Code Civ. Proc. § 527.6) (All Defendants)
13. Intentional Infliction of Emotional Distress (All Defendants)
14. Negligence (Emotional Distress) (District & Individual District Defendants)
15. Negligence (District & Individual District Defendants)
16. Fourteenth Amendment Due Process (42 U.S.C. § 1983) (Individual District Defendants); California Constitution Due Process (Art. I, § 7) (District & Individual District Defendants)
17. Fourteenth Amendment Equal Protection (42 U.S.C. § 1983) (Individual District Defendants); California Constitution Equal Protection (Art. I, § 7) (District & Individual District Defendants)
18. Civil Rights Conspiracy (42 U.S.C. § 1983) (All Defendants)
19. Breach of Contract (District Only)

**Demand For Jury Trial**

David M. Kissner ("Kissner"), by and through his undersigned counsel, brings this Complaint against the above-named Defendants, their employees, agents, and successors in office, and unknown Doe Defendants 1 through 50 (collectively, "Defendants"), on his own behalf, and in support thereof, alleges the following:

**INTRODUCTION**

1.     This is a case involving a school district that retaliated against a teacher for publicly expressing opposition to its policies and reporting wrongdoing, waste, fraud and/or abuse.

2.     Kissner was initially stigmatized for challenging his school district's unlawful policy of excusing student absences from class to allow them to attend a partisan political rally.

2

3.      Kissner's reputation already sullied by the school district's unwarranted investigations into his contesting the school-sanctioned student walkout, Kissner was ultimately laid off and terminated from employment for his protected speech.

4.      The reasons given given by the school district for punishing an upstanding public school teacher are pretextual. Kissner is the victim of political and/or ideological differences with his public employer. Another casualty of the well-known cancel culture.

5.      Government is constrained from teaching impressionable children partisan viewpoints. Its function is to educate, not to indoctrinate. In this case, Defendant Loma Prieta Joint Union School District (the "District"), a public school district, sought to promote just one side of a heated political controversy and thereby indoctrinate students into joining one side of a political debate. A public controversy arose in 2018 when the District violated state truancy and other laws by joining a partisan nationwide political protest. As schools throughout the nation heedlessly climbed aboard the precipitous clamor to shape the views of impressionable students into pressuring lawmakers to tighten the nation's gun laws, just one teacher stood against the transparent political indoctrination campaign.

6.      Kissner was employed since 2012 as a math and science teacher at CT English Middle School ("CT Middle") in Los Gatos, California. Until 2018, Kissner was well-regarded by his colleagues and members of the school community. In March of 2018, Kissner objected to the District's participation in a politically-organized nationwide student walkout, not because he opposed the political cause promoted but because the District's participation in and promotion of the walkout was unlawful. Traditionally, Kissner's informed disapproval of unlawful policy decisions could be expected to have earned him respectful feedback. It instead touched off a firestorm of attacks on him by school and local community members, attacks characterized by false accusations of misconduct with minors. When Kissner became politically active in issues involving

3

objectionable District policies, these unfounded attacks returned with force, ultimately leading to his loss of employment with the District.

7.      This Complaint arises from a campaign of harassment and discrimination carried out over a period of three years culminating in Kissner's simultaneous <u>layoff</u> and <u>dismissal</u> and irreparable harm to his reputation. The simultaneous layoff and dismissal are not coincidental. They reflect the District's frustration with associating with a contrarian in the habit of exposing its duplicitous conduct.

8.      The District's reasons for laying off and dismissing Kissner are pretextual and meant to conceal their discriminatory and retaliatory motives.

1.      There is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries. And months, or even years, of unwarranted and public criticism of a previously distinguished employee, implied threats of termination, contacts with subordinates that only could have the effect of undermining an employee's effectiveness, and new regulation of the manner in which an employee must be scrutinized for his conduct may be meant to punish the employee for failing to comply with a supervisor's orders and thereby place his career in jeopardy. As alleged herein, the District's patient, calculated, and inexorable efforts to sever its relationship with Kissner in retaliation for his protected activities is the only rational explanation for the harm the Defendants have caused.

## JURISDICTION AND VENUE

9.      This action arises in part under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Kissner's rights to freedom of speech, due process, and equal protection under the First and Fourteenth Amendments to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the

**Verified First Amended Complaint**                               Case No. 22-CV-00949-VKD

requested damages and redress—including nominal damages—under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

10.     This Court has supplemental jurisdiction over the state constitutional and statutory claims pursuant to 28 U.S. Code § 1367 because the state claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

11.     The Northern District of California is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)-(d) because it is the District in which Defendants reside, maintain offices, exercise their authority in their official capacities, and it is the District in which substantially all of the events giving rise to the claims occurred.

## PARTIES

**Plaintiff**

12.     David M. Kissner (hereinafter alternatively referred to as "Plaintiff" and "Kissner") at all relevant times was an individual residing in Santa Cruz County, California.

**Defendants**

**I.      District**

13.     Defendant Loma Prieta Joint Union School District ("District") is a California state agency capable of suing and being sued, and is sued only in connection with the state claims herein.

**II.     Individual District Defendants**

14.     Defendant Lisa Fraser is a former Superintendent of the Loma Prieta Joint Union School District Board of Trustees who, at all relevant times, is and was a resident of Santa Cruz County, California, and is sued in her official and individual capacities.

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

15. Defendant Corey Kidwell is a former Superintendent of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, was a resident of Santa Cruz County, California, and is sued in her official and individual capacities.

16. Defendant Kevin Grier is the current Superintendent of the Loma Prieta Joint Union School District Board of Trustees, and successor to Defendant Lisa Fraser, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in his official and individual capacities.

17. Defendant Billy Martin is the current principal of Loma Prieta Joint Union School District, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in his official and individual capacities.

18. Defendant Deana A. Arnold, is a member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, is and was a resident of Santa Cruz County, California, and is sued in her official and individual capacities.

19. Defendant Ben Abeln is a member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in his official and individual capacities.

20. Defendant Ron Bourque is a member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in his official and individual capacities.

21. Defendant Charlotte Khandelwal is a member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, is and was a resident of Santa Cruz County, California, and is sued in her official and individual capacities.

22.     Defendant Erin Asheghian is a member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in her official and individual capacities.

**III.     District Agent Defendants**

23.     Defendant Patricia Elliot is an individual, who, at all relevant times, is and was a resident of and doing business as an employment investigator in Santa Clara County, California, and is sued in her official capacity as an agent of the District and in her individual capacity.

24.     Defendant Joie Grimmet is an individual, who, at all relevant times, is and was a resident of and doing business as an employment investigator in San Bernardino, California, and is sued in her official capacity as an agent of the District and in her individual capacity.

**IV.     Community Defendants**

25.     Defendant Lawrence McVoy is an individual, who, at all relevant times, is and was a resident of Santa Cruz County, California.

**V.     Unknown Defendants**

26.     Kissner is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 50, and for that reason has sued them by their fictitious names. On information and belief, Kissner alleges that each of these fictitiously named Defendants are responsible in some manner for some or all of the acts alleged herein.  Kissner will amend this Complaint to set forth the true names and capacities of the fictitiously-named Defendants once ascertained.

27.     Kissner is informed and believes, and thereon alleges, that each of the Defendants sued herein, including those named herein as Does, are the agents, servants, employees, licensees, guarantees, indemnitors, invitees, or assignees of each other, and in doing the things herein alleged acted within the course and scope of such agency, employment, license, guaranty, indemnity,

Verified First Amended Complaint                                    Case No. 22-CV-00949-VKD

invitation, assignment and/or relationship and with the full knowledge, consent and approval of the remaining Defendants.

## FACTUAL BACKGROUND

### I.    Introduction

28.    The District serves over 400 students in grades TK-8 and administers just two schools, Loma Prieta Elementary School (K-5) and CT Middle (6-8).

29.    Kissner was a tenured, certificated teacher employed by CT Middle. Kissner had enjoyed full-time employment with the District for approximately nine years teaching math (for which he is certificated) and science while additionally volunteering to coach wrestling.

30.    Kissner was fired after a three-year ordeal in which he was subjected to multiple investigations and falsely accused of immoral conduct involving minors. Defendants disfavored Kissner due to his political views and opposition to District policies as more fully described herein.

### II.    Kissner's Background

31.    The District removed Kissner from his teaching job based on false and fabricated evidence, severely damaging his reputation and impugning his moral character in the process. Indeed, it falsely and recklessly charged him with sexual abuse of minors, or "grooming," dropping the unfounded charges only after recklessly and/or maliciously releasing them to the public.

32.    In fact, Kissner's demand that the charges be dropped went unheeded for months until the dismissal hearings when the District finally conceded it lacked evidence to prove it. But that was too little, too late; the reputational damage had been done. The image of Kissner, a man of strong moral character, had been transformed into that of a monster. The District's reckless and gratuitous charges were outrageous and resulted in the permanent loss of Kissner's reputable standing in the community, forcing him to leave it as a result of their impact. Accordingly, this narrative begins with a description of Kissner's true character.

### A.     <u>Kissner Is A Proud Former Officer In The U.S. Marine Corps</u>

2.     Kissner served his country honorably as a U.S. Marine Corps officer. He graduated with an engineering degree from the U.S. Naval Academy in 2002. Upon graduating, Kissner earned his commission as an officer in the Corps. During his active duty service, Kissner served in Korea, Indonesia, Japan, and Iraq, where he completed a combat tour as a battery executive officer leading his Marines to fulfill artillery and provisional infantry missions. He also served as a battalion operations officer before being honorably discharged as a first lieutenant. Kissner is proud of his military service and of his country and the values and ideals that this country was founded on. He believes that those ideals are worth fighting for and defending.

### B.     <u>Kissner Is A Proud Educator</u>

33.     After leaving active duty in the United States Marine Corps, Kissner continued in his life of service as a teacher, coach, and youth wilderness guide. His work in education began by helping at-risk minors teaching in county continuation schools and juvenile detention facilities. Kissner served incarcerated, drug addicted, impoverished, and foster youth, many of whom were involved with gangs. Some 11 years later, Kissner continues to maintain relationships with many of his former students from this period.

34.     Kissner was hired in 2012 by the Loma Prieta School District to teach math and science at CT English Middle School. He remained employed in this position until the District moved to dismiss him in February, 2021.

35.     Kissner enjoyed a reputation for building connections with students and for delivering rigorous content and setting high expectations that encouraged students to excel.

36.     During the school year, Kissner volunteered his time coaching middle school wrestling for the school team and for an independent youth sports non-profit he formed to serve youth in his community. The sport of wrestling was an impactful experience for Kissner in high

school, and he credits the sport and his coaches with dramatically redirecting his life in a positive way.

37.    Kissner finds it rewarding to be able to provide formative and life changing experiences to youth.  In 2020, the school wrestling team had 52 participants, representing one out of every five students in the school.  This popular and successful program competed with much larger schools and had significantly higher rates of participation than any other school in the league. Countless young people have been positively impacted by Kissner's coaching and leadership in wrestling.

### C.    **Kissner Is A Family Man**

38.    Kissner is a family man, and values serving alongside his wife and six-year old son. Kissner and his wife Stacy just celebrated their seven-year wedding anniversary and some 10 years serving youth and families together.  Their son was named after one of King David's generals and has been right there with them on the camping and backpacking and bike trips from as young as five weeks old when he went on his first camping trip to Death Valley.

### D.    **Kissner Is An Active Community Member**

39.    As a teacher, Kissner had a significant amount of time off each year.  Kissner and his wife and son spent this time in the outdoors, taking families and kids on unique camping, backpacking, or mountain biking adventures all over the western U.S. and Canada.  Kissner believes that time in the outdoors is invaluable for himself and his family and the youth he works with.  He also believes that being face to face with creation in nature is a great way to meet with and hear from God.

40.    In addition to his many service-oriented activities, Kissner is also active in his community by engaging in the local political process.  Kissner values and upholds the Constitution

Verified First Amended Complaint                    Case No. 22-CV-00949-VKD

and the republic that is built upon it.  He believes strongly in the principles of limited government, government accountability and transparency, and fiscal responsibility.

41.     Kissner believes that government at all levels can function properly only when citizens are actively involved in the process and providing accountability and oversight.  As such, Kissner became a community leader in several local political issues.  As discussed in greater detail below, during the student walkouts of March 2018 Kissner stood alone among his colleagues to defend the rights of all students and taxpayers with varying viewpoints from inappropriate indoctrination by public entities.

42.     Kissner's unpopular position on the walkout and the school's responsibility to remain neutral on controversial and tendentious issues resulted in national news attention and the loathing of certain community and staff members and the entirety of district leadership.  However, his position also resulted in the school leadership changing their ad hoc policies on student walkouts to be in alignment with the law.

43.     Kissner has subsequently been a vocal leader for local fiscal accountability and taxpayer rights, and recently led a successful campaign to defeat a local school tax measure.  He has also advocated for reforms to how the representative system works locally, pushing for elections as opposed to appointments to school board positions.  While these political positions have made him unpopular among the school district's political establishment, Kissner has also been a welcome voice for community members who have felt disenfranchised by the status quo.

E.      **Kissner Is A Devout Practicing Christian**

44.     Kissner was raised in a Christian household, and his faith became truly personal for him during his years in the military.  Kissner believes in the sovereignty of Jesus, as the son of the triune God, and as the only way through which man's broken relationship with God can be restored.

11

45.     Kissner has been active in his church and faith his entire life.  Kissner attends church regularly and is an active member of the church communities he serves and worships in.  Kissner has served in youth ministry and has also participated in or led multiple service and missions projects to New Orleans after Hurricane Katrina.

46.     Kissner also launched and leads a nonprofit service organization that serves youth and families by providing unique outdoor experiences in a spiritual setting.  He has worked with multiple churches, church leaders, nonprofit organizations, and community leaders over the last 13 years in this capacity.  Kissner's faith informs every aspect of his life, including family, work, politics, and how he spends his time and resources.

F.      **Kissner's Reputation Was Marred By An Incident In 2016 When He Admitted To Sharing A Sip Of Whiskey With A Minor During A Wilderness Camping Excursion**

47.     People make mistakes. Kissner is no different than any other person in that regard.

48.     In 2016, while on a wilderness adventure, Kissner toasted a teenaged boy's successful leadership accomplishments by sharing a single sip of alcohol with the minor. The trip was neither school related nor involved any District students.  When the teenager's parent, Helen Odea, also a District teacher, learned about the incident, she sought a meeting with Kissner. The matter was resolved when Kissner acknowledged the impropriety and took responsibility for exercising poor judgment.

49.     Two years later, as described hereinbelow, this single transgression was used against Kissner by the District to discredit him in response to his challenging District policy over a student walkout and has followed him even to the point of his termination six years later.

III.    **Kissner's Relevant Contractual Rights Are Set Forth In The Collective Bargaining Agreement**

50.     The rights of District employees are protected by the Loma Prieta Teacher's Association's Collective Bargaining Agreement ("CBA"). (A true and correct copy of the relevant

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

agreement is attached hereto as Exhibit "1" and incorporated herein by reference as though fully set forth herein.)

51.     The CBA provides in relevant part:

Article VI: Personal and Academic Freedom

(A) The Employer shall not take action against a teacher based on his or her personal, political, or other activities, so long as these activities are lawful and do not affect the teacher's professional performance….

* * *

(C) The Employer shall not interfere with a teacher's lawful freedom of speech or use of curriculum and materials which fall within state and district approved guidelines….

Article VII: Grievance Procedure

(D)(1) No reprisals of any kind will be taken by either party against any grievant, any party in interest, any member of the Association, or any other participant in the grievance procedure by reason of such participation.

Article 15: Personnel Files and Records

(D) Personnel Files: Except as contained in Sections 44939-44942 of the Education Code, the Employer shall not base any adverse action against a teacher upon, materials which are not contained in such teacher's personnel file.

(F) A teacher shall be provided any negative or derogatory material before it is placed in his/her personnel file. S/he shall also be given release time during the school day to initial and date the material and to prepare a written response to such material. The derogatory material shall not be placed in the file until a ten (I 0) day opportunity to respond has passed.

Article 16: Parent Complaints

No negative material based upon information of a derogatory or critical nature which has been received by administration from parents shall be placed in a personnel file unless the following procedures have been followed:

I. A good faith effort shall be made to resolve the issue at the lowest level. The lowest level shall mean resolution with the faculty member directly or at the site with the next level site administrator, if possible.

2. If the complaint by a parent about a unit member may be used against the unit member, it shall be reported to the unit member within twenty-four (24) hours or as soon thereafter as is practicable of the receipt of the complaint.

**Verified First Amended Complaint**                                   Case No. 22-CV-00949-VKD

3.  The administrator shall inform the unit member of his/her right to have Association/legal representation at any meeting regarding a complaint.

4.  During the processing of any parent complaint a faculty member has the right to request a meeting with his or her immediate supervisor to discuss the complaint and the advisability of meeting directly with the parent complainant to attempt to resolve the complaint. A faculty member has the right to have an Association representative present during such meeting.

