**P O R T E R | S C O T T**

A PROFESSIONAL CORPORATION
Lindsay A. Goulding, SBN 227195
Tatiana M. Bush, SBN 343503
350 University Avenue, Suite 200
Sacramento, California 95825
lgoulding@porterscott.com
tbush@porterscott.com
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendant
LAWRENCE MCVOY

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID M. KISSNER, an individual, | CASE NO. 22-CV-00949-VKD |
| Plaintiff, | |
| v. | **DECLARATION OF LAWRENCE MCVOY IN SUPPORT OF DEFENDANT'S NOTICE OF MOTIONS AND [1] SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE, CAL. CODEOF CIV. PROC. § 425.16, OR, IN THE ALTERNATIVE, [2] MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** |
| LOMA PRIETA JOINT UNION SCHOOL DISTRICT, a California public agency; LISA FRASER, former superintendent at Loma Prieta Joint Union School District, in her official and individual capacitites; COREY KIDWELL, former superintendent at Loma Prieta Joint School District, in her official and individual capacities; KEVIN GRIER, successor superintendent at Loma Prieta Joint School District, in his official capacity; BILLY MARTIN, principal of CT English Middle School, in his official and individual capacities; DEANA A. ARNOLD, Loma Prieta Joint Union School District trustee, in her official and individual capacities; BEN ABELN, Loma Prieta Joint Union School District trustee, in his official and individual capacities; RON BOURQUE, Loma Prieta Joint Union School District trustee, in his official and individual capacities; CHARLOTTE KHANDELWAL, Loma Prieta Joint Union School District trustee, in her official and | **Date:** July 26, 2022
**Time:** 10:00 a.m.
**Ctrm:** 2
**Judge:** Magistrate Virginia K. Demarchi

Complaint Filed: 3/20/2022 |

{02711803.DOCX}

1

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

1  Loma Prieta Joint Union School District
   trustee, in her official and individual
2  capacities; ERIN ASHEGHIAN, Loma
   Prieta Joint Union School District trustee, in
3  her official and individual capacities;
   PATRICIA ELLIOT, an individual; JOIE
4  GRIMMET, an individual; LAWRENCE
   MCVOY, and individual, and DOES 1
5  through 50, inclusive,

6

7          Defendants.
   _____/
8

9

10              **<u>DECLARATION OF LAWRENCE MCVOY</u>**

11        I, Lawrence McVoy, state and declare as follows:

12        1.      I am an individual defendant in the above-captioned matter.

13        2.      I have personal knowledge of all facts stated in this declaration, and if called to

14  testify, I could and would testify competently thereto.

15        3.      I have reviewed the attached Decision of the Commission On Professional

16  Competence for Loma Prieta Joint Union School District, OAH No. 2021050291 ("Decision").

17        4.      I confirm that the attached Decision is a true and correct copy of the document I

18  downloaded and responded to in the 95033 online Community forum.

19        5.      I have reviewed the attached thread of the 95033 online Community forum in its

20  entirety.

21        6.      I confirm that the attached thread of the 95033 online Community forum is a true

22  and complete copy of the 95033 online Community forum that I responded to.

23  ///

24  ///

25  ///

26  ///

27  ///

28
   {02711803.DOCX}                          2

   **DECLARATION OF LAWRENCE MCVOY IN SUPPORT OF DEFENDANT'S NOTICE OF MOTIONS
   AND [1] SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE, CAL.
   CODEOF CIV. PROC. § 425.16, OR, IN THE ALTERNATIVE, [2] MOTION TO DISMISS PURSUANT TO
   FED. R. CIV. P. 12(b)(6)**

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL. 916.929.1481
FAX: 916.927.3706

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct and that this declaration was executed on May 25, 2022 in Los Gatos, California.

3

4

5

6

7

8  Dated: May 25, 2022

9  By _____

10                                    Lawrence McVoy

11                                    COMMUNITY DEFENDANT

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

{02711803.DOCX }                              3

**DECLARATION OF LAWRENCE MCVOY IN SUPPORT OF DEFENDANT'S NOTICE OF MOTIONS AND [1] SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE, CAL. CODE OF CIV. PROC. § 425.16, OR, IN THE ALTERNATIVE, [2] MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

| CASE NAME: | ***DAVID M. KISSNER v. LOMA PRIETA JOINT UNION SCHOOL DISTRICT et al.,*** |
|---|---|
| COURT: | **UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA** |
| CASE NO.: | **22-CV-00949-VKD** |

## PROOF OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.  My business address is 350 University Avenue, Suite 200, Sacramento, California 95825.

On the date below, I served the following document:
DECLARATION OF LAWRENCE MCVOY IN SUPPORT OF DEFENDANT'S NOTICE OF MOTIONS AND [1] SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE, CAL. CODEOF CIV. PROC. § 425.16, OR, IN THE ALTERNATIVE, [2] MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

|  | **BY MAIL:**  I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. |
|---|---|
|  | **BY FAX TRANSMISSION:** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed below.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached |
| XX | **BY ELECTRONIC SERVICE**: Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification address listed below. |

Addressed as follows:

William J. Beker, Jr. ESQ
Jeremiah D. Graham, ESQ
FREEDOM X
11500 Olympic Blvd., Suite 400
Los Angeles, CA. 90064
Bill@FreedomXLaw.com
JeremiahDGraham@gmail.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at Sacramento, California on May 26, 2022.

_____
VIRGINIA YAO

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL.: 916.929.1481
FAX: 916.927.3706

{02661838.DOCX}

1

# DECISION

01054547.WPD

**BEFORE A**
**COMMISSION ON PROFESSIONAL COMPETENCE**
**LOMA PRIETA JOINT UNION SCHOOL DISTRICT**
**STATE OF CALIFORNIA**

**In the Matter of the Dismissal of:**

**DAVID KISSNER, A Permanent Certificated Employee,**

**Respondent.**

**OAH No. 2021050291**

**DECISION**

A Commission on Professional Competence (Commission) heard this matter by videoconference on October 4, 5, 6, 8, 11, 12, 13, 14, 15, 25, and 28, 2021. The Commission's members were Katherine Everett, Santa Clara County Office of Education; Scott Guagliardo, Downtown College Prep (San Jose); and Administrative Law Judge Juliet E. Cox, State of California, Office of Administrative Hearings, who presided.

Attorneys Brian D. Bock and Amanda S. Georgino represented the Loma Prieta Joint Union School District.

Attorneys William J. Becker, Jr., and Jeremiah D. Graham represented respondent David Kissner, who was present throughout the hearing.

The Commission received oral opening statements, testimonial and documentary evidence (including audio and video recordings), and oral closing

arguments. The record was held open to permit the Commission to review evidence and to deliberate in executive session. The record closed and the matter was submitted for decision on November 10, 2021, at the conclusion of the Commission's deliberations.

## FACTUAL FINDINGS

1.      Respondent David Kissner holds a clear single subject credential authorizing him to teach mathematics.

2.      The Loma Prieta Joint Union School District is a small school district in the Santa Cruz mountains, between Los Gatos and Santa Cruz. It includes two schools on a single campus: Loma Prieta Elementary School and C.T. English Middle School. The District serves about 500 students and employs about 30 teachers.

3.      Respondent began teaching mathematics and physical science in the District in fall 2012. Except for the assignment described below in Finding 46, respondent taught in the District's C.T. English Middle School.

4.      In February 2021, the District's Board of Trustees (Board) received a statement of charges against respondent from District superintendent Lisa Fraser, and voted to seek respondent's dismissal from employment. Respondent timely requested a hearing.

5.      In June 2021, the Board approved an amended statement of charges against respondent. The amended statement of charges alleges numerous incidents involving respondent and bearing on his fitness for continuing service. The District characterizes these incidents, separately or together, as cause under the Education

Code to dismiss respondent from employment for immoral conduct, for evident unfitness for service, and for persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools.

## Respondent's Education and Professional Experience

6.      Respondent grew up in the San Jose area. After graduating from high school in San Jose, respondent attended the United States Naval Academy.

7.      Respondent graduated from the Naval Academy in 2002, and served five years in the United States Marines.

8.      After completing his military service, respondent traveled extensively. He then decided to pursue a teaching career, and obtained the credential described above in Finding 1.

9.      Respondent started his teaching career with the Santa Clara County Office of Education. He taught mathematics in an alternative community school, and as a long-term substitute in Santa Clara County juvenile incarceration facilities.

10.     In the District, respondent's initial assignment was to teach mathematics and science in sixth grade. He also has taught mathematics to seventh-grade students. The evidence did not establish respondent's science assignments for the District in detail, but did establish that he taught at least one middle school science class each school year except for the 2018–2019 school year. Respondent coached C.T. English Middle School's wrestling team.

## Timeline of Investigations and Related Events

11.     In March and April 2018, respondent and the District garnered regional and national media attention because of conflict within the District and the community over a nationwide political event to draw attention to gun violence in schools.

12.     Some witnesses testified that they respected respondent's position in this conflict. Respondent testified, however, that most of his teaching colleagues disagreed with his position, and that several became very unfriendly to him as a result of the conflict and media attention. Respondent's visibility in the news media on this issue also caused him to receive hostile criticism through social media, both from people he knew in the community and from strangers.

13.     The District conducted an investigation into the conflict described in Findings 11 and 12. After this investigation, the District took no disciplinary action against respondent for his actions relating to this conflict.

14.     Also in late March or early April 2018, the Board received an anonymous letter making several serious allegations about respondent's behavior outside the school setting. Respondent believes that he knows who wrote the letter. He testified, plausibly although without corroboration, that the author is a community member who wished to damage his career and his reputation because of the conflict described above in Findings 11 and 12.

15.     Regardless of the author's motive, the allegations stated in the anonymous letter warranted investigation by the District. As described in greater detail in Findings 28, 29, and 71, below, the District's investigation of these allegations revealed evidence supporting some of the allegations. The investigation did not substantiate the letter's most serious allegations.

4

16.     At the end of the 2017–2018 school year, the District's former superintendent, Corey Kidwell, retired. Fraser became the District's superintendent beginning July 1, 2018, and Karren Zook became principal of the District's two schools.

17.     District administrators did not conclude that the investigation described in Finding 15 had revealed misconduct warranting respondent's dismissal from employment. In October 2018, Fraser delivered a letter to respondent summarizing what the investigation had shown, and warning respondent that further behavior similar to the substantiated allegations would result in disciplinary action.

18.     Respondent pressed Fraser during the 2018–2019 school year for further action or communication about the conflict described above in Findings 11 and 12, but Fraser told respondent that the District's Board members and administrators preferred not to "re-hash" that conflict. The evidence did not show that any District administrator raised further concerns with respondent about his on-campus or off-campus conduct during the 2018–2019 school year. In April 2019, however, respondent began an effort to obtain detailed public records from the District regarding the investigations described above in Findings 13 and 15, and this effort continued throughout the summer.

