**P O R T E R | S C O T T**

A PROFESSIONAL CORPORATION
Lindsay A. Goulding, SBN 227195
Tatiana Moana Bush, SBN 343503
350 University Avenue, Suite 200
Sacramento, California 95825
lgoulding@porterscott.com
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendant
LAWRENCE MCVOY

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DAVID M. KISSNER, an individual,

        Plaintiff,

v.

LOMA PRIETA JOINT UNION SCHOOL DISTRICT, a California public agency; LISA FRASER, former superintendent at Loma Prieta Joint Union School District, in her official and individual capacitites; COREY KIDWELL, former superintendent at Loma Prieta Joint School District, in her official and individual capacities; KEVIN GRIER, successor superintendent at Loma Prieta Joint School District, in his official capacity; BILLY MARTIN, principal of CT English Middle School, in his official and individual capacities; DEANA A. ARNOLD, Loma Prieta Joint Union School District trustee, in her official and individual capacities; BEN ABELN, Loma Prieta Joint Union School District trustee, in his official and individual capacities; RON BOURQUE, Loma Prieta Joint Union School District trustee, in his official and individual capacities; CHARLOTTE KHANDELWAL, Loma Prieta Joint Union School District trustee, in her official and individual capacities; ERIN ASHEGHIAN, Loma

CASE NO. 22-CV-00949-CRB

**DECLARATION OF LINDSAY A. GOULDING IN SUPPORT OF DEFENDANT'S NOTICE AND APPLICATION FOR ENTRY OF JUDGMENT BY COURT PURSUANT TO COURT ORDER**

Complaint Filed: 3/20/2022

{02795770.DOCX}                                  1

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA 95825
TEL: 916.929.1481
FAX: 916.927.3706

Prieta Joint Union School District trustee, in her official and individual capacities; PATRICIA ELLIOT, an individual; JOIE GRIMMET, an individual; LAWRENCE MCVOY, and individual, and DOES 1 through 50, inclusive,

          Defendants.

_____/

### DECLARATION OF LINDSAY A. GOULDING

I, Lindsay A. Goulding, state and declare as follows:

1.     I am an attorney at law licensed to practice before all courts in the State of California. I am a shareholder at the law firm of Porter Scott, attorneys of record for defendant LAWRENCE MCVOY ("defendant") in the above-entitled action. In that capacity, I have personal knowledge of the facts set forth below or have been sufficiently informed with respect to the information and could competently testify thereto if called upon to do so.

2.     I have reviewed the Notice and Application For Entry Of Judgment By Court Pursuant To Court Order;

3.     To my knowledge plaintiff, DAVID M. KISSNER, is not a minor or an incompetent person or in military service or otherwise exempted under the Soldiers' and Sailors' Civil Relief Act of 1940;

4.     On August 24, 2022, Judge Charles R. Breyer filed the Court's Order Granting Motion To Strike, Denying Motion To Dismiss awarding defendant's Request For Attorneys' Fees in the amount of $10,755.00. See attached **Exhibit A**.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on September 7, 2022, in Sacramento, California.



_____
Lindsay A. Goulding

{02795770.DOCX}           2

**DECLARATION OF LINDSAY A. GOULDING IN SUPPORT OF DEFENDANT'S NOTICE AND APPLICATION FOR ENTRY OF JUDGMENT BY COURT PURSUANT TO COURT ORDER**

| CASE NAME: | ***DAVID M. KISSNER v. LOMA PRIETA JOINT UNION SCHOOL DISTRICT et al.,*** |
|---|---|
| COURT: | **UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA** |
| CASE NO.: | **22-CV-00949-VKD** |

## PROOF OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.   My business address is 350 University Avenue, Suite 200, Sacramento, California 95825.

On the date below, I served the following document:

**DECLARATION OF LINDSAY A. GOULDING IN SUPPORT OF DEFENDANT'S NOTICE AND APPLICATION FOR ENTRY OF JUDGMENT BY COURT PURSUANT TO COURT ORDER**

| | |
|---|---|
| | **BY MAIL:**  I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. |
| | **BY FAX TRANSMISSION:** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed below.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached |
| XX | **BY ELECTRONIC SERVICE**: Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification address listed below. |

Addressed as follows:

William J. Beker, Jr. ESQ
FREEDOM X
11500 Olympic Blvd., Suite 400
Los Angeles, CA. 90064
Bill@FreedomXLaw.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at Sacramento, California on September 7, 2022.

/s/*Virginia Yao*

VIRGINIA YAO

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

**DECLARATION OF LINDSAY A. GOULDING IN SUPPORT OF DEFENDANT'S NOTICE AND APPLICATION FOR ENTRY OF JUDGMENT BY COURT PURSUANT TO COURT ORDER**

# EXHIBIT "A"

01054547.WPD

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID M. KISSNER,

   Plaintiff,

v.

LOMA PRIETA JOINT UNION
SCHOOL DISTRICT, et al.,

   Defendants.

Case No. 22-cv-00949-CRB

**ORDER GRANTING MOTION TO STRIKE, DENYING MOTION TO DISMISS**

Plaintiff David Kissner has brought suit against a number of parties stemming from his dismissal from his position as a math and science teacher at CT English Middle School, in the Loma Prieta Joint Union School District ("the District").[1]  See generally Second Amended Complaint ("SAC") (dkt. 16).  Although the suit began with nineteen claims alleged variously against thirteen named defendants and Does 1 through 50 ("Does"),[2] Kissner has gradually reduced both the claims and parties.  See Voluntary dismissals (dkts. 33–34, 41–42,43-2, 46-1, 49–50).

The remaining claims fall broadly into two categories: (1) claims relating to the motivation and manner of Kissner's dismissal, which Kissner brings against the District's

---

[1]  Although Kissner's claims stem from the actions surrounding his dismissal, he is separately appealing the dismissal itself in the Santa Clara Superior Court.  Becker Decl. (dkt. 51–1) ¶ 3.

[2]  Kissner alleges that the Does "are responsible in some manner for some or all of the acts" alleged in the complaint, and that all are "the agents, servants, employees, licensees, guarantees, indemnitors, invitees, or assignees of each other, and in doing the things [alleged in the complaint] acted with the course and scope of such agency, employment, license, guaranty, indemnity, invitation, assignment and/or relationship and with the full knowledge, consent and approval of the remaining Defendants."  SAC ¶¶ 27–28.

principal and current and former members of its Board of Trustees[3] ("Individual District Defendants" or "IDDs") and Does, and (2) claims relating to online discussion of Kissner's dismissal, which Kissner brings against Lawrence McVoy and Does. Both the Individual District Defendants and McVoy have filed motions aimed at some of these claims. See IDD MTD, McVoy MTS/MTD (dkts. 43–44). For the following reasons, the Court GRANTS McVoy's motion to strike and DENIES the IDDs' motion to dismiss.[4]

## I. BACKGROUND

### A. Factual History

#### 1. Kissner's tumultuous employment at the school district

Kissner worked as a math and science teacher from 2012 until his removal in 2021. SAC ¶ 36. The complaint provides little information about Kissner's relationship with the school or community until 2018, when much of this controversy began. Since 2018, Kissner has been subject to two official investigations by the District, several warnings for unprofessional conduct, widespread community discussion, and parental complaints; he has also filed separate complaints of workplace retaliation and religious discrimination. See SAC ¶¶ 68, 133, 136, 155; Notice to Dismiss (dkt. 44–1) ¶¶ 8, 10, 12, 18, 22, 35, 42. Kissner argues that these events—set out in more detail below—were part of "a campaign of harassment and discrimination," that the first investigation was "an open-ended witch-hunt," the second investigation was "retaliation for his political speech," and the various complaints were "from a handful of vindictive parents motivated by their personal, politically-charged animus towards Kissner." See SAC ¶¶ 4, 33, 198, 203. In February of 2021, the District served Kissner with a Notice of Intent to Dismiss, detailing allegations against him. See generally Notice to Dismiss. In April of 2021, Kissner requested a

---

[3] The remaining IDDs are Lisa Fraser (a former Superintendent of the Board of Trustees), Kevin Grier (the current Superintendent of the Board of Trustees), Billy Martin (the current Principal of the District), and four members of the Board of Trustees (Ben Abeln, Ron Bourque, Charlotte Khandelwal, and Erin Asheghian). Kissner sues all in both their official and individual capacities.

[4] The Court vacated the hearing on these motions **Error! Main Document Only.**pursuant to Civil Local Rule 7-1(b).

2

hearing on the notice, and in October, a commission of state officials and an administrative Law Judge from the Office of Administrative Hearings ("the Commission") conducted the hearing.  See generally Dismissal Hearing (dkt. 44–2).  The Commission ultimately found one of three charges against Kissner substantiated, and ordered his dismissal.  See id.

### a.   The 2018 school walkout controversy, anonymous letter, and first investigation

Tension between Kissner and the District seems to have begun in the Spring of 2018, as students planned a walkout in response to the Parkland school shooting.  SAC ¶ 55.  Kissner opposed the school's authorization of the protest, believing it violated California's truancy laws, the Education Code, and the "school's responsibility to remain neutral on controversial and tendentious issues."  Id. ¶¶ 4, 44.  The school itself waivered in its response to the protest, first affirming that "[a]s a school district, we cannot promote or endorse civil disobedience, nor can we discourage participation" on March 7, before reversing on March 14 and allowing students to participate without receiving an unexcused absence.  See id. ¶¶ 58, 65.  Ultimately, three students from Kissner's scheduled class participated in the March 14 protest and missed a prescheduled quiz; he gave them each a failing grade on the assignment.  Id. ¶ 86.  Kissner warned students ahead of time that they could not make up the quiz.  Id.

Parents variously complained to the administration about the failing grades, challenged the grades under Education Code, and approached a local television affiliate about the incident.  Id. ¶¶ 87–89.  The controversy grew as Kissner agreed to an interview that received national attention on March 18, parents tried to remove their children from Kissner's class, and discussion of an additional walkout began.  Id. ¶¶ 68, 99, 103.  Many disagreed with Kissner's position, and he began to receive "hostile criticism" through social media.  See Dismissal Hearing § Factual Findings ¶ 12.  Around this time,[5] the

---

[5]  The timeline around the anonymous letter and investigation is somewhat muddled. Kissner describes the District as receiving the letter on March 20, 2018, and beginning an investigation into Kissner's opposition to the walkout "in about late March 2018."  SAC ¶¶ 108, 110.  Kissner later describes the District's formal investigation as beginning on April 19, 2018.  Id. ¶ 133. The Commission describes both the investigation and anonymous

District began an investigation into this conflict, but did not take disciplinary action against Kissner related to the walkout.  Id. ¶ 13.  Contemporaneously, the Board received an anonymous letter about Kissner, described by the Commission as "serious allegations about [his] behavior outside the school setting," and by Kissner as accusations of "child grooming behavior."  Id. ¶ 14; SAC ¶ 111.

After receiving the letter, the District either expanded the investigation into Kissner's conduct to include these allegations, or created a separate investigation to pursue them.[6]  SAC ¶ 112.  The District placed Kissner on paid administrative leave on April 30. Id.  It then hired an independent investigator to look into these claims.  Notice to Dismiss § Statement of Charges ¶ 4.  On May 10, with the District's permission, Kissner returned to the classroom, believing all investigations complete.  See SAC ¶¶ 122, 125.  However, he soon learned that the investigation into the anonymous letter continued, and he requested medical leave for "adjustment disorder with anxious and depressed mood" on May 23.  Id. ¶ 126.

