**PORTER | SCOTT**
A PROFESSIONAL CORPORATION
Lindsay A. Goulding, SBN 227195
Tatiana Moana Bush, SBN 343503
350 University Avenue, Suite 200
Sacramento, California 95825
lgoulding@porterscott.com
tbush@porterscott.com
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendant
LAWRENCE MCVOY

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

DAVID M. KISSNER, an individual,

       Plaintiff,

v.

LOMA PRIETA JOINT UNION SCHOOL DISTRICT, a California public agency; LISA FRASER, former superintendent at Loma Prieta Joint Union School District, in her official and individual capacities; COREY KIDWELL, former superintendent at Loma Prieta Joint School District, in her official and individual capacities; KEVIN GRIER, successor superintendent at Loma Prieta Joint School District, in his official capacity; BILLY MARTIN, principal of CT English Middle School, in his official and individual capacities; DEANA A. ARNOLD, Loma Prieta Joint Union School District trustee, in her official and individual capacities; BEN ABELN, Loma Prieta Joint Union School District trustee, in his official and individual capacities; RON BOURQUE, Loma Prieta Joint Union School District trustee, in his official and individual capacities; CHARLOTTE KHANDELWAL, Loma Prieta Joint Union School District trustee, in her official and individual

CASE NO. 22-CV-00949-VKD

**DECLARATION OF LINDSAY A. GOULDING IN SUPPORT OF DEFENDANT'S AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT ON COURT'S ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 54(b)**

**Date: December 2, 2022**
**Time: 10:00 a.m.**
**Ctrm: 6**
**Judge: Charles R. Breyer**

Complaint Filed: 3/20/2022

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA 95825
TEL: 916.929.1481
FAX: 916.927.3706

{02711802.DOCX}        1

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL. 916.929.1481
FAX: 916.927.3706

1   capacities;   ERIN   ASHEGHIAN,   Loma
2   Prieta Joint Union School District trustee, in
    her   official   and   individual   capacities;
3   PATRICIA ELLIOT, an individual; JOIE
    GRIMMET,   an   individual;   LAWRENCE
4   MCVOY,   and   individual,   and   DOES   1
    through 50, inclusive,

5

6               Defendants.
    _____/
7

8                    **<u>DECLARATION OF LINDSAY A. GOULDING</u>**

9           I, Lindsay A. Goulding, state and declare as follows:

10          1.      I am an attorney at law licensed to practice before all courts in the State of

11   California. I am a shareholder at the law firm of Porter Scott, attorneys of record for defendant

12   LAWRENCE MCVOY in the above-entitled action.  In that capacity, I have personal knowledge

13   of the facts set forth below or have been sufficiently informed with respect to the information, and

14   could competently testify thereto if called upon to do so.

15          2.      I have reviewed the Memorandum of Points and Authorities in Support of

16   Defendant's Motion for Entry of Final Judgment on Court's Order Pursuant to FRCP 54(b) that

17   accompanies my declaration and believe the contents of the motion is true and accurate and that

18   the granting of the motion is warranted in this case.

19          3.      On July 29, 2022, Plaintiff filed a Complaint for Damages in Santa Clara County

20   against ten named defendants, including Defendant McVoy, which mirrors Plaintiff's operative

21   complaint in the instant litigation.  See **Exhibit A**.

22          4.      On September 6, 2022, I requested that the State Court Complaint be dismissed in

23   light of this Court's ruling on the Motion to Strike and Motion to Dismiss. Plaintiff's counsel

24   refused stating that, "No judgment has been entered."  See emails attached hereto as **Exhibit B**.

25          I declare under penalty of perjury under the laws of the United States that the foregoing is

26   true and correct and that this declaration was executed on October 26, 2022, in Sacramento,

27   California.

28                                          _____
                                                    Lindsay A. Goulding

{02711802.DOCX}                                     2

**DECLARATION OF LINDSAY A. GOULDING IN SUPPORT OF DEFENDANT'S AMENDED
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ENTRY OF FINAL
JUDGMENT ON COURT'S ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 54(b)**

# EXHIBIT "A"

01054547.WPD

William J. Becker, Jr., Esq. (SBN: 134545)
Bill@FreedomXLaw.com
Jeremiah D. Graham, Esq. (SBN: 313206)
JeremiahDGraham@gmail.com
**FREEDOM X**
11500 Olympic Blvd., Suite 400
Los Angeles, California 90064
Telephone: (310) 636-1018
Facsímile: (310) 765-6328

Counsel for *David M. Kissner*

E-FILED
7/29/2022 11:03 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
22CV402699
Reviewed By: A. Villanueva

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA
## COUNTY OF SANTA CLARA

**DAVID M. KISSNER**, an individual,

vs.

**LOMA PRIETA JOINT UNION SCHOOL DISTRICT** ("LPJUSD"), a California public agency; **LISA FRASER**, former superintendent at LPJUSD, in her individual capacity; **KEVIN GRIER**, successor superintendent at LPJUSD, in his official capacity; **BILLY MARTIN**, principal of CT English Middle School, in his official and individual capacities; **DEANA A. ARNOLD**, LPJUSD trustee, in her official and individual capacities; **BEN ABELN**, LPJUSD trustee, in his official and individual capacities; **RON BOURQUE**, LPJUSD trustee, in his official and individual capacities; **ERIN ASHEGHIAN**, LPJUSD trustee, in her official and individual capacities; **CHARLOTTE KHANDELWAL**, former LPJUSD trustee, in her individual capacity; **LAWRENCE MCVOY**, an individual; and **DOES 1 through 50**, inclusive,

Defendants.

Case No.: 22CV402699

**COMPLAINT**

1. First Amendment Free Speech Clause (42 U.S.C. § 1983); California Constitution Free Speech (Art. I, § 2))
2. Fourteenth Amendment Due Process (42 U.S.C. § 1983); California Constitution Due Process (Art. I, § 7)
3. Fourteenth Amendment Equal Protection (42 U.S.C. § 1983); California Constitution Equal Protection (Art. I, § 7)
4. Civil Rights Conspiracy (42 U.S.C. § 1983)
5. Civil Rights Defamation (42 U.S.C. §1983)
6. Wrongful Termination
7. Defamation Per Se
8. False Light Invasion of Privacy
9. Negligence
10. Intentional Infliction of Emotional Distress
11. Breach of Contract
12. Discrimination and Retaliation for Engaging in Protected Activity (Lab. Code §§ 98.6 & 1101-1102)

**Complaint**

David M. Kissner (alternatively "Plaintiff" or Kissner"), by and through his undersigned counsel, brings this Complaint against the above-named Defendants, their employees, agents, and successors in office, and unknown DOE Defendants 1 through 50 (collectively, "Defendants"), on his own behalf, and in support thereof, alleges the following:

## INTRODUCTION

1.     This is a case involving a school district that retaliated against a teacher for publicly expressing opposition to its policies and reporting wrongdoing, waste, fraud and/or abuse.

2.     Kissner was initially stigmatized for challenging his school district's unlawful policy of excusing student absences from class to allow them to attend a partisan political rally.

3.     Kissner, whose reputation had already been sullied by the school district's unwarranted investigations into his contesting the school-sanctioned student walkout, was ultimately laid off and terminated from employment for his protected speech.

4.     The reasons given by the school district for punishing an upstanding public school teacher are pretextual. Kissner is the victim of political and/or ideological differences with his public employer. Another casualty of the well-known cancel culture.

5.     Government is constrained from teaching impressionable children partisan viewpoints. Its function is to educate, not to indoctrinate. In this case, Defendant Loma Prieta Joint Union School District (the "District"), a public school district, sought to promote just one side of a heated political controversy and thereby indoctrinate students into joining one side of a political debate.

6.     A public controversy arose in 2018 when the District violated state truancy and other laws by joining a partisan nationwide political protest. As schools throughout the nation heedlessly climbed aboard the precipitous clamor to shape the views of impressionable students into pressuring

**Complaint**

lawmakers to tighten the nation's gun laws, just one teacher stood against the transparent political indoctrination campaign.

7.      Kissner was employed since 2012 as a math and science teacher at CT English Middle School ("CT Middle") in Los Gatos, California. Until 2018, Kissner was well-regarded by his colleagues and members of the school community. In March of 2018, Kissner objected to the District's participation in a politically-organized nationwide student walkout, not because he opposed the political cause promoted but because the District's participation in and promotion of the walkout was unlawful. Traditionally, Kissner's informed disapproval of unlawful policy decisions could be expected to have earned him respectful feedback. It instead touched off a firestorm of attacks on him by school and local community members, attacks characterized by false accusations of misconduct with minors. When Kissner became politically active in issues involving objectionable District policies, these unfounded attacks returned with force, ultimately leading to his loss of employment with the District.

8.      This Complaint arises from a campaign of harassment and discrimination carried out over a period of three years culminating in Kissner's simultaneous <u>layoff</u> and <u>dismissal</u> and irreparable harm to his reputation. The simultaneous layoff and dismissal are not coincidental. They reflect the District's continuing and growing frustration with an employee boldly exposing its misfeasance and malfeasance.

9.      The District's reasons for laying off and dismissing Kissner are pretextual and meant to conceal their discriminatory and retaliatory motives.

10.     There is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries. And months, or even years, of unwarranted and public criticism of a previously distinguished employee, implied threats of termination, contacts with subordinates that only could have the effect of undermining an employee's effectiveness, and

3

**Complaint**

new regulation of the manner in which an employee must be scrutinized for his conduct may be meant to punish the employee for failing to comply with a supervisor's orders and thereby place his career in jeopardy. As alleged herein, the District's patient, calculated, and inexorable efforts to sever its relationship with Kissner in retaliation for his protected activities is the only rational explanation for the harm the Defendants have caused.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over this matter percent Code Civ. Proc. § 395, because, at all times relevant, Defendants, and each of them, resided in and/or did business in the State of California and the events, which combined to produce the injury sustained by Plaintiff, occurred in the County of Santa Clara, State of California. Venue is proper in the county of Santa Clara because a substantial part of the events, acts, omissions, and/or transactions complained of hearing occurred in and/or originated from Santa Clara county, State of California. The amount in controversy exceeds the jurisdictional minimum of this court.

## PARTIES

**Plaintiff**

12.     David M. Kissner (hereinafter alternatively referred to as "Plaintiff" and "Kissner") at all relevant times was an individual residing in Santa Cruz County, California.

**Defendants**

**I.     District**

13.     Defendant Loma Prieta Joint Union School District ("District") is a California state agency capable of suing and being sued.

**II.     Defendants**

14.     Defendant Lisa Fraser is a former Superintendent of the Loma Prieta Joint Union School District Board of Trustees who, at all relevant times, is and was a resident of Santa Cruz

**Complaint**

County, California, and is sued in her individual capacity only because her successor bears liability for official capacity claims.

15.     Defendant Kevin Grier is the current Superintendent of the Loma Prieta Joint Union School District Board of Trustees, and successor to Defendant Lisa Fraser, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in his official and individual capacities.

16.     Defendant Billy Martin is the current principal of Loma Prieta Joint Union School District, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in his official and individual capacities.

17.     Defendant Deana A. Arnold, is a current member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, is and was a resident of Santa Cruz County, California, and is sued in her official and individual capacities.

18.     Defendant Ben Abeln is a current member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in his official and individual capacities.

19.     Defendant Ron Bourque is a current member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in his official and individual capacities.

20.     Defendant Erin Asheghian is a current member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, is and was a resident of Santa Clara County, California, and is sued in her official and individual capacities.

21.     Defendant Charlotte Khandelwal was a member of the Loma Prieta Joint Union School District Board of Trustees, who, at all relevant times, was a resident of Santa Cruz County,

Complaint

California, and is sued in her individual capacity only because her successor bears liability for official capacity claims.

**III.     Community Defendant**

22.     Defendant Lawrence McVoy is an individual, who, at all relevant times, is and was a resident of Santa Cruz County, California.

**IV.     Unknown Defendants**

23.     Kissner is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 50, and for that reason has sued them by their fictitious names. On information and belief, Kissner alleges that each of these fictitiously named Defendants are responsible in some manner for some or all of the acts alleged herein.  Kissner will amend this Complaint to set forth the true names and capacities of the fictitiously-named Defendants once ascertained.

24.     Kissner is informed and believes, and thereon alleges, that each of the Defendants sued herein, including those named herein as Does, are the agents, servants, employees, licensees, guarantees, indemnitors, invitees, or assignees of each other, and in doing the things herein alleged acted within the course and scope of such agency, employment, license, guaranty, indemnity, invitation, assignment and/or relationship and with the full knowledge, consent and approval of the remaining Defendants.

**FACTUAL BACKGROUND**

**I.   Introduction**

25.     The District serves over 400 students in grades TK-8 and administers just two schools, Loma Prieta Elementary School (K-5) and CT Middle (6-8).

26.     Kissner was a tenured, certificated teacher employed by CT Middle. Kissner had enjoyed full-time employment with the District for approximately nine years teaching math (for which he is certificated) and science while additionally volunteering to coach wrestling.

6

**Complaint**

27.     Kissner was fired after a three-year ordeal in which he was subjected to multiple investigations and falsely accused of immoral conduct involving minors. Defendants disfavored Kissner due to his political views and opposition to District policies as more fully described herein.

## II.     Kissner's Background

28.     The District removed Kissner from his teaching job based on false and fabricated evidence, severely damaging his reputation and impugning his moral character in the process. Indeed, it falsely and recklessly charged him with sexual abuse of minors, or "grooming," dropping the unfounded charges only after recklessly and/or maliciously releasing them to the public.

29.     In fact, Kissner's demand that the charges be dropped went unheeded for months until the dismissal hearings when the District finally conceded it lacked evidence to prove it. But that was too little, too late; the reputational damage had been done. The image of Kissner, a man of strong moral character, had been transformed into that of a monster. The District's reckless and gratuitous charges were outrageous and resulted in the permanent loss of Kissner's reputable standing in the community, forcing him to leave it as a result of their impact. Accordingly, this narrative begins with a description of Kissner's true character.

### A.     Kissner Is A Proud Former Officer In The U.S. Marine Corps

30.     Kissner served his country honorably as a U.S. Marine Corps officer. He graduated with an engineering degree from the U.S. Naval Academy in 2002. Upon graduating, Kissner earned his commission as an officer in the Corps. During his active duty service, Kissner served in Korea, Indonesia, Japan, and Iraq, where he completed a combat tour as a battery executive officer leading his Marines to fulfill artillery and provisional infantry missions in Fallujah. He also served as a battalion operations officer before being honorably discharged as a first lieutenant.  Kissner is proud of his military service and of his country and the values and ideals that this country was founded on.  He believes that those ideals are worth fighting for and defending.

7

**Complaint**

**B.** **Kissner Is A Proud Educator**

31.     After leaving active duty in the United States Marine Corps, Kissner continued in his life of service as a teacher, coach, and youth wilderness guide.  His work in education began by helping at-risk minors teaching in county continuation schools and juvenile detention facilities. Kissner served incarcerated, drug addicted, impoverished, and foster youth, many of whom were involved with gangs.  Some 11 years later, Kissner continues to maintain relationships with many of his former students from this period.

32.     Kissner was hired in 2012 by the Loma Prieta School District to teach math and science at CT English Middle School.  He remained employed in this position until the District moved to dismiss him in February 2021.

33.     Kissner enjoyed a reputation for building connections with students and for delivering rigorous content and setting high expectations that encouraged students to excel.

34.     During the school year, Kissner volunteered his time coaching middle school wrestling for the school team and for an independent youth sports non-profit he formed to serve youth in his community.  The sport of wrestling was an impactful experience for Kissner in high school, and he credits the sport and his coaches with dramatically redirecting his life in a positive way.

35.     Kissner finds it rewarding to be able to provide formative and life changing experiences to youth.  In 2020, the school wrestling team had 52 participants, representing one out of every five students in the school.  This popular and successful program competed with much larger schools and had significantly higher rates of participation than any other school in the league. Countless young people have been positively impacted by Kissner's coaching and leadership in wrestling.

Complaint

### C.   Kissner Is A Family Man

36.     Kissner is a family man, and values serving alongside his wife and six-year old son. Kissner and his wife Stacy just celebrated their seven-year wedding anniversary and some 10 years serving youth and families together.  Their son was named after one of King David's generals and has been right there with them on the camping and backpacking and bike trips from as young as five weeks old when he went on his first camping trip to Death Valley.

### D.   Kissner Is An Active Community Member

37.     As a teacher, Kissner had a significant amount of time off each year.  Kissner and his wife and son spent this time in the outdoors, taking families and kids on unique camping, backpacking, or mountain biking adventures all over the western U.S. and Canada.  Kissner believes that time in the outdoors is invaluable for himself and his family and the youth he works with.  He also believes that being face to face with creation in nature is a great way to meet with and hear from God.

38.     In addition to his many service-oriented activities, Kissner is also active in his community by engaging in the local political process.  Kissner values and upholds the Constitution and the republic that is built upon it.  He believes strongly in the principles of limited government, government accountability and transparency, and fiscal responsibility.

39.     Kissner believes that government at all levels can function properly only when citizens are actively involved in the process and providing accountability and oversight.  As such, Kissner became a community leader in several local political issues.  As discussed in greater detail below, during the student walkouts of March 2018 Kissner stood alone among his colleagues to defend the rights of all students and taxpayers with varying viewpoints from inappropriate indoctrination by public entities.

9

Complaint

40.     Kissner's unpopular position on the walkout and the school's responsibility to remain neutral on controversial and tendentious issues resulted in national news attention and the loathing of certain community and staff members and the entirety of district leadership.  However, his position also resulted in the school leadership changing their ad hoc policies on student walkouts to be in alignment with the law.

41.     Kissner has subsequently been a vocal leader for local fiscal accountability and taxpayer rights, and recently led a successful campaign to defeat a local school tax measure.  He has also advocated for reforms to how the representative system works locally, pushing for elections as opposed to appointments to school board positions.  While these political positions have made him unpopular among the school district's political establishment, Kissner has also been a welcome voice for community members who have felt disenfranchised by the status quo.

**E.     Kissner Is A Devout Practicing Christian**

42.     Kissner was raised in a Christian household, and his faith became truly personal for him during his years in the military.  Kissner believes in the sovereignty of Jesus, as the son of the triune God, and as the only way through which man's broken relationship with God can be restored.

43.     Kissner has been active in his church and faith his entire life.  Kissner attends church regularly and is an active member of the church communities he serves and worships in.  Kissner has served in youth ministry and has also participated in or led multiple service and missions projects to New Orleans after Hurricane Katrina.

44.     Kissner also launched and leads a nonprofit service organization that serves youth and families by providing unique outdoor experiences in a spiritual setting.  He has worked with multiple churches, church leaders, nonprofit organizations, and community leaders over the last 13 years in this capacity.  Kissner's faith informs every aspect of his life, including family, work, politics, and how he spends his time and resources.

10

**Complaint**

**F.** **Kissner's Reputation Was Marred By An Incident In 2016 When He Admitted To Sharing A Sip Of Whiskey With A Minor During A Wilderness Camping Excursion**

45.     People make mistakes. Kissner is no different than any other person in that regard.

46.     In 2016, while on a wilderness adventure, Kissner toasted a teenaged boy's successful leadership accomplishments by sharing a single sip of alcohol with the minor. The trip was neither school related nor involved any District students.  When the teenager's parent, Helen Odea, also a District teacher, learned about the incident, she sought a meeting with Kissner. The matter was resolved when Kissner acknowledged the impropriety and took responsibility for exercising poor judgment.

47.     Two years later, as described hereinbelow, this single transgression was used against Kissner by the District to discredit him in response to his challenging District policy over a student walkout and has followed him even to the point of his termination six years later.

**III.** **Kissner's Relevant Contractual Rights Are Set Forth In The Collective Bargaining Agreement**

48.     The rights of District employees are protected by the Loma Prieta Teacher's Association's Collective Bargaining Agreement ("CBA"). (A true and correct copy of the relevant agreement is attached hereto as Exhibit "1" and incorporated herein by reference as though fully set forth herein.)

49.     The CBA provides in relevant part:

Article VI: Personal and Academic Freedom

(A) The Employer shall not take action against a teacher based on his or her personal, political, or other activities, so long as these activities are lawful and do not affect the teacher's professional performance….

* * *

(C) The Employer shall not interfere with a teacher's lawful freedom of speech or use of curriculum and materials which fall within state and district approved guidelines….

11

**Complaint**

Article VII: Grievance Procedure

(D)(1) No reprisals of any kind will be taken by either party against any grievant, any party in interest, any member of the Association, or any other participant in the grievance procedure by reason of such participation.

Article 15: Personnel Files and Records

(D) Personnel Files: Except as contained in Sections 44939-44942 of the Education Code, the Employer shall not base any adverse action against a teacher upon, materials which are not contained in such teacher's personnel file.

(F) A teacher shall be provided any negative or derogatory material before it is placed in his/her personnel file. S/he shall also be given release time during the school day to initial and date the material and to prepare a written response to such material. The derogatory material shall not be placed in the file until a ten (10) day opportunity to respond has passed.

Article 16: Parent Complaints

No negative material based upon information of a derogatory or critical nature which has been received by administration from parents shall be placed in a personnel file unless the following procedures have been followed:

1. A good faith effort shall be made to resolve the issue at the lowest level. The lowest level shall mean resolution with the faculty member directly or at the site with the next level site administrator, if possible.

2. If the complaint by a parent about a unit member may be used against the unit member, it shall be reported to the unit member within twenty-four (24) hours or as soon thereafter as is practicable of the receipt of the complaint.

3. The administrator shall inform the unit member of his/her right to have Association/legal representation at any meeting regarding a complaint.

4. During the processing of any parent complaint a faculty member has the right to request a meeting with his or her immediate supervisor to discuss the complaint and the advisability of meeting directly with the parent complainant to attempt to resolve the complaint. A faculty member has the right to have an Association representative present during such meeting.

5. If the matter is not resolved to the satisfaction of the complainant, he/she shall put the complaint in writing, and submit the original to the unit member, with a copy to the unit member's immediate supervisor. The unit member shall be given time during the duty day, without salary deduction, to review the complaint.

6. The unit member is provided the right of representation and is informed prior to any meeting which may involve criminal allegations, that the member is entitled to such representation.

Complaint

7. The unit member has the right to attach written and signed comments to any written complaint filed by the complainant.

8. If any action is taken against the unit member based on the complaint and the unit member believes the complaint is false and/or based on hearsay, or that improper procedures were followed, a grievance may be initiated.

9. Complaints which are shown to be false, or are not sustained by the grievance procedure shall not be placed in the unit member's personal file nor utilized in any disciplinary action against the unit member.

## IV.   The 2018 National School Walkout Controversy

### A.   The Walkout's Purpose Was Explicitly Political

50.    The District's campaign of harassment, discrimination, and retaliation against Kissner took root in 2018 when Kissner sought to follow District policies and state truancy laws in his classroom, and rejected the District's endorsement of a student political protest.

51.    On February 14, 2018, Marjory Stoneman Douglas High School in Parkland, Florida, became the scene of a deadly mass shooting carried out by a 19-year-old former student. In the wake of the tragedy, an anti-gun campaign aimed at staging nationwide student walkouts throughout America's schools was organized. The walkouts' website identified three objectives: (1) to "hold elected officials accountable," (2) to advocate "solutions to gun violence," and (3) to "encourage students to be more engaged in politics."[1]

### B.   Applicable Truancy Law And Policy Did Not Excuse Absences For Political Activity

#### 1.   California's Education Code does not authorize excused absences for political rallies

52.    Cal. Educ. Code § 48205 limits the type of excused absences from the classroom authorized in the state's public schools. It does not authorize excused absences for political rallies,

---

[1] Michael Gold, "What to Expect From the National School Walkout for Gun Safety," *New York Times* (April 19, 2018); https://www.nytimes.com/2018/04/19/us/national-school-walkout-guns.html.

**Complaint**

demonstrations, walkouts, protests, or other assemblies. Nor are school officials vested with power to exempt students from state truancy laws.

### 2. The District's own absence/truancy policy prohibited students from attending political rallies

53.     Despite the existence of well-established law barring the District from participating in and/or promoting the walkouts, and with full knowledge of the relevant law, the District ultimately turned a blind eye toward it.

54.     The school's official policy regarding the walkout treated student absences from class as unexcused. In a March 7, 2018, letter to parents, the District's then-superintendent, Corey Kidwell ("Kidwell"), wrote:

> Students who choose to walk out will be provided with a space to gather in quiet solidarity. **Their absence from class will be considered "unexcused" and dealt with as a "class cut". Missed work or assignments will be dealt with per the syllabus for each instructor**…. As a school district, we cannot promote or endorse civil disobedience, nor can we discourage participation.

(Emphasis added.)

### 3. The District received legal advice concluding that student walkouts are statutorily barred

55.     Legal guidance circulated to faculty and staff at CT Middle unambiguously outlined the danger of schools sanctioning of student walkouts:

> Students should not be disciplined for engaging in the act of protest. **But make it clear to students that a walkout protest is an act of civil disobedience and, by definition, a violation of rules. Those infractions will be handled in the standard manner, typically as unexcused absence**. While students and parents might regard protest as educational activity, **the full lesson in civil disobedience is compromised if students are exonerated**.
>
> **Principals, teachers, and other school officials should not participate in or endorse the protest**. Most district policies on staff expression prohibit protest during the school day, regardless of how strongly the school official feels about the issue. **Specifically in the case of a walkout, school officials' participation sets a harmful precedent for endorsing a flagrant violation of school or district policy. Moreover, students with differing views might feel alienated or compelled to**

14

Complaint

**participate against their will if school officials are perceived as supporting the protest**.

Q: What are the consequences of leaving class for students? For staff?

A: Students voluntarily electing to leave class/campus without authorization **are truant and subject to appropriate consequences**. **The fact that the students are leaving to demonstrate is immaterial**.[2]

(Bold underlined emphasis added.)

56.     The District initially recognized its obligation to remain neutral regarding the political demonstrations planned.

## C.    The District Abandoned Its Legal Obligations By Promoting And Encouraging The Walkout

1.     **The walkouts were organized by politically-partisan activists to further an anti-gun agenda using the nation's impressionable youth to exert political pressure on lawmakers**

57.     The March 14, 2018, demonstrations were part of the #Enough! National School Walkout to raise awareness about issues of school safety and the impact of gun violence.[3]

58.     The nationwide walkouts were organized by Women's March Youth Empower,[4] "the student-led organizing body of Women's March."[5]   The Women's March was organized initially to protest Donald Trump's presidential election campaign, his political views, and his defeat of presidential nominee Hillary Clinton.[6] It later organized demonstrations to protest

---

[2] The same advice can be found at the Alameda County counsel's website and the National Association of Secondary School Principals' website. Fagen, Friedman & Fulfrost, *Walkout: Students' Call To Action To Make Their Voices Heard* (2/26/2018); https://www.f3law.com/downloads/Tipsheet%20-%20FAQs%20on%20Student%20Walkouts%20.pdf; *Considerations For Principals When Students Are Planning An Organized Protest Or Walkout* (2/23/2018); https://www.nassp.org/2018/02/23/considerations-for-principals-when-students-are-planning-an-organized-protest-or-walkout/.

[3] Sarah Gray, "Thousands of Students Walked Out of School Today in Nationwide Protests. Here's Why," *Time* (3/14/2018); https://time.com/5195960/national-school-walkout-march-14/.

[4] *Id.*

[5] https://actionnetwork.org/groups/empower

[6] Wikipedia; https://en.wikipedia.org/wiki/2017_Women%27s_March#Organizers.

