# BEFORE A
# COMMISSION ON PROFESSIONAL COMPETENCE
# LOMA PRIETA JOINT UNION SCHOOL DISTRICT
# STATE OF CALIFORNIA

## In the Matter of the Dismissal of:

## DAVID KISSNER, A Permanent Certificated Employee,

## Respondent.

## OAH No. 2021050291

## DECISION

A Commission on Professional Competence (Commission) heard this matter by videoconference on October 4, 5, 6, 8, 11, 12, 13, 14, 15, 25, and 28, 2021. The Commission's members were Katherine Everett, Santa Clara County Office of Education; Scott Guagliardo, Downtown College Prep (San Jose); and Administrative Law Judge Juliet E. Cox, State of California, Office of Administrative Hearings, who presided.

Attorneys Brian D. Bock and Amanda S. Georgino represented the Loma Prieta Joint Union School District.

Attorneys William J. Becker, Jr., and Jeremiah D. Graham represented respondent David Kissner, who was present throughout the hearing.

The Commission received oral opening statements, testimonial and documentary evidence (including audio and video recordings), and oral closing

arguments. The record was held open to permit the Commission to review evidence
and to deliberate in executive session. The record closed and the matter was
submitted for decision on November 10, 2021, at the conclusion of the Commission's
deliberations.

## FACTUAL FINDINGS

1.      Respondent David Kissner holds a clear single subject credential
authorizing him to teach mathematics.

2.      The Loma Prieta Joint Union School District is a small school district in
the Santa Cruz mountains, between Los Gatos and Santa Cruz. It includes two schools
on a single campus: Loma Prieta Elementary School and C.T. English Middle School.
The District serves about 500 students and employs about 30 teachers.

3.      Respondent began teaching mathematics and physical science in the
District in fall 2012. Except for the assignment described below in Finding 46,
respondent taught in the District's C.T. English Middle School.

4.      In February 2021, the District's Board of Trustees (Board) received a
statement of charges against respondent from District superintendent Lisa Fraser, and
voted to seek respondent's dismissal from employment. Respondent timely requested
a hearing.

5.      In June 2021, the Board approved an amended statement of charges
against respondent. The amended statement of charges alleges numerous incidents
involving respondent and bearing on his fitness for continuing service. The District
characterizes these incidents, separately or together, as cause under the Education

2

Code to dismiss respondent from employment for immoral conduct, for evident unfitness for service, and for persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools.

## Respondent's Education and Professional Experience

6.     Respondent grew up in the San Jose area. After graduating from high school in San Jose, respondent attended the United States Naval Academy.

7.     Respondent graduated from the Naval Academy in 2002, and served five years in the United States Marines.

8.     After completing his military service, respondent traveled extensively. He then decided to pursue a teaching career, and obtained the credential described above in Finding 1.

9.     Respondent started his teaching career with the Santa Clara County Office of Education. He taught mathematics in an alternative community school, and as a long-term substitute in Santa Clara County juvenile incarceration facilities.

10.     In the District, respondent's initial assignment was to teach mathematics and science in sixth grade. He also has taught mathematics to seventh-grade students. The evidence did not establish respondent's science assignments for the District in detail, but did establish that he taught at least one middle school science class each school year except for the 2018–2019 school year. Respondent coached C.T. English Middle School's wrestling team.

## Timeline of Investigations and Related Events

11.     In March and April 2018, respondent and the District garnered regional and national media attention because of conflict within the District and the community over a nationwide political event to draw attention to gun violence in schools.

12.     Some witnesses testified that they respected respondent's position in this conflict. Respondent testified, however, that most of his teaching colleagues disagreed with his position, and that several became very unfriendly to him as a result of the conflict and media attention. Respondent's visibility in the news media on this issue also caused him to receive hostile criticism through social media, both from people he knew in the community and from strangers.

13.     The District conducted an investigation into the conflict described in Findings 11 and 12. After this investigation, the District took no disciplinary action against respondent for his actions relating to this conflict.

14.     Also in late March or early April 2018, the Board received an anonymous letter making several serious allegations about respondent's behavior outside the school setting. Respondent believes that he knows who wrote the letter. He testified, plausibly although without corroboration, that the author is a community member who wished to damage his career and his reputation because of the conflict described above in Findings 11 and 12.

15.     Regardless of the author's motive, the allegations stated in the anonymous letter warranted investigation by the District. As described in greater detail in Findings 28, 29, and 71, below, the District's investigation of these allegations revealed evidence supporting some of the allegations. The investigation did not substantiate the letter's most serious allegations.

4

16.     At the end of the 2017–2018 school year, the District's former superintendent, Corey Kidwell, retired. Fraser became the District's superintendent beginning July 1, 2018, and Karren Zook became principal of the District's two schools.

17.     District administrators did not conclude that the investigation described in Finding 15 had revealed misconduct warranting respondent's dismissal from employment. In October 2018, Fraser delivered a letter to respondent summarizing what the investigation had shown, and warning respondent that further behavior similar to the substantiated allegations would result in disciplinary action.

18.     Respondent pressed Fraser during the 2018–2019 school year for further action or communication about the conflict described above in Findings 11 and 12, but Fraser told respondent that the District's Board members and administrators preferred not to "re-hash" that conflict. The evidence did not show that any District administrator raised further concerns with respondent about his on-campus or off-campus conduct during the 2018–2019 school year. In April 2019, however, respondent began an effort to obtain detailed public records from the District regarding the investigations described above in Findings 13 and 15, and this effort continued throughout the summer.

19.     On May 9, 2012, the Board adopted Board Policy 4119.21, concerning professional standards for employees. This policy, which was in evidence, was in effect during most of respondent's tenure with the District. In February 2020, the Board adopted revisions to Board Policy 4119.21, but the policy as revised was not in evidence.

20.     Zook retired as principal of the District's schools on June 30, 2020. Billy Martin replaced Zook as principal beginning July 1, 2020.

5

21.     The Board placed a local tax measure (Measure N) on the ballot for the November 2020 election. In December 2019, respondent had informed Fraser that he intended to oppose any such tax measure. Respondent was prominent in the campaign against Measure N, including by debating the measure in social media and by recording videos and releasing them through social media channels explaining his opposition to the measure. In mid-December 2020, certified election returns confirmed that Measure N had failed.

22.     Respondent's advocacy against Measure N drew negative reactions from some community members, including from at least one member of the Board. Respondent experienced these reactions chiefly through social media and through gossip. As described below in Findings 76 and 77, however, the District also received some complaints about respondent's teaching performance during this time from parents whom respondent understood to disagree with his position on Measure N.

23.     Respondent's wife ran for the Board in the November 2020 election. She was not elected.

24.     Soon after the November 2020 election, a Board member who had won re-election resigned. The remaining Board members voted to appoint a replacement, but respondent and some other members of the community advocated in early 2021 for the District instead to conduct a special election to replace the Board member.

25.     On February 22, 2021, because the Board had voted to seek respondent's dismissal from employment, District administrators notified respondent's students' families that respondent would be on leave for the rest of the 2020–2021 school year.

26.     In early March 2021, the District received statements in writing regarding the events described below in Findings 30 through 44. After investigation, the District

6

amended the statement of charges against respondent to allege those events as additional grounds to dismiss respondent from employment.

## Alleged Grounds for Dismissal

27.     As amended, the District's statement of charges against respondent includes allegations spanning about three years. The evidence at hearing did not address some allegations at all, and was not conclusive as to others. Any allegations that were in dispute at the hearing but that the Commission has not addressed explicitly in this decision were not proven by a preponderance of evidence, and did not affect the Commission's decision.

### FURNISHING ALCOHOL TO TEENS

28.     The anonymous letter described above in Finding 14 stated that respondent had served alcohol to at least three teenage boys during camping trips.[1] It also stated that respondent had "admitted to doing it one time."

29.     During the investigation described above in Finding 15, respondent repeated his admission that he had served alcohol to a teenage boy during a camping trip. The letter described above in Finding 17 referred to this admission, and warned respondent that "any further report of providing alcohol to a minor will result in

---

[1] The letter described some such trips as having been "through CT English." This description was false. For many years, but never as a District activity, respondent has organized camping trips that sometimes include teens who attend without parents.

further corrective action up to and including criminal charges and/or possible termination of your employment."

30.    In April 2019, respondent organized a week-long group camping trip to Death Valley. About 30 people in total were in the group. Some participants were adult friends of respondent's family, who attended with their children. Ten or twelve of the participants were teens who attended without their parents.[2]

31.    The group had organized into several cars and trucks, with a trailer to haul food, water, and cooking and sleeping gear. In Death Valley, the trailer suffered serious damage to a "leaf spring" (part of its suspension). Respondent decided that he needed to obtain a replacement spring, and to repair the trailer, as soon as possible.

32.    Respondent asked four unaccompanied teens, all boys, to come with him on this errand, while the rest of the group continued on to a campsite in the remaining cars and trucks. These boys were Maxwell Cunningham (age 16), Boz Freiling (age 15), Andrew Peck (age 17), and Joey Vierra (age 17).

33.    Earlier in the trip, before the trailer damage, respondent had chastised Peck and Vierra for walking away from the rest of the group to smoke cannabis. They had brought cannabis on the trip despite respondent's explicit pre-trip instruction to

_____

[2] Respondent stated that he maintains a "mailing list" about his trips, and several witnesses used the term "advertise" to describe how respondent distributed information about upcoming trips. The District does not allege that the trips themselves or respondent's general practices in organizing them (such as financial arrangements, insurance, safety protocols, or parental communications and permissions for unaccompanied minors) are cause for his dismissal.

them not to bring alcohol or other recreational drugs. Respondent waited until after the group had returned from Death Valley to tell Peck's and Vierra's parents about their sons' misbehavior.

34.     Respondent explained several reasons for having chosen to take these boys along on the trailer repair mission, including that the remaining vehicles would not have space for them, and that he thought he might need their labor to make the repair. He also noted that because Peck and Vierra already had disobeyed his reasonable instructions (as described in Finding 33), he did not want to foist responsibility for supervising them onto the trip's other adults.

35.     After making several telephone calls, respondent determined that the closest place to obtain a replacement leaf spring for the trailer would be in Las Vegas. He also learned, however, that the store would close for the day before he and the boys would be able to get there. Respondent decided to drive with the four boys to Las Vegas, spend the night in a hotel, buy the spring as soon as the store opened the next morning, and then return to Death Valley to repair the trailer.

36.     Respondent did not speak personally to any of the four boys' parents about their new itinerary. He testified that he asked the boys to call their parents on the way, to tell their parents where they were going.

37.     The group arrived in Las Vegas after dark. Respondent had reserved a single room for the group at a hotel on the Las Vegas Strip. Before they checked into the hotel, respondent stopped at a convenience store and bought a bottle of whiskey.

38.     The evidence did not establish that respondent purposely alerted any of the boys that he had stopped at the convenience store for alcohol. At the same time, Peck and Vierra understood correctly that respondent had bought alcohol.

9

39.     When the group arrived in the hotel room, respondent took a shower. The boys took turns showering after respondent. Meanwhile, respondent served himself some whiskey and began either to watch television or to read from bed.

40.     After showering, Cunningham and Freiling got into sleeping bags and went to sleep. Peck and Vierra did not go to bed right away, but neither Cunningham nor Freiling testified to having seen or heard what Peck and Vierra did after showering and before going to bed.

41.     Peck, Vierra, and respondent gave conflicting testimony about what they did next. According to Peck and Vierra, respondent allowed them to share his whiskey, and told them that they could leave the room to see the Las Vegas Strip as long as they returned within 30 minutes. According to respondent, he neither offered the boys whiskey nor left it where they could access it, and told them that they should not leave the room. None of this testimony is completely credible.

42.     Peck and Vierra drank some of respondent's whiskey. The evidence did not establish that respondent encouraged them to drink it, or even that he knew that night that they had taken some. Nevertheless, after bringing whiskey to the hotel room, respondent took no effective steps to stop Peck and Vierra from consuming it.

43.     Peck had never visited Las Vegas before. He and Vierra told respondent that they intended to leave the hotel room whether or not respondent approved. They did leave, and spent between two and four hours exploring the Las Vegas Strip on foot. The evidence did not establish that respondent encouraged or even approved their leaving the room. Nevertheless, respondent did not inform Peck's or Vierra's parents of their sons' plan, and he did not stop Peck and Vierra from going out.

10

44.     Peck and Vierra returned to the hotel room before dawn. In the morning, the group left the hotel, bought the leaf spring, returned to Death Valley, and repaired the trailer.

45.     Peck told his father a few days after returning from the trip that respondent had taken the boys to Las Vegas, and that Peck and Vierra drank whiskey and then walked around the Strip unsupervised at night. Peck's and Vierra's mothers later discussed the matter with one another and among their friends, and eventually brought it to the District's attention as described above in Finding 26.

### 2020–2021 7TH GRADE ALGEBRA COURSE

46.     During the 2018–2019 school year, the District assigned respondent to teach mathematics to fifth-grade students who were ready for more challenging mathematics instruction than the rest of their classmates. He taught these students during their regular class times, in groups separate from the rest of their classes.

47.     During the 2019–2020 school year, respondent continued teaching above-grade-level mathematics to some of his sixth-grade students, most or all of whom were the students he had taught in fifth grade during the previous school year. Until mid-March, respondent offered this enrichment through a combination of before-school meetings and work during their regular class, sometimes with a parent volunteer.

48.     In mid-March 2020, the District began using videoconference learning because of the COVID-19 pandemic. Respondent concluded that because remote

learning severely limited his instructional time with students,[3] and also interfered with his ability to separate students into small groups for focused work, he could not continue offering different in-class instruction to subsets of his sixth-grade mathematics students. Instead, until the end of the 2019–2020 school year, respondent taught these students in a separate videoconference class period.

49.     Remote instruction continued for the 2020–2021 school year. Respondent and some of these accelerated students' parents made several proposals to Martin and Fraser about how to serve these students in a videoconference setting without neglecting respondent's other students. Martin and Fraser deemed these proposals either impractical or inadvisable. The District began the 2020–2021 school year by placing these students in respondent's regular seventh-grade math course (Math 7, a pre-algebra curriculum), but encouraging them to undertake additional extracurricular math enrichment activities to prepare them to "test into a year-long Geometry course" for eighth grade.

50.     With respondent's assistance, a Los Gatos High School student who had been respondent's student during middle school set up a videoconference mathematics tutoring program for the 2020–2021 school year. They called this program the Mountain Math Initiative (MMI), and announced that respondent would teach an algebra course through MMI to interested students beginning August 31.

---

[3] Before the COVID-19 pandemic, respondent spent 270 in-person minutes each week with a class, over five sessions. Remote learning offered him and each class only 70 videoconference minutes together per week, in two sessions.

51.     Many if not all of respondent's accelerated seventh-grade students signed up for the MMI algebra course. Respondent did not use the District's videoconferencing or virtual classroom services for the MMI course, and he did not use students' District email addresses for day-to-day communication about the MMI course. He taught the course in the mid- to late afternoon, after the C.T. English Middle School instructional day had ended.

52.     Respondent told students who were in his C.T. English Middle School Math 7 course, and who also had signed up for the MMI after-school algebra course, that they did not need to attend both class sessions. He told these students, and their parents, that he would treat the students as having attended their videoconference C.T. English Middle School Math 7 class, even if they had not, if they attended the videoconference MMI class instead. He also told parents and students that students' participation and performance in the MMI algebra course would qualify them for full Math 7 credit at C.T. English Middle School.

53.     Martin struggled at the beginning of the 2020–2021 school year to communicate clear remote-learning attendance requirements to parents and students, and attendance-taking protocols to teachers. By mid-September 2020, however, Martin learned that respondent had given his students and their parents the messages summarized above in Finding 52.

54.     On September 9, 2020, Martin stated to respondent by email, "Students are still expected to adhere to school attendance policies set by current CDE [California Department of Education] guidance and are not to be directed to 'skip' their CT math courses if participating in MMI outside of school." On September 14, 2020, Martin told respondent by email, "A parent contacted me concerned that their student was told they do not have to attend their CT class if they are participating in the MMI program.

You and I talked in person about this. I just wanted to make sure this isn't a reocurring issue."

55.    The issue recurred. On October 8, 2020, Martin told respondent by email that Martin had met with several parents about "current attendance/participation concerns," and had explained to those parents that

> 1. All students are required to attend the CTE [C.T. English] courses in which they are enrolled following current CDE guidelines;
>
> 2. All students are required to complete the work assigned to them by their CTE teachers during the course of their CTE classes;
>
> 3. Only work and assessments assigned through the course of CTE classes may count toward grades received at CTE;
>
> 4. Students intending to enroll in Geometry 8 are still required to receive an A/A- in Math 7 as a prerequisite;
>
> 5. Mountain Math Initiative is enrichment and cannot in any way supplant/replace CTE math courses;
>
> 6. Attendance in Mountain Math Initiative does not count as attendance for a student's CTE courses.

Martin also directed respondent to send Martin "a list of students with whom attendance at CTE may have been communicated as optional or who believe

14

participation in Mountain Math Initiative counts as attendance/participation for their CTE classes."

56.     Respondent did not send Martin any such list. Instead, he sent Martin a complete roster of his Math 7 students. Respondent also sent Martin a lengthy email response explaining why he intended to continue treating his MMI algebra class as equivalent to the C.T. English Middle School Math 7 class.

57.     Martin replied by reiterating to respondent on October 14, 2020, "I have been informed by several parents that their child has been told by you that they are not required to attend their CT math course if they are participating in Mountain Math Initiative and that the work done and the grade earned for that after school enrichment course will be applied to their CT math course. . . . This is the action I need to make clear is not acceptable practice."

58.     In mid-October 2020, respondent stopped teaching the after-school MMI algebra course. He continued teaching this course to the same students during the C.T. English Middle School instructional day. Rather than teaching these students during the regular twice-weekly Math 7 time period, however, respondent taught this algebra course three days per week, during a time the District had designated as "office hours" for teachers to meet with students individually or in small groups. He began using a District virtual classroom; but he did not use his District videoconference account for the class sessions, and he continued to communicate with students about the class using personal rather than school email addresses.

59.     Later in 2020, the District offered some seventh-grade students the opportunity to switch from respondent's Math 7 class into a C.T. English Middle School algebra class with a different teacher. Some, but not all, of the students to whom

15

respondent had been teaching algebra through MMI and later during his office hours made this switch.

60.    Respondent testified, credibly but tangentially, that he "was never directed to stop teaching algebra." As described above in Findings 54 through 57, however, Martin directed respondent clearly and repeatedly in fall 2020 to stop telling parents and students that respondent's extracurricular algebra course was a credit alternative to Math 7, and to stop treating the course as a Math 7 alternative. Nevertheless, until the District placed respondent on leave in February 2021, respondent continued to communicate to students and their parents that his office hours algebra course was equivalent, and alternative, to Math 7.

### REMOTE TEACHING DURING COVID-19 PANDEMIC

61.    On August 26, 2020, Fraser received a report by email suggesting that respondent was conducting in-person teaching for District students at one or more locations outside the District's schools. The email to Fraser stated,

> For older kids (usually 10+ unless accompanied by a
> parent), Kissner is organizing 3 Remote Wilderness School
> camps this fall . . . . "We will provide a structured time and
> place for school on each school day during school hours,
> with electrical power. All locations have strong verizon
> signal for hotspots. Plenty of outdoor activities for after
> school and on the weekends. We will also provide the food,
> shelters, evening campfire routine, opportunity for activities,
> etc. Priority is work and school during these trips—but it is

16

nice to work in these beautiful places and have so many
cool things to do when the homework is done!"

62.    Respondent acknowledged at the hearing having written and circulated
the description that appeared within quotation marks in the email Fraser received. He
testified that the remainder of the report to Fraser paraphrased his announcement,
rather than quoting it. When Fraser received this report, however, she had no way,
other than by asking respondent, to clarify what his announcement had said or what
his remote teaching plans might be.

63.    Fraser emailed respondent to ask these questions. Her email noted that
respondent appeared to be planning group travel "in conflict with regular school hours
for kids and contracted hours of employment for you, which could pose a variety of
complex issues if this is accurate." She asked respondent promptly to "provide a
description of the proposed activities you have planned during school hours such that
we can properly evaluate the legality of your proposition from a district standpoint
and to provide you with advice and counsel such that you are protected from personal
liability as well."

64.    In answer, respondent did not provide any such description. Instead, he
stated simply that he would not "share details" about his "private life" with Fraser.

65.    Fraser provided a further memorandum to respondent regarding this
issue on August 28, 2020. Her memorandum advised respondent that the Board's
pandemic school plan gave him "no permission nor the authority to conduct an out-
of-area, in-person learning cohort which violates state and public health department
regulations." She also stated that "[t]aking **some** students out of the state during
school hours for unsanctioned learning activities that are clearly inaccessible to your

17

other students creates a whole host of instructional inequities that the district will not endorse" (emphasis original).

66.     On November 3, 2020, Fraser and Martin received a further report by email to the effect that respondent was "planning another lengthy (3 week) trip in November." Fraser sent respondent another memorandum on November 5, 2020, about these activities. It stated that the District was "not requiring you to cease such activities, but rather to closely review and provide written responses to the issues raised herein." The memorandum listed 20 questions about respondent's plans, and asked him "to promptly provide us with information" answering the questions. The questions were detailed, and reflected then-common public health anxiety about COVID-19. In substance, however, the questions were reasonable.

67.     Respondent did not answer any of Fraser's questions clearly. Instead, his response by email on November 7, 2020, stated,

> Thank you for your email outlining your concerns. I am confident that
>
> • I have been—and will continue to—fully meet (and exceed) my professional obligations equitably to all my students.
>
> • Nothing about my physical location or the people that happen to be in my vicinity have any impact on my performance of my professional duties.
>
> • There is nothing about my physical location or the people that happen to be in my vicinity that has anything to do with the district.
>
> • I am not in violation of any laws or district policies.

18

68.     Respondent testified to the Commission that he organized three group camping trips during fall 2020 during which he taught his District classes from a tent. Each trip included one or more other families, and two of the three trips included high school students who attended without any parent. Respondent testified that no trip included any District students who attended without their parents, but that at least one trip included District students who traveled with one or both of their parents. During the school day, respondent's wife and other adults on the trip supervised and assisted any students in their school activities.

69.     Respondent also testified that he regrets having given Fraser such terse answers to her questions, and believes in hindsight that he should have been more forthcoming in addressing her concerns. He also testified, however, that at the time he considered his remote teaching plans to be "none of Ms. Fraser's business."

70.     The evidence did not establish that respondent's camping trips caused him to neglect or to fail in any of his duties as a District employee. The evidence also did not establish that respondent taught any District student in person on any camping trip, while teaching other students by videoconference. Finally, the evidence did not establish that respondent represented to anyone, or that anyone actually believed, that the District had endorsed his trips or that he was offering supervision to children in his capacity as a District employee.

### RESISTANCE TO SUPERVISION

71.     The October 2018 letter described above in Finding 17 advised respondent that some of the allegations the District had investigated and found true

19

reflected "either a lack of professional boundaries or questionable teaching practices."[4] It also advised respondent to be mindful of the possibility that parents or children could misperceive his mentorship as inappropriate sexual interest, and offered "a list [from the National Education Association] of common-sense pointers for avoiding false allegations which you may be wise to review and consider in your future interactions with youth."

72.     Respondent himself testified, credibly and reasonably, that he took great offense to the implication that his commitment to teaching and mentoring teens reflects sexual interest. Yet rather than considering Fraser's advice about avoiding even the appearance of impropriety, respondent answered her October 2018 letter with a four-page, single-spaced memorandum insisting that he always maintained appropriate boundaries, that he intended to change nothing about his behavior, and that every aspect of the anonymous letter and the District's resulting investigation was "the very definition of a witch hunt."

73.     After October 2018, respondent repeatedly invoked the spring 2018 political controversy and anonymous letter, and the resulting investigations, in response to Zook's, Martin's, and Fraser's efforts to investigate complaints or concerns about his activities. For example,

---

[4] Respondent admitted, for example, having offered a "binder clip" to a middle school boy who had asked permission to leave class to use the restroom. Respondent did not say that he had told the boy directly to put the clip on his penis, but acknowledged that he had intended "subtle innuendo."

a.     Respondent relied on these past conflicts in declining to provide information to Fraser relating to the complaint described below in Finding 81. He reiterated these objections in a memorandum on April 3, 2020, stating "Superintendent Fraser did not have the benefit of hearing from me on this matter because I refused to participate in her inquiry."

b.     Respondent relied on these past conflicts in declining to provide information to Zook relating to the complaint described below in Finding 82. He reiterated these objections in a memorandum on April 3, 2020, stating "Principal Zook did not have the benefit of hearing from me on this matter because I refused to meet with her to discuss it."

c.     On January 19, 2021, respondent answered email from Martin asking again about respondent's office hours algebra class by stating "I do not participate in any district-led investigations or inquiries based on the district's history of abusing this process and failure to address the issue. Your inquiry fits in this category."

74.     In fall 2020, respondent recorded and released on social media a 37-minute video urging viewers to vote against Measure N. He spent much if not most of the video's duration explaining his continuing unhappiness about the spring 2018 political controversy, the anonymous letter, and the resulting investigations, and reiterating his unwillingness to put those conflicts to rest.

75.     The matters stated in Findings 42, 43, 52, 56, 58, 60, 64, 67, 69, and 72 through 74, as well as respondent's presentation to the Commission, confirmed that neither respondent's behavioral patterns nor his views about the District's authority to advise or supervise him have changed since October 2018.

21

## PANDEMIC GRADING

76.     During fall 2020, some of respondent's students' parents complained to him and to Martin that respondent had not provided timely feedback to students on their class performance.

77.     At the hearing, respondent characterized all of these parents as community members who disagreed with his political positions, and in particular with his position on Measure N. No non-hearsay evidence either corroborated or refuted respondent's belief about these parents' political opinions, or his belief that political disagreement rather than educational concern had motivated their complaints.

78.     Respondent replied to some of these parents about their concerns. He told one parent that he was "tardy" in updating students' grades because he also was busy "answering insane amounts of emails, and [doing] other time-consuming admin tasks like attendance that take all day." He also blamed some students' poor work habits for his inability to give the students timely feedback. These answers were unprofessional in tone, because they deflected parents' concerns about respondent onto students and onto District administrators.

79.     Many of respondent's colleagues also struggled somewhat to adapt to remote learning, particularly during the first half of the 2020–2021 school year. The evidence did not establish that respondent's grading timeliness during this period was notably worse than that of his colleagues.

## OTHER EVENTS ALLEGED AS GROUNDS FOR DISMISSAL

80.     On September 8, 2020, respondent sent email to his students through their school email accounts, giving notes and tips about how he planned to use

22

remote learning resources during that school year. The email included an announcement about an "online after school homework center," with a link to a website describing MMI. Respondent had not shown this announcement to Martin before sending it, and had not received permission to send information to students through their school email accounts about a service the District had not screened or approved.

81.    In November 2019, a parent complained to Fraser that respondent had referred, in front of her child and a few other students, to an Asian-ancestry student's "slitty eyes." Fraser investigated this complaint; but as noted above in Finding 73.a, respondent refused to speak to her about it. Respondent denied at the hearing ever having used this phrase, and no non-hearsay evidence established that the parent's report was accurate.

82.    In March 2020, a school staff member reported to Zook that a student had complained about respondent to the staff member. The staff member understood that respondent had displayed anger to the student, in front of other students, by pounding a table with his fist and using profanity. Zook investigated this complaint; but as noted above in Finding 73.b, respondent refused to speak to her about it. Respondent acknowledged at the hearing having criticized the student on this occasion, but denied having pounded his fist or used profanity. Because the Commission received no other first-hand testimony about the incident, the evidence was inconclusive as to whether respondent's behavior on this occasion was or was not professionally appropriate.

83.    In late January 2021, one of respondent's students' parents sent email to respondent, Martin, and Fraser about stories respondent had told, and that the parent feared respondent might continue to tell, to the parent's son. The parent, an officer in

23

the United States Air Force, was preparing for an overseas deployment, and wished to avoid having his son hear stories about "Afghanistan, combat, or the military" at school. Although the parent's email stated that the parent had spoken with respondent during fall 2020 about respondent's "sharing stories of his personal experience with Afghanistan combat fatalities in the classroom," respondent testified that he had not told his class any such stories. The evidence did not establish whether respondent had told his students stories during the 2020–2021 school year about military fatalities in any country, or if so in what context and with what detail.

84. When the District initiated the investigation described above in Finding 15, it directed respondent to "maintain the confidentiality of both the fact of and information concerning" the investigation. Although many community members became aware of the investigation, the evidence did not establish that respondent violated the District's confidentiality directive.

## Additional Evidence

85. The Commission heard evidence about several matters that were material to its decision, although the District did not allege them as grounds for respondent's dismissal.

### FALSE STATEMENTS AND TESTIMONY

86. The District does not allege that the incidents summarized above in Findings 28 and 29 and below in Findings 87 through 93 constitute cause for respondent's dismissal. Respondent volunteered testimony about these incidents, however. This testimony was emphatic, detailed, and in key respects false.

87.    The incident in which respondent admitted having given alcohol to a minor occurred during a camping trip in July 2016 that respondent had organized through his church. Fifteen-year-old Aidan Willner participated in the trip. Neither of Willner's parents accompanied him.

88.    Willner had been respondent's student, and he also had gone on one or more previous camping trips with respondent. Willner's mother, Helen O'Dea, is a teacher with the District.

89.    During the trip, respondent and several teenage participants took an overnight backpacking excursion. Respondent testified that he asked Willner to lead some of the other, younger hikers and that Willner did so successfully. Willner testified that he did not take any special role during the hike.

90.    When the backpacking group arrived at its campsite, most of the group decided after the evening meal to walk a short distance away to explore a nearby abandoned cabin. Respondent and Willner stayed behind.

91.    Respondent testified that as he and Willner relaxed at the campsite near a campfire, respondent poured himself a modest amount of whiskey. He congratulated Willner on his leadership during that day's hike, and offered Willner a sip of whiskey from his cup as a toast. Willner accepted it, and respondent did not offer Willner more, either that night or on any other occasion.

92.    Willner testified that as he and respondent relaxed at the campsite near a campfire, respondent poured himself some whiskey and also offered to pour some into Willner's own cup. Willner accepted the whiskey and drank it. Respondent then offered Willner a refill, which Willner accepted and drank. When respondent offered Willner a second refill, Willner declined, and excused himself to sleep.

25

93.     Willner also testified that later in the same trip, at a different campsite in the morning, respondent added something "minty" to Willner's hot chocolate. Willner believed the addition included alcohol, in part because respondent told Willner not to let the other youths know that respondent had added the substance to Willner's cup.

94.     When Willner returned home from the trip, he did not immediately mention the campfire whiskey or the spiked hot chocolate to his parents. Later, when he discussed the matter with his mother, he downplayed the incidents.

95.     O'Dea also testified. She stated that she heard first from respondent's pastor about the possibility that respondent had offered her son alcohol during the July 2016 camping trip.

96.     O'Dea spoke to Willner about the pastor's report, and understood Willner to have told her that respondent had offered him only a sip of alcohol. Later, without Willner's knowledge, O'Dea attended a meeting involving respondent and the pastor in which they discussed the incident. According to O'Dea, respondent grudgingly endorsed her description of her son's account, agreeing that he had given Willner a sip of alcohol as they sat by a campfire and apologizing for his poor judgment. O'Dea does not recall respondent's offering any independent account of the incident during that meeting.

97.     O'Dea considered the matter closed after her meeting with respondent and the pastor. During the District's investigation into the spring 2018 anonymous letter described above in Finding 14, however, the investigator contacted her for information about her son's July 2016 experience. O'Dea confirmed the information she had learned in 2016 from her son and from respondent. She and Willner both

26

testified that Willner was in poor mental health during 2018 and that he did not wish to offer further information to the District's investigator at that time.

98.     Respondent contends that Willner's testimony to the Commission embellished the incident, and that discrepancies between Willner's testimony in 2021 and the stories he told his mother in 2016 confirm that Willner's earlier description was true. Rather than undermining Willner's credibility, however, these discrepancies reflect Willner's improved mental health and his adult maturity. The evidence did not establish that Willner spoke to any adults outside his family in either 2016 or 2018 about respondent's offering him alcohol in July 2016, and it did establish that he felt conflict and shame about the incident when it occurred and for some time afterward. As between Willner's testimony about this incident and respondent's, Willner's testimony is more credible.

99.     Respondent also contends that O'Dea exaggerated his culpability in this incident, and encouraged her son and others to give false information to District administrators and to the Commission, because of her extreme animosity toward him arising from the political conflict described above in Findings 11 and 12. O'Dea testified, in contrast, that she holds no special animosity toward respondent because of that political conflict. Instead, her dislike for respondent stems from her understanding that he offered alcohol to her vulnerable son in July 2016, and from her perception that respondent continues to minimize this conduct's wrongfulness.[5] In

_____

[5] On several occasions, including in his testimony to the Commission, respondent has characterized his error with respect to Willner as a mistake akin to a traffic infraction.

27

light of all the evidence in this matter, O'Dea's testimony about her own motivations is credible, and respondent's is not.

100. Respondent gave Willner more than a single sip of whiskey at the campfire, and he also gave Willner alcohol on a later morning. On neither occasion did respondent offer Willner alcohol to celebrate a milestone or an unusual success. Instead, respondent served Willner alcohol casually, as if Willner were an adult peer. Respondent's testimony, as summarized in Finding 91, is false.

101. In response to the District letter described in Finding 14, respondent stated falsely that he had given a minor "a single sip of an alcoholic beverage as a toast after a significant outdoor achievement." Likewise, several witnesses aside from respondent testified that respondent had told them about giving Willner alcohol in July 2016, in terms that were essentially identical to his false statement to the District and his false testimony to the Commission. Some of these witnesses testified specifically that the incident, as they understood it, did not reflect poorly on respondent because it seemed so minimal.

102. Respondent testified that Willner was the only teen to whom respondent ever has offered alcohol during a camping trip. The Commission heard additional evidence to the effect that respondent had served alcohol to a second teen during the same July 2016 trip. This evidence was inconclusive.

### BOARD POLICY 4119.21

103. During her tenure as District superintendent, Fraser caused the Board to amend and update many of its adopted Board Policies. She did so generally to ensure that these policies reflected current professional norms.

28

104.   As adopted on May 9, 2012, Board Policy 4119.21 called for District employees to behave in a manner that would "enhance the integrity of the district and advance the goals of the district's educational programs." It required employees to "exercise good judgment and maintain professional standards and boundaries when interacting with students both on and off school property." As examples of inappropriate conduct, Board Policy 4119.21 listed "engaging in harassing or discriminatory behavior" and "furnishing tobacco, alcohol, or other illegal or unauthorized substances to a student."

105.   At its meeting on February 12, 2020, the Board considered and adopted amendments to Board Policy 4119.21. The Board's printed agenda summarized this action item as, "review the current Board policy to align with current California School Boards Association board Policy." The Board adopted the revised policy, but the evidence did not establish whether the revisions affected any of the statements summarized above in Finding 104.

106.   At the same February 12, 2020, meeting, the Board also adopted or revised several other policies that revised Board Policy 4119.21 cross-referenced, including a "Code of Ethics" and policies about "Firearms on School Grounds," "Employee Security," and "Bullying." These other policies were not in evidence.

## TEACHING SKILL

107.   The Commission received testimony from several parents who stated credibly that respondent taught and mentored their children very effectively. Some of these parents' children were among the accelerated mathematics students who respondent taught beginning in fifth grade. One parent testified, however, that her child was in the same grade as the accelerated mathematics students but was not

29

among them. That parent and her child believed that separating the accelerated students for instruction also benefited the other students, because it created better opportunities for respondent to teach all students at their appropriate levels.

108.    On September 10, 2020, Martin observed one of respondent's videoconference classes. He believed that respondent interacted well with students. Martin sent respondent email after that observation stating that respondent had shown "astounding" patience, and great skill both in complimenting students' correct answers and in identifying students' mistakes without undermining their confidence.

## LEGAL CONCLUSIONS

1.    The District bears the burden in this matter of proving facts and circumstances constituting cause under the Education Code for respondent's dismissal. A preponderance of the evidence must prove these facts and circumstances. (*Gardner v. Commission on Professional Competence* (1985) 164 Cal.App.3d 1035, 1038-1039.)

2.    The Commission has considered all testimonial and documentary evidence, and weighed all witnesses' credibility, in making the factual findings above. These findings reflect a preponderance of the evidence.

### Cause for Dismissal

3.    The District alleges three statutory causes for respondent's dismissal: immoral conduct (Ed. Code, § 44932, subd. (a)(1)), evident unfitness for service (*id.*, subd. (a)(7)), and persistent violation of, or refusal to obey, reasonable regulations prescribed by the Board (*id.*, subd. (a)(8)).

30

**PERSISTENT VIOLATION OF REGULATIONS**

4.     The only Board-adopted regulation in evidence was Board Policy 4119.21, as it existed between May 2012 and February 2020.

5.     Board Policy 4119.21 forbids District employees from offering alcohol to students, but the matters stated in Findings 30 through 44, 87 through 93, and 102 do not establish that respondent ever offered alcohol to a District student.

6.     Aside from its few specific examples, Board Policy 4119.21 makes extremely general references to professionalism and integrity, as summarized in Finding 104. The matters stated in Findings 45 through 84 do not constitute persistent failure or refusal by respondent to follow these vague standards.

**IMMORAL CONDUCT**

7.     The Education Code further defines "immoral conduct" as "including, but not limited to, egregious misconduct." (Ed. Code, § 44932, subd. (a)(1).) Courts have interpreted this term to mean conduct "indicative of corruption, indecency, depravity, [or] dissoluteness," as "shameless conduct showing moral indifference to the opinions of respectable members of the community," or as "an inconsiderate attitude toward good order and the public welfare." (*Palo Verde Unified Sch. Dist. v. Hensey* (1970) 9 Cal.App.3d 967, 972.)

8.     The matters stated in Findings 28 through 84 do not constitute immoral conduct within the meaning of the Education Code.

31

**EVIDENT UNFITNESS FOR SERVICE**

9.      The Education Code authorizes a school district to dismiss a permanent certificated employee who is "clearly not fit, not adapted to, or unsuitable for teaching, ordinarily by reason of temperamental defects or inadequacies." (*Woodland Joint Unified Sch. Dist. v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1444.) Such evident unfitness may exist, for example, when a teacher is repeatedly and incurably insubordinate, or is incapable of maintaining cordial, cooperative relationships with colleagues. (*Id.*, at pp. 1436-1440.)

10.      The Commission must evaluate "unfitness," in this context, with reference to several criteria, including likelihood and degree of adverse impact on students and fellow teachers, proximity or remoteness in time of the relevant conduct, extenuating or aggravating circumstances, praiseworthiness or blameworthiness of the teacher's motives, and likelihood of recurrence. (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 229-230.) In addition, the Commission must evaluate whether the conduct demonstrating unfitness "is caused by a defect in temperament." (*Woodland, supra*, 2 Cal.App.4th at p. 1445.) In light of the matters stated below in Legal Conclusions 11 through 19, the conduct described in Findings 30 through 44 (taking four teens to Las Vegas and failing to supervise them properly), 51 through 69 (refusing to follow Martin's and Fraser's directives, and teaching a course that was not in the District's curriculum), 71 through 75 (resisting both supervision and cooperation), and 78 (communicating unprofessionally with parents) establishes respondent's evident unfitness for service.

## Adverse Impact on Students and Fellow Teachers

11.     The matters stated in Findings 33, 36, 42 and 43 threatened adverse impact to Cunningham, Freiling, Peck, and Vierra, and especially to the latter two. In addition, the matters stated in Findings 52 through 60 threatened significant adverse impact to students, who risked missing credit for a key course. The matters stated in Findings 61 through 69 confirm that respondent brushed off warnings from Fraser regarding potential adverse effects on students from his "remote wilderness school camps." Finally, the matters stated in Findings 11, 12, 21, 22, 24, 25, 45, 74, and 78 show that respondent became notorious in the District's small community because of his behavior, undermining his ability to cooperate with fellow teachers and with District administrators to serve students.

12.     Although the evidence did not show actual, serious harm to students from respondent's behavior, the evidence overall showed that respondent created serious risks of such harm. Moreover, the rancor evident before the Commission did reflect damage to the District's educational community, and the matters stated in Findings 11, 12, 18, 21, 22, 24, 25, 74, and 78 show that respondent's conflict-seeking behavior was a significant cause of that damage.

## Proximity or Remoteness in Time

13.     The matters stated in Findings 30 through 44, 51 through 69, 71 through 75, 78, and 98 through 101 confirm that conduct showing respondent's unfitness continued until and even after his suspension from duty.

## Extenuating or Aggravating Circumstances

14.     The COVID-19 pandemic was both an extenuating and an aggravating circumstance in this matter. On the one hand, and as shown in Findings 48, 49, 53, and 79, the pandemic disrupted previous teaching practices and forced the entire District community to adapt and compromise. On the other hand, and as shown in Findings 51 through 69, respondent's steadfast refusal to share information with Fraser and to follow Martin's instructions exacerbated uncertainty and anxiety for Fraser and Martin as well as for parents and students.

15.     Respondent's dishonesty, as summarized in Findings 91, 100, and 101, is a significantly aggravating circumstance in this matter.

## Respondent's Motives

16.     The matters stated in Findings 46 through 50 confirm that respondent established his 2020–2021 algebra course with praiseworthy motives. More generally, the matters stated in Findings 46 through 50, 107, and 108 revealed respondent's sincere interest in teaching well, and also in mentoring adolescents outside the classroom.

17.     The matters stated in Findings 18, 52, 56, 58, 60, 64, 67, 69, and 72 through 75, however, reflect respondent's insistence on prolonging conflicts, and his refusal to accept partial victories. These motives are blameworthy.

## Likelihood of Recurrence

18.     The matters stated in Findings 72 through 75 confirm that if the District retained respondent as a teacher, respondent would continue to stoke conflict within

the District and to resist any efforts by District administrators to control or supervise his teaching.

### Temperament

19.     As summarized in Findings 69, 72, 100, and 101, respondent expressed minimal remorse before the Commission for any of the conduct showing his unfitness for service. To the contrary, and as summarized in Findings 14, 56, 74, 77, 98, and 99, and in Legal Conclusions 20 through 23, respondent presented himself to the Commission as someone who deserves respect for his moral courage but who instead faces persecution. These matters, all together, make respondent's unfitness evident.

## Retaliation for Constitutionally Protected Activities

20.     Respondent contends that the District's effort to dismiss him from employment constitutes unlawful retaliation against him for exercising his rights under the California and United States Constitutions to express his personal views and to participate in his community's political life.

21.     Respondent contends specifically that the Board revised Board Policy 4119.21 in February 2020 to target him for dismissal. The matters stated in Findings 19 and 103 through 106, and in Legal Conclusion 6, do not support this contention.

22.     As additional support for his retaliation defense, respondent identified many examples that he characterized as acts by community members and by fellow District faculty members arising from their hostility to respondent's views and political positions. Because such examples, if true, might undermine these people's credibility, the Commission has addressed credibility where relevant. Such examples would not establish unlawful retaliation against respondent by the District itself, however,

because every community member and District faculty member has the same personal rights respondent has to state opinions and to petition government agencies for action. Whether wise or unwise, respondent's neighbors and colleagues have the right to express disagreement or disrespect to respondent on social media or to his face; to ignore or even to criticize him in faculty meetings; and to ask the District to dismiss him because of real or imagined deficiencies in his performance or his character.

23.     Respondent also contends that Board members and administrative staff have displayed animus toward respondent because of his political opinions and activities, and that this animus proves that his dismissal from employment would constitute unlawful retaliation against him for exercising his right to free speech and political participation. This contention ignores two key protections the Education Code gives respondent.

a.     First, the District cannot dismiss respondent unilaterally. Rather, under Education Code sections 44943 and 44944, because respondent requested a hearing, this Commission—comprising by law persons who have no prior relationship with respondent, with the District's administrators and elected officials, or with the events at issue—must decide whether or not the District should dismiss respondent from employment.

b.     Second, under Education Code section 44932, this Commission may direct the District to dismiss respondent only if statutory cause exists to dismiss him, and not otherwise. As with community members and fellow faculty members, Board members' and administrators' animus toward respondent, if proven, might have affected their credibility before the Commission. Any such animus did not prevent the Commission's finding cause to dismiss respondent, however.

36

24.     Although the Commission has found cause to dismiss respondent, the Commission has discretion to decline to dismiss him. (*Fontana Unified Sch. Dist. v. Burman* (1988) 45 Cal.3d 208, 222.) Respondent's contention that his dismissal would constitute unlawful retaliation against him is most relevant to the Commission's exercise of this discretion.

25.     The totality of evidence in this matter does not establish an effort by the Board or by District administrators to discipline or to dismiss respondent because of his opinions or his political activity. To the contrary, all evidence in this matter shows that after significant conflict within the District in March and April 2018, the District in October 2018 offered respondent the opportunity to save face and move on. Respondent emphatically rejected this opportunity. Instead, between October 2018 and the hearing, respondent made repeated efforts to reopen and revisit the 2018 conflicts. He also responded to new potential and minor conflicts by amplifying them into major conflicts; he became increasingly insubordinate and uncommunicative regarding school activities, even during the novelty and uncertainty of the COVID-19 pandemic; and he continued to exercise very poor judgment outside school in circumstances involving his supervision of teenagers.

26.     The Commission finds the matters stated in Findings 30 through 44, 51 through 69, 71 through 75, and 78, and in Legal Conclusions 9 through 19 to justify respondent's dismissal from employment regardless of his opinions or his participation in political activity within the District.

27.     The Commission does not direct the District to dismiss respondent from employment to punish him, or to retaliate against him for having exercised his rights to express his opinions and to participate in the community's political life. The Commission directs the District to dismiss respondent from employment because a

37

preponderance of the evidence before the Commission establishes his evident unfitness to continue teaching District students.

## ORDER

Respondent David Kissner is dismissed from his position as a permanent certificated employee of the Loma Prieta Joint Union School District due to evident unfitness for service.

DATE: 12/07/2021

*Juliet C. Cox*

JULIET E. COX

Commission Member

Administrative Law Judge

Office of Administrative Hearings

DATE: 12/06/2021

*Katherine E. Everett*
Katherine E. Everett (Dec 6, 2021 09:19 PST)

KATHERINE EVERETT, ED.D.

Commission Member

DATE: 12/07/2021

*Scott Guagliardo*
Scott Guagliardo (Dec 7, 2021 12:33 PST)

SCOTT GUAGLIARDO

Commission Member