```
                BEFORE A COMMISSION ON PROFESSIONAL COMPETENCE
                    LOMA PRIETA JOINT UNION SCHOOL DISTRICT
                             COUNTY OF SANTA CLARA
                              STATE OF CALIFORNIA
          _____

          In the Matter of:

          DAVID KISSNER,

          A permanent certificated employee,        Case No.
                  v.                                2021050291
                          Respondent.
          _____

                          VIDEOCONFERENCE DEPOSITION OF
                                   LISA FRASER

          DATE:            Monday, August 9, 2021
          TIME:            9:29 a.m.
          LOCATION:        Remote Proceeding
                           Los Angeles, California 90017
          REPORTED BY:     Nicole Beaudoin, Notary Public
          JOB No.:         4729499
```

1  whatever their sexual questions or concerns, or things
2  like that were, and that's what, I think, was reported
3  in the investigation, and so that's -- I see that as
4  being very different than sexual quote, misconduct, but
5  it still may be outside the bounds of what a teacher
6  should be doing at night.
7       Q    I get that you want to explain yourself, but I
8  just asked you a simple question, and for the record I
9  need a simple answer, because if I file a motion in the
10 case, it's got to line up with my question.  All right?
11 So my question had to do with whether you have specific
12 personal knowledge based on evidence presented to you
13 that any text messages that Mr. Kissner ever wrote to a
14 minor child, had anything to do of a sexual nature;
15 isn't that true?
16      A    I don't have copies of the -- of what those
17 texts were.  No, I don't.
18      Q    Answer the question.  The question --
19      A    I did.
20      Q    Personal knowledge.
21      A    I don't have personal knowledge of the content
22 of those.
23      Q    Okay.  You don't have personal knowledge, do
24 you?
25      A    I do not.

1  Q    And you weren't presented with any evidence. Well, you'd have personal knowledge, if you were presented, but you weren't presented with any evidence that those text messages were improper, because they contained something of a sexual nature; isn't that true?

6  A    Only what's based in the investigative report.

7  Q    Okay. But you don't remember what the report says; correct?

9  A    I would have to go back and re-read the specifics, as I just said.

11 Q    Don't you think if there was something in the report that said that it involved sexual misconduct, or sexual text messaging, that you would have remembered that?

15 A    Again, I did not -- I'm sorry, I misunderstood your question. I did not -- don't have any copies of those text messages, nor do I have knowledge of there being anything about sexual misconduct, but the investigative report does mention some things about inappropriate texting, and that's what I was referencing.

22 Q    I'm going to skip to G-18. What is grooming?

23 A    Well, I mean, I don't have a specific definition right in front of me, but there's a lot of literature and guidance out there around what grooming

```
 1   behaviors are, but generally speaking they are behaviors
 2   that sometimes adults engage in, relative to minors, and
 3   they can be very well documented in terms of, you know,
 4   these are the behaviors you might see if an adult was
 5   trying to groom a minor.
 6        Q    Ms. Fraser, my client has already been laid
 7   off.  The district is trying to terminate him
 8   permanently for behavior that you are accusing him of.
 9   And accusing a human being, especially a Christian like
10   Mr. Kissner, of grooming children, is a very, very
11   serious allegation.  You know that; right?  And you knew
12   that, when you signed these charges under penalty of
13   perjury.  True?
14        A    I'm aware that grooming behavior is harmful to
15   children, yes, I am.
16        Q    So whether you use the term --
17        A    And that it's serious.  Yes, I understand
18   that.
19        Q    When you used the term "grooming," what did
20   you mean?
21        A    The term "grooming" was used in the
22   investigative report and when I spoke with Mr. Kissner
23   about this topic, and he explained that he didn't feel
24   like, you know, that words, somehow that he wasn't sure
25   whether that was accurate or not accurate, I based it on
```

Page 105

Veritext Legal Solutions
866 299-5127

```
1   what was in the report.  I provided him with information
2   regarding how to avoid people making assumptions about
3   grooming behavior, so I did provide him with that
4   information, but I didn't use the word "grooming" and
5   the word "grooming" was used in the investigative
6   report, and it was included as such.
7       Q    Ms. Fraser, do you not understand that when
8   you sign charges against somebody, accusing them of
9   improper behavior, that that's on you, not some
10  investigator?  That's you alleging those charges.  And
11  when you accused David Kissner of grooming, are you
12  testifying here today that you had no specific
13  understanding of the meaning of the word "grooming"?
14            MS. GEORGINO:  I object.  That misstates
15  her testimony.  She didn't say she didn't understand
16  what grooming behavior means, Bill.
17            THE WITNESS:  I completely understand
18  what grooming behavior is.
19  BY MR. BECKER:
20      Q    Okay.  You refer to potential grooming, not
21  actual grooming.  So, you're not accusing him of
22  actually grooming minor children, are you?
23            MS. GEORGINO:  With respect to G-18, are
24  you referring, or just in general, Bill?
25            MR. BECKER:  G-18.
```

referenced here as a potential grooming behavior.

Q  The fact is, you don't have any factual basis for making these allegations. You were completely dependent on whatever Ms. Elliot said in her report; isn't that true?

A  Those are the facts that I have, yes.

Q  Those are all the facts, and you didn't bother to question Ms. Elliot. When somebody accuses you of engaging in such a scurrilous act as sexual exploitation of children, which is what grooming is, you never bothered to ask her, where's the evidence for that, I feel uncomfortable signing a charging statement on that?

A  No, I did not talk to the investigator, nor would I equate grooming behavior with sexual exploitation. I think those are different terms, but that's beside the point. But no, I did not talk with Patricia Elliot, the investigator.

Q  If I went down to the police department right now -- this is hypothetical -- I went down to the police station, I filed a report against you for rape, wouldn't you want to know where the evidence is?

A  Of course.

Q  And wouldn't you be just a little ticked off that somebody made that allegation against you with no evidence?

```
 1        A    I don't know.  I never met her.  I based it on
 2   the investigative report.  I was not in the district at
 3   the time that the report was being conducted.  I
 4   received the report when I was hired.  I read through
 5   it, and I assume it was a factual report, based on the
 6   evidence that she collected.  So, that's what I know.
 7        Q    Now, 4-G-18, on Bates stamp 36, does not
 8   specify the statutory cause for dismissal that it
 9   purportedly corresponds to; isn't that right?
10        A    That's correct.
11        Q    And isn't it true that Mr. Kissner was,
12   therefore, not on notice as to which of the statutory
13   causes for dismissal you were alleging he violated?
14        A    Not which, but any one of the five, based on
15   the statute of dismissal charges.
16        Q    He could just pick or choose any of the five;
17   right, whatever he assumed it was?
18        A    That would be his prerogative.
19        Q    Now, you're aware, aren't you, that the charge
20   of grooming actually began with an anonymous letter sent
21   to the district; right?
22        A    That's referenced in the investigative charge,
23   yes.
24        Q    And, in fact, that's the only reference to
25   grooming in the investigative report to the anonymous
```

```
 1    letter; isn't that right?
 2         A    I believe that's accurate.
 3         Q    And you did read the investigative report?
 4         A    Yes, I did.
 5         Q    Front to back; right?
 6         A    Yes, I did.
 7         Q    And one of the issues in that report, and I
 8    should probably bring it in and have it admitted as
 9    evidence --
10              MR. BECKER:  Jeremiah, would you mind
11    doing that, and once you have the number of the exhibit,
12    we'll identify it.
13              MS. GEORGINO:  It's 12:30 now, so do you
14    anticipate being able to break for lunch at some point.
15    I'm getting a little, sorry, hungry.
16              MR. BECKER:  It is 12:30.  Give me some
17    questions here, we'll break for -- Madam Reporter, we've
18    got a lot to go through, and we started late.  Can we
19    make a short lunch, like I mean, 15 minutes even?
20              REPORTER:  I'm good for whatever you guys
21    need.
22              MR. BECKER:  Let me finish this line of
23    questions, and then we'll take a 15-minute lunch break.
24              MS. GEORGINO:  I need more than 15.
25    Sorry.
```

1     A    No.

2     Q    So for all you know, this version of the facts

3 could have been modified, had a final report been

4 issued; right?

5     A    I operated on the information I was given,

6 which is that this was the report.

7     Q    You assumed this was a final draft?

8     A    I was told it was a final draft.

9     Q    By whom?

10    A    By legal counsel that provided it.

11    Q    Now, I mentioned to you that the statement of

12 grooming appears just once in this report, in a

13 reference to the anonymous letter that was received by

14 the district. I'm looking now at Respondent's 1646. Do

15 you see that?

16    A    I see 1646. What would you -- you're asking

17 me to look at --

18    Q    -- confidential draft is; right? Where the

19 "C" is on confidential draft is, it says --

20    A    Yes.

21    Q    "I have never heard of Kissner physically

22 touching a boy, but the acts that he has done are

23 clearly 'grooming.'" You see that?

24    A    Yes.

25    Q    And you're aware of the fact that the word is

```
 1    not used again in the report; correct?
 2                 MS. GEORGINO:  I'm going to object.  The
 3    document speaks for itself, and --
 4                 MR. BECKER:  She read the report back to
 5    front -- front to back.
 6                 MS. GEORGINO:  She doesn't know if a 600
 7    and something page report that she's even testified that
 8    she reviewed, you know, she hasn't reviewed in the past
 9    week --
10                 MR. BECKER:  This is not an objection.
11                 MS. GEORGINO:  -- asked.  I mean, this is
12    ridiculous to ask her --
13                 MR. BECKER:  She signed the charges.  She
14    signed the charges.
15                 MS. GEORGINO:  If the document says
16    "grooming" there or not, is -- we can refer to the
17    document and know that.  She doesn't need to testify as
18    to what the document does or doesn't say.
19                 MR. GRAHAM:  But Amanda, she can't
20    testify as to her awareness, and that's what Bill --
21                 MS. GEORGINO:  She can testify if she
22    knows of it.  He didn't ask that.  He did not ask that.
23                 MR. GRAHAM:  He did.  He asked --
24                 MS. GEORGINO:  Did she know if the
25    document has the word "grooming" in it more than once?
```

```
 1   You can ask her that.  Does the document -- there's a
 2   difference between those two statements.
 3               MR. GRAHAM:  And that was his question,
 4   Amanda.  He was asking her if she was aware.
 5               MS. GEORGINO:  Then I misheard.  I did
 6   not hear that to be the question.  I heard "Does the
 7   document contain the word 'grooming' in it more than
 8   once?"  I apologize if I misheard him.
 9               THE WITNESS:  I don't recall if it does
10   or doesn't.
11   BY MR. BECKER:
12        Q    Well, if I represented to you that it doesn't,
13   and that the only reference to it is cited in quoting an
14   anonymous letter, that draws that opinion, on what basis
15   then would you have accused him of grooming as part of
16   the charges against him, apart from that?
17        A    I've already answered that I based the charges
18   based on the investigative report.
19        Q    Let me just draw your attention --
20        A    It says "potential grooming behaviors" and
21   then it cites some specific potential grooming behaviors
22   that were cited in the investigative report.  Beyond
23   that, I don't recall whatever references were in the
24   investigative report.
25        Q    After the break we'll try to get into that, if
```

```
 1   behavior, your answer is yes, regardless of whether
 2   alcohol is involved; right?
 3        A    It could be, yes.
 4        Q    And Mr. Kissner, you're aware, has these
 5   mountain retreats, these Christian mountain retreats,
 6   where he and other adults host young children during the
 7   summer months.  You're aware of that; correct?
 8        A    Yes.
 9        Q    All right.  So, taking out the alcohol issue,
10   is it your contention that Mr. Kissner, if he's alone
11   with a minor at any time, is committing an act of
12   grooming?
13        A    Well, first of all, it's potential grooming,
14   and no, I wouldn't say that that in and of itself would
15   -- would be potential grooming behavior, but coupled
16   with the other things, I would definitely say it would
17   be ill-advised, which is exactly what I wrote in his
18   letter of corrective action, that these behaviors are
19   ill-advised.  So, that you can avoid -- such that you
20   can avoid any allegations in the future of quote,
21   unquote, potential grooming, so I did have that
22   conversation and did provide that information to Mr.
23   Kissner.
24        Q    Are you familiar of any other time that Mr.
25   Kissner singled out a minor and was alone with a minor
```

```
 1   before filing the Statement of Charges?
 2        A    I don't have evidence that I'm prepared to
 3   offer, no.
 4        Q    Do you know who Ann Harrington is?
 5        A    Yes.
 6        Q    Who is she?
 7        A    She was a paraeducator that -- formerly
 8   employed by the district.
 9        Q    Did she have anything to do with sitting in
10   Mr. Kissner's classes?
11        A    I don't know.  Potentially she could have been
12   sitting in there to assist a student, in one of Mr.
13   Kissner's classes.  That wouldn't be uncommon.
14        Q    And you're not aware of the fact that she
15   regularly sat in his classes; correct?
16        A    I don't know what level of regularity, but I
17   know that it's probably not -- there probably were
18   occasions, when she was assigned to his classroom, yes.
19        Q    Are you aware that the investigator
20   interviewed her?
21        A    I don't recall.
22        Q    Well, it says so in the report.
23        A    Okay, but I don't recall.
24        Q    And last night she produced an audio tape of
25   her interview with Ann Harrington.  You don't have any
```

```
 1    questions, please, Bill.  Let's move on with questions,
 2    please.  Thank you.
 3                THE WITNESS:  I just don't care to
 4    speculate.
 5                MR. BECKER:  Mm-hmm.
 6                THE WITNESS:  Thank you.
 7   BY MR. BECKER:
 8        Q    So we'll skip past offering alcohol.  We know
 9    that you think that's potential grooming.  Asking about
10    sex and sexual encounters, what evidence do you have
11    that Mr. Kissner engaged at any time in asking minors
12    about sex or sexual encounters?
13        A    Just the evidence that has been provided in
14    the investigation, as I said.
15        Q    What evidence?
16        A    The investigative report.
17        Q    What evidence?  I know there's a report but
18    there's no evidence in the report.
19        A    Whatever is included in the investigative
20    report is what I base that statement on.
21        Q    You don't remember whether there's evidence of
22    asking about sex or sexual encounters anywhere in the
23    report, do you?
24        A    I believe there was commentary about that in
25    the investigative report.  I also had a conversation
```

```
 1   with Mr. Kissner about it, wherein --
 2       Q   And what did he tell you?
 3       A   He shared that he viewed his role as being a
 4   dual role, and that he was a teacher, but he was also a
 5   youth minister, and that he thought it was okay and
 6   appropriate to talk to kids about when they asked about
 7   sex and sexual encounters in that role, and that he
 8   intended to continue to do so, if he felt it was helpful
 9   to kids.
10       Q   So, he expressed that he would engage in
11   talking to minors about sex and sexual encounters in his
12   role as a religious mentor; is that right?
13       A   Correct.
14       Q   And you believe that's an act of potential
15   grooming behavior?
16       A   I didn't say that.
17       Q   But that's what you're saying in the charge,
18   4-G-18.
19       A   No, I said that that's what Mr. Kissner said
20   when I had the conversation with him about that
21   particular item.
22       Q   So you don't know really what was ever said,
23   if it was said, about sex or sexual encounters with
24   minors; right?
25       A   No, I don't.  I wasn't there.
```

1     Q    And posting images of youth partially
2  unclothed on the internet, what's your evidence that Mr.
3  Kissner engaged in potential grooming behavior by
4  posting images of youth partially unclothed, on the
5  internet?
6     A    I believe that the images that were referenced
7  during that time of the investigative report or with the
8  anonymous letter, had to do with images of kids who -- I
9  don't know if they were in bathing suits or whatever
10 they were in, and being taught how to shoot a gun or
11 something, and they were posted on an internet page, and
12 thought that was inappropriate, and subsequently Mr.
13 Kissner took them down.
14    Q    Did you ever see those pictures?
15    A    No, I did not.
16    Q    Did you ever see any evidence of those
17 pictures?
18    A    I can't recall.
19    Q    Did you -- being aware that Mr. Kissner hosts
20 minors on Mountain Retreats over the summer months,
21 where children swim in lakes in their bathing suits, and
22 that's what those pictures or images were on the
23 internet, you believe that the posting of children
24 swimming in their swimming wear is potential grooming
25 behavior; is that right?

1     A    I didn't say I believed that.  I said that I
2  presented the evidence that was presented -- the
3  investigation that was presented to me was in reference
4  to that, and in conversation with Mr. Kissner, he
5  explained what the images were and made a choice to take
6  them down.  That's what I said.
7     Q    I know what you said.  It doesn't answer the
8  question.  The question is, posting images of youth in
9  their swim trunks, swimming at a mountain retreat in the
10 summertime --
11    A    Mm-hmm.
12    Q    -- on the internet in your view amounts to
13 potential grooming behavior; is that true?
14    A    No, I don't think that's necessarily adamantly
15 true.  But I think it could be perceived as a grooming
16 behavior, but I personally wouldn't say in and of itself
17 that that would be evidence of grooming behavior, but in
18 combination with some of the other things that were
19 reported, it potentially could.
20    Q    I don't remember if you defined the word
21 "grooming."  If you did, it was not something that I
22 remember, so do you have a definition of the word
23 "grooming"?
24    A    I don't have a personal definition of the word
25 "grooming," but I know that there are a number of

```
 1   different articles and different things that you could
 2   read, where it would itemize certain behaviors, even
 3   complete workshops, on how to identify grooming
 4   behaviors, and there are a lot of different potential
 5   behaviors that could be perceived as grooming,
 6   individually or collectively.  That's what I know.
 7        Q    So your charge is really just based on the use
 8   of the word by an anonymous author, that the
 9   investigator quoted, and what you understand to be
10   incidents describing these categories in Paragraph 4-G-
11   18?
12        A    And Mr. Kissner acknowledges singling out a
13   minor and offering alcohol in an isolated setting, as
14   well, I believe within the investigative report.
15        Q    One time; right?
16        A    I've got to go back and read it, but I know
17   for sure at least one time.
18        Q    Yeah.
19        A    Yeah.
20        Q    And that's grooming?
21        A    Potential grooming.
22        Q    All right.  Let's move on to No. 5.  5-A says
23   that you're charging Mr. Kissner with having "made
24   inappropriate personal comments to students, minors,
25   about death and violence, including stories in class
```