5.  If the matter is not resolved to the satisfaction of the complainant, he/she shall put the complaint in writing, and submit the original to the unit member, with a copy to the unit member's immediate supervisor. The unit member shall be given time during the duty day, without salary deduction, to review the complaint.

6.  The unit member is provided the right of representation and is informed prior to any meeting which may involve criminal allegations, that the member is entitled to such representation.

7.  The unit member has the right to attach written and signed comments to any written complaint filed by the complainant.

8.  If any action is taken against the unit member based on the complaint and the unit member believes the complaint is false and/or based on hearsay, or that improper procedures were followed, a grievance may be initiated.

9.  Complaints which are shown to be false, or are not sustained by the grievance procedure shall not be placed in the unit member's personal file nor utilized in any disciplinary action against the unit member.

IV.  **The 2018 National School Walkout Controversy**

A.  **The Walkouts' Purpose Was Explicitly Political**

52.     The District's campaign of harassment, discrimination, and retaliation against Kissner took root in 2018 when Kissner sought to enforce state truancy laws in order to prevent the District from endorsing a student political protest.

53.     On February 14, 2018, Marjory Stoneman Douglas High School in Parkland, Florida, became the scene of a deadly mass shooting carried out by a 19-year-old former student. In the wake of the tragedy, an anti-gun campaign aimed at staging nationwide student walkouts throughout America's schools was organized. The walkouts' website identified three objectives:

14

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

(1) to "hold elected officials accountable," (2) to advocate "solutions to gun violence," and (3) to "encourage students to be more engaged in politics."[1]

**B.    Applicable Truancy Law And Policy Did Not Excuse Absences For Political Activity**

**1.    California's Education Code does not authorize excused absences for political rallies**

54.    Cal. Educ. Code § 48205 limits the type of excused absences from the classroom authorized in the state's public schools. It does not authorize excused absences for political rallies, demonstrations, walkouts, protests, or other assemblies. Nor are school officials vested with power to exempt students from state truancy laws.

**2.    The District's own absence/truancy policy prohibited students from attending political rallies**

55.    Despite the existence of well-established law barring the District from participating in and/or promoting the walkouts, and with full knowledge of the relevant law, the District ultimately turned a blind eye toward it.

56.    The school's official policy regarding the walkout treated student absences from class as unexcused. In a March 7, 2018, letter to parents, the District's then-superintendent, Defendant Corey Kidwell ("Kidwell"), wrote:

> Students who choose to walk out will be provided with a space to gather in quiet solidarity. **Their absence from class will be considered "unexcused" and dealt with as a "class cut". Missed work or assignments will be dealt with per the syllabus for each instructor**…. As a school district, we cannot promote or endorse civil disobedience, nor can we discourage participation.

(Emphasis added.)

---

[1] Michael Gold, "What to Expect From the National School Walkout for Gun Safety," *New York Times* (April 19, 2018); https://www.nytimes.com/2018/04/19/us/national-school-walkout-guns.html.

**Verified First Amended Complaint**                                      Case No. 22-CV-00949-VKD

### 3. The District received legal advice concluding that student walkouts are statutorily barred

57.     Legal guidance circulated to faculty and staff and CT Middle unambiguously outlined the danger of schools sanctioning of student walkouts:

> Students should not be disciplined for engaging in the act of protest. **But make it clear to students that a walkout protest is an act of civil disobedience and, by definition, a violation of rules. Those infractions will be handled in the standard manner, typically as unexcused absence**. While students and parents might regard protest as educational activity, **the full lesson in civil disobedience is compromised if students are exonerated**.

> **Principals, teachers, and other school officials should not participate in or endorse the protest**. Most district policies on staff expression prohibit protest during the school day, regardless of how strongly the school official feels about the issue. **Specifically in the case of a walkout, school officials' participation sets a harmful precedent for endorsing a flagrant violation of school or district policy. Moreover, students with differing views might feel alienated or compelled to participate against their will if school officials are perceived as supporting the protest**.

> Q: What are the consequences of leaving class for students? For staff?

> A: Students voluntarily electing to leave class/campus without authorization **are truant and subject to appropriate consequences**. **The fact that the students are leaving to demonstrate is immaterial**.[2]

(Bold underlined emphasis added.)

58.     The District initially recognized its obligation to remain neutral regarding the political demonstrations planned.

---

[2] The same advice can be found at the Alameda County counsel's website and the National Association of Secondary School Principals' website. Fagen, Friedman & Fulfrost, *Walkout: Students' Call To Action To Make Their Voices Heard* (2/26/2018); https://www.f3law.com/downloads/Tipsheet%20-%20FAQs%20on%20Student%20Walkouts%20.pdf; *Considerations For Principals When Students Are Planning An Organized Protest Or Walkout* (2/23/2018); https://www.nassp.org/2018/02/23/considerations-for-principals-when-students-are-planning-an-organized-protest-or-walkout/.

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

C.    **The District Abandoned It's Legal Obligations By Promoting And Encouraging The Walkout**

1.    **The walkouts were organized by politically-partisan activists to further an anti-gun agenda using the nation's impressionable youth to exert political pressure on lawmakers**

59.    The March 14, 2018, demonstrations were part of the #Enough! National School Walkout to raise awareness about issues of school safety and the impact of gun violence.[3]

60.    The nationwide walkouts were organized by Women's March Youth Empower,[4] "the student-led organizing body of Women's March."[5]   The Women's March was organized initially to protest Donald Trump's presidential election campaign, his political views, and his defeat of presidential nominee Hillary Clinton.[6] It later organized demonstrations to protest Trump's inauguration.[7] It's organizers and national co-chairs make up a Who's Who list of radical, militant, leftwing activists, including anti-Semite Linda Salsour, feminist Gloria Steinem, and Marxist Angela Davis.[8] Initially organized by the Women's March "youth branch," the National Student Walkout demanded three key actions from Congress:

- Ban assault weapons;

- Require universal background checks before gun sales;

- Pass a gun violence restraining order law that would allow courts to disarm people who display warning signs of violent behavior.[9]

---

[3] Sarah Gray, "Thousands of Students Walked Out of School Today in Nationwide Protests. Here's Why," *Time* (3/14/2018); https://time.com/5195960/national-school-walkout-march-14/.
[4] *Id.*
[5] https://actionnetwork.org/groups/empower
[6]  Wikipedia; https://en.wikipedia.org/wiki/2017_Women%27s_March#Organizers.
[7] Meghan Keneally, "More Than 1 Million Rally at Women's Marches in US and Around World," ABC News (1/22/2017); https://abcnews.go.com/Politics/womens-march-heads-washington-day-trumps-inauguration/story?id=44936042
[8] *Id.*, n. 7.
[9] Emanuella Grinberg and Holly Yan, "A generation raised on gun violence sends a loud message to adults: Enough," CNN (3/16/208); https://www.cnn.com/2018/03/14/us/national-school-walkout-gun-violence-protests/index.html.

17

61.     Though gun control is not strictly a partisan issue, there is generally more support for gun control legislation in the Democrat Party than in the Republican Party.[10] The Libertarian Party, whose campaign platforms favor limited government regulation, is outspokenly against gun control.[11]

62.     The walkouts' divisive political effect on communities was inevitable. While the walkouts drew significant support and participation nationwide, many citizens viewed them as indoctrination exercises intended to poison the political attitudes of students by appealing to their sense of compassion and sympathy for the victims of gun violence. One individual described the walkout as "a tragic event to push … political agendas, such as gun control."[12]

         **2.     While The District followed an inconsistent and erroneous policy in response to the walkout, Kissner elected to enforce state truancy laws in his classroom**

63.     On March 14, 2018, the date of the first nationwide walkout, the District announced that it would allow students to participate in the political demonstration without consequence, thus unlawfully treating their leaving class as excused absences. This was entirely inconsistent with its earlier proclamations as well as with the legal advice given by two county agencies.

64.     Kissner had planned a quiz for his class that day and informed his students that leaving class would result in a failing grade on the quiz. Kissner believed any such absence from class to be a class cut and in violation of District policy, state law, and other requirements.

65.     Notwithstanding Cal. Educ. Code § 48205, two counties' legal guidance, and the District's own March 7, 2018, policy statement affirming that the District, as a government agency,

---

[10] Wikipedia, citing Spitzer, Robert J., *The Politics of Gun Control*, P. 16 (Chatham House Publishers, Inc., 1995).
[11] *Id.*, citing Harry L. Wilson, *Libertarianism and Support for Gun Control" in Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law, Volume 1*, p. 512 (Gregg Lee Carter, Ed., ABC-CLIO, 2012).
[12] *Id.*

**Verified First Amended Complaint**                        Case No. 22-CV-00949-VKD

was constitutionally barred from taking a partisan position on political matters, Kissner's decision proved to be wildly unpopular among segments of the liberal community of Los Gatos.  Parents sympathetic to the goals of the walkout organizers took to media to protest his grading decision. The story garnered extensive headlines, and Kissner began receiving insults and threats on social media. On March 18, 2018, in the face of the public outcry, Kissner gave a news conference to defend his decision.[13]

66.     It was not just angry parents who complained about Kissner's decision; staff, faculty and District board members were also unhappy about it. With an April 20, 2018, additional nationwide walkout planned, Kissner took part in contentious discussions with the District over whether students would be allowed to participate. Indeed, the investigator ostensibly hired to investigate the District's walkout response wrote that "[r]elations between Mr. Kissner and most of the rest of the staff at CT English became extremely tense as a result of Mr. Kissner's behavior."

67.     The District was contacted by an attorney representing the interests of parents opposed to the District's sponsoring or implied endorsement of the walkout. The attorney demanded the District exercise government neutrality on a controversial political matter and distance itself from any level of participation in the April 20 walkout. He argued, in part, that "[s]tudents and staff who do not share in the ideological message conveyed during the walkout expose themselves as opponents of that message and thereby set themselves up to become the targets of bullying, intimidation and harassment." That is precisely what happened to Kissner, who quickly became isolated as the target of bullying, intimidation, and harassment from all corners of the community, including from District employees, trustees, parents, students, neighbors, and anonymous individuals.

---

[13] *See*, *e.g.*, Joseph Geha, "Los Gatos: Teacher defends lowering student's grade after school walkout," San Jose Mercury News (March 18, 2021; https://www.mercurynews.com/2018/03/18/sjm-l-teacher-0318/.

**Verified First Amended Complaint**                              Case No. 22-CV-00949-VKD

68.     On March 5, 2018, Defendant Kidwell (then-District superintendent) emailed staff with legal guidance from the Santa Clara and Alameda County Offices of Education pertaining to the March 14 walkout. At the meeting, Kidwell and "Teacher Leader" Tony Arias ("Arias") addressed the CT Middle staff.[14]  Kidwell and Arias announced that (1) the school schedule would be changed to accommodate the walkout participants, (2) teachers would not be authorized to plan any significant graded activities during the 10:00 a.m., 17-minute walkout demonstration, (3) students with parents who call in to have their children excused would be given an excused absence, and (4) that Kidwell and another administrator would join the students in the gym.

69.     Kissner brought up legal and ethical concerns he had over the school's plans, pointing out the glaring inconsistencies between county counsels' legal guidance, which had been distributed to staff and faculty by the superintendent, and the school's plans.

70.     The excused absence directive also conflicted with Cal. Educ. Code § 48205, which grants California schools no discretion to authorize excused absences for political demonstrations.

71.      Kidwell told the staff that unless teachers had preexisting plans to conduct graded instructional activities, they were not authorized to schedule any.

72.     In the staff meeting, Kissner advised Kidwell and Arias that he already had plans to administer a quiz on the day of the walkout, which coincided with "Pi Day."[15]  Kidwell appeared obviously angered by Kissner's representations. Although Kissner had preexisting plans to administer a graded quiz, Kidwell responded to Kissner by threatening him with legal action if he were to carry out his plan to grade assignments during the walkout.

---

[14] The "Teacher Leader" is responsible for serving as a liaison between faculty and administration, helping with scheduling and discipline issues, and other administrative tasks.
[15] Pi day is a day set aside to learn about and celebrate the universal ratio of Pi (for every circle, the ratio of circumference to diameter is always 3.14…), which is one of the most important numbers in the universe, and which helps the science or math student to understand the natural world with greater clarity.  It is celebrated on March 14 each year because the date represents Pi (3.14).

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

73.     The next day, Kidwell contradicted herself in an ambiguous memorandum notifying faculty that the March 14 walk-out would be treated "as unexcused **unless a parent comes and signs [their child] out**," while inconsistently stating that the partial period absence would be treated as a "cut" (meaning any assignment or test missed during that time would be treated as unexcused work in accordance with the teacher's syllabus), and that teachers were to remain in class.

74.     On March 7, 2018, Kidwell notified parents by email that students who participated in the walkout would be deemed truant:

> We must have a process that fulfills our obligations to student safety, maintenance of instructional programing, and support respectful differences of opinion that we can use consistently regardless of topic.

75.     Kidwell explained the policy that was to be implemented:

> Students who choose to walk out will be provided with a space to gather in quiet solidarity. Their absence from class will be considered "unexcused" and dealt with as a "class cut". Missed work or assignments will be dealt with per the syllabus for each instructor.  Please know that teachers do not enjoy the same freedom of speech rights during the school day and are expected to remain in class delivering the scheduled content. As a school district, we cannot promote or endorse civil disobedience, nor can we discourage participation. It is our job to maintain an effective learning environment for all students.

*Id.*

76.     That day, in an email to Kidwell, Kissner raised the point that the walkout was a political event organized by the partisan Women's March and not, as she had represented in the staff meeting two days earlier, a remembrance dedicated to the victims of the Marjorie Stoneman school shootings. Kidwell acknowledged the political nature of the event.

77.     Incredibly, despite (1) legal guidance received by the District, (2) the lack of statutory power to excuse truants attending political events, (3) Kidwell's announcements that the District would treat class absences as cuts, and (4) her assurances the District would be viewpoint neutral regarding the walkout, on March 13, 2018, one day before the walkout, Kidwell inexplicably reversed herself, informing students and parents in an email and to students, teachers, and staff over

21

the public address system that there would be no adverse consequences—academic, disciplinary, or otherwise—imposed on students joining the walkout.

78.     Kissner saw Kidwell's sudden policy reversal as a rejection of legal advice and clear law. In response, he prepared an open letter to the Board of Trustees expressing his concerns.

79.     On March 14, 2018, the District removed any impediment to students participating in the walkout. Kidwell's participation in it placed the school's imprimatur on the walkout's political message. The school schedule was changed to accommodate the walkout plans; the absence policy was changed to relieve truant students of adverse consequences; teachers were instructed not to grade classwork; students and families were told there would be no academic or disciplinary consequences; Kidwell appeared to lead the walkout in solidarity with the political views expressed by one side of the gun controversy; and the District departed from lawful and constitutional protocols and procedures in other ways.

### 3.     Kissner gave failing grades to three students who opted to attend the walkout

80.     Both students and parents had advance notice of the consequences of choosing to cut class. In the days leading up to the walkout, Kissner informed his class about the scheduled Pi Day activity and quiz and advised his students that any student who cut class would be given a zero grade for the day's class assignment.  Additionally, all three of the students who ultimately chose to walk out of class spoke individually with Kissner beforehand concerning his grading policy.

81.     The student identified in the Walkout Report as Student 2 emailed Kissner on March 9, 2018: "Hi Kissner, I was wondering what are your policies around cutting class? Do you allow people who do so to make up their work? Thanks for responding!"

82.     Kissner responded that "since cutting class is against school rules, I would not allow a student to make up the work."

Verified First Amended Complaint                                    Case No. 22-CV-00949-VKD

83.     The students identified as Students 1 and 3 also approached Kissner on March 13, 2018, to ask about the consequences of walking out of class the next day, and were told the same.

84.     On March 14, 2018, more than 80 CT Middle students participated in the walkout. Only three students from Kissner's science class participated (Identified as students 1-3 in Patricia Elliot's walkout investigation report). The class included a fun "Pi Day" activity and a quiz that Kissner had historically given on the annual Pi Day. Kissner entered failing grades on that assignment for Students 1-3, who walked out even though they understood the grading consequences.

### 4.     Parents and teachers reacted angrily to Kissner's decision to give failing grades for the quiz to the three students

85.     Both Kissner and Kidwell received emails from the parents of one of the failed students upset that Kissner gave their child a failing grade in light of Kidwell's assurances that there would be no adverse consequences for participating in the student walkout demonstration. This parent should have known that Kissner planned to give failing grades on that assignment to those students who did not remain in class because (1) Kissner had advised their child of that fact on at least three occasions, and (2) Kidwell had notified all parents a week prior that participating in the walkout would be considered a class cut and missed work would be handled per the teacher's policy.

86.     Kissner was later notified by Kidwell that the three students' parents were challenging their children's grades under Cal. Educ. Code §§ 49066 and 49070.

### 5.     A parent of one of the students who received a failing grade on the quiz appeared on TV to complain about Kissner's decision

87.     On March 16, 2018, a parent of one of the three students who earned a failing grade approached a local TV news affiliate, NBC Bay Area, criticizing Kissner and falsely accusing

23

Kissner of giving a "pop quiz" during the walkout demonstration.[16] After the story aired on NBC affiliates throughout California, Kissner began receiving multiple news interview requests.

88.     After watching the television news report, Kissner sought a meeting with school officials to discuss how the District would respond to the parent's public criticism in order to clear his name, and going forward, how the District and he could cooperatively handle future political events. But neither Kidwell nor the trustees he contacted timely responded to his request.

89.     Both Kissner and his wife, Stacy Kissner, began receiving a flood of vulgar, threatening, and harassing messages and emails. For example, Stacy received emails stating: "You bitch, Kissner, dare you to respond to this message" and "Kissner, can't believe you are married to such as [sic] asshole... he deserves to be fired."

90.     An anonymous writer suggested Kissner not go to church "unless you are comfortable with parents confronting you."

91.     Kissner received messages such as "QUIT YOUR JOB AND GO WORK AT MCDONALD'S!!!! Fuck you," "You know you and Trump have a [sic] in common . . . you are both scumbags and abusers." "You're a dick and you're fat. So, fuck you," "Fuck you....Hope you lose your job asshole...DOes [sic] Trump lube you up firdt [sic] with NRA lube?"

92.     Kissner's wife was shopping at a local store when a person told her to tell her husband that "he had better watch his back."

93.     Kissner received emails from the parent of one of the three students who were given failing grades accusing Kissner of betraying his Christian faith. The child's mother initially appealed to Kissner's Christian faith by telling him her child was a devout Christian, that her son

---

[16] Anoushah Rasta, "Los Gatos Student Punished by Science Teacher for Participating in National School Walkout," NBC Bay Area (3/16/2018); https://www.nbcbayarea.com/news/local/los-gatos-student-punished-by-science-teacher-for-participating-in-national-school-walkout/195585/

Verified First Amended Complaint                                   Case No. 22-CV-00949-VKD

was distraught by what was happening in the media and was concerned for Mr. Kissner. Kissner wrote back to her, including a reassuring message for her son with a reference to faith, which he asked her permission to send only if she felt it was appropriate and helpful. The parent enthusiastically agreed. The parent later deceptively altered the email exchange to suggest that Kissner was improperly imposing his religious views, unsolicited, on her child and should not be teaching in a public school.

### 6. Kissner felt the need to defend himself in the face of the mounting attacks on him

94.     On March 18, 2018, Kissner agreed to be interviewed by a reporter with the Bay Area News Group. The article from the interview was picked up and spread by media nationwide. Only then, after Kissner had committed to a news interview, did Kidwell agree to meet with him.

### 7. The District agreed to enlist the services of a "facilitator" to resolve walkout policy discord

95.     Board President Deana Arnold ("Arnold"), Kidwell, Kissner, and two others met on March 19, 2021.  The group agreed the District should select a mutually acceptable "facilitator" to make sense of District policy regarding student walkouts, come to common understanding, learn from the incident, and resolve the discord among faculty members.

96.     That day, the District released a joint statement to the school community and to the media with a photo of Kissner, the board president, and Kidwell stating in part: "The District will seek outside facilitation to help us learn from these challenges and develop a set of shared understandings to guide us going forward." At no time was an "investigation" mentioned.

### 8. Kissner's colleagues continued their attacks and demanded he resign

97.     The controversy over Kissner's grading decision during the walkout erupted after news reports spread nationwide. The parents of the three students who had received failing grades

on the assignment for not taking the Pi Day quiz asked that their children be removed from his class. At school, things were chilly.

98.     The other teachers, previously friendly to Kissner, gave him the cold shoulder. They mounted personal attacks, questioning Kissner's character and motives for challenging the walkout. Teacher Leader Tony Arias condemned Kissner for possessing a "corrupt belief system" and told him in front of the entire staff that "There will be NO FORGIVENESS. EVER!"

99.     Among other insults the prickly teachers hurled at Kissner, he was accused of being "mean," uncompassionate, and indifferent to the suffering of the victims of gun violence in schools. Teachers demanded that Kissner resign or that the board discipline him harshly, accusing him of throwing "sand into the gears of our well-oiled CT machine."

### 9.     Kidwell illegally and surreptitiously changed the student grades

100.     During the March 19 meeting where the District agreed to seek a facilitator, Kidwell also told Kissner—falsely—that the student grades would be a non-issue under a District policy requiring pass/fail marks in lieu of letter grades where a change in teacher is made mid-quarter.  In fact, the three students who had asked to be moved from Kissner's class for the last four days of the quarter had their grades covertly and artificially inflated by the students' new teachers.  Kidwell was actively involved in this process and was working to offset any negative academic impact for the three students who walked out of class on March 14. This underhanded change to a student's grade without a hearing violated Kissner's rights as a classroom teacher of record and violated Cal. Educ. Code §§ 49066 and 49070.

### 10.     Kissner engaged in discussions with the District over the possibility of an April 20, 2018, nationwide walkout

101.     News outlets announced that another nationwide student walkout was planned for April 20, 2018, to coincide with the anniversary of the 1999 Columbine school shootings in Colorado. In light of the fallout from the earlier walkout, Kissner sought to persuade Kidwell that

26

adoption and enforcement of an updated truancy policy was necessary to avoid attracting more negative publicity and to comply with state and federal law.

102.    In early April, an attorney retained by concerned parents wrote to the District characterizing the walkout policy as discriminatory under federal civil rights law and demanding that it "distance itself from any level of participation in the walkout. The attorney pointed out that "[s]tudents and staff who do not share in the ideological message conveyed during the walkout expose themselves as opponents of that message and thereby set themselves up to become the targets of bullying, intimidation and harassment." This is precisely what happened to Kissner.

103.    Defendant Kidwell, in consultation with Kissner, did, in fact, update the student handbook midyear to address policies pertaining to cutting class and their consequences in advance of the April 20, 2018, walkout. Consistent with state law, the policy update required the District to remain neutral on political matters.

**11.    The *Mercury News* contacted Kissner for information concerning how the District was expected to handle a April 20 walkout**

104.    On April 16, 2018, Kissner responded to an email request for an interview with the San Jose *Mercury News* inquiring into the District's plans for an April 20 walkout. Kissner declined an interview and instead directed the news reporter to the District's public website link containing the Superintendent's letter to parents and the updated student handbook. Kissner additionally summarized the  letter: "Students who walk out will be escorted to the office, parents called to pick them up, they will be assigned Saturday school, and they will receive zeros for any work missed without the ability to make it up." The subsequent news article ignored the direct evidence of the policy update contained in the link and instead quoted Kissner's summary.

105.    At all relevant times, Kissner was communicating with reporters contacting him as a private individual on matters of public concern and public record.

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

1

2

**D.**     <u>The District Retaliated Against Kissner With Contrived Investigations</u>

3

     **1.**    **Kissner became aware that District representations of a "facilitation" were false and that he was the target of an unexplained investigation**

4

5

106.    Unbeknownst to Kissner and contradicting representations made by District officials

6 to Kissner, on or about * THE District launched an investigation into Kissner's opposition to the

March 2018 student walkout.

7

107.    In April 2018, Defendant Kidwell e-mailed the parents of the three truant students

8

that the District had opened an investigation into whether Kissner had violated District policy

9

during the walkout.

10

108.    On April 23, 2018, following the publication of the *Mercury News* article, District

11

administrators notified Kissner that the District was "adding to the investigation" an inquiry into

12

13 charges he improperly represented the District in the press. This was Kissner's first notice of any

14 investigation targeting him for any reason.

15

     **2.**    **A disgruntled community member sent an anonymous letter accusing Kissner of improper behavior with minors**

16

17 109.    On March 20, 2018, just days after the walkout and the public uproar over Kissner's

18 grading decision, the District received an anonymous letter falsely accusing Kissner of child

19 "grooming" behavior.[17]

20

110.    The District inexplicably acted on the anonymous complaint only after the

21

nationwide April 20 student walkout had taken place and after sitting on it for more than six weeks.

22

23 Had the District been genuinely concerned about the allegations of the anonymous letter, it

24 reasonably should have acted on it immediately.

25

26 [17] " 'Grooming' generally describes conduct or actions by an offender that are undertaken to develop a bond between the victim and offender and, ultimately, make the victim more receptive to sexual activity with the offender." *Perez v. State*, 129 Nev. 850, 853 (2013); *see also People v. Shazier*, 60 Cal. 4th 109, 145 (2014) ("patiently cultivating and manipulating them to achieve his purposes"). A false and unfounded charge of "grooming" can serve no purpose other than to cause a visceral reaction—to create undue prejudice.

27

28

**Verified First Amended Complaint**            Case No. 22-CV-00949-VKD

111.    On April 30, 2018, the District notified Kissner he was being placed on paid administrative leave pending an investigation into "inappropriate interactions with minors." Kissner was not told he was accused of any specific offense but only that the District was "adding these issues to the already pending [walkout] investigation."

112.    The salacious allegations and innuendos contained in the anonymous letter were intended to place Kissner in a false light and depict him as criminally immoral.

113.    Kissner has <u>NEVER</u> "singled out" any minors for sexual, immoral, unethical, or otherwise improper interactions, and the District has <u>never</u> produced a shred of evidence that he has.  Individual District Defendants testified that they had no evidence of such behavior.

114.    On a single occasion more than two years prior to the conduct investigation, Kissner acknowledged sharing a toast with a high school aged individual (Summer of 2016).  The single sip of alcohol was intended to celebrate a significant outdoor achievement.  This incident did not involve a District student and was on a trip that was not in any way school related.

115.    Kissner has never asked minors about their sexual experience. Acting as a mentor, Kissner has built a trust with former students based on his Christian values who have come to him with various personal issues, including questions dealing with their dating relationships. Students have occasionally interviewed Kissner about intimate topics as part of a high school health class assignment asking them to interview a trusted adult and record notes of the conversation.  Kissner has never had an inappropriate conversation about sex with any minor or asked any minor about sex and the District has <u>never</u> produced a shred of evidence that he has.

116.    The anonymous letter author's assertion that "the acts" Kissner has engaged in with minors is "clearly grooming" is false and defamatory. The author's insinuation that Kissner "gets close physical contacts with many boys" for sexual reasons as a wrestling coach is false and defamatory.

**Verified First Amended Complaint**                                        Case No. 22-CV-00949-VKD

117.    The District has <u>NEVER</u> produced a shred of evidence that he has ever engaged in acts of a sexual nature or acts intended to be sexual in nature with minor students.

118.    In subsequent discovery, the anonymous letter writer was found to be (1) a disgruntled parent of former students of Kissner, (2) politically motivated by her own passionate support of the student walkouts, to the point that she used social media to organize participation in local marches, and (3) later expressed second thoughts about her false, salacious, and defamatory accusations.

### 3.    Some community members rallied to Kissner's defense, leading to tensions on campus

119.    Kissner's forced leave of absence created a stir in the small local community. At a May 4, 2018, board meeting, Kissner's supporters stepped forward to criticize the District's handling of the walkout events and what they perceived to be related examples of political indoctrination. His supporters, including students and parents, displayed signs along roadways and handed out stickers and petitions at school demanding his return.

120.    The public support Kissner received only infuriated his detractors. Arguments broke out around the school campus and in one case sheriffs responded to a call when a fight broke out. A student's petition calling for Kissner's return was confiscated while another student was ordered to remove a sticker supporting Kissner from his t-shirt or leave track practice.

121.    The uproar from Kissner's supporters pressured the District to restore Kissner to his classroom. In early May 2018, Kissner was informed the District had completed its investigation and he was welcome to return to the classroom, and a public statement notified the school community and the media of the same.  He returned to the classroom on May 10, 2018. But the investigation was not complete. In fact, the allegations from the anonymous letter morphed into two investigations, one purporting to look into walkout policy irregularities and the other purporting to scrutinize Kissner's conduct with children.

**Verified First Amended Complaint**                           Case No. 22-CV-00949-VKD

1
2

### 4.   Kissner took medical leave for emotional distress over the hostile workplace environment and harassment

3

4

122.   After the March 14 walkout, Kissner was subjected to hostility by his colleagues,

5

both overtly and subtly.  He endured pointed attacks on his character and person.  During this time,

6

he was the subject of a walkout investigation and an investigation into anonymous and unspecified

7

claims of predatory behavior with children. He was placed on forced leave. The cumulative effect

8

of these circumstances wore deeply on Kissner's mental and physical health.

9

123.   Kissner's anxiety was such that the mere thought of going on campus caused a

10

physiological response, including nausea, irritability, headaches, and a sense of despair.  When not

11

at school, he would drive well out of his way to run errands to avoid coming near the campus.  Even

12

at home, certain topics or school related topics would trigger anxiety and nausea. Kissner lost sleep,

13

negatively affecting his relationships with his wife and son.  For a prolonged period of time, he had

14

little or no appetite.

15

124.   When Kissner returned to campus after his forced leave, he was committed to

16

making it through to the end of the year.  He expected a facilitated process for all parties to resolve

17

the walkout issues, as promised by Kidwell and Arnold.  He had been told that the investigation

18

into the anonymous letter allegations was completed.  In mid-May, Kissner learned that there would

19

be no "facilitation" in the walkout matter, but that he was instead the subject of a secretive

20

investigation.  On March 18, 2018, Kissner learned that Kidwell and Arnold had lied to him about

21

the investigation into the anonymous letter – the investigation continued.

22

23

125.   These new developments took such a toll on Kissner's mental and physical health

24

that he sought medical attention. Kissner's doctor diagnosed him with "Adjustment Disorder with

25

Anxious and Depressed Mood" and prescribed him to remain on medical leave until the end of the

26

school year. On May 23, 2018, Kissner submitted his request for medical leave.

27

28

**Verified First Amended Complaint**                                        Case No. 22-CV-00949-VKD

**5.    Kissner filed a workplace retaliation and harassment complaint**

126.    Kissner filed a workplace retaliation complaint with his employer the same day he applied for medical leave.

127.    The complaint alleged that staff had shunned and ostracized Kissner after the walkout; attacked his moral character; sought to shame and embarrass him; proclaimed they would never forgive him; demanded his resignation; and solicited the board for harsh discipline against him.

128.    The complaint additionally alleged that although Kidwell was aware of the staff's animus toward Kissner, she failed to intervene or attempt to restore harmony to the workplace and that district leadership failed to address open examples of retaliation and harassment.

129.    The complaint further alleged that the District continued to maintain an intrusive, covert investigation into Kissner's moral character after misrepresenting to him and to the public that the investigation was complete.

130.    Kissner summed up his grievance as follows:

> The public attacks on my character, the ostracism by my colleagues, lack of remedy by district leadership, and the duplicitous dealings with me by the administration regarding the closed investigation have had a dramatic impact on my emotional, mental, and physical health.   It has caused me to be unable to perform my professional duties at this time.   It has led me to seek medical services where I have been diagnosed with "Adjustment Disorder with Mixed Anxiety and Depressed Mood." It has dramatically affected my quality of life and that of my family.

131.    Ultimately, the District hired an investigator to look into Kissner's retaliation complaint. During the next school year, following multiple requests for information, the District finally told Kissner that they found his complaint to be unsubstantiated.  Although District policy requires an explanation be provided to the complainant, the District withheld its report from Kissner and failed to explain its reasons for its decision.

**Verified First Amended Complaint**                                        Case No. 22-CV-00949-VKD

6.   **The District commissioned an investigation to determine whether Kissner violated District policies by protesting the student walkout and failing students attending it**

132.    On April 19, 2021, the District began a formal investigation "to determine the facts and circumstances regarding how the District and District staff conducted themselves" related to the walkout. The District retained Defendant Patricia Elliot ("Elliot"), an "independent" investigator and attorney to conduct an open-ended witch-hunt into Kissner's role in the controversial walkout storm.

133.    In her report, dated June 23, 2018, Elliot described the scope of the investigation as limited to:

> the CT English student walkouts on March 14, 2018[,] and April 20, 2018, including the way the District prepared for the events and actions taken by administrators and staff in response to the events. The investigation will determine the facts relevant to whether or not the District or **District personnel engaged in activities that may be in violation of District policy or applicable law**.

(Emphasis added.)

134.    But the stated scope of the investigation was both disingenuous and completely false. It never once identified a District policy or law relevant to the inquiry. In fact, the investigation report specified later that it did "not address whether or not the alleged incidents, if they occurred, violate either District policy or state or federal law." Indeed, the investigator's subjective polemic admits to not drawing any legal conclusions, disavowing any legal determination whatsoever, stating that "[a] finding that an incident or circumstance more likely than not occurred is not a judgment as to whether or not that incident or circumstance amounts to a violation of the District's policies or state or federal law." In other words, while drawing conclusions as to the relevancy of facts pertaining to law or policy violations, the investigation doesn't even foundationally identify what laws or policies are even relevant. This puts the cart

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

before the horse. Without preliminarily establishing the relevant foundational law or policy implicated, the relevant facts cannot be deduced.

135.     The investigation's real objective was to discover and charge Kissner with some wrongdoing, arming the District with a rationale to terminate or discipline him in some manner and to sate the unforgiving and vengeful appetites of Kissner's objectors, including the Defendants herein.

136.     The investigator's report is unsparing in its indictment of Kissner, accusing him of violating "explicit instructions that teachers were to neither reward nor punish students for participating in the March 14th walkout." The "independent" investigator summed up her one-sided hostility toward Kissner's walkout grading decision: "Neutrality was not enough. Mr. Kissner wanted the District [to] dissuade students from participating in the walkout and to punish any who did." As detailed more fully below, the investigator's report is bursting with such examples of bias, in addition to hearsay and fabrications.

137.     Despite her pretense of independence and impartiality, Elliot selectively chose hostile witnesses to interview and ambiguous evidence to find fault with Kissner.  She interviewed only the students who left class during the first walkout and their parents but no one who supported Kissner's grading decision or his other actions or anyone who wasn't hostile to Kissner. She couched her conclusions concerning Kissner's role in pejorative terms (e.g., "he believed he had leverage," "Kissner argues…") while treating Kidwell with kid gloves (e.g., "Ms. Kidwell consistently and repeatedly stated…"). She accepts Kidwell's directive to eliminate all adverse consequences for students participating in the walkout as valid and within the law without exploring its invalidity. She falsely concludes that Kissner was driven by politically "conservative" motives by misunderstanding the distinction between an "unexcused absence" and a "class cut."  She falsely accused Kissner of speaking to the media "on behalf of the District" and not on his own behalf. She

**Verified First Amended Complaint**                          Case No. 22-CV-00949-VKD

focuses exclusively on Kissner's actions without exploring any other potential "violations of law or policy" by the District or others.

> **7.    The District conducted an investigation into the anonymous letter allegations regarding Kissner's conduct with children, but took it a step further by trying to develop a factual basis for finding other misconduct**

138.    Although the District has a practice of not accepting unsigned complaints, the District felt that the anonymous letter somehow merited an exception to the policy and asked Defendant Elliott to investigate its claims. The District never explained why it made an exception, or why it waited over six weeks – until after the April 20, 2018 walkout media attention – to add this to their investigation.

139.    On or about April 30, 2018, Kissner was notified that he would be placed on paid administrative leave while the District investigated his "interactions with minors." The letter indicated that Kissner would remain on paid leave "pending the completion of the investigation" and when Kissner returned to work he was told the investigation had been completed. That wasn't true.

140.    The District did not share any details of the anonymous letter with Kissner until October 18, 2018, when Fraser referred to both the letter and the investigation in another letter. Even then the District did not show the anonymous letter to Kissner.

141.    Kissner reacted to the October 18, 2018, letter with indignation:

The contents of this disciplinary letter are the result of a personal character attack perpetrated by anonymous cowards who sought retribution for my stance in the March 14th, 2018 walkout. I am surprised that the district would like to go on record here that it is giving credence to an anonymous letter full of false and unsubstantiated accusations. Does the timing of such allegations, the unprincipled broadening of the district's investigation, and now this disciplinary letter not show evidence of retaliation for my position during the school sponsored political walkout?

This Investigation was conducted without any regard to the stated scope (the walkout and the anonymous letter), and pursued lines of questioning that were completely irrelevant to the matters at hand. These issues included my classroom bathroom procedures, personal stories I have shared in class for years, and math and science

**Verified First Amended Complaint**                          Case No. 22-CV-00949-VKD

problems I have used for years. In addition, the school district investigated recreational activities I conduct with youth and families outside of school, my faith and science-based beliefs about the origins of life, my Marine Corps career, and other completely irrelevant subjects.

This free-wheeling investigation of every aspect of my personal life and how I perform my professional responsibilities is the very definition of a witch-hunt—a campaign against a person holding unpopular views. It is both unethical and illegal to retaliate against an employee in this way.

It is telling that an investigation of this breadth failed to discover any noteworthy evidence of wrong-doing. As such, this letter makes note of a number of "significant concerns" which lack specific detail and describe situations that are completely innocuous, while implying that something nefarious is going on. It is disingenuous, and betrays an effort to lay the groundwork for future disciplinary action, seeing as none is possible from the walkout controversy.

I am saddened by the fact that the district leadership has apparently joined in the same nasty, personal, divisive political fray that consumes our nation in this era. A different view in a political discourse does not merit an invasive assault on a person's character and life. To use baseless accusations leveled by anonymous cowards in the heat of a· political conflict as a pretense for a limitless investigation into a person's life and work is shameful.

To then take the empty results of said investigation and craft a disciplinary letter that insinuates that there is some merit to the accusations is all the more shameful. To direct these attacks against someone who has proven over years to be a tireless servant of kids and families in the community is reprehensible.

142.     The District never produced a final version of Elliot's subsequent reports in response to Kissner's CPRA requests. Kissner's attempts to obtain a copy of the reports through CPRA requests were rebuffed. Finally, as part of the District's evidence in support of its dismissal charges some 30 months later, on February 12, 2021, a "confidential draft" version dated August 13, 2018, was disclosed.

143.     The reason given by Elliot for the District's request to conduct an investigation into Kissner's "conduct with children" was to determine (1) whether facts support the allegations in the anonymous letter, and (2) whether facts regarding "other concerns" about Mr. Kissner's conduct with children existed.

36

144.    The real purpose for the District's interest in probing Kissner's relationship with children was to find justification for terminating him in retaliation for his walkout decision.

145.    Though claiming to be an "independent" investigator, Elliot framed her investigation around the animus of the three walkout students, their parents, and teachers eager to see Kissner fired. Missing from her investigation was any firsthand knowledge of misconduct that could objectively rise to the level of a terminable offense. Indeed, even after submitting a written report in August 2018 based on Elliot's lopsided fact-finding, the District was left without the ammo necessary to pull the trigger and continued to employ Kissner.

146.    Defendant Elliot went to extreme lengths to portray Kissner as a politically motivated, misogynistic, violence-fixated, anti-evolution, alcoholic, pederast. However, she failed to understand or distinguish between "class cuts" and "unexcused absences," conflating the two and concluding that Kissner acted hypocritically by failing students attending the walkout while not penalizing students who took absences for participating in his bike rides.[18] She drones on about how "female students feel that Mr. Kissner treats them differently" and "feel ignored" without mentioning she is relying on the untrustworthy word of just two girls, both biased and harboring

---

[18] A class cut is a disciplinary matter while an unexcused absence is not. A class cut is a "purposeful choice to miss class," or "a student attends school for part of the day then misses part, or all, of one or more classes without being signed out by a parent." The updated student handbook stated that "Students who cut classes will be referred to the administration and will receive progressive discipline." "Class cuts are considered unexcused and missed work may not be made up." This, of course, would not apply to a student who is signed out by their parent.

Students at CT Middle have unexcused absences for many reasons. A parent may neglect to call in when they are ill. A parent may sign their child out of school early for a haircut appointment or to go on vacation early or to participate in a sporting event. While "unexcused" under state law and school policy, these absences are not treated as disciplinary issues, and students are generally permitted to make up any missed work in any class.

While the term "class cut" was not defined at CT Middle prior to the March 14 walkout, Superintendent Kidwell repeatedly described the decision to participate in the walkout as a "class cut." After the walkout took place and the drama that ensued, Kidwell added language to the student/parent handbook to define a class cut.

Kissner was not inconsistent in his grading of unexcused absences and class cuts. Students who cut class were not excused and not signed out by a parent could not make up an assignment. Students who were signed out by a parent for excused or unexcused reasons were allowed to make up any missed work. Elliot either conveniently or ignorantly neglects to make the distinction.

37

animus because Kissner failed them for attending the walkout. She uncritically accepts the grumblings of these three walkout students regarding Kissner's war stories and supposed use of violent imagery without mentioning that no one—NO ONE—ever—EVER—in seven years had registered a complaint. Her brief gratuitous honorable mention of Kissner's alleged refusal to teach evolution is incomplete and groundless. Ultimately, after many months and tens and tens of thousands of dollars expended on investigations, the district was left without any grounds to discipline Kissner for either his principled decisions during the walkout or the anonymous letter allegations.

147. <u>NOWHERE</u> does Elliot confirm any instance of pederasty. Nor does she bother to follow up with the anonymous writer's incriminating and baseless accusation of "grooming." Elliot doesn't even bother to concede she found no evidence to support such a scandalous charge.

148. Elliot showed the anonymous letter to parents and staff, including Helen Odea, the parent of Student 5 and an art teacher at school ("When Student Five's mother read the Anonymous Letter, she became quite concerned.")

149. Tellingly, while Elliot is quick to share the tawdry anonymous letter with parents and staff she interviewed, <u>she never once showed it to Kissner himself</u>. Throughout the process he was purposefully kept blind concerning the actual allegations made against him by the anonymous writer.

150. Elliot's unscrupulous report is notable for jumping to conclusions unsupported by the facts. For example: "Some teachers [who? How many?] expressed concern about the amount of time Mr. Kissner spends with some students outside of school [what is their concern?] and have wondered whether he keeps it professional…." After raising the question of impropriety, does Elliot bother to validate these "concerns" of unprofessionalism? Of course not. The "concerns" of "some

teachers" are left to die on the vine. There is no elucidation, only amateurish insinuation and loose ends.

151.    In the end, Elliot's inconclusive Conduct Report resulted in <u>no evidence of actionable wrongdoing and zero disciplinary action</u>.

152.    Elliot's investigation did, however, plant suspicion in the community. Her interviews with parents and children were not a guarded secret but the germ of slanderous gossip. This gossip continued unabated for several years as Kissner continued to be a controversial figure involved in the local political process.

### 8.    Kissner filed a religious discrimination complaint after the District engaged in adverse action based on his religious views

153.    In August 2018, just days before the start of school, Kissner was contacted by Defendant Fraser, the newly hired superintendent, who replaced Kidwell. In an email, Fraser told Kissner that he needed to pack up his classroom, where he had been for seven years, because his new assignment would not involve classroom instruction of core classes with students.

154.    Fraser explained the decision by stating there was uncertainty about whether or not Kissner would return to teaching in the Fall.

155.    Kissner suspected foul play based on questions concerning evolution raised by Elliott in her interviews with him during the summer. She had asked his opinions concerning intelligent design theory and creationism and on teaching evolution. Elliot's recorded interviews with Kissner's colleagues included discussions about his beliefs about the origins of life, and his colleagues had falsely accused him of being unwilling to teach evolution. Kissner was aware of reactions to intelligent design theory as an explanation for life and the material universe where it is frequently and erroneously conflated with the Biblical doctrine of creationism.

156.    On October 28, 2018, Kissner filed a religious discrimination complaint with the EEOC based on a suspicion that he had been removed from his science classes not based on the

reasons given by the District but based on a false belief by some of his colleagues that Kissner's "religious" beliefs—namely, his interest in intelligent design theory— prevented him from teaching evolution.

157.    The EEOC investigation couldn't substantiate Kissner's suspicions because the District refused to turn over the notes and recordings relied on by Elliot.

**V.    Kissner's Protected Political Speech Aggravated District Leadership**

**A.    <u>Kissner Successfully Led Opposition To A District-Funding Tax Measure</u>**

158.    The District had been receiving revenue from a parcel tax measure approved by voters in 2013, set to expire after seven years. District trustees approved a November 2020 ballot seeking public funding to continue an additional seven years under a new parcel tax measure.

159.    Kissner opposed the new parcel tax measure, known as Measure N, and joined the campaign opposing it.

160.    Kissner believed the District had misused the public funding it had received for seven years by, *inter alia*, failing to balance its budget during that time and failing to identify specific fiscal objectives.

161.    Proponents of the new measure, including District Defendants (officials and trustees) failed still to explain how the funding would be allocated.

162.    The lack of government transparency made the measure unpopular with a large segment of the Los Gatos community and created outspoken divisiveness in the small community on social media.

163.    During the political campaign to pass the measure, District officials, including the District Defendants, openly voiced their support for its passage.

164.    In September 2020, the California Teachers Association-Loma Prieta invited opponents of the measure to present their positions to its members.

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

3.      Kissner prepared a video explaining the reasons for his opposition.

165.    Kissner released a second video  critical of the District's board and administration's management of the budget and lack of transparency regarding the use of public funding. The video was widely circulated throughout the community, including among board members and the superintendent.

166.    Measure N was an extremely divisive issue in the small community of Los Gatos, generating hundreds of passionate social media posts and comments, letters to the board, and public debate.  Kissner was personally and publicly targeted by many school employees and others for his opposition to Measure N.

167.    Every board trustee had reason to be bitter about Kissner's opposition. Indeed, Defendant Asheghian, a current trustee, led the Yes on N campaign. Defendants Abeln, Arnold and Bourque, all District trustees at the time, openly campaigned for it. And Defendant trustee Bourque had recommended the parcel tax as a member of the Superintendent's Budget Advisory Committee. Defendant superintendent Fraser along with other school staff members and leadership personally attended community rallies in support of Measure N.

168.    The District's fixation with seeing the measure pass led Defendant Abeln to publicly threaten to "personally go after" anyone who opposed Measure N.

4.      Measure N was ultimately defeated, dealing the District a major financial setback.

**B.    Kissner Led The Public Effort to Invalidate The Board's Provisional Appointment and to Compel A Special Election**

169.    In January 2021, after Measure N had been defeated and the District had lost its hoped-for public source of revenue, Kissner poked the bear again by leading an effort calling for a special election to fill a board vacancy.

170.    Kissner's wife, Stacy, sought an elected position to fill the vacancy. The board moved instead to fill the position by appointment.

41

171.    On January 6, 2021, during a public board meeting, Kissner presented the trustees with a letter co-signed by other members of the community urging them not to fill the vacant position with an appointed figure but to approve a special election.

172.    Kissner's letter informed the board that if it failed to call for a special election, Kissner would lead an effort to force a special election. The board instead made a provisional appointment of a member to the board, and Kissner launched a petition campaign to overturn the appointment and compel an election.

173.    Kissner determined that the board had a history of appointing political cronies to fill board vacancies. The appointed replacement would then have the incumbent advantage to maintain the position in a future election. In this way, the District could maintain its power structure.

174.    Kissner's actions once again drew the rage of factions, including the District Defendants, within the school community.  Kissner and his allies were bombarded with profanity-laced attacks on social media platforms. Some of those posting on social media wished death on them. One individual anonymously threated to spread false information about Kissner claiming him to be a child molester unless the petition was withdrawn.

175.    On the last day for the petition's signatures to be approved by the superintendent of schools for the County of Santa Clara, Kissner was notified that the petition was rejected due to formatting irregularities.

176.    Kissner filed for a writ of mandate in the Superior Court of Santa Clara, Case No. 21-cv-381463, challenging the decision of the county school superintendent. The Hon. Audra Ibarra granted Kissner's writ ordering the election to proceed and granting a one week stay of her order to allow the county school superintendent to appeal.

177.    The county school superintendent filed an appeal, which is venued in California's Fourth District, Case No. G060946, and set for oral argument March 21, 2022.

**Verified First Amended Complaint**                          Case No. 22-CV-00949-VKD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.  **Kissner Publicly Challenged The District's Improper Apportionment Of Public Funds**

178.   On February 10, 2021, Kissner wrote a letter to the County Superintendent of Schools and copied Fraser and the board.  The letter requested that the County Superintendent of Schools deny the waiver request from the District for its chronic non-compliance with Cal. Educ. Code § 41372.  This law requires that 60% or more of the cost of education be spent on classroom instruction.  The District has been out of compliance with this law for many years, and every year requests and is granted a waiver.  In 2021, with budget cuts needed, the District planned to leave administration, which had grown while student count had diminished, untouched, while slashing classroom teachers, bringing the District even further out of compliance with Section 41372.

179.   Kissner asked that the waiver request be denied. CT Middle Principal Billy Martin ("Martin"), who engaged in adverse employment action against Kissner in 2020, would be the primary administrative position on the chopping block if the District were to meet its obligations under the law.

VI.   **Kissner Was Simultaneously, But Not Coincidentally, Given His Walking Papers In Both Layoff And Dismissal Proceedings**

D.   **The District Served Kissner With A Notice Of Proposed Intent To Dismiss And Statement Of Charges**

1.   **Introduction**

180.   On or about February 12, 2021, Defendants District and Individual District Defendants served Kissner with a Notice of Proposed Intent to Dismiss  with Statement of Charges ("Statement").

181.   The Statement falsely asserted as fact that Kissner was guilty of "Potential grooming behavior, such as: singling out a minor and being alone with a minor; … asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet ("statement")."

Verified First Amended Complaint                                    Case No. 22-CV-00949-VKD

5.      The defamatory statement of fact is false, unprivileged, and has a natural tendency to injure Kissner, including and especially at his place of work and in the education world where he might be required to seek employment.

182.    On or about March 22, 2021, Kissner, through counsel, demanded the District dismiss the false statement accusing Kissner of potential grooming behavior.  The letter stated in relevant part:

> These slanderous charges lack any substance and are shamelessly based on nothing more than anonymous inadmissible hearsay. Accusations of "potential grooming," asking about sex, etc., are made with NO SOURCE, NO VICTIM, NO DETAILS, NO OFFICIAL COMPLAINT, NO REPORTS.… Should these accusations remain in these proceedings or otherwise find their way toward republication, we will not hesitate to hold the District and each person involved accountable.

183.    Counsel for the District never responded to the demand, never sought to meet and confer regarding it, and, as alleged hereinbelow, apparently authorized the false and defamatory Statement's release to the public.

184.    On or about April 16, 2021, Defendant District and Individual District Defendants received a request for a copy of the Statement from an anonymous, fictitiously-named individual pursuant to the California Public Records Act. The request was served by email at or about 9:49 a.m.

185.    On or about April 16, 2021, at or about 10:43 a.m., just 54 minutes after receiving the request, Defendant District and Individual District Defendants responded to the request by attaching the Statement to an email. The response additionally included a letter, which stated in relevant part:

> [T]he California Court of Appeals held that records of complaints or investigations against a public employee can be disclosed only if "the complaint is of a substantial natureand there is reasonable cause to believe the complaint or charge of misconduct is well founded." (*See, Bakersfield City School Dist. v. Superior Court* (2004) 118 Cal.App.4th 1041 at 1044; *see also, ERV, Inc. v. Superior Ct.* (2006) 143 Cal.App.4th 742.) **However, in such instances, a public agency's decision to release confidential documents under the PRA is reviewable by petition for writ**

44

**of mandate in a "reverse-PRA" lawsuit. (*See, Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 250**.)

\*\*\*

[T]he District is unable to produce privileged document(s) or information encompassed by an exemption under the PRA or any state or federal law. (*See e.g.*, Gov. Code 6254 and 6255.) Accordingly, the District will segregate and/or redact privileged and/or exempt information as needed.

(Emphasis added.)

186.    By the letter's express language, Defendant District and Individual District Defendants knew and understood that they were obligated to consult with Kissner to determine whether he intended to object to the release of the false and defamatory Statement on the basis of any privacy concerns by filing a petition for writ of mandate to enjoin the false and defamatory Statement's release to the public.

187.    Additionally, by the letter's express language, Defendant District and Individual District Defendants knew and understood that they were prohibited from producing information encompassed by an exemption under the PRA or any state or federal law.

188.    By releasing the false and defamatory Statement as herein alleged, Defendant District and Individual District Defendants failed to provide Kissner with an opportunity to challenge its release either in whole or in part by filing a petition for writ of mandate seeking injunctive relief and thereby deprived him of his constitutional right to due process. The failure to provide Kissner with due process constitutes a violation of his constitutional rights under state and federal law and exempted the District from releasing it to the public.

6.    The charges were promptly republished by members of the public and predictably subjected Kissner to shame and humiliation, threats, intimidation, mockery and derision by members of the public throughout the community. In particular, Defendant Lawrence McVoy wrote

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

on the "95033 Talk" Yahoo community forum: "… Fuck that guy. He's someone who was grooming kids. I can't prove that but all the evidence points that way."

189.    On or about June 11, 2021, Defendants District and Individual District Defendants served Kissner with an Amended Notice of Proposed Intent to Dismiss with Statement of Charges ("Amended Statement") once again falsely stating that Kissner engaged in immoral conduct consisting of, *inter alia*, "[p]otential grooming behavior, such as: singling out a minor and being alone with a minor; offering alcohol; asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet."

190.    Subsequent to the release of the defamatory charges, Individual District Defendants testified during dismissal proceedings that they had no evidence supporting such charges, and that they were aware of the statutory protections preventing their publication.

191.    On February 12, 2021, the District notified Kissner of its decision to terminate him. On April 22, 2021, Kissner requested a hearing. The hearing concluded in December 2021.

192.    A Statement of Charges accompanied the District's notice of intent to dismiss Kissner. The Statement of Charges alleged five statutory causes for dismissal, including (1) immoral conduct, (2) unprofessional conduct, (3) unsatisfactory performance, (4) persistent violation of rules or regulations of the board, and (5) evident unfitness.

193.    The Statement of Charges identified an array of false allegations unsupported by admissible evidence, and lacking objectivity. It was a continuation of the Defendants' discriminatory campaign of harassment and adverse employment action against Kissner in retaliation for his political speech. It relied exclusively for its support for charges of immoral and unprofessional conduct on the almost three-year-old Walkout and Conduct Reports generated by Defendant Elliot and content that was almost five years old. It reached back to the salacious,

unfounded anonymous letter allegations of 2018 in addition to alleging new claims of unsatisfactory performance and insubordination. <u>None of the allegations specified a violation of District policy</u>.

### 2.   The District improperly charged Kissner with unprofessional conduct/unsatisfactory performance by violating Cal. Educ. Code § 44938

194.   The District violated Cal. Educ. Code § 44938 by bringing charges of unprofessional conduct and unsatisfactory performance against Kissner without providing him with notice or an opportunity to cure, or a written evaluation, and was therefore jurisdictionally-barred from prosecuting them. Indeed, on that basis, the District was compelled to drop these charges during pre-hearing conferences on matters raised by Kissner's motions in limine.

195.   The performance evaluations appearing in Kissner's personnel file contain only favorable assessments of Kissner's job performance and contain no reference to unprofessional conduct or unsatisfactory performance. No evidence of Article 11 evaluations exists in the charging documents at all.   The District's failure to comply with its mandatory Article 11 evaluation by specifying unprofessional conduct/unsatisfactory performance as a metric in Kissner's ultimate performance evaluations nullified any actionable justification for bringing these charges. Yet the District stubbornly refused to dismiss the charges until the time of the dismissal hearings.

### 3.   The charges of immoral conduct were time barred

196.   Cal. Educ. Code § 44944(a) prohibits the introduction of evidence relating to matters occurring more than four years before a school district files a notice of intention to dismiss a teacher. It also bars the dismissal of a teacher for events occurring more than four years before the notice was filed. *Atwater Elementary School Dist. v. California Dept. of General Services* (2007) 41 Cal.4th 227, 230. Indeed, the Commission on Professional Competence ("CPC") found <u>no</u> evidence of immoral conduct. Nevertheless, it violated § 44944(a) by considering and reaching a decision to

dismiss Kissner on the basis of evidence of matters occurring more than four years before a school District filed its notice.

### 4.    The District improperly charged Kissner with evident unfitness for service

197.    Most of the charges contained in the Statement of Charges dealt with the District's frustrated attempts to improperly exercise control over Kissner's personal life by policing activities having no nexus to his service. Other charges sought to cast his Christian community service initiatives in a false and salacious light, alluding to false charges of pederasty.

198.    Most of the accusations of misconduct come from a handful of vindictive parents motivated by their personal, politically-charged animus toward Kissner, and are directly connected to disgruntled school staff or leadership.

199.    As with the other charges, by failing to specifically characterize any particular act as evidence of Kissner's evident unfitness for service, the District hoped to get away with lumping it in with all the other charges, expecting perhaps that the ALJ panel would sort it out for the District. But evident unfitness for service is not synonymous with unprofessional conduct. *Woodland Jt. Unified Sch. Dist. v. Commn. on Prof. Competence, supra*, at 1441. "Unlike 'unprofessional conduct,' 'evident unfitness for service' connotes a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectations of the employing school district" *Id*. at 1444. There was nothing alleged in the charging statement remotely dispositive under this standard. It was this one charge, out of five, that the CPC laid hold of in its erroneous decision to dismiss.

/ / /

/ / /

/ / /

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

**5. The District improperly charged Kissner with persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools by the state board or by the governing board of the school district employing him**

200.    As with the other charges, the District failed to cite any state or school law, state board regulation, or local board regulation Kissner allegedly violated. Not only was there no evidence in the charging statement that Kissner violated any law, policy, regulation or objective standard, the District nevertheless charged him with unsatisfactory performance based on grading practices implemented during the remote learning school year where no law, regulation, policy, or objective standard had been adopted or recognized.

201.    Remarkably, while making Kissner's grading practices the basis of multiple charges—and after confronting Kissner—the District began soliciting teachers for their input regarding what they thought equitable grading practice policies should be. In other words, the District is charging Kissner with unsatisfactory performance based on practices they did not understand and non-existent policies they sought to establish only after reprimanding Kissner.  The CPC did not find any evidence of a violation of a law, regulation, or policy.

**E.    Dismissing Kissner Would Not Be Enough. Belts And Supenders Were Needed So The District Simultaneously Eliminated Kissner Through An Unlawful Reduction In Force**

202.    The District's desire to remove Kissner would not be complete without belts and suspenders. As argued below, the District singled Kissner out as the only tenured casualty of the District layoffs and selected him for removal even though his removal had no fiscal impact on the District's 2021-2022 budget.  District officials repeatedly describe – and documents define – a change in education program that would affect Kissner - and only Kissner – purportedly resulting from a need to reduce the budget and declining enrollment.

203.    Education Code § 44955(b) provides the general rule that layoffs must be made in order of reverse seniority—that is, junior employees must be laid off before more senior employees.

Verified First Amended Complaint                    Case No. 22-CV-00949-VKD

In the administrative proceedings that led to the challenged decision, the District failed to satisfy its burden of demonstrating that any of the limited exceptions to that rule, which are contained in Cal. Educ. Code § 44955(d), apply to its decision to retain junior employees in lieu of Petitioner.

204.    At a hearing before an Administrative Law Judge ("ALJ"), Defendant Billy Martin testified that there was an open position for instruction in sixth grade math and science that Kissner was experienced teaching, and competent and certified to teach (as long as the school district applied for a consent to teach waiver for sixth grade science, which they had used for that subject for the previous nine years), and that a teacher junior to Kissner with no known experience teaching the subject was likely to fill that open position after the layoff was completed.

205.    At that same hearing, Defendants Fraser and Martin, and the District's Chief Business Officer, Cathy Vance, testified that despite earlier representation, the need to layoff Kissner was not in fact connected to declining enrollment or fiscal constraints, and that there was no budget savings from that change in programming.  They instead offered new and vague language around "programming needs" as a justification.

206.    The ALJ erred in her proposed decision by ignoring this testimony and finding that the pretextual and superficial change to the name of the programming justified the layoff.

207.    The ALJ erred in her proposed decision by finding that competency meant "(e.g., credential or authorization)" and finding that Kissner did not have the correct "credential," despite testimony from District witnesses that Kissner was competent to teach in the open position and that his credential allowed him to teach with a consent to teach waiver, which the District had used for that subject for the last nine years.

208.    At the Administrative Hearing, the superintendent, Fraser, testified that the retained certificated employees junior to Petitioner were not required for the purposes of teaching a specific course or course of study. The principal of both schools within the District testified that teachers

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

junior to Kissner were being considered for an open position to teach sixth grade math and science––the position Kissner was originally hired by the District to teach—even though Kissner was the only teacher in the District who he was aware of as having any experience teaching both sixth grade math and science simultaneously.

209.   The ALJ ignored the evidence and held that a pretextual change in programming—from a "departmentalized" to a "core" program—allowed the District to skip all junior employees who held multi-subject credentials, disregarding the reverse seniority requirements of Cal. Educ. Code § 44955(b) and the clearly and convincingly evidenced retaliatory motive of the District.

210.   The ALJ erred in finding that there was no evidence, other than Kissner's testimony, to show that his layoff was not related to budget reductions and reduced enrollment. The witnesses called by the District testified that the reason Kissner was being laid off was because of a change in programming that was not required by reduced enrollment and would have a net zero effect on the budget.

211.   The ALJ also erred in finding that Kissner presented no evidence, other than his own testimony, of retaliation for political speech and viewpoint discrimination, despite the fact that the witnesses called by the District, on cross-examination, testified that they were aware of his political speech, they opposed his political speech, and made the decision to lay him off only a short time after his political speech was made.

212.   District witnesses at the hearing testified that teachers junior to Kissner who were retained were not needed to teach a specific course or course of study. The Administrative Law Judge erroneously ignored this testimony and erroneously found that the District had properly applied "skipping" rules.

213.   The ALJ erroneously found that Kissner would not be certificated to teach in a core model with a single subject credential.  Although Defendant Martin claimed this in his testimony,

he later had to concede that the California Commission on Teacher Credentialing Administrator's Assignment Manual specifically explains that a single subject credentialed teacher is qualified to teach in a "core" classroom model.  Further, there is evidence that Kissner was originally hired explicitly to teach 6th grade math and science in a "core" model.

214.    The ALJ made other findings contrary to the evidence presented at the hearing, and contrary to the law.

215.    The Defendants adopted the ALJ's erroneous proposed decision in violation of the law.

## VII.    The District Produced the Statement Of Charges Within 52 Minutes Of Receiving A California Public Records Act Request

216.    On April 16, 2021, shortly after the Notice of Dismissal and Notice of Layoff were issued, an individual using a fake name and email address requested a copy of the Statement of Charges from the District. Within 52 minutes, the District responded to the request without redacting the defamatory portions or providing Kissner with an opportunity to seek a writ prohibiting its release. The anonymous person promptly posted the defamatory information on various social media forums.

## VIII.    The District Amended The Statement Of Charges After Receiving An Additional Complaint That He Had Given Alcohol To Two Teenaged Boys Two Years Earlier

217.    No sooner had the District notified Kissner of its intent to dismiss him, in February 2021, it launched yet another investigation into alleged wrongdoing.

218.    The new investigation purported to respond to allegations of Kissner providing alcohol to minors in 2019, some two years prior, and after he had already been warned against such conduct.

219.    The timing of these new allegations, miraculously arriving during the pendency of dismissal proceedings, was remarkably fortuitous for Kissner's detractors.

220. The newly alleged allegations involved an incident allegedly occurring two years earlier.

221. Helen Odea, the disgruntled mother of the high school student five years earlier who Kissner gave a single sip of alcohol to as a toast, coordinated with other disgruntled parents to bring forward the new allegations.

222. Odea's hostility toward Kissner surfaced in the investigative report notes and in her sworn testimony during dismissal hearings.

223. Odea was particularly upset at Kissner over the defeat of Measure N because her teaching position could have been reduced due to budget cuts.

224. Odea testified that she had wanted the District to take the 2016 incident seriously and fire Kissner ever since the student walkout investigation and was thrilled it was finally taking action.

225. The District retained Defendant Joie Grimett ("Grimmet"), characterized by the District as an "independent" investigator, to conduct an inquiry into the new allegations from years prior.

226. Grimmet, however, was not an "independent" investigator, and admitted in sworn testimony at a deposition that (1) she relied on hearsay and unspecified "evidence" that was not recorded anywhere, (2) her investigation was influenced by improperly reviewing the dismissal charges (which were provided to her by the District's legal counsel), (3) she was rushed and pressured by the District to conclude her investigation to support their dismissal efforts before her investigation was complete ("They wanted something. They needed something for the board"), (4) she failed to interview exculpatory witnesses, (5) she asked leading questions of witnesses, and that (6) she failed to explore glaring inconsistencies,.

**Verified First Amended Complaint**                          Case No. 22-CV-00949-VKD

227.    Ultimately, the CPC failed to substantiate any of the principal allegations raised regarding the 2019 charges.

### FIRST CLAIM FOR RELIEF

### Free Speech Clause of First Amendment to U.S. Constitution

### (42 U.S.C. § 1983)

(By Kissner Against Individual District Defendants Only)

228.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

229.    The First Amendment to the United States Constitution prohibits abridgement of the freedom of speech, and the First Amendment is incorporated against the states by the Fourteenth Amendment. Persons violating the First Amendment under color of law are liable at law and in equity under 42 U.S.C. § 1983.

230.    Individual District Defendants are sued in their individual capacity for damages and in their official capacity for equitable relief.

231.    Kissner engaged in protected political speech in 2018 when he expressed his opposition and objection to the District's deviation from law and District policy by authorizing student walkouts organized for the purpose of demonstrating for gun control legislation.

232.    The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993). Even if a policy is constitutionally viewpoint-neutral on its face, it may not be when it is applied under particular circumstances.

233.    The District violates canons of free speech guarantees when it engages in any kind of viewpoint-based conduct that establishes an endorsement of one political viewpoint on matters of public concern.

234.    The March 14, 2018, walkout was a politically-organized scheme to influence and indoctrinate impressionable youth into taking a specific anti-Second Amendment political position.

235.    The March 14 and April 20, 2018 walkouts had nothing to do with the District's educational mission. Because the walkouts were not authorized by education policy in California, and because they were viewpoint-based, the District was required to publicly distance itself from planning and participation in it.

236.    Kissner also engaged in protected political speech when he campaigned against Measure N, petitioned for a special board trustee election, and spoke out concerning improper expenditures of public funds.

237.    The District Defendants, acting under color of state law and according to a pattern and practice, have engaged in viewpoint discrimination by targeting Kissner for adverse employment action in retaliation for his protected political speech.

238.    Defendants' investigations, pretextual excuses for falsely charging him with actionable misconduct, disregard for the creation of a hostile work environment, efforts to remove him from the school campus to satisfy his colleagues' political animus, efforts to remove him from his employment, harassment, and other acts were and are unreasonable and have a chilling effect on protected speech.

239.    By reason of the aforementioned policy, practice, custom, acts, and omissions, engaged in under color of state law, Defendants have imposed content-and viewpoint-based restrictions on Kissner's speech in violation of the Free Speech Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

**Verified First Amended Complaint**                      Case No. 22-CV-00949-VKD

240.    As a direct and proximate consequence of Defendants' violation of Kissner's federal civil rights under 42 U.S.C. § 1983 and the First Amendment, Kissner has suffered irreparable injury that cannot fully be compensated by an award of monetary damages.

241.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Kissner is entitled to declaratory relief and preliminary and permanent injunctive prospective relief invalidating and restraining enforcement of the restrictions imposed on Kissner's freedom of speech. As to this claim for relief, Kissner seeks said equitable relief pursuant to *Ex Parte Young*, 209 U.S. 123 (1908), against all Individual District Defendants acting in their official capacities.

7.    Additionally, Kissner is entitled to his actual and nominal damages arising from the District Defendants' unconstitutional actions in their individual capacity while acting under color of state law, as well as reasonable costs of suit. a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021).

242.    Kissner is entitled to an award of nominal damages for the past loss of his constitutional rights as set forth in this Complaint against the Individual District Defendants pursuant to the First and Fourteenth Amendments to the United States Constitution.

243.    Kissner found it necessary to engage the services of private counsel to vindicate his rights under the law. Kissner is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

**SECOND CLAIM FOR RELIEF**

**California Constitution Free Speech**

**(Art. 1, § 2)**

(By Kissner Against District & Individual District Defendants Only)

244.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

245.    In California "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. Art. 1, §2.

246.    "The California Supreme Court has recognized that the California Constitution is 'more protective, definitive and inclusive of rights to expression and speech' than the First Amendment to the United States Constitution." *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1167 (9th Cir. 2007).

247.    For the reasons stated in the First Claim for Relief, Defendants violated Kissner's liberty of speech rights under the California Constitution as well.

8.    Kissner is entitled to his actual and nominal damages arising from the District Defendants' unconstitutional actions in their individual capacity while acting under color of state law, as well as reasonable costs of suit. a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021).

248.    Kissner is entitled to an award of nominal damages for the past loss of his constitutional rights as set forth in this Complaint against the Individual District Defendants pursuant to the First and Fourteenth Amendments to the United States Constitution.

**Verified First Amended Complaint**                        Case No. 22-CV-00949-VKD

249.    Kissner has found it necessary to engage the services of private counsel to vindicate his rights under the law. Kissner is therefore entitled to an award of attorney fees and costs pursuant to Cal. Civ. Proc. § 1021.5.

### THIRD CLAIM FOR RELIEF

### Civil Rights Defamation

### (42 U.S.C. § 1983)

(By Kissner Against District, Individual District Defendants & Agent Defendants Only)

250.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

251.    Kissner suffered a deprivation of a constitutional liberty interest because the manner of his termination imposed a stigma that has precluded his ability to continue working as a teacher in public education.

252.    Kissner suffered a deprivation of a constitutional property interest because the District and Individual District Defendants divested him of his rights to continued employment in the field of public education.

253.    The District and Individual District Defendants dismissed Kissner for pretextual, unsubstantiated, and retaliatory reasons that seriously damage his standing in the community.

254.    Agency Defendants Elliott and Grimmet participated with the District and Individual District Defendants in fabricating the pretextual and unsubstantiated reasons for firing Kissner by conducting result-oriented investigations into Kissner's conduct calculated to find fault with him and sufficient to justify adverse action, including discipline and termination.

255.    Agency Defendants Elliott and Grimmet communicated false and defamatory assertions of fact to the District and Individual District Defendants by negligently conducting

58

flawed, incomplete, and one-sided investigations into Kissner's public opposition to the student walkouts and his relationships with minors.

256.    The District and Individual District Defendants exploited the flawed, incomplete, and one-sided findings of written reports generated by Agency Defendants Elliott and Grimmet for the purpose of justifying Kissner's termination from employment.

257.    The District Defendants' pretextual, unsubstantiated, and retaliatory reasons for dismissing Kissner were sufficiently serious to stigmatize or otherwise burden Kissner so that he is not able to take advantage of other employment opportunities.

258.    The unsubstantiated stigmatizing charges were improperly disclosed and published to the public when the District/Individual District Defendants released them in response to a public records request.

259.    The charges of immoral conduct, including "grooming" of minors, has impaired Kissner's reputation for honesty and morality.

260.    Kissner contested the accuracy of the charges made against him for immoral conduct, and ultimately those charges were not upheld by the Commission on Professional Competence.

261.    As a direct and proximate consequence of Defendants' violation of Kissner's federal civil rights under 42 U.S.C. § 1983 and the First Amendment, Kissner has suffered irreparable injury that cannot fully be compensated by an award of monetary damages.

262.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Kissner is entitled to declaratory relief and preliminary and permanent injunctive prospective relief invalidating and restraining enforcement of the restrictions imposed on Kissner's freedom of speech. As to this claim for relief, Kissner seeks said equitable relief pursuant to *Ex Parte Young*, 209 U.S. 123 (1908) against all Individual District Defendants acting in their official capacities.

**Verified First Amended Complaint**                        Case No. 22-CV-00949-VKD

263.    Additionally, Kissner is entitled to his actual and nominal damages arising from the District Defendants' unconstitutional actions in their individual capacity while acting under color of state law, as well as reasonable costs of suit.

264.    Kissner is entitled to an award of nominal damages for the past loss of his constitutional rights as set forth in this Complaint against the Individual District Defendants pursuant to the First and Fourteenth Amendments to the United States Constitution.

265.    Kissner found it necessary to engage the services of private counsel to vindicate his rights under the law. Kissner is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF

### Defamation *Per Se*

(By Kissner Against District, Individual District & Community Defendants Only)

266.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

267.    On or about February 12, 2021, Defendants District and Individual District Defendants served Kissner with a Notice of Proposed Intent to Dismiss  with Statement of Charges ("Statement"). The Statement falsely asserted as fact that Kissner was guilty of "Potential grooming behavior, such as: singling out a minor and being alone with a minor; … asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet ("statement")."

9.    The defamatory statement of fact is false, unprivileged, and has a natural tendency to injure Kissner, including and especially at his place of work and in the education world where he might be required to seek employment.

268.     On or about March 22, 2021, Kissner, through counsel, demanded the District dismiss the defamatory statement accusing Kissner of potential grooming behavior. The letter stated in relevant part:

> These slanderous charges lack any substance and are shamelessly based on nothing more than anonymous inadmissible hearsay. Accusations of "potential grooming," asking about sex, etc., are made with NO SOURCE, NO VICTIM, NO DETAILS, NO OFFICIAL COMPLAINT, NO REPORTS.… Should these accusations remain in these proceedings or otherwise find their way toward republication, we will not hesitate to hold the District and each person involved accountable.

269.     Counsel for the District never responded to this demand, never sought to meet and confer regarding it, and, on information and belief, authorized the false and defamatory statement's release to the public.

270.     On or about April 16, 2021, Defendant District and Individual District Defendants received a California Public Records Act request for a copy of the Statement from an anonymous, fictitiously-named individual. The request was served by email at or about 9:49 a.m.

271.     At or about 10:43 a.m., just 54 minutes after receiving the request, Defendant District and Individual District Defendants responded to the request by attaching the Statement to an email. The response additionally included a letter, which stated in relevant part:

> [T]he California Court of Appeals held that records of complaints or investigations against a public employee can be disclosed only if "the complaint is of a substantial nature and there is reasonable cause to believe the complaint or charge of misconduct is well founded." (*See, Bakersfield City School Dist. v. Superior Court* (2004) 118 Cal.App.4th 1041 at 1044; *see also, ERV, Inc. v. Superior Ct.* (2006) 143 Cal.App.4th 742.) **However, in such instances, a public agency's decision to release confidential documents under the PRA is reviewable by petition for writ of mandate in a "reverse-PRA" lawsuit. (*See, Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 250**.)
>
> ***
>
> [T]he District is unable to produce privileged document(s) or information encompassed by an exemption under the PRA or any state or federal law. (*See e.g.*, Gov. Code 6254 and 6255.) Accordingly, the District will segregate and/or redact privileged and/or exempt information as needed.

1   (Emphasis added.)

2   272.    By the letter's express language and citation to relevant legal authority, Defendant

3   District and Individual District Defendants knew and understood that they owed a duty to Kissner

4   to inform him of the request and to afford him an opportunity to challenge the public release of the

5   false and defamatory statement by filing a petition for writ of mandate to enjoin it.

6   273.    Additionally, by the letter's express language, Defendant District and Individual

7   District Defendants knew and understood that they were prohibited from producing information

8   encompassed by an exemption under the PRA <u>or any state or federal law</u>.

9   274.    By releasing the false and defamatory statement as herein alleged, Defendant

10  District and Individual District Defendants failed to provide Kissner with an opportunity to

11  challenge its release either in whole or in part by filing a petition for writ of mandate seeking

12  injunctive relief and thereby deprived him of his constitutional right to due process. The failure to

13  provide Kissner with due process constitutes a violation of Kissner's state and federal constitutional

14  rights and exempted the District from releasing it to the public.

15  10.    The communication of the false and defamatory information was made with malice,

16  i.e., with a state of mind arising from hatred or ill-will, evidencing a willingness to vex, annoy, or

17  injure Kissner as described throughout this Complaint.

18  275.    The charges were promptly republished by members of the public and predictably

19  subjected Kissner to shame and humiliation, threats, intimidation, mockery and derision by

20  members of the public throughout the community. For example, Defendant Lawrence McVoy wrote

21  on the "95033 Talk" Yahoo community forum: "… Fuck that guy. He's someone who was

22  grooming kids. I can't prove that but all the evidence points that way."

23  276.    Defendant McVoy defamed Kissner by asserting as fact that Kissner is "someone

24  who was grooming kids" and that "all the evidence points that way."

**Verified First Amended Complaint**                              Case No. 22-CV-00949-VKD

11.     Defendant McVoy's statement of fact is false, unprivileged, and has a natural tendency to injure Kissner throughout the community of Los Gatos and beyond, where such false statements can follow Kissner wherever he may be by virtue of the geographical reach of social media and the internet.

277.     On or about June 11, 2021, Defendants District and Individual District Defendants served Kissner with an Amended Notice of Proposed Intent to Dismiss with Statement of Charges ("Amended Statement") once again falsely stating that Kissner engaged in immoral conduct consisting of, *inter alia*, "[p]otential grooming behavior, such as: singling out a minor and being alone with a minor; offering alcohol; asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet."

278.     Subsequent to the release of the defamatory charges, Defendant Lisa Frasier testified during dismissal proceedings that Defendant District had no evidence supporting such charges, and that, as the official author of the letter accompanying the release of the Statement, she was aware of the statutory protections preventing their publication.

279.     Kissner is a private figure for the purposes of this defamation action, having lived his entire life out of the public eye.

280.     Prior to the walkout in March 2018, Kissner had no notoriety of any kind in the community at large.

281.     Kissner did not engage the public's attention to resolve any public issue that could impact the community at large until a parent of one of the walkout students went to the media and exposed Kissner as the teacher who had given failing grades to three of the walkout students. Kissner made no public appearances prior to the false accusations that he had given a "pop quiz" and intended to punish the students for political reasons.

Verified First Amended Complaint                                        Case No. 22-CV-00949-VKD

282.    Kissner's limited public statements after the accusations in 2018 were reasonable, proportionate, and in direct response to the false accusations against him and do not render Kissner as a limited purpose public figure.

283.    The Individual District Defendants failed to conduct a reasonable investigation into the false charges, limiting their interviews to disgruntled students and parents and failing to take their political biases into account while discrediting Kissner as politically-motivated in opposing the walkout.

284.    The Individual District Defendants failed to conduct a reasonable investigation into the false charges by relying on an anonymous letter, whose allegations and innuendos were unfounded and in the case of a distant incident involving a sip of alcohol proven not to be an actionable continuing or ongoing pattern of behavior or practice.

285.    By virtue of the release of the stigmatizing charges to the public, Kissner was deprived of his liberty interest in his employment with the District. Kissner has denied the charges and their accuracy and the charges were neither sustained by the Commission on Professional Competence in the dismissal proceedings nor accepted into evidence once the District, through counsel, understood and recognized that it has not evidence to support the false and defamatory statements.

286.    The publication of the false and defamatory statements directly and proximately caused substantial and permanent damage to Kissner, including the deprivation of his liberty interest in employment.

287.    The false and defamatory statements were republished by third-parties and a social media mob of bullies, which was reasonably foreseeable.

288.     The false and defamatory statements against Kissner are defamatory per se, as they are libelous on their face without resort to additional facts, and as clearly demonstrated here, Kissner was subjected to public hatred, contempt, scorn, obloquy, and shame.

289.     As a direct and proximate result of the false and defamatory statements, Kissner suffered permanent harm to his reputation.

290.     As a direct and proximate result of the false and defamatory statements Kissner suffers and will continue to suffer severe emotional distress.

291.     As a direct and proximate result of the false and defamatory statements Kissner is forced to live his life in a constant state of concern over his safety and the safety of his family.

12.     Defendant District, Individual District Defendants, Defendant McVoy, and Does 1-50 published the false and defamatory statements negligently and/or intentionally with malice, oppression, and/or fraud, and intended to injure and damage Kissner, which warrants an award of punitive damages under Code Civ. Proc. § 3294.

**FIFTH CLAIM FOR RELIEF**

**False Light Invasion of Privacy**

(By Kissner Against All Defendants)

292.     Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

293.     Defendant District and Individual District Defendants violated Kissner's right to privacy by publicly disclosing false and defamatory information depicting Kissner in a false light by asserting as fact that he is guilty of grooming or potential grooming of minors.

294.     The false light created by the disclosure would be highly offensive to a reasonable person in Kissner's position.

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

295.    Defendant District and Individual District Defendants knew the disclosure would create a false impression about Kissner or acted with reckless disregard for the truth.

296.    Defendant District and Individual District Defendants knew the disclosure would be widely circulated within the community, and thereby subject Kissner to public hatred, contempt, scorn, obloquy, and shame.

297.    Defendant District and Individual District Defendants were negligent in determining the truth of the information or whether a false impression would be created by its disclosure.

13.    The communication of the false and defamatory information to the public was made with malice, i.e., with a state of mind arising from hatred or ill-will, evidencing a willingness to vex, annoy, or injure Kissner as described throughout this Complaint and was therefore unprivileged.

298.    Subsequent to the disclosure, Defendant Frasier testified during dismissal proceedings that Defendant District had no evidence supporting the defamatory statement, and that, as the official author of the letter accompanying the release of the Statement, she was aware of the statutory protections preventing its publication.

299.    As a direct and proximate result of the charges placing Kissner in a false light, Kissner sustained harm to his reputation, profession, and occupation.

300.    The conduct of Defendant District and Individual District Defendants was a substantial factor in Kissner's harm.

301.    The conduct of Defendant District and Individual District Defendants served no legitimate purpose; the only purpose was to harass Kissner and to punish him for opposing and calling the public's attention to District policies.

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

302.   The conduct of Defendant District and Individual District Defendants conduct would cause a reasonable person to suffer substantial emotional distress, and actually did cause substantial emotional distress to Kissner.

14.   The information disclosed to the public that Kissner is guilty of grooming minors was promptly republished by members of the public and predictably subjected Kissner to shame and humiliation, threats, intimidation, mockery and derision by members of the public throughout the community. For example, Defendant Lawrence McVoy wrote on the "95033 Talk" Yahoo community forum: "… Fuck that guy. He's someone who was grooming kids. I can't prove that but all the evidence points that way."

303.   Defendant McVoy knew the republication of the disclosure would create a false impression about Kissner or acted with reckless disregard for the truth.

304.   Defendant McVoy knew the disclosure would be widely circulated within the community, and thereby subject Kissner to public hatred, contempt, scorn, obloquy, and shame.

305.   Defendant McVoy was negligent in determining the truth of the information he republished or whether a false impression would be created by its republication.

15.   In fact, Defendant McVoy has no evidence that Kissner is "someone who was grooming kids" and that "all the evidence points that way."

306.   Kissner seeks damages for the emotional distress he has suffered as a result of Defendants' campaign of harassment.

307.   By engaging in the conduct described herein, Defendants acted with malice and oppression and/or in conscious disregard of Kissner's rights and well-being, and intended to subject Kissner to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

## SIXTH CLAIM FOR RELIEF

### Public Disclosure of Private Facts

(By Kissner Against District & Individual District Defendants Only)

308.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

309.    Defendant District and Individual District Defendants disclosed unfounded and illegitimate allegations of immoral conduct against Kissner when it responded to a California Public Records Act request.

310.    Kissner had an objectively reasonable expectation of privacy since at the time of the disclosure, he had not requested a dismissal hearing.

311.    The unwarranted publication of intimate details regarding salacious and false allegations of immoral conduct fell outside the realm of legitimate public interest.

312.    Defendant District and Individual District Defendants knew the allegations would be widely circulated to members of the public or reasonably should have expected them to be in light of the ongoing campaign of personal attacks, animus, and ill-will directed at Kissner.

313.    The conduct of Defendant District and Individual District Defendants was a substantial factor in Kissner's harm.

314.    The conduct of Defendant District and Individual District Defendants served no legitimate purpose; the only purpose was to harass Kissner and to punish him for opposing and calling the public's attention to District policies.

315.    The conduct of Defendant District and Individual District Defendants would cause a reasonable person to suffer substantial emotional distress, and actually did cause substantial emotional distress to Kissner.

**Verified First Amended Complaint**                              Case No. 22-CV-00949-VKD

316.    Kissner seeks damages for the emotional distress he has suffered as a result of District Defendants' the conduct of Defendant District and Individual District Defendants .

317.    By engaging in the conduct described herein, Individual District Defendants acted with malice and oppression and/or in conscious disregard of Kissner's rights and well-being, and intended to subject Kissner to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Individual District Defendants and deter others from engaging in similar conduct.

## SEVENTH CLAIM FOR RELIEF

### Discrimination and Retaliation for Engaging in Protected Activity

### (Cal. Lab. Code §§ 98.6 & 1101)

(By Kissner Against District & Individual District Defendants Only)

318.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

319.    Employers may not discharge or discriminate against an employee for engaging in political activities or the exercise of any rights afforded him.

320.    Cal. Govt. Code § 1101 prohibits an employer from making, adopting, or enforcing any rule, regulation, or policy "tending to control or direct the political activities or affiliations of employees."

321.    Defendant District and Individual District Defendants discriminated and retaliated against Kissner for publicly opposing the District's endorsement of the student walkouts, publicly opposing Measure N, publicly supporting a special trustee election, and putting political pressure on the Defendant District and Individual District Defendants to balance the District's budget and to reform its mismanaged budget practices.

69

322.    As a proximate result of Individual District Defendants conduct, Kissner has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses in an amount according to proof at the time of trial.

323.    As a further direct and proximate result of these District Defendants' conduct, Kissner will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

324.    As a further direct and proximate result of District Defendants' conduct, Kissner has suffered a loss of financial stability, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

325.    District Defendants, and each of them, committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Kissner, from an evil and improper motive amounting to malice, and in conscious disregard of Kissner's rights, in that District Defendants, and each of them, refused to allow Kissner to engage in constitutionally protected speech despite the fact that they knew that Kissner was able to perform the essential functions of his position. Thus, Kissner is entitled to recover punitive damages from Defendants.

### EIGHTH CLAIM FOR RELIEF

### Discrimination and Retaliation for Engaging in Protected Activity

### (Cal. Lab. Code §§ 98.6 & 1102)

(By Kissner Against District & Individual District Defendants Only)

326.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

327.   Employers may not discharge or discriminate against an employee for engaging in political activities or the exercise of any rights afforded him.

328.   Cal. Lab. Code § 1102 prohibits employers from coercing or influencing or attempting to coerce or influence their employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity.

329.   District Defendants, and each of them, supported and advocated for the passage of Measure N.

330.   In particular, Defendant Abeln issued threats intended to intimidate and silence opponents of Measure N. Kissner was a leading opponent of Measure N. Abeln conveyed his threat to Kissner's political ally and requested that the message be shared with all opponents of Measure N.

331.   On information and belief, Individual District Defendants additionally sought to coerce and/or influence Kissner and therefore deter him from mounting a special trustee board election so that they could retain a trustee sympathetic to their political interests as a member of the board.

332.   As a proximate result of Individual District Defendants conduct, Kissner has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses in an amount according to proof at the time of trial.

333.   As a further direct and proximate result of these District Defendants' conduct, Kissner will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

334.   As a further direct and proximate result of District Defendants' conduct, Kissner has suffered a loss of financial stability, peace of mind and future security, and has suffered

71

embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his

detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and

subject to proof at the time of trial.

335.    By reason of the conduct of Individual District Defendants herein, Kissner has

retained attorneys to prosecute his claims. Kissner is therefore entitled to recover reasonable

attorneys" fees and costs pursuant to Govt. Code § 12965(b), in addition to other damages as

provided by law and as alleged herein.

336.    District Defendants, and each of them, committed the acts alleged herein

oppressively and maliciously, with the wrongful intention of injuring Kissner, from an evil and

improper motive amounting to malice, and in conscious disregard of Kissner's rights, in that District

Defendants, and each of them, refused to allow Kissner to engage in constitutionally protected

speech despite the fact that they knew that Kissner was able to perform the essential functions of

his position. Thus, Kissner is entitled to recover punitive damages from Defendants.

## NINTH CLAIM FOR RELIEF

### Wrongful Termination

(By Kissner Against District & Individual District Defendants Only)

337.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if

fully set forth herein.

338.    Defendants are public entities—as defined in Cal. Gov. Code § 811.2—and public

employees—as defined in Cal. Gov. Code §811.4.

339.    Defendants laid off Kissner as part of a reduction in force for pretextual reasons.

Defendants true reason for laying off Kissner was in retaliation for his political speech, which

speech was made as in his capacity as a private person and not pursuant to his duties, or in the

course or scope of his employment as an employee of Defendants.

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

340.    The District's decision to layoff Kissner discriminated against him in violation of Cal. Lab. Code §§ 1101 and 1102 as set forth herein.

341.    Kissner's speech was on matters of public interest and concern wholly unrelated to his employment.

342.    Kissner's speech was protected by the First Amendment of the United States Constitution and by Cal. Const. Art. I. § 2(a).

343.    Therefore, the District's reason for laying Kissner off was an illegal reason.

344.    "[C]ourts reason a layoff due to a reduction in force may, on proper showing, constitute the basis for a common law tort or statutory claim of discriminatory termination." *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 64, citing *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 579–580 (noting an economically necessary layoff due to reduction in force may violate anti-discrimination laws if the layoff is based on illegal criteria.).

345.    The layoff of Kissner constitutes a discriminatory termination because:

   a)  Kissner was laid off for exercising a federal and state constitutional right or privilege;

   b)  Kissner was laid off after receiving a notice of dismissal which demonstrates that the layoff is intended to be permanent; and

   c)  The District lacked jurisdiction or acted ultra vires in excess of its jurisdiction with improper motives.

346.    Under Gov. Code § 820, Defendants are liable for the damages caused to Kissner by his wrongful discharge from his employment.

347.    As a proximate result of Defendants'' conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses in an amount according to proof at the time of trial.

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

348.    As a further direct and proximate result of Defendants' conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

349.    As a further direct and proximate result of Defendants' conduct, Plaintiff has suffered loss of financial stability, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

### TENTH CLAIM FOR RELIEF

### Wrongful Termination in Violation of Public Policy

(By Kissner Against District & Individual District Defendants Only)

350.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

351.    Cal. Lab. Code §§ 1101 and 1102 embody fundamental state public policies. These statutes contain specific language which forbid an employer and its employees from discriminating against an employee based on the content and viewpoint of his political speech and expression.

352.    The discharge of an employee in retaliation for resisting employer violations of laws that secure important public policies contravenes those policies and gives rise to a common law action in tort.

353.    Kissner was terminated for asserting his statutory and constitutional rights to engage in protected expressive activity. District Defendant's violation of Kissner's statutory and constitutional rights is inconsistent and hostile to the public's interest in expressing political and other views and has a chilling effect on such protected activity.

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

354.    District Defendants' arguments for terminating Kissner are pretextual in nature and calculated to disguise the motivating basis of the adverse employment action to which Kissner was subjected.

355.    Kissner is informed and believes, and on that basis alleges, that District Defendants, and each of them, terminated Kissner's employment based upon his political speech and expression.

356.    As a proximate result of District Defendants' conduct, Kissner has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses in an amount according to proof at the time of trial. As a further direct and proximate result of District Defendants' conduct, Kissner will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

357.    As a further direct and proximate result of District Defendants' conduct, Kissner has suffered loss of financial stability, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

358.    Defendants, and each of them, committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Kissner, from an evil and improper motive amounting to malice, and in conscious disregard of Kissner's rights, in that District Defendants, and each of them, refused to allow Kissner to engage in constitutionally protected speech despite the fact that they knew that Kissner was able to perform the essential functions of his position. Thus, Kissner is entitled to recover punitive damages from District Defendants.

/ / /

/ / /

/ / /

**Verified First Amended Complaint**                      Case No. 22-CV-00949-VKD

# ELEVENTH CLAIM FOR RELIEF

## Whistleblower Retaliation

## (Cal. Lab. Code § 1102.5)

(By Kissner Against District, District Defendants & District Agent Defendants Only)

16.     Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

359.     An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

360.     As alleged hereinabove, the District and Individual District Defendants retaliated against Kissner for refusing to comply with unlawful and unconstitutional directives by participating in the 2018 student walkout.

361.     Kissner advised the District that it was engaged in unlawful conduct when it violated state and federal laws and constitutions by ignoring truancy statutes and engaging in viewpoint discrimination.

362.     As a proximate result of Individual District Defendants conduct, Kissner has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses in an amount according to proof at the time of trial.

363.     As a further direct and proximate result of these District Defendants' conduct, Kissner will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

364.     As a further direct and proximate result of District Defendants' conduct, Kissner has suffered a loss of financial stability, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

365.    District Defendants, and each of them, committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Kissner, from an evil and improper motive amounting to malice, and in conscious disregard of Kissner's rights, in that District Defendants, and each of them, refused to allow Kissner to engage in constitutionally protected speech despite the fact that they knew that Kissner was able to perform the essential functions of his position. Thus, Kissner is entitled to recover punitive damages from Defendants.

## TWELFTH CLAIM FOR RELIEF

### Civil Harassment

### (Cal. Code Civ. Proc. §527.6)

(By Kissner Against All Defendants)

366.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

367.    Doe Defendants, or some of them, acting on behalf of and/or in conspiracy with one another, knowingly and willfully directed a course of conduct at Kissner that seriously alarmed, annoyed, and harassed him.

368.    Defendants' course of conduct served no legitimate purpose, and was undertaken specifically with the continuing purpose of alarming, annoying, and harassing Kissner, including defaming Kissner online and attempting to coerce him to cease certain political activity under threat of further defamation.

369.    Defendants' conduct served no legitimate purpose; the only purpose was to harass Kissner and to cause him emotional distress.

**Verified First Amended Complaint**                              Case No. 22-CV-00949-VKD

370.     Defendants' course of conduct would cause a reasonable person to suffer substantial emotional distress, and actually did cause substantial emotional distress to Kissner.

371.     Pursuant to Cal. Code Civ. Proc. §527.6, Kissner seeks an injunction to prevent further acts of harassment directed toward him, including without limitation, contacting Kissner and his family in any way, either directly or indirectly, including in person or by email, telephone, and text message.

372.     Kissner also seeks damages for the emotional distress he has suffered as a result of Defendants' campaign of harassment.

373.     By engaging in the conduct described herein, Defendants acted with malice and oppression and/or in conscious disregard of Kissner's rights and well-being, and intended to subject Kissner to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

374.     Kissner also seeks reasonable attorneys' fees and costs of suit pursuant to Cal. Civ. Proc. § 527.6(s).

## THIRTEENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

(By Kissner Against All Defendants)

375.     Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

376.     By virtue of the conduct discussed above, including, but not limited to, the subsequent release of the statement of charges to the public without accommodating Kissner's right to seek a writ of mandate prohibiting its release to the public, the false statements to community members, known and unknown, and the myriad of threats made directly and indirectly to Kissner,

Defendants, or some of them, acting on behalf of and/or in conspiracy with one another, committed extreme and outrageous conduct.

377.    Defendants' conduct was intended to cause or was done with reckless disregard of the probability of causing, emotional distress to Kissner.

378.    Kissner has suffered extreme emotional distress, humiliation, and anxiety as an actual, direct, and proximate result of Defendants' conduct.

379.    As discussed herein, Defendants intended to inflict emotional distress on Kissner and acted with malice, oppression, and/or fraud, and intended to injure and damage Kissner, which warrants an award of punitive damages under Cal. Civ. Code § 3294.

380.    Kissner is entitled to an award of general, compensatory, and punitive damages, in an amount to be determined at trial.

381.    Pursuant to *Christensen v. Superior Court*, 54 Cal.3d 868, 903 (1991), Kissner is entitled to recover for the intentional infliction of emotional distress where, "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."

382.    As more fully alleged herein, Kissner was subjected to discrimination and harassment by Defendants, and each of them, because of his political advocacy.

383.    As more fully alleged herein, Kissner was subjected to acts of retaliation and those described as the Adverse Employment Actions by Defendants, and each of them, because Defendants maintained a negative animus concerning Kissner's protected political viewpoints, all of which Defendants' despised and/or did not want to accommodate or allow, and in whom Defendants did not want to invest or continue to employ.

79

384.    Defendants' extreme and outrageous conduct, as alleged herein and incorporated by reference, is imputed to Defendants, and each of them.

385.    Kissner was forced to work in a severe and hostile work environment where the Individual District Defendants harassed and ridiculed Kissner and subjected Kissner to acts of discrimination based on Kissner's political and/or ideological beliefs and in an effort to specifically harm Kissner based on said beliefs.

386.    As a proximate result of Defendants' conduct, Kissner has suffered and continues to suffer from severe emotional distress including embarrassment, humiliation, disappointment anxiety, and anger, all to Kissner's damage in an amount to be proved and which is within the jurisdiction of this court.

387.    Defendants' acts and omissions, as set forth herein above, were extreme and outrageous and were undertaken in a despicable, oppressive, deceitful, fraudulent, deliberate, egregious and inexcusable manner, with malice and oppression as defined by Code Civ. Proc. § 3294.

388.    In committing the outrageous acts and omissions described herein above, Defendants, and each of them, knew or should have known that their conduct would result in Kissner's severe emotional distress, and Defendants' acts and omission were perpetrated with the intent to inflict and/or with reckless disregard for the probability of inflicting humiliation, mental anguish and severe emotional distress on Kissner.

389.    As a proximate result of the wrongful acts of Defendants, and each of them, Kissner has been harmed in that Kissner has suffered actual, consequential and incidental financial losses, including without limitations loss of salary and benefits, and the intangible loss of employment-related opportunities, medical benefits and other benefits including retirement, all in an amount subject to proof at the time of trial.

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

390. Kissner claims such amounts as damages together with prejudgment interest.

391. As a proximate result of the wrongful acts of Defendants, and each of them, Kissner has suffered and continues to suffer anxiety, worry, embarrassment humiliation, mental anguish, and emotional distress. Kissner has experienced, among other things, mental anguish, psychological pain and suffering, and related items such as humiliation, embarrassment, nervousness, sleeplessness, irritability, agitation, annoyance, fear, anger, anxiety, frustration, hopelessness, despair, depression, difficulty with concentration.

392. Kissner is informed and believes and thereon alleges that Kissner will continue to experience said pain and emotional suffering for a period in the future all in an amount subject to proof at the time of trial.

393. The actions taken toward Kissner described herein were carried out by and/or ratified by Defendants, and each of them, including DOES 1 through 50, and/or managing agent employees of Defendants, all of whom acted in a despicable, oppressive, cruel, fraudulent, malicious, deliberate, deceitful, egregious, and inexcusable manner in order to injure and damage Kissner, thereby justifying an award to Kissner of punitive damages in a sum appropriate to punish and make an example of Defendants.

## FOURTEENTH CLAIM FOR RELIEF

### Negligence (Emotional Distress)

(By Kissner Against District & Individual District Defendants Only)

394. Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

395. Kissner was the direct victim of the District Defendants' negligent handling of its Walkout Investigation and Conduct with Children investigation, both of which sought to disgrace

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

him in retaliation for his public opposition to the District's mishandling of the walkouts and to fabricate charges against him sufficient to justify disciplinary action against him.

396. The Individual District Defendants owed a duty of care to Kissner to conduct a fair and impartial investigation into the District's mishandling of the walkouts. The Individual District Defendants breached its duty to Kissner by instead conducting unfair, one-sided investigations into Kissner's character based on an anonymous letter writer's politically motivated animus.

397. The Individual District Defendants further owed a duty of care to Kissner to protect him from the public release of salacious, false, and baseless accusations made against him.

398. The Individual District Defendants breached their duty of care by relying exclusively on a disinformation campaign of grievances from parents of students Kissner had given grades of zero to for their truancy during the first walkout. The Individual District Defendants further breached their duty of care by adopting and accepting the salacious, false, inconclusive, and baseless findings and conclusions of the investigator, Defendant Elliott, as the basis for initiating dismissal proceedings and other adverse employment actions.

399. The Individual District Defendants further breached their duty of care to Kissner by releasing salacious, false, and baseless accusations made against him to the public.

400. As a proximate result of the salacious, false, inconclusive, and baseless accusations made against Kissner, his forced leave of absence, and the District's continuing harassment, Kissner suffered serious emotional distress and sought medical leave from his employment in 2018. Kissner was relieved of his emotional trauma only after the dust had settled and it became clear that he would not be facing disciplinary proceedings in 2018-2020.

401. In 2021, however, Kissner's emotional suffering resurfaced when the Individual District Defendants served him with statement of charges that relied almost exclusively on the salacious, false, and baseless accusations to justify his dismissal.

**Verified First Amended Complaint**                               Case No. 22-CV-00949-VKD

402.    As a proximate result of the salacious, false, inconclusive, and baseless accusations made against Kissner in the statement of charges, the notice of dismissal, the notice of layoff and layoff determination, continuing harassment by the District Defendants, and malicious defamatory gossip by the community generated by the District Defendants' public release of the accusations, Kissner has suffered and continues to suffer severe emotional distress.

403.    As a proximate result of the salacious, false, inconclusive, and baseless accusations made against Kissner in the statement of charges, the notice of dismissal, the notice of layoff and layoff determination, layoff determination, continuing harassment by the District Defendants, and malicious defamatory gossip by the community generated by the District Defendants' public release of the accusations, Kissner has suffered and continues to suffer anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

404.    The District Defendants' negligence was a substantial factor in causing Kissner's serious emotional distress.

405.    As a direct and proximate result of District Defendants' negligence, Kissner is entitled compensatory and special damages.

## FIFTEENTH CLAIM FOR RELIEF

### Negligence

(By Kissner Against All Defendants)

406.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

407.    Defendants, and each of them, had a duty to conduct their activities so as to not unduly subject Plaintiff to false and malicious accusations of wrongdoing, including, without limitation, misconduct with minor children.

83

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

1

2

408.     As described herein, each of the Defendants breached this duty, resulting in compensable harms being suffered by Kissner.

3

4

5

6

7

409.     The actions by Defendants named herein and DOES 1-50 were undertaken with malice or with reckless indifference to Kissner's federally protected rights and were in conscious disregard of Kissner's rights, including the conscious and willful suppression of Plaintiffs' rights under the California and U.S. constitutions to engage in public political debate.

8

9

10

11

12

13

14

15

16

17

18

19

410.     Defendants breached a duty of care owed to Kissner, *inter alia*, by (1) releasing false and defamatory statements in response to a Public Record Act request without affording Kissner his constitutional right to due process by consulting him regarding his interest in securing injunctive relief over the statements' release to the public; (2) suppressing Kissner's right to engage in protected speech under the California and U.S. Constitutions; (3) failing to protect Kissner from harassment and retaliation; (4) failing to conduct objective, fair, impartial, thorough, and confidential investigations; (5) needlessly conducting unfair investigations; (6) violating law and school policies during the walkout and allowing Kissner to become the target of harassment, false accusations, reputational harm, emotional distress and other injuries; (7)  doing the acts alleged elsewhere herein; and (8) doing acts that may be learned through discovery or investigations as these proceedings continue.

20

21

22

23

411.     Defendants are therefore liable to Plaintiff for general damages, actual or special damages incurred to date, actual or special damages to be incurred in the future, compensation for ongoing and future harms as against all Defendants, and for punitive or exemplary damages.

24

/ / /

25

/ / /

26

/ / /

27

28

**Verified First Amended Complaint**                           Case No. 22-CV-00949-VKD

## SIXTEENTH CLAIM FOR RELIEF

### Due Process

### (42 U.S.C. § 1983)

(By Kissner Against Individual District Defendants Only)
**(Cal. Const. Art. I, § 7)**
(By Kissner Against District & District Defendants Only)

412.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

413.    "The due process clauses of the federal and state Constitutions provide that a person may not be deprived of life, liberty, or property without due process of law." *Duncan v. Dept. of Personnel Admin.*, 77 Cal. App. 4th 1166, 1174–75 (Cal. App. 2d Dist. 2000); Cal. Const., art. I, § 7, subd. (a); U.S. Const., 14th Amend., § 1.

414.    Under California law, a certified employee is classified as permanent, i.e., acquires tenure, if, after having been employed for two complete successive school years in a position requiring certification qualifications, he is reelected for the following year.

415.    Tenured teachers possess a property right in continued employment. The state must comply with procedural due process requirements before it may deprive a permanent employee of his property interest in continued employment by punitive action.

416.    Kissner was a permanent, tenured teacher employed by the District.

417.    The California Civil Service Act endows state employees who attain permanent status with a property interest. Such employees may not be dismissed or subjected to other disciplinary measures unless facts exist constituting cause for such discipline. In the absence of sufficient cause, the permanent employee has a statutory right to continued employment free of these punitive measures.

**Verified First Amended Complaint**                                      Case No. 22-CV-00949-VKD

418.    Where a reduction in force was merely a pretext for a personal agenda to terminate a particular employee, Kissner's due process rights are violated. The reduction in force alleged herein was merely a pretext for the District Defendants' personal agenda to terminate Kissner in retaliation for his political advocacy.

419.    Kissner's (1) political opposition to the student walkouts and (2) opposition to Measure N, (3) advocacy for a special trustee board election, and (4) promoting budget reform were protected activities. The Individual District Defendants were aware of the protected activities, and the adverse actions of layoff and dismissal followed within a relatively short time thereafter.

420.    The controversies generated by Kissner's political speech drove an ideological wedge between him and District administrators, faculty, staff, and board trustees. But for his unpopular views regarding the student walkouts, Measure N, the trustee board special election, and budget reform, Kissner would have remained a teacher employed by the District.

421.    Kissner is entitled to an award of nominal damages for the past loss of his constitutional rights as set forth in this Complaint against Defendants pursuant to the First and Fourteenth Amendments to the United States Constitution

422.    Kissner found it necessary to engage the services of private counsel to vindicate their rights under the law. Kissner is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

/ / /

/ / /

/ / /

**Verified First Amended Complaint**                                    Case No. 22-CV-00949-VKD

## SEVENTEENTH CLAIM FOR RELIEF

### Equal Protection

### (42 U.S.C. § 1983)

(By Kissner Against Individual District Defendants Only)

### (Cal. Const. Art. I, § 7)

(By Kissner Against District & Individual District Defendants Only)

423.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

424.    Kissner is a permanent teacher who is protected from discharge by seniority rules. Specifically, Individual District Defendants are required by state law to retain teachers based on seniority, pursuant to Cal. Educ. Code § 44955(b).

425.    After Kissner engaged in political speech, the Individual District Defendants discriminated against him because of the content of that speech.

426.    Kissner was a senior teacher at the school, the most experienced and qualified teacher for an open position to teach sixth grade math and science, but the Individual District Defendants skipped eighteen teachers junior to him and discharged him because of his political speech.

427.    Kissner has received only positive performance evaluations, but the Individual District Defendants discriminated against him by charging him with unsatisfactory performance while violating the provisions of Cal. Educ. Code § 44663(a).

428.    The Individual District Defendants have adopted a policy that it will not respond to anonymous complaints against teachers, but they discriminated against Kissner by deviating from that policy to investigate him because of his political speech.

429.    Pursuant to Cal. Lab. Code §§ 1101 and 1102, Individual District Defendants are prohibited from discriminating on the basis of political speech.

87

430.    A facially neutral policy that has an adverse effect and was motivated by discriminatory animus violates the Equal Protection Clause of the Fourteenth Amendment.

431.    Kissner engaged in core political speech by expressing his views regarding the student walkouts, Measure N, the special trustee board election, and budget reform. District Defendants' efforts to lay off and dismiss Kissner have the effect of chilling core political speech.

432.    Individual District Defendants violated Kissner's right to equal protection because their false accusations and other wrongful actions that led to the institution of layoff and dismissal proceedings were intentionally discriminatory, resulting in disparate treatment.

433.    Individual District Defendants sought to punish Kissner because of his opposition to the student walkouts and Measure N, his support for a special trustee board election, and political pressure he brought to bear on the Individual District Defendants to balance their budget and comply with the law.

434.    But for Kissner's political advocacy, the Individual District Defendants would not have initiated the layoff and dismissal proceedings based on false reports of immoral conduct, unprofessional conduct, unsatisfactory performance, and persistent violations of laws or policies. In fact, the CPC failed to find evidence of any of these causes in the dismissal hearing.

435.    By their actions, Individual District Defendants have treated Kissner differently from other teachers, staff, faculty, and administrative employees, who have disagreed with Kissner's political views and advocacy.

436.    Individual District Defendants inconsistently applied their policies based upon subjective determinations as to which messages are acceptable and which messages are not.

437.    All of the actions taken by Individual District Defendants described in this Complaint were taken while acting under color or state of law and had the effect of depriving

Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### EIGHTEENTH CLAIM FOR RELIEF

### Civil Rights Conspiracy

### (42 U.S.C. § 1983)

(By Kissner Against All Defendants)

438.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

439.    Defendants and other private persons conspired and agreed together to inflict injury upon Kissner by procuring and causing official governmental retaliation against him for Kissner's First Amendment-protected expression on matters of public concern.

440.    Defendants are sued in their individual capacity for damages and in their official capacity for equitable relief.

441.    Overt acts taken in furtherance of this conspiracy include, but are not limited to, conducting investigations targeting Kissner and seeking incriminating evidence against him in order to justify adverse employment action against him, the delivery of an anonymous letter containing false and misleading statements concerning Kissner's character and conduct with minors, reliance on the anonymous letter in justifying an intrusive probe into Kissner's relationships with students and minors, placing Kissner on a leave of absence without any legitimate reason or explanation provided to Kissner, conducting biased and unscrupulous investigations, contriving false and malicious charges to serve as the basis of termination proceedings, contriving a lawful rationale for laying off Kissner as part of a bogus reduction in force, releasing unfounded and stigmatizing allegations about Kissner to the public, publication of unfounded and stigmatizing allegations about Kissner, associating Kissner's name with emails and websites falsely purporting

89

to be owned or administered by Kissner, and rejecting Kissner's contributions and offer to join the District's budget advisory committee.

442.    The overt acts of the Defendants and potentially other participants in the conspiracy (which Kissner may seek leave of Court to add as defendants, as may be appropriate) have resulted in Kissner's wrongful discharge, damages, and reputational and emotional injuries.

443.    As a direct and proximate result of Defendants' actions in furtherance of the above-referenced conspiracy, as described in this Complaint, Kissner has suffered injury.

444.    In acting as alleged herein, the Defendants acted knowingly, willfully, and maliciously, and with reckless and callous disregard for Kissner's clearly established and constitutionally protected rights, justifying an award of punitive damages in an amount sufficient to punish the Defendants and discourage others from engaging in similar gross abuse of the public trust and governmental power.

445.    As a result of Defendants' actions, Kissner has suffered and will continue to suffer extreme hardship and actual and impending irreparable injury, loss, and damage in that Kissner is informed and believes and thereon alleges that Defendants will continue to defame him and spread false and malicious statements about him.

446.    By reason of the aforementioned policy, practice, custom, acts, and omissions, engaged in under color of state law, Individual District Defendants have imposed content and viewpoint-based restrictions on Kissner's speech in violation of the Free Speech Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

447.    As a direct and proximate consequence of Defendants' violation of Kissner's federal civil rights under 42 U.S.C. § 1983 and the First Amendment, Kissner has suffered and will suffer irreparable injury that cannot fully be compensated by an award of monetary damages.

448.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Kissner is entitled to declaratory relief and preliminary and permanent injunctive prospective relief invalidating and restraining enforcement of the restrictions imposed on Kissner's freedom of speech. As to this claim for relief, Kissner seeks said equitable relief pursuant to *Ex Parte Young*, 209 U.S. 123 (1908) against all Defendants acting in their official capacities.

449.     Additionally, Kissner is entitled to his actual and nominal damages arising from Defendants' unconstitutional actions in their individual capacity while acting under color of state law, as well as reasonable costs of suit.

450.     Kissner found it necessary to engage the services of private counsel to vindicate their rights under the law. Kissner is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### NINETEENTH CLAIM FOR RELIEF

### Breach of Contract

(By Kissner Against District Only)

451.     Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

452.     Defendant District and Kissner entered into an employment agreement (CBA, Exh. "1"), which constitutes an enforceable contract under the laws of California.

453.     The District breached its duty under the CBA as follows:

A.   The District charged Kissner in part with using curriculum and materials not personally approved by Principal Martin in violation of Art. 6(C);
B.   The District retaliated against Kissner constituting reprisals after Kissner filed grievances on or about April 3, 2020, December 17, 2020, and December 26, 2020, alleging that the District failed to uphold the CBA in its improper handling of parent complaints and personnel files as described below in violation of Art. 6(C);
C.   The District retaliated against Kissner constituting reprisals by wrongfully discharging him in violation of Art. 6(C);
D.   The District retaliated against Kissner constituting reprisals by wrongfully subjecting him to layoff in violation of Art. 6(C);

91

E. The District based its wrongful discharge and layoff of Kissner based on materials which had been excluded or removed from his personnel file and content that had never been a part of his personnel file, including, without limitation, (1) the conduct with children investigative report, (2) unsubstantiated allegations from parent complaints, (3) rescinded documents, including a letter of reprimand that had explicitly been removed from Kissner's personnel file all in violation of Art. 15(D);

F. The District placed the Notice of Intent to Dismiss and Statement of Charges containing negative and derogatory material in Kissner's personnel file while he remained employed without providing him with release time during the school day to initial and date the material and to prepare a written response to it within 10 days of placing it there in violation art. 14(F);

G. The District placed in Kissner's personnel file negative and derogatory material received from parents between June 10, 2019, and December 20, 2020, without following the CBA's authorized procedures in violation of Art. 16, §§ 1-9; and

H. The District utilized parent complaints shown to be false in disciplinary actions taken against Kissner in violation of Art. 16, § 9.

454.    As a proximate result of the District's conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses, job and career opportunities, costs and expenses incurred in seeking employment and other economic and non-economic harm in an amount according to proof at the time of trial.

455.    As a further direct and proximate result of the District's conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

456.    As a further direct and proximate result of the District's conduct, Plaintiff has suffered loss of financial stability, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Kissner respectfully requests that this Court enter judgment against Defendants as follows:

1.    For judgment in favor of Kissner against Defendants;

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

2.      For preliminary and permanent injunctive relief enjoining further publication of the social media posts, and enjoining the re-publication of content that is substantively identical to the social media posts, or anonymous accusations, in any forum;

3.      For a permanent injunction pursuant to Cal. Civ. Proc. § 527.6, enjoining Individual District Defendants from committing further acts of harassment directed toward Kissner and other injunctive relief as necessary and appropriate;

4.      For a permanent injunction from discriminating against Kissner for engaging in First Amendment activities;

5.      For a permanent injunction from retaliating against Kissner because he engaged in First Amendment protected activities;

6.      For an order reinstating Kissner to the position he occupied at the time he was terminated;

7.      For back pay, forward pay, costs and expenses incurred seeking employment, and reimbursement for additional lost benefits in an amount subject to proof at trial, with prejudgment interest to the maximum extent permitted by law;

8.      For substantial compensatory and special damages against Defendants sued in their individual capacity and District Agent Defendants in an amount subject to proof at trial in an amount not less than $10,000,000;

9.      For damages against Defendants sued in their individual capacity and District Agent Defendants representing harm to Kissner's reputation and loss of standing in the community;

10.     For emotional distress damages against Defendants sued in their individual capacity and District Agent Defendants;

**Verified First Amended Complaint**                    Case No. 22-CV-00949-VKD

11.     For nominal damages for the past loss of Kissner's constitutional rights as set forth in this Complaint against Defendants sued in their individual capacity and District Agent Defendants pursuant to the First and Fourteenth Amendments to the United States Constitution;

12.     For punitive damages against Defendants sued in their individual capacity and District Agent Defendants in an amount to be determined according to proof at trial, sufficient to punish said Defendants and make an example of them for their abuse of the public trust and governmental power, in an amount not less than $50,000,000;

13.     For an award of reasonable attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

14.     For prejudgment and postjudgment interest; and

15.     For such other and further relief as the Court deems appropriate and just.

Date: March 8, 2022                     FREEDOM X


                                By:   /s/ William J. Becker, Jr.
                                      William J. Becker, Jr., Esq. (SBN: 134545)
                                      Bill@FreedomXLaw.com
                                      Jeremiah D. Graham, Esq. (SBN: 313206)
                                      jeremiahdgraham@gmail.com

**Verified First Amended Complaint**                     Case No. 22-CV-00949-VKD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, David M. Kissner demands trial by jury on all individual claims they bring against Defendants in this action of all issues so triable.

DATE: March 8, 2022

FREEDOM X

*s/ William J. Becker, Jr.*
William J. Becker, Jr., Esq.,
Attorneys for Kissner

**<u>VERIFICATION ON FOLLOWING PAGE</u>**

95

1

## VERIFICATION

2      I, David M. Kissner, declare under penalty of perjury under the laws of the United States

3  of America that the foregoing is true and correct. 28 U.S.C. § 1746.

4  Date: March 8, 2022

5

6                                                David M. Kissner

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Verified First Amended Complaint**                Case No. 22-CV-00949-VKD