19.     On May 9, 2012, the Board adopted Board Policy 4119.21, concerning professional standards for employees. This policy, which was in evidence, was in effect during most of respondent's tenure with the District. In February 2020, the Board adopted revisions to Board Policy 4119.21, but the policy as revised was not in evidence.

20.     Zook retired as principal of the District's schools on June 30, 2020. Billy Martin replaced Zook as principal beginning July 1, 2020.

21.     The Board placed a local tax measure (Measure N) on the ballot for the November 2020 election. In December 2019, respondent had informed Fraser that he intended to oppose any such tax measure. Respondent was prominent in the campaign against Measure N, including by debating the measure in social media and by recording videos and releasing them through social media channels explaining his opposition to the measure. In mid-December 2020, certified election returns confirmed that Measure N had failed.

22.     Respondent's advocacy against Measure N drew negative reactions from some community members, including from at least one member of the Board. Respondent experienced these reactions chiefly through social media and through gossip. As described below in Findings 76 and 77, however, the District also received some complaints about respondent's teaching performance during this time from parents whom respondent understood to disagree with his position on Measure N.

23.     Respondent's wife ran for the Board in the November 2020 election. She was not elected.

24.     Soon after the November 2020 election, a Board member who had won re-election resigned. The remaining Board members voted to appoint a replacement, but respondent and some other members of the community advocated in early 2021 for the District instead to conduct a special election to replace the Board member.

25.     On February 22, 2021, because the Board had voted to seek respondent's dismissal from employment, District administrators notified respondent's students' families that respondent would be on leave for the rest of the 2020–2021 school year.

26.     In early March 2021, the District received statements in writing regarding the events described below in Findings 30 through 44. After investigation, the District

6

amended the statement of charges against respondent to allege those events as additional grounds to dismiss respondent from employment.

## Alleged Grounds for Dismissal

27.     As amended, the District's statement of charges against respondent includes allegations spanning about three years. The evidence at hearing did not address some allegations at all, and was not conclusive as to others. Any allegations that were in dispute at the hearing but that the Commission has not addressed explicitly in this decision were not proven by a preponderance of evidence, and did not affect the Commission's decision.

### FURNISHING ALCOHOL TO TEENS

28.     The anonymous letter described above in Finding 14 stated that respondent had served alcohol to at least three teenage boys during camping trips.[1] It also stated that respondent had "admitted to doing it one time."

29.     During the investigation described above in Finding 15, respondent repeated his admission that he had served alcohol to a teenage boy during a camping trip. The letter described above in Finding 17 referred to this admission, and warned respondent that "any further report of providing alcohol to a minor will result in

_____

[1] The letter described some such trips as having been "through CT English." This description was false. For many years, but never as a District activity, respondent has organized camping trips that sometimes include teens who attend without parents.

further corrective action up to and including criminal charges and/or possible termination of your employment."

30.    In April 2019, respondent organized a week-long group camping trip to Death Valley. About 30 people in total were in the group. Some participants were adult friends of respondent's family, who attended with their children. Ten or twelve of the participants were teens who attended without their parents.[2]

31.    The group had organized into several cars and trucks, with a trailer to haul food, water, and cooking and sleeping gear. In Death Valley, the trailer suffered serious damage to a "leaf spring" (part of its suspension). Respondent decided that he needed to obtain a replacement spring, and to repair the trailer, as soon as possible.

32.    Respondent asked four unaccompanied teens, all boys, to come with him on this errand, while the rest of the group continued on to a campsite in the remaining cars and trucks. These boys were M████ C█████████ (age 16), B██ F█████ (age 15), A█████ P███ (age 17), and J███ V████ (age 17).

33.    Earlier in the trip, before the trailer damage, respondent had chastised P███ and V████ for walking away from the rest of the group to smoke cannabis. They had brought cannabis on the trip despite respondent's explicit pre-trip instruction to

---

[2] Respondent stated that he maintains a "mailing list" about his trips, and several witnesses used the term "advertise" to describe how respondent distributed information about upcoming trips. The District does not allege that the trips themselves or respondent's general practices in organizing them (such as financial arrangements, insurance, safety protocols, or parental communications and permissions for unaccompanied minors) are cause for his dismissal.

them not to bring alcohol or other recreational drugs. Respondent waited until after the group had returned from Death Valley to tell P███'s and V███'s parents about their sons' misbehavior.

34.     Respondent explained several reasons for having chosen to take these boys along on the trailer repair mission, including that the remaining vehicles would not have space for them, and that he thought he might need their labor to make the repair. He also noted that because P███ and V███ already had disobeyed his reasonable instructions (as described in Finding 33), he did not want to foist responsibility for supervising them onto the trip's other adults.

35.     After making several telephone calls, respondent determined that the closest place to obtain a replacement leaf spring for the trailer would be in Las Vegas. He also learned, however, that the store would close for the day before he and the boys would be able to get there. Respondent decided to drive with the four boys to Las Vegas, spend the night in a hotel, buy the spring as soon as the store opened the next morning, and then return to Death Valley to repair the trailer.

36.     Respondent did not speak personally to any of the four boys' parents about their new itinerary. He testified that he asked the boys to call their parents on the way, to tell their parents where they were going.

37.     The group arrived in Las Vegas after dark. Respondent had reserved a single room for the group at a hotel on the Las Vegas Strip. Before they checked into the hotel, respondent stopped at a convenience store and bought a bottle of whiskey.

38.     The evidence did not establish that respondent purposely alerted any of the boys that he had stopped at the convenience store for alcohol. At the same time, P███ and V███ understood correctly that respondent had bought alcohol.

9

39.     When the group arrived in the hotel room, respondent took a shower. The boys took turns showering after respondent. Meanwhile, respondent served himself some whiskey and began either to watch television or to read from bed.

40.     After showering, C█████████ and F█████ got into sleeping bags and went to sleep. P███ and V████ did not go to bed right away, but neither C█████████ nor F█████ testified to having seen or heard what P███ and V████ did after showering and before going to bed.

41.     P███, V████, and respondent gave conflicting testimony about what they did next. According to P███ and V████, respondent allowed them to share his whiskey, and told them that they could leave the room to see the Las Vegas Strip as long as they returned within 30 minutes. According to respondent, he neither offered the boys whiskey nor left it where they could access it, and told them that they should not leave the room. None of this testimony is completely credible.

42.     P███ and V████ drank some of respondent's whiskey. The evidence did not establish that respondent encouraged them to drink it, or even that he knew that night that they had taken some. Nevertheless, after bringing whiskey to the hotel room, respondent took no effective steps to stop P███ and V████ from consuming it.

43.     P███ had never visited Las Vegas before. He and V████ told respondent that they intended to leave the hotel room whether or not respondent approved. They did leave, and spent between two and four hours exploring the Las Vegas Strip on foot. The evidence did not establish that respondent encouraged or even approved their leaving the room. Nevertheless, respondent did not inform P███'s or V████'s parents of their sons' plan, and he did not stop P███ and V████ from going out.

44.     P███ and V███ returned to the hotel room before dawn. In the morning, the group left the hotel, bought the leaf spring, returned to Death Valley, and repaired the trailer.

45.     P███ told his father a few days after returning from the trip that respondent had taken the boys to Las Vegas, and that P███ and V███ drank whiskey and then walked around the Strip unsupervised at night. P███'s and V███'s mothers later discussed the matter with one another and among their friends, and eventually brought it to the District's attention as described above in Finding 26.

### 2020–2021 7TH GRADE ALGEBRA COURSE

46.     During the 2018–2019 school year, the District assigned respondent to teach mathematics to fifth-grade students who were ready for more challenging mathematics instruction than the rest of their classmates. He taught these students during their regular class times, in groups separate from the rest of their classes.

47.     During the 2019–2020 school year, respondent continued teaching above-grade-level mathematics to some of his sixth-grade students, most or all of whom were the students he had taught in fifth grade during the previous school year. Until mid-March, respondent offered this enrichment through a combination of before-school meetings and work during their regular class, sometimes with a parent volunteer.

48.     In mid-March 2020, the District began using videoconference learning because of the COVID-19 pandemic. Respondent concluded that because remote

learning severely limited his instructional time with students,[3] and also interfered with his ability to separate students into small groups for focused work, he could not continue offering different in-class instruction to subsets of his sixth-grade mathematics students. Instead, until the end of the 2019–2020 school year, respondent taught these students in a separate videoconference class period.

49.     Remote instruction continued for the 2020–2021 school year. Respondent and some of these accelerated students' parents made several proposals to Martin and Fraser about how to serve these students in a videoconference setting without neglecting respondent's other students. Martin and Fraser deemed these proposals either impractical or inadvisable. The District began the 2020–2021 school year by placing these students in respondent's regular seventh-grade math course (Math 7, a pre-algebra curriculum), but encouraging them to undertake additional extracurricular math enrichment activities to prepare them to "test into a year-long Geometry course" for eighth grade.

50.     With respondent's assistance, a Los Gatos High School student who had been respondent's student during middle school set up a videoconference mathematics tutoring program for the 2020–2021 school year. They called this program the Mountain Math Initiative (MMI), and announced that respondent would teach an algebra course through MMI to interested students beginning August 31.

---

[3] Before the COVID-19 pandemic, respondent spent 270 in-person minutes each week with a class, over five sessions. Remote learning offered him and each class only 70 videoconference minutes together per week, in two sessions.

51.     Many if not all of respondent's accelerated seventh-grade students signed up for the MMI algebra course. Respondent did not use the District's videoconferencing or virtual classroom services for the MMI course, and he did not use students' District email addresses for day-to-day communication about the MMI course. He taught the course in the mid- to late afternoon, after the C.T. English Middle School instructional day had ended.

52.     Respondent told students who were in his C.T. English Middle School Math 7 course, and who also had signed up for the MMI after-school algebra course, that they did not need to attend both class sessions. He told these students, and their parents, that he would treat the students as having attended their videoconference C.T. English Middle School Math 7 class, even if they had not, if they attended the videoconference MMI class instead. He also told parents and students that students' participation and performance in the MMI algebra course would qualify them for full Math 7 credit at C.T. English Middle School.

53.     Martin struggled at the beginning of the 2020–2021 school year to communicate clear remote-learning attendance requirements to parents and students, and attendance-taking protocols to teachers. By mid-September 2020, however, Martin learned that respondent had given his students and their parents the messages summarized above in Finding 52.

54.     On September 9, 2020, Martin stated to respondent by email, "Students are still expected to adhere to school attendance policies set by current CDE [California Department of Education] guidance and are not to be directed to 'skip' their CT math courses if participating in MMI outside of school." On September 14, 2020, Martin told respondent by email, "A parent contacted me concerned that their student was told they do not have to attend their CT class if they are participating in the MMI program.

13

You and I talked in person about this. I just wanted to make sure this isn't a reoccurring issue."

55.     The issue recurred. On October 8, 2020, Martin told respondent by email that Martin had met with several parents about "current attendance/participation concerns," and had explained to those parents that

> 1. All students are required to attend the CTE [C.T. English] courses in which they are enrolled following current CDE guidelines;
>
> 2. All students are required to complete the work assigned to them by their CTE teachers during the course of their CTE classes;
>
> 3. Only work and assessments assigned through the course of CTE classes may count toward grades received at CTE;
>
> 4. Students intending to enroll in Geometry 8 are still required to receive an A/A- in Math 7 as a prerequisite;
>
> 5. Mountain Math Initiative is enrichment and cannot in any way supplant/replace CTE math courses;
>
> 6. Attendance in Mountain Math Initiative does not count as attendance for a student's CTE courses.

Martin also directed respondent to send Martin "a list of students with whom attendance at CTE may have been communicated as optional or who believe

participation in Mountain Math Initiative counts as attendance/participation for their CTE classes."

56.     Respondent did not send Martin any such list. Instead, he sent Martin a complete roster of his Math 7 students. Respondent also sent Martin a lengthy email response explaining why he intended to continue treating his MMI algebra class as equivalent to the C.T. English Middle School Math 7 class.

57.     Martin replied by reiterating to respondent on October 14, 2020, "I have been informed by several parents that their child has been told by you that they are not required to attend their CT math course if they are participating in Mountain Math Initiative and that the work done and the grade earned for that after school enrichment course will be applied to their CT math course. . . . This is the action I need to make clear is not acceptable practice."

58.     In mid-October 2020, respondent stopped teaching the after-school MMI algebra course. He continued teaching this course to the same students during the C.T. English Middle School instructional day. Rather than teaching these students during the regular twice-weekly Math 7 time period, however, respondent taught this algebra course three days per week, during a time the District had designated as "office hours" for teachers to meet with students individually or in small groups. He began using a District virtual classroom; but he did not use his District videoconference account for the class sessions, and he continued to communicate with students about the class using personal rather than school email addresses.

59.     Later in 2020, the District offered some seventh-grade students the opportunity to switch from respondent's Math 7 class into a C.T. English Middle School algebra class with a different teacher. Some, but not all, of the students to whom

respondent had been teaching algebra through MMI and later during his office hours made this switch.

60.     Respondent testified, credibly but tangentially, that he "was never directed to stop teaching algebra." As described above in Findings 54 through 57, however, Martin directed respondent clearly and repeatedly in fall 2020 to stop telling parents and students that respondent's extracurricular algebra course was a credit alternative to Math 7, and to stop treating the course as a Math 7 alternative. Nevertheless, until the District placed respondent on leave in February 2021, respondent continued to communicate to students and their parents that his office hours algebra course was equivalent, and alternative, to Math 7.

### REMOTE TEACHING DURING COVID-19 PANDEMIC

61.     On August 26, 2020, Fraser received a report by email suggesting that respondent was conducting in-person teaching for District students at one or more locations outside the District's schools. The email to Fraser stated,

> For older kids (usually 10+ unless accompanied by a
> parent), Kissner is organizing 3 Remote Wilderness School
> camps this fall . . . . "We will provide a structured time and
> place for school on each school day during school hours,
> with electrical power. All locations have strong verizon
> signal for hotspots. Plenty of outdoor activities for after
> school and on the weekends. We will also provide the food,
> shelters, evening campfire routine, opportunity for activities,
> etc. Priority is work and school during these trips—but it is

nice to work in these beautiful places and have so many

cool things to do when the homework is done!"

62.     Respondent acknowledged at the hearing having written and circulated the description that appeared within quotation marks in the email Fraser received. He testified that the remainder of the report to Fraser paraphrased his announcement, rather than quoting it. When Fraser received this report, however, she had no way, other than by asking respondent, to clarify what his announcement had said or what his remote teaching plans might be.

63.     Fraser emailed respondent to ask these questions. Her email noted that respondent appeared to be planning group travel "in conflict with regular school hours for kids and contracted hours of employment for you, which could pose a variety of complex issues if this is accurate." She asked respondent promptly to "provide a description of the proposed activities you have planned during school hours such that we can properly evaluate the legality of your proposition from a district standpoint and to provide you with advice and counsel such that you are protected from personal liability as well."

64.     In answer, respondent did not provide any such description. Instead, he stated simply that he would not "share details" about his "private life" with Fraser.

65.     Fraser provided a further memorandum to respondent regarding this issue on August 28, 2020. Her memorandum advised respondent that the Board's pandemic school plan gave him "no permission nor the authority to conduct an out-of-area, in-person learning cohort which violates state and public health department regulations." She also stated that "[t]aking **some** students out of the state during school hours for unsanctioned learning activities that are clearly inaccessible to your

other students creates a whole host of instructional inequities that the district will not endorse" (emphasis original).

66.     On November 3, 2020, Fraser and Martin received a further report by email to the effect that respondent was "planning another lengthy (3 week) trip in November." Fraser sent respondent another memorandum on November 5, 2020, about these activities. It stated that the District was "not requiring you to cease such activities, but rather to closely review and provide written responses to the issues raised herein." The memorandum listed 20 questions about respondent's plans, and asked him "to promptly provide us with information" answering the questions. The questions were detailed, and reflected then-common public health anxiety about COVID-19. In substance, however, the questions were reasonable.

67.     Respondent did not answer any of Fraser's questions clearly. Instead, his response by email on November 7, 2020, stated,

> Thank you for your email outlining your concerns. I am confident that

> • I have been—and will continue to—fully meet (and exceed) my professional obligations equitably to all my students.

> • Nothing about my physical location or the people that happen to be in my vicinity have any impact on my performance of my professional duties.

> • There is nothing about my physical location or the people that happen to be in my vicinity that has anything to do with the district.

> • I am not in violation of any laws or district policies.

18

68.     Respondent testified to the Commission that he organized three group camping trips during fall 2020 during which he taught his District classes from a tent. Each trip included one or more other families, and two of the three trips included high school students who attended without any parent. Respondent testified that no trip included any District students who attended without their parents, but that at least one trip included District students who traveled with one or both of their parents. During the school day, respondent's wife and other adults on the trip supervised and assisted any students in their school activities.

69.     Respondent also testified that he regrets having given Fraser such terse answers to her questions, and believes in hindsight that he should have been more forthcoming in addressing her concerns. He also testified, however, that at the time he considered his remote teaching plans to be "none of Ms. Fraser's business."

70.     The evidence did not establish that respondent's camping trips caused him to neglect or to fail in any of his duties as a District employee. The evidence also did not establish that respondent taught any District student in person on any camping trip, while teaching other students by videoconference. Finally, the evidence did not establish that respondent represented to anyone, or that anyone actually believed, that the District had endorsed his trips or that he was offering supervision to children in his capacity as a District employee.

## RESISTANCE TO SUPERVISION

71.     The October 2018 letter described above in Finding 17 advised respondent that some of the allegations the District had investigated and found true

reflected "either a lack of professional boundaries or questionable teaching practices."[4] It also advised respondent to be mindful of the possibility that parents or children could misperceive his mentorship as inappropriate sexual interest, and offered "a list [from the National Education Association] of common-sense pointers for avoiding false allegations which you may be wise to review and consider in your future interactions with youth."

72.    Respondent himself testified, credibly and reasonably, that he took great offense to the implication that his commitment to teaching and mentoring teens reflects sexual interest. Yet rather than considering Fraser's advice about avoiding even the appearance of impropriety, respondent answered her October 2018 letter with a four-page, single-spaced memorandum insisting that he always maintained appropriate boundaries, that he intended to change nothing about his behavior, and that every aspect of the anonymous letter and the District's resulting investigation was "the very definition of a witch hunt."

73.    After October 2018, respondent repeatedly invoked the spring 2018 political controversy and anonymous letter, and the resulting investigations, in response to Zook's, Martin's, and Fraser's efforts to investigate complaints or concerns about his activities. For example,

---

[4] Respondent admitted, for example, having offered a "binder clip" to a middle school boy who had asked permission to leave class to use the restroom. Respondent did not say that he had told the boy directly to put the clip on his penis, but acknowledged that he had intended "subtle innuendo."

a.      Respondent relied on these past conflicts in declining to provide information to Fraser relating to the complaint described below in Finding 81. He reiterated these objections in a memorandum on April 3, 2020, stating "Superintendent Fraser did not have the benefit of hearing from me on this matter because I refused to participate in her inquiry."

b.      Respondent relied on these past conflicts in declining to provide information to Zook relating to the complaint described below in Finding 82. He reiterated these objections in a memorandum on April 3, 2020, stating "Principal Zook did not have the benefit of hearing from me on this matter because I refused to meet with her to discuss it."

c.      On January 19, 2021, respondent answered email from Martin asking again about respondent's office hours algebra class by stating "I do not participate in any district-led investigations or inquiries based on the district's history of abusing this process and failure to address the issue. Your inquiry fits in this category."

74.     In fall 2020, respondent recorded and released on social media a 37-minute video urging viewers to vote against Measure N. He spent much if not most of the video's duration explaining his continuing unhappiness about the spring 2018 political controversy, the anonymous letter, and the resulting investigations, and reiterating his unwillingness to put those conflicts to rest.

75.     The matters stated in Findings 42, 43, 52, 56, 58, 60, 64, 67, 69, and 72 through 74, as well as respondent's presentation to the Commission, confirmed that neither respondent's behavioral patterns nor his views about the District's authority to advise or supervise him have changed since October 2018.

21

**PANDEMIC GRADING**

76.     During fall 2020, some of respondent's students' parents complained to him and to Martin that respondent had not provided timely feedback to students on their class performance.

77.     At the hearing, respondent characterized all of these parents as community members who disagreed with his political positions, and in particular with his position on Measure N. No non-hearsay evidence either corroborated or refuted respondent's belief about these parents' political opinions, or his belief that political disagreement rather than educational concern had motivated their complaints.

78.     Respondent replied to some of these parents about their concerns. He told one parent that he was "tardy" in updating students' grades because he also was busy "answering insane amounts of emails, and [doing] other time-consuming admin tasks like attendance that take all day." He also blamed some students' poor work habits for his inability to give the students timely feedback. These answers were unprofessional in tone, because they deflected parents' concerns about respondent onto students and onto District administrators.

79.     Many of respondent's colleagues also struggled somewhat to adapt to remote learning, particularly during the first half of the 2020–2021 school year. The evidence did not establish that respondent's grading timeliness during this period was notably worse than that of his colleagues.

**OTHER EVENTS ALLEGED AS GROUNDS FOR DISMISSAL**

80.     On September 8, 2020, respondent sent email to his students through their school email accounts, giving notes and tips about how he planned to use

remote learning resources during that school year. The email included an announcement about an "online after school homework center," with a link to a website describing MMI. Respondent had not shown this announcement to Martin before sending it, and had not received permission to send information to students through their school email accounts about a service the District had not screened or approved.

81.    In November 2019, a parent complained to Fraser that respondent had referred, in front of her child and a few other students, to an Asian-ancestry student's "slitty eyes." Fraser investigated this complaint; but as noted above in Finding 73.a, respondent refused to speak to her about it. Respondent denied at the hearing ever having used this phrase, and no non-hearsay evidence established that the parent's report was accurate.

82.    In March 2020, a school staff member reported to Zook that a student had complained about respondent to the staff member. The staff member understood that respondent had displayed anger to the student, in front of other students, by pounding a table with his fist and using profanity. Zook investigated this complaint; but as noted above in Finding 73.b, respondent refused to speak to her about it. Respondent acknowledged at the hearing having criticized the student on this occasion, but denied having pounded his fist or used profanity. Because the Commission received no other first-hand testimony about the incident, the evidence was inconclusive as to whether respondent's behavior on this occasion was or was not professionally appropriate.

83.    In late January 2021, one of respondent's students' parents sent email to respondent, Martin, and Fraser about stories respondent had told, and that the parent feared respondent might continue to tell, to the parent's son. The parent, an officer in

23

the United States Air Force, was preparing for an overseas deployment, and wished to avoid having his son hear stories about "Afghanistan, combat, or the military" at school. Although the parent's email stated that the parent had spoken with respondent during fall 2020 about respondent's "sharing stories of his personal experience with Afghanistan combat fatalities in the classroom," respondent testified that he had not told his class any such stories. The evidence did not establish whether respondent had told his students stories during the 2020–2021 school year about military fatalities in any country, or if so in what context and with what detail.

84.     When the District initiated the investigation described above in Finding 15, it directed respondent to "maintain the confidentiality of both the fact of and information concerning" the investigation. Although many community members became aware of the investigation, the evidence did not establish that respondent violated the District's confidentiality directive.

## Additional Evidence

85.     The Commission heard evidence about several matters that were material to its decision, although the District did not allege them as grounds for respondent's dismissal.

### FALSE STATEMENTS AND TESTIMONY

86.     The District does not allege that the incidents summarized above in Findings 28 and 29 and below in Findings 87 through 93 constitute cause for respondent's dismissal. Respondent volunteered testimony about these incidents, however. This testimony was emphatic, detailed, and in key respects false.

24

87.     The incident in which respondent admitted having given alcohol to a minor occurred during a camping trip in July 2016 that respondent had organized through his church. Fifteen-year-old A███ W███ participated in the trip. Neither of W███'s parents accompanied him.

88.     W███ had been respondent's student, and he also had gone on one or more previous camping trips with respondent. W███'s mother, H███ O███, is a teacher with the District.

89.     During the trip, respondent and several teenage participants took an overnight backpacking excursion. Respondent testified that he asked W███ to lead some of the other, younger hikers and that W███ did so successfully. W███ testified that he did not take any special role during the hike.

90.     When the backpacking group arrived at its campsite, most of the group decided after the evening meal to walk a short distance away to explore a nearby abandoned cabin. Respondent and W███ stayed behind.

91.     Respondent testified that as he and W███ relaxed at the campsite near a campfire, respondent poured himself a modest amount of whiskey. He congratulated W███ on his leadership during that day's hike, and offered W███ a sip of whiskey from his cup as a toast. W███ accepted it, and respondent did not offer W███ more, either that night or on any other occasion.

92.     W███ testified that as he and respondent relaxed at the campsite near a campfire, respondent poured himself some whiskey and also offered to pour some into W███'s own cup. W███ accepted the whiskey and drank it. Respondent then offered W███ a refill, which W███ accepted and drank. When respondent offered W███ a second refill, W███ declined, and excused himself to sleep.

25

93.   W███ also testified that later in the same trip, at a different campsite in the morning, respondent added something "minty" to W███'s hot chocolate. W███ believed the addition included alcohol, in part because respondent told W███ not to let the other youths know that respondent had added the substance to W███'s cup.

94.   When W███ returned home from the trip, he did not immediately mention the campfire whiskey or the spiked hot chocolate to his parents. Later, when he discussed the matter with his mother, he downplayed the incidents.

95.   O███ also testified. She stated that she heard first from respondent's pastor about the possibility that respondent had offered her son alcohol during the July 2016 camping trip.

96.   O███ spoke to W███ about the pastor's report, and understood W███ to have told her that respondent had offered him only a sip of alcohol. Later, without W███'s knowledge, O███ attended a meeting involving respondent and the pastor in which they discussed the incident. According to O███, respondent grudgingly endorsed her description of her son's account, agreeing that he had given W███ a sip of alcohol as they sat by a campfire and apologizing for his poor judgment. O███ does not recall respondent's offering any independent account of the incident during that meeting.

97.   O███ considered the matter closed after her meeting with respondent and the pastor. During the District's investigation into the spring 2018 anonymous letter described above in Finding 14, however, the investigator contacted her for information about her son's July 2016 experience. O███ confirmed the information she had learned in 2016 from her son and from respondent. She and W███ both

testified that W█████ was in poor mental health during 2018 and that he did not wish to offer further information to the District's investigator at that time.

98.     Respondent contends that W████'s testimony to the Commission embellished the incident, and that discrepancies between W████'s testimony in 2021 and the stories he told his mother in 2016 confirm that W████'s earlier description was true. Rather than undermining W████'s credibility, however, these discrepancies reflect W████'s improved mental health and his adult maturity. The evidence did not establish that W████ spoke to any adults outside his family in either 2016 or 2018 about respondent's offering him alcohol in July 2016, and it did establish that he felt conflict and shame about the incident when it occurred and for some time afterward. As between W███'s testimony about this incident and respondent's, W███'s testimony is more credible.

99.     Respondent also contends that O████ exaggerated his culpability in this incident, and encouraged her son and others to give false information to District administrators and to the Commission, because of her extreme animosity toward him arising from the political conflict described above in Findings 11 and 12. O████ testified, in contrast, that she holds no special animosity toward respondent because of that political conflict. Instead, her dislike for respondent stems from her understanding that he offered alcohol to her vulnerable son in July 2016, and from her perception that respondent continues to minimize this conduct's wrongfulness.[5] In

---

[5] On several occasions, including in his testimony to the Commission, respondent has characterized his error with respect to W████ as a mistake akin to a traffic infraction.

light of all the evidence in this matter, O████'s testimony about her own motivations is credible, and respondent's is not.

100.    Respondent gave W████ more than a single sip of whiskey at the campfire, and he also gave W████ alcohol on a later morning. On neither occasion did respondent offer W████ alcohol to celebrate a milestone or an unusual success. Instead, respondent served W████ alcohol casually, as if W████ were an adult peer. Respondent's testimony, as summarized in Finding 91, is false.

101.    In response to the District letter described in Finding 14, respondent stated falsely that he had given a minor "a single sip of an alcoholic beverage as a toast after a significant outdoor achievement." Likewise, several witnesses aside from respondent testified that respondent had told them about giving W████ alcohol in July 2016, in terms that were essentially identical to his false statement to the District and his false testimony to the Commission. Some of these witnesses testified specifically that the incident, as they understood it, did not reflect poorly on respondent because it seemed so minimal.

102.    Respondent testified that W████ was the only teen to whom respondent ever has offered alcohol during a camping trip. The Commission heard additional evidence to the effect that respondent had served alcohol to a second teen during the same July 2016 trip. This evidence was inconclusive.

## BOARD POLICY 4119.21

103.    During her tenure as District superintendent, Fraser caused the Board to amend and update many of its adopted Board Policies. She did so generally to ensure that these policies reflected current professional norms.

104.    As adopted on May 9, 2012, Board Policy 4119.21 called for District employees to behave in a manner that would "enhance the integrity of the district and advance the goals of the district's educational programs." It required employees to "exercise good judgment and maintain professional standards and boundaries when interacting with students both on and off school property." As examples of inappropriate conduct, Board Policy 4119.21 listed "engaging in harassing or discriminatory behavior" and "furnishing tobacco, alcohol, or other illegal or unauthorized substances to a student."

105.    At its meeting on February 12, 2020, the Board considered and adopted amendments to Board Policy 4119.21. The Board's printed agenda summarized this action item as, "review the current Board policy to align with current California School Boards Association board Policy." The Board adopted the revised policy, but the evidence did not establish whether the revisions affected any of the statements summarized above in Finding 104.

106.    At the same February 12, 2020, meeting, the Board also adopted or revised several other policies that revised Board Policy 4119.21 cross-referenced, including a "Code of Ethics" and policies about "Firearms on School Grounds," "Employee Security," and "Bullying." These other policies were not in evidence.

**TEACHING SKILL**

107.    The Commission received testimony from several parents who stated credibly that respondent taught and mentored their children very effectively. Some of these parents' children were among the accelerated mathematics students who respondent taught beginning in fifth grade. One parent testified, however, that her child was in the same grade as the accelerated mathematics students but was not

among them. That parent and her child believed that separating the accelerated students for instruction also benefited the other students, because it created better opportunities for respondent to teach all students at their appropriate levels.

108.    On September 10, 2020, Martin observed one of respondent's videoconference classes. He believed that respondent interacted well with students. Martin sent respondent email after that observation stating that respondent had shown "astounding" patience, and great skill both in complimenting students' correct answers and in identifying students' mistakes without undermining their confidence.

## LEGAL CONCLUSIONS

1.    The District bears the burden in this matter of proving facts and circumstances constituting cause under the Education Code for respondent's dismissal. A preponderance of the evidence must prove these facts and circumstances. (*Gardner v. Commission on Professional Competence* (1985) 164 Cal.App.3d 1035, 1038-1039.)

2.    The Commission has considered all testimonial and documentary evidence, and weighed all witnesses' credibility, in making the factual findings above. These findings reflect a preponderance of the evidence.

## Cause for Dismissal

3.    The District alleges three statutory causes for respondent's dismissal: immoral conduct (Ed. Code, § 44932, subd. (a)(1)), evident unfitness for service (*id.*, subd. (a)(7)), and persistent violation of, or refusal to obey, reasonable regulations prescribed by the Board (*id.*, subd. (a)(8)).

**PERSISTENT VIOLATION OF REGULATIONS**

4.      The only Board-adopted regulation in evidence was Board Policy 4119.21, as it existed between May 2012 and February 2020.

5.      Board Policy 4119.21 forbids District employees from offering alcohol to students, but the matters stated in Findings 30 through 44, 87 through 93, and 102 do not establish that respondent ever offered alcohol to a District student.

6.      Aside from its few specific examples, Board Policy 4119.21 makes extremely general references to professionalism and integrity, as summarized in Finding 104. The matters stated in Findings 45 through 84 do not constitute persistent failure or refusal by respondent to follow these vague standards.

**IMMORAL CONDUCT**

7.      The Education Code further defines "immoral conduct" as "including, but not limited to, egregious misconduct." (Ed. Code, § 44932, subd. (a)(1).) Courts have interpreted this term to mean conduct "indicative of corruption, indecency, depravity, [or] dissoluteness," as "shameless conduct showing moral indifference to the opinions of respectable members of the community," or as "an inconsiderate attitude toward good order and the public welfare." (*Palo Verde Unified Sch. Dist. v. Hensey* (1970) 9 Cal.App.3d 967, 972.)

8.      The matters stated in Findings 28 through 84 do not constitute immoral conduct within the meaning of the Education Code.

31

## EVIDENT UNFITNESS FOR SERVICE

9.      The Education Code authorizes a school district to dismiss a permanent certificated employee who is "clearly not fit, not adapted to, or unsuitable for teaching, ordinarily by reason of temperamental defects or inadequacies." (*Woodland Joint Unified Sch. Dist. v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1444.) Such evident unfitness may exist, for example, when a teacher is repeatedly and incurably insubordinate, or is incapable of maintaining cordial, cooperative relationships with colleagues. (*Id.*, at pp. 1436-1440.)

10.     The Commission must evaluate "unfitness," in this context, with reference to several criteria, including likelihood and degree of adverse impact on students and fellow teachers, proximity or remoteness in time of the relevant conduct, extenuating or aggravating circumstances, praiseworthiness or blameworthiness of the teacher's motives, and likelihood of recurrence. (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 229-230.) In addition, the Commission must evaluate whether the conduct demonstrating unfitness "is caused by a defect in temperament." (*Woodland, supra*, 2 Cal.App.4th at p. 1445.) In light of the matters stated below in Legal Conclusions 11 through 19, the conduct described in Findings 30 through 44 (taking four teens to Las Vegas and failing to supervise them properly), 51 through 69 (refusing to follow Martin's and Fraser's directives, and teaching a course that was not in the District's curriculum), 71 through 75 (resisting both supervision and cooperation), and 78 (communicating unprofessionally with parents) establishes respondent's evident unfitness for service.

## Adverse Impact on Students and Fellow Teachers

11.     The matters stated in Findings 33, 36, 42 and 43 threatened adverse impact to C██████, F█████, P███, and V████, and especially to the latter two. In addition, the matters stated in Findings 52 through 60 threatened significant adverse impact to students, who risked missing credit for a key course. The matters stated in Findings 61 through 69 confirm that respondent brushed off warnings from Fraser regarding potential adverse effects on students from his "remote wilderness school camps." Finally, the matters stated in Findings 11, 12, 21, 22, 24, 25, 45, 74, and 78 show that respondent became notorious in the District's small community because of his behavior, undermining his ability to cooperate with fellow teachers and with District administrators to serve students.

12.     Although the evidence did not show actual, serious harm to students from respondent's behavior, the evidence overall showed that respondent created serious risks of such harm. Moreover, the rancor evident before the Commission did reflect damage to the District's educational community, and the matters stated in Findings 11, 12, 18, 21, 22, 24, 25, 74, and 78 show that respondent's conflict-seeking behavior was a significant cause of that damage.

## Proximity or Remoteness in Time

13.     The matters stated in Findings 30 through 44, 51 through 69, 71 through 75, 78, and 98 through 101 confirm that conduct showing respondent's unfitness continued until and even after his suspension from duty.

33

## Extenuating or Aggravating Circumstances

14.     The COVID-19 pandemic was both an extenuating and an aggravating circumstance in this matter. On the one hand, and as shown in Findings 48, 49, 53, and 79, the pandemic disrupted previous teaching practices and forced the entire District community to adapt and compromise. On the other hand, and as shown in Findings 51 through 69, respondent's steadfast refusal to share information with Fraser and to follow Martin's instructions exacerbated uncertainty and anxiety for Fraser and Martin as well as for parents and students.

15.     Respondent's dishonesty, as summarized in Findings 91, 100, and 101, is a significantly aggravating circumstance in this matter.

## Respondent's Motives

16.     The matters stated in Findings 46 through 50 confirm that respondent established his 2020–2021 algebra course with praiseworthy motives. More generally, the matters stated in Findings 46 through 50, 107, and 108 revealed respondent's sincere interest in teaching well, and also in mentoring adolescents outside the classroom.

17.     The matters stated in Findings 18, 52, 56, 58, 60, 64, 67, 69, and 72 through 75, however, reflect respondent's insistence on prolonging conflicts, and his refusal to accept partial victories. These motives are blameworthy.

## Likelihood of Recurrence

18.     The matters stated in Findings 72 through 75 confirm that if the District retained respondent as a teacher, respondent would continue to stoke conflict within

34

the District and to resist any efforts by District administrators to control or supervise his teaching.

### Temperament

19.    As summarized in Findings 69, 72, 100, and 101, respondent expressed minimal remorse before the Commission for any of the conduct showing his unfitness for service. To the contrary, and as summarized in Findings 14, 56, 74, 77, 98, and 99, and in Legal Conclusions 20 through 23, respondent presented himself to the Commission as someone who deserves respect for his moral courage but who instead faces persecution. These matters, all together, make respondent's unfitness evident.

## Retaliation for Constitutionally Protected Activities

20.    Respondent contends that the District's effort to dismiss him from employment constitutes unlawful retaliation against him for exercising his rights under the California and United States Constitutions to express his personal views and to participate in his community's political life.

21.    Respondent contends specifically that the Board revised Board Policy 4119.21 in February 2020 to target him for dismissal. The matters stated in Findings 19 and 103 through 106, and in Legal Conclusion 6, do not support this contention.

22.    As additional support for his retaliation defense, respondent identified many examples that he characterized as acts by community members and by fellow District faculty members arising from their hostility to respondent's views and political positions. Because such examples, if true, might undermine these people's credibility, the Commission has addressed credibility where relevant. Such examples would not establish unlawful retaliation against respondent by the District itself, however,

because every community member and District faculty member has the same personal rights respondent has to state opinions and to petition government agencies for action. Whether wise or unwise, respondent's neighbors and colleagues have the right to express disagreement or disrespect to respondent on social media or to his face; to ignore or even to criticize him in faculty meetings; and to ask the District to dismiss him because of real or imagined deficiencies in his performance or his character.

23.     Respondent also contends that Board members and administrative staff have displayed animus toward respondent because of his political opinions and activities, and that this animus proves that his dismissal from employment would constitute unlawful retaliation against him for exercising his right to free speech and political participation. This contention ignores two key protections the Education Code gives respondent.

a.     First, the District cannot dismiss respondent unilaterally. Rather, under Education Code sections 44943 and 44944, because respondent requested a hearing, this Commission—comprising by law persons who have no prior relationship with respondent, with the District's administrators and elected officials, or with the events at issue—must decide whether or not the District should dismiss respondent from employment.

b.     Second, under Education Code section 44932, this Commission may direct the District to dismiss respondent only if statutory cause exists to dismiss him, and not otherwise. As with community members and fellow faculty members, Board members' and administrators' animus toward respondent, if proven, might have affected their credibility before the Commission. Any such animus did not prevent the Commission's finding cause to dismiss respondent, however.

36

24.     Although the Commission has found cause to dismiss respondent, the Commission has discretion to decline to dismiss him. (*Fontana Unified Sch. Dist. v. Burman* (1988) 45 Cal.3d 208, 222.) Respondent's contention that his dismissal would constitute unlawful retaliation against him is most relevant to the Commission's exercise of this discretion.

25.     The totality of evidence in this matter does not establish an effort by the Board or by District administrators to discipline or to dismiss respondent because of his opinions or his political activity. To the contrary, all evidence in this matter shows that after significant conflict within the District in March and April 2018, the District in October 2018 offered respondent the opportunity to save face and move on. Respondent emphatically rejected this opportunity. Instead, between October 2018 and the hearing, respondent made repeated efforts to reopen and revisit the 2018 conflicts. He also responded to new potential and minor conflicts by amplifying them into major conflicts; he became increasingly insubordinate and uncommunicative regarding school activities, even during the novelty and uncertainty of the COVID-19 pandemic; and he continued to exercise very poor judgment outside school in circumstances involving his supervision of teenagers.

26.     The Commission finds the matters stated in Findings 30 through 44, 51 through 69, 71 through 75, and 78, and in Legal Conclusions 9 through 19 to justify respondent's dismissal from employment regardless of his opinions or his participation in political activity within the District.

27.     The Commission does not direct the District to dismiss respondent from employment to punish him, or to retaliate against him for having exercised his rights to express his opinions and to participate in the community's political life. The Commission directs the District to dismiss respondent from employment because a

37

preponderance of the evidence before the Commission establishes his evident unfitness to continue teaching District students.

## ORDER

Respondent David Kissner is dismissed from his position as a permanent certificated employee of the Loma Prieta Joint Union School District due to evident unfitness for service.

DATE:  12/07/2021

*Juliet C. Cox*

JULIET E. COX

Commission Member

Administrative Law Judge

Office of Administrative Hearings

DATE:  12/06/2021

*Katherine E. Everett*
Katherine E. Everett (Dec 6, 2021 09:19 PST)

KATHERINE EVERETT, ED.D.

Commission Member

DATE:  12/07/2021

*Scott Guagliardo*
Scott Guagliardo (Dec 7, 2021 12:33 PST)

SCOTT GUAGLIARDO

Commission Member

# COMMUNITY FORUM THREAD

01054547.WPD

/ 📧 Topics (https://95033talk.groups.io/g/main/topics?p=,,,0,0,0,0)  /  💬 Kissner dismissal                          🔍

🔇 Mute This Topic (https://95033talk.groups.io/g/main/ft/88363249?csrf=8127475784339833671&mute=1&p=Created%2C%2C%2C20%2C1%2C0%2C0)

## Kissner dismissal        Date ⌃ (https://95033talk.groups.io/g/main/topic/88363249?p=Created%2C%2C%2C20%2C2%2C0%2C0)

 Allan Hessenflow (/g/main/profile/166517)          Jan 11 🔗 (https://95033talk.groups.io/g/main/message/121744)

Here is the decision from the Kissner administrative hearing.

Allan



Kissner_OAH_Decision.pdf
(https://95033talk.groups.io/g/main/attachment/121744/0/Kissner_OAH_Decision.pdf)

↩ Reply                          👍 Like                          ☰ More

Barry                              Jan 11 🔗 (https://95033talk.groups.io/g/main/message/121746)

Hint: Scroll down to the bottom for the GOOD news...

Show quoted text

↩ Reply                          👍 Like                          ☰ More

shoeguy95033 (/g/main/profile/166676)          Jan 11 🔗 (https://95033talk.groups.io/g/main/message/121749)

TLDR. Cliff Notes? Sorry.

↩ Reply                          👍 Like                          ☰ More
👍 1 person liked this

 Marc B

Jan 11 🔗 (https://95033talk.groups.io/g/main/message/121754)

Larry,

Thanks for the PM insinuating something negative about my character.

From what I have experienced your heart is in the right place and you are more than generous with your time and efforts to assist those who need a hand in the mountains.

I have a different opinion of David than those who are most vocal here.  That opinion is based in fact and several years of interaction with David and the positive influence he had on my son and family.  To watch you and others publicly gloat and revel in this whole mess from behind a keyboard is simply sad in my opinion.

Show quoted text

↩ Reply                                    👍 Like                                    ≡ More

 Mark Vande Pol

Jan 11 🔗 (https://95033talk.groups.io/g/main/message/121755)

Since its inception, the primary purpose of public education as a system has been to groom children (since%20its%20inception) The real question is: groomed to what end?  The above link is to a simply fascinating history betraying the true purpose of instituting public education as a project of the richest people in the world to raise generations of a controllable demos.  Nor is that the only such source available (https://archive.org/details/JohnTaylorGattoTheUndergroundHistoryOfAmericanEducationBook).
What the public infers to be the ultimate goals of the system is where people get all crossed up in definitions of terms and the claim that set intersection is equivalent to set identity (false equivalence being the bane of rhetoric).  Would that *The Trivium (https://archive.org/details/triviumliberalar0000miri)* was a core element of secondary education as it once was.
M

Show quoted text

↩ Reply                                    👍 Like                                    ≡ More

 Niall Gallagher (/g/main/profile/@niallg)

Jan 11 🔗 (https://95033talk.groups.io/g/main/message/121756)

Thanks Allan for your regular updates on this matter.

↩ Reply                                    👍 Like                                    ≡ More

Les Niles (/g/main/profile/157142)

Jan 11 🔗 (https://95033talk.groups.io/g/main/message/121757)

Regardless of what one thinks of David Kissner, his politics, his judgement in supervising adolescents, or his behavior as an employee, he is not a sexual predator. Absolutely not.  I would stake my own reputation on that.  To suggest that he is based on these documents is a ridiculous leap, and in this case wholly unfounded.

  -Les

Show quoted text

On 11 Jan 2022, at 19:24, Larry McVoy <lm@...> wrote:

Summary because I read it all looking for this:

Respondent David Kissner is dismissed from his position as a permanent
certificated employee ... due to evident unfitness for service.

Finally, seems like what should have happened happened. And I say
this as a dude that thought he was wrongly accused, then I learned
more, and yeah, f*ck that guy, he's someone who was grooming kids.
I can't prove that but all the evidence points that way.

The vast majority of teachers are awesome, they love their kids,
they spend their own money on class supplys, they protect those
kids from crazy helicopter parents, or abusive parents, teachers
rock. And should get paid more.

Kissner guy was a train wreck waiting to happen.

On Tue, Jan 11, 2022 at 04:33:16PM -0800, Allan Hessenflow wrote:
Here is the decision from the Kissner administrative hearing.

Allan

Attachments:
Kissner_OAH_Decision.pdf: https://groups.io/g/95033talk/attachment/121744/0
(https://groups.io/g/95033talk/attachment/121744/0)

<https://groups.io/g/95033talk/attachment/121744/0 (https://groups.io/g/95033talk/attachment/121744/0)>

--
---
Larry McVoy lm at mcvoy.com http://www.mcvoy.com/lm (http://www.mcvoy.com/lm)

<http://www.mcvoy.com/lm (http://www.mcvoy.com/lm)>

↩ Reply                    👍 Like                    ☰ More



Nell Griscom

Feb 2 🔗 (https://95033talk.groups.io/g/main/message/122247)

Thank you, Leah, that's very forthright of you and difficult to do.
Nell

Show quoted text

--
Nell Griscom
Summit Woods

Be kind!

↩ Reply                                    👍 Like                                    ☰ More
👍 2 people liked this

leahjrogers@...

Feb 16 🔗 (https://95033talk.groups.io/g/main/message/122553)

I understand that David Kissner is still texting and calling kids privately and he has a bike ride with kids and people who seem to not know he is being investigated for a crime committed December 2021 scheduled for Saturday 2/19/22 and more camping trips scheduled through a co-run with Dean and Lila's organization The En Gedi Project.

Stacy has blocked and unfriended most everyone on the mountain and as of today when I was reached out to by the detective neither Stacy nor David Kissner have spoken to the Detective. I feel David and Stacy Kissner can clear this matter up pretty quickly by talking to the police instead of hiding and using kids.

I believe as a parent and community member and someone that has supported the Kissners for years that until David Kissner talks to the detective and the criminal investigation is closed this community needs to be actively protecting and supporting the children, youth and young adults affected by this situation.

↩ Reply                                    👍 Like                                    ☰ More
👍 2 people liked this

Christine Blasingame

Feb 16 🔗 (https://95033talk.groups.io/g/main/message/122554)

It's sickening. I was really torn until this latest event. I really hope these people, letting their kids near him, wake up before it's to late.

Show quoted text

--
Warmly,
Christine Blasingame

↩ Reply                                    👍 Like                                    ☰ More
👍 2 people liked this

on Wednesday about why it laid off or fired Kissner, or to the
complaint filed Wednesday. The district brought in facilitators after
controversy erupted over the grades. And some parents and students
showed up at a school board meeting demanding to know why he was
fired.

In a series of events starting in March 2018, Kissner told students he
was giving a quiz on the same day and at the same time as the March 14
National Student Walkout against gun violence. Kissner gave three
students failing grades on a quiz after they left class to join a
walkout aimed at bringing attention to gun violence after the Parkland
school shooting.

Kissner has stood firmly behind his decision to give the kids failing
grades, and in his opinion the school district and administrators
violated his constitutional rights to free speech.

In an interview Wednesday, Kissner said he didn't have a problem with
students wanting to politically express themselves, but takes issue
with the school district supporting students to take a side on the
"political controversy of gun violence."

"They can protest, it's not a matter of debate," he said, adding,
"Wouldn't any student expect that if they walked out of class it would
affect their grade?"

In the interview, Kissner said he was not surprised by the district's
move to lay him off in April, or fire him in December last year. The
district placed Kissner on paid leave in May 2021. He never returned
to the classroom.

"It was kind of expected in the years running up to it," Kissner said.
"We're in the business of education. One important question to ask is:
What are we teaching our kids? We know there's difference of opinion,
and kids are seeing people in power create reasons to get rid of
opposition."

Kissner's suit claims the district violated his civil rights on
political issues, and defamed him after he became the subject of
accusations of grooming, or sexually abusing minors, at the school.
Kissner denied the claims, and called the accusations "atrocious" and
"politically motivated."
"It's the worst thing that anybody could do to somebody else," he said.

"These charges were outrageous and resulted in the permanent loss of
his standing in the community, which he was forced to leave," his
lawsuit adds.

His attorney, Bill Becker, president and chief counsel for Freedom X,
a Los Angeles-based nonprofit public interest law firm protecting
conservative freedom of expression, said the main thrust of moving
forward with the lawsuit is that Kissner "was retaliated against by
the school district for taking a position it didn't like."

"And it divided the community," Becker said.

Show quoted text

/ 📧 Topics (https://95033talk.groups.io/g/main/topics?p=,,,0,0,0,0) / 💬 Kissner dismissal     🔍

🔇 Mute This Topic (https://95033talk.groups.io/g/main/ft/88363249?csrf=8127475784339833671&mute=1&p=Created%2C%2C%2C20%2C1%2C20%2C0)

## Kissner dismissal     Date ▲ (https://95033talk.groups.io/g/main/topic/88363249?p=Created%2C%2C%2C20%2C2%2C20%2C0)



Allan Hessenflow (/g/main/profile/166517)     Feb 16   🔗 (https://95033talk.groups.io/g/main/message/122561)

On Wed, Feb 16, 2022 at 08:10 PM, Barry wrote:

> Ok, call me confused....  I thought he lost his suit....is this yet another?
> So hard to understand how he could have lost his standing in the
> community..... geez. Why is it that this reporter made no mention of
> everything else that has gone down????

Today Mr. Kissner filed a federal suit against the district, the current
and former superintendents, the principal, all of the board members,
and some unknown number of additional community members (he
named one and left the rest as John Does).

As soon as this was filed it became public record easily located by
anyone monitoring the federal courts, including I assume this reporter.
I doubt the reporter knows about everything else that has gone down;
in their rush to print they did not get statements from anyone other than
Mr. Kissner.

Allan

On Wednesday, February 16, 2022, 08:01:59 PM PST, Andrew
<texclix@...> wrote:

Article in the Merc:

"Los Gatos teacher who gave 'F' grades to students protesting gun
violence sues Loma Prieta district, administration"
https://www.mercurynews.com/2022/02/16/los-gatos-teacher-who-gave-f-grades-to-students-protesting-gun-violence-sues-
loma-prieta-district-administration/ (https://www.mercurynews.com/2022/02/16/los-gatos-teacher-who-gave-f-grades-to-stu-
dents-protesting-gun-violence-sues-loma-prieta-district-administration/)

Text:

By KAYLA JIMENEZ | kjimenez@... | Bay Area News Group
PUBLISHED: February 16, 2022 at 6:06 p.m. | UPDATED: February 16, 2022
at 6:41 p.m.

A former Los Gatos teacher who gave students 'F' grades on a math quiz
they skipped — attending a walkout against gun violence on campus
instead — filed a lawsuit against the Loma Prieta Joint Union School
District and numerous school officials, claiming he was unlawfully
laid off, fired and retaliated against for his political speech
against the protest, among other issues in the district.

David Kissner, who taught math and science at C.T. English Middle
School, claims the district used an "unlawful and unconstitutional
abuse of its power" against him, "not because he opposed the political
cause being promoted but because he opposed the District breaking the
law and violating the Constitution," the lawsuit reads.

"In ordinary times, his informed objection to the District's
participation in and promotion of a student walkout should have earned
him respectful feedback. It instead drew vociferous attacks," it
continues.

District officials did not immediately respond to an interview request
on Wednesday about why it laid off or fired Kissner, or to the
complaint filed Wednesday. The district brought in facilitators after
controversy erupted over the grades. And some parents and students
showed up at a school board meeting demanding to know why he was
fired.

In a series of events starting in March 2018, Kissner told students he
was giving a quiz on the same day and at the same time as the March 14
National Student Walkout against gun violence. Kissner gave three
students failing grades on a quiz after they left class to join a
walkout aimed at bringing attention to gun violence after the Parkland
school shooting.

Kissner has stood firmly behind his decision to give the kids failing
grades, and in his opinion the school district and administrators
violated his constitutional rights to free speech.

In an interview Wednesday, Kissner said he didn't have a problem with
students wanting to politically express themselves, but takes issue
with the school district supporting students to take a side on the

"political controversy of gun violence."

"They can protest, it's not a matter of debate," he said, adding,
"Wouldn't any student expect that if they walked out of class it would
affect their grade?"

In the interview, Kissner said he was not surprised by the district's
move to lay him off in April, or fire him in December last year. The
district placed Kissner on paid leave in May 2021. He never returned
to the classroom.

"It was kind of expected in the years running up to it," Kissner said.
"We're in the business of education. One important question to ask is:
What are we teaching our kids? We know there's difference of opinion,
and kids are seeing people in power create reasons to get rid of
opposition."

Kissner's suit claims the district violated his civil rights on
political issues, and defamed him after he became the subject of
accusations of grooming, or sexually abusing minors, at the school.
Kissner denied the claims, and called the accusations "atrocious" and
"politically motivated."
"It's the worst thing that anybody could do to somebody else," he said.

"These charges were outrageous and resulted in the permanent loss of
his standing in the community, which he was forced to leave," his
lawsuit adds.

His attorney, Bill Becker, president and chief counsel for Freedom X,
a Los Angeles-based nonprofit public interest law firm protecting
conservative freedom of expression, said the main thrust of moving
forward with the lawsuit is that Kissner "was retaliated against by
the school district for taking a position it didn't like."

"And it divided the community," Becker said.

On Wed, Feb 16, 2022 at 6:20 PM Linda Terrill <lszterrill@...> wrote:


Seriously?

On Feb 16, 2022, at 4:58 PM, Marc B <mbercaw1@...> wrote:


Too late for what Christine?


On Feb 16, 2022, at 12:42 PM, Christine Blasingame <Cblasing.cb@...>
wrote:


It's sickening. I was really torn until this latest event. I really hope
these people, letting their kids near him, wake up before it's to late.

On Wed, Feb 16, 2022 at 12:24 PM leahjrogers via groups.io
<leahjrogers@...> wrote:

I understand that David Kissner is still texting and calling kids privately and he has a bike ride with kids and people who seem to not know he is being investigated for a crime committed December 2021 scheduled for Saturday 2/19/22 and more camping trips scheduled through a co-run with Dean and Lila's organization The En Gedi Project.

Stacy has blocked and unfriended most everyone on the mountain and as of today when I was reached out to by the detective neither Stacy nor David Kissner have spoken to the Detective. I feel David and Stacy Kissner can clear this matter up pretty quickly by talking to the police instead of hiding and using kids.

I believe as a parent and community member and someone that has supported the Kissners for years that until David Kissner talks to the detective and the criminal investigation is closed this community needs to be actively protecting and supporting the children, youth and young adults affected by this situation.

--
Warmly,
Christine Blasingame

↩ Reply                                             👍 Like                                             ☰ More
 2 people liked this

 Ron                    Feb 17  🔗 (https://95033talk.groups.io/g/main/message/122566)

I for one have heard enough rumor and innuendo.  I suspect that my reaction is shared by many, but others have decided to stay on the sidelines as their views would be met by the armchair star chamber that has monopolized this board.

I don't know Mr. Kissner; we have never met.  But reading some of the reference material, it would be easy to see that he believes that he was treated poorly by the school officials.  They gave considerable weight to an anonymous letter; then went from there.  Characterizing and intimating that his behavior had ulterior motives.  I am sure he feels wronged; his actions were deliberately cast in the most disparaging light.  I suspect that contributed to and motivated his political positions with respect to the school measure and special election.

This board blamed him for the cost of the special election and conflated his political views with accusations made in his professional capacity.  There have been over 100 posts relating to Mr. Kissner; most amplifying and validating the comments of other contributors.  Positive comments about Mr. Kissner were dismissed.  There was general elation expressed about his dismissal.

Maybe some of you have a deep and valid reason to dislike Mr. Kissner.  But, I would hope that this board and the echo chamber it encourages could return to more civil exchange that emphasizes discussion about issues unique to the mountains.   A little grace would be welcome as well.

↩ Reply                                             👍 Like                                             ☰ More

 Barry

Feb 17  (https://95033talk.groups.io/g/main/message/122567)

@ron - anyone reading your letter who had also read the list of particulars submitted by the local board AND seen the efforts of Mr. Kissner to cost the district money for no purpose possible but vengence.....would like myself find your pleas naive at BEST.....worst can go a long way down. I can not imagine a much more deserving candidate for firing based on the evidence presented in abundance. While he is entitled to his perverse political views of the world, his history of dismissals and lawsuits shows a pattern that you may have chosen to ignore. Lastly, his tolerance for dissent was clearly shown when he punished 3 students for their protests. I find it hard to summon up the least amount of empathy give the record. Kissner IS the injustice.

Show quoted text

↩ Reply                                     👍 Like                                     ≡ More
👍 2 people liked this

 Christine Blasingame

Feb 17 (https://95033talk.groups.io/g/main/message/122568)

Ron, I do know him and that is why I was torn. I am not anymore. More will come to light and all I can say is my kids will not go near him or his family ever again. I don't hate him. I hope he changes and repents. I hope there is justice.

I'm sure there are thing he was mistreated about. But there are some things that are more inexcusable then others.

Show quoted text

--
Warmly,
Christine Blasingame

↩ Reply                                     👍 Like                                     ≡ More
👍 1 person liked this

 Charley Kearns

Feb 17 (https://95033talk.groups.io/g/main/message/122571)

It may have been already posted, but here is the link to the SJMN article about Kissner.  Seems to only present his side.

- A Los Gatos teacher who gave F's to students who skipped class for a protest **is suing over his dismissal** (http://enews.email.bayareanewsgroup.com/q/IE1SYZH-bB0XMBSbcAs21_2kLED6bPa0drLZcOJa2NmQHZlcml6b24ubmV0w4gX8gZNyiTfoVrLKimCwmUYuV3PGA).  Click on the words "is suing over his dismissal"

I was curious about the firm representing him.  So, found this link:  https://freedomxlaw.com/ (https://freedomxlaw.com/)
His attorney's bio is here:  https://freedomxlaw.com/about/william-j-becker-jr/ (https://freedomxlaw.com/about/william-j-becker-jr/)
Charley

Show quoted text

↩ Reply                                     👍 Like                                     ≡ More

 Niall Gallagher (/g/main/profile/@niallg)   Feb 17   (https://95033talk.groups.io/g/main/message/122573)

I want to express my gratitude to the parents that stood up last school year and made complaints about Mr. Kissner's teaching performance while I was still stuck in the mode of him being a great teacher and the problem being my kids. Yes, I was a terrible parent for not listening to my kids' complaints for which I did later apologize to them.  That year until he left, my kids were incredibly frustrated with Mathematics and we spent countless hours together in the evenings learning what they should have learned at school.

It not just, as is being characterized, a few disgruntled parents with an axe to grind making complaints regarding Mr. Kissner's classes. Anyone with a child in his class last year that was paying attention to what was going on knows this.

The parents that realized what was happening, stood up and did something about it deserve our full support. As does the school district for taking action.

The article is terrible. So are the legal actions.  But the right thing was done.

↩ Reply                                    👍 Like                                    ☰ More
👍 1 person liked this

 Christine Blasingame   Feb 17   (https://95033talk.groups.io/g/main/message/122574)

We are all just trying to do our best. Sometimes we have big wins and sometimes major fails. I hope you're not too hard on yourself.

Show quoted text

--
Warmly,
Christine Blasingame

↩ Reply                                    👍 Like                                    ☰ More

 Barry   Feb 17   (https://95033talk.groups.io/g/main/message/122575)

When new information comes to light and we change opinions to match the new information, that is smart, courageous and laudable. I think your kids got a great lesson here.

Show quoted text

↩ Reply                                    👍 Like                                    ☰ More

 Allan Hessenflow (/g/main/profile/166517)   Feb 17   (https://95033talk.groups.io/g/main/message/122578)

The Mercury News article has been updated; it is far more complete now.
It is available at the same link.

Allan

↩ Reply                                     👍 Like                                     ≡ More

Larry McVoy (/g/main/profile/167448)        Feb 17  🔗 (https://95033talk.groups.io/g/main/message/122579)

On Thu, Feb 17, 2022 at 05:28:06PM -0800, Allan Hessenflow wrote:

> The Mercury News article has been updated; it is far more complete now.
> It is available at the same link.

Which is:

https://www.mercurynews.com/2022/02/16/los-gatos-teacher-who-gave-f-grades-to-students-protesting-gun-violence-sues-loma-pri-
eta-district-administration (https://www.mercurynews.com/2022/02/16/los-gatos-teacher-who-gave-f-grades-to-students-protesting-
gun-violence-sues-loma-prieta-district-administration)

for those who already deleted the previous email with the link.

↩ Reply                                     👍 Like                                     ≡ More
👍 1 person liked this

Barry                                       Feb 17  🔗 (https://95033talk.groups.io/g/main/message/122580)

Wow, The former article should not have been written until the full story was told.....and so it appears it has been now.

Show quoted text

↩ Reply                                     👍 Like                                     ≡ More

Kathy McKinney                              Feb 17  🔗 (https://95033talk.groups.io/g/main/message/122585)

Can someone share the text of the updated Merc article for those of us who don't subscribe?

↩ Reply                                     👍 Like                                     ≡ More

Larry McVoy (/g/main/profile/167448)        Feb 17  🔗 (https://95033talk.groups.io/g/main/message/122586)

You don't have to subscribe, I don't, I just had to disable my ad blocker
for that site.

Show quoted text

--
---
Larry McVoy           lm at mcvoy.com   http://www.mcvoy.com/lm (http://www.mcvoy.com/lm)

↩ Reply                                     👍 Like                                     ≡ More

Barry                                       Feb 17  🔗 (https://95033talk.groups.io/g/main/message/122587)

Try clicking on the article copying the link and putting it in different browsers...especially with adblocking disable. I finally got it to run
on my iPad.

Show quoted text

↩ Reply                                    👍 Like                                    ≡ More

 Emma Kelly                    Feb 18   🔗 (https://95033talk.groups.io/g/main/message/122588)

Here is the text of the article:

Update: Los Gatos teacher fired — not only for dishing out "F" grades to students who skipped class to participate in national gun violence protest David Kissner has filed a lawsuit against the school district, saying his constitutional rights were violated

*Correction: An earlier version of this article incorrectly said that the state Commission on Professional Competence upheld certain findings of the Loma Prieta Joint Union School District regarding the behavior of teacher David Kissner. While finding him unfit for service and upholding his firing, the state commission did not sustain the district's findings regarding allegations that Kissner supplied alcohol to multiple minors or engaged in potential grooming behavior.*

A former Los Gatos teacher who gave students 'F' grades on a math quiz they skipped to attend a campus walkout against gun violence has sued the Loma Prieta Joint Union School District and numerous school officials, claiming he was unlawfully laid off, fired and retaliated against for his political speech against the protest.

But court and school district records show the failing grades were far from the only reason David Kissner was fired.

In December, the Loma Prieta Joint Union School District officially terminated Kissner, who taught math and science at C.T. English Middle School, for insubordination and inappropriate conduct with students. A district investigation found that he gave alcohol to at least one minor on a camping trip, used inappropriate sexual innuendo with minors and improperly handled remote learning during the pandemic, among other concerns, according to legal records signed by Superintendent Lisa Fraser. A state oversight commission later upheld Kissner's firing based on a finding that he was unfit for service.

"Not only has your conduct eroded your relationship with your students, but it's also created distrust and tarnished your reputation in the community," Fraser wrote in an administrative filing of charges for Kissner's dismissal. "Based on the foregoing, the District has lost all confidence in your ability to continue serving as an employee of the District and seeks to dismiss you from employment."

On Thursday, Kissner and Bill Becker, president and chief counsel for Freedom X, a Los Angeles-based law firm that specializes in conservative causes, adamantly denied all of the accusations.

"All of those charges of wrongful behavior are false," said Becker, adding "a lot of people are out to get my client."

"People hate Christians and hate conservatives up there," he said.

The district cited immoral conduct, unprofessional conduct, unsatisfactory performance, evident unfitness for service and "persistent violation of or refusal to obey the school laws or reasonable regulations," after Kissner had been warned that he could lose his job, administrative court records show.

His suit claims the district violated his civil rights on political issues and retaliated against him for it and defamed him after he became the subject of accusations of grooming, or sexually abusing minors, at the school. Kissner denied the grooming claims and called the accusations "atrocious" and "politically motivated."

The Commission on Professional Competence, a state agency that determines if a certificated teacher should be dismissed or suspended, heard Kissner's appeal of the district's case against him in October 2021.

A report from the agency shows it found no evidence that the district's action was because of "Kissner's opinions or his political activity" and noted that the district tried to resolve the conflict over the failing grades in early 2018 and again in October 2018 to no avail.

The agency's report also found the district had the right to fire Kissner for different reasons, adding that the teacher "responded to new potential and minor conflicts by amplifying them into major conflicts; he became increasingly insubordinate and uncommunicative regarding school activities, even during the novelty and uncertainty of the COVID-19 pandemic; and he continued to exercise very poor judgment outside school in circumstances involving his supervision of teenagers."

However, the agency found that the district could not fire him on other grounds, such as immoral conduct.

A judge and two commissioners from the state's Office of Administrative Hearings, a quasi-judicial tribunal that hears administrative disputes, then signed off and ordered Kissner be fired in December for "evident unfitness for service."

District officials did not immediately respond to a request for comment about Kissner's lawsuit on Thursday.

In an interview Wednesday, Kissner said he stands firm in his opinion that the school district and administrators retaliated against him and violated his constitutional rights to free speech.

The case has continued to polarize the community since Kissner's actions first came under scrutiny.

In a series of events starting in March 2018, Kissner told students he was giving a quiz at the same time as a nationally organized walkout on March 14 to bring attention to school gun violence after the Parkland, Florida, school shooting a month earlier.

He gave three students failing grades on the quiz after they left class to join the walkout. The district brought in facilitators after controversy erupted over the grades.

Shortly after, officials removed Kissner from the classroom to conduct an investigation on a "confidential matter." Parents and students on both sides of Kissner's employment showed up at a school board meeting demanding to know why he was placed on leave.

Kissner returned to the classroom after a seven-day leave of absence (https://www.mercurynews.com/2018/05/09/controversial-los-gatos-teacher-is-returning-to-the-classroom/). The district in a filing with a state professional competence commission alleges a series of controversial and alarming events followed his return.

In March and April 2020, the district issued Kissner warnings for two instances of unprofessional conduct with students, the records show. Both involved unprofessional treatment of his students, the district determined.

Then, on March 21, 2021, district officials received three separate complaints of "serious allegations of misconduct" against Kissner.

In May 2021, the district placed Kissner on paid leave while it investigated the incidents.

He never returned to the classroom.

Kissner said he was not surprised by the district's move to lay him off at the time or fire him in December.

"It was kind of expected in the years running up to it," Kissner said, holding onto the argument of political differences.

"One important question to ask is: What are we teaching our kids? We know there's difference of opinion, and kids are seeing people in power create reasons to get rid of opposition."

He and his attorney claim the district used an "unlawful and unconstitutional abuse of its power" against Kissner, "not because he opposed the political cause being promoted by the students, but because he opposed the District breaking the law and violating the Constitution," the lawsuit reads.

On the failing grades, Kissner said in an interview he didn't have a problem with students wanting to politically express themselves, but he took issue with the school district supporting students to take a side on the "political controversy of gun violence."

"They can protest. It's not a matter of debate," he said, adding, "Wouldn't any student expect that if they walked out of class that it would affect their grade?"

Show quoted text

↩ Reply                                            👍 Like                                            ☰ More

 Greg Witmer

Feb 18   🔗 (https://95033talk.groups.io/g/main/message/122589)

I have to call this out:

"People hate Christians and hate conservatives up there," (Becker) said.

This claim is wholly unsubstantiated and the opposite of my personal experience as a Christian community resident. I have several close friends that span a diverse range of religious and political beliefs, and find the community to be a very welcoming place (I love y'all, and I love Jesus!).

It is an example of a crude attempt to polarize the community as a smoke screen to distract from the specific and credible issues that led to "a state oversight commission later up[holding] Kissner's firing based on a finding that he was unfit for service".

↩ Reply                                              👍 Like                                              ≡ More
👍 4 people liked this

 Cyndi Morris

Feb 18   🔗 (https://95033talk.groups.io/g/main/message/122592)

Right?!? That's a pretty wild claim considering that there are 4 churches in the immediate Summit area!

Show quoted text

↩ Reply                                              👍 Like                                              ≡ More
👍 1 person liked this

 Charley Kearns

Feb 18   🔗 (https://95033talk.groups.io/g/main/message/122595)

Not surprised Becker would say that after looking at his firms website and his bio.
Yes, Greg, a smoke screen attempting to polarize.

Show quoted text

↩ Reply                                              👍 Like                                              ≡ More

 Jeff Miller

Feb 19   🔗 (https://95033talk.groups.io/g/main/message/122650)

Hey Les, while you might stake your reputation on supporting David Kissner, would you let your kids go with him on a trip?

Initially I thought David Kissner was a victim of his own beliefs that happened to be in conflict with most in the community. However reflecting on what some very good, non-politically motivated people are saying about him, even though nothing is proven  , I feel he might have displayed what others are calling "grooming behavior" towards some kids I know.

Honestly , I hope all of the worst accusations about David are false. However , I also would not risk leaving my young kids with him.

↩ Reply                                              👍 Like                                              ≡ More
👍 1 person liked this

 Lynn Mitchell

Feb 19 🔗 (https://95033talk.groups.io/g/main/message/122654)

Check what happened on K's most recent outing in Nevada!

Show quoted text

↩ Reply                    👍 Like                    ☰ More



‹ (https://95033talk.groups.io/g/main/topic/kissner_dismissal/88363249?p=Created%2C%2C%2C20%2C1%2C0%2C0&prev=1)

21
-
40
of
42

1 (https://95033talk.groups.io/g/main/topic/kissner_dismissal/88363249?p=Created%2C%2C%2C20%2C1%2C0%2C0&jump=1)

**2**

3 (https://95033talk.groups.io/g/main/topic/kissner_dismissal/88363249?p=Created%2C%2C%2C20%2C1%2C40%2C0&jump=1)

› (https://95033talk.groups.io/g/main/topic/kissner_dismissal/88363249?p=Created%2C%2C%2C20%2C1%2C40%2C0&next=1)

← (https://95033talk.groups.io/g/main/topic/89237544?p=,,,20,0,0,0::,,,0,0,0,89237544)

→ (https://95033talk.groups.io/g/main/topic/89263111?p=,,,20,0,0,0::,,,0,0,0,89263111)

/ 🖥 Topics (https://95033talk.groups.io/g/main/topics?p=,,,0,0,0,0)   /   💬 Kissner dismissal                                                  🔍

🔇 Mute This Topic (https://95033talk.groups.io/g/main/ft/88363249?csrf=812747578433983367 1&mute=1&p=Created%2C%2C%2C20%2C1%2C40%2C0)

## Kissner dismissal    Date ▲ (https://95033talk.groups.io/g/main/topic/88363249?p=Created%2C%2C%2C20%2C%2C2%2C0%2C0)

👤 Christine Blasingame                                   Feb 19   🔗 (https://95033talk.groups.io/g/main/message/122655)

Les, Where do we find this info?

[ Show quoted text ]

--
Warmly,
Christine Blasingame

↩ Reply                                    👍 Like                                    ☰ More

👤 Christine Blasingame                                   Feb 19   🔗 (https://95033talk.groups.io/g/main/message/122656)

Sorry, I meant Lynn

[ Show quoted text ]

--
Warmly,
Christine Blasingame

↩ Reply                                    👍 Like                                    ☰ More

‹ (https://95033talk.groups.io/g/main/topic/kissner_dismissal/88363249?
p=Created%2C%2C%2C20%2C1%2C20%2C0&prev=1)

41 -    1 (https://95033talk.groups.io/g/main/topic/kissner_dismissal/88363249?
42      p=Created%2C%2C%2C20%2C1%2C0%2C0&jump=1)
of
42      2 (https://95033talk.groups.io/g/main/topic/kissner_dismissal/88363249?
        p=Created%2C%2C%2C20%2C1%2C20%2C0&jump=1)

3   ›

← (https://95033talk.groups.io/g/main/topic/89237544?p=,,,20,0,0,0::,,,0,0,0,89237544)

→ (https://95033talk.groups.io/g/main/topic/89263111?p=,,,20,0,0,0::,,,0,0,0,89263111)