The anonymous letter investigation continued through the Summer and into the Fall, culminating in an official letter of reprimand to Kissner on October 18.  Notice to Dismiss § Statement of Charges ¶ 3.  The investigation revealed that during a Kissner-led camping trip in 2016, Kissner provided alcohol to an unaccompanied 15-year-old student. Notice to Dismiss § Statement of Charges ¶ 4a.  Kissner repeatedly downplayed this incident as "sharing a single sip of alcohol" as part of toasting the student's "successful leadership accomplishments."  SAC ¶ 50.  The student later testified during the Commission's 2021 hearing that Kissner had given him multiple alcoholic beverages and that the drinks were unrelated to any accomplishments.  Dismissal Hearing § Factual

---

letter as being in "late March or early April 2018."  Dismissal Hearing § Factual Findings ¶¶ 13–14.
[6] Kissner is inconsistent in whether he describes the anonymous letter investigation as an expansion of the walkout investigation or as an entirely separate investigation.  Compare SAC ¶ 142 ("the unprincipled broadening of the district's investigation") with id. ¶ 122 ("the allegations from the anonymous letter morphed into two investigations, one purporting to look into walkout policy irregularities and the other purporting to scrutinize Kissner's conduct with children").  The same investigator looked into both.  See id. ¶ 143.

Findings ¶¶ 91–92. The 2021 Commission found the student's testimony more credible than Kissner's, concluding that Kissner "served [the student] alcohol casually, as if [the student] were an adult peer," and that some of Kissner's testimony was false. Id. ¶¶ 98, 100. The 2018 investigation further concluded that Kissner had "a history of improperly providing alcohol to minors." Notice to Dismiss § Statement of Charges ¶ 4e. The culminating disciplinary letter warned that "any further report of providing alcohol to a minor will result in further corrective action up to and including criminal charges and/or possible termination of your employment." Dismissal Hearing § Factual Findings ¶ 29.

This investigation also detailed "other instances of misconduct by [Kissner] with children that represent and compound the finding of a lack of professional boundaries and/or questionable teaching practices on [his] part." Notice to Dismiss § Statement of Charges ¶ 4g. Specifically, the investigation found that Kissner shared graphic stories detailing his combat experience, showed video clips to students depicting death and violence, incorporated death and violence in "inappropriate classroom exercises," "inappropriately physically wrestled with boys on the classroom floor," and offered to provide a male student with a small binder clip when he asked to use the restroom, implying "he could use [it] on his penis to stop the need to go to the bathroom." Id. ¶ 5. The District imposed no additional disciplinary measures at that time.

### b. Kissner's initial 2018 complaints against the school district

In response to perceived mistreatment by the District and his coworkers during the walkout controversy and following the first investigation, Kissner filed multiple complaints.

### i. Allegation of retaliation

On May 23, 2018, Kissner filed a workplace retaliation complaint with the District, alleging "that staff had shunned and ostracized [him] after the walkout; attacked his moral character; sought to shame and embarrass him; proclaimed they would never forgive him; demanded his resignation; and solicited the [B]oard for harsh discipline against him," that district leadership was aware of the problem and failed to intervene, and that the District

United States District Court
Northern District of California

"continued to maintain an intrusive, covert investigation into [his] moral character." SAC ¶ 127–30.  The District hired an investigator who could not substantiate Kissner's claims. Id. ¶ 132.  Kissner asserts that the District's withholding of the investigator's report and failure to provide an explanation for finding the complaint unsubstantiated violated District policy.  Id.

### ii. Allegation of religious discrimination

In August 2018, the new superintendent, Defendant Fraser, informed Kissner that "there was uncertainty about whether or not Kissner would return to teaching in the Fall." Id. ¶¶ 154–55.  Kissner believed that questions the anonymous letter investigator asked him about evolution and intelligent design were at the root of the uncertainty.  Id. ¶ 156. Two months later, on October 28, 2018, Kissner filed a religious discrimination complaint with the EEOC, alleging that the District had removed him from teaching science based on his expressed interest in intelligent design.  Id. ¶ 157.  The District did not turn over notes and recordings used by the prior investigator to the EEOC investigation, and the EEOC did not substantiate any of Kissner's claims.  Id. ¶ 158.

### c. A brief lull

Despite the contentious 2018 year, the complaint barely mentions 2019.  In the late Fall of 2018 and into the beginning of 2019, Kissner pressed for further communication about the walkout controversy, but Superintendent Fraser told him that the District's Board members and administrators "preferred not to re-hash that conflict."  Dismissal Hearing § Factual Findings ¶ 18.  In the Spring and Summer of 2019, Kissner tried to learn more about the investigation of allegations made against him in the anonymous letter.  Id.

### d. 2020-2021 complaints against Kissner

2020 brought renewed tension between Kissner, the District, and various parents. Kissner received a number of complaints from parents and faculty (see §A.1.d.i–d.iii below), but argues that these were largely in retaliation for his renewed political activities (see §A.1.e below).  While these complaints began in Spring of 2020, they became more frequent that Fall.  These complaints fell into four primary categories: unprofessional

United States District Court
Northern District of California

conduct with students, delays in grading and cancelled classes, confusion arising from Kissner's extracurricular math class, and non-cooperation with supervisors.

### i. Allegations of unprofessional conduct with students

From March 2020 through January 2021, the District received four complaints about Kissner's interactions with students, of which the Commission investigated three.

First, on March 31, 2020, Kissner received a warning after a parent complained that Kissner made a comment about a student's "slitty eyes." Notice to Dismiss § Statement of Charges ¶ 8. Kissner denied using the phrase at his dismissal hearing, and the Commission could not substantiate it with non-hearsay evidence. Dismissal Hearing § Factual Findings ¶ 81.

Second, on April 2, 2020, Kissner received a warning for responding to a student's comment that she was late to detention by allegedly shouting, "No shit [student's name]" and slamming his fist on the table. Notice to Dismiss § Statement of Charges ¶ 10. The Commission heard no first-hand testimony about the incident, and did not believe that the evidence was conclusive about the appropriateness of Kissner's behavior. Dismissal Hearing § Factual Findings ¶ 82.

Third, on October 1, 2020, a parent requested that Kissner not teach their younger child, citing their older child's experience having Kissner tear up the student's homework in front of the class for using a pen rather than pencil. Notice to Dismiss § Statement of Charges ¶ 18. The Commission did not comment on this incident.

Fourth, on January 28, 2021, a military parent stationed overseas complained to the District about Kissner sharing graphic war stories with students. Notice to Dismiss § Statement of Charges ¶ 35. The Commission could not establish whether Kissner shared such stories during the 2020-2021 school year. Dismissal Hearing § Factual Findings ¶ 83.

### ii. Delays in grading and cancelled classes

During the shift to remote learning in the late Spring and Fall of 2020, Kissner received complaints about delays in grading and cancellation of classes, which the Commission investigated as part of the dismissal hearings. See, e.g., Notice to Dismiss §

Statement of Charges ¶¶ 12, 24, 29–32, 42. School officials repeatedly reached out to Kissner about the problem and chastised him for his "inappropriate" apology emails to parents. Id. at ¶¶ 22–26. Kissner eventually received a letter of reprimand from the school's principal, Defendant Martin, for "failure of duties" and his unprofessional email response. Id. ¶ 33. Kissner asserted that these complaints were politically motivated, which the Commission could neither substantiate nor refute. Dismissal Hearing § Factual Findings ¶ 77. However, the Commission found no evidence to suggest that Kissner's grading timeliness was "notably worse" than that of any of his colleagues. Id. ¶ 79.

In November of 2020, school administrators received complaints about Kissner cancelling and cutting short Zoom classes while he taught remotely during camping trips. Notice to Dismiss § Statement of Charges ¶ 25. Kissner denied ever cancelling or skipping a Zoom meeting, and claimed to have cut them short only on "the few days where there were power outages." Id. ¶ 26. The Commission did not establish that these trips caused Kissner to neglect his duties. Dismissal Hearing § Factual Findings ¶ 70. However, a review of Kissner's Zoom logs revealed that he had failed to attend required office hours on 29 days. Notice to Dismiss § Statement of Charges ¶ 42.

### iii.  Confusion around extracurricular math class

Throughout the Fall of 2020 and into the start of 2021, Kissner taught a math course through a private tutoring program ("MMI"). Dismissal Hearing § Factual Findings ¶ 50. The District had previously encouraged students to sign up for extracurricular math activities because the school could not offer its normal opportunities during the pandemic. Id. ¶ 49. On September 8, 2020, Kissner emailed students' private accounts advertising extra math help, including a link to his personal website, which featured a donation link. Notice to Dismiss § Statement of Charges ¶ 14. Kissner told MMI students that they would not have to attend his normal math class if they attended his after school MMI class. Dismissal Hearing § Factual Findings ¶¶ 51–52. Parents reached out to Principal Martin to clarify the attendance policy. Id. ¶ 54.

On September 9, 2020, Martin informed Kissner that allowing students to skip the

normal class if they attended the MMI class violated California Department of Education guidance.  Id. ¶ 54.  Martin emailed Kissner again on September 14 and October 8 about the ongoing parental confusion, summarizing the conversations he had with the parents, and asking Kissner to provide a list of the students Kissner had told about the MMI attendance policy.  Id. ¶¶ 54–55.  Kissner replied by sending Martin a roster of his entire seventh grade class and stating that he "intended to continue treating his MMI algebra course as equivalent" to a normal class.  Id. ¶ 56.  Martin responded that telling students or parents the MMI class would count towards their official attendance or grades was "not acceptable practice."  Id. ¶ 57.  Shortly thereafter, Kissner switched from teaching the class after hours to during his District designated office hours.  Id. ¶ 58.  Despite Martin's consistent communication, Kissner continued to tell parents that his office hours algebra course "was equivalent, and alternative, to Math 7" until the District placed him on leave in February 2021.  Id. ¶ 60.  Parents continued to reach out to the District with questions about the policy.  Notice to Dismiss § Statement of Charges ¶¶ 38–41.

### iv.    Allegations of non-cooperation with superiors

During this period, the District also alleged in its Notice to Dismiss that Kissner regularly failed to cooperate with the school administration.  This non-cooperation largely stemmed from Kissner's repeated refusals to meet with the Superintendent or Principal about the incidents described in § A.1.d.i-iv.  See Notice of Intent to Dismiss § Statement of Charges ¶¶ 9, 11, 13, 20, 26.

### e.    Kissner's political activity outside of class in 2019-2021

In addition to his in-school behavior, Kissner's ongoing out-of-class political activity contributed to the tension.  The District's Board placed a local tax measure on the ballot for the November 2020 election.  Dismissal Hearing § Factual Findings ¶ 21.  In December 2019, Kissner informed then-Superintendent Fraser that he intended to oppose the tax measure, which he did prominently through social media.  Id.

United States District Court
Northern District of California

1    Sometime in the Fall of 2020, Kissner posted a video on social media.[7]  Kissner

2 describes the video as explaining his rationale for opposing the tax measure.  SAC ¶ 166.

3 The Committee report acknowledges that the "37-minute video urg[ed] viewers to vote

4 against Measure N," but posits that Kissner spent "much if not most of the video's duration

5 explaining his continuing unhappiness about the Spring 2018 political controversy, the

6 anonymous letter, and the resulting investigations, and reiterating his unwillingness to put

7 those conflicts to rest."  Dismissal Hearing § Factual Findings ¶ 74.

8    Kissner's opposition drew negative responses from the community and the Board.

9 Id. ¶ 22.  Kissner claims that he was "personally and publicly targeted by many school

10 employees and others for his opposition to Measure N."  SAC ¶ 168.  The measure

11 ultimately failed.  Dismissal Hearing § Factual Findings ¶ 21.

12    At the same time, Kissner's wife unsuccessfully campaigned for a seat on the Board

13 in the November 2020 election.  Dismissal Hearing § Factual Findings ¶ 23.  Shortly after

14 the election, one Board member resigned and Kissner pushed for a special election, rather

15 than the normal appointment process, to fill the seat.  Id. ¶ 24.  When the Board proceeded

16 with the appointment, Kissner launched a petition to overturn the appointment and compel

17 an election.  SAC ¶ 175.  The superintendent of schools for the County of Santa Clara

18 rejected the petition due to formatting irregularities, which Kissner is currently challenging

19 in a separate action.  Id. ¶¶ 178–80.  In February 2021, Kissner wrote a letter to the County

20 Superintendent of Schools, copying the District Board, alleging an improper

21 apportionment of public funds.  Id. ¶ 182.

### 2.    Kissner's dismissal from the District

23    Kissner's formal dismissal process began in February 2021 and continued into

24 December.

### a.    Initial dismissal proceedings

---

[7] McVoy and the Committee's report reference one video, while Kissner references two videos. McVoy's Reply at 4; Dismissal Hearing § Factual Findings ¶ 74; SAC ¶¶ 166–167. It appears that there is one video (described above) and likely another video that is less relevant.

On February 12, 2021, the District served Kissner a formal notice of intent to dismiss. SAC ¶ 183. The notice's Statement of Charges alleged five causes for dismissal: immoral conduct, unprofessional conduct, unsatisfactory performance, persistent violation of rules and regulations of the board, and evident unfitness. Notice to Dismiss § Statutory Causes for Dismissal. The notice included accusations of "potential grooming behavior, such as singling out a minor and being alone with a minor; . . . asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet." SAC ¶ 194. On February 22, District administrators notified Kissner's students' families that Kissner would be on leave for the remainder of the school year. Dismissal Hearing § Factual Findings ¶ 25. Around the same time, in early March, the District received written statements about Kissner's behavior during a separate camping trip, which the District investigated (see §A.2.b below). On March 22, Kissner demanded that the District dismiss the grooming allegation. SAC ¶ 186. He claims that he received no reply to that demand. Id. ¶ 187.

On April 16, 2021, the District received a California Public Records Act request "from an anonymous, factitiously-named individual" for a copy of the Notice to Dismiss, which it immediately produced. SAC ¶ 188. The publication of the Notice contributed to an ongoing online discussion of the allegations (see § A.3 below). Kissner asserts that the District acted improperly by releasing the Notice without first affording him the opportunity to file a petition. Id. ¶ 189–91. On April 22, Kissner requested a hearing on the Notice to Dismiss. Notice to Dismiss § Notice of Right to Defend and Request a Hearing. On June 11, 2021, the District served Kissner with an Amended Notice of Proposed Intent to Dismiss, which maintained allegations of "potential grooming behavior," as well as new allegations stemming from the second investigation. Notice to Dismiss § Statement of Charges ¶ 4.g.14. On July 6, 2021, the District received a records request for the Amended Notice, which the District produced to the public. Pl.'s Opp'n to McVoy (dkt. 51) at 5.

**b.    Second anonymous letter investigation**

11

The early March 2021 written statements described an April 2019 Kissner-led camping trip, prompting both the District and the Commission to investigate. Dismissal Hearing § Factual Findings ¶ 30. Thirty people went on the trip, including ten to twelve teens who attended without their parents. Id. During the trip, Kissner caught two of the teens ("Teens One and Two") away from the group smoking marijuana. Id. ¶ 33. Kissner chastised the teens for violating his pre-trip instructions to bring neither alcohol nor drugs, but did not alert their parents until after the trip's conclusion. Id. Later in the trip, Kissner needed to obtain a replacement part for one of the group's damaged trailers, and determined that the closest store that stocked the part was in Las Vegas and closed for the day. Id. ¶¶ 32, 35. Kissner took Teens One and Two and two other teens with him to Las Vegas, where he stopped to purchase whiskey, before the group checked into a hotel room on the Las Vegas Strip. Id. ¶ 37.

Kissner served himself whiskey in the room. Id. ¶ 39. The two other teens went to sleep, while Teens One and Two remained awake. At the Commission hearing, Teens One and Two testified that Kissner shared whiskey with them and allowed them to leave the room to see the Las Vegas Strip. Id. ¶ 41. Kissner testified that he neither offered them whiskey nor left it accessible, and informed Teens One and Two that they should not leave the room. Id. The Commission found that "[n]one of this testimony [was] completely credible," but that Teens One and Two did drink some whiskey and did leave the room. Id. ¶¶ 41–43. The Commission could not determine if Kissner encouraged or was even aware of their drinking, but found that he failed to prevent it. Id. ¶ 42.

### c. Dismissal hearing

In conferences with the administrative law judge ahead of the dismissal hearing, the District voluntarily withdrew the District's language about "potential grooming behavior" and related allegations. Becker Decl. ¶ 4. The judge then prepared a redacted version of the District's Notice to Dismiss. Id.[8] The redacted version largely excluded allegations

---

[8] Both the unredacted and redacted versions of the Notice to Dismiss are included as exhibits. See Notice to Dismiss; Becker Decl, Ex. 1 ("Redacted Notice to Dismiss").

United States District Court
Northern District of California

1  stemming from the 2018 anonymous letter investigation.  Id.

2  Throughout October, the Commission considered evidence on the following

3  grounds for Kissner's dismissal: furnishing alcohol to teens, the extracurricular math class,

4  his remote teaching practices, his resistance to supervision, his pandemic grading practices,

5  and other instances of allegedly inappropriate conduct.  See generally Dismissal Hearings

6  § Factual Findings ¶¶ 27–84.  Though the District did not allege that the 2016 camping trip

7  constituted cause for dismissal, the Commission considered Kissner's testimony on the

8  matter, which it found to be "emphatic, detailed, and in key respects false."  Id. ¶ 86.

9  Ultimately, the Commission found that the District had failed to prove the

10  allegations of persistent violation of regulations or immoral conduct, but had proved

11  Kissner's evident unfitness for service.  Dismissal Hearings § Legal Conclusions ¶¶ 4–10.

12  The Commission also rejected Kissner's arguments that the dismissal constituted

13  retaliation for constitutionally protected activities:

> The totality of evidence in this matter does not establish an effort by the Board or
> by District administrators to discipline or to dismiss respondent because of his
> opinions or political activity.  To the contrary, all evidence in this matter shows that
> after significant conflict within the District in March and April 2018, the District in
> October 2018 offered respondent the opportunity to save face and move on.
> Respondent emphatically rejected this opportunity.  Instead, between October 2018
> and the hearing, respondent made repeated efforts to reopen and revisit the 2018
> conflicts.  He also responded to new potential and minor conflicts by amplifying
> them into major conflicts; he became increasingly insubordinate and
> uncommunicative regarding school activities, even during the novelty and
> uncertainty of the COVID-19 pandemic; and he continued to exercise very poor
> judgment outside school in circumstances involving his supervision of teenagers.

21  Id. ¶ 25.  Because of this evident unfitness for service, the Commission dismissed Kissner

22  on December 7, 2021.  Dismissal Hearings § Order.  Kissner alleges procedural and legal

23  errors in the hearing.  SAC ¶¶ 211–20.

### 3.  Online discussion of Kissner

25  After the District publicly released the initial Notice to Dismiss on April 16, 2021,

26  Kissner claims that "[t]he charges were promptly republished by members of the public

27  and predictably subjected Kissner to shame and humiliation, threats, intimidation, mockery

28  and derision by members of the public throughout the community."  SAC ¶ 193.

United States District Court
Northern District of California

On January 11, 2022, an individual posted a copy of the Commission's final decision to an online forum popular with Los Gatos residents. McVoy's MTS/MTD at 7. Posters expressed a variety of views on the order. See Community Forum Thread (dkt. 44–2). Defendant McVoy made one such post, which is now at the center of Kissner's claims against him:

> Summary because I read it all looking for this:
>
> Respondent David Kissner is dismissed from his position as a permanent certificated employee . . . due to evident unfitness for service.
>
> Finally, seems like what should have happened[,] happened. And I say this as a dude that thought he was wrongly accused, then I learned more, and yeah, f*ck that guy. [H]e's someone who was grooming kids. I can't prove that but all the evidence points that way.
>
> The vast majority of teachers are awesome, they love their kids, they spend their own money on class supplys [sic], they protect those kids from crazy helicopter parents, or abusive parents, teachers rock. And should get paid more.
>
> Kissner guy was a trainwreck [sic] waiting to happen.

Community Forum Thread, Reply No. 121751.

**B.     Procedural History**

**1.     Initial complaints and voluntary dismissals**

On February 16, 2022, Kissner filed his initial complaint. Compl. (dkt. 1). On March 8, Kissner filed the FAC. FAC (dkt. 8). On March 20, Kissner filed the SAC, which contains the claims now before the Court. SAC. The SAC initially included 19 claims variously against the District, the IDDs, McVoy, two investigators hired by the District, and Does. SAC. Kissner has gradually reduced both the claims and parties. See Voluntary dismissals (dkts. 33–34, 41–42, 43-2, 46-1, 49–50). These dismissals have removed all defendants except McVoy and the IDDs. Kissner maintains claims of IIED, defamation per se, and false light invasion of privacy against McVoy. Notice of Voluntary Dismissal (dkt. 49). Kissner maintains claims of Civil Rights Defamation, Civil Rights Conspiracy, and violations of the Free Speech Clause of the First Amendment, the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the

United States District Court
Northern District of California

1  Fourteenth Amendment against the IDDs.  Notice of Voluntary Dismissal of District and

2  IDDs (dkt. 50).

3          **2.**     **Current motions**

4         On May 26, the IDDs moved to dismiss the Civil Rights Defamation and Civil

5  Rights Conspiracy claims as subsumed and duplicative of the Free Speech, Due Process,

6  and Equal Protection claims.  IDDs' MTD.  Kissner opposed this motion.  Pl.'s Opp'n to

7  IDDs (dkt. 52).  On the same day, McVoy moved to strike all three remaining claims

8  against him and to receive attorneys' fees under California's anti-SLAPP statute or,

9  alternatively, to dismiss all three claims.  McVoy's MTS/MTD.  Kissner opposed

10  McVoy's motion to strike or dismiss and sought his own attorneys' fees under the anti-

11  SLAPP statute.  Pl.'s Opp'n to McVoy.  Kissner requests leave to amend should the Court

12  grant McVoy's Motion to Strike, and asks the Court to consider his financial status before

13  awarding McVoy attorneys' fees.  Id.

14  **II.**    **DISCUSSION: EXTRINSIC DOCUMENTS**

15         One preliminary issue applies to both motions.  Both parties rely on extrinsic

16  evidence (i.e., evidence beyond the complaint) in their motions, primarily the Notice to

17  Dismiss, Dismissal Hearing, and Community Forum Thread.  McVoy makes arguments

18  about why the Court should consider this evidence, under both the anti-SLAPP statute and

19  the typical rules of a motion to dismiss.  See McVoy's MTS/MTD at 2–4.  Additionally,

20  Kissner attaches to his opposition several statements that McVoy allegedly wrote,

21  expressing hostility towards Kissner prior to McVoy's allegedly defamatory statement.

22  See Kissner's Decl., Ex. 1 (dkt. 51-2) ("McVoy's Prior Statements").[9]  No parties object to

23  any of these references, but out of an abundance of caution, the Court raises the issue.

24

25

26

27  ---

    [9]  Neither Kissner's opposition nor his sur-reply cite McVoy's Prior Statements, though

28  they appear relevant to determining whether McVoy acted with actual malice for the
purpose of the defamation charge.  Pl.'s Opp'n to McVoy; Pl.'s Sur-Reply.

United States District Court
Northern District of California

### A.    Extrinsic Documents Under Anti-SLAPP Statute

McVoy cites authority from the California Supreme Court that "California courts should accept the opponent's documentary evidence in an anti-SLAPP motion even if it would not be admissible at trial in the form offered so long as it is 'reasonably possible that the evidence set out in those statements will be admissible at trial.'"  McVoy's MTS/MTD at 2 (quoting Sweetwater Union School Dist. v. Gilbane Building Co., 6 Cal. 5th 931, 949 (2019)).

To begin, "[t]he degree to which [California's] anti-SLAPP provisions are consistent with the Federal Rules of Civil Procedure has been hotly disputed."  Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress, 890 F.3d 828, 833 (9th Cir.), amended, 897 F.3d 1224 (9th Cir. 2018).  Some "portions of the California anti-SLAPP statute are inapplicable in federal court," but "there is no direct collision between the special motion to strike subsection of the statute and the Federal Rules."  Herring Networks, Inc. v. Maddow, 8 F.4th 1148, 1155 (9th Cir. 2021).  In order to avoid such a collision, federal courts treat anti-SLAPP motions to strike differently depending on the basis for the motion: when a defendant moves to strike "on purely legal arguments," courts analyze the motions pursuant to Rules 8 and 12, but when a defendant moves to strike by asserting "a factual challenge," the court must analyze the motion under Rule 56.  See id. at 1155–56.  In a case, as here, where the defendant moves to strike on purely legal grounds, "reliance on evidence outside of [the] complaint in defending against the motion [is] improper and inconsistent with the Federal Rules."  See Herring Networks, 8 F.4th at 1156.  As such, the blanket admission of potentially admissible evidence adopted by the California Supreme Court in anti-SLAPP motions does not apply in federal courts.  See id. (answering in the affirmative "whether the district court's consideration of evidence in determining whether to grant a motion to strike would conflict with Rule 12(b)(6).").

Because Ninth Circuit precedent establishes that Rule 12(b)(6) governs consideration of anti-SLAPP motions like the one here, the Court now examines whether it can consider any of these documents under Rule 12(b)(6).

United States District Court
Northern District of California

**B.      Extrinsic Documents in a Motion to Dismiss**

"When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." United States v. Ritchie, 342 F.3d 903, 907 (9th Cir. 2003).  But the Court may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice when ruling on a 12(b)(6) motion.[10] Id. at 908.

### 1.      The Notice to Dismiss and Dismissal Hearing

McVoy argues that the SAC "makes numerous references" to the Notice to Dismiss and Dismissal Hearings, that Kissner relied on those documents' "terms and effects in drafting the complaint," and that those documents are integral to the complaint.  McVoy's MTS/MTD at 3–4.  Although the "mere mention of the existence of a document is insufficient to incorporate the documents by reference," "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim" then the complaint incorporates that document.  Ritchie, 342 F.3d at 908.

The SAC refers extensively to the Notice to Dismiss.  See, e.g. SAC ¶¶ 183–87, 194–208, 222–31, 264–65.  It also refers extensively to the Dismissal Hearing.  See, e.g., id. ¶¶ 209–20.  Both documents are integral to Kissner's complaint and form the basis of his claims.  See id. ¶ 281 (arguing that releasing the Notice to Dismiss constituted a violation of Kissner's constitutional rights).  For these reasons, the Court will consider both the Notice to Dismiss and Dismissal Hearing as incorporated by reference into Kissner's complaint.

### 2.      Community Forum Thread

McVoy additionally argues that the Court should consider the entire Community Forum Thread because Kissner "makes numerous references to the allegedly defamatory statement published by McVoy but only includes a redacted version of that statement, rather than the statement in its entirety."  McVoy's MTS/MTD at 4.  Because McVoy's

---

[10] Neither party has asked the Court to take judicial notice of any of these documents.

1    statement forms the basis of Kissner's claims against him, the Court considers it in its

2    entirety.  Further, because the totality of circumstances test (discussed in detail in §

3    III.A.2.b.i.(2) below) considers the setting and context of the post, the Court considers the

4    entirety of the Community Forum Thread.  See Browning v. Am. Honda Motor Co., 549 F.

5    Supp. 3d 996, 1004 (N.D. Cal. 2021) (citations omitted) ("Courts thus routinely consider

6    the full page of a website where, as here, a portion of the page is quoted or relied on in the

7    complaint."); accord Feld v. Conway, 16 F. Supp. 3d 1, 4 (D. Mass. 2014) (holding that in

8    an analyzing a tweet for defamation, "[t]he tweet cannot be read in isolation, but in the

9    context of the entire discussion.").

### 3.   McVoy's Prior Statements

11       Kissner does not make a legal argument as to why the Court should consider

12   McVoy's prior emails and group forum posts, but instead offers that they "reflected

13   McVoy's hostility towards [Kissner]."  Kissner Decl. at 2.  Kissner does not reference

14   these statements directly in his complaint.  SAC.  "For a reference to be sufficiently

15   'extensive,' a document should be referred to 'more than once.'"  AliveCor, Inc. v. Apple

16   Inc., No. 21-CV-03958-JSW, 2022 WL 833628, at *3 (N.D. Cal. Mar. 21, 2022).  For this

17   reason, Kissner has not incorporated McVoy's prior statements by reference.

18       Courts may still "take judicial notice of documents on which allegations necessarily

19   rely, even if not expressly referenced in the complaint, provided that the authenticity of

20   those documents are not in dispute."  Browning, 549 F. Supp. 3d at 1004.  A court may

21   also "take judicial notice of publications introduced to indicate what was in the public

22   realm at the time, not whether the contents of those articles were in fact true."  Id.

23       Here, the SAC does mention that Kissner received a "flood of vulgar, threatening

24   and harassing messages and emails" and "profanity-laced attacks on social media

25   platforms" in response to his activities.  SAC ¶¶ 91–95, 177.  Further, because McVoy

26   alleges that Kissner is a limited purpose public figure, Kissner's ability to prove actual

27   malice is material.  Finally, several of McVoy's posts were to the same public forum as the

28   allegedly defamatory statement, and thus "indicate what was in the public realm at the

United States District Court
Northern District of California

time." See Browning, 549 F. Supp. 3d at 1004. Considering what was in the public realm will help the Court understand the expectations of the audience members in the forum, which is again relevant to the totality of circumstances test. Because the SAC references general online harassment of Kissner, the issue of actual malice is necessary for Kissner's claim, the statements will help the Court conduct the totality of circumstances test, and McVoy has not objected to the authenticity of the documents, the Court takes judicial notice of these prior statements.

The Court now turns to the two pending motions.

## III. DISCUSSION: CLAIMS AGAINST MCVOY

This section will first discuss (A) McVoy's motion to strike under the anti-SLAPP statute, then (B) McVoy's motion to dismiss, and then (C) the issue of leave to amend.

### A. Anti-SLAPP Motion

#### 1. Legal Standard

California's anti-SLAPP statute "is designed to discourage suits that 'masquerade as ordinary lawsuits but are brought to deter common citizens from exercising their political or legal rights or to punish them for doing so.'" In re NCAA Student-Athlete Name & Likeness Licensing Litig., 724 F.3d 1268, 1272 (9th Cir. 2013) (quoting Batzel v. Smith, 333 F.3d 1018, 1024 (9th Cir. 2003)). The anti-SLAPP statute sets forth a procedure by which defendants can move to strike SLAPP claims:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that there is a probability that the plaintiff will prevail on the claim.

Cal. Code Civ. P. § 425.16(b)(1).

#### 2. Discussion

There are two steps in analyzing an anti-SLAPP motion. First, "[t]he defendant bears the initial burden to show that the statute applies because the lawsuit arises from defendant's act in furtherance of its right of petition or free speech." See Doe v. Gangland Prods., Inc., 730 F.3d 946, 953 (9th Cir. 2013). Second, if the defendant makes that

United States District Court
Northern District of California

1  showing, the court then considers whether the plaintiff has demonstrated "a reasonable

2  probability" of prevailing on the merits of his claims.  In re NCAA, 724 F.3d at 1273.

3  ### a.  Act in furtherance of right of petition or free speech

4  One way in which a lawsuit arises from an act in furtherance of the defendant's

5  right of petition or free speech is if the defendant has shown that "the alleged defamatory

6  statements were made in a public forum in connection with an issue of public interest."

7  Grenier v. Taylor, 234 Cal. App. 4th 471, 481 (2015).[11]  "Statements made on a Web site,"

8  like McVoy's post, "are made in a public forum."  See id.

9  While the statute does not define what constitutes a public interest, "in each case

10  where it was determined that an issue of public interest existed, the subject statements

11  either concerned a person or entity in the public eye, conduct that could directly affect a

12  large number of people beyond the direct participants or a topic of widespread, public

13  interest."  Id. at 482 (citations omitted).  An issue can still be of public interest even if it is

14  "of interest to only a limited but definable portion of the public."  Id.  Issues of child

15  molestation or abuse and the protection of children in the community "concern issues of

16  public interest."  Id.; see also Terry v. Davis Cmty. Church, 131 Cal. App. 4th 1534, 1547

17  (2005) (noting that even when an investigation into alleged abuse finds "insufficient

18  evidence of a crime, that does not negate the public interest" in protecting children).

19  Because McVoy posted in a public forum on a topic of public interest, he has

20  satisfied the first prong of the anti-SLAPP analysis.

21  ### b.  Probability of prevailing

22  At the second step of the anti-SLAPP analysis, the burden shifts to Kissner to

23  establish "a reasonable probability" of prevailing on the merits of its claims.  See In re

24  NCAA, 724 F.3d at 1273.  The Ninth Circuit has characterized the standard to withstand

25  an anti-SLAPP motion as "a low bar": "plaintiff must demonstrate that the complaint is

26

27  [11] Kissner initially conceded that McVoy had met the first prong of the test.  Pl.'s Opp'n to
McVoy at 11.  However, in his sur-reply, Kissner seems to retract this concession, challenging the
28  prong for the first time, and arguing that "a public teacher's dismissal is generally not a matter of
public interest."  Pl.'s Sur-Reply (dkt. 59) at 12.

1    both legally sufficient and supported by a sufficient prima facie showing of facts to sustain

2    a favorable judgment if the evidence submitted by the plaintiff is credited." <u>Roberts v.</u>

3    <u>McAfee, Inc.</u>, 660 F.3d 1156, 1163 (9th Cir. 2011) (quoting <u>Manufactured Home Cmties.,</u>

4    <u>Inc. v. Cnty. of San Diego</u>, 655 F.3d 1171, 1176–77 (9th Cir. 2011)).  Although "the court

5    does not weigh the credibility or comparative probative strength of competing evidence, it

6    should grant the motion if, as a matter of law, the defendant's evidence supporting the

7    motion defeats the plaintiff's attempt to establish evidentiary support for the claim." <u>Id.</u>

8        The Ninth Circuit has held that courts should apply the Federal Rules of Civil

9    Procedure to determine the proper standard in assessing the probability that a plaintiff will

10   prevail under the California anti-SLAPP statute. <u>Planned Parenthood</u>, 890 F.3d at 834.  A

11   court must determine if the motion to strike challenges the legal sufficiency of the claim or

12   the factual sufficiency of the claim. <u>Id.</u>  When the motion challenges only the legal

13   sufficiency of a claim, "the district court should apply the Federal Rule of Civil Procedure

14   12(b)(6) standard and consider whether a claim is properly stated." <u>Id.</u> at 834–35.

15       Pursuant to Rule 12(b)(6), a complaint may be dismissed for failure to state a claim

16   upon which relief may be granted.  Dismissal may be based on either "the lack of a

17   cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

18   theory." <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990).  A court

19   "must presume all factual allegations of the complaint to be true and draw all reasonable

20   inferences in favor of the nonmoving party." <u>Usher v. City of Los Angeles</u>, 828 F.2d 556,

21   561 (9th Cir. 1987).  However, it is "not bound to accept as true a legal conclusion

22   couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986); <u>Clegg v.</u>

23   <u>Cult Awareness Network</u>, 18 F.3d 752, 754–55 (9th Cir. 1994).  Moreover, a "pleading

24   that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

25   action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid

26   of 'further factual enhancement.'  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)

27   (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555, 557 (2007)).  Rather, a

28   complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief

United States District Court
Northern District of California

that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).  A claim is
plausible "when the plaintiff pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the misconduct alleged." Id.

McVoy argues that Kissner has not demonstrated a probability of prevailing on any
claim.  See generally McVoy's Reply.  This order therefore examines Kissner's claims for
(i) defamation; (ii) false light invasion of privacy; and (iii) IIED.

### i.    Defamation

To state a claim for defamation under California law, a plaintiff must allege that the
defendant intentionally published a statement of fact "which is false, unprivileged, and has
a natural tendency to injure or which causes special damage."  Ringeler Assocs. Inc. v.
Md. Cas. Co., 80 Cal. App. 4th 1165, 1179 (2000).  Further, "false statements charging the
commission of crime, or tending directly to injure a plaintiff in respect to his or her
profession by imputing dishonesty or questionable professional conduct are defamatory per
se." Burrill v. Nair, 217 Cal. App. 4th 357, 383, 158 Cal. Rptr. 3d 332, 351
(2013), disapproved of on other grounds by Baral v. Schnitt, 1 Cal. 5th 376, 376 P.3d 604
(2016).

McVoy argues that Kissner has failed to demonstrate a probability of prevailing on
the defamation per se claim because (1) Kissner constituted a limited purpose public figure
but failed to demonstrate McVoy's malice through clear and convincing evidence and (2)
McVoy's statement was a non-actionable opinion.  McVoy's Reply at 2–6, 9–13.

#### (1)   Limited purpose public figure

McVoy argues that Kissner is a limited purpose public figure and thus to allege
defamation, Kissner must prove actual malice and meet the clear and convincing evidence
standard.  Id. at 3–5 (citing Balla v. Hall, 59 Cal. App. 5th 652, 682–83 (2021), review
denied (Apr. 14, 2021)).

Qualification as a limited purpose public figure has three elements: (a) a public
controversy involving a publicly debated issue with a foreseeable and substantial
ramification for nonparticipants; (b) a voluntary act by the plaintiff to influence resolution

22

1   of the issue or thrust themselves into the public eye; and (c) that the allegedly defamatory

2   statement is relevant to the plaintiff's involvement in the public controversy. Gilbert v.

3   Sykes, 147 Cal. App. 4th 13, 24 (2007).

### (a) Public controversy

5   Kissner argues that he is a private figure for the purposes of this matter because he

6   never "engage[d] in any public controversy regarding any allegations of inappropriate

7   conduct with children, or 'grooming.'" Pl.'s Opp'n to McVoy at 8. McVoy counters that

8   "public controversy surrounds Plaintiff beginning with his political activism, social

9   activism, religious involvement and inappropriate behavior with children." McVoy's

10  Reply at 3. McVoy's argument does not allege a particular public controversy, but

11  suggests that a controversial person can become a public controversy. McVoy does not

12  cite cases that support such a broad notion.

13  In Gilbert, cited by McVoy, the court found that a plastic surgeon plaintiff had

14  voluntarily injected himself into the public debate on the merits of plastic surgery by

15  promoting the procedures in the media, and thus that the defendant patient's allegedly

16  defamatory statements about a surgery the plaintiff performed enjoyed constitutional

17  protection. See 147 Cal. App. 4th at 24. Gilbert involved a much more narrowly defined

18  controversy than McVoy's wide ranging "various roles in the community." See McVoy's

19  Reply at 4. McVoy argues that Kissner himself has merged the various controversial

20  issues surrounding him, asserting that "Plaintiff also sees these public issues as one

21  ongoing, public controversy. Even now in the Opposition, Plaintiff spends the first seven

22  pages detailing his experiences as a limited purpose public figure in the public

23  controversy." See id. at 4–5. However, McVoy's definition would transform Kissner into

24  an all-purpose public figure, which runs counter to the logic of the limited purpose public

25  figure designation. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 352 (1974) ("Absent

26  clear evidence of general fame or notoriety in the community, and pervasive involvement

27  in the affairs of society, an individual should not be deemed a public personality for all

28  aspects of his life.").

United States District Court
Northern District of California

23

1    Although McVoy's definition of the controversy proves too broad, Kissner's proves

2    too narrow.  Kissner argues that his conduct with children was not a subject of years-long

3    debate or divisiveness in the community.  Pl.'s Opp'n to McVoy at 8.  This assertion has

4    two problems.  First, Kissner himself notes that a parent had previously gone "to extreme

5    lengths to portray Kissner as a . . . pederast," and thus the topic was already a matter of

6    parental and staff discussion, and that "gossip continued unabated for several years as

7    Kissner continued to be a controversial figure involved in the local political process."

8    SAC ¶¶ 147, 150, 153.  Kissner's interaction with children was an ongoing subject of

9    debate.  Further, although Kissner narrowly frames the public discussion as being about

10   pederasty, the public discussion more broadly entailed Kissner's fitness to be a teacher;

11   these accusations formed an important part of the investigation and conversation.

12   **(b) Voluntary acts**

13   Accepting that there was public controversy about both Kissner's interaction with

14   children and his fitness as a teacher, Kissner must have also voluntarily injected himself

15   into the conversation surrounding those controversies.  McVoy points to Kissner's

16   voluntary interviews, media coverage, and public speeches at board meetings.  McVoy's

17   Reply at 4.  Although Kissner involved himself voluntarily in public controversies

18   surrounding the walkout, tax measure, and the board election, nothing suggests any of

19   those acts sought to influence the outcome of either the public discussion of his fitness as a

20   teacher, nor the discussion of his interactions with children, which are the public

21   controversies at issue here.  SAC ¶¶ 89, 96, 106.

22   However, Kissner's posting of a video on social media discussing the controversy

23   likely qualifies as a voluntarily entering the controversy.  The parties provide differing

24   descriptions of the video.  McVoy describes it as a "public and well-viewed video" that

25   Kissner released in which Kissner discussed "the District's ongoing investigations into

26   him" and his "desires and plans to fight all investigations and the results thereof, including

27   the investigations into his inappropriate behavior with children."  McVoy's Reply at 4.

28   McVoy's description matches the Committee's: Kissner spent "much if not most of the

24

video's duration explaining his continuing unhappiness about the Spring 2018 political controversy, the anonymous letter, and the resulting investigations, and reiterating his unwillingness to put those conflicts to rest."  Dismissal Hearing § Factual Findings ¶ 74. In contrast, Kissner only briefly mentions the video in his SAC, and downplays any connection between his public statements, noting that "he did not seek public attention for his employment troubles."  SAC ¶ 166; Pl.'s Sur-Reply at 10.

Kissner further argues that he did not engage in any voluntary act but was instead "drawn in," noting that "in the particular controversy in issue, Kissner did not seek to be fired and laid off . . . [or] falsely charged with 'grooming' children."  Pl.'s Sur-Reply at 4. Kissner argues that he merely litigated actions in the dismissal hearing to maintain his job, citing Time, Inc. v. Firestone, 424 U.S. 448, 457 (1976) for the proposition that he was "drawn into a public forum largely against [his] will in order to attempt to obtain the only redress available to [him] or to defend [himself] against actions brought by the state or by others."  Pl.'s Sur Reply at 4–5 (citing Firestone).  But in Firestone, the party did not create and post a video arguing their own position outside of the proceedings.  See generally 424 U.S. 448.  By creating the video, Kissner voluntarily involved himself.  See Denney v. Lawrence, 22 Cal. App. 4th 927, 935–36 (1994) (holding that plaintiff was public figure for purposes of public debate on his brother's murder charges after giving voluntary press interviews where "he promoted a version of the case favorable to his brother," and comparing case to another where plaintiff "aggressively promoted her version of the case outside the courtroom," and "encouraged public interest in herself.").

Kissner's public video was a voluntary act relevant to the ongoing controversy about his fitness and interactions with children, and thus made him a limited purpose public figure for those controversies.

**(c) Statements were relevant**

McVoy's statement directly addressed the investigation into Kissner and the allegations of inappropriate conduct with children, satisfying the third prong of the test.

**(d) Actual malice**

25

United States District Court
Northern District of California

1    If Kissner is a limited purpose public figure, he must demonstrate actual malice,

2    which requires showing by clear and convincing evidence that McVoy made the

3    statements "with knowledge that [they were] false or with reckless disregard of whether

4    [they were] false or not." Balla v. Hall, 59 Cal. App. 5th 652, 682–83 (2021), review

5    denied (Apr. 14, 2021). Circumstantial evidence can demonstrate actual malice, and

6    "considerations such as 'anger and hostility toward the plaintiff,' 'reliance upon sources

7    known to be unreliable or known to be biased against the plaintiff,' and 'failure to

8    investigate' may 'in an appropriate case indicate that the publisher himself had serious

9    doubts regarding the truth of his publication.'" Id. at 683.

10   McVoy asserts that Kissner "offers no evidentiary support" for McVoy's malice.

11   McVoy's Reply at 6. However, Kissner's declaration includes several statements that

12   McVoy made prior to the allegedly defamatory statement that suggest "anger and hostility

13   toward the plaintiff." See Balla, 59 Cal. App. 5th at 683. For example, on May 7, 2021,

14   McVoy posted a message to the community forum about Kissner and someone who was

15   working with Kissner on a political initiative ("Rokni"): "Kissner and Rokni need to find a

16   different place to live. I don't speak for anyone but me, but in my mind, they are not

17   welcome here," and "the amount of harm they have caused is way too much for them to

18   stay." Kissner's Decl., Ex. 1 (dkt. 51-2) ("McVoy's Prior Statements"). Kissner's

19   declaration also includes emails that McVoy sent in May 2021 that, while addressed to

20   Rokni alone, seem to highlight hostility towards both Kissner and Rokni: "You could have

21   been a decent person and let things play out but instead you just poured your hate on the

22   school district, you are fine with costing all of us $200-$600k. Fuck you. If I saw you

23   bleeding out and you needed my help to live, I'd let you bleed out. You suck that much."[12]

24   See id. In concluding this email, McVoy explicitly notes that this language is a deviation

25   from his standard correspondence discourse, suggesting his hostility towards his reader:

26   _____

27   [12] The email continues: "And you can take me to court with my words . . . . I'll tell the
     judge, ['judge, this guy is a piece of shit, here is what he did and here is why I said what I
28   said.' And you know what? I'm 100% positive the judge will sigh and go [']I'm with
     Larry, I'm not with this asshole.'" See McVoy's Prior Statements.

1    "[a]nd for the record, in my 59 years, I have never written an email like this, this is way

2    over the top for me, if my wife saw this she would be pissed.  You are that awful."  See id.

3    These messages lend support to a finding of actual malice, although "mere proof of

4    ill will on the part of the publisher may . . . be insufficient" to make such a finding.

5    Reader's Dig. Assn. v. Superior Ct., 37 Cal. 3d 244, 258, (1984).  Kissner has offered no

6    evidence of McVoy's reliance upon sources known to be unreliable or suggested that

7    McVoy had a duty to further investigate.[13]  See Balla, 59 Cal. App. at 682–83.  While it is

8    a close question, the evidence demonstrating McVoy's disdain for Kissner suggests actual

9    malice.

10   **(2) Non-actionable opinion**

11   "Generally, statements of opinion are not actionable as defamation, whereas

12   statements of fact are actionable."  Piping Rock Partners, Inc. v. David Lerner Assocs.,

13   Inc., 946 F. Supp. 2d 957, 970 (N.D. Cal. 2013), aff'd, 609 F. App'x 497 (9th Cir. 2015).

14   However, a statement of opinion remains actionable defamation if a "reasonable

15   factfinder" could find it "implies an assertion of objective fact."  See Unelko Corp. v.

16   Rooney, 912 F.2d 1049, 1053 (9th Cir. 1990).  California courts apply the totality of

17   circumstances test to understand what a reasonable factfinder would conclude.  See

18   Ferlauto v. Hamsher, 74 Cal. App. 4th 1394, 1401 (1999).  A court should consider: (1) the

19   entirety of the statement, including language, tone, specificity, cautionary words, and the

20   publisher's self-presentation and inclusion of the facts underlying their opinion and (2) the

21   surrounding circumstances and context of publication, including other statements within

22   the conversation and the potential impact of the setting on audience expectations.  See ZL

23   Techs., Inc. v. Does 1-7, 13 Cal. App. 5th 603, 624 (2017) (collecting cases).

24   **(a) The entirety of the statement**

25   Kissner argues that two elements of McVoy's statement ("he's someone who was

---

[13]  Kissner does argue that McVoy's disclaimer "I can't prove that" reflects "serious
doubts" as to the truth of the publication.  Pl.'s Sur Reply at 6.  Kissner offers only
conclusory statements in support of this argument.  See id.

United States District Court
Northern District of California

grooming kids" and "all the evidence points that way") combine to make the statement actionable, because they imply that "the evidence proved Kissner was guilty of grooming children." Pl.'s Opp'n to McVoy at 15. Although the statement includes lax grammar, typos, and profanity, its overall tone remains earnest, providing mixed signals on actionability. See ZL Techs., Inc. v. Does 1-7, 13 Cal. App. 5th 603, 624 (2017).

Kissner additionally argues that McVoy's entire post offers "a 'summary' of the Decision." Pl.'s Opp'n to McVoy at 15. However, the Court must consider the entirety of the statement, "not merely a particular phrase or sentence." Info. Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir. 1980). Here, the first paragraph of the post introduces the second paragraph, which is a quote from the decision. See Community Forum Thread, Reply No. 121751. In the remaining paragraphs, McVoy provides his commentary on the decision. See id. The structure does not suggest that McVoy intended the final three paragraphs to be a summary of the decision. For example, McVoy's fourth paragraph merely provides his general opinion of teachers and does not address anything in the report. Id.

Kissner further contends that McVoy's comment that he previously thought that Kissner was falsely accused deliberately "inculcate[d] a sense of reliability and trustworthiness." Pl.'s Opp'n to McVoy at 16. On the one hand, McVoy's attempt to depict himself as unbiased increases actionability, given his previously expressed vitriol; on the other, McVoy makes no claim to have any expertise or insider knowledge with which to evaluate the evidence, decreasing actionability.[14] See ZL Techs., 13 Cal. App. 5th at 624 (noting that when a publisher "represents himself as unbiased, having specialized or first-hand experience, or having personally witnessed abhorrent behavior" it suggests the statement may be actionable).

Although Kissner argues that the statement lacks qualification or cautionary terms,

---

[14] Kissner claims that "McVoy sought to pass himself off as qualified to interpret a legal opinion in order to appear credible. . . ." Pl.'s Sur-Reply at 7. But McVoy makes no claims about his legal expertise; this argument is meritless.

the statement's key portion reads: "Finally, <u>seems like</u> what should have happened[,] happened. . . . [H]e's someone who was grooming kids.  <u>I can't prove that</u>, but all the evidence <u>points</u> that way."  Community Forum Thread, Reply No. 121751 (emphasis added).  When a publisher qualifies their statement, courts should "give weight to cautionary terms."  <u>Info. Control Corp. v. Genesis One Computer Corp.</u>, 611 F.2d 781, 784 (9th Cir. 1980).  Kissner attempts to downplay the importance of the line "I can't prove that," as merely a "throwaway expression."[15]  Pl.'s Opp'n to McVoy at 16.  Indeed, even a "disclaimer that that the contents represented a 'judgment' does not conclusively resolve . . . whether a reasonable fact finder could conclude that the publication declares or implies a provably false assertion of fact."  <u>Overstock.com, Inc. v. Gradient Analytics, Inc.</u>, 151 Cal. App. 4th 688, 704, (2007).  While such language does not definitively answer the question, it still cuts against actionability.  <u>See</u> <u>Gregory v. McDonnell Douglas Corp.</u>, 17 Cal. 3d 596, 603 (1976).

Further, McVoy only makes generalizations about Kissner's alleged behavior.  The absence of specifics, especially "as to the time or place of alleged conduct," cuts against actionability.  <u>See</u> <u>ZL Techs.</u>, 13 Cal. App. 5th at 624; <u>see also</u> <u>Chaker v. Mateo</u>, 209 Cal. App. 4th 1138, 1149–50 (2012) (finding statements to the effect that plaintiff "picks up street walkers and homeless drug addicts and is a deadbeat dad" non-actionable in part due to lack of specifics).

Additionally, McVoy made clear that he relied on the Commission's decision as the basis for his statement.  Kissner implicitly agrees that McVoy's statement relied on the Committee's decision.  <u>See</u> Pl.'s Opp'n to McVoy at 15 ("We know where McVoy came into the newly acquired information because he tells us in the next sentence: in the Decision . . . .").  By pointing to the Commission's decision as the basis for his statement,

---

[15]  Kissner treats this line inconsistently across his filings.  In his sur-reply, Kissner argues that McVoy's total statement "is factually declarative and leaves the reader with no doubt he believes unreservedly that Kissner is a groomer," but then continues that the line "I can't prove that," demonstrates that McVoy "entertains serious doubts as to the truth of the publication."  Pl.'s Sur-Reply at 6.

United States District Court
Northern District of California

McVoy greatly mitigated its actionability.  See Partington v. Bugliosi, 56 F.3d 1147, 1156–57 (9th Cir. 1995) ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment."); see also Redmond v. Gawker Media, LLC, No. A132785, 2012 WL 3243507, at *6 (Cal. Ct. App. Aug. 10, 2012) (holding that an article constituted non-actionable opinion in part because "[t]he article is completely transparent.  The sources upon which the authors rely for their conclusions are specified, and the article incorporates active links to many of the original sources . . . Having ready access to the same facts as the authors, readers were put in a position to draw their own conclusions . . . .").  Here too, McVoy's statement conveyed an interpretation of the facts, made available to other readers, who came to both similar and differing opinions.  See Community Forum Thread, Replies No. 121757, 122553, 122554.

Pointing to the decision does not necessarily relieve McVoy of all liability because "even where the speaker states facts upon which he or she bases an opinion, if the facts are incorrect or incomplete, or if the speaker's assessment of them is erroneous, the statement can still imply an actionable statement."  Overstock, 151 Cal. App. 4th at 705.  In Overstock, the plaintiff corporation sued the defendant short seller based on the short seller's statements that the corporation had changed its accounting practices to artificially boost revenue.  Id. at 704.  The short seller based this assessment in part on an analysis of the corporation's financials, arguing that the accounting changes did not make sense because the corporation's business model did not face the specific risk it claimed as the reason for changing its accounting.  Id.  However, the corporation presented evidence that it did indeed face that risk, undermining the short seller's factual basis.  Id.

Here, McVoy relies on the Committee report as his factual basis, but the report did not substantiate allegations of immoral conduct.  Dismissal Hearing § Legal Conclusions ¶ 8.  Kissner asserts that it "neither mentions a charge of grooming, analyzes facts pertaining to a charge of grooming, nor reaches any factual or legal conclusions relating to a charge

of grooming." Pl.'s Sur-Reply at 8.  Nevertheless, the report outlines certain behaviors that could be consistent with grooming, like Kissner's provision of alcohol to a minor, and his minimization and false testimony about that provision.  Dismissal Hearing § Factual Findings ¶¶ 28, 98, n. 5.[16]  Unlike Overstock, where the defendant based his statement on underlying evidence that proved incorrect, here McVoy based his underlying statement on Kissner's uncontested behaviors.  See 151 Cal. App. 4th at 705.

The Ninth Circuit has distinguished between statements that carry implicit, undisclosed facts, and statements that disclose their basis, even if it that basis is not itself definitive.  See Standing Comm. on Discipline of U.S. Dist. Ct. for Cent. Dist. of California v. Yagman, 55 F.3d 1430, 1439 (9th Cir. 1995) (differentiating between the statements "I think Jones is an alcoholic" and "Jones moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a drink in his hand. I think he must be an alcoholic," and noting that the former seems to carry implied facts, making it actionable, while the latter discloses facts that could suggest the conclusion, without implying other, unstated facts, making it unactionable).  As such, McVoy was "writing about a controversial occurrence," "fairly describe[d] the general events involved," and "offer[ed] his personal perspective about some of its ambiguities and disputed facts," suggesting protected speech.  See Partington, 56 F.3d 1147 at 1154; see also Herring Networks, 8 F.4th at 1159 (holding that general context of reporter's mix of news and analysis was such that "[a] reasonable viewer would be able to differentiate between [her] commentary and the actual news she [was] reporting.").  In fact, the Committee report acknowledged that the District had previously warned Kissner "of the possibility that parents or children could misperceive his

---

[16] Grooming is not a defined crime in California.  However, expert testimony in various California courts has described aspects of grooming behavior and thought patterns.  See, e.g., Light v. Martel, No. 09-00177 JSW, 2009 WL 4456385, at *3 (N.D. Cal. Nov. 30, 2009) ("[A]nother not uncommon behavior of offenders is providing legal or illegal substances, [including] maybe purchasing alcohol or giving alcohol. . . ."); Dawn D. v. Regents of Univ. of California, No. B155555, 2003 WL 21404925, at *13 (Cal. Ct. App. June 19, 2003) ("The typical offender's 'thinking patterns' . . .  may incorporate denial, . . . minimizing, excusing, lying, seeking sympathy, avoiding detail . . . .").

mentorship as inappropriate sexual interest," reinforcing that the actions at issue could constitute a factual basis for such a belief. Dismissal Hearing § Factual Findings ¶ 71.

Accordingly, the entirety of the statement suggests that it is a non-actionable opinion.

### (b) The statement's setting

McVoy additionally asserts that the statement's setting, "internet and social media postings made by a speaker engaged in an ongoing, emotional and very public debate in which many other members of the communities were also engaged," undercuts actionability. McVoy's Reply at 10. McVoy posted as part of a heated public debate about Kissner, which likely constitutes a setting "in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole," supporting the argument that "language which generally might be considered as statements of fact may well assume the character of statements of opinions." See Ferlauto v. Hamsher, 74 Cal. App. 4th 1394, 1401 (1999).

However, McVoy has not offered any evidence that "readers of [the forum] would expect purported facts to be anything other than true." See Piping Rock, 946 F. Supp. 2d at 973 (N.D. Cal. 2013). Further, McVoy's postings were not anonymous and thus lacked that obvious indicator to the audience to treat the posts more cautiously. See Summit Bank v. Rogers, 206 Cal. App. 4th 669, 696–97 (2012) ("Indeed, the very fact that most of the posters remain anonymous, or pseudonymous, is a cue to discount their statements accordingly."). That said, McVoy had previously shared his opinions and negative feelings about Kissner online to large groups under his name, suggesting that the audience was on alert to his potential biases. See McVoy's Prior Statements (addressing the forum more than a year before post at issue to express disdain for Kissner). Thus, the setting slightly favors finding the statement non-actionable.

In conclusion, McVoy's statement presented his interpretive summary of the hearing's evidence, couched in the language of apparency, in a way that allowed other readers to make their own determinations. The setting also suggested, to a lesser extent,

1    that McVoy's audience would not take his statement as a declaration of fact. As such, it

2    was a non-actionable opinion, and so Kissner is unlikely to prevail on his defamation

3    claim.

### ii.      False light invasion of privacy

5         To state a claim for false light invasion of privacy, a plaintiff must establish that: (1)

6    the plaintiff has been "placed before the public in a false light," (2) the false light would be

7    "highly offensive to a reasonable person," and (3) "the defendant knew or acted in reckless

8    disregard as to the falsity of the publicized matter and the false light in which the plaintiff

9    would be placed." Jackson v. Mayweather, 10 Cal. App. 5th 1240, 1264 (2017), as

10   modified (Apr. 19, 2017) (quoting Price v. Operating Engineers Loc. Union No. 3, 195

11   Cal. App. 4th 962, 970 (2011)). "When a false light claim is coupled with a defamation

12   claim, the false light claim is essentially superfluous, and stands or falls on whether it

13   meets the same requirements as the defamation cause of action." Jackson, 10 Cal. App.

14   5th at 1264 (quoting Eisenberg v. Alameda Newspapers, Inc., 74 Cal. App. 4th 1359, 1385,

15   88 Cal. Rptr. 2d 802, 823 (1999)).

16        Here, Kissner's false light invasion of privacy claim is based on the same statement

17   as the defamation claim and suffers the "same fatal defect" as the defamation claim:

18   McVoy's statement is a non-actionable opinion. See Jackson, 10 Cal. App. 5th at 1264

19   (dismissing false light claim because of same defects found in defamation claim); accord

20   Karimi v. Golden Gate Sch. of L., 361 F. Supp. 3d 956, 977 (N.D. Cal. 2019), aff'd, 796 F.

21   App'x 462 (9th Cir. 2020) (dispensing with false light claim together with defamation

22   claim). Accordingly, Kissner has not demonstrated a probability of prevailing on the false

23   light invasion of privacy claim.

### iii.     IIED

25        To state a claim for IIED, a plaintiff must allege: (1) the defendant engaged in

26   "extreme and outrageous conduct . . . with the intention of causing, or reckless disregard of

27   the probability of causing, emotional distress;" (2) the plaintiff "suffer[ed] severe or

28   extreme emotional distress;" and (3) the defendant's conduct must be the "actual and

United States District Court
Northern District of California

33

1    proximate causation of [the plaintiff's] emotional distress." Christensen v. Sup. Ct., 54

2    Cal. 3d 868, 903, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991). McVoy argues that Kissner

3    cannot satisfy the first or third prongs. McVoy's MTS/MTD at 22.[17]

4        **(a) Extreme and outrageous conduct**

5        To be outrageous, a defendant's conduct must be "so extreme as to exceed all the

6    bounds of that usually tolerated in a civilized society." Hughes v. Pair, 46 Cal. 4th 1035,

7    1050–51, (2009).

8        Kissner argues that "McVoy's exploitation of the false allegation, referring

9    specifically to 'all the evidence' proving that Kissner 'was grooming kids'" constitutes

10   extreme and outrageous conduct. Pl.'s Opp'n to McVoy at 22. McVoy counters that his

11   statement did not exceed what a civilized community would tolerate because

12   "communities across California and the United States are forced to engage in public

13   debates about pedastry as it is an issue of public interest." McVoy's MTS/MTD at 22.

14   But just because many communities need to discuss child abuse does not mean that an

15   allegedly false accusation of child abuse cannot be extreme and outrageous. See

16   FreemanGrove v. Childtime Learning Centers, Inc., No. SACV160745JVSJEMX, 2016

17   WL 3561773, at *3 (C.D. Cal. June 28, 2016) (holding "[f]alse accusations of child abuse,

18   if proven, could constitute outrageous conduct since such conduct exceeds the bounds

19   tolerated by civilized society.").

20       However, IIED cases based on such false accusations generally involve accusations

21   first levied by the defendant or reported by the defendant to authorities. See, e.g., Heineke

22   v. Santa Clara Univ., No. 17-CV-05285-LHK, 2017 WL 6026248, at *10 (N.D. Cal. Dec.

23   5, 2017) (sustaining IIED claim against alleged originator of false accusations of sexual

24

---

25   [17] Although neither party raises this issue, courts in the Ninth Circuit have occasionally ruled that a plaintiff cannot maintain an IIED claim based on the same statement for which a plaintiff also
26   brings a defamation claim. See, e.g., Dworkin v. Hustler Mag., Inc., 668 F. Supp. 1408, 1420–21 (C.D. Cal. 1987), aff'd, 867 F.2d 1188 (9th Cir. 1989) (holding "Dworkin cannot maintain a
27   separate cause of action for mental and emotional distress where the gravamen is defamation."); Silva v. Hearst Corp., No. CV97-4142 DDP(BQRX), 1997 WL 33798080, at *3 (C.D. Cal. Aug.
28   22, 1997) (noting that "[w]hen a complaint alleges a defamation claim, as well as other causes of action based on the same allegations, the additional claims should be dismissed as surplusage").

United States District Court
Northern District of California

1   harassment); <u>Siam v. Kizilbash</u>, 130 Cal. App. 4th 1563, 1582, (2005) (sustaining IIED

2   claim against defendant who made allegedly false reports of child abuse to mandatory

3   reporters and law enforcement).  In contrast, here McVoy did not start these allegations,

4   report them to any legal authorities, or otherwise take any action to subject Kissner to

5   investigation.  Instead, McVoy merely shared his interpretation of the findings of an

6   investigation that was initiated without his involvement.  Kissner cites no authority holding

7   that simply commenting on preexisting allegations, already made public by the District,

8   constitutes extreme and outrageous behavior.  Accordingly, the IIED claim fails due to

9   lack of extreme and outrageous behavior.

   **(b) Proximate cause**

11          McVoy further argues that the District, not his statement, was the proximate cause

12   of Kissner's harm.  McVoy's Reply at 8.  Kissner's own motions demonstrate the minimal

13   role that McVoy played in spreading rumors of Kissner's alleged grooming behavior:

> The road to inventing the fictional character <u>Kissner the child "groomer"</u> becoming
> urban legend began with an anonymous letter.  The letter prompted an investigation.
> The investigation produced a report quoting the anonymous allegation.  The
> allegation was borrowed from the investigative report and inserted as an allegation
> into a charging document released to the public.  Repeated by McVoy, it gained
> mythical acceptance.

18   Pl.'s Opp'n to McVoy at 5–6 (emphasis in the original).  <u>See also id.</u> at 5 ("[A]n individual

19   submitted a public records act request for the charging statement to the school district.  The

20   district didn't hesitate to produce it, and within less than an hour the false charge of

21   grooming was loosed into the community, where it great into a beanstalk of vilification on

22   social media."); SAC ¶ 390 (describing IIED claim: "By virtue of the conduct discussed

23   above, including, but not limited to, the subsequent release of the statement of charges to

24   the public without accommodating Kissner's right to seek a writ of mandate prohibiting its

25   release to the public, the false statements to community members, known and unknown,

26   and the myriad of threads made directly and indirectly to Kissner, Defendants, or some of

27   them, acting on behalf of and/or in conspiracy with one another, committed extreme and

28   outrageous conduct.").

United States District Court
Northern District of California

Despite the initial accusation by someone other than McVoy, its inclusion in government investigation reports and official charging documents, its release by government officials, its publication by someone other than McVoy, and its discussion by other members of the community, Kissner claims that McVoy's single repetition of the claim in an online forum allowed it to gain "mythical acceptance." Pl.'s Opp'n to McVoy at 6. Kissner does not allege that the community views McVoy as a particular arbiter of truth, instead offering:

> McVoy's statement transformed unproven allegations into an authoritative distillation of evidence purportedly presented to the CPC. It is common knowledge that statements made on social media have the effect of becoming conventional wisdom or perceived truth. Understanding this, Kissner was forced to relocate his family out of the area in order to distance himself from the stigma he has been branded with.

Pl.'s Opp'n to McVoy at 6–7.

Kissner cites no support for the assertion that McVoy's statement elevated the allegations, nor that McVoy's post caused the stigma that forced him to move, nor even that it is commonly accepted that statements made on social media "have the effect of becoming conventional wisdom or perceived truth." See id. Instead, Kissner merely cites his own declaration to affirm that "the duress [he] suffers caused by McVoy's defamatory statements forced [him] to leave the community," and that he is "constantly distressed over the perception McVoy's statement of [him] has left on members of the community." See Kissner's Decl. in Support of Pl.'s Opp'n to McVoy ("Kissner's Decl.") (dkt. 51–2). In fact, other community members' subsequent posts refute the idea that McVoy's statement has transformed anyone's opinion or become "conventional wisdom." See, e.g., Community Forum Thread, Reply No. 121751 ("Regardless of what one thinks of David Kissner . . . he is not a sexual predator. . . To suggest that he is based on these documents is a ridiculous leap."); Reply No. 122566 ("There have been over 100 posts relating to Mr. Kissner; most amplifying and validating the comments of other contributors."); Reply No. 122568 ("More will come to light and all I can say is my kids will not go near him or his family ever again."); Reply No. 122650 ("even though nothing is proven, I feel he might

36

have displayed what others are calling 'grooming behavior' towards some kids I know."). If anything, the forum posts underscore the community's continuing polarization about Kissner and the allegations, with many differing perceptions, and no "perceived truth." See Pl.'s Opp'n to McVoy at 6–7.

Ultimately, Kissner acknowledges that McVoy played only a limited role in his distress:

> Kissner was driven out of his community by the falsehoods the District placed before the public by releasing the unfounded charge of grooming and made an involuntary target of derision by certain members of the community. McVoy's exploitation of the false allegations, referring specifically to "all the evidence" proving that Kissner "was grooming kids" compounded the sense of foreboding and alienation from which Kissner continues to suffer.

Pl.'s Opp'n to McVoy at 22 (emphasis added). In total, because of Kissner's inconsistent descriptions of how McVoy has harmed him, and his descriptions of how other actors are responsible for some or all of the harm, the IIED claim fails for a lack of causation. Accordingly, Kissner has not demonstrated a probability of prevailing on this claim.

Because Kissner cannot demonstrate a probability of prevailing on any of his three claims against McVoy, and because McVoy's statement was an act in furtherance of his right of petition or free speech, the Court **GRANTS** McVoy's Motion to Strike.

### c.    Attorneys' Fees

Both Kissner and McVoy seek attorneys' fees under California's anti-SLAPP statute. McVoy's MTD at 23–24; Pl.'s Opp'n to McVoy at 23–24. The statute provides in relevant part:

> [A] prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion.

Cal. Civ. Proc. Code § 425.16(c).

### i.    Kissner request

Plaintiffs may recover attorneys' fees when they defeat an anti-SLAPP motion only

37

United States District Court
Northern District of California

if a court finds that the motion is "frivolous or is solely intended to cause unnecessary delay." Cal. Civ. Proc. Code § 425.16(c). Frivolity is a high bar that requires finding that "any reasonable attorney would agree such motion is totally devoid of merit." Moore v. Shaw, 116 Cal. App. 4th 182, 199 (2004), as modified (Mar. 26, 2004). Because the Court grants the anti-SLAPP motion, it **DENIES** Kissner's request for attorneys' fees.

### ii.     McVoy request

A defendant who prevails on a special motion to strike "shall be entitled to recover his or her attorney's fees and costs." Cal. Civ. Proc. Code § 425.16(c). The party seeking these fees "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." ComputerXpress, Inc. v. Jackson, 93 Cal. App. 4th 993, 1020 (2001).

McVoy prevails on the motion to strike and has documented his attorneys' fees and costs. See Decl. of Lindsay A. Goulding in Support of McVoy's MTS/MTD at 3.[18]

### iii.     Kissner's financial status

Kissner argues that California law requires this Court to "make findings as to [his] ability to pay attorney fees, and how large the award should be in light of [his] financial situation." Pl.'s Opp'n to McVoy at 23 (citing Alexis v. Rogers No. 15CV691-CAB-BLM, 2017 WL 3840341, at *2 (S.D. Cal. Sept. 1, 2017), aff'd, 735 F. App'x 389 (9th Cir. 2018)). Kissner further asserts that "any award of attorney's fees would be unduly burdensome and would impose an undue financial hardship on Kissner and his family." Id. at 24. Kissner cites five cases to support the argument that the Court must consider his financial resources and burden in making this decision. See generally id. at 23–24.

Three of those cases address only discretionary fees and are therefore inapposite. Patton v. County of Kings, 857 F.2d 1379 (9th Cir. 1988) did not concern the mandatory award of fees from an anti-SLAPP motion, but the discretionary award of attorneys' fees in a 42 U.S.C. § 1983 case. Similarly, Alexis v. Rogers involved the discretionary award

---

[18] McVoy requests $10,755. McVoy's MTS/MTD at 24.

of fees under FEHA.  See No. 15CV691-CAB-BLM, 2017 WL 3840341, at *2 (S.D. Cal. Sept. 1, 2017), aff'd, 735 F. App'x 389 (9th Cir. 2018) ("[I]n civil actions brought under this section, the court, in its discretion, may award. . .").  Chisholm v. Daniel, 963 F.2d 378 (9th Cir. 1992), involved discretionary fees under federal copyright law.

In the next case Kissner cites, Garcia v. Santana, 174 Cal. App. 4th 464, 469 (Cal. Ct. App. 2009), the California Court of Appeal found that a trial court did not abuse its discretion in awarding zero fees under a state act.  Although the act required that "the prevailing party shall be awarded reasonable attorney's fees and costs," the court found zero to be a reasonable fee.  Id.  In upholding this determination, the appellate court noted that "nothing in the Civil Code indicates a legislative determination that parties should be punished for bringing unsuccessful cases, when the threat of an award of fees untethered to any consideration of ability to pay would mean the denial of meaningful access."  Id. at 475–76.  In contrast, the language of the anti-SLAPP statute makes the legislative intent clear:

> The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.  The legislature finds and declares that is in the public interest to encourage continued participation in matters of public significance and that this participation should not be chilled through abuse of the judicial process.  To this end, the section shall be construed broadly.

Cal. Civ. Proc. Code § 425.16(a).  Further, Garcia noted that "in determining the amount of fees to be awarded to the prevailing party where the statute, as here, requires the fee to be reasonable, the trial court must consider the other circumstances in the case in performing the lodestar analysis."  Id. at 476 (emphasis added).  In contrast, the anti-SLAPP statute's language only requires the attorneys' fees to be reasonable when ruling for the plaintiff, not the defendant.  See Cal. Civ. Proc. Code § 425.16(c).

Finally, in the last case that Kissner cites, Gordon v. County of Alameda, No. CV-06-02997-SBA, 2007 WL 2904281, at *2 (N.D. Cal. Oct. 4, 2007), the court merely affirmed that in some instances, courts "may take into account a party's ability to pay

1    when determining the appropriateness of awarding attorney's fees," especially in cases

2    brought under §§ 1981, 1983 or Title VII, "which often involve awarding sizable attorney

3    fees." The court then went on to reject such considerations in the case at issue. Id.

4         Kissner cites no on-point cases to support his argument that this Court must

5    consider his circumstances in awarding fees. Accord Darling v. Pentecost, No. E059958,

6    2015 WL 1863051, at *4 (Cal. Ct. App. Apr. 22, 2015) ("[W]e have not discovered any

7    authority requiring California courts to consider the unsuccessful plaintiff's financial status

8    in making an award of attorney fees and costs to a prevailing defendant under the anti-

9    SLAPP statute."). In fact, it is unclear whether courts may consider such factors. See

10   Ketchum v. Moses, 24 Cal. 4th 1122, 1131 (2001) (noting "any SLAPP defendant who

11   brings a successful motion to strike is entitled to mandatory attorney fees.") (emphasis

12   added).

13        Because Kissner has not cited any authority that requires or even allows the Court

14   to deny mandatory anti-SLAPP fees, the Court **GRANTS** McVoy's motion for attorneys'

15   fees in the amount of $10,755.

16        **B.    Motion to Dismiss**

17        Because this order analyzed the anti-SLAPP motion under the FRCP 12(b)(6)

18   standard, the motion to dismiss analysis parallels the anti-SLAPP analysis. See Planned

19   Parenthood, 890 F.3d at 834–35. For the reasons stated above, Kissner has not pleaded

20   sufficient facts to state claims for relief on defamation, false light invasion of privacy, or

21   IIED against McVoy, and the Court therefore **GRANTS** McVoy's motion to dismiss.

22        **C.    Leave to Amend**

23        Kissner asks for leave to amend if the Court is inclined to grant the anti-SLAPP

24   motion or dismiss any of his claims. Pl.'s Opp'n to McVoy at 22–23.

25             **1.    Legal Standard**

26        Courts consider "five factors in assessing the propriety of leave to amend—bad

27   faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the

28   plaintiff has previously amended the complaint." United States v. Corinthian Colleges,

United States District Court
Northern District of California

1    655 F.3d 984, 995 (9th Cir. 2011).  "Although a district court should freely give leave [to

2    amend] when justice so requires, the court's discretion to deny such leave is particularly

3    broad where the plaintiff has previously amended its complaint."  Ecological Rts. Found.

4    v. Pac. Gas & Elec. Co., 713 F.3d 502, 520 (9th Cir. 2013) (citations and quotation marks

5    omitted).

### 2.    Discussion

7         Here, any amendment is futile.  To determine futility, a court must consider whether

8    it could "conceive of facts that would render the plaintiff's claim viable."  United States v.

9    Corinthian Colleges, 655 F.3d 984, 995 (9th Cir. 2011).  Those additional facts must also

10    be "consistent with the challenged pleading" and "not contradict the allegations in the

11    original complaint."  Id.  All three of Kissner's claims against McVoy stem from the

12    online posting, which is a non-actionable opinion.  No amendment can change the

13    statement's actionability, rendering amendment futile.  For these reasons, the Court

14    **DENIES** Kissner's request to amend.

## IV.    DISCUSSION: CLAIMS AGAINST INDIVIDUAL SCHOOL DISTRICTS

16         The IDDs move to dismiss Kissner's civil rights conspiracy and civil rights

17    defamation claims brought under § 1983.  IDDs' MTD.  The IDDs do not move to dismiss

18    Kissner's claims brought under the First Amendment's Free Speech Clause, or the

19    Fourteenth Amendment's Due Process and Equal Protection clauses.  Id.

### A.    Civil rights conspiracy

21         The IDDs move to dismiss the civil rights conspiracy charge as duplicative of the

22    remaining civil rights claims, arguing that is not a basis for liability independent of the

23    underlying constitutional claims.[19]  IDDs' MTD at 11–12.  Kissner opposes, arguing that

24    "[a]lleging a civil rights conspiracy cause of action results in no prejudice to defendants,"

25    and that the "motion is really based on a matter of form over substance."  Pl.'s Opp'n to

26    IDDs at 9.  The IDDs counter that "[i]f such claims are not properly and timely addressed

27    _____

28    [19]  The IDDs do not argue that Kissner has failed to plead sufficient facts to state a claim
     for conspiracy.

United States District Court
Northern District of California

1   at the pleadings stage, it creates more work for the parties and the Court at later stages of

2   litigation," and thus it is "imperative for the Court to properly address these issues now,

3   regardless [of] whether or not plaintiff believes defendants will be 'prejudiced' by the

4   inclusion of the duplicative causes of action."  IDDs' Reply at 2.

5           To state a claim for conspiracy under 42 USC § 1983, a plaintiff must sufficiently

6   allege a constitutional violation, because "[c]onspiracy is not itself a constitutional tort

7   under § 1983." Lacey v. Maricopa Cnty., 693 F.3d 896, 935 (9th Cir. 2012).  Conspiracy

8   cannot "enlarge the nature of the claims," but can "enlarge the pool of responsible

9   defendants by demonstrating their causal connections to the violation." Id.  As such,

10  plaintiffs typically allege conspiracy in § 1983 cases "to draw in private parties who would

11  otherwise not be susceptible to a § 1983 action because of the state action doctrine, or to

12  aid in proving claims against otherwise tenuously connected parties in a complex case."

13  Id. (citations omitted).  Based on these authorities, the IDDs argue:

> Plaintiff need not use conspiracy as a mechanism to establish state action on the part
> of any of the individual District defendants, because all of them are indisputably
> state actors alleged to have acted in the course and scope of their governmental
> duties.  Furthermore, any claim that the individual District defendants conspired
> with one another to deprive plaintiff of the right to free speech, due process, and/or
> equal protection is subsumed within the substantive civil rights claims alleged in the
> 1st, 16th, and 17th causes of action, respectively. Because plaintiff has already
> alleged separate causes of action for the deprivation of the specific constitutional
> rights he alleges defendants violated, the independent cause of action for "civil
> rights conspiracy" is duplicative and should be dismissed.

20  IDDs' MTD at 12.

21          However, the IDDs cite no authority to support the idea that this should result in

22  dismissal.  When faced with the same issue, another court in this circuit expressly rejected

23  "the idea that one cannot simultaneously plead conspiracy to violate Section 1983 and an

24  actual violation of Section 1983," quoting approvingly the logic of an N.D. Ill. court:

> It would be entirely possible for a trier of fact to find that one or more of the
> defendants did not directly cause the constitutional violations but did participate in
> a conspiracy to cause those violations.  Moreover, even an active participant in
> causing injury to plaintiff's constitutional rights may not have been an active
> participant in every act violative of plaintiff's rights.... The court also finds
> significant the failure of defendants to cite any authority for the proposition that

United States District Court
Northern District of California

1

2

> a Section 1983 conspiracy claim should be dismissed as duplicative where the conspirators are also alleged to have directly committed some or all of the acts causing the alleged constitutional deprivations.

3

4

5

6

7

Pilgram v. Lafave, No. CV 12-5304 GAF (EX), 2013 WL 12124126, at *3 (C.D. Cal. Feb. 7, 2013) (quoting Borst v. O'Brien, 1990 U.S. Dist. LEXIS 7805, at *13–14 (N.D. Ill. June 25, 1990) accord Brown v. Alexander, No. 13-01451 SC, 2013 WL 6578774, at *14 (N.D. Cal. Dec. 13, 2013) (rejecting defendants' argument that plaintiff could not allege conspiracy as a tort separate from the underlying wrong).

8

9

10

11

12

13

14

15

Further, that it is unclear how Kissner's conspiracy claim benefits him does not preclude the claim if it has a foundation in a properly alleged constitutional claim or claims. See Lacey, 693 F.3d at 935 (accepting validity of conspiracy claim where plaintiff alleged "a conspiracy by [two defendants] to violate the same constitutional rights that we have already concluded were sufficiently pled as individual claims against them. It may be that the conspiracy claim helps to bridge any gap between, for example, [two defendants] and the false arrest claim," even though "it is not clear how [plaintiff]'s conspiracy claim benefits him here.").

16

17

18

In sum, although it is unclear what benefit Kissner gains by alleging conspiracy in addition to the underlying civil rights claims, that does not necessitate dismissal. The Court therefore **DENIES** the motion to dismiss the civil rights conspiracy claim.

19

### B.  Civil rights defamation

20

21

22

23

24

25

The IDDs move to dismiss the civil rights defamation claim, arguing that it is duplicative of the remaining procedural due process claim.[20]  IDDs' MTD at 15.  Kissner opposes this motion, again describing it as an "attempt to lift form over substance," arguing that the separate defamation claim does not prejudice defendants, is not barred by case law, and is "necessary to distinguish it from other due process violations."  Opp'n to IDDs at 11.

26

Because reputation alone is not a constitutionally protected interest, to state a claim

27

28

[20]  The IDDs do not argue that Kissner has failed to adequately allege civil rights defamation.

> United States District Court
> Northern District of California

1  for defamation under § 1983, a plaintiff must demonstrate that he was "stigmatized in

2  connection with the denial of a 'more tangible' interest." Hart v. Parks, 450 F.3d 1059,

3  1069–70 (9th Cir. 2006) (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)).  In order to

4  meet this "stigma-plus" test, a plaintiff can either allege that the injury to their reputation

5  "caused the denial of a federally protected right," or that the injury "was inflicted in

6  connection with a federally protected right." Cooper v. Dupnik, 924 F.2d 1520, 1532 (9th

7  Cir. 1991), on reh'g, 963 F.2d 1220 (9th Cir. 1992).

8      The IDDs argue that Kissner's due process claim should subsume his defamation

9  claim, reasoning "[w]hile proof of reputation harm resulting from the deprivation may

10  result in additional damages, the alleged harm to plaintiff's reputation is not a separate

11  constitutional tort." IDDs' Reply at 5.  However, Kissner's claims may ultimately address

12  different alleged wrongs, harms, and interests.  His due process claim alleges that the IDDs

13  deprived him of the continued employment enjoyed as a property right by California

14  teachers under state law.  SAC ¶¶ 429–31.  In contrast, Kissner's defamation claim alleges

15  that the IDDs' defamatory statements not only unjustly deprived him of his previous

16  employment, but have also "precluded his ability to continue working as a teacher in

17  public education," and "burden Kissner so that he is not able to take advantage of other

18  employment opportunities." SAC ¶¶ 258, 263.  Stigmatizing statements can deprive a

19  worker of liberty interests if they effectively bar a worker from all employment in his field,

20  and "accusations of dishonesty or immorality are sufficiently stigmatizing to implicate a

21  liberty interest." See Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health

22  Care Servs., 727 F.3d 917, 925 (9th Cir. 2013).

23      Thus, Kissner sufficiently alleges that the defamation was both inflicted in

24  connection with a federally protected right (his property interest under state law in

25  continued employment) and caused the denial of a federally protected right (his liberty

26  interest in future employment in education).  It may make sense at some point to combine

27  these two claims, but the IDDs have cited no authority holding that the Court must do so

28  now.  For the foregoing reasons, the Court **DENIES** the motion to dismiss the civil rights

United States District Court
Northern District of California

defamation claim.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** McVoy's motion to strike, along with his request for attorneys' fees, DENIES Kissner's request to amend the complaint and his request for fees, and **DENIES** the IDDs' motion to dismiss.

**IT IS SO ORDERED.**

Dated: August 24 2022

_____

CHARLES R. BREYER
United States District Judge