15

**Complaint**

Trump's inauguration.[7] It's organizers and national co-chairs make up a Who's Who list of radical, militant, leftwing activists, including anti-Semite Linda Salsour, feminist Gloria Steinem, and Marxist Angela Davis.[8] Initially organized by the Women's March "youth branch," the National Student Walkout demanded three key actions from Congress:

- Ban assault weapons;

- Require universal background checks before gun sales;

- Pass a gun violence restraining order law that would allow courts to disarm people who display warning signs of violent behavior.[9]

59.    Though gun control is not strictly a partisan issue, there is generally more support for gun control legislation in the Democrat Party than in the Republican Party.[10] The Libertarian Party, whose campaign platforms favor limited government regulation, is outspokenly against gun control.[11]

60.    The walkouts' divisive political effect on communities was inevitable. While the walkouts drew significant support and participation nationwide, many citizens viewed them as indoctrination exercises intended to poison the political attitudes of students by appealing to their sense of compassion and sympathy for the victims of gun violence. One individual described the walkout as "a tragic event to push … political agendas, such as gun control."[12]

---

[7] Meghan Keneally, "More Than 1 Million Rally at Women's Marches in US and Around World," ABC News (1/22/2017); https://abcnews.go.com/Politics/womens-march-heads-washington-day-trumps-inauguration/story?id=44936042

[8] *Id*., n. 7.

[9] Emanuella Grinberg and Holly Yan, "A generation raised on gun violence sends a loud message to adults: Enough," CNN (3/16/208); https://www.cnn.com/2018/03/14/us/national-school-walkout-gun-violence-protests/index.html.

[10] Wikipedia, citing Spitzer, Robert J., *The Politics of Gun Control*, P. 16 (Chatham House Publishers, Inc., 1995).

[11] *Id*., citing Harry L. Wilson, *Libertarianism and Support for Gun Control" in Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law, Volume 1*, p. 512 (Gregg Lee Carter, Ed., ABC-CLIO, 2012).

[12] *Id*.

16

**Complaint**

### 2. While the District followed an inconsistent and erroneous policy in response to the walkout, Kissner elected to enforce state truancy laws in his classroom

61.     On March 14, 2018, the date of the first nationwide walkout, the District announced that it would allow students to participate in the political demonstration without consequence, thus unlawfully treating their leaving class as excused absences. This was entirely inconsistent with its earlier proclamations as well as with the legal advice given by two county agencies.

62.     Kissner had planned a quiz for his class that day and informed his students that leaving class would result in a failing grade on the quiz. Kissner believed any such absence from class to be a class cut and in violation of District policy, state law, and other requirements.

63.     Notwithstanding Cal. Educ. Code § 48205, two counties' legal guidance, and the District's own March 7, 2018, policy statement affirming that the District, as a government agency, was constitutionally barred from taking a partisan position on political matters, Kissner's decision proved to be wildly unpopular among segments of the liberal community of Los Gatos.  Parents sympathetic to the goals of the walkout organizers took to media to protest his grading decision. The story garnered extensive state-wide headlines, and Kissner began receiving insults and threats on social media. On March 18, 2018, in the face of the public outcry, Kissner gave a news conference to defend his decision.[13]

64.     It was not just angry parents who complained about Kissner's decision; staff, faculty and District board members were also unhappy about it. With an April 20, 2018, additional nationwide walkout planned, Kissner took part in contentious discussions with the District over whether students would be allowed to participate. Indeed, the investigator ostensibly hired to

---

[13] *See*, *e.g.*, Joseph Geha, "Los Gatos: Teacher defends lowering student's grade after school walkout," San Jose Mercury News (March 18, 2021; https://www.mercurynews.com/2018/03/18/sjm-l-teacher-0318/.

**Complaint**

investigate the District's walkout response wrote that "[r]elations between Mr. Kissner and most of the rest of the staff at CT English became extremely tense as a result of Mr. Kissner's behavior."

65.    The District was contacted by an attorney representing the interests of parents opposed to the District's sponsoring or implied endorsement of the walkout. The attorney demanded the District exercise government neutrality on a controversial political matter and distance itself from any level of participation in the April 20 walkout. He argued, in part, that "[s]tudents and staff who do not share in the ideological message conveyed during the walkout expose themselves as opponents of that message and thereby set themselves up to become the targets of bullying, intimidation and harassment." That is precisely what happened to Kissner, who quickly became isolated as the target of bullying, intimidation, and harassment from all corners of the community, including from District employees, trustees, parents, students, neighbors, and anonymous individuals.

66.    On March 5, 2018, Kidwell (then-District superintendent) emailed staff with legal guidance from the Santa Clara and Alameda County Offices of Education pertaining to the March 14 walkout. At the meeting, Kidwell and "Teacher Leader" Tony Arias ("Arias") addressed the CT Middle staff.[14]  Kidwell and Arias announced that (1) the school schedule would be changed to accommodate the walkout participants, (2) teachers would not be authorized to plan any significant graded activities during the 10:00 a.m., 17-minute walkout demonstration, (3) students with parents who call in to have their children excused would be given an excused absence, and (4) that Kidwell and another administrator would join the students in the gym.

---

[14] The "Teacher Leader" is responsible for serving as a liaison between faculty and administration, helping with scheduling and discipline issues, and other administrative tasks.

18

**Complaint**

67.     Kissner brought up legal and ethical concerns he had over the school's plans, pointing out the glaring inconsistencies between county counsels' legal guidance, which had been distributed to staff and faculty by the superintendent, and the school's plans.

68.     The excused absence directive also conflicted with Cal. Educ. Code § 48205, which grants California schools no discretion to authorize excused absences for political demonstrations.

69.     Kidwell told the staff that unless teachers had preexisting plans to conduct graded instructional activities, they were not authorized to schedule any.

70.     In the staff meeting, Kissner advised Kidwell and Arias that he already had plans to administer a quiz on the day of the walkout, which coincided with "Pi Day."[15]  Kidwell appeared obviously angered by Kissner's representations. Although Kissner had preexisting plans to administer a graded quiz, Kidwell responded to Kissner by threatening him with legal action if he were to carry out his plan to grade assignments during the walkout.

71.     The next day, Kidwell contradicted herself in an ambiguous memorandum notifying faculty that the March 14 walk-out would be treated "as unexcused **unless a parent comes and signs [their child] out**," while inconsistently stating that the partial period absence would be treated as a "cut" (meaning any assignment or test missed during that time would be treated as unexcused work in accordance with the teacher's syllabus), and that teachers were to remain in class.

72.     On March 7, 2018, Kidwell notified parents by email that students who participated in the walkout would be deemed truant:

> We must have a process that fulfills our obligations to student safety, maintenance of instructional programing, and support respectful differences of opinion that we can use consistently regardless of topic.

---

[15] Pi day is a day set aside to learn about and celebrate the universal ratio of Pi (for every circle, the ratio of circumference to diameter is always 3.14…), which is one of the most important numbers in the universe, and which helps the science or math student to understand the natural world with greater clarity.  It is celebrated on March 14 each year because the date represents Pi (3.14).

**Complaint**

73.     Kidwell explained the policy that was to be implemented:

Students who choose to walk out will be provided with a space to gather in quiet solidarity. Their absence from class will be considered "unexcused" and dealt with as a "class cut". Missed work or assignments will be dealt with per the syllabus for each instructor. Please know that teachers do not enjoy the same freedom of speech rights during the school day and are expected to remain in class delivering the scheduled content. As a school district, we cannot promote or endorse civil disobedience, nor can we discourage participation. It is our job to maintain an effective learning environment for all students.

*Id.*

74.     That day, in an email to Kidwell, Kissner raised the point that the walkout was a political event organized by the partisan Women's March and not, as she had represented in the staff meeting two days earlier, a remembrance dedicated to the victims of the Marjorie Stoneman school shootings. Kidwell acknowledged the political nature of the event.

75.     Incredibly, despite (1) legal guidance received by the District, (2) the lack of statutory power to excuse truants attending political events, (3) Kidwell's announcements that the District would treat class absences as cuts, and (4) her assurances the District would be viewpoint neutral regarding the walkout, on March 13, 2018, one day before the walkout, Kidwell inexplicably reversed herself, informing students and parents in an email and to students, teachers, and staff over the public address system that there would be no adverse consequences—academic, disciplinary, or otherwise—imposed on students joining the walkout.

76.     Kissner saw Kidwell's sudden policy reversal as a rejection of legal advice and clear law. In response, he prepared an open letter to the Board of Trustees expressing his concerns.

77.     On March 14, 2018, the District removed any impediment to students participating in the walkout. Kidwell's participation in it placed the school's imprimatur on the walkout's political message. The school schedule was changed to accommodate the walkout plans; the absence policy was changed to relieve truant students of adverse consequences; teachers were instructed not to grade classwork; students and families were told there would be no academic or

20

**Complaint**

disciplinary consequences; Kidwell appeared to lead the walkout in solidarity with the political views expressed by one side of the gun controversy; and the District departed from lawful and constitutional protocols and procedures in other ways.

### 3.   Kissner gave failing grades to three students who opted to attend the walkout

78.     Both students and parents had advance notice of the consequences of choosing to cut class. In the days leading up to the walkout, Kissner informed his class about the scheduled Pi Day activity and quiz and advised his students that any student who cut class would be given a zero grade for the day's class assignment.  Additionally, all three of the students who ultimately chose to walk out of class spoke individually with Kissner beforehand concerning his grading policy.

79.     The student identified in the Walkout Report as Student 2 emailed Kissner on March 9, 2018: "Hi Kissner, I was wondering what are your policies around cutting class? Do you allow people who do so to make up their work? Thanks for responding!"

80.     Kissner responded that "since cutting class is against school rules, I would not allow a student to make up the work."

81.     The students identified as Students 1 and 3 also approached Kissner on March 13, 2018, to ask about the consequences of walking out of class the next day, and were told the same.

82.     On March 14, 2018, more than 80 CT Middle students participated in the walkout. Only three students from Kissner's science class participated (identified as students 1-3 in Patricia Elliot's walkout investigation report). The class included a fun "Pi Day" activity and a quiz that Kissner had historically given on the annual Pi Day. Kissner entered failing grades on that assignment for Students 1-3, who walked out even though they understood the grading consequences.

**Complaint**

#### 4. Parents and teachers reacted angrily to Kissner's decision to give failing grades for the quiz to the three students

83. Both Kissner and Kidwell received emails from the parents of one of the failed students upset that Kissner gave their child a failing grade in light of Kidwell's assurances that there would be no adverse consequences for participating in the student walkout demonstration. This parent should have known that Kissner planned to give failing grades on that assignment to those students who did not remain in class because (1) Kissner had advised their child of that fact on at least three occasions, and (2) Kidwell had notified all parents a week prior that participating in the walkout would be considered a class cut and missed work would be handled per the teacher's policy.

84. Kissner was later notified by Kidwell that the three students' parents were challenging their children's grades under Cal. Educ. Code §§ 49066 and 49070.

#### 5. A parent of one of the students who received a failing grade on the quiz appeared on TV to complain about Kissner's decision

85. On March 16, 2018, a parent of one of the three students who earned a failing grade approached a local TV news affiliate, NBC Bay Area, criticizing Kissner and falsely accusing Kissner of giving a "pop quiz" during the walkout demonstration.[16] After the story aired on NBC affiliates throughout California, Kissner began receiving multiple news interview requests.

86. After watching the television news report, Kissner sought a meeting with school officials to discuss how the District would respond to the parent's public criticism in order to clear his name, and going forward, how the District and he could cooperatively handle future political events. But neither Kidwell nor the trustees he contacted timely responded to his request.

---

[16] Anoushah Rasta, "Los Gatos Student Punished by Science Teacher for Participating in National School Walkout," NBC Bay Area (3/16/2018);  https://www.nbcbayarea.com/news/local/los-gatos-student-punished-by-science-teacher-for-participating-in-national-school-walkout/195585/

**Complaint**

87.     Both Kissner and his wife, Stacy Kissner, began receiving a flood of vulgar, threatening, and harassing messages and emails. For example, Stacy received emails stating: "You bitch, Kissner, dare you to respond to this message" and "Kissner, can't believe you are married to such as [sic] asshole… he deserves to be fired."

88.     An anonymous writer suggested Kissner not go to church "unless you are comfortable with parents confronting you."

89.     Kissner received messages such as "QUIT YOUR JOB AND GO WORK AT MCDONALD'S!!!! Fuck you," "You know you and Trump have a [sic] in common . . . you are both scumbags and abusers." "You're a dick and you're fat. So, fuck you," "Fuck you....Hope you lose your job asshole...DOes [sic] Trump lube you up firdt [sic] with NRA lube?"

90.     Kissner's wife was shopping at a local store when a person told her to tell her husband that "he had better watch his back."

91.     Kissner received emails from the parent of one of the three students who were given failing grades accusing Kissner of betraying his Christian faith. The child's mother initially appealed to Kissner's Christian faith by telling him her child was a devout Christian, that her son was distraught by what was happening in the media and was concerned for Mr. Kissner. Kissner wrote back to her, including a reassuring message for her son with a reference to faith, which he asked her permission to send only if she felt it was appropriate and helpful. The parent enthusiastically agreed. The parent later deceptively altered the email exchange to suggest that Kissner was improperly imposing his religious views, unsolicited, on her child and should not be teaching in a public school.

Complaint

**6.    Kissner felt the need to defend himself in the face of the mounting attacks on him**

92.    On March 18, 2018, Kissner agreed to be interviewed by a reporter with the Bay Area News Group. The article from the interview was picked up and spread by media nationwide. Only then, after Kissner had committed to a news interview, did Kidwell agree to meet with him.

**7.    The District agreed to enlist the services of a "facilitator" to resolve walkout policy discord**

93.    Defendant and Board President Deana Arnold ("Arnold"), Kidwell, Kissner, and two others met on March 19, 2018.   The group agreed the District should select a mutually acceptable "facilitator" to make sense of District policy regarding student walkouts, come to common understanding, learn from the incident, and resolve the discord among faculty members.

94.    That day, the District released a joint statement to the school community and to the media with a photo of Kissner, Arnold, and Kidwell stating in part: "The District will seek outside facilitation to help us learn from these challenges and develop a set of shared understandings to guide us going forward." At no time was an "investigation" mentioned.

**8.    Kissner's colleagues continued their attacks and demanded he resign**

95.    The controversy over Kissner's grading decision during the walkout erupted after news reports spread nationwide. The parents of the three students who had received failing grades on the assignment for not taking the Pi Day quiz asked that their children be removed from his class. At school, things were chilly.

96.    The other teachers, previously friendly to Kissner, gave him the cold shoulder. They mounted personal attacks, questioning Kissner's character and motives for challenging the walkout. Teacher Leader Tony Arias condemned Kissner for possessing a "corrupt belief system" and told him in front of the entire staff that "There will be NO FORGIVENESS. EVER!"

Complaint

97.     Among other insults the prickly teachers hurled at Kissner, he was accused of being "mean," uncompassionate, and indifferent to the suffering of the victims of gun violence in schools. Teachers demanded that Kissner resign or that the board discipline him harshly, accusing him of throwing "sand into the gears of our well-oiled CT machine."

### 9.     District officials illegally and surreptitiously changed the student grades

98.     During the March 19 meeting where the District agreed to seek a facilitator, Kidwell and Arnold also told Kissner—falsely—that the student grades would be a non-issue under a District policy requiring pass/fail marks in lieu of letter grades where a change in teacher is made mid-quarter.  In fact, the three students who had asked to be moved from Kissner's class for the last four days of the quarter had their grades covertly and artificially inflated by the students' new teachers.  Kidwell and Arnold were actively involved in this process and were working to offset any negative academic impact for the three students who walked out of class on March 14. This underhanded change to a student's grade without a hearing violated Kissner's rights as a classroom teacher of record and violated Cal. Educ. Code §§ 49066 and 49070.

### 10.    Kissner engaged in discussions with the District over the possibility of an April 20, 2018, nationwide walkout

99.     News outlets announced that another nationwide student walkout was planned for April 20, 2018, to coincide with the anniversary of the 1999 Columbine school shootings in Colorado. In light of the fallout from the earlier walkout, Kissner sought to persuade Kidwell that adoption and enforcement of an updated truancy policy was necessary to avoid attracting more negative publicity and to comply with state and federal law.

100.    In early April, an attorney retained by concerned parents wrote to the District characterizing the walkout policy as discriminatory under federal civil rights law and demanding that it "distance itself from any level of participation in the walkout." The attorney pointed out that "[s]tudents and staff who do not share in the ideological message conveyed during the walkout

**Complaint**

expose themselves as opponents of that message and thereby set themselves up to become the targets of bullying, intimidation and harassment." This is precisely what happened to Kissner.

101.    Kidwell and defendant Arnold, in consultation with Kissner, did, in fact, update the student handbook midyear to address policies pertaining to cutting class and their consequences in advance of the April 20, 2018, walkout. Consistent with state law, the policy update required the District to remain neutral on political matters.

### 11.    The *Mercury News* contacted Kissner for information concerning how the District was expected to handle an April 20 walkout

102.    On April 16, 2018, Kissner responded to an email request for an interview with the San Jose *Mercury News* inquiring into the District's plans for an April 20 walkout. Kissner declined an interview and instead directed the news reporter to the District's public website link containing the Superintendent's letter to parents and the updated student handbook. Kissner additionally summarized the letter: "Students who walk out will be escorted to the office, parents called to pick them up, they will be assigned Saturday school, and they will receive zeros for any work missed without the ability to make it up." The subsequent news article ignored the direct evidence of the policy update contained in the link and instead quoted Kissner's summary.

103.    At all relevant times, Kissner was communicating with reporters contacting him as a private individual on matters of public concern and public record.

### D.    The District Retaliated Against Kissner With Contrived Investigations

### 1.    Kissner became aware that District representations of a "facilitation" were false and that he was the target of an unexplained investigation

104.    Unbeknownst to Kissner and contradicting representations made by District officials to Kissner, in or about late March 2018 the District launched an investigation into Kissner's opposition to the March 2018 student walkout. In April 2018, Kidwell e-mailed the parents of the

26

three truant students that the District had opened an investigation into whether Kissner had violated District policy during the walkout.

105.    On April 23, 2018, following the publication of the *Mercury News* article, District administrators notified Kissner that the District was "adding to the investigation" an inquiry into charges he improperly represented the District in the press. This was Kissner's first notice of any investigation targeting him for any reason.

### 2.    A disgruntled community member sent an anonymous letter accusing Kissner of improper behavior with minors

106.    On March 20, 2018, just days after the walkout and the public uproar over Kissner's grading decision, the District received an anonymous letter falsely accusing Kissner of child "grooming" behavior.[17]

107.    The District inexplicably acted on the anonymous complaint only after the nationwide April 20 student walkout had taken place and after sitting on it for more than six weeks. Had the District been genuinely concerned about the allegations of the anonymous letter, it reasonably should have acted on it immediately.

108.    On April 30, 2018, the District notified Kissner he was being placed on paid administrative leave pending an investigation into "inappropriate interactions with minors." Kissner was not told he was accused of any specific offense but only that the District was "adding these issues to the already pending [walkout] investigation."

109.    The salacious allegations and innuendos contained in the anonymous letter were intended to place Kissner in a false light and depict him as criminally immoral.

---

[17] " 'Grooming' generally describes conduct or actions by an offender that are undertaken to develop a bond between the victim and offender and, ultimately, make the victim more receptive to sexual activity with the offender." *Perez v. State*, 129 Nev. 850, 853 (2013); *see also People v. Shazier*, 60 Cal. 4th 109, 145 (2014) ("patiently cultivating and manipulating them to achieve his purposes"). A false and unfounded charge of "grooming" can serve no purpose other than to cause a visceral reaction—to create undue prejudice.

**Complaint**

110.    Kissner has <u>NEVER</u> "singled out" any minors for sexual, immoral, unethical, or otherwise improper interactions, and the District has <u>never</u> produced a shred of evidence that he has.  Individual District Defendants testified that they had no evidence of such behavior.

111.    On a single occasion more than two years prior to the conduct investigation, Kissner acknowledged sharing a toast with a high school aged individual (Summer of 2016).  The single sip of alcohol was intended to celebrate a significant outdoor achievement.  This incident did not involve a District student and was on a trip that was not in any way school related.

112.    Kissner has never asked minors about their sexual experience. Acting as a mentor, Kissner has built a trust with former students based on his Christian values who have come to him with various personal issues, including questions dealing with their dating relationships. Students have occasionally interviewed Kissner about intimate topics as part of a high school health class assignment asking them to interview a trusted adult and record notes of the conversation.  Kissner has never had an inappropriate conversation about sex with any minor or asked any minor about sex and the District has <u>never</u> produced a shred of evidence that he has.

113.    The anonymous letter author's assertion that "the acts" Kissner has engaged in with minors is "clearly grooming" is false and defamatory. The author's insinuation that Kissner "gets close physical contacts with many boys" for sexual reasons as a wrestling coach is false and defamatory.

114.    The District has <u>NEVER</u> produced a shred of evidence that he has ever engaged in acts of a sexual nature or acts intended to be sexual in nature with minor students.

115.    In subsequent discovery, the anonymous letter writer was found to be (1) a disgruntled parent of former students of Kissner, (2) politically motivated by her own passionate support of the student walkouts, to the point that she used social media to organize participation in

**Complaint**

local marches, and (3) later expressed second thoughts about her false, salacious, and defamatory accusations.

### 3. Some community members rallied to Kissner's defense, leading to tensions on campus

116.   Kissner's forced leave of absence created a stir in the small local community. At a May 4, 2018, board meeting, Kissner's supporters stepped forward to criticize the District's handling of the walkout events and what they perceived to be related examples of political indoctrination. His supporters, including students and parents, displayed signs along roadways and handed out stickers and petitions at school demanding his return.

117.   The public support Kissner received only infuriated his detractors. Arguments broke out around the school campus and in one case sheriffs responded to a call when a fight broke out. A student's petition calling for Kissner's return was confiscated while another student was ordered to remove a sticker supporting Kissner from his t-shirt or leave track practice.

118.   The uproar from Kissner's supporters pressured the District to restore Kissner to his classroom. In early May 2018, defendant Arnold informed Kissner that the District had completed its investigation and he was welcome to return to the classroom, and a public statement notified the school community and the media of the same.  He returned to the classroom on May 10, 2018. But the investigation was not complete. In fact, the allegations from the anonymous letter morphed into two investigations, one purporting to look into walkout policy irregularities and the other purporting to scrutinize Kissner's conduct with children.

### 4. Kissner took medical leave for emotional distress over the hostile workplace environment and harassment

119.   After the March 14 walkout, Kissner was subjected to hostility by his colleagues, both overtly and subtly.  He endured pointed attacks on his character and person.  During this time, he was the subject of a walkout investigation and an investigation into anonymous and unspecified

**Complaint**

claims of predatory behavior with children. He was placed on forced leave. The cumulative effect of these circumstances wore deeply on Kissner's mental and physical health.

120.    Kissner's anxiety was such that the mere thought of going on campus caused a physiological response, including nausea, irritability, headaches, and a sense of despair.  When not at school, he would drive well out of his way to run errands to avoid coming near the campus.  Even at home, certain topics or school related topics would trigger anxiety and nausea. Kissner lost sleep, negatively affecting his relationships with his wife and son.  For a prolonged period of time, he had little or no appetite.

121.    When Kissner returned to campus after his forced leave, he was committed to making it through to the end of the year.  He expected a facilitated process for all parties to resolve the walkout issues, as promised by Kidwell and Arnold.  He had been told that the investigation into the anonymous letter allegations was completed.  In mid-May, Kissner learned that there would be no "facilitation" in the walkout matter, but that he was instead the subject of a secretive investigation.  On May 18, 2018, Kissner learned that Kidwell and defendant Arnold had lied to him about the investigation into the anonymous letter being complete – the investigation continued.

122.    These new developments took such a toll on Kissner's mental and physical health that he sought medical attention. Kissner's doctor diagnosed him with "Adjustment Disorder with Anxious and Depressed Mood" and prescribed him to remain on medical leave until the end of the school year. On May 23, 2018, Kissner submitted his request for medical leave.

### 5.    Kissner filed a workplace retaliation and harassment complaint

123.    Kissner filed a workplace retaliation complaint with his employer the same day he applied for medical leave.

124.    The complaint alleged that staff had shunned and ostracized Kissner after the walkout; attacked his moral character; sought to shame and embarrass him; proclaimed they would

**Complaint**

never forgive him; demanded his resignation; and solicited the board for harsh discipline against him.

125.    The complaint additionally alleged that although District officials were aware of the staff's animus toward Kissner, they failed to intervene or attempt to restore harmony to the workplace and that district leadership failed to address open examples of retaliation and harassment.

126.    The complaint further alleged that the District continued to maintain an intrusive, covert investigation into Kissner's moral character after misrepresenting to him and to the public that the investigation was complete.

127.    Kissner summed up his grievance as follows:

> The public attacks on my character, the ostracism by my colleagues, lack of remedy by district leadership, and the duplicitous dealings with me by the administration regarding the closed investigation have had a dramatic impact on my emotional, mental, and physical health.  It has caused me to be unable to perform my professional duties at this time.  It has led me to seek medical services where I have been diagnosed with "Adjustment Disorder with Mixed Anxiety and Depressed Mood." It has dramatically affected my quality of life and that of my family.

128.    Ultimately, the District hired an investigator to look into Kissner's retaliation complaint. During the next school year, following multiple requests for information, the District finally told Kissner that they found his complaint to be unsubstantiated.  Although District policy requires an explanation be provided to the complainant, the District withheld its report from Kissner and failed to explain its reasons for its decision.

### 6.    The District commissioned an investigation to determine whether Kissner violated District policies by protesting the student walkout and failing students attending it

129.    On April 19, 2018, the District began a formal investigation "to determine the facts and circumstances regarding how the District and District staff conducted themselves" related to the walkout. The District retained Patricia Elliot ("Elliot"), an "independent" investigator and

**Complaint**

attorney to conduct an open-ended witch-hunt into Kissner's role in the controversial walkout storm.

130.    In her report, dated June 23, 2018, Elliot described the scope of the investigation as limited to:

> the CT English student walkouts on March 14, 2018[,] and April 20, 2018, including the way the District prepared for the events and actions taken by administrators and staff in response to the events. The investigation will determine the facts relevant to whether or not the District or **District personnel engaged in activities that may be in violation of District policy or applicable law**.

(Emphasis added.)

131.    But the stated scope of the investigation was both disingenuous and completely false. It never once identified a District policy or law relevant to the inquiry. In fact, the investigation report specified later that it did "not address whether or not the alleged incidents, if they occurred, violate either District policy or state or federal law." Indeed, the investigator's subjective polemic admits to not drawing any legal conclusions, disavowing any legal determination whatsoever, stating that "[a] finding that an incident or circumstance more likely than not occurred is not a judgment as to whether or not that incident or circumstance amounts to a violation of the District's policies or state or federal law." In other words, while drawing conclusions as to the relevancy of facts pertaining to law or policy violations, the investigation doesn't even foundationally identify what laws or policies are even relevant. This puts the cart before the horse. Without preliminarily establishing the relevant foundational law or policy implicated, the relevant facts cannot be deduced.

132.    The investigation's real objective was to discover and charge Kissner with some wrongdoing, arming the District with a rationale to terminate or discipline him in some manner and to sate the unforgiving and vengeful appetites of Kissner's objectors, including the Defendants herein.

32

**Complaint**

133.    The investigator's report is unsparing in its indictment of Kissner, accusing him of violating "explicit instructions that teachers were to neither reward nor punish students for participating in the March 14th walkout." The "independent" investigator summed up her one-sided hostility toward Kissner's walkout grading decision: "Neutrality was not enough. Mr. Kissner wanted the District [to] dissuade students from participating in the walkout and to punish any who did." As detailed more fully below, the investigator's report is bursting with such examples of bias, in addition to hearsay and fabrications.

134.    Despite the District's pretense of independence and impartiality, the District hired an investigator who (1) was referred to Superintendent Kidwell by a close personal friend who was also a witness in the investigation, and (2) previously worked for the same law firm representing the District.

135.    Under the direction of the District, the investigator selectively chose only hostile witnesses to interview and ambiguous evidence to find fault with Kissner. Except for one favorable witness, she interviewed only the students who left class during the first walkout and their parents but no one who supported Kissner's grading decision or his other actions or anyone who wasn't hostile to Kissner. The favorable witness she interviewed, staff member Ann Harrington, supported Kissner and refuted the claims of the three walkout students.  Yet Elliot deliberately omitted Harrington's interview statements from her report completely. Elliot also took recorded statements from witnesses she interviewed and falsely recorded those statements differently in her report. She couched her conclusions concerning Kissner's role in pejorative terms (e.g., "he believed he had leverage," "Kissner argues…") while treating Kidwell with kid gloves (e.g., "Ms. Kidwell consistently and repeatedly stated…"). She accepts Kidwell's directive to eliminate all adverse consequences for students participating in the walkout as valid and within the law without exploring its invalidity. She falsely concludes that Kissner was driven by politically "conservative" motives

33

Complaint

by misunderstanding the distinction between an "unexcused absence" and a "class cut." She falsely accused Kissner of speaking to the media "on behalf of the District" and not on his own behalf. She focuses exclusively on Kissner's actions without exploring any other potential "violations of law or policy" by the District or others.

### 7. The District conducted an investigation into the anonymous letter allegations regarding Kissner's conduct with children, but took it a step further by trying to develop a factual basis for finding other misconduct

136.    Although the District has a practice of not accepting unsigned complaints, the District felt that the anonymous letter somehow merited an exception to the policy and asked Elliott to investigate its claims. The District never explained why it made an exception, or why it waited over six weeks – until after the April 20, 2018 walkout media attention – to add this to their investigation.

137.    On or about April 30, 2018, Kissner was notified that he would be placed on paid administrative leave while the District investigated his "interactions with minors." The letter specified that Kissner would remain on paid leave "pending the completion of the investigation" and when Kissner returned to work he was told the investigation had been completed. That wasn't true.

138.    The District did not share any details of the anonymous letter with Kissner until October 18, 2018, when Fraser referred to both the letter and the investigation in another letter. Even then the District did not show the anonymous letter to Kissner.

139.    Kissner reacted to the October 18, 2018, letter with indignation:

The contents of this disciplinary letter are the result of a personal character attack perpetrated by anonymous cowards who sought retribution for my stance in the March 14th, 2018 walkout. I am surprised that the district would like to go on record here that it is giving credence to an anonymous letter full of false and unsubstantiated accusations. Does the timing of such allegations, the unprincipled broadening of the district's investigation, and now this disciplinary letter not show evidence of retaliation for my position during the school sponsored political walkout?

34

**Complaint**

This Investigation was conducted without any regard to the stated scope (the walkout and the anonymous letter), and pursued lines of questioning that were completely irrelevant to the matters at hand. These issues included my classroom bathroom procedures, personal stories I have shared in class for years, and math and science problems I have used for years. In addition, the school district investigated recreational activities I conduct with youth and families outside of school, my faith and science-based beliefs about the origins of life, my Marine Corps career, and other completely irrelevant subjects.

This free-wheeling investigation of every aspect of my personal life and how I perform my professional responsibilities is the very definition of a witch-hunt—a campaign against a person holding unpopular views. It is both unethical and illegal to retaliate against an employee in this way.

It is telling that an investigation of this breadth failed to discover any noteworthy evidence of wrong-doing. As such, this letter makes note of a number of "significant concerns" which lack specific detail and describe situations that are completely innocuous, while implying that something nefarious is going on. It is disingenuous, and betrays an effort to lay the groundwork for future disciplinary action, seeing as none is possible from the walkout controversy.

I am saddened by the fact that the district leadership has apparently joined in the same nasty, personal, divisive political fray that consumes our nation in this era. A different view in a political discourse does not merit an invasive assault on a person's character and life. To use baseless accusations leveled by anonymous cowards in the heat of a· political conflict as a pretense for a limitless investigation into a person's life and work is shameful.

To then take the empty results of said investigation and craft a disciplinary letter that insinuates that there is some merit to the accusations is all the more shameful. To direct these attacks against someone who has proven over years to be a tireless servant of kids and families in the community is reprehensible.

140.    The District never produced a final version of Elliot's subsequent reports in response to Kissner's CPRA requests. Kissner's attempts to obtain a copy of the reports through CPRA requests were rebuffed. Finally, as part of the District's evidence in support of its dismissal charges some 30 months later, on February 12, 2021, a "confidential draft" version dated August 13, 2018, was disclosed to Kissner.

141.    The reason given by Elliot for the District's request to conduct an investigation into Kissner's "conduct with children" was to determine (1) whether facts support the allegations in the

35

anonymous letter, and (2) whether facts regarding "other concerns" about Mr. Kissner's conduct with children existed.

142.     The real purpose for the District's interest in probing Kissner's relationship with children was to find justification for terminating him in retaliation for his walkout decision.

143.     Though claiming to be an "independent" investigator, Elliot framed her investigation around the animus of the three walkout students, their parents, and teachers eager to see Kissner fired. Missing from her investigation was any firsthand knowledge of misconduct that could objectively rise to the level of a terminable offense. Indeed, even after submitting a written report in August 2018 based on Elliot's lopsided fact-finding, the District was left without the ammunition necessary to pull the trigger and continued to employ Kissner.

144.     Elliot went to extreme lengths to portray Kissner as a politically motivated, misogynistic, violence-fixated, anti-evolution, alcoholic, pederast. However, she failed to understand or distinguish between "class cuts" and "unexcused absences," conflating the two and concluding that Kissner acted hypocritically by failing students attending the walkout while not penalizing students who took absences for participating in his bike rides.[18]  She drones on about

---

[18] A class cut is a disciplinary matter while an unexcused absence is not. A class cut is a "purposeful choice to miss class," or "a student attends school for part of the day then misses part, or all, of one or more classes without being signed out by a parent." The updated student handbook stated that "Students who cut classes will be referred to the administration and will receive progressive discipline." "Class cuts are considered unexcused and missed work may not be made up." This, of course, would not apply to a student who is signed out by their parent.

Students at CT Middle have unexcused absences for many reasons. A parent may neglect to call in when they are ill. A parent may sign their child out of school early for a haircut appointment or to go on vacation early or to participate in a sporting event. While "unexcused" under state law and school policy, these absences are not treated as disciplinary issues, and students are generally permitted to make up any missed work in any class.

While the term "class cut" was not defined at CT Middle prior to the March 14 walkout, Superintendent Kidwell repeatedly described the decision to participate in the walkout as a "class cut." After the walkout took place and the drama that ensued, Kidwell added language to the student/parent handbook to define a class cut.

Kissner was not inconsistent in his grading of unexcused absences and class cuts. Students who cut class were not excused and not signed out by a parent could not make up an assignment. Students who were signed out by a parent for excused or unexcused reasons were allowed to make up any missed work. Elliot either conveniently or ignorantly neglects to make the distinction.

**Complaint**

how "female students feel that Mr. Kissner treats them differently" and "feel ignored" without mentioning she is relying on the untrustworthy word of just two girls, both biased and harboring animus because Kissner failed them for attending the walkout. She uncritically accepts the grumblings of these three walkout students regarding Kissner's war stories and supposed use of violent imagery without mentioning that no one—NO ONE—ever—EVER—in seven years had registered a complaint. Her brief gratuitous honorable mention of Kissner's alleged refusal to teach evolution is incomplete and groundless. Ultimately, after many months and tens and tens of thousands of dollars expended on investigations, the district was left without any grounds to discipline Kissner for either his principled decisions during the walkout or the anonymous letter allegations.

145.   NOWHERE does Elliot confirm any instance of pederasty. Nor does she bother to follow up with the anonymous writer's incriminating and baseless accusation of "grooming." Elliot doesn't even bother to concede she found no evidence to support such a scandalous charge.

146.   Elliot showed the anonymous letter to parents and staff, including Helen Odea, the parent of Student 5 and an art teacher at school ("When Student Five's mother read the Anonymous Letter, she became quite concerned.")

147.   Tellingly, while Elliot is quick to share the tawdry anonymous letter with parents and staff she interviewed, she never once showed it to Kissner himself. Throughout the process he was purposefully kept blind concerning the actual allegations made against him by the anonymous writer.

148.   Elliot's unscrupulous report is notable for jumping to conclusions unsupported by the facts. For example: "Some teachers [who? How many"] expressed concern about the amount of time Mr. Kissner spends with some students outside of school [what is their concern?] and have wondered whether he keeps it professional…." After raising the question of impropriety, does Elliot

37

Complaint

bother to validate these "concerns" of unprofessionalism? Of course not. The "concerns" of "some teachers" are left to die on the vine. There is no elucidation, only amateurish insinuation and loose ends.

149.    In the end, Elliot's inconclusive Conduct Report resulted in <u>no evidence of actionable wrongdoing and zero disciplinary action</u>.

150.    The District's investigation did, however, plant suspicion in the community. Elliot's interviews with parents and children were not a guarded secret but the germ of slanderous gossip. This gossip continued unabated for several years as Kissner continued to be a controversial figure involved in the local political process.

### 8.    Kissner filed a religious discrimination complaint after the District engaged in adverse action based on his religious views

151.    In August 2018, just days before the start of school, Kissner was contacted by Defendant Fraser, the newly hired superintendent, who replaced Kidwell. In an email, Fraser told Kissner that he needed to pack up his classroom, where he had been for seven years, because his new assignment would not involve classroom instruction of core classes with students.

152.    Fraser explained the decision by stating there was uncertainty about whether or not Kissner would return to teaching in the Fall.

153.    Kissner suspected foul play based on questions concerning evolution raised by Elliott in her interviews with him during the summer. She had asked his opinions concerning intelligent design theory and creationism and on teaching evolution. Elliot's recorded interviews with Kissner's colleagues included discussions about his beliefs about the origins of life, and his colleagues had falsely accused him of being unwilling to teach evolution. Kissner was aware of reactions to intelligent design theory as an explanation for life and the material universe where it is frequently and erroneously conflated with the Biblical doctrine of creationism.

**Complaint**

154.   On October 28, 2018, Kissner filed a religious discrimination complaint with the EEOC based on a suspicion that he had been removed from his science classes not based on the reasons given by the District but based on a false belief by some of his colleagues that Kissner's "religious" beliefs—namely, his interest in intelligent design theory— prevented him from teaching evolution.

155.   The EEOC investigation couldn't substantiate Kissner's suspicions because the District refused to turn over the notes and recordings relied on by Elliot.

## V.   Kissner's Protected Political Speech Aggravated District Leadership

### A.   <u>Kissner Successfully Led Opposition To A District-Funding Tax Measure</u>

156.   The District had been receiving revenue from a parcel tax measure approved by voters in 2013, set to expire after seven years. District trustees approved a November 2020 ballot seeking public funding to continue an additional seven years under a new parcel tax measure.

157.   Kissner opposed the new parcel tax measure, known as Measure N, and joined the campaign opposing it.

158.   Kissner believed the District had misused the public funding it had received for seven years by, *inter alia*, failing to balance its budget during that time and failing to identify specific fiscal objectives.

159.   Proponents of the new measure, including District Defendants (officials and trustees) failed still to explain how the funding would be allocated.

160.   The lack of government transparency made the measure unpopular with a large segment of the Los Gatos community and created outspoken divisiveness in the small community on social media.

161.   During the political campaign to pass the measure, District officials, including the District Defendants, openly voiced their support for its passage.

39

162.    In September 2020, the California Teachers Association-Loma Prieta invited opponents of the measure to present their positions to its members.

163.    Kissner prepared a video explaining the reasons for his opposition.

164.    Kissner released a second video critical of the District's board and administration's management of the budget and lack of transparency regarding the use of public funding. The video was widely circulated throughout the community, including among board members and the superintendent.

165.    Measure N was an extremely divisive issue in the small community of Los Gatos, generating hundreds of passionate social media posts and comments, letters to the board, and public debate.  Kissner was personally and publicly targeted by many school employees and others for his opposition to Measure N.

166.    Every board trustee had reason to be bitter about Kissner's opposition. Indeed, Defendant Asheghian, a current trustee, led the Yes on N campaign. Defendants Abeln, Arnold and Bourque, all District trustees at the time, openly campaigned for it. And Defendant trustee Bourque had recommended the parcel tax as a member of the Superintendent's Budget Advisory Committee. Defendant Superintendent Fraser along with other school staff members and leadership personally attended community rallies in support of Measure N.

167.    The District's fixation with seeing the measure pass led Defendant Abeln to publicly threaten to "personally go after" anyone who opposed Measure N.

168.    Measure N was ultimately defeated, dealing the District a major financial setback.

**B.**    **Kissner Led The Public Effort to Invalidate The Board's Provisional Appointment and to Compel A Special Election**

169.    In January 2021, after Measure N had been defeated and the District had lost its hoped-for public source of revenue, Kissner poked the bear again by leading an effort calling for a special election to fill a board vacancy.

Complaint

170.     Kissner's wife, Stacy, sought an elected position to fill the vacancy. The board moved instead to fill the position by appointment.

171.     On January 6, 2021, during a public board meeting, Kissner presented the trustees with a letter co-signed by other members of the community urging them not to fill the vacant position with an appointed figure but to approve a special election.

172.     Kissner's letter informed the board that if it failed to call for a special election, Kissner would lead an effort to force a special election. The board instead made a provisional appointment of a member to the board, and Kissner launched a petition campaign to overturn the appointment and compel an election.

173.     Kissner determined that the board had a history of appointing political cronies to fill board vacancies. The appointed replacement would then have the incumbent advantage to maintain the position in a future election. In this way, the District could maintain its power structure.

174.     Kissner's actions once again drew the rage of factions, including the District Defendants, within the school community.  Kissner and his allies were bombarded with profanity-laced attacks on social media platforms. Some of those posting on social media wished death on them. One individual anonymously threated to spread false information about Kissner claiming him to be a child molester unless the petition was withdrawn.

175.     On the last day for the petition's signatures to be approved by the superintendent of schools for the County of Santa Clara, Kissner was notified that the petition was rejected due to formatting irregularities.

176.     Kissner filed for a writ of mandate in the Superior Court of Santa Clara, Case No. 21-cv-381463, challenging the decision of the county school superintendent. The Hon. Audra Ibarra granted Kissner's writ ordering the election to proceed and granting a one week stay of her order to allow the county school superintendent to appeal.

Complaint

177.     The county school superintendent appealed in California's Fourth District, Case No. G060946. The appeal was denied. The appointed board member has since been forced to resign, and the position will be filled er an election.

### C.     Kissner Publicly Challenged The District's Improper Apportionment Of Public Funds

178.     On February 10, 2021, Kissner wrote a letter to the County Superintendent of Schools and copied Fraser and the board.  The letter requested that the County Superintendent of Schools deny the waiver request from the District for its chronic non-compliance with Cal. Educ. Code § 41372.  This law requires that 60% or more of the cost of education be spent on classroom instruction.  The District has been out of compliance with this law for many years, and every year requests and is granted a waiver.  In 2021, with budget cuts needed, the District planned to leave administration, which had grown while student count had diminished, untouched, while slashing classroom teachers, bringing the District even further out of compliance with Section 41372.

179.     Kissner asked that the waiver request be denied. CT Middle Principal Billy Martin ("Martin"), who engaged in adverse employment action against Kissner in 2020, would be the primary administrative position on the chopping block if the District were to meet its obligations under the law.

## VI.    Kissner Was Simultaneously, But Not Coincidentally, Given His Walking Papers In Both Layoff And Dismissal Proceedings

### D.     The District Disclosed Unfounded Allegations Of Grooming To The Public

#### 1.     Introduction

180.     On or about February 12, 2021, Defendants District and Individual District Defendants served Kissner with a Notice of Proposed Intent to Dismiss with Statement of Charges ("Statement").

**Complaint**

181.    The Statement falsely asserted as fact that Kissner was guilty of "Potential grooming behavior, such as: singling out a minor and being alone with a minor ... asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet." (the "statement.") The allegations derived exclusively from the anonymous letter sent to the District in the heat of the 2018 walkout controversy, which were investigated, and where no evidence was found to substantiate such allegations.

182.    The defamatory statement of fact is false, unprivileged, and has a natural tendency to injure Kissner, including and especially at his place of work and in the education world where he might be required to seek employment.

183.    On or about March 22, 2021, Kissner, through counsel, demanded the District dismiss the false statement accusing Kissner of potential grooming behavior.  The letter stated in relevant part:

> These slanderous charges lack any substance and are shamelessly based on nothing more than anonymous inadmissible hearsay. Accusations of "potential grooming," asking about sex, etc., are made with NO SOURCE, NO VICTIM, NO DETAILS, NO OFFICIAL COMPLAINT, NO REPORTS.... Should these accusations remain in these proceedings or otherwise find their way toward republication, we will not hesitate to hold the District and each person involved accountable.

184.    Counsel for the District never responded to the demand, never sought to meet and confer regarding it, and, as alleged hereinbelow, apparently authorized the false and defamatory Statement's release to the public.

185.    On or about April 16, 2021, Defendant District and Individual District Defendants received a request for a copy of the Statement from an anonymous, fictitiously-named individual pursuant to the California Public Records Act. The request was served by email at or about 9:49 a.m.

186.    On or about April 16, 2021, at or about 10:43 a.m., just 54 minutes after receiving the request, Defendant District and Individual District Defendants responded to the request by

43

**Complaint**

attaching the Statement to an email. The response additionally included a letter, which stated in relevant part:

> [T]he California Court of Appeals held that records of complaints or investigations against a public employee **can be disclosed only if "the complaint is of a substantial nature and there is reasonable cause to believe the complaint or charge of misconduct is well founded."** (*See, Bakersfield City School Dist. v. Superior Court* (2004) 118 Cal.App.4th 1041 at 1044; *see also, ERV, Inc. v. Superior Ct.* (2006) 143 Cal.App.4th 742.) **However, in such instances, a public agency's decision to release confidential documents under the PRA is reviewable by petition for writ of mandate in a "reverse-PRA" lawsuit. (*See, Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 250**.)
>
> ***
>
> [T]he District is unable to produce privileged document(s) or information encompassed by an exemption under the PRA or any state or federal law. (*See e.g.*, Gov. Code 6254 and 6255.) Accordingly, the District will segregate and/or redact privileged and/or exempt information as needed.

(Emphasis added.)

187.    By the letter's express language, Defendant District and Individual District Defendants knew and understood that they were obligated to consult with Kissner to determine whether he intended to object to the release of the false and defamatory Statement on the basis of any privacy concerns by filing a petition for writ of mandate to enjoin the false and defamatory Statement's release to the public.

188.    Additionally, by the letter's express language, Defendant District and Individual District Defendants knew and understood that they were prohibited from producing information encompassed by an exemption under the PRA or any state or federal law.

189.    Fraser testified that she (1) did not know who the anonymous and fictitious individual making the PRA request was, (2) personally authorized her secretary, Eileen Bevans, to release the statement to the public, (3) reviewed the statement to assess whether any of its cotent required redaction, (4) signed the document, (5) understood and signed the letter accompanying the statement, and (5) did not redact any part of the statement.

**Complaint**

190.    By releasing the false and defamatory Statement as herein alleged, Defendant District and Individual District Defendants failed to provide Kissner with an opportunity to challenge its release either in whole or in part by filing a petition for writ of mandate seeking injunctive relief and thereby deprived him of his constitutional right to due process. The failure to provide Kissner with due process constitutes a violation of his constitutional rights under state and federal law and exempted the District from releasing it to the public.

191.    The charges were promptly republished by members of the public and predictably subjected Kissner to shame and humiliation, threats, intimidation, mockery and derision by members of the public throughout the community. It led to community members posting on the "95033 Talk" Yahoo community forum: "… Fuck that guy. He's someone who was grooming kids. I can't prove that but all the evidence points that way."

192.    On or about June 11, 2021, Defendants District and Individual District Defendants served Kissner with an Amended Notice of Proposed Intent to Dismiss with Statement of Charges ("Amended Statement") once again falsely stating that Kissner engaged in immoral conduct consisting of, *inter alia*, "[p]otential grooming behavior, such as: singling out a minor and being alone with a minor; offering alcohol; asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet."

193.    On or about July 6, 2021, Defendants District and Grier received a request for a copy of the Amended Statement from community member Allan Hessenflow pursuant to the California Public Records Act.

194.    On July 6, 2021, Defendants District and Grier responded to the request by attaching the Amended Statement to an email. The response additionally included a letter, which stated in relevant part:

> [T]he California Court of Appeals held that records of complaints or investigations against a public employee can be disclosed only if "the complaint is of a substantial

45

Complaint

nature and **there is reasonable cause to believe the complaint or charge of misconduct is well founded."** (*See, Bakersfield City School Dist. v. Superior Court* (2004) 118 Cal.App.4th 1041 at 1044; *see also, ERV, Inc. v. Superior Ct.* (2006) 143 Cal.App.4th 742.) **However, in such instances, a public agency's decision to release confidential documents under the PRA is reviewable by petition for writ of mandate in a "reverse-PRA" lawsuit. (*See, Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 250**.)

***

[T]he District is unable to produce privileged document(s) or information encompassed by an exemption under the PRA or any state or federal law. (*See e.g.*, Gov. Code 6254 and 6255.) Accordingly, the District will segregate and/or redact privileged and/or exempt information as needed.

(Emphasis added.)

195.    By the letter's express language, Defendant District and Individual District Defendants knew and understood that they were obligated to consult with Kissner to determine whether he intended to object to the release of the false and defamatory Amended Statement on the basis of any privacy concerns by filing a petition for writ of mandate to enjoin the false and defamatory Amended Statement's release to the public.

196.    Additionally, by the letter's express language, Defendant District and Individual District Defendants knew and understood that they were prohibited from producing unfounded allegations under the PRA or any state or federal law and were required to provide Kissner with an opportunity to file a reverse PRA lawsuit challenging release of the statement.

197.    By releasing the false and defamatory amended statement as herein alleged, Defendant District and Individual District Defendants failed to provide Kissner with an opportunity to challenge its release either in whole or in part by filing a petition for writ of mandate seeking injunctive relief and thereby deprived him of his constitutional right to due process. The failure to provide Kissner with due process constitutes a violation of his constitutional rights under state and federal law and exempted the District from releasing it to the public.

**Complaint**

198.    The charges were promptly republished by members of the public and predictably subjected Kissner to shame and humiliation, threats, intimidation, mockery and derision by members of the public throughout the community. It led to community members posting on the "95033 Talk" Yahoo community forum: "… Fuck that guy. He's someone who was grooming kids. I can't prove that but all the evidence points that way." It has been reposted on various websites and is easily found with an internet search engine.

199.    Subsequent to the release of the defamatory charges, Individual District Defendants testified during dismissal proceedings that they had no evidence supporting such charges, and that they were aware of the statutory protections preventing their publication.

200.    Subsequent to its publication, at the start of the dismissal proceedings, the District dropped the unfounded allegations. The CPC considered no evidence and made no findings concerning "grooming" and the written decision makes no mention of them.

201.    Defendant Fraser testified that she had no personal knowledge of any evidence of "grooming" behavior, but that in including them in the statements of charges she relied exclusively on the 2018 conduct with children investigative report. She conceded that the 2018 conduct with children investigative report contains no reference to "grooming" at all, let alone draws any conclusions concerning "grooming" behavior. The term "grooming" makes a single appearance in the report limited to quoting the anonymous letter. Fraser also testified that she lacked concern over Kissner's coaching wrestling, a close, physical sport, in the years between the anonymous letter investigation and his dismissal.

202.    On February 12, 2021, the District notified Kissner of its decision to terminate him. On April 22, 2021, Kissner requested a hearing. The hearing concluded in December 2021.

203.    A Statement of Charges accompanied the District's notice of intent to dismiss Kissner. The Statement of Charges alleged five statutory causes for dismissal, including (1)

47

**Complaint**

immoral conduct, (2) unprofessional conduct, (3) unsatisfactory performance, (4) persistent violation of rules or regulations of the board, and (5) evident unfitness.

204.     The Statement of Charges identified an array of false allegations unsupported by admissible evidence, and lacking objectivity. It was a continuation of the Defendants' discriminatory campaign of harassment and adverse employment action against Kissner in retaliation for his political speech. It relied exclusively for its support for charges of immoral and unprofessional conduct on the almost three-year-old Walkout and Conduct Reports generated by Defendant Elliot and content that was almost five years old. It reached back to the salacious, unfounded anonymous letter allegations of 2018 in addition to alleging new claims of unsatisfactory performance and insubordination. <u>None of the allegations specified a violation of any District policy</u>.

**2.     The District improperly charged Kissner with unprofessional conduct/unsatisfactory performance by violating Cal. Educ. Code § 44938**

205.     The District violated Cal. Educ. Code § 44938 by bringing charges of unprofessional conduct and unsatisfactory performance against Kissner without providing him with notice or an opportunity to cure, or a written evaluation, and was therefore jurisdictionally-barred from prosecuting them. Indeed, on that basis, the District was compelled to drop these charges during pre-hearing conferences on matters raised by Kissner's motions in limine.

206.     The performance evaluations appearing in Kissner's personnel file contain only favorable assessments of Kissner's job performance and contain no reference to unprofessional conduct or unsatisfactory performance. No evidence of Article 11 evaluations exists in the charging documents at all.  The District's failure to comply with its mandatory Article 11 evaluation by specifying unprofessional conduct/unsatisfactory performance as a metric in Kissner's ultimate

**Complaint**

performance evaluations nullified any actionable justification for bringing these charges. Yet the District stubbornly refused to dismiss the charges until the time of the dismissal hearings.

### 3.      The charges of immoral conduct were time barred

207.      Cal. Educ. Code § 44944(a) prohibits the introduction of evidence relating to matters occurring more than four years before a school district files a notice of intention to dismiss a teacher. It also bars the dismissal of a teacher for events occurring more than four years before the notice was filed. *Atwater Elementary School Dist. v. California Dept. of General Services* (2007) 41 Cal.4th 227, 230. Indeed, the Commission on Professional Competence ("CPC") found <u>no</u> evidence of immoral conduct. Nevertheless, it violated § 44944(a) by considering and reaching a decision to dismiss Kissner on the basis of evidence of matters occurring more than four years before a school District filed its notice.

### 4.      The District improperly charged Kissner with evident unfitness for service

208.      Most of the charges contained in the Statement of Charges dealt with the District's frustrated attempts to improperly exercise control over Kissner's personal life by policing activities having no nexus to his service. Other charges sought to cast his Christian community service initiatives in a false and salacious light, alluding to false charges of pederasty.

209.      Most of the accusations of misconduct come from a handful of vindictive parents motivated by their personal, politically-charged animus toward Kissner, and are directly connected to disgruntled school staff or leadership.

210.      As with the other charges, by failing to specifically characterize any particular act as evidence of Kissner's evident unfitness for service, the District hoped to get away with lumping it in with all the other charges, expecting perhaps that the administrative panel would sort it out for the District. But evident unfitness for service is not synonymous with unprofessional conduct. *Woodland Jt. Unified Sch. Dist. v. Commn. on Prof. Competence, supra*, at 1441. "Unlike

49

**Complaint**

'unprofessional conduct,' 'evident unfitness for service' connotes a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectations of the employing school district" *Id*. at 1444. There was nothing alleged in the charging statement remotely dispositive under this standard. It was this one charge, out of five, that the CPC laid hold of in its erroneous decision to dismiss.

     **5.**    **The District improperly charged Kissner with persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools by the state board or by the governing board of the school district employing him**

211.    As with the other charges, the District failed to cite any state or school law, state board regulation, or local board regulation Kissner allegedly violated. Not only was there no evidence in the charging statement that Kissner violated any law, policy, regulation or objective standard, the District nevertheless charged him with unsatisfactory performance based on grading practices implemented during the remote learning school year where no law, regulation, policy, or objective standard had been adopted or recognized.

212.    Remarkably, while making Kissner's grading practices the basis of multiple charges—and after confronting Kissner—the District began soliciting teachers for their input regarding what they thought equitable grading practice policies should be. In other words, the District is charging Kissner with unsatisfactory performance based on practices they did not understand and non-existent policies they sought to establish only after reprimanding Kissner.  The CPC did not find any evidence of a violation of a law, regulation, or policy.

    **E.**    <u>**Dismissing Kissner Would Not Be Enough. Belts And Suspenders Were Needed So The District Simultaneously Eliminated Kissner Through An Unlawful Reduction In Force**</u>

213.    The District's desire to remove Kissner would not be complete without belts and suspenders. As argued below, the District singled Kissner out as the only tenured casualty of the District layoffs and selected him for removal even though his removal had no fiscal impact on the

**Complaint**

District's 2021-2022 budget. District officials repeatedly describe – and documents define – a change in education program that would affect Kissner - and only Kissner – purportedly resulting from a need to reduce the budget and declining enrollment.

214. Education Code § 44955(b) provides the general rule that layoffs must be made in order of reverse seniority—that is, junior employees must be laid off before more senior employees. In the administrative proceedings that led to the challenged decision, the District failed to satisfy its burden of demonstrating that any of the limited exceptions to that rule, which are contained in Cal. Educ. Code § 44955(d), apply to its decision to retain junior employees in lieu of Petitioner.

215. At a hearing before an Administrative Law Judge ("ALJ"), Defendant Billy Martin testified that there was an open position for instruction in sixth grade math and science that Kissner was experienced teaching, and competent and certified to teach (as long as Kissner signed a consent to teach waiver for sixth grade science, which he had signed in accepting science positions over the previous nine years), and that a teacher junior to Kissner with no known experience teaching the subject was likely to fill that open position after the layoff was completed.

216. At that same hearing, Defendants Fraser and Martin, and the District's Chief Business Officer, Cathy Vance, testified that despite earlier representation, the need to layoff Kissner was not in fact connected to declining enrollment or fiscal constraints, and that there was no budget savings from that change in programming. They instead offered new and vague language around "programming needs" as a justification.

217. The ALJ erred in her proposed decision by ignoring this testimony and finding that the pretextual and superficial change to the name of the programming justified the layoff.

218. The ALJ erred in her proposed decision by finding that competency meant "(e.g., credential or authorization)" and finding that Kissner did not have the correct "credential," despite testimony from District witnesses that Kissner was competent to teach in the open position and that

**Complaint**

his credential allowed him to teach with a consent to teach waiver, which the District had used for that subject for the last nine years.

219.    At the Administrative Hearing, the superintendent, Fraser, testified that the retained certificated employees junior to Petitioner were not required for the purposes of teaching a specific course or course of study. The principal of both schools within the District testified that teachers junior to Kissner were being considered for an open position to teach sixth grade math and science––the position Kissner was originally hired by the District to teach—even though Kissner was the only teacher in the District who he was aware of as having any experience teaching both sixth grade math and science simultaneously.

220.    The ALJ ignored the evidence and held that a pretextual change in programming—from a "departmentalized" to a "core" program—allowed the District to skip all junior employees who held multi-subject credentials, disregarding the reverse seniority requirements of Cal. Educ. Code § 44955(b) and the clearly and convincingly evidenced retaliatory motive of the District.

221.    The ALJ erred in finding that there was no evidence, other than Kissner's testimony, to show that his layoff was not related to budget reductions and reduced enrollment. The witnesses called by the District testified that the reason Kissner was being laid off was because of a change in programming that was not required by reduced enrollment and would have a net zero effect on the budget.

222.    The ALJ also erred in finding that Kissner presented no evidence, other than his own testimony, of retaliation for political speech and viewpoint discrimination, despite the fact that the witnesses called by the District, on cross-examination, testified that they were aware of his political speech, they opposed his political speech, and made the decision to lay him off only a short time after his political speech was made.

Complaint

223.     District witnesses at the hearing testified that teachers junior to Kissner who were retained were not needed to teach a specific course or course of study. The Administrative Law Judge erroneously ignored this testimony and erroneously found that the District had properly applied "skipping" rules.

224.     The ALJ erroneously found that Kissner would not be certificated to teach in a core model with a single subject credential.  Although Defendant Martin claimed this in his testimony, he later had to concede that the California Commission on Teacher Credentialing Administrator's Assignment Manual specifically explains that a single subject credentialed teacher is qualified to teach in a "core" classroom model.  Further, there is evidence that Kissner was originally hired explicitly to teach 6th grade math and science in a "core" model.

225.     The ALJ made other findings contrary to the evidence presented at the hearing, and contrary to the law.

226.     The Defendants adopted the ALJ's erroneous proposed decision in violation of the law.

**VII.    The District Produced the Statement Of Charges Within 52 Minutes Of Receiving A California Public Records Act Request**

227.     On April 16, 2021, shortly after the Notice of Dismissal and Notice of Layoff were issued, an individual using a fake name and email address requested a copy of the Statement of Charges from the District. Within 52 minutes, the District responded to the request without redacting the defamatory portions or providing Kissner with an opportunity to seek a writ prohibiting its release. The anonymous person promptly posted the defamatory information on various social media forums.

/ / /

/ / /

**Complaint**

**VIII.** **The District Amended The Statement Of Charges After Receiving An Additional Complaint That He Had Given Alcohol To Two Teenaged Boys Two Years Earlier**

228.    No sooner had the District notified Kissner of its intent to dismiss him, in February 2021, it launched yet <u>another</u> investigation into alleged wrongdoing.

229.    The new investigation purported to respond to allegations of Kissner providing alcohol to minors in 2019, some two years prior, and <u>after</u> he had already been warned against such conduct.

230.    The timing of these new allegations, miraculously arriving during the pendency of dismissal proceedings, was remarkably fortuitous for Kissner's detractors.

231.    The newly alleged allegations involved an incident allegedly occurring two years earlier.

232.    Helen Odea, the disgruntled mother of the high school student five years earlier who Kissner gave a single sip of alcohol to as a toast, coordinated with other disgruntled parents to bring forward the new allegations.

233.    Odea's hostility toward Kissner surfaced in the investigative report notes and in her sworn testimony during dismissal hearings.

234.    Odea was particularly upset at Kissner over the defeat of Measure N because her teaching position could have been reduced due to budget cuts.

235.    Odea testified that she had wanted the District to take the 2016 incident seriously and fire Kissner ever since the student walkout investigation and was thrilled it was finally taking action.

236.    The District retained Joie Grimmet ("Grimmet"), characterized by the District as an "independent" investigator, to conduct an inquiry into the new allegations from years prior.

237.    Grimmet, however, was not an "independent" investigator, and admitted in sworn testimony at a deposition that (1) she relied on hearsay and unspecified "evidence" that was not

54

**Complaint**

recorded anywhere, (2) her investigation was influenced by improperly reviewing the dismissal charges (which were provided to her by the District's legal counsel), (3) she was rushed and pressured by the District to conclude her investigation to support their dismissal efforts before her investigation was complete ("They wanted something. They needed something for the board"), (4) she failed to interview exculpatory witnesses, (5) she asked leading questions of witnesses, (6) she failed to explore glaring inconsistencies, and (7) she was hired to help the District with the dismissal. Ultimately, the CPC failed to substantiate any of the principal allegations raised regarding the 2019 charges.

## IX.   The District Produced The Amended Statement Of Charges After Receiving A California Public Records Act Request

238.     On or about July 6, 2021, an individual identifying himself as Allan Hessenflow made a PRA request for the amended statement of charges. On July 6, 2021, just as it had done in response to the first PRA request and after having Kissner's attorney had warned District counsel Brian Bock not to publish the unfounded allegations, the District once again responded to the request without redacting the unfounded allegations or providing Kissner with an opportunity to seek a writ prohibiting its publication. Predictably, the amended statement was hastily published on social media forums and various searchable websites.

## X.   Kissner Continues To Suffer Severe Emotional Distress

239.     Kissner's loss of employment and harm to his reputation have made him a pariah in the South Bay, so much so that he has moved out of California to try to avoid the stigma publication of the unfounded allegations has caused him. Despite leaving the state, the stigma follows him wherever he goes. For instance, Kissner joined a church in a new community where he had been teaching Sunday school. Recently, Kissner's church pastor informed him that members of the church had googled his name and came across the unfounded allegations. They requested that

**Complaint**

Kissner be removed as a Sunday school teacher. The pastor complied with the request. Examples like this compound the mental anguish Kissner and his wife continue to unfairly experience.

**FIRST CLAIM FOR RELIEF**

**Free Speech Clause of First Amendment to U.S. Constitution (42 U.S.C. § 1983)**

(Against Individual District Defendants Only);

**California Constitution Free Speech (Art. 1, § 2)**

(Against District & Individual District Defendants Only)

240.     Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

241.     The First Amendment to the United States Constitution prohibits abridgement of the freedom of speech, and the First Amendment is incorporated against the states by the Fourteenth Amendment. Persons violating the First Amendment under color of law are liable at law and in equity under 42 U.S.C. § 1983.

242.     Individual District Defendants are sued in their individual capacity for damages and in their official capacity for equitable relief.

243.     Kissner engaged in protected political speech in 2018 when he expressed his opposition and objection to the District's deviation from law and District policy by authorizing student walkouts organized for the purpose of demonstrating for gun control legislation.

244.     The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993). Even if a policy is constitutionally viewpoint-neutral on its face, it may not be when it is applied under particular circumstances.

/ / /

/ / /

56

**Complaint**

245.    The District violates canons of free speech guarantees when it engages in any kind of viewpoint-based conduct that establishes an endorsement of one political viewpoint on matters of public concern.

246.    The March 14, 2018, walkout was a politically-organized scheme to influence and indoctrinate impressionable youth into taking a specific anti-Second Amendment political position.

247.    The March 14 and April 20, 2018 walkouts had nothing to do with the District's educational mission. Because the walkouts were not authorized by education policy in California, and because they were viewpoint-based, the District was required to publicly distance itself from planning and participation in it.

248.    Kissner also engaged in protected political speech when he campaigned against Measure N, petitioned for a special board trustee election, and spoke out concerning improper expenditures of public funds.

249.    The District Defendants, acting under color of state law and according to a pattern and practice, have engaged in viewpoint discrimination by targeting Kissner for adverse employment action in retaliation for his protected political speech.

250.    Defendants' investigations, pretextual excuses for falsely charging him with actionable misconduct, disregard for the creation of a hostile work environment, efforts to remove him from the school campus to satisfy his colleagues' political animus, efforts to remove him from his employment, harassment, and other acts were and are unreasonable and have a chilling effect on protected speech.

251.    In California "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. Art. 1, §2.

57

**Complaint**

252.    "The California Supreme Court has recognized that the California Constitution is 'more protective, definitive and inclusive of rights to expression and speech' than the First Amendment to the United States Constitution." *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1167 (9th Cir. 2007).

253.    By reason of the aforementioned policy, practice, custom, acts, and omissions, engaged in under color of state law, Defendants have imposed content-and viewpoint-based restrictions on Kissner's speech in violation of the Free Speech Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

254.    As a direct and proximate consequence of Defendants' violation of Kissner's federal civil rights under 42 U.S.C. § 1983 and the First Amendment, and Cal. Const., art. 1, § 2, Kissner has suffered irreparable injury that cannot fully be compensated by an award of monetary damages.

255.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Kissner is entitled to declaratory relief and preliminary and permanent injunctive prospective relief invalidating and restraining enforcement of the restrictions imposed on Kissner's freedom of speech. As to this claim for relief, Kissner seeks said equitable relief pursuant to *Ex Parte Young*, 209 U.S. 123 (1908), against all Individual District Defendants acting in their official capacities.

256.    Additionally, Kissner is entitled to his actual and nominal damages arising from the District Defendants' unconstitutional actions in their individual capacity while acting under color of state law, as well as reasonable costs of suit. A request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021).

/ / /

/ / /

58

**Complaint**

257.    Kissner is entitled to an award of nominal damages for the past loss of his constitutional rights as set forth in this Complaint against the Individual District Defendants pursuant to the First and Fourteenth Amendments to the United States Constitution.

258.    Kissner found it necessary to engage the services of private counsel to vindicate his rights under the law. Kissner is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

### Due Process

### (42 U.S.C. § 1983)

(Against Individual District Defendants Only)

### California Constitution Due Process

### (Cal. Const. Art. I, § 7)

(Against District & District Defendants Only)

259.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

260.    "The due process clauses of the federal and state Constitutions provide that a person may not be deprived of life, liberty, or property without due process of law." *Duncan v. Dept. of Personnel Admin.*, 77 Cal. App. 4th 1166, 1174–75 (Cal. App. 2d Dist. 2000); Cal. Const., art. I, § 7, subd. (a); U.S. Const., 14th Amend., § 1.

261.    Under California law, a certified employee is classified as permanent, i.e., acquires tenure, if, after having been employed for two complete successive school years in a position requiring certification qualifications, he is reelected for the following year.

/ / /

/ / /

59

**Complaint**

262.     Tenured teachers possess a property right in continued employment. The state must comply with procedural due process requirements before it may deprive a permanent employee of his property interest in continued employment by punitive action.

263.     Kissner was a permanent, tenured teacher employed by the District.

264.     The California Civil Service Act endows state employees who attain permanent status with a property interest. Such employees may not be dismissed or subjected to other disciplinary measures unless facts exist constituting cause for such discipline. In the absence of sufficient cause, the permanent employee has a statutory right to continued employment free of these punitive measures.

265.     Where a reduction in force was merely a pretext for a personal agenda to terminate a particular employee, Kissner's due process rights are violated. The reduction in force alleged herein was merely a pretext for the District Defendants' personal agenda to terminate Kissner in retaliation for his political advocacy.

266.     Kissner's (1) political opposition to the student walkouts and (2) opposition to Measure N, (3) advocacy for a special trustee board election, and (4) promoting budget reform were protected activities. The Individual District Defendants were aware of the protected activities, and the adverse actions of layoff and dismissal followed within a relatively short time thereafter.

267.     The controversies generated by Kissner's political speech drove an ideological wedge between him and District administrators, faculty, staff, and board trustees. But for his unpopular views regarding the student walkouts, Measure N, the trustee board special election, and budget reform, Kissner would have remained a teacher employed by the District.

268.     Kissner is entitled to an award of nominal damages for the past loss of his constitutional rights as set forth in this Complaint against Defendants pursuant to the First and Fourteenth Amendments to the United States Constitution.

**Complaint**

269.    Kissner found it necessary to engage the services of private counsel to vindicate his rights under the law. Kissner is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF

### Equal Protection

### (42 U.S.C. § 1983)

(Against Individual District Defendants Only)

### California Constitution Equal Protection

### (Cal. Const. Art. I, § 7)

(Against District & Individual District Defendants Only)

270.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

271.    Kissner is a permanent teacher who is protected from discharge by seniority rules. Specifically, Individual District Defendants are required by state law to retain teachers based on seniority, pursuant to Cal. Educ. Code § 44955(b).

272.    After Kissner engaged in political speech, the Individual District Defendants discriminated against him because of the content of that speech.

273.    Kissner was a senior teacher at the school, the most experienced and qualified teacher for an open position to teach sixth grade math and science, but the Individual District Defendants skipped eighteen teachers junior to him and discharged him because of his political speech.

274.    Kissner has received only positive performance evaluations, but the Individual District Defendants discriminated against him by charging him with unsatisfactory performance while violating the provisions of Cal. Educ. Code § 44663(a).

Complaint

275.    The Individual District Defendants have adopted a policy that it will not respond to anonymous complaints against teachers, but they discriminated against Kissner by deviating from that policy to investigate him because of his political speech.

276.    Pursuant to Cal. Lab. Code §§ 1101 and 1102, Individual District Defendants are prohibited from discriminating on the basis of political speech.

277.    A facially neutral policy that has an adverse effect and was motivated by discriminatory animus violates the Equal Protection Clause of the Fourteenth Amendment.

278.    Kissner engaged in core political speech by expressing his views regarding the student walkouts, Measure N, the special trustee board election, and budget reform. District Defendants' efforts to lay off and dismiss Kissner have the effect of chilling core political speech.

279.    Individual District Defendants violated Kissner's right to equal protection because their false accusations and other wrongful actions that led to the institution of layoff and dismissal proceedings were intentionally discriminatory, resulting in disparate treatment.

280.    Individual District Defendants sought to punish Kissner because of his opposition to the student walkouts and Measure N, his support for a special trustee board election, and political pressure he brought to bear on the Individual District Defendants to balance their budget and comply with the law.

281.    But for Kissner's political advocacy, the Individual District Defendants would not have initiated the layoff and dismissal proceedings based on false reports of immoral conduct, unprofessional conduct, unsatisfactory performance, and persistent violations of laws or policies. In fact, the CPC failed to find evidence of any of these causes in the dismissal hearing.

282.    By their actions, Individual District Defendants have treated Kissner differently from other teachers, staff, faculty, and administrative employees, who have disagreed with Kissner's political views and advocacy.

Complaint

283.    Individual District Defendants inconsistently applied their policies based upon subjective determinations as to which messages are acceptable and which messages are not.

284.    All of the actions taken by Individual District Defendants described in this Complaint were taken while acting under color of state of law and had the effect of depriving Plaintiff of rights secured by the Constitution and laws of the United States, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## FOURTH CLAIM FOR RELIEF

### Civil Rights Conspiracy

### (42 U.S.C. § 1983)

(Against Individual District Defendants Only)

285.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

286.    Defendants and other private persons conspired and agreed together to inflict injury upon Kissner by procuring and causing official governmental retaliation against him for Kissner's First Amendment-protected expression on matters of public concern.

287.    Defendants are sued in their individual capacity for damages and in their official capacity for equitable relief.

288.    Overt acts taken in furtherance of this conspiracy include, but are not limited to, conducting investigations targeting Kissner and seeking incriminating evidence against him in order to justify adverse employment action against him, the delivery of an anonymous letter containing false and misleading statements concerning Kissner's character and conduct with minors, reliance on the anonymous letter in justifying an intrusive probe into Kissner's relationships with students and minors, placing Kissner on a leave of absence without any legitimate reason or explanation provided to Kissner, conducting biased and unscrupulous investigations, contriving

63

Complaint

false and malicious charges to serve as the basis of termination proceedings, contriving a lawful rationale for laying off Kissner as part of a bogus reduction in force, releasing unfounded and stigmatizing allegations about Kissner to the public, publication of unfounded and stigmatizing allegations about Kissner, associating Kissner's name with emails and websites falsely purporting to be owned or administered by Kissner, and rejecting Kissner's contributions and offer to join the District's budget advisory committee.

289.     The overt acts of the Defendants and potentially other participants in the conspiracy (which Kissner may seek leave of Court to add as defendants, as may be appropriate) have resulted in Kissner's wrongful discharge, damages, and reputational and emotional injuries.

290.     As a direct and proximate result of Defendants' actions in furtherance of the above-referenced conspiracy, as described in this Complaint, Kissner has suffered injury.

291.     In acting as alleged herein, the Defendants acted knowingly, willfully, and maliciously, and with reckless and callous disregard for Kissner's clearly established and constitutionally protected rights, justifying an award of punitive damages in an amount sufficient to punish the Defendants and discourage others from engaging in similar gross abuse of the public trust and governmental power.

292.     As a result of Defendants' actions, Kissner has suffered and will continue to suffer extreme hardship and actual and impending irreparable injury, loss, and damage in that Kissner is informed and believes and thereon alleges that Defendants will continue to defame him and spread false and malicious statements about him.

293.     By reason of the aforementioned policy, practice, custom, acts, and omissions, engaged in under color of state law, Individual District Defendants have imposed content and viewpoint-based restrictions on Kissner's speech in violation of the Free Speech Clause of the First

Complaint

Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

294.    As a direct and proximate consequence of Defendants' violation of Kissner's federal civil rights under 42 U.S.C. § 1983 and the First Amendment, Kissner has suffered and will suffer irreparable injury that cannot fully be compensated by an award of monetary damages.

295.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Kissner is entitled to declaratory relief and preliminary and permanent injunctive prospective relief invalidating and restraining enforcement of the restrictions imposed on Kissner's freedom of speech. As to this claim for relief, Kissner seeks said equitable relief pursuant to *Ex Parte Young*, 209 U.S. 123 (1908) against all Defendants acting in their official capacities.

296.    Additionally, Kissner is entitled to his actual and nominal damages arising from Defendants' unconstitutional actions in their individual capacity while acting under color of state law, as well as reasonable costs of suit.

297.    Kissner found it necessary to engage the services of private counsel to vindicate his rights under the law. Kissner is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### FIFTH CLAIM FOR RELIEF

### Civil Rights Defamation

### (42 U.S.C. § 1983)

(Against Individual District Defendants Only)

298.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

/ / /

/ / /

Complaint

299.    Kissner suffered a deprivation of a constitutional liberty interest because the manner of his termination imposed a stigma that has precluded his ability to continue working as a teacher in public education.

300.    Kissner suffered a deprivation of a constitutional property interest because the District and Individual District Defendants divested him of his rights to continued employment in the field of public education.

301.    The District and Individual District Defendants dismissed Kissner for pretextual, unsubstantiated, and retaliatory reasons that seriously damage his standing in the community.

302.    Among other deceptive practices, Defendant District and the Individual District Defendants commissioned result-oriented investigations into Kissner's conduct calculated to find fault with him and sufficient to justify adverse action, including discipline and termination.

303.    Defendant District and the Individual District Defendants, by and through their agents, negligently conducted flawed, incomplete, and one-sided investigations into Kissner's public opposition to the student walkouts and his relationships with minors.

304.    The District and Individual District Defendants exploited the flawed, incomplete, and one-sided findings of written reports for the purpose of justifying Kissner's termination from employment and/or other adverse employment actions.

305.    Defendant District's and the Individual District Defendants' pretextual, unsubstantiated, and retaliatory reasons for discharging Kissner were sufficiently serious to stigmatize or otherwise burden Kissner so that he is not able to take advantage of other employment opportunities.

/ / /

/ / /

Complaint

306.    The unsubstantiated stigmatizing charges were improperly disclosed and published to the public when the District/Individual District Defendants released them in response to a public records request.

307.    The charges of immoral conduct, including "grooming" of minors, has impaired Kissner's reputation for honesty and morality.

308.    Kissner contested the accuracy of the charges made against him for immoral conduct, and ultimately those charges were not upheld by the Commission on Professional Competence.

309.    As a direct and proximate consequence of Defendants' violation of Kissner's federal civil rights under 42 U.S.C. § 1983 and the First Amendment, Kissner has suffered irreparable injury that cannot fully be compensated by an award of monetary damages.

310.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Kissner is entitled to declaratory relief and preliminary and permanent injunctive prospective relief invalidating and restraining enforcement of the restrictions imposed on Kissner's freedom of speech. As to this claim for relief, Kissner seeks said equitable relief pursuant to *Ex Parte Young*, 209 U.S. 123 (1908) against all Individual District Defendants acting in their official capacities.

311.    Additionally, Kissner is entitled to his actual and nominal damages arising from the District Defendants' unconstitutional actions in their individual capacity while acting under color of state law, as well as reasonable costs of suit.

312.    Kissner is entitled to an award of nominal damages for the past loss of his constitutional rights as set forth in this Complaint against the Individual District Defendants pursuant to the First and Fourteenth Amendments to the United States Constitution.

Complaint

313.     Kissner found it necessary to engage the services of private counsel to vindicate his rights under the law. Kissner is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**SIXTH CLAIM FOR RELIEF**

**Wrongful Termination In Violation Of Public Policy**

(Against District & Individual District Defendants Only)

314.     Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

315.     Defendant District is a public entity—as defined in Cal. Gov. Code § 811.2—and Defendant School Officials are public employees—as defined in Cal. Gov. Code §811.4.

316.     Kissner is informed and believes, and on that basis alleges, that Defendants, and each of them, terminated Kissner's employment based upon his political speech and expression.

317.     Defendants, and each of them, are individually and collectively liable for laying off Kissner as part of a "reduction in force" and subsequently discharging him for pretextual reasons. Defendants' true reason for laying off and subsequently discharging Kissner was in retaliation for his political speech, which speech was made in his capacity as a private person and not pursuant to his duties, or in the course or scope of his employment as an employee of Defendant District.

318.     The layoff and discharge of an employee in retaliation for engaging in expressive activities directed at securing important public policies contravenes those policies and gives rise to a common law action in tort.

319.     Defendants' decision to layoff and subsequently discharge Kissner constitute retaliatory discrimination against him for engaging in political speech, expression, and activities in violation of Cal. Lab. Code §§ 1101 and 1102 as set forth herein.

Complaint

320.     Cal. Lab. Code §§ 1101 and 1102 embody fundamental state public policies. These statutes contain specific language which forbids an employer and its employees from discriminating against an employee based on the content and viewpoint of his political speech, expression, and political activities.

321.     Defendants' decision to layoff and subsequently discharge Kissner constitute retaliatory discrimination against him for engaging in political speech, expression, and activities in violation of the United States Constitution and Cal. Const. Art. I. § 2(a). The United States Constitution and Cal. Const. Art. I. § 2(a) prohibit discrimination on the basis of the content or viewpoint of speech.

322.     The United States Constitution and Cal. Const. Art. I. § 2(a) embody fundamental federal and state public policies. Kissner's speech was protected by the First Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 and by Cal. Const. Art. I. § 2(a).

323.     Kissner was laid off and subsequently discharged for asserting his statutory and constitutional rights to engage in protected expressive activity. Defendants' violation of Kissner's statutory and constitutional rights is inconsistent and hostile to the public's interest in expressing political and other views and has a chilling effect on such protected activity.

324.     Defendants' reasons for terminating Kissner were pretextual in nature and calculated to disguise the motivating basis of the adverse employment action to which Kissner was subjected.

325.     Kissner's speech was on matters of public interest and concern wholly unrelated to his employment.

326.     Therefore, the District's reason for laying Kissner off was an illegal reason.

327.     A layoff due to a reduction in force and/or discharge may, on proper showing, constitute the basis for a common law tort or statutory claim of discriminatory termination. An

**Complaint**

economically necessary layoff due to reduction in force or discharge may violate anti-discrimination laws if the layoff or discharge is based on illegal criteria.

328.    The layoff and subsequent discharge of Kissner constitutes discriminatory termination because:

a) Kissner was laid off and subsequently discharged for exercising a federal and state constitutional right or privilege;

b) Kissner was laid off and subsequently discharged after receiving a notice of dismissal which demonstrates that the layoff is intended to be permanent; and

c) The District lacked jurisdiction or acted ultra vires in excess of its jurisdiction with improper motives.

329.    Under Gov. Code § 820, Defendants are liable for the damages caused to Kissner by his wrongful discharge from his employment.

330.    As a proximate result of Defendants' conduct, Plaintiff Kissner has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses in an amount according to proof at the time of trial.

331.    As a further direct and proximate result of Defendants' conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

332.    As a further direct and proximate result of Defendants' conduct, Plaintiff has suffered loss of financial stability, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

Complaint

333.     As a proximate result of Defendants' conduct, Kissner has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses in an amount according to proof at the time of trial. As a further direct and proximate result of Defendants' conduct, Kissner will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

334.     Defendants, and each of them, committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Kissner, from an evil and improper motive amounting to malice, and in conscious disregard of Kissner's rights, in that Defendants, and each of them, sought punishment of Kissner for engaging in statutorily and constitutionally protected expressive activities despite the fact that they knew that Kissner was able to perform the essential functions of his position. Thus, Kissner is entitled to recover punitive damages from Defendants.

## SEVENTH CLAIM FOR RELIEF

### Defamation *Per Se*

(Against All Defendants )

335.     Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

336.     On or about February 12, 2021, Defendants District and Defendants served Kissner with a Notice of Proposed Intent to Dismiss with Statement of Charges ("Statement"). The Statement falsely asserted as fact that Kissner was guilty of "Potential grooming behavior, such as: singling out a minor and being alone with a minor; … asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet ("statement")."

337.     The defamatory statement of fact is false, unprivileged, and has a natural tendency to injure Kissner, including and especially at his place of work, in the education world where he might be required to seek employment, and even, as alleged herein, at his church.

71

338.   On or about March 22, 2021, Kissner, through counsel, demanded the District dismiss the defamatory statement accusing Kissner of potential grooming behavior. The letter stated in relevant part:

> These slanderous charges lack any substance and are shamelessly based on nothing more than anonymous inadmissible hearsay. Accusations of "potential grooming," asking about sex, etc., are made with NO SOURCE, NO VICTIM, NO DETAILS, NO OFFICIAL COMPLAINT, NO REPORTS…. Should these accusations remain in these proceedings or otherwise find their way toward republication, we will not hesitate to hold the District and each person involved accountable.

339.   Counsel for the District never responded to this demand, never sought to meet and confer regarding it, and, on information and belief, authorized the false and defamatory statement's release to the public.

340.   On or about April 16, 2021, Defendants District and Fraser received a California Public Records Act request for a copy of the Statement from an anonymous, fictitiously-named individual. The request was served by email at or about 9:49 a.m.

341.   At or about 10:43 a.m., just 54 minutes after receiving the request, Defendants District and Fraser responded to the request by attaching the Statement to an email. The response additionally included a letter, which stated in relevant part:

> [T]he California Court of Appeals held that records of complaints or investigations against a public employee can be disclosed only if "the complaint is of a substantial nature and **there is reasonable cause to believe the complaint or charge of misconduct is well founded**." (*See, Bakersfield City School Dist. v. Superior Court* (2004) 118 Cal.App.4th 1041 at 1044; *see also, ERV, Inc. v. Superior Ct.* (2006) 143 Cal.App.4th 742.) **However, in such instances, a public agency's decision to release confidential documents under the PRA is reviewable by petition for writ of mandate in a "reverse-PRA" lawsuit. (*See, Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 250**.)
>
> \*\*\*
>
> **[T]he District is unable to produce privileged document(s) or information encompassed by an exemption under the PRA or any state or federal law**. (*See e.g.*, Gov. Code 6254 and 6255.) Accordingly, the District will segregate and/or redact privileged and/or exempt information as needed.

Complaint

(Emphasis added.)

342.   By the letter's express language and citation to relevant legal authority, Defendants District and Fraser knew and understood that they owed a duty to Kissner to inform him of the request and to afford him an opportunity to challenge the public release of the false and defamatory statement by filing a petition for writ of mandate to enjoin it.

343.   Additionally, by the letter's express language, Defendants District and Fraser knew and understood that they were prohibited from producing information encompassed by an exemption under the PRA <u>or any state or federal law</u>.

344.   Defendants District and Fraser knew and understood that they had no reasonable cause to believe the statement was well founded and, therefore, that its release should not have been authorized and executed.

345.   Defendants District and Fraser knew and understood that Kissner was entitled to challenge the release of the statement in a reverse PRA lawsuit.

346.   Defendants District and Fraser knew and understood that the statement constituted exempt information that was required to be segregated from the released information and/or redacted.

347.   By releasing the false and defamatory statement as herein alleged, Defendants District and Fraser  failed to provide Kissner with an opportunity to challenge its release either in whole or in part by filing a petition for writ of mandate seeking injunctive relief and thereby deprived him of his constitutional right to due process. The failure to provide Kissner with due process constitutes a violation of Kissner's state and federal constitutional rights.

348.   The communication of the false and defamatory information was made with malice, i.e., with a state of mind arising from hatred or ill-will, evidencing a willingness to vex, annoy, or injure Kissner as described throughout this Complaint.

73

**Complaint**

349.    The charges were promptly republished by members of the public and predictably subjected Kissner to shame and humiliation, threats, intimidation, mockery and derision by members of the public throughout the community. Defendant McVoy defamed Kissner by asserting as fact that Kissner is "someone who was grooming kids" and that "all the evidence points that way."

Defendant McVoy's statement of fact is false, unprivileged, and has a natural tendency to injure Kissner throughout the community of Los Gatos and beyond, where such false statements can follow Kissner wherever he may be by virtue of the geographical reach of social media and the internet.

350.    On or about June 11, 2021, Defendants served Kissner with an Amended Notice of Proposed Intent to Dismiss with Statement of Charges ("Amended Statement") once again falsely stating that Kissner engaged in immoral conduct consisting of, *inter alia*, "[p]otential grooming behavior, such as: singling out a minor and being alone with a minor; offering alcohol; asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet" (amended statement).

351.    Defendant Fraser testified during dismissal proceedings that she had no evidence supporting the amended statement, and that, as the official author of the letter accompanying the release of the amended statement, she was aware of the statutory protections preventing its publication.

352.    On or about July 6, 2021, Defendants District and Grier received a California Public Records Act request for a copy of the amended statement from an individual named Allan Hessenflow.

353.    Just as they had done with the earlier California Public Records Act request, Defendants District and Grier responded to the request by attaching the amended statement to an

74

**Complaint**

email. The response included a letter identical to the one attached to the earlier response, which

stated in relevant part:

> [T]he California Court of Appeals held that records of complaints or investigations
> against a public employee can be disclosed only if "the complaint is of a substantial
> nature and **there is reasonable cause to believe the complaint or charge of
> misconduct is well founded**." (*See, Bakersfield City School Dist. v. Superior Court*
> (2004) 118 Cal.App.4th 1041 at 1044; *see also, ERV, Inc. v. Superior Ct.* (2006) 143
> Cal.App.4th 742.) **However, in such instances, a public agency's decision to
> release confidential documents under the PRA is reviewable by petition for writ
> of mandate in a "reverse-PRA" lawsuit. (*See, Marken v. Santa Monica-Malibu
> Unified School Dist.* (2012) 202 Cal.App.4th 250**.)
>
> \*\*\*
>
> **[T]he District is unable to produce privileged document(s) or information
> encompassed by an exemption under the PRA or any state or federal law**. (*See
> e.g.*, Gov. Code 6254 and 6255.) Accordingly, the District will segregate and/or
> redact privileged and/or exempt information as needed.

(Emphasis added.)

354.   By the letter's express language and citation to relevant legal authority, Defendants

District and Fraser knew and understood that they owed a duty to Kissner to inform him of the

request and to afford him an opportunity to challenge the public release of the false and defamatory

amended statement by filing a petition for writ of mandate to enjoin it.

355.   Additionally, by the letter's express language, Defendants District and Fraser knew

and understood that they were prohibited from producing information encompassed by an

exemption under the PRA or any state or federal law.

356.   Defendants District and Fraser knew and understood that they had no reasonable

cause to believe the amended statement was well founded and, therefore, that its release should not

have been authorized and executed.

357.   Defendants District and Fraser knew and understood that Kissner was entitled to

challenge the release of the amended statement in a reverse PRA lawsuit.

75

Complaint

358.     Defendants District and Fraser knew and understood that the amended statement constituted exempt information that was required to be segregated from the released information and/or redacted.

359.     By releasing the false and defamatory amended statement as herein alleged, Defendants District and Fraser  failed to provide Kissner with an opportunity to challenge its release either in whole or in part by filing a petition for writ of mandate seeking injunctive relief and thereby deprived him of his constitutional right to due process. The failure to provide Kissner with due process constitutes a violation of Kissner's state and federal constitutional rights.

360.     The communication of the false and defamatory information was made with malice, i.e., with a state of mind arising from hatred or ill-will, evidencing a willingness to vex, annoy, or injure Kissner as described throughout this Complaint.

361.     The charges were promptly republished by members of the public and predictably subjected Kissner to shame and humiliation, threats, intimidation, mockery and derision by members of the public throughout the community.

362.     Kissner is a private figure for the purposes of this defamation action, having lived his entire life out of the public eye.

363.     Prior to the walkout in March 2018, Kissner had no notoriety of any kind in the community at large.

364.     Kissner did not engage the public's attention to resolve any public issue that could impact the community at large until a parent of one of the walkout students went to the media and exposed Kissner as the teacher who had given failing grades to three of the walkout students. Kissner made no public appearances prior to the false accusations that he had given a "pop quiz" and intended to punish the students for political reasons.

**Complaint**

365.   Kissner's limited public statements after the accusations in 2018 were reasonable, proportionate, and in direct response to the false accusations against him and do not render Kissner as a limited purpose public figure.

366.   Defendants District and Fraser failed to conduct a reasonable investigation into the false charges, limiting their interviews to disgruntled students and parents and failing to take their political biases into account while discrediting Kissner as politically-motivated in opposing the walkout.

367.   Defendants District and Fraser failed to conduct a reasonable investigation into the false charges by relying on an anonymous letter, whose allegations and innuendos were unfounded and in the case of a distant incident involving a sip of alcohol proven not to be an actionable continuing or ongoing pattern of behavior or practice.

368.   By virtue of the release of the stigmatizing charges to the public, Kissner was deprived of his liberty interest in his employment with the District. Kissner has denied the charges, and the charges were neither sustained or even considered by the Commission on Professional Competence in the dismissal proceedings. Once the District, through counsel, understood and recognized that it had no evidence to support the false and defamatory statements, the District withdrew the stigmatizing charges from the dismissal proceedings.

369.   The publication of the false and defamatory statements directly and proximately caused substantial and permanent damage to Kissner, including the deprivation of his liberty and property interests in employment.

370.   The false and defamatory statements were republished by third-parties, which was reasonably foreseeable.

/ / /

/ / /

**Complaint**

371.    The false and defamatory statements against Kissner are defamatory per se, as they are libelous on their face without resort to additional facts, and as clearly demonstrated here, Kissner was subjected to public hatred, contempt, scorn, obloquy, and shame.

372.    As a direct and proximate result of the false and defamatory statements, Kissner suffered permanent harm to his reputation.

373.    As a direct and proximate result of the false and defamatory statements Kissner suffers and will continue to suffer severe emotional distress.

374.    As a direct and proximate result of the false and defamatory statements Kissner is forced to live his life in a constant state of concern over his safety and the safety of his family.

375.    As a proximate result of Defendants' conduct, Kissner has suffered and continues to suffer from severe emotional distress including embarrassment, humiliation, disappointment anxiety, and anger, all to Kissner's damage in an amount to be proved and which is within the jurisdiction of this court.

376.    Defendants' acts and omissions, as set forth herein above, were extreme and outrageous and were undertaken in a despicable, oppressive, deceitful, fraudulent, deliberate, egregious and inexcusable manner, with malice and oppression as defined by Code Civ. Proc. § 3294.

377.    In committing the outrageous acts and omissions described herein above, Defendants, and each of them, knew or should have known that their conduct would result in Kissner's severe emotional distress, and Defendants' acts and omission were perpetrated with the intent to inflict and/or with reckless disregard for the probability of inflicting humiliation, mental anguish and severe emotional distress on Kissner.

378.    As a proximate result of the wrongful acts of Defendants, and each of them, Kissner has been harmed in that he has suffered actual, consequential and incidental financial losses,

**Complaint**

including without limitations loss of salary and benefits, and the intangible loss of employment-related opportunities, medical benefits and other benefits including retirement, all in an amount subject to proof at the time of trial.

379.    Kissner claims such amounts as damages together with prejudgment interest.

380.    As a proximate result of the wrongful acts of Defendants, and each of them, Kissner has suffered and continues to suffer anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress. Kissner has experienced, among other things, mental anguish, psychological pain and suffering, and related items such as humiliation, embarrassment, nervousness, sleeplessness, irritability, agitation, annoyance, fear, anger, anxiety, frustration, hopelessness, despair, depression, difficulty with concentration.

381.    Kissner is informed and believes and thereon alleges that he will continue to experience said pain and emotional suffering for a period in the future all in an amount subject to proof at the time of trial.

382.    The actions taken toward Kissner described herein were carried out by and/or ratified by Defendants, and each of them, including DOES 1 through 50, and/or managing agent employees of Defendants, all of whom acted in a despicable, oppressive, cruel, fraudulent, malicious, deliberate, deceitful, egregious, and inexcusable manner in order to injure and damage Kissner, thereby justifying an award to Kissner of punitive damages in a sum appropriate to punish and make an example of Defendants.

## EIGHTH CLAIM FOR RELIEF

### False Light Invasion of Privacy

(Against All Defendants)

383.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

Complaint

384.    Occasionally, an employer will release parts or all of a terminated employee's file or other personal information to substantiate the termination. Even when this information is accurate, if it causes recipients to draw a false conclusion about the employee, the employee might have a cause of action for false light.

385.    The elements of a false light claim are (1) a public disclosure (2) that places the plaintiff in a false light and (3) that would be objectionable to a reasonable person. *Fellows v. National Enquirer, Inc.* (1986) 42 Cal.3d 234, 238.

386.    A false light claim is the invasion of a privacy tort that most resembles defamation, the main difference being that a publication may place a person in a false light, and yet not be defamatory, because the information is true, even though it is misleading in some way, e.g., is incomplete or selective.

387.    Defendant District, Defendant Fraser, and, on information and belief, other individuals disclosed or caused to be disclosed to the public the unfounded and false accusation that Plaintiff was capable of "potential grooming" of children. This accusation was likely to and in fact did cause members of the public to draw the false conclusion that Plaintiff is a child predator and a danger to children. Such an accusation would be objectionable to a reasonable person.

388.    Defendants' extreme and outrageous conduct, as alleged herein and incorporated by reference, is imputed to Defendants, and each of them.

389.    As a proximate result of Defendants' conduct, Kissner has suffered and continues to suffer from severe emotional distress including embarrassment, humiliation, disappointment anxiety, and anger, all to Kissner's damage in an amount to be proved and which is within the jurisdiction of this court.

390.    Defendants' acts and omissions, as set forth herein above, were extreme and outrageous and were undertaken in a despicable, oppressive, deceitful, fraudulent, deliberate,

Complaint

egregious and inexcusable manner, with malice and oppression as defined by Code Civ. Proc. § 3294.

391.   In committing the outrageous acts and omissions described herein above, Defendants, and each of them, knew or should have known that their conduct would result in Kissner's severe emotional distress, and Defendants' acts and omission were perpetrated with the intent to inflict and/or with reckless disregard for the probability of inflicting humiliation, mental anguish and severe emotional distress on Kissner.

392.   As a proximate result of the wrongful acts of Defendants, and each of them, Kissner has been harmed in that he has suffered actual, consequential and incidental financial losses, including without limitations loss of salary and benefits, and the intangible loss of employment-related opportunities, medical benefits and other benefits including retirement, all in an amount subject to proof at the time of trial.

393.   Kissner claims such amounts as damages together with prejudgment interest.

394.   As a proximate result of the wrongful acts of Defendants, and each of them, Kissner has suffered and continues to suffer anxiety, worry, embarrassment humiliation, mental anguish, and emotional distress. Kissner has experienced, among other things, mental anguish, psychological pain and suffering, and related items such as humiliation, embarrassment, nervousness, sleeplessness, irritability, agitation, annoyance, fear, anger, anxiety, frustration, hopelessness, despair, depression, difficulty with concentration.

395.   Kissner is informed and believes and thereon alleges that he will continue to experience said pain and emotional suffering for a period in the future all in an amount subject to proof at the time of trial.

396.   The actions taken toward Kissner described herein were carried out by and/or ratified by Defendants, and each of them, including DOES 1 through 50, and/or managing agent

81

employees of Defendants, all of whom acted in a despicable, oppressive, cruel, fraudulent, malicious, deliberate, deceitful, egregious, and inexcusable manner in order to injure and damage Kissner, thereby justifying an award to Kissner of punitive damages in a sum appropriate to punish and make an example of Defendants.

## NINTH CLAIM FOR RELIEF

### Negligent Infliction Of Emotional Distress

(Against All Defendants)

397.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

398.    Personal injury claims that implicate fundamental public policy considerations are not preempted by the Workers' Compensation Act.

399.    Defendants had a duty not to retaliate or discriminate against him due to his political activities (Cal. Lab. Code §§ 1101-1102) or the exercise of his constitutional right of free speech under the state and federal constitutions.

400.    Defendants further owed a duty of care to Kissner to redact false, defamatory, and unfounded allegations and to afford him his procedural due process right under the United States and California constitutions to file a reverse PRA lawsuit challenging the release of the false, defamatory, and unfounded allegations.

401.    District and Individual District Defendants breached their duty of care owed to Kissner by implicating fundamental public policy considerations appertaining to these duties.

402.    Defendant McVoy breached his duty of care owed to Kissner by failing to reasonably investigate the facts before publishing defamatory statements about Kissner.

/ / /

/ / /

**Complaint**

403.     As a proximate result of Defendants' breach of their duty, Kissner has suffered and continues to suffer serious emotional distress, including anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

404.     Defendants' negligence was a substantial factor in causing Kissner's serious emotional distress.

405.     As a direct and proximate result of Defendants' negligence, Kissner is entitled to compensatory and special damages.

406.     The actions by Defendants were undertaken with malice or with reckless indifference to and in conscious disregard of Kissner's rights, including the conscious and willful suppression of Plaintiff's rights under the United States and California constitutions to engage in political expressive activities.

407.     Defendants are therefore liable to Plaintiff for general damages, actual or special damages incurred to date, actual or special damages to be incurred in the future, compensation for ongoing and future harms as against all Defendants, and for punitive or exemplary damages.

## TENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

(Against All Defendants)

408.     Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

409.     As discussed herein, Defendants intended to inflict emotional distress on Kissner and acted with malice, oppression, and/or fraud, and intended to injure and damage Kissner, which warrants an award of punitive damages under Cal. Civ. Code § 3294.

410.     By virtue of the conduct discussed above, including, but not limited to, the publication of unfounded  allegations contained in the statement of charges released to the public

83

Complaint

without accommodating Kissner's right to file a reverse PRA lawsuit, the false statements to and among community members, known and unknown, and the myriad of threats made directly and indirectly to Kissner, Defendants, or some of them, committed extreme and outrageous conduct.

411.    Defendants' conduct was intended to cause or was done with reckless disregard for the probability of causing emotional distress to Kissner.

412.    Kissner has suffered and continues to suffer severe or extreme emotional distress.

413.    Kissner has suffered extreme emotional distress, humiliation, and anxiety as an actual, direct, and proximate result of Defendants' conduct.

414.    Kissner is entitled to an award of general, compensatory, and punitive damages, in an amount to be determined at trial.

415.    Defendants' extreme and outrageous conduct, as alleged herein and incorporated by reference, is imputed to Defendants, and each of them.

416.    As a proximate result of Defendants' conduct, Kissner has suffered and continues to suffer from severe emotional distress, including embarrassment, humiliation, disappointment anxiety, and anger, all to Kissner's damage in an amount to be proved and which is within the jurisdiction of this court.

417.    Defendants' acts and omissions, as set forth herein above, were extreme and outrageous and were undertaken in a despicable, oppressive, deceitful, fraudulent, deliberate, egregious and inexcusable manner, with malice and oppression as defined by Code Civ. Proc. § 3294.

418.    In committing the outrageous acts and omissions described herein above, Defendants, and each of them, knew or should have known that their conduct would result in Kissner's severe emotional distress, and Defendants' acts and omission were perpetrated with the

**Complaint**

intent to inflict and/or with reckless disregard for the probability of inflicting humiliation, mental anguish and severe emotional distress on Kissner.

419.     As a proximate result of the wrongful acts of Defendants, and each of them, Kissner has been harmed in that he has suffered actual, consequential and incidental financial losses, including without limitations loss of salary and benefits, and the intangible loss of employment-related opportunities, medical benefits and other benefits including retirement, all in an amount subject to proof at the time of trial.

420.     The actions taken toward Kissner described herein were carried out by and/or ratified by Defendants, and each of them, all of whom acted in a despicable, oppressive, cruel, fraudulent, malicious, deliberate, deceitful, egregious, and inexcusable manner in order to injure and damage Kissner, thereby justifying an award to Kissner of punitive damages in a sum appropriate to punish and make an example of Defendants.

## ELEVENTH CLAIM FOR RELIEF

### Breach of Contract

(Against District Only)

421.     Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

422.     Defendant District and Kissner entered into an employment agreement (CBA, Exh. "1"), which constitutes an enforceable contract under the laws of California.

423.     The District violated the following terms of the CBA by contravening them and/or terminating Kissner:

a)  Art. 6 (Personal and Academic Freedom):

The Employer shall not take action against a teacher based on his or her personal, political, or other activities, so long as these activities are lawful and do not affect the teacher's professional performance….

85

\*

The Employer shall not interfere with a teacher's lawful freedom of speech or use of curriculum and materials which fall within state and district approved guidelines....

b)  Art. 7(D)(1) (Grievance Procedure):

No reprisals of any kind will be taken by either party against any grievant, any party in interest, any member of the Association, or any other participant in the grievance procedure by reason of such participation.

c)  Art. 15(D)-(F) (Personnel Files and Records):

Personnel Files: Except as contained in Sections 44939-44942 of the Education Code, the Employer shall not base any adverse action against a teacher upon, materials which are not contained in such teacher's personnel file.

A teacher shall be provided any negative or derogatory material before it is placed in his/her personnel file. S/he shall also be given release time during the school day to initial and date the material and to prepare a written response to such material. The derogatory material shall not be placed in the file until a ten (10) day opportunity to respond has passed.

d)  Art. 16 (Parent Complaints):

No negative material based upon information of a derogatory or critical nature which has been received by administration from parents shall be placed in a personnel file unless the following procedures have been followed:

A good faith effort shall be made to resolve the issue at the lowest level. The lowest level shall mean resolution with the faculty member directly or at the site with the next level site administrator, if possible.

If the complaint by a parent about a unit member may be used against the unit member, it shall be reported to the unit member within twenty-four (24) hours or as soon thereafter as is practicable of the receipt of the complaint.

The administrator shall inform the unit member of his/her right to have Association/legal representation at any meeting regarding a complaint.

During the processing of any parent complaint a faculty member has the right to request a meeting with his or her immediate supervisor to discuss the complaint and the advisability of meeting directly with the parent complainant to attempt to resolve the complaint. A faculty member has the right to have an Association representative present during such meeting.

If the matter is not resolved to the satisfaction of the complainant, he/she shall put the complaint in writing, and submit the original to the unit member, with a copy to

Complaint

the unit member's immediate supervisor. The unit member shall be given time during the duty day, without salary deduction, to review the complaint.

The unit member is provided the right of representation and is informed prior to any meeting which may involve criminal allegations, that the member is entitled to such representation.

The unit member has the right to attach written and signed comments to any written complaint filed by the complainant.

If any action is taken against the unit member based on the complaint and the unit member believes the complaint is false and/or based on hearsay, or that improper procedures were followed, a grievance may be initiated.

Complaints which are shown to be false, or are not sustained by the grievance procedure shall not be placed in the unit member's personal file nor utilized in any disciplinary action against the unit member.

424.   As a proximate result of the District's conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses, job and career opportunities, costs and expenses incurred in seeking employment and other economic and non-economic harm in an amount according to proof at the time of trial.

425.   As a further direct and proximate result of the District's conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

426.   As a further direct and proximate result of the District's conduct, Plaintiff has suffered loss of financial stability, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

**Complaint**

## TWELFTH CLAIM FOR RELIEF

### Discrimination and Retaliation for Engaging in Protected Activity

### (Cal. Lab. Code §§ 98.6 & 1101-1102)

(Against District Only)

427.    Kissner incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

428.    Employers may not discharge or discriminate against an employee for engaging in political activities or the exercise of any rights afforded him.

429.    Cal. Govt. Code § 1101 prohibits an employer from making, adopting, or enforcing any rule, regulation, or policy "tending to control or direct the political activities or affiliations of employees."

430.    Defendant District discriminated and retaliated against Kissner for publicly opposing the District's endorsement of the student walkouts, publicly opposing Measure N, publicly supporting a special trustee election, and putting political pressure on Defendant District and Defendants to balance the District's budget and to reform its mismanaged budget practices.

431.    Cal. Lab. Code § 1102 prohibits employers from coercing or influencing or attempting to coerce or influence their employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity.

432.    Defendants, and each of them, supported and advocated for the passage of Measure N.

433.    In particular, Defendant Abeln issued threats intended to intimidate and silence opponents of Measure N. Kissner was a leading opponent of Measure N. Abeln conveyed his threat

88

Complaint

to Kissner's political ally and requested that the message be shared with all opponents of Measure N.

434.    On information and belief, Defendants additionally sought to coerce and/or influence Kissner and therefore deter him from mounting a petition effort mandating a special trustee board election so that they could retain a trustee sympathetic to their political interests as a member of the board.

435.    As a proximate result of Defendants conduct, Kissner has suffered special damages in the form of lost earnings, benefits and/or out of pocket expenses in an amount according to proof at the time of trial.

436.    As a further direct and proximate result of these Defendants' conduct, Kissner will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at the time of trial.

437.    As a further direct and proximate result of Defendants' conduct, Kissner has suffered a loss of financial stability, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

438.    By reason of the conduct of Defendants herein, Kissner has retained attorneys to prosecute his claims. Kissner is therefore entitled to recover reasonable attorneys' fees and costs pursuant to Govt. Code § 12965(b), in addition to other damages as provided by law and as alleged herein.

Defendants, and each of them, committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Kissner, from an evil and improper motive amounting to malice, and in conscious disregard of Kissner's rights, in that Defendants, and each of them, refused to

89

Complaint

allow Kissner to engage in constitutionally protected speech despite the fact that they knew that Kissner was able to perform the essential functions of his position. Thus, Kissner is entitled to recover punitive damages from Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Kissner respectfully requests that this Court enter judgment against Defendants as follows:

1. For judgment in favor of Kissner against Defendants;

2. For a permanent injunction from discriminating against Kissner for engaging in First Amendment activities;

3. For an order reinstating Kissner to the position he occupied at the time he was terminated;

4. For back pay and reimbursement for additional lost benefits in an amount subject to proof at trial, with prejudgment interest to the maximum extent permitted by law;

5. For substantial compensatory and special damages against Defendants in an amount subject to proof at trial in an amount not less than $10,000,000;

6. For damages against Defendants representing harm to Kissner's reputation and loss of standing in the community;

7. For emotional distress damages against Defendants;

8. For nominal damages;

9. For punitive damages against Defendants in an amount to be determined according to proof at trial, sufficient to punish said Defendants and make an example of them for their abuse of the public trust and governmental power, in an amount not less than $50,000,000;

10. For an award of reasonable attorneys' fees, costs and expenses as authorized by law;

11. For prejudgment and postjudgment interest; and

90

Complaint

12.    For such other and further relief as the Court deems appropriate and just.

Date: July 5, 2022                 FREEDOM X

By: _____

William J. Becker, Jr., Esq.

## VERIFICATION

I, David M. Kissner, am a party to this action, and I have read the foregoing Complaint and know its contents. The matters stated in the Complaint are true based on my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on July 5, 2022, at Buffalo, Wyoming.

_____

David M. Kissner

91

**Complaint**

# EXHIBIT 1

# Collective Bargaining Agreement

between

# LOMA PRIETA TEACHERS ASSOCIATION, CTA/NEA

and

# LOMA PRIETA JOINT UNION SCHOOL DISTRICT

## July 1, 2014

## through

## June 30, 2017

# TABLE OF CONTENTS

**ARTICLE 1**
Agreement                                                                 4

**ARTICLE 2**
Recognition                                                               6

**ARTICLE 3**
Negotiation Procedure                                                     7

**ARTICLE 4**
Association Rights                                                         8

**ARTICLE 5**
Hours                                                                    10

**ARTICLE 6**
Personal and Academic Freedom                                            12

**ARTICLE 7**
Grievance Procedure                                                      13

**ARTICLE 8**
Leaves                                                                   17

**ARTICLE 9**
Catastrophic Leave Program                                               24

**ARTICLE 10**
Salary                                                                   26

**ARTICLE 11**
Part-Time Contract                                                       28

**ARTICLE 12**
Teacher Hiring                                                           29

**ARTICLE 13**
Transfers and Reassignments                                              30

**ARTICLE 14**
Early Retirement Programs                                                32

**ARTICLE 15**
Personnel Files and records                                              35

**ARTICLE 16**
    Parent Complaint Procedures      37

**ARTICLE 17**
    Formal Evaluation Procedure      39

**ARTICLE 18**
    Concerted Activities      42

**ARTICLE 19**
    District Rights      43

**ARTICLE 20**
    Teacher Safety      44

**ARTICLE 21**
    Fringe Benefits      46

**ARTICLE 22**
    Class Size      47

**ARTICLE 23**
    Reporting of Child Abuse      48

**ARTICLE 24**
    Miscellaneous      49

**ARTICLE 25**
    Professional Assistant Program (PAR)      50

**APPENDICES**
    Appendix 1—2014-2015 & 2015-16 Salary Schedules      53
    Appendix 2—MOU Re: Shared Decision-Making      55
    Appendix 3—MOU Re: Alternative Evaluation      57

# ARTICLE 1

## AGREEMENT

A.  The articles and provisions contained herein constitute a bilateral and binding agreement ("Agreement") by and between the governing Board of the Loma Prieta School District, hereinafter referred to as the "Employer" and the Loma Prieta Teachers Association/California Teachers Association/National Education Association, hereinafter referred to as the "Association," an employee organization.

B.  This Agreement is entered into pursuant to Chapter 10.7, Sections 3450-3549.3 of the Government Code, hereinafter referred to as the "Act."

C.  This Agreement shall remain in full force and effect until June 30, 2017.

D.  At each intervening year, the Employer and the Association may each open for negotiation two (2) non-economic items. By mutual agreement, the parties may reopen economic items.

E.  This agreement does not preclude the possibility of further meeting and negotiating sessions when both parties mutually agree that such sessions are necessary and/or useful, or in the event there is a change in state law brought about by administrative or judicial finding or a change in statute directly affecting the contract.

F.  Savings Provision:  If any provisions of this Agreement are held to be contrary to law by a court of competent jurisdiction, such provisions will not be deemed valid and subsisting except to the extent permitted by law, but all other provisions will continue in full force and effect.  Moreover, the parties shall meet not later than ten (10) days after such court decision to renegotiate the provision or provisions affected.

G.  Support of Agreement:  The Employer and the Association agree that it is to their mutual benefit to encourage the resolution of differences through the meet and negotiation process. Therefore, it is agreed that the Association and the Employer will support this Agreement for its term and will not seek change or improvement in any matter subject to the meet and negotiation process except by mutual agreement of the Employer and the Association.  This does not preclude a teacher's right to grieve a violation, misinterpretation, or misapplication of the terms of this Agreement.

H.  Effect of Agreement:  It is understood and agreed that the specific provisions contained in this Agreement shall prevail over District practices and procedures and over State laws to the extent permitted by State law and that in the absence of specific provisions in this Agreement such practices and procedures are discretionary.

I.  Completion of Meet and Negotiation:  This document comprises the entire agreement between the Association and the Employer in the matters lawfully within the scope of

4

# ARTICLE 2

## **RECOGNITION**

A. The District confirms its recognition of the Association as the exclusive representative for that unit of teachers, to wit:

> classroom teachers, resource teachers, special education teachers, nurses, temporary teachers, and part-time teachers.

and excluding all other positions not designated, including, but not limited to:

> the superintendent, principal, summer school teachers, and substitute teachers.

negotiation.  The Employer and the Association shall have no further obligation to meet and negotiate during the term of this Agreement , on any subject, whether or not said subject is covered by this agreement, even though such subject was not known or considered at the time of negotiations leading to the execution of this Agreement, unless by mutual agreement.

# ARTICLE 3

## NEGOTIATION PROCEDURES

A. The Employer shall furnish the Association with appropriate data and information as requested in preparation for bargaining within 10 days or as soon thereafter as reasonably possible.

B. All proposals shall be sunshined no later than the second board meeting in March of the year of the expiration of the Agreement.

C. A good faith effort shall be made to announce all agreements no later than June 30th.

D. Negotiations will take place at a mutually agreed upon time. The District will provide reasonable release time as necessary.

7

# ARTICLE 4

## ASSOCIATION RIGHTS

A.   Representatives of the Association shall have the right to make reasonable use of school equipment, buildings, and facilities for Association business when such equipment, buildings, and facilities are not otherwise in use.  Such equipment shall include typewriters, copy machines, adding machines, computers designated by site administrator, fax machines on a reimbursement basis, and all types of audio-visual equipment.  None of the aforementioned equipment or facilities shall be used for campaigning or influencing public elections, except for purposes of internal Association communication.

B.   The Association shall have the right to post legal notices of activities and matters of Association concern on Association bulletin boards, at least one of which shall be provided on each school site, in areas frequented by teachers.  The association may use the teacher mailboxes for communication to teachers.

C.   Authorized representatives of the Association shall be permitted to transact official Association business on school property at all times, other than classroom time, so long as it does not interfere with the educational process.

D.   The Employer shall provide the Association with the names, addresses, and telephone numbers of all teachers no later than September 30 of each school year.

E.   All rights granted to the Association under the Act as the exclusive representative are granted solely to the Loma Prieta Teachers Association/California Teachers Association/National Education Association and shall not be utilized by any other teacher organization as contemplated by the Act, unless so authorized by the Act.

F.   Association Leave:  Six (6) days of paid leave shall be available for four (4) members chosen by the Association to utilize for local, state or national conferences or for conducting other lawful business pertinent to Association affairs.  The Association shall pay for substitutes.  This provision is in addition to the reasonable released time which may be required for the conduct of negotiations pursuant to the Rodda Act.

G.   The District shall not seek to independently modify the terms and conditions of this agreement with individual bargaining unit members.  All changes within the scope of bargaining shall be bargained through the Association.  In the event that the need for changes within scope arise (i.e. new legal mandates; reasonable accommodation requests; etc.) the Association shall be contacted prior to the initiation of the process to make changes.  Before seeking any waiver of this contract:

   a.   The current contract language that is to be changed must be identified and submitted to the Association along with a waiver request.

b. If the Association finds the waiver to be a disservice to its members, it may deny the waiver.

H.  The second Monday of each month shall be designated as the Association meeting day, and the District shall not schedule any meetings that would require staff attendance on those days. The fourth Monday of each month shall be designated as the second Association meeting day; however, should the Association not need that Monday for meetings, the District may request to schedule activities requiring teacher attendance. Should the District hope to use the fourth Monday for meetings that would require teacher attendance, the Administrator will contact the LPTA chapter president, not later than the preceding Thursday. The Association has the right of refusal should a meeting be scheduled.

# ARTICLE 5

## HOURS

A.    All teachers shall be at their school and ready to perform their professional responsibilities prior to the commencement of classes as determined by their immediate supervisor.  The time requirement set by the immediate supervisor shall not exceed thirty (30) minutes prior to the commencement of classes.

B.    All teachers must remain after their last school assignment as long as necessary to meet their responsibilities to the students and to the educational program.  In addition, the immediate supervisor shall have the authority to assign responsibilities outside of regular class hours so long as these assignments are made fairly and equitably.

C.    The Employer may require teachers to attend up to one hundred eighty (180) minutes of regularly scheduled faculty meetings beyond the scheduled workday every month, with a maximum of 25 hours per year.

   1.    The superintendent or principal who calls such meetings shall provide teachers with an agenda for the meeting at least one (1) day before each meeting is held and shall also permit teachers, either individually or through their Association representative, to place items on the agenda prior to its publication.  Association business is not to be deducted from the 180 minutes of faculty meetings.

D.    No teacher shall be required to perform more than fifteen (15) minutes of playground supervision per day or more than one (1) playground supervision per day unless an emergency situation exists. Teachers will be placed on a yard duty schedule which fairly and equitably distributes weeks on and off and supervision duties. Teachers shall not be required to perform after school supervision in any capacity other than bus duty, and bus duty shall be deemed as complete when students have successfully loaded onto the buses and the buses are leaving (first run, only).

E.    Every teacher shall be entitled to one (1) duty-free, uninterrupted thirty (30) minute lunch period daily.

F.    On days when teachers are scheduled to work, but pupils are not scheduled to be present, the workday shall be set forth by the building principal. On days of an emergency release of pupils, the workday shall be determined by the superintendent or his/her designee. In either case the workday shall not exceed the normal amount of time students are in attendance, plus thirty (30) minutes.

G.    The number of scheduled work days shall be 185, 180 of which are teaching days.

H.    Adjunct Pay:  The adjunct duty rate for direct instruction or curriculum development may be $50 per hour, at the discretion of the administration. Members will be informed

as to which rate an adjunct duty will be paid and may decline participation. All other adjunct duties shall be paid at the rate of $35 per hour.

Should the District and member determine to offer an additional class, outside of the school day or year and without school funding, fees for the class shall reflect a pro rated per diem rate for the member.

J.    Preparation Periods. Middle School teachers will have one (1) period of six (6) for planning and preparation. A Middle School teacher acting as a substitute during his/her preparation time will be paid at the adjunct duty hourly rate. The District will make its best efforts to provide a minimum of one (1) hour of preparation, per week, for Elementary classroom teachers.

K.    In the extraordinary circumstance that an elementary school teacher is required by the site administrator to simultaneously manage his/her own class and another teacher's class, for more than 30 minutes, that teacher shall be paid on a pro-rata basis for the time at the regular substitute rate. Any teacher who fulfills this obligation more than two times shall be paid at the adjunct duty hourly rate.

L.    In the event of classroom relocation after the beginning of the school year, in lieu of release time from classroom duties, the unit member may elect to receive two (2) days of pay at the adjunct duty hourly rate.

M.    Kindergarten Teachers: As per the current practice, the Kindergarten teachers' work day includes the use of non-instructional time.

N.    The schedule for students and teachers shall be modified to allow for an adjusted Wednesday, each week. The purpose of the adjusted Wednesday will include, but not be limited to, staff development, collaboration, grade level meetings, and faculty meetings. Each Wednesday shall end for students at approximately 1:30. Meetings and activities for teachers on adjusted Wednesdays shall begin at 1:45 and end not later than 3:15 PM.

The Association and District shall collaborate on the calendar to maintain the necessary minutes in order to meet the requirements of the law, allow the adjusted Wednesday schedule to work, as well as assure that the general calendar is consistent with this agreement.

O.    There will be up to 5 additional days of staff development in the summers of 2015, 2016 and 2017. These days will be voluntary and paid at per diem. The District will select and approve the trainings based on the District's needs.

# ARTICLE 6

## PERSONAL AND ACADEMIC FREEDOM

A. The Employer shall not take action against a teacher based on his or her personal, political, or other activities, so long as these activities are lawful and do not affect the teacher's professional performance.

B. It is recognized and agreed that the welfare of students is served through the introduction and open exchange of varying ideas, materials, and positions which might be deemed unpopular or controversial. It is also mutually agreed that such materials, ideas, and positions should be appropriate to the age and maturity of the student involved.

C. The Employer shall not interfere with a teacher's lawful freedom of speech or use of curriculum and materials which fall within state and district approved guidelines.

D. The Association shall have the right to consult with the Employer on the definition of educational objectives, the determination of the content of courses and curriculum and the selection of textbooks and materials (EERA 3543.2 Paragraph (a) ).

# ARTICLE 7

## GRIEVANCE PROCEDURE

A. Definitions

    1. A "grievance" is a claim by one or more teachers, or the Association, that there has been a violation, misinterpretation, or misapplication of the terms of this Agreement.

    2. A "grievant" is the person, persons, or Association making the claim.

    3. A "party in interest" is any person or persons who might be required to take action or against whom action might be taken in order to resolve the claim.

    4. A "day" is any day teachers are required to be on duty.

B. Purpose

    1. The purpose of this procedure is to secure, at the lowest possible administrative level, equitable solutions to the problems which may arise from an alleged violation, misinterpretation, or misapplication of the Agreement. Both parties agree that these proceedings will be kept as informal and confidential as may be appropriate at any level of the procedure.

    2. Nothing contained herein will be construed as limiting the right of any teacher having a grievance to discuss the matter informally with any appropriate member of the administration, and to have the grievance adjusted without intervention by the Association, provided that the adjustment is not inconsistent with the terms of this Agreement and that the Association has been given an opportunity to review the adjustment and to state its views. If the grievant wishes, the Association may be present at such an adjustment and state its views. This provision does not apply to Level Four.

    3. Since it is important that grievances be processed as rapidly as possible, the time limits specified at each level should be considered maximums and every effort should be made to expedite the process. The time limits may, however, be extended by mutual agreement.

    4. In the event a grievance is filed at such a time that it cannot be processed through all the steps in this grievance procedure by the end of the school year and, if left unresolved until the beginning of the following school year could result in harm to the grievant, the time limits set forth herein will be reduced so that the procedure may be exhausted prior to the end of the school year or as soon as practicable.

C. Procedure

1. Informal:  Before filing a formal written grievance, the grievant shall attempt to resolve the issue by an informal discussion with the grievant's immediate supervisor. The grievant has 10 working days from the date the unit member had or reasonably should have had knowledge of the event, action or inaction which led to the grievance. The informal conference shall be held within 5 working days of the request.

   If a grievance arises from action or inaction on the part of a member of the administration at level above the principal or immediate supervisor, the grievant shall submit such grievance in writing to the superintendent and the Association directly and the processing of such grievance will be commenced at Level Two.

2. Level One:  If the grievant is not satisfied with the results of the informal step he or she may, within five (5) working days after the response at the informal level, file a Level One grievance with the immediate supervisor.   A level one grievance shall be submitted on the appropriate form and shall include the following:

   > A clear, concise statement of the grievance;
   > The circumstances involved;
   > The specific provision of the Agreement alleged to have been violated; and
   > The specific remedy sought.

   The supervisor shall communicate a decision to the grievant in writing within ten (10) days after receiving the Level One grievance.  If the supervisor does not respond within the time limits, the grievant may appeal to the next level.

3. Level Two:  In the event that the grievant is not satisfied with the decision at Level One, he or she may appeal the decision on the appropriate District designated form to the Superintendent or designee within ten (10) days.  The appeal shall include a copy of the original grievance, the decision rendered, and a clear, concise statement of the reasons for the appeal.  The Superintendent or designee shall communicate a decision within ten (10) days of receiving the appeal.  If the Superintendent or designee does not respond within the time limits, the grievant may appeal to the next level.

4. Level Three:  If the  grievant is not satisfied with the disposition of his/her grievance at Level Two, or if no written decision has been rendered within ten (10) working days after s/he had first met with the superintendent or his designee, the grievant may, within ten (10) working days after a decision by the superintendent or his designee, submit his/her grievance to the Board.  The Board, within ten (10) working days after receipt of the request from the grievant, may conduct a hearing on the grievance in an effort to resolve it, and shall render a decision in writing within ten (10) working days.

   The grievant has the right to bypass level three and proceed directly to level 4 arbitration.

5.  Level Four:  If the grievant is not satisfied with the disposition of his/her grievance at the previous level, or if the grievant or Board has elected not to have the Board hear the grievance, the grievant may within ten (10) working days after a decision of the Board or after a decision of the Board or grievant not to have the Board hear the grievance, request in writing that the Association submit his/her grievance to arbitration.  The Association, by written notice to the superintendent within ten (10) working days after receipt of the request from the grievant, may submit the grievance to binding arbitration.

    a.  Choice of the arbitrator shall be made from a list supplied by the State Mediation and Conciliation Service.  The arbitrator shall be chosen by the parties alternately striking names until only one remains.  First party to strike shall be determined by lot.

    b.  The arbitrator's decision will be in writing and will set forth his/her findings of fact, reasoning, and conclusions on the issues submitted.  The arbitrator will be without power or authority to make any decision which requires the commission of an act prohibited by law or which is in violation of the terms of this Agreement.  However, it is agreed that the arbitrator is empowered to include in any award such financial reimbursement or other remedies s/he judges to be proper.  The decisions of the arbitrator will be submitted to the employer and the Association and will be final and binding upon the parties of this Agreement.

    c.  All costs for the services of the arbitrator, including, but not limited to per them expense, the arbitrator's travel and subsistence expenses, and the cost of any hearing room will be borne equally by the Employer and the Association.  All other costs, with the exception of mandated costs, will be borne by the party incurring them.

D.  Rights of Teachers to Representation

    1.  No reprisals of any kind will be taken by either party against any grievant, any party in interest, any member of the Association, or any other participant in the grievance procedure by reason of such participation.

    2.  A teacher may be represented at all stages of the grievance procedure, short of arbitration, by him/herself or, at his/her option, by a representative selected by the Association.  If a teacher is not represented by the Association or its representatives, the Association shall have the right to review and state its views at all stages of the grievance procedure.  When a decision is rendered, the Association shall be informed and given an opportunity to comment.

E.  Miscellaneous

    1.  Decisions rendered at Levels One, Two, and Three of the Grievance procedure will be in writing, setting forth the decision and the reasons therefore, and will be transmitted promptly to all parties in interest and to the president of the Association.  Time limits

for appeal provided in each level shall begin the working day following receipt of written decision, or the date that written decision would be due in the case that no written decision is offered, by the parties in interest.

2. When it is necessary for a representative designated by the Association to attend a hearing during the day, the representative will, upon notice to his/her principal or immediate supervisor by the President of the Association, be released without loss of pay in order to participate in the foregoing activities.  Any teacher who is requested to appear at a hearing as a witness shall be accorded the same right.

3. All documents, communications, and records dealing with the processing of a grievance will be filed in a separate grievance file and will not 'be kept in the personnel file of any of the participants.

4. Forms for filing grievances, serving notices, taking appeals, making reports and recommendations, and other necessary documents will be agreed upon jointly by the Employer and the Association and given appropriate distribution by the Association so as to facilitate operation of the grievance procedure.  The costs of preparing and reproducing such forms shall be borne by the Employer.

5. A grievance may be withdrawn at any level without establishing precedent.

# ARTICLE 8

## LEAVES

A. The mandatory benefits provided teachers by Sections 44962 through 44985 and 44800 and 44801 of the Education Code are incorporated into this Agreement, except as supplemented. in this Article.  Unless otherwise stated in this article, a teacher returning from a paid or unpaid leave of absence granted after this contract is ratified:

1. Shall have a good faith attempt made to be placed in the same position which s/he held at the time said leave commenced, if the position is still in existence, or, if the position is not in existence, to the same school site, and as close to the same grade level and/or subject matter as possible, provided the total absence does not exceed one (1) year.

2. Upon request, the Employer may renew and extend a teacher's leave for a maximum of one (1) year provided the other contract provisions are complied with.  The date of return shall coincide with the trimester or semester unless a different date is agreed upon by both the Employee and the District.

   a. Employees must notify the District by March 1st about their intention to return the next school year.  Exceptions may be made by mutual agreement.

3. Any teacher who seeks an extension of leave taken for less than a year shall make application no later than thirty (30) days preceding the expiration date of the original leave.

4. Leaves shall be defined as state mandated, or protected under law, and district provided, or part of the local contract State mandated leaves include, but are not limited to, sick leave, family leave, pregnancy leave, and disability leave.  District provided leaves may include personal leaves, study leaves, and political leaves.

5. Teachers shall have the option to continue the health and/or dental plans their own expense unless otherwise indicated in the Leave subsection.

6. Teachers who are absent from scheduled staff development days would make up the missed day(s) in such a way so as to meet audit criteria.  If other than sick day(s) or bereavement day(s) were taken and not made up, the teacher's salary would be adjusted by the number of days missed.

B. Sick Leave:  Every full-time teacher shall be entitled to ten (10) sick leave days per school year.  Part-time teachers shall have their sick leave allotment pro-rated.

1. Unused sick leave shall accrue from school year to school year.

17

2. On each salary warrant, the district shall report each teacher's sick leave allotment on his/her salary warrant. A teacher may use his/her credited sick leave at any time during the school year.

3. A unit member, shall be credited at his/her retirement foreach day of accumulated and unused leave of absence for illness or injury for which full salary is allowed to which the member was entitled or the final day s/he rendered service to the school district or other employing agency by which s/he was last employed in a position requiring membership STRS. The number of years of service credit to be granted shall be determined by STRS. When the member has made application for retirement pursuant to Section 23900, the school district shall certify to STRS the number of days of accumulated and unused leave of absence for illness or injury to which the employee is entitled on his/her final day of employment.

4. If a teacher has utilized all of his/her accumulated sick leave and is still absent from his/her duties on account of illness or accident for a period of five (5) school months or less, then the amount of salary deducted in any month shall not exceed the sum which was actually paid a substitute or 50% of the salary due him/her during the period of absence, whichever is the lesser amount. The five (5) months or less, during which the above deductions occur, shall not begin until all other paid sick leave provisions for which s/he is eligible have been exhausted. *(44977)*

C. Pregnancy Disability Leave:

1. The commencement and length of leave of absence shall be determined by the employee and the employee's physician, not to exceed applicable legally mandated leave provided under the State Pregnancy Disability Leave or the Federal FMLA Leave. Employee shall notify district of intention to take leave at least 60 days before due date unless emergency arises.

2. Because of a teacher's pregnancy, the District shall:

   a) not refuse to hire or employ,

   b) not refuse to select her for a training program leading to employment, assignment, or promotion,

   c) not bar or discharge her from employment,

   d) not bar her from training programs leading to employment, reassignment, or promotion,

   e) not discriminate against her in compensation or in terms, conditions, or privileges of employment.

3. Any or all sick leave days earned may be used for Pregnancy Disability Leave purposes if such disability occurs while the employee is rendering paid service to the District.  In turn, the teacher shall agree to repay, upon resignation or within one (1) year, whichever is sooner, any monies owed the Employer as the result of there being at that time an excess of used sick leave days over earned sick leave days.

D. <u>Family Leave</u>:  A teacher employed for at least one year may be eligible for unpaid, job-protected, Family Leave for a time of not more than twelve (12) weeks, (Family and Medical Leave) in rolling twelve (12) months period. In the case of a Military Exigency Leave or Servicemember Family Leave, a unit member may take up to 26 work weeks total in a rolling twelve-month period. For example, if an employee takes off 12 work weeks to bond with a newly adopted child and later during the same 12-month period wishes to take time off from work to care for a family member under the Servicemember Family Leave provisions, the employee may take up to 14 additional work weeks off, not to exceed a combined total of 26 weeks.

1. This leave may be used for the purposes of:

   a. Birth or placement of child for adoption or foster care;

      i. A teacher may apply for Family Leave at any time during pregnancy, but not later than twelve (12) months following childbirth or placement.

      ii. Intermittent use subject to employer's approval consistent with FMLA and CFRA provisions.

   b. Caring for spouse, child or parent with serious health conditions;

      i. Intermittent use allowable when necessary consistent with FMLA and CFRA provisions.

   c. Medical leave when employee is unable to work because of serious health condition;

      i. Intermittent use allowable when necessary consistent with FMLA and CFRA provisions.

   d. A qualifying exigency for military operations arising out of spouse's domestic partner's, child's or parent's Armed Forces (including the National Guard and Reserves) active duty or call to active duty in support of a "contingency operation" declared by the U.S. Secretary of Defense, President or Congress, as required by law ("Military Exigency Leave"); or

   e. To care for a spouse, domestic partner, child, parent or next of kin (nearest blood relative of an individual) who is an Armed Forces member with a serious injury or illness incurred in the line of duty while on active duty that may render the

individual medically unfit to perform his or her military duties ("Servicemember Family Leave").

2. The Employer must continue to provide health care benefits for up to twelve weeks of the Family and Medical Leave or for up to a combined total of 26 weeks under the Military Exigency or Servicemember Leave provisions as though the unit member were still working regular hours; however, the Employer may request that employees repay the health care premiums paid on their behalf during the leave if the unit member doesn't return to work.

3. Leave may be denied to unit members who are of the highest-paid 10% of the work force if allowing such leave would cause substantial injury or damaging interruption in the school operation.

4. The Employer is permitted to obtain medical certifications to justify the need, not the condition, for Family Leave.

5. Unit member must give a thirty (30) day notice when foreseeable. Employees seeking to use FMLA leave to cover Military Exigency Leave must provide the District with as much notice of the need for leave as is reasonable and practicable under the circumstances.

E.  Personal Necessity Leave:  Every teacher shall be entitled to up to ten (10) days personal necessity leave allotment during each school year to be deducted from sick leave.  This leave may be used for purposes, including, but not limited to bereavement, family illness, health, or other matters of urgent necessity to the employee that cannot be deferred to non-duty time.

1. This leave is not accruable and prior approval for personal necessity leave is not required.

2. Teachers shall notify the immediate supervisor his/her designee within reasonable time before the leave is to be taken when such prior notification is practicable.

3. Such leave shall not be used during a concerted effort designed as a work slowdown or stoppage.

4. In no case shall personal necessity leave be used to violate the contract.

F.  Personal Leave:  A permanent unit member who has worked a minimum of two (2) years for the district may be entitled to a Maximum of one (1) year unpaid leave to be used for any purpose which such teacher deems sufficiently important to absent himself/herself from his/her duties.  The decision to grant or deny such leave is solely within the discretion of the District.  However, such leave shall not be capriciously or arbitrarily denied.  A teacher who has requested such a leave and who has been denied shall be entitled to a written

statement of the reasons for such denial.  A teacher applying for such a leave shall do so in accordance with this section.

1. A teacher shall notify the Employer at least thirty (30) working days in advance of taking such leave, unless an emergency makes such advance notification impossible.  A teacher shall/'not be required to explain the purposes for which such leave is to be used.

2. Only teachers who have attained permanent status shall be entitled to such leave.

3. A teacher who takes a Personal Leave of 20% or less, and works 80% or more of a year, shall receive one year of advancement on the salary schedule and retirement credit.

4. A unit member who returns to work from personal leave prior to exhausting their full approved leave time shall be deemed to have completed such leave regardless of the time actually spent on leave.

5. Personal leave shall not be used for reduced load contracts which are governed by Article X "Part-time Contract."

G. Study Leave:  A permanent unit member who has worked a minimum of two (2) years for the district may request an unpaid leave of absence to pursue a goal of directed study which is of benefit to the teacher and District.  The decision to grant or deny such leave is solely within the discretion of the District.  Teachers must make application to the Study Leave Committee (consisting of the Superintendent and one (1) board member) which shall make its recommendation to the board.  Such leave shall be for a maximum of one (1) school year.

1. A teacher shall apply in writing to the board for such leave no later than thirty (30) days before its anticipated commencement.

2. Leave must coincide with school trimesters or semesters.

3. Notice of intent to return to work must be made to the District at least thirty (30) days before the employee resumes duties.

4. Teachers returning from Study Leave must present evidence of successful completion of goals.  Teachers unable to present such evidence (or teachers not returning to the district) shall not receive advancement on the salary schedule.

H. Legal Leave:

1. The teacher, while serving jury duty, or when summoned to appear as a subpoenaed witness in court, other than as a litigant or paid expert witness, for reasons not brought about through the connivance or misconduct of the teacher, will receive pay in the amount of the difference between the teacher's regular earnings and any amount received, exclusive of mileage and other directly reimbursed expenses.

2. On a school related suit, (a suit related to matters at school, on school related business or going to or from school, a teacher who is a litigant, plaintiff or defendant, in such a suit shall receive all regular earnings unless adjudged personally -responsible for deliberate or wanton misconduct as determined by the legal tribunal adjudicating the case.

I. In-Service Leave: A teacher shall be entitled to request two (2) days of paid leave each school year for the purpose of improving his/her performance. Such leave may be used to visit classes within the school or in other schools or to attend workshops related to his/her performance.

1. A teacher shall request such leave from his/her building principal at least five (5) school days prior to such leave and must obtain the principal's authorization.

2. Either a teacher or an administrator may initiate the use of such leave, provided the teacher's absence does not cause undue disruption to the class.

J. Bereavement Leave:

1. A unit member shall be granted leave of absence for the death of any member of the immediate family without loss of pay or deduction from other leave benefits found in this Article. This leave shall be for three (3) days, unless travel of more than two hundred (200) miles is required; in such case the length of the leave shall be for five (5) days.

2. Immediate family shall include, but not be limited to the following: Mother (stepmother), mother-in-law, father (stepfather), father-in-law, husband, wife, son(stepson), daughter (stepdaughter), brother, sister, grandparent, legal guardian, foster children, grandchild of the unit member or spouse, or any person living in the immediate household of the unit member.

K. Industrial Accident and Illness Leave:

1. All unit members shall be eligible for leave of absence because of industrial accident or illness as acknowledged by the State of California Compensation Insurance Fund. Allowable leaves shall be sixty (60) working days in any one fiscal year for the same accident and shall commence the first day of absence.

2. Leave of absence under this policy shall not be accumulated from year-to-year. When the industrial, accident or illness leave overlaps into the next fiscal year, the unit member shall be entitled to only the amount of unused leave due him/her for the same illness or injury.

3. A unit member shall be paid such portion of his/her salary due him/her for any month in which absence occurs as, when added to the temporary disability indemnity under the

California Labor Code, will result in payment to him/her of not more than his/her full monthly salary.

4. Leaves of absence applied for under this article shall be reduced by one day for each day of authorized absence regardless of a temporary disability award to the Unit member.

5. Upon termination of industrial accident leave, the unit member shall be entitled to accumulated sick leave benefits under Article VIII of this Agreement with the provision that if the unit member continues to receive a temporary disability indemnity, s/he may elect to receive as much of his/her accumulated sick leave which, when added to his/her temporary disability indemnity, will result in a payment to him/her of not more than his/her full salary. During any paid leave of absence, the unit member shall endorse to the District the temporary disability indemnity checks received on account of his/her industrial accident or illness. The District, in turn, shall issue the appropriate salary warrants for payment of salary and shall deduct normal retirement and other authorized contributions. Unless travel outside of California is authorized by the Board of Trustees, unit members receiving benefits under this article during periods of illness or injury shall remain in the State of California.

6. The Superintendent, working through the Personnel Department, shall recommend to the Board any unit member's petition for leave of absence under this article. A unit member petitioning for such leave is responsible for furnishing the District Superintendent, upon his/her request, a statement signed by a licensed physician or practitioner verifying the nature of the injury or illness and the number of days of absence that will be needed for the leave of absence. A second signed physician's or practitioner's statement may be required of the unit member upon request of the District Superintendent at termination of the unit member's leave of absence certifying that the unit member's condition is satisfactory to warrant a return to service.

L. Disability Applicant Leave:

1. The District shall grant a leave of absence to any unit member who has applied for a disability allowance from the State Teachers' Retirement System (STRS). This leave shall not extend more than thirty (30) days beyond the final determination of the disability allowance.

# ARTICLE 9

## CATASTROPHIC LEAVE PROGRAM

The Association and the district agree to establish a Catastrophic Leave Bank for all employees of the District.  The Catastrophic Leave Bank (the Bank) is limited to the terms, conditions and purposes specified herein.  Catastrophic illness or injury means an illness or injury that is expected to incapacitate the employee for an extended period of time or that incapacitates a member of the employee's family, which incapacity requires the employee to take time off from work for an extended period of time to care for that family member, and taking extended time off work creates a financial hardship for the employee because he or she has exhausted all of his or her sick leave and other paid time off. (Ed. Code 44043.5).

A. Contributions:  Every employee shall be given the opportunity to contribute to the Bank, but only contributors shall be allowed to draw from the Bank.  Only those who have contributed to the bank are eligible participants in the Bank for that fiscal year. Contributions are irrevocable.

   1. The annual rate of contribution to the Bank by each participating employee for each fiscal year will be one (1) day of sick leave.

   2. Contributions to the Bank become the property of the Bank, even if not utilized, and can only be withdrawn under the terms and conditions of this regulation.

   3. The Employer shall notify new probationary employees of the opportunity to donate at the time of hire.  New employees will have 30 days after starting employment with the Employer to donate in order to be eligible to participate in that fiscal year.  Regular, continuing employees must indicate their participation, on the form provided by the district, no later than October 1st of the fiscal year.

   4. In the event the Bank accrues 40 net days, no further annual contributions will be required from ongoing participants in order to sustain their eligibility to draw from the Bank.  Voluntary deposits to the Bank shall not be requested again until a draw from the Bank is made and the total days accrued falls below 20.  In such event, employees will be requested to re-enroll during the next September 1st to October 1st period as described in Section A3 above.  New employees may continue to join even if the accrued amount of days in the Bank reaches 40.  Continuing regular employees may initiate (or restart) their Bank eligibility during the next September 1st to October 1st period regardless of the number of days accrued in the Bank.

B. Withdrawals:  Withdrawals from the Bank can only be made when the contributor has exhausted all other available leave, including differential pay, to recover from a serious accident or illness to the employee, their immediate family, or individuals residing in the employee's household.  The request must be accompanied with a doctor's statement

indicating the nature of the illness or injury and the probable length of absence from work. Employees covered under Worker's Compensation benefits are excluded.

1. A participating employee may qualify for a withdrawal from the Bank for a maximum of 20 days in any fiscal year.

2. For purposes of withdrawal from the Bank, a "day" shall be recorded as the hourly/daily equivalent the employee serves in their regular assignment at the time of his/her contribution or withdrawal. The employee may withdraw a "day" at the same percentage s/he contributed.

C. Miscellaneous:

1. For purposes of the bank, a full day will be considered eight (8) hours. The District will convert the percentage of FTE of days donated in relation to eight (8) hours for purposes of determining net days in the Bank.

2. By October 15th of each year, the District shall provide notification of the status of the Bank to current Bank participants, including, but not limited to, total number of days accumulated in the Bank as of June 30th of the previous year, the total number of days used since the last reporting, and the balance of days available for use by participants for the current fiscal year.

3. The Bank shall be considered self-contained and limited by the employee contributions received and accrued over time. There shall be no catastrophic leave awarded, nor any obligation to provide such leave, when all days in the bank have been exhausted.

4. If the Catastrophic Leave Bank is terminated for any reason, the days remaining in the Bank shall be returned to the then current participant pool proportionately.

# ARTICLE 10

## SALARY

Beginning July 1, 2014, the salary schedule shall be increased by 4%.

If the property tax increases 3% above the base increased projected in the Board's final adopted budget for the 2015-16 school year, the salary schedule will increase by 2%, effective July 1, 2015.

If the property tax increases 3% above the base increase projected in the Board's final adopted budget for the 2016-17 school year, the salary schedule3 will increase by 2%, effective July 1, 2016.

The Board will designate 2.5% each year to provide up to 5 additional days of staff development in the summers of 2015, 2016 and 2017. These days will be voluntary and paid at per diem.

The following criteria shall be used to accrue additional units on the salary schedule.

A. All units beyond the AB degree are based on semester units. Quarter units and CEUs will be converted to semester units at a rate of 2/3 to 1. If a bargaining unit member pays for the the units and all related expenses and the class is not during duty hours, the bargaining unit member shall be able to use those units toward the salary schedule.

B. All units taken from an accredited institution with a minimum grade of C or passing shall qualify for advancement on the salary schedule.

C. Additional units may be earned through district-sponsored workshops, County Office of Education classes or other activities, workshops, or institutes which meet the requirements of this article so long as the employee is not particiating in a program during duty time or at District expense. Credit for these courses shall be approved by the coursework committee when related to current or anticipated classroom assignment or professional duties.

  - Continuing Educational unit credits earned shall be granted "semester hour" credit for salary placement as 3 CEU credits = 2 semester units (or equivalent portion thereof.)

  - Coursework and training offered where no college or CEU credit is available may earn District credit with the committee's approval. The minimum number of in class hours for which CEU credit will be considered is ten (10) hours.

D. The coursework committee shall consist of two(2) teachers appointed by the Association and 1 administrator. The function of the committee shall be to review application requests for credit pursuant to section C of this article. This committee shall meet once a year.

E. After completing the course, the teacher must notify the district office by September 15th and submit an official card or transcript showing the course number, title, number of units, and grade received by October 15th. Courses/units must have been completed within the previous school year to be eligible for application for salary advancement.

F. All courses completed after September shall apply for salary advancement for the following school year.

G. Up to five (5) years of credit for previous teaching experience shall be granted by the district superintendent. Additional credit may be granted upon recommendation by the district superintendent and approval of the board of trustees.

H. Any step advancement on the Salary Schedule will not be granted until the certificated employee has completed an equivalent of 75% of the days required by the contract of employment.

I. Part-time certificated employees, earning a pro-rated salary, during the 2007-2008 school year, shall earn a full step when determining the salary schedule placement for 2008-2009.

Beginning the 2008-2009 school year, part-time employees earning a pro-rated salary shall earn a full step of movement for purposes of salary schedule placement.

This agreement is not retroactive and shall affect placement for bargaining unit members beginning the 2008-2009 school year.

# ARTICLE 11

## PART-TIME CONTRACT

A. AB 3339, amending sections 44922, 22724, and 89516 of the Education Code and Section 20185 of the Government Code, is incorporated into this Agreement and is supplemented as follows: any teacher who is interested in reducing his/her employment in the District to part-time or shared position shall be entitled to request a Part-Time Contract, with the following provisions:

1. The teacher must submit such request in writing to the Employer on or before March 1st for the following year. Exceptions may be made by mutual agreement.

2. The site administrator shall meet with the teacher, within one (1) week of written request, to mutually agree on the teacher's job description, duties, hours, the location at which s/he is required to perform such services.

3. The Employer shall publicize, in a timely manner, the part-time assignment vacancy resulting from the teacher's application for Part-Time Contract. The applicant shall be included in the interview panel.

4. If the site administrator determines that it is in the best interest of the District to grant such a request, the site administrator shall notify the applicant of the Assignment of his/her Part-Time Contract on or before June 1st.

5. If the site administrator determines that it is in the best interest of the District to deny such a request, the site administrator shall notify the applicant of the reasons in writing. Applicant may appeal the decision to the board.

B. Teachers who serve on a Part-Time Contract shall receive the same percentage of salary, health and welfare benefits, sick leave and retirement credit equivalent to the percentage of full-time assignment in which they are serving.

C. A teacher serving on a Part-Time Contract shall be entitled to full use of his/her accumulated sick leave; such use shall be pro-rated to the amount of service required in his/her Part-Time Contract.

D. A teacher on Part-Time Contract shall only perform a pro-rated share of the responsibilities defined in Article V s/he would be performing on a full-time contract.

# ARTICLE 12

## TEACHER HIRING

A. One or more teachers shall be given the opportunity to be present in an advisory capacity when interviews for teaching positions are conducted. Teachers selected for the hiring committee will be employed at the school which has the opening. One of the aforementioned teachers will be employed in the grade level, if such teacher is available. If such teacher is not available, the district shall notify the Association president or his/her designated representative who shall attempt to provide an appropriate teacher for the interview.

B. Notices of vacancies shall be posted for at least ten (10) days on the bulletin board in each school site. Such notices shall be posted as soon as the Employer determines that a vacancy exists and shall include the position description and location, grade level or subject matter assignment, and credential requirements. Copies of all notices of vacancies shall be:

1. Placed on bulletin boards at each site and e-mailed to all unit members when vacancy occurs during school year.

2. Sent to teachers' last known addresses during vacation periods.

# ARTICLE 13

## TRANSFERS AND REASSIGNMENTS

A. A "transfer" refers to any Employer action which results in the movement of a teacher from one school site to another. "Reassignment" refers to a change of assignment at the same school site. Hereafter, "transfer" refers to both transfers and reassignments.

   1. A transfer may be teacher initiated ("voluntary") or Employer initiated ("involuntary").

   2. All transfers shall be made in accordance with the terms and conditions of the Agreement.

B. <u>Voluntary Transfers</u>: A unit member may request a voluntary transfer, when a vacancy occurs, to take effect during the school year or at the beginning of the next school year. The request shall be made on a "Request for Transfer" form and sent to the district office.

   1. For openings that occur during the school year, or after May 1 of the school year, all unit members shall be given three (3) days notice prior to public posting (per Article XI, B.1). Unit members shall have the right to be interviewed by the Superintendent or Principal during such 3-day period prior to public posting upon filing a "Request for Transfer". (If the Superintendent or Principal feel no unit member is credentialed to fill the opening, s/he may simultaneously publicly post the position).

   2. For openings that will occur at the beginning of the next school year, the "Request for Transfer" shall be filed no later than May 1st of the preceding school year.

   3. In the best interests of the district, all requests for voluntary transfers shall be considered on the basis of the following criteria:

      a. Credentials to perform the required services.
      b. Seniority in the district as measured by accrued service credit.
      c. Experience related to opening.
      d. Formal evaluations.

   4. The unit member shall on request be granted a formal interview for the position for which s/he has applied.

   5. If a voluntary transfer request is denied, the unit member, upon request, shall be provided with the specific reasons for the denial in writing.

      a. Prior to the position being filled, the unit member may request a hearing before the Board.

C. <u>Involuntary Transfers</u>:

1. Such transfers shall be made on the basis of the following criteria:

    a. Reduction of class size.
    b. Change in enrollment.
    c. Program and district needs as determined by the employer.
    d. Specialized services needed as mutually agreed. upon between the unit member and employer.

2. A unit member to be involuntarily transferred shall have the following rights:

    a. At least ten (10) working days notice in advance of the transfer.
    b. A statement of the specific reasons for the transfer in writing upon request.
    c. A formal interview with the Superintendent, upon request.
    d. An appeal to the Board, upon request.
    e. To indicate preferences from any list of vacancies.
    f. No loss of compensation, seniority, or fringe benefits for the duration of the school year.
    g. Two (2) paid duty free day(s) to move any equipment and materials. In Lieu of release time from classroom duties, the unit member may elect to receive two (2) days of pay at the substitute teacher rate for moving on a non-school day.

# ARTICLE 14

## EARLY RETIREMENT PROGRAMS

I.  EARLY RETIREMENT CONSULTANT PROGRAM

A.  Teachers with a minimum of ten (10) years of service in the District are eligible for participation.  A year of service is defined as working 75% of the days required by the contract of employment.

    1.  Applicants shall be between ages of 55 and 64 inclusive.

    2.  In any one year, there shall be no more than three (3) teachers in this Early Retirement Program.

B.  Compensation:  The annual compensation shall be $8019.00 for the 2011-2012 school year, and shall reflect the same percentage increase on the certificated salary schedule as annually negotiated.

C.  Eligible teachers may apply for Early Retirement. If the Board approves the application, the teacher shall actually resign from the school district.

    1.  Teachers employed under this program shall be considered employees of the district.

    2.  Early Retirement Consultants may apply annually to renew contracts for up to five (5) years.

    3.  Such contracts shall not be renewable after the fifth school year or at the end of the school year in which the teacher reaches 65 years of age, whichever comes first.

    4.  Early Retirement Consultants shall serve twenty-five (25) days per year at such time as may be mutually agreed upon.  In unusual circumstances, the superintendent may waive this requirement or roll over any unserved days into the next school year.

    5.  Under the terms of this plan, the Early Retirement Consultant shall perform such services for the district as will be mutually agreed upon.

    6.  Participation in this Early Retirement Plan shall be purely voluntary on the part of the teacher.  The Early Retirement Consultant may choose to discontinue this program at the end of any contract year.  Application shall be made to the Personnel Office ninety (90) calendar days prior to the effective date of the proposed resignation.  No leaves shall be earnable under the terms of this plan and the Employee may not use sick leave accumulated prior to retirement.

   7.  A retiree who participates in this program is eligible for any other district retirement program with the exception of the Willie Brown Act.

D.  <u>Health Entitlements for Retirees</u>:

   1.  If retirees work at least a minimum of 37 days of service, then they may be eligible for employee Health Entitlements (Medical, Dental, Etc.) during a retirement year.  Full time Health Entitlements shall be granted to retirees at the rate of $200/month ($2400 annually) for any group insurance option afforded employees.

   2.  Days of service shall be scheduled by the Superintendent.

   3.  Retirees shall be eligible to participate in the IRS 125 Cafeteria plan offered to employees.

II.  <u>WILLIE BROWN ACT (Education Code Section 44922)</u>

A.  To qualify, an employee must have at least the equivalent of ten (10) full years of service in the Loma Prieta Joint Union School District.

   1.  The employee must have reached age 55 and have at least ten (10) years of STRS service, the last five of which were full-time employment ("...sabbaticals and other approved leaves of absence shall not constitute a break in service...", according to AB 1162).

   2.  The employee may reduce his/her workload to 50% but no lower.

   3.  The employee may stay in the program until the end of the school year when he/she reaches age 70.

   4.  The employee may stay in the program no more than five years.

   5.  Once in the program, the contract cannot be revoked without the consent of the employee.

   6.  The employee's salary will be based on a pro-rata share of the salary he/she would earn if employed on a full-time basis.

   7.  The employee's salary for the "high-three years" computation will be based on a full-time salary.

   8.  Both the employee and the District must contribute to STRS an amount based on a full-time salary.

   9.  The employee will advance on the salary schedule as a full-time employee.

10. The district will continue the same fringe benefit contributions as though the staff member were on a full-time salary.

11. The employee will receive a full year of retirement credit for each year in the program.

12. The employee must request to enter the program.

B. Notification must be made by April 15th except by mutual agreement by both the Employer and the certificated employee.

C. Duties, period of time for the contract, and work schedule, will be agreed to by both the Employer and certificated employee in order to create the best learning environment for the children.

# ARTICLE 15

## PERSONNEL FILES AND RECORDS

A.  Excluding initial references of the District pertaining to said teacher, a teacher will have the right to review the contents of all records originating after initial employment and to have a representative of the Association accompany him/her in such review.  The teacher will have the right to review his/her file with the superintendent or his/her designee present.

B.  No material of originating after initial employment will be placed in his/her, personnel file unless the teacher has had an opportunity to review the material and discuss the matter with the administrator who placed it in his/her file.  The teacher may submit a written notation regarding any material and the same shall be attached to the file copy of the material in question.  If the teacher is asked to sign material placed in his/her fife, such signature shall be understood to indicate his/her awareness of the material, but in no instance shall said signature be interpreted to mean agreement with the content of the material.

C.  Any derogatory information relayed formally or informally by school administrators about a teacher, written or oral, shall be based solely on the contents of the teacher's personnel file.

D.  Personnel Files:  Except as contained in Sections 44939-44942 of the Education Code, the Employer shall not base any adverse action against a teacher upon, materials which are not contained in such teacher's personnel file.

E.  Unless otherwise agreed to by the involved teacher, a teacher's personnel file shall not include ratings, or records which were obtained prior to the employment of the teacher, unless such materials are already contained within his/her personnel file.  No material shall be placed in the official personnel file of a bargaining unit member by a non-administrator.

F.  A teacher shall be provided any negative or derogatory material before it is placed in his/her personnel file.  S/he shall also be given release time during the school day to initial and date the material and to prepare a written response to such material.  The derogatory material shall not be placed in the file until a ten (10) day opportunity to respond has passed.

G.  Upon written authorization by the teacher, a representative of the Association shall be permitted to examine and/or obtain one copy each of any materials in such teacher's personnel file.

H.  The person or persons who draft and/or place material in a teacher's personnel file shall sign the material and signify the date on which such material was drafted and placed in the file.

I.   The District shall observe confidentiality of the personnel file, which shall mean that access to and use of the contents of the file. shall be limited exclusively to those persons with a legitimate administrative need to know such data.

J.   Derogatory material, other than formal teaching evaluation, shall remain in file no longer than four (4) years.  A unit member may petition the superintendent to remove such material before the four-year limit.

K.   A teacher will have the right to provide pertinent materials, such as, but not limited to, recommendations, references, letters from parents or colleagues for inclusion in his/her personnel file.

L.   The Employer shall maintain one official personnel file for each teacher at the District's central office, and no other "official" personnel file shall be kept in any other building.

# ARTICLE 16

## PARENT COMPLAINT PROCEDURES

No negative material based upon information of a derogatory or critical nature which has been received by administration from parents shall be placed in a personnel file unless the following procedures have been followed:

1. A good faith effort shall be made to resolve the issue at the lowest level. The lowest level shall mean resolution with the faculty member directly or at the site with the next level site administrator, if possible.

2. If the complaint by a parent about a unit member may be used against the unit member, it shall be reported to the unit member within twenty-four (24) hours or as soon thereafter as is practicable of the receipt of the complaint.

3. The administrator shall inform the unit member of his/her right to have Association/legal representation at any meeting regarding a complaint.

4. During the processing of any parent complaint a faculty member has the right to request a meeting with his or her immediate supervisor to discuss the complaint and the advisability of meeting directly with the parent complainant to attempt to resolve the complaint. A faculty member has the right to have an Association representative present during such meeting.

5. If the matter is not resolved to the satisfaction of the complainant, he/she shall put the complaint in writing, and submit the original to the unit member, with a copy to the unit member's immediate supervisor. The unit member shall be given time during the duty day, without salary deduction, to review the complaint.

6. The unit member is provided the right of representation and is informed prior to any meeting which may involve criminal allegations, that the member is entitled to such representation.

7. The unit member has the right to attach written and signed comments to any written complaint filed by the complainant.

8. If any action is taken against the unit member based on the complaint and the unit member believes the complaint is false and/or based on hearsay, or that improper procedures were followed, a grievance may be initiated.

9. Complaints which are shown to be false, or are not sustained by the grievance procedure shall not be placed in the unit member's personal file nor utilized in any disciplinary action against the unit member.

10. The unit member is allowed to remain in the position until formal charges have been made by the complainant, except in circumstances where the Superintendent may remove the unit member from duty with or without pay in accordance with the Education Code pending investigation of any formal complaint.

11. All other formal complaints not covered by this complaint procedure against faculty members must be processed in accordance with appropriate District policies and procedures.  A parent complaint involving allegations of discrimination, harassment, workplace violence or other allegation regulated by law and by a specific district policy shall be processed in accordance with such specific policy.

# ARTICLE 17

## EVALUATION

17.1    The purpose of certificated evaluation is to enhance student learning through improved instructional performance and to provide constructive assistance and support to unit members.

17.2    Frequency of Evaluation

   17.2.1   Temporary and Probationary employees shall be evaluated on a continuing basis, and not less than twice a year, once each semester.

   17.2.2   Permanent employees shall be evaluated on a continuing basis, and not less than once every two years, unless qualified and participant in the five year evaluation cycle identified below:

      17.2.2.1   If the evaluator and permanent employee being evaluated agree, unit members who have been employed at least 10 years with the school district, are highly qualified (if those employees occupy positions that are required to be filled by a highly qualified professional by the federal No Child Left Behind Act of 2001 [20 U.S.C. Sec. 6301, et seq.], as defined in 20 U.S.C. Sec. 7801), and whose previous evaluation rated the employee as "exceeds standards", may be evaluated once every five years. The unit member or the evaluator may withdraw consent at any time.

17.3    Basis for Evaluation
   Evaluations shall be based upon the California Standards for the Teaching Profession (CSTP).

17.4    Primary Evaluator
   Not later than October 1 of each school year, certificated employees who will be formally evaluated shall be notified as to who their primary evaluator will be. If the unit member requests, and the primary evaluator agrees, a different primary evaluator may be designated.

17. 5    Evaluation Plans

   17.5.1   Standard Evaluation
      Not later than October 15, the unit member and evaluator will arrive at agreement on the goals and objectives to be achieved during the evaluation period, based upon review of the CSTP. Although a bargaining unit member is expected to work with all the standards and subsets therein, for the purpose of evaluation, temporary and probationary 1 employees shall focus primarily upon CSTP Standard II, Creating and Maintaining Effective Environments for Student

39

Learning. Probationary 2 employees shall focus primarily upon CSTP Standard II and Standard III, Understanding and Organizing Subject Matter for Student Learning. All permanent employees are responsible for all six CSTP, but the evaluation shall primarily focus upon CSTP Standard II, III and one other standard, established by the unit member and administrator, jointly. If the parties fail to agree, the primary evaluator will determine the third standard. Permanent employees on the five year cycle will be evaluated on all six standards.

17.5.2   Optional Evaluation
Permanent unit members who, in their previous evaluation cycle, met or exceeded standard in all six (6) of the CSTP, are eligible for the Optional Evaluation. Not later than October 15, the unit member and evaluator will collaboratively design and mutually agree upon an optional evaluation plan. Should the parties be unable to agree, the unit member shall participate in a standard evaluation. The unit member and evaluator shall meet by February 1 to review progress on the plan. At least thirty (30) days prior to the end of the school year, the unit member and primary evaluator shall meet and review the completion of this evaluation cycle. A notice of Optional Evaluation shall be placed in the unit member's file, identifying successful completion of the plan, continuation of the plan into the subsequent year, or return to the standard evaluation process.

17.6   Evaluation Process

17.6.1   Formal Observation
The unit member and primary evaluator shall meet within 2 weeks of the formal evaluation to discuss the elements of the CSTP to be included in the observation, and a firm date and time for the formal observation shall be established. Should either party need to change the time and or date of the observation, arrangements for an additional pre-observation conference will occur, should either party request it. In no case shall the unit member have less than 48 hour notice of the date and time of the formal observation.

17.6.1.1   Within ten (10) working days following the formal observation, a post-observation conference meeting shall occur between the evaluator and unit member.

17.6.1.2   Within five (5) working days following the post-observation conference, the evaluator shall submit a final summary evaluation letter, to which the unit member may attach a response, within 10 day, for inclusion in the personnel file.

17.6.1.2.1   The formal evaluation process, inclusive of the final summary letter, shall be completed no later than March 1 of each school year for temporary and probationary employees and May 1 for permanent employees.

### 17.6.2 Informal Observation
The informal, drop-in observation, may occur during the evaluation cycle; any notes taken shall be copied to the unit member within 48 hours and on the appropriate form.

### 17.6.3 Follow-up Formal Observation
At the request of the unit member, a second, formal observation shall take place. The teacher may submit rebuttal documentation to the administrator for consideration prior to the second formal observation occurring. At the request of the unit member, a third, formal observation shall take place with a different administrator.

## 17.7 Unsatisfactory Evaluation
In the circumstance where a unit member receives an unsatisfactory evaluation, the member shall be referred to PAR and must participate with a consulting teacher. The evaluator shall establish, with the unit member, a plan to support the member, including a schedule for observations, on-going meetings to review progress, and benchmarks to assess the process for what other support may be appropriate in order to move the unit member from unsatisfactory to satisfactory. The plan shall be on the District form Performance Improvement Plan.

The unit member who has received an unsatisfactory evaluation may request additional observations with another administrator; however, the primary evaluator shall be responsible for completing all aspects of the evaluation cycle.

# ARTICLE 18

## CONCERTED ACTIVITIES

A.  The Association and the Employer agree that differences between the parties hereto shall be settled by peaceful means as provided in this agreement.  During the term of the Agreement, the Association will not engage in, instigate, or condone any strike, work stoppage, or any concerted refusal to perform work duties as required in this Agreement.

B.  During the term of this Agreement, the Employer, in consideration of the terms and conditions of the Agreement, will not authorize or permit any lockout of Association members or other persons covered by the Agreement.

C.  If either party fails to honor its commitments in paragraph A or B above, the other party shall be free to pursue such legal remedies as may be appropriate.

# ARTICLE 19

## DISTRICT RIGHTS

The Employer retains its rights, powers, and authority to direct and control to the full extent of the law. The exercise of these rights, powers, authority, duties, and responsibilities by the District, the adoption of policies, rules, regulations, and practices in furtherance thereof, and the use of judgment and discretion in connection therewith, shall be limited only by the specific and express terms of this Agreement, and then only to the extent such specific and express terms are in conformance with the laws of the State of California.

# ARTICLE 20

## TEACHER SAFETY

A. The District will provide and maintain a safe place of employment. Employees shall not be required to work under unsafe or hazardous conditions or to perform tasks which endanger health or safety. All employees shall report any unsafe practices, equipment, or conditions to the building principal on a District form. Upon such notification, the District shall investigate the situation and take appropriate steps to remedy any unsafe conditions. In cases where the District determines that an unsafe condition exists, the District will take immediate steps (either temporary or permanent) to secure a safe work environment. If, after investigation the District determines that the reported condition does not constitute an unsafe condition, the bargaining unit member has the right to:

- Request a meeting with the Superintendent to discuss the situation within five days of such determination, and

- Request a written response to the report from the District within five days of meeting with the Superintendent.

B. Any assault upon a teacher, either by students or adults, shall be reported to the building principal. The report shall contain the teacher's name, the date, the location of the assault, time of the assault, the description of the assault, and the name of the person making the assault, if known. The report shall be reported, immediately to the police by the building principal, if the principal deems it appropriate to file such a report *or* if the teacher so requests.

C. The District shall, upon recommendation of the student's teacher, exclude from class any student who suffers from a contagious or infectious disease which could infringe on the welfare of the other students or unit members. A student excluded from class under such conditions shall not return to the classroom until the condition which prompted the exclusion no longer exists.

D. The Board will provide for the reimbursement of any unit member for the destruction, or damage by arson burglary or vandalism of personal property used in schools of the District so long as the rules and regulations of the District are followed. The amount of reimbursement shall not exceed $1,000.00. The unit member shall list and notify the District office of each item or group of items valued in excess of $250.00.

E. A teacher has the right to suspend a student from his/her class for the day of the infraction and the day following for grounds enumerated in EC 48900 as a last resort when other means of correction fail to bring about proper conduct. S/he shall report the suspension to the building principal and shall send the student to the building principal for appropriate action.

F. Whenever monies are collected by the teacher, provision will be made for the teacher to turn the money in to the office.  In no event shall teachers be required to retain these monies overnight.

G. Teachers shall not be required to be responsible for custodial services.

H. The employer will furnish instructional and other necessary materials and equipment and such non-teaching employee services necessary to safely conduct the school.  Such material, equipment, and non-teaching services necessary must be mutually agreed upon by the teacher involved and the superintendent.  If the teacher wishes, s/he may appeal that decision to the Board.  The teachers will make effective, economical, and proper use of such materials.

# ARTICLE 21

## FRINGE BENEFITS

A. Effective January 1, 2008, the district will provide $495.42 per month, or $5954 annually, per eligible employee to be used in a district sponsored IRS 125 cafeteria plan. New employees hired on or after July 1, 2008, shall not have the option of participating in either sections 2 or 3 (TSA or cash), below. This plan will include two (2) tiers:

1. Health Benefits

   a. Choice of medical insurance:

      i. Kaiser Foundation Health Plan of Northern California
      ii. Blue Cross HMO and POS

   b. Delta Dental Plan of California

2. Fringe Benefits: any unused portion of the $380.00 (original rate) may be applied to the following items provided that the unit member subscribes to coverage in above or shows evidence that coverage is provided by another source.

   a. Cancer Insurance

   b. Disability Insurance

   c. Life Insurance

   d. And mutually agreed upon programs

3. The employee shall be permitted to receive a maximum of $250.00 of the $380.00 (original rate) as cash back provided the employee can show evidence of having a tax-sheltered annuity taken from his/her pay in the same or greater amount than the amount of cash back requested, and provided s/he shows evidence of health insurance coverage.

# ARTICLE 22

## CLASS SIZE

A. The class size objectives throughout the District are as follows:

| | |
|---|---|
| K-3 | 20* |
| 4-5 | 26 |
| 6-8 | 26 |

B. When class size exceeds the District's objectives, effort shall be made to provide assistance to the classroom teacher upon his or her request. Such assistance shall be through the hiring of aides or tutors, as the District's budget permits, including categorical funds, or through the recruitment of volunteer aides by the principal and/or the involved teacher.

C. After October 1st, no new inter-district transfers shall be accepted into classes which are over the objective size unless agreed to by teacher of impacted classroom.

D. Any time a teacher feels additional help is needed in the classroom, effort shall be made to provide such help through the hiring of aides or tutors, as the District's budget permits, including categorical funds, or through the recruitment of volunteer aides by the principal and/or the involved teacher.

E. Before the class lists are finalized or made public, the opportunity will be provided for teachers to review their lists and provide input on class makeup. The principal has the ultimate responsibility and makes the final decision on class makeup.

F. Any time a class or proposed class should exceed the "class size objectives" by two (2) or more students, a special meeting may be called at the request of either the principal or the teacher(s) affected. This meeting shall include the principal and all teachers affected. The parties at this meeting will make a good-faith effort to resolve this problem.


*Contingent upon continued state funding for class size reduction at the current ratio. In the event that the state funding ratio changes the District has the right to adjust class size for K-3 in accordance with this Article and state funding guidelines.

47

# ARTICLE 23

## REPORTING OF CHILD ABUSE

A. No later than the end of the first week of school, the district shall provide each teacher with a copy and explanation of the laws regarding the teacher's responsibilities of reporting child abuse and materials on how to recognize child abuse.

B. When a teacher notifies his/her immediate supervisor of an actual or potential case of child abuse, the supervisor shall provide immediate and positive assistance to that teacher in his/her fulfillment of legal responsibilities.  Such assistance shall include, but not be limited to, providing copies of the official report forms, agency addresses or telephone numbers, a quiet and private place to complete the forms, friendly and courteous assistance in the completion of the forms, and release time for the completion of the forms.

C. The District shall respect and maintain the confidentiality of all information on child abuse which a teacher reports to the appropriate authorities.

D. The District shall provide all necessary assistance to protect a teacher from attempted harassment or intimidation as a result of him/her having completed and submitted the necessary forms on child abuse.

E. The District shall provide legal assistance to a teacher who is involved in legal actions as a result of his/her reporting of child abuse.

# ARTICLE 24

## MISCELLANEOUS

A. Within thirty (30) days of ratification of the Agreement by both parties herein, the Association will provide the Employer with a Macintosh formatted copy of the contract. The Employer shall reproduce and deliver to the Association one copy for each member of the bargaining unit and an additional five copies for Association use.

B. The provisions of this Agreement shall not be interpreted or applied in a manner which is arbitrary, capricious, or unlawfully discriminatory. Rules which are designed to implement this Agreement shall be uniform in application and effect.

C. A teacher's notification to the Board that s/he intends to resign shall remain revocable until such time'as the Board officially takes action on such notification.

# ARTICLE 25

## PROFESSIONAL ASSISTANT PROGRAM (PAR)

A. Preamble

The Loma Prieta Teachers Association and the Loma Prieta Joint Union Elementary School District strive to provide the highest possible quality of education to the students of Loma Prieta. Both parties agree that optimum student performance can be achieved only if there is a fully-qualified teacher in every classroom. In order for students to succeed in learning, teachers must succeed in teaching. The Parties believe that all teachers, even the most skilled, must focus on continuous improvement in their professional practice. Therefore, the parties agree to cooperate in the design and implementation of a professional development program to improve the quality of instruction through expanded and improved staff development, peer assistance, and professional accountability.

Participating teachers recommended to the program are viewed as valuable professionals who are entitled to have resources available to them to enhance continuous performance improvement.

B. Peer Assistance and Review (PAR) Council

1. The PAR Council will consist of three (3) members. Members of the PAR Council will include 2 designees of LPTA, and one (1) selected by the Superintendent or Designee. The PAR Council will establish the operational procedures of the Council, including the method for the selection of a Chairperson.

2. The PAR Council will establish the meeting schedule. To hold meetings, all members of the PAR Council must be present. Such meetings may take place during the regular workday, in which event teachers who are members of the Council will be released from their regular duties without loss of pay.

3. The PAR Council shall be responsible for selecting Consulting Teachers, evaluating Consulting Teachers and their documentation, and providing in-service training for consulting teachers during the school year. Written confirmation of participation in PAR program will be provided by the PAR Council to participating teachers, referred teachers, Principals or immediate supervisors, and Consulting Teachers.

4. The PAR Council, either by consensus or majority vote, will adopt Guidelines for implementing the provisions of this Article. Said Guidelines will be consistent with the provisions of the Agreement and the law, and to the extent that there is an inconsistency, the Agreement will prevail and to the extent the Agreement is inconsistent with the law, the law will prevail.

5. The PAR Council will assign the Consulting Teacher to a participating teacher. The participating teacher has the right to meet the PAR Council to discuss the assignment of the Consulting Teacher within two weeks of notification.

6. It is intended that all documentation and information related to participation in the PAR Program be regarded as a personnel matter, and, as such, is subject to the personnel record exemption in Government Code 6250 et seq.

7. The PAR Council is responsible for evaluating annually the impact of the PAR Program in order to improve the program.

8. Serve 2 years staggered. Re-ups ok. PAR Council members will serve staggered, 2-year terms. Members may serve consecutive terms if elected.

9. Unit members shall receive stipend for work outside regular working hours.

C. Consulting Teachers

1. Minimum qualifications for Consulting Teacher:

   a. The Consulting Teacher must be a credentialed classroom teacher with permanent status or a Retired Teacher with at least five years experience.

   b. The Consulting Teacher must demonstrate exemplary teaching ability, have effective communication skills, and a broad knowledge of subject matter. They must also have the ability to meet student needs in different contexts.

   c. The Consulting Teacher must have the ability to work cooperatively and effectively with other teachers and administrators and demonstrate effective leadership skills.

2. A Consulting Teacher may be a permanent certificated teacher from another district.

3. Consulting Teachers shall be compensated as approved by the PAR Council.

4. The Consulting Teacher will not participate in evaluations of a Volunteer Teacher, Beginning Teacher, Referred Teacher or Experienced Teachers.

D. Participating Teachers

1. A Participating Teacher is a unit member who receives assistance and coaching, to improve instructional skills, classroom management, knowledge of subject and related aspects of teaching performance. All participation and information shall remain confidential.

2. There are four (4) categories of Participating Teachers.

a. Beginning Teacher (BT) Participants
   i.  In order to help new unit members successfully begin their careers in the District, all newly-hired unit members with less than two full years of fully credential teaching, experience will be required to participate in the PAR program.

b. Experienced Participants
   i   The purpose of the PAR program is to provide assistance and guidance to all teachers in staff and curriculum development.

   ii. The PAR program will provide a Consulting Teacher to implement specific academic needs defined and aligned to the goals of the district/school.

   iii. The Consulting Teacher will provide a process for whole groups, grade level, small group and/or individual assistance.

c. Referred Teacher Participants
   i.  The purpose of participation in the PAR program is to help correct job-related deficiencies and to assist the unit member in improving performance. Unit members who exhibit serious deficiencies in subject matter knowledge or teaching methodologies and have received an (Unsatisfactory rating) by the Principal on a certificated evaluation, shall be required to participate in the PAR program as an intervention.

d. Volunteer Teacher (VT) Participants
   i.  In the interest of improving ones teaching, teacher may volunteer to participate in PAR. All such requests shall go through the PAR Council. The purpose of participation in the PAR Program is only to receive a peer coaching experience. The Volunteer Teacher may terminate his/her participation in the PAR Program at any time without being required to state a reason for termination from the program.

F. Information obtained by the Consulting Teacher while assisting the Volunteer Teacher, Beginning Teacher, Referred Teacher or Experienced Teacher cannot be utilized in the certificated evaluation process and/or as the basis for mandatory participation in the PAR Program unless so requested by the Participating Teacher.

| | | 2014/2015 | | | | |
|---|---|---|---|---|---|---|
| | | **LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT** | | | | |
| | | **CERTIFICATED SALARY SCHEDULE** | | | | |
| | | | | | | |
| Starting Salary | $47,366.69 | | | | | |
| Step Increase (yrs. 1-12) | $2,244.85 | | | | | |
| Step Increase (yrs.13-21) | $987.77 | For Columns 30; 45; 60; 75 | | | | |
| YRS. 13-21 @ 90 UNITS ADD ADD'L | $460.49 | | | | | |
| 15 Unit increase | $2,244.85 | $1,122.43 | 45 Unit  column half way between 30 and 60 | | | |
| Masters Increase | $2,244.86 | | | | | |
| Top salary | $91,032.62 | | | | | |
| | | | | | | |
| | Non-Fully | Fully | | | | |
| | Credentialed | Credential Plus | | | | |
| **Step #** | * | **30 Units** | **45 Units** | **60 Units** | **75 Units** | **90 Units** |
| 1 | $47,365.60 | $47,366.69 | | | | |
| 2 | $47,365.60 | $47,366.69 | | | | |
| 3 | $47,365.60 | $47,366.69 | | | | |
| 4 | $49,610.45 | $49,611.54 | $50,733.99 | $51,856.41 | $54,101.28 | $56,346.14 |
| 5 | $51,543.33 | $51,825.21 | $52,978.84 | $54,101.28 | $56,346.14 | $58,591.01 |
| 6 | | $54,101.28 | $55,223.71 | $56,346.14 | $58,591.01 | $60,835.88 |
| 7 | | $56,346.14 | $57,468.58 | $58,591.01 | $60,835.88 | $63,080.74 |
| 8 | | $58,591.01 | $59,713.44 | $60,835.88 | $63,080.74 | $65,325.60 |
| 9 | | $60,835.88 | $61,958.30 | $63,080.74 | $65,325.60 | $67,570.47 |
| 10 | | $63,080.74 | $64,203.18 | $65,325.60 | $67,570.47 | $69,815.34 |
| 11 | | $65,325.60 | $66,448.04 | $67,570.47 | $69,815.34 | $72,060.22 |
| 12 | | $67,570.47 | $68,692.90 | $69,812.09 | $72,060.22 | $74,305.08 |
| 13 | | $68,558.26 | $69,680.68 | $70,803.12 | $73,047.98 | $75,753.35 |
| 14 | | $69,546.03 | $70,668.46 | $71,790.89 | $74,035.75 | $77,201.61 |
| 15 | | $70,533.80 | $71,656.23 | $72,778.67 | $75,023.53 | $78,649.88 |
| 16 | | | $72,644.00 | $73,766.44 | $76,011.30 | $80,098.15 |
| 17 | | | $73,631.78 | $74,754.21 | $76,999.08 | $81,546.42 |
| 18 | | | $74,619.55 | $75,741.99 | $77,986.85 | $82,994.67 |
| 19 | | | $75,607.33 | $76,729.76 | $78,974.63 | $84,442.95 |
| 20 | | | $76,595.11 | $77,717.55 | $79,962.41 | $85,891.22 |
| 21 | | | $77,582.88 | $78,705.52 | $80,950.18 | $87,339.49 |
| 22 | | | $78,570.66 | $79,693.09 | $81,937.95 | $88,787.76 |
| 3% increase effective 8/22/2007 | | | | | | |
| Add Step 22 effective 7/01/2011 | | | | | | |
| 1% increase effective 7/1/2014 | | | | | | |
| 4% Increase effective 7/1/2014 | | | | | | |

. 2015/16
## LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT
## CERTIFICATED SALARY SCHEDULE

| Step # | Non-Fully Credentialed | Fully Credential Plus 30 Units | Fully Credential Plus 45 Units | Fully Credential Plus 60 Units | Fully Credential Plus 75 Units | Fully Credential Plus 90 Units |
|---|---|---|---|---|---|---|
| 1 | $48,312.91 | $48,314.02 | | | | |
| 2 | $48,312.91 | $48,314.02 | | | | |
| 3 | $48,312.91 | $48,314.02 | | | | |
| 4 | $50,602.66 | $50,603.77 | $51,748.67 | $52,893.54 | $55,183.31 | $57,473.06 |
| 5 | $52,574.20 | $52,893.52 | $54,038.42 | $55,183.31 | $57,473.06 | $59,762.83 |
| 6 | | $55,183.31 | $56,328.18 | $57,473.06 | $59,762.83 | $62,052.60 |
| 7 | | $57,473.06 | $58,617.95 | $59,762.83 | $62,052.60 | $64,342.35 |
| 8 | | $59,762.83 | $60,907.71 | $62,052.60 | $64,342.35 | $66,632.11 |
| 9 | | $62,052.60 | $63,197.47 | $64,342.35 | $66,632.11 | $68,921.88 |
| 10 | | $64,342.35 | $65,487.24 | $66,632.11 | $68,921.88 | $71,211.65 |
| 11 | | $66,632.11 | $67,777.00 | $68,921.88 | $71,211.65 | $73,501.42 |
| 12 | | $68,921.88 | $70,066.76 | $71,211.65 | $73,501.42 | $75,791.18 |
| 13 | | $69,929.43 | $71,074.29 | $72,219.18 | $74,508.94 | $77,268.42 |
| 14 | | $70,936.95 | $72,081.83 | $73,226.71 | $75,516.47 | $78,745.64 |
| 15 | | $71,944.48 | $73,089.35 | $74,234.24 | $76,524.00 | $80,222.88 |
| 16 | | | $74,096.88 | $75,241.77 | $77,531.53 | $81,700.11 |
| 17 | | | $75,104.42 | $76,249.29 | $78,539.06 | $83,177.35 |
| 18 | | | $76,111.94 | $77,256.83 | $79,546.59 | $84,654.56 |
| 19 | | | $77,119.48 | $78,264.36 | $80,554.12 | $86,131.81 |
| 20 | | | $78,127.01 | $79,271.90 | $81,561.66 | $87,609.04 |
| 21 | | | $79,134.54 | $80,279.43 | $82,569.18 | $89,086.28 |
| 22 | | | $80,142.07 | $81,286.95 | $83,576.71 | $90,563.52 |

Masters Stipend               $2,289.76

ADOPTED: February 10, 2016

54

MEMORANDUM OF UNDERSTANDING
Between
LOMA PRIETA Jt. UNION SCHOOL DISTRICT
And
LOMA PRIETA TEACHERS ASSOCIATION, CTA/NEA

Re:  Teacher Leaders Pilot Project

The parties agree that during the 2014-2015 school year there will be one Teacher Leader appointed by the Superintendent/Principal at Loma Prieta Elementary School and one Teacher Leader appointed by the Superintendent/Principal at C.T. English Middle School.  The role of the Teacher Leaders is to increase communication, to support continuity of programs, to develop leadership skills and to ensure student success.  The Teacher Leaders will attend weekly Cabinet meetings and Board meetings as well as Faculty meetings.  In order to compensate the Teacher Leaders for increased duties beyond the regular school day, each Teacher Leader will be paid a stipend of $5,000 to be paid in two installments in December and May.   The duties of the Teacher Leaders include the following:

**Communication between stakeholders:**
Calendar of events (Teacher to Teacher (T2T), SST, deadlines, events, etc.)
Newsletter updates
Student concerns
Teacher concerns
Staff development needs and opportunities
Operational issues between departments (technology, special education, etc.)

**Staff Development**
New teacher support and orientation
New staff support and orientation (Go-to person for AP)
Cultural and climate support
Power School/Report card training
Facilitate teachers meetings
Wednesday collaboration priorities and support

**Program Continuity**
Student activities (SOTW, assemblies, student council, etc.)
SST/IEP processes
Site based scheduling awareness (yard duty, library, tech lab, PE, etc.)
Site based programs (tutorial, project cornerstone, enrichment, etc.)
Rules and traditions: *The Loma and CT Way*

**Student support**
First level discipline and parent communication
At-risk student referral
Enrichment/activities
Assemblies

The Teacher Leader Program is a Pilot Project that will terminate June 30, 2015 unless the parties mutually agree to extend it for another year or to retain it.

Date _4/22/14_

Date _4/22/14_

KRIS DENUES, for LPTA

COREY KIDWELL,
Superintendent

LISA VIELER, for LPTA

# Memorandum of Understanding
April 16, 2015
Loma Prieta Teachers Association
And
Loma Prieta Joint Union School District

Evaluation Option:

Unit members who have permanent status and whose most recent formal evaluation was deemed "Satisfactory" may elect to participate in this alternative evaluation option.

Each eligible unit member will meet with his/her primary evaluator not later than October 1 to identify his or her plan for the evaluation cycle.

Plan: An alternative Evaluation Option shall contain the following:
1. A specific goal the member hopes to achieve during the evaluation cycle.
2. A method for achieving this goal, which may include, but is not limited to, video-taping and feedback journaling; development of a unit or lessons to deliver curriculum that has not previously been taught or is being taught using a new methodology; a joint evaluation project working with another bargaining unit member to create curriculum and/or lessons; a study to analyze student performance and determine how to move student achievement forward.
3. A timeline that includes two "status check" meetings with the primary evaluator, one to occur before winter break, one to occur before the February break. Establishing these meetings is the responsibility of the unit member.
4. The final meeting to review the result of the evaluation process shall include a 1 page summary, and whatever appropriate support materials have been agreed upon by the parties, and this meeting shall occur not later than May 1.

Should the final meeting result in the primary evaluator signing off on the evaluation as "satisfactory", the unit member shall be off cycle. Should the evaluation be deemed as "unsatisfactory", the unit member shall be placed on a traditional evaluation cycle for the following year. Should the evaluation be incomplete, the parties may agree to continue this process for a second year.

| | |
|---|---|
| _For the District_ | 4/16/15 _Date_ |
| _For the Association_ | 4/16/15 _Date_ |
| _For the Association_ | 4/16/15 _Date_ |

# EXHIBIT
# "B"

01054547.WPD

**Virginia Yao**

| | |
|---|---|
| **From:** | William Becker <freedomxlaw@gmail.com> |
| **Sent:** | Wednesday, September 7, 2022 8:24 AM |
| **To:** | Lindsay A. Goulding |
| **Cc:** | Virginia Yao; Tatiana Bush |
| **Subject:** | Re: Kissner v. McVoy |

**\*\*\*External email\*\*\***

No judgment has been entered. We may appeal when it is. Dismissal without prejudice will be filed at the appropriate time.

Sent from my iPhone
May have been dictated and may contain typos


Bill Becker

President/CEO/Chief Counsel
www.freedomxlaw.com



Freedom X is registered with the IRS as a 501(c)(3) charitable non-profit.
Your donations are tax-deductible.

11500 Olympic Blvd., Suite 400 | Los Angeles, CA 90064
Tel: (310) 636-1018 | Toll Free: (866) 649-6057 | Google Voice (747) 900-1677 | Fax: (310) 765-6328


Confidentiality Notice: This electronic mail message (including attachments) is covered by the Electronic Communications Privacy  Act, 18 U.S.C. §§ 2510-2521, is confidential and may be legally privileged.  If you are not the intended recipient, you are hereby  notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited.  Please reply to the  sender that you have received the message in error, or please call the sender at (310) 636-1018 and then delete this email from  your system.  Thank you.


On Sep 7, 2022, at 8:08 AM, Lindsay A. Goulding <lgoulding@porterscott.com> wrote:


You can, actually.  It happens all the time.



*Lindsay A. Goulding*
Attorney | Shareholder
350 University Avenue | Suite 200 | Sacramento, CA 95825
T| 916. 929. 1481 x 311 F| 916. 927. 3706
www.porterscott.com

**CONFIDENTIALITY NOTICE:** This email and any attachments are confidential and privileged. Any inadvertent disclosure shall not waive the attorney-client or work product privileges. If you have received this email in error, please notify the sender immediately and delete all copies of the email and any attachments.

---

**From:** William Becker <freedomxlaw@gmail.com>
**Sent:** Tuesday, September 6, 2022 5:58 PM
**To:** Lindsay A. Goulding <lgoulding@porterscott.com>
**Subject:** Re: Kissner v. McVoy

**<span style="color:red">***External email***</span>**


We can't dismiss a complaint we haven't served.

Sent from my iPhone
May have been dictated and may contain typos



Bill Becker


President/CEO/Chief Counsel
www.freedomxlaw.com



Freedom X is registered with the IRS as a 501(c)(3) charitable non-profit.
Your donations are tax-deductible.

11500 Olympic Blvd., Suite 400 | Los Angeles, CA 90064
Tel: (310) 636-1018 | Toll Free: (866) 649-6057 | Google Voice (747) 900-1677 | Fax: (310) 765-6328


Confidentiality Notice: This electronic mail message (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, or please call the sender at (310) 636-1018 and then delete this email from your system. Thank you.

On Sep 6, 2022, at 5:07 PM, Lindsay A. Goulding <lgoulding@porterscott.com> wrote:

Bill,

Please confirm that the attached State Court Complaint will be immediately dismissed with prejudice in light of the Federal Court's ruling.



*Lindsay A. Goulding*
Attorney | Shareholder
350 University Avenue | Suite 200 | Sacramento, CA 95825
T| 916. 929. 1481 x 311 F| 916. 927. 3706
www.porterscott.com

**CONFIDENTIALITY NOTICE:** This email and any attachments are confidential and privileged. Any inadvertent disclosure shall not waive the attorney-client or work product privileges. If you have received this email in error, please notify the sender immediately and delete all copies of the email and any attachments.