1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10
11
12
13

DAVID M. KISSNER,

Plaintiff,

v.

LOMA PRIETA JOINT UNION
SCHOOL DISTRICT, et al.,

Defendants.

Case No. 22-cv-00949-CRB

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
SUMMARY JUDGMENT**

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff David Kissner brought this suit in connection with his dismissal from his position as a 6th grade teacher at CT English Middle School, in the Loma Prieta Joint Union School District ("District"). See Second Amended Complaint ("SAC") (dkt. 16). Although the suit began with nineteen claims and thirteen named defendants and Does, Kissner has gradually reduced both the claims and parties. See Voluntary Dismissals (dkts. 33–34, 41–42,43-2, 46-1, 49–50). The Court further narrowed the case by striking the claims against Defendant Lawrence McVoy, thus leaving only the claims against the individual District Defendants in the case. See Order on Motion to Strike/Dismiss (dkt. 65). Those Defendants have now moved for summary judgment. See MSJ (dkt. 97). As discussed below, the Court GRANTS summary judgment to Defendants as to Claim 1 and all claims in connection with Kissner's layoff, and DENIES summary judgment to Defendants as to Claim 3.

United States District Court
Northern District of California

# I.     BACKGROUND

## A.     Factual History

The factual history in this case involves several overlapping timelines.

### 1.     Controversy, Investigation, and Statement of Charges

Kissner was employed by the District as a middle school teacher from 2012 to 2021.  SAC at 3.[1]  On March 14, 2018, in the wake of the Parkland school shooting, students nationwide participated in a school walkout to advocate for gun control.  Id. at 14–15.  Kissner informed his students that anyone who participated in the walkout would be deemed absent without excuse.  Id. at 18.  Kissner scheduled a quiz on that day, and when three of his students skipped class for the walkout, he gave them failing grades on the quiz.  Id. at 18, 22–23.  Kissner's stance led to controversy in the local community.  Id. at 18–19.

Shortly after the controversy began, the District received an anonymous letter accusing Kissner of engaging in inappropriate "grooming" behavior with minors.  Id. at 28.  The District retained outside counsel to conduct an investigation into the allegations.  Id. at 37.  The investigation continued through the Summer and into the Fall.  Notice to Dismiss (dkt. 44-1) § Statement of Charges ¶ 3.  The investigation revealed that during a camping trip in 2016, Kissner provided alcohol to an unaccompanied 15-year-old student.  Notice to Dismiss § Statement of Charges ¶ 4a.  Kissner repeatedly downplayed this incident as "sharing a single sip of alcohol" to toast the student's "successful leadership accomplishments."  See SAC ¶¶ 50, 115.  The student later testified that Kissner had given him multiple alcoholic beverages, unrelated to celebrating a milestone.  Dismissal Hearing (dkt. 44–2) § Factual Findings ¶¶ 91–92, 100.  An administrative law judge from the Office of Administrative Hearings found the student's testimony more credible than

---

[1] While ordinarily the Court expects the parties to cite to the record in summary judgment briefing, see Fed. R. Civ. P. 56(c)(1) ("Supporting Factual Positions"), "a verified complaint may serve as an affidavit for purposes of summary judgment" under the appropriate circumstances, see Moran v. Selig, 447 F.3d 748, 759 (9th Cir. 2006).  The SAC is verified, see SAC at 96, and both parties cite to it extensively in their briefs, see, e.g., MSJ at 9–10; Opp'n (dkt. 100) at 2–3.

United States District Court
Northern District of California

1   Kissner's, concluding that Kissner "served [the student] alcohol casually, as if [the student]

2   were an adult peer," and that some of Kissner's testimony was false.  Id. ¶¶ 98, 100, 101.

3   The 2018 investigation concluded that Kissner had "a history of improperly providing

4   alcohol to minors."  Notice to Dismiss § Statement of Charges ¶ 4e.

5   The District did not terminate or otherwise discipline Kissner as a result of the 2018

6   investigation.  SAC at 39.  Then-Superintendent Lisa Fraser sent Kissner a letter in

7   October 2018 summarizing the investigation, concluding that Kissner's conduct "has had a

8   significant negative impact on students," and advising him that "should there be future

9   incidents wherein students are negatively impacted by your use of ill-advised classroom

10  practices and/or protocols, further corrective action may result, up to and including

11  possible termination of your employment."  Opp'n Ex. 2 (dkt. 99-3).

12  Years later, on February 12, 2021, Kissner received a Notice of Intent to Dismiss

13  with Statement of Charges.  MSJ Ex. 13.  It informed Kissner of his dismissal and charged

14  him with violations of the Education Code involving immoral conduct, unprofessional

15  conduct, unsatisfactory performance, evident unfitness for service, and persistent

16  violations of or refusal to obey school rules.  Id.  It detailed specific bases for the decision,[2]

17  starting with the 2018 anonymous letter and the findings of the investigation, and

18  continuing with incidents of alleged unprofessional, confrontational, and insubordinate

19  conduct in connection with students, parents, the principal, and the superintendent,

20  continuing through late January 2021.  Id. at PL000786–PL000791, PL000797.  It attached

21  a slew of supporting documents.  See id. at PL000803–PL001032.

22  Kissner's counsel sent a letter to District counsel demanding that the

23  "unsubstantiated salacious charges" of potential grooming be removed from the Statement

24  of Charges.  Opp'n Ex. 23 (dkt. 99-24) at 3.  Kissner's counsel wrote in part: "These

25  slanderous charges lack any substance and are shamelessly based on nothing more than

26  anonymous inadmissible hearsay. . . . Should these accusations remain in these

27

28  [2] See further discussion below in Section A.4.

3

proceedings or otherwise find their way toward republication, we will not hesitate to hold the District and each person involved accountable." Id.  The District did not remove the grooming allegations from either the initial Statement of Charges or an amended version. Fraser admits that she drew from the investigation in order to include the grooming allegations in the Statement of Charges.  Opp'n Ex. 4 (dkt. 99-5) at 110, 114 ("I based it on the investigative report.  I was not in the district at the time that the report was being conducted.  I received the report when I was hired."); see also id. 103 (no personal knowledge that Kissner sent text message of sexual nature); id. at 114–15 (answering "I believe that's accurate" to question of whether "the only reference to grooming in the investigative report" was "the anonymous letter"); id. at 144 (singling out minor and offering alcohol in an isolated setting is "potential grooming").

## 2.    Political Activities

Backing up a bit, during the 2019–2020 school year, the District experienced budget deficits and declining reserves.  Opp'n Ex. 8 (dkt. 99-9) at 16–18.  Fraser convened a Budget Advisory Committee to look at what could be done to balance the budget.  Id. at 17.  The Committee was "guiding the Measure N parcel tax as a means of" managing the budget; the District would have to make $100,000 in budget cuts if the Measure passed and about $400,000 in budget cuts if the Measure failed.  Id. at 18.  There was also a need for an FTE (full-time equivalent) reduction due to enrollment decline.  Id.  Fraser supported Measure N.  Opp'n Ex. 8 (dkt. 99-9) at 71.

Fraser was aware that Kissner opposed Measure N.  Id. at 72 ("He made that very clear that that was his intention was . . . to promote opposition.").[3]  Kissner notified Fraser in December 2019 that he would campaign in opposition.  Opp'n Ex. 17 (dkt. 99-18) at 2 (Kissner depo).  Measure N was defeated in the November 2019 election.  Opp'n Ex. 8 at

---

[3] Kissner cites to this Fraser testimony in support of his assertion that "Plaintiff led the campaign opposing the tax measure and advocated for transparency, accountability, and responsible use of public funds."  Opp'n at 6 (citing Ex. 8 at 71:9–72:17).  But that short quote about Kissner making it "very clear" that he opposed the measure was the only portion of the testimony in that page range about Kissner's role, and it does not nearly say what Kissner says it says.

72.[4]

### 3. Layoff

Following the defeat of Measure N, the District had a budget shortfall and sought to eliminate 4.0 FTE (the equivalent of four full-time teachers). See MSJ at 11; Opp'n at 6; see also RJN Ex. D (layoff decision by ALJ) at 2–5. In deciding which teachers to lay off, the District prioritized retaining teachers with multiple subject credentials. RJN (dkt. 97-2) Ex. A (3/10/21 resolution 21-XII by school district). Kissner holds a single subject credential in math. RJN Ex. E at 2. On March 12, 2021, Fraser informed Kissner that his position was subject to layoff. MSJ Ex. 12 at Z11–12. Fraser informed Kissner that the layoff was "not indicative of [his] abilities or performance" but based "on [his] seniority with the District." Id. at Z11. She wrote: "There is no probationary or permanent certified employee with less seniority retained who is rendering service for which you are credentialed and competent to render." Id. She further informed Kissner of his right to a hearing. Id. And she explained that Kissner's name would be placed on a reemployment list and "when openings arise, teachers affected by this reduction in force will be recalled in seniority order to fill openings in positions for which they are credentialed and competent to serve." Id. at Z12.

Kissner was notified that he had a right to request a hearing regarding the layoff, and did request such a hearing. MSJ Ex. N (dkt. 97-16) at 67:5–13. He had a hearing before an administrative law judge, where he was represented by counsel. Id. at 67:14–18. The administrative law judge upheld the layoff. Id. at 67:19–21. Kissner then had the right to appeal the administrative law judge's decision to the superior court, and did so. Id. at 67:22–68:3. He was represented by counsel before the superior court, and the superior court upheld his layoff. Id. at 68:4–9.[5]

---

[4] The SAC also references Kissner in January 2021 "pok[ing] the bear again by leading an effort calling for a special election to fill a board vacancy" and Kissner's wife's efforts to be elected to fill the vacancy. SAC ¶¶ 172–73. Kissner briefly references this political activity in his opposition. See Opp'n at 2.
[5] At the motion hearing, the parties explained that the layoff is presently on appeal in the state court. Kissner also reiterated that the case before this Court is a section 1983 case,

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kissner was replaced by a teacher who—at the point in time when Kissner printed her biography from the middle school website—was entering her seventh year as a teacher in the district.  See Opp'n Ex. 13 (screenshot); Opp'n Ex. 9 at 53:15–16 (6th grade math and science could be taught by "any of the multiple subject credential holders"), 55:9–56:3 (Ms. Van Zante is number 15 on the seniority list; "if she is credentialed to teach the position, I would ask her to teach."); see also Opp'n Ex. 14 at 3 (Van Zante "had a multi-subject credential").  One teacher initially subject to a reduction in force (Ms. Cole) voluntarily separated from the district before the layoff.  See Opp'n Ex. 14 (Martin supplemental response to interrogatories); Opp'n Ex. 15 at 207 (District Board Meeting notes of June 16, 2021, Personnel Report, listing under "Finalize Reduction in Force" the names Kelli Cole, David Kissner, and Nancy Lanovaz).[6]  Kissner asserts that by June 20201, "all of the noticed layoffs, except Kissner's, were rescinded."  Opp'n at 6–7 (citing Exs. 14, 15).  The documents he cites do not support this.[7]  Kissner also asserts that the "District received unexpected funding in Spring 2021 and did not implement any budget cuts or reduce or eliminate teaching positions for the 2021–2022 school year."  Opp'n at 7 (citing Ex. 16, slides 2 and 23).  Slide 2 lists nothing under 2023–22 Projected Budget Reductions, but states: "Ongoing budget reductions were implemented in the 2021–2022 budget.  Some of the cuts have been restored with LPEF and COVID relief funding, for one year only.  Deeper ongoing budget cuts are necessary in 2022–23 to meet financial sustainability goals by the end of 2022–23."  Opp'n Ex. 16, slide 2.  Slide 23, representing Expenditure Assumptions Certificated Positions, shows 28.1 Total Teachers for 2020–21 and 27.7 Total Teachers for 2021–22, as well as 24.1 Total Teachers for 2022–23.  Opp'n

---

and not a wrongful termination case.

[6] Kissner asserts in his brief that "he was the only teacher laid off."  Opp'n at 6 (citing Exs. 14, 15).  The cited documents suggest that Cole was initially intended for a layoff but then left voluntarily, and that Lanovaz was initially intended for a layoff, but the documents do not state that that did not occur.

[7] As discussed above, Exhibit 14 only states that "Ms. Cole ultimately was not subjected to a reduction in force," see Opp'n Ex. 14 at 2, and Exhibit 15 lists Cole, Kissner, and Lanovaz as subject to the reduction in force.  These documents do not state that Lanovaz's layoff was rescinded.

Ex. 16, slide 23.  This does suggest that 4.0 FTE were not cut for 2021–2022 per the June 16, 2021 District Board Meeting.

Kissner asserts that because he was "not laid off due to budget priorities, he is entitled to be reappointed to his former job," per California Education Code Annotated § 44956.[8]  Opp'n at 7.  He has not been reappointed.

### 4.    Termination

In addition to being laid off, Kissner was also terminated.

Kissner asserts that in December 2019, soon after he notified Fraser of his intent to oppose Measure N, Fraser brought a new proposed amendment to Board Policy 4119.21, adding what Kissner calls "unconstitutionally vague language to the original version." Opp'n at 7 (citing Opp'n Exs. 18–20).  Exhibit 18, the minutes from a February 12, 2020 Board Meeting, state that Fraser was "working to bring District policies up to date," including section 4119.21.  Opp'n Ex. 18 at B256–B257.  One of the examples Fraser provided at the meeting was a change to the language about "staff conduct with students," which would be "much more detailed with clear descriptors."  Id.  A December 26, 2020 printout of section 4119.21, Professional Standards, includes the following language:

> The Board expects all employees to exercise good judgment and maintain professional standards and boundaries when interacting with students both on and off school property. Inappropriate employee conduct shall include, but not be limited to, engaging in harassing or discriminatory behavior; engaging in inappropriate socialization or fraternization with a student; soliciting, encouraging, or establishing an inappropriate written, verbal, or physical relationship with a student; furnishing tobacco, alcohol, or other illegal or unauthorized substance to a student; or engaging in child abuse.

Opp'n Ex. 19 at A992.[9]

---

[8] This section provides in part that "Any permanent employee whose services have been terminated as provided in Section 44955 shall have the following rights: (a) For a period of 39 months from the date of the termination, any employee who in the meantime has not attained the age of 65 years shall have the preferred right to reappointment, in the order of original employment as determined by the board . . . ."

[9] The original version said, as to Inappropriate Conduct: "Inappropriate employee conduct includes, but is not limited to: 1. Engaging in any conduct that endangers students, staff, or

Kissner asserts that Fraser cited "only the new policy" in two disciplinary letters to him, one on March 31, 2020 and another on April 2, 2020. Opp'n at 7 (citing Opp'n Exs. 21 and 22). The March 31, 2020 letter ("Warning of Unprofessional Conduct") pertained to a comment Kissner allegedly made to one student, in the presence of several students, about a student of Asian descent having "slitty eyes." See Opp'n Ex. 21. The April 2, 2020 letter ("Warning of Unsatisfactory Performance") pertained to an incident in which Kissner allegedly banged his fist on a table with anger when a student arrived late to detention and when she exclaimed that it would be a waste of time to come to his room, responded in front of several other students, "No shit, Claire." Opp'n Ex. 22. Kissner then allegedly refused to meet with the Principal about the issue when she twice asked him to do so. Id. The letter concluded that Kissner's conduct "lacked good professional judgement, which requires that you refrain from using profane language in conversations with students," "caused embarrassment . . . and had a negative impact on the student's sense of safety" in his classroom. Id.

On February 12, 2021, Kissner received the Notice of Proposed Intent to Dismiss with Statement of Charges discussed above. See infra § I.A.1. The Statement of Charges charged Kissner with violations of the Education Code involving immoral conduct, unprofessional conduct, unsatisfactory performance, evident unfitness for service, and persistent violations of or refusal to obey school laws. MSJ Ex. 13 at 4. It also referenced Board Policy 4119.21, noting that as an employee of the District, Kissner was required to exhibit professional behavior. Id. It discussed specific acts or omissions, as reported by the outside investigator whom the District brought in after the anonymous 2018 complaint. Id. These included: knowingly providing alcohol to a 15-year old; providing alcohol to

---

others, including, but not limited to, physical violence, threats of violence, or possession of a firearm or other weapon . . . 2. Engaging in harassing or discriminatory behavior towards students . . . 4. Engaging in inappropriate socialization or fraternization with a student or soliciting, encouraging, or maintaining an inappropriate written, verbal, or physical relationship with a student. . . . 8. Using tobacco, alcohol, or an illegal or unauthorized substance, or possession any controlled substance, while in the workplace, on district property, or at a school-sponsored activity." Opp'n Ex. 20 at LP000641–42.

United States District Court
Northern District of California

minors on other occasions; making inappropriate comments to students about death and violence; physically wrestling with boys on the classroom floor; ignoring directives to maintain the confidentiality of facts surrounding his investigation; the "slitty eyes" incident; the "No shit, Claire" incident; failing to comply with an August 27, 2020 request for information, and subsequent questionnaire, from the superintendent about camp trips in apparent conflict with regular school days/hours; emails to District students about providing extra math help through an "online after school homework center" with a link to his personal website and an opportunity to donate money; a complaint in October 2020 about tearing up a student's math work in front of the class because the student used a pen; parent concerns in the Fall of 2020 about whether some students "were allowed to receive class attendance credit for alternatively attending" Kissner's outside math tutoring program, and failure to cooperate with the Principal in providing a list of impacted students; many issues with late grading or failing altogether to grade assignments; canceling classes and instructing students to grade their own tests; a December 16, 2020 Letter of Reprimand from Principal Martin about some of these issues; concern in January 2021 from a parent serving overseas about Kissner sharing graphic stories about his military service including combat fatalities; a private in-person math class taught during school hours contrary to school policy; and failing to conduct Zoom office hours on approximately 29 days. Id. at PL000781– PL000798. The Statement of Charges concluded: "Your overall conduct as detailed herein negatively impacts your working relationships with students and your colleagues, your job effectiveness, the efficiency of operations, overall staff and student/parents morale, and has compromised the safety and welfare of students. Moreover your actions have had a detrimental effect on your students/parents and the operations of the District." Id. at PL000798– PL000799.

On March 25, 2021, the Board met in a closed session to determine whether to proceed with termination proceedings against Kissner. RJN Ex. C (dkt. 97-4) ("the Board approved by a 5–0 vote to authorize moving forward with the dismissal of a certificated employee"). Kissner and his counsel appeared at the Board meeting and presented reasons

why the Board should not move forward with the termination.  MSJ Ex. N at 70:15–71:1.
The Board voted to move forward with the termination.  Id. at 71:7–10.

Kissner then requested a hearing before a three-member panel of the Commission
on Professional Competence.  Id. at 69:15–20.  In preparation for the hearing, Kissner had
the right to conduct discovery, subpoena witnesses, depose witnesses, request documents,
and to be represented by counsel throughout.  Id. at 71:7–20.  In front of the three-member
administrative panel, Kissner had the right to call witnesses and present evidence, and the
right to be represented by counsel.  Id. at 71:21–72:6.  Kissner's termination became
effective when the Commission on Professional Competence made its decision in
December of 2021.  Id. at 68:18–69:2.  The Commission issued a lengthy written decision
on December 7, 2021, detailing the alleged grounds for dismissal, making a series of legal
conclusions, and ultimately directing the District to terminate Kissner's employment due to
his evident unfitness for service.  RN Ex. E (Termination Decision).[10]

### 5.    Public Records Act Facts

On April 16, 2021—after the Notice of Proposed Intent to Dismiss but before the
termination became effective—the District received a California Public Records Act
(PRA) request seeking a copy of the initial Statement of Charges.  Opp'n Ex. 6. (dkt. 99-
7).  Fraser responded to the request within an hour.  See id. at 4298, 4299.  The District's
response, signed by Fraser, stated that the request for "the charges for Mr. Kissner's
dismissal" did "not meet the requirement for a proper PRA request in that it fail[ed] to
identify records with reasonable particularity."  Id. at 4300.  It continued that it was "not
able to produce records that are exempt from disclosure under the PRA and/or state and
federal law," and that "the California Court of Appeals held that records of complaints or
investigations against a public employee can be disclosed only if 'the complaint is of a
substantial nature and there is reasonable cause to believe the complaint or charge of
misconduct is well-founded.'"  Id. at 4301.  The Response nonetheless enclosed the Notice

---

[10] The Commission also rejected Kissner's argument that the District had dismissed him in
retaliation for his exercising his rights to express his personal views.  Id. at 35–38.

United States District Court
Northern District of California

of Proposed Intent to Dismiss with Statement of Charges. Id. at 4302. At the motion hearing, counsel confirmed that this disclosure consisted of the entire Intent to Dismiss with Statement of Charges, without redactions.

On June 17, 2021—also after the Notice of Proposed Intent to Dismiss but before the termination became effective—the District received another PRA request seeking a copy of the amended Statement of Charges. Opp'n Ex. 7 at 1. The District's response on July 6, 2021, this time signed by Grier, again noted the limitations under the law, quoting the same California Court of Appeals decision. See id. at 4328. That Response also had an enclosure, though its contents are not part of the record. See id. at 4329. At the motion hearing, counsel confirmed that this disclosure also consisted of the entire Intent to Dismiss with Statement of Charges, without redactions.

The District voluntarily dropped the allegations of grooming and associated conduct before the dismissal proceedings began, and the allegations did not appear in the heavily redacted statement of charges presented to the Commission. See Opp'n to Mot. to Strike Ex. 1 (Becker Decl.) ¶ 4.

## B.    Procedural History

On February 16, 2022, Kissner filed this suit. See Compl. (dkt. 1). The SAC originally included 19 causes of action under federal and state law. See SAC. Plaintiff voluntarily dismissed the state law claims. Voluntary Dismissal (dkt. 50). He also dismissed all claims against the District. Notice of Voluntary Dismissal (dkt. 66). In August of 2022, this Court granted McVoy's motion to strike and denied the District defendants' motion to dismiss. See Order on Motion to Strike/Dismiss. The remaining claims at that point were Claim 1, for First Amendment retaliation; Claim 3, for "stigma-plus" defamation; Claim 16, for violation of the Fourteenth Amendment right to due process; Claim 17, for violation of the Fourteenth Amendment right to equal protection; and Claim 18, for civil rights conspiracy. MSJ at 11. Each remaining defendant—Lisa Fraser, Kevin Grier, Billy Martin, Deana Arnold, Ben Abeln, Ron Bourque, Charlotte Kgandelwal, and Erin Asheghian—is a party to each of the remaining federal

1   constitutional claims.  Id.  Defendants have moved for summary judgment.

2   **II.    LEGAL STANDARD**

3          Summary judgment is proper where the pleadings, discovery, and affidavits show

4   that there is "no genuine dispute as to any material fact and the [moving] party is entitled

5   to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may

6   affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

7   (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a

8   reasonable jury to return a verdict for the nonmoving party.  Id.

9          The moving party for summary judgment bears the initial burden of identifying

10   those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a

11   genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  Where

12   the moving party will have the burden of proof on an issue at trial, it must affirmatively

13   demonstrate that no reasonable trier of fact could find other than for the moving party.  Id.

14   But on an issue for which the opposing party will have the burden of proof at trial, the

15   moving party need only point out "that there is an absence of evidence to support the

16   nonmoving party's case."  Id.

17          Once the moving party meets its initial burden, the nonmoving party must go

18   beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by

19   "citing to specific parts of material in the record" or "showing that the materials cited do

20   not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  A

21   triable dispute of fact exists only if there is sufficient evidence favoring the nonmoving

22   party to allow a jury to return a verdict for that party.  Anderson, 477 U.S. at 249.  If the

23   nonmoving party fails to make this showing, "the moving party is entitled to judgment as a

24   matter of law."  Celotex, 477 U.S. at 323.

25          It is not a court's task "to scour the record in search of a genuine issue of triable

26   fact."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (internal citation omitted).

27   Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable

28   particularity the evidence that precludes summary judgment."  See id.  When deciding a

United States District Court
Northern District of California

summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  Anderson, 477 U.S. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

Defendants argued that: (1) as to Claim 16, Kissner cannot demonstrate either procedural or substantive due process; (2) as to Claim 17, Kissner's equal protection claim fails, because it amounts to a First Amendment retaliation claim; (3) as to all claims, several defendants played no role in the layoff decision and those who did are entitled to absolute legislative immunity; (4) Claim 3, for "stigma-plus" defamation, fails; (5) Claim 1, for First Amendment retaliation, is barred under Mount Healthy; and (6) as to Claim 18, Kissner cannot create a triable issue of fact as to conspiracy.  MSJ.

In his opposition brief, Kissner stated that he does not oppose Defendants' motion as to Claim 17, for violation of the Fourteenth Amendment right to equal protection, or Claim 18, for civil rights conspiracy.  Opp'n at 25.  Kissner also does not oppose the dismissal of Martin, Arbold, Abeln, Bourque, Khandelwal, or Asheghian as to Claim 3, for "stigma-plus" defamation.  Id.  And Kissner does not address Claim 16, for violation of the Fourteenth Amendment right to due process, see Opp'n at i, ii (addressing only retaliation claim, "stigma-plus" defamation claim, layoff and termination) and therefore concedes that Defendants should prevail on it.[11]  See Bolbol v. City of Daly City, 754 F. Supp. 2d 1095, 1115 (N.D. Cal. 2010) ("plaintiff fails to address this issue in her opposition brief and apparently concedes that she may not proceed on this claim.  Accordingly, the court grants summary judgment in favor of defendants as to this claim.").

Accordingly, what remains for the Court to decide is Defendants' motion as to: (A) Claim 1, for First Amendment retaliation; (B) Claim 3, for "stigma plus" defamation against Fraser and Grier only; and (C) all claims with respect to the layoff only.

_____

[11] Kissner focused his due process arguments on Claim 3, the "stigma-plus" defamation claim.  See Opp'n at 24.

13

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A.      Claim 1: First Amendment Retaliation

Defendants move for summary judgment on Kissner's first claim.  See MSJ at 14–16.  In that claim, Kissner alleges that he engaged in protected political speech when he expressed his opposition to the 2018 school walkout, and when he campaigned against Measure N.  SAC ¶¶ 235, 240.  He further alleges that the District defendants retaliated against him for engaging in such protected speech by targeting him for adverse employment action and ultimately removing him from his employment.  Id. ¶¶ 241, 242.  The evidence does not bear out Kissner's allegations.

#### 1.      Legal Framework

As an initial matter, the parties disagree about the legal framework the Court should use to analyze this claim, and so they argue past each other a fair amount.  Defendants argue that the test from Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977) controls.  See MSJ at 25.  Mount Healthy, which involved a school district's decision not to rehire a teacher, held that the plaintiff had to "show [1] that his conduct was constitutionally protected, and [2] that this conduct was a 'substantial factor'" or a "'motivating factor' in the Board's decision not to rehire him"; then, if he did so, the school district, to escape liability, would have to show [3] "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct."  429 U.S. at 287.  Kissner insists that Mount Healthy does not apply where, as here, "the District has never claimed to have [taken an adverse employment action] in part or in whole, because of his protected actions."  Opp'n at 12.  Kissner instead maintains that the Court should employ a burden-shifting analysis in which a plaintiff must ultimately demonstrate that "the District's stated reasons for terminating [him] were 'false or pretextual.'"  Id. (quoting Skinner v. Medivators, Inc., No. 20-cv-06979-JSW, 2022 WL 4544701, at *3 (N.D. Cal. Sept. 28, 2022), Kannan v. Apple Inc., No. 5:17-cv-07305-EJD, 2022 WL 3973918 (9th Cir. Aug. 31, 2022)).[12]

---

[12] Kissner repeatedly conflates the concepts of establishing a prima facie case and establishing pretext.  See, e.g., Opp'n at 14 ("'burden of establishing a prima facie case . . . is not onerous' . . . . A plaintiff may establish pretext either directly . . . or indirectly"), 15

14

United States District Court
Northern District of California

The Ninth Circuit has described Mount Healthy as "the default rule for First Amendment retaliation claims."  See Bello-Reyes v. Gaynor, 985 F.3d 696, 702 (9th Cir. 2021).  Although Kissner is correct that the Defendants here have not conceded that they terminated him because of his protected actions,[13] the Court is aware of no requirement that defendants do so for the test to apply.  See, e.g., Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 923, 928 (9th Cir. 2004) (employing Mount Healthy framework[14] even where "defendants contend that the plaintiffs cannot meet their burden of establishing that retaliation was a substantial or motivating factor in the defendant's actions because there is no evidence that [defendants] had any knowledge of the expressive conduct against which they allegedly retaliated.").  The Court therefore disagrees with Kissner when he states that "The question in this case is not whether the District would have terminated Kissner but for his protected conduct.  Rather, the question is whether the District's stated reasons for terminating Kissner were 'false or pretextual . . . .'"  Opp'n at 12.[15]

### 2.    **Mount Healthy Analysis**

While Defendants lay out the "three-step" inquiry envisioned by Mount Healthy,

---

("Evidence of pretext in this case includes. . . . 'A plaintiff can satisfy his or her initial burden'").

[13] Sometimes, that happens.  In Mount Healthy, the defendant school district sent the plaintiff a "statement of reasons" for its decision not to rehire him, one of which was that the plaintiff contacted a radio station to complain about a new dress code.  429 U.S. at 283.  See also Riley's American Heritage Farms v. Elsasser, 32 F.4th 707, 723 (9th Cir. April 29, 2022) (no genuine dispute that school defendants canceled longstanding practice of sending field trips to defendant's farm only after they received complaints about the contents of farm owner's tweets).

[14] In fact, in Alpha Energy Savers, the Ninth Circuit explained that a plaintiff must show that "(1) it engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against it; and (3) its expressive conduct was a substantial or motivating factor for the adverse action."  381 F.3d at 923.  Then, to escape liability, the court explained, government officials could demonstrate either (a) "under the balancing test established by Pickering v. Board of Education, 391 U.S. 563, 568 (1968), legitimate administrative interests in promoting efficient service-delivery and avoiding workplace disruption outweigh the contractor's free speech interests; or (b) under the mixed motives analysis established by Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977), they would have taken the same actions in the absence of the contractor's expressive conduct."  381 F.3d at 923 (emphasis added) (cleaned up).  Defendants here only avail themselves of the Mount Healthy avenue of escaping liability and do not take the Pickering avenue.  See MSJ at 25.

[15] That said, there is no reason to conclude based on this record that Kissner would have any more success demonstrating pretext.

they do not discuss each step separately.  See MSJ at 25–26.  Moreover, they seem to concede the first step, whether the plaintiff's conduct was constitutionally protected, entirely.  See MSJ at 25–26 (not discussing first step); Mount Healthy, 429 U.S. at 287.  Indeed, it is clear that Kissner satisfies the first step: opposing the student walkouts in support of gun control, and opposing Measure N are both public speech about issues of public importance.  See Pickering, 391 U.S. at 572 ("Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent.  Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal"), 574 ("a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment").

As to the second step, that the constitutionally protected conduct was a 'substantial factor'" or a "'motivating factor' in" Defendants' decision to terminate him, see Mount Healthy, 429 U.S. at 287, Defendants argue that Kissner has failed to show that he was terminated because of his political speech, MSJ at 25.  They rely on the fact that Defendants did not really terminate Kissner, but that "the matter of termination was decided by a disinterested, three-member administrative panel" and Kissner has presented "no evidence that any of the panel members had a retaliatory motive to recommend [Kissner's] termination."  Id.  Defendants cite to the administrative panel's decision, which addressed Kissner's assertion of retaliation, saying: "The Commission does not direct the District to dismiss respondent from employment to punish him, or to retaliate against him for having exercised his rights to express his opinions and to participate in the community's political life."  Id. at 25–26 (citing RJN E at 37).[16]  They also quote the

---

[16] Kissner objects to the Commission's termination decision, RJN Ex. E, as irrelevant and inadmissible hearsay.  Opp'n at 12 n.1.  It is certainly relevant, as it goes to Kissner's termination.  It may be hearsay if the Court considered it for the truth of the matter, but the Court will not accept as true the Commission's assertion that it did not recommend termination for an improper purpose.  Rather, it will consider the document for the fact that the Commission said that.  Kissner also argues without citation to relevant authority that an administrative law decision is not evidence.  Opp'n at 12.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Commission stating that the record reflects no effort to punish Kissner for his political

2    opinions; rather, "between October 2018 and the hearing, respondent made repeated efforts

3    to reopen and revisit the 2018 conflicts.  He also responded to new potential and minor

4    conflicts by amplifying them into major conflicts; he became increasingly insubordinate

5    and uncommunicative regarding school activities . . . and he continued to exercise very

6    poor judgment outside school in circumstances involving his supervision of teenagers."  Id.

7    at 26 (citing RJN Ex. E at 37).

8         Defendants' Commission-based argument is probably adequate.  While the Court

9    does not accept for the truth of the matter the facts asserted by the Commission about its

10   objectivity, Kissner has identified no evidence indicating that the Commission's decision

11   was politically motivated.  And Kissner admitted in his deposition that his termination was

12   not effective until the Commission issued its decision.  RJN Ex. N at 68:18–24.  Kissner's

13   only response to this is that "[s]uch impenetrable reasoning would impermissibly and

14   somewhat preposterously place factfinders"—presumably he means the Commission

15   members—"in the shoes of defendants."  Opp'n at 12.  But this is likely one of the reasons

16   that school districts use a Commission on Professional Competence—so that impartial

17   adjudicators, and not school board members and principals (the defendants here), are the

18   ones making such decisions.

19        Nor has Kissner satisfied step two even as to these Defendants' own decisions.

20   Kissner argues that Defendants retaliated against him because (1) his opposition to

21   Measure N and his work to fill a Board vacancy in December 2020 and January 2021 was

22   roughly a month before Defendants notified him of their intent to dismiss him[17]; (2) his

23   simultaneous dismissal and layoff was unprecedented[18]; (3) Fraser amended the Board

---

[17] The authority he cites, though, states that proximity can support a plaintiff's initial
burden under McDonnell-Douglas.  See Opp'n at 15.  Proximity is not enough to establish
pretext.  See Hooker v. Parker Hannifin Corp., 548 F. App'x 368, 370 (9th Cir. 2013)
("While evidence of temporal proximity is sufficient to demonstrate a prima facie case of
retaliation . . . it is ordinarily insufficient to satisfy the secondary burden to provide
evidence of pretext.").

[18] He provides no authority for this assertion.

policy in early 2020 shortly after he notified her of his intent to oppose Measure N and then it was "the sole policy basis for [the] charges brought in 2021 against him" and the language "appears suspiciously tailored to apply to Kissner"[19]; (4) reliance on "stale allegations of misconduct," like the 2016 anonymous letter and the 2018 investigation[20]; and (5) "conflicting, contradictory, and implausible reasons for Kissner's layoff.[21]"  Opp'n at 15–17.  As discussed in the relevant footnotes, these reasons are unpersuasive. Accordingly, the Court concludes that Kissner has failed to carry his burden of showing that his political action was a substantial factor in Defendants' decision to terminate him.[22]

But even if Kissner had met his burden on the second step, Defendants would still escape liability if they could demonstrate "by a preponderance of the evidence that [they] would have reached the same decision . . . even in the absence of the protected conduct." See Mount Healthy, 429 U.S. at 287.  They must "show more than that they could have punished [Kissner] in the absence of the protected speech; instead, the burden is on the defendants to show through evidence that they would have punished [Kissner] under those

United States District Court
Northern District of California

---

[19] Kissner's position that the District "Invented a Policy Basis to Punish Kissner" is unsupported by the record.  See Opp'n at 7.  The warnings he received for unsatisfactory performance in March 2020 and April 2020 involved unambiguously improper behavior that would also have violated the original version of the policy.  See, e.g., Opp'n Ex. 20 at LP000641–42 (original version, prohibiting "discriminatory behavior towards students"—like referring to a student's slitty eyes).  And the "Statement of Charges" of February 12, 2021 relied on violations of the Education Code as well as this policy; moreover, much of the conduct alleged in the Statement of Charges also would have violated the original policy.  See, e.g., Opp'n Ex. 20 at LP000641–42 (original version, prohibiting "Engaging in inappropriate socialization or fraternization with a student").

[20] But the school's response to the 2018 investigation was to warn Kissner that "should there be future incidents wherein students are negatively impacted by your use of ill-advised classroom practices and/or protocols, further corrective action may result, up to and including possible termination of your employment," Opp'n Ex. 2 (dkt. 99-3), and the Statement of Charges went on to list a significant number of incidents after 2018 demonstrating how students were negatively impacted by Kissner's actions, see MSJ Ex. 13 at PL000786–PL000798.

[21] Kissner includes only a string cite to different testimony by Fraser about the need for a layoff, see Opp'n at 17, and while it includes multiple explanations of the layoff, they are not obviously contradictory.

[22] Even if Kissner could show that Defendants did not like him—something he has not shown—that would be insufficient.  See Erwin v. Ramos, No. 20-55903, 2022 WL 541188 (9th Cir. Feb. 23, 2022) ("While the record is replete with evidence of hostility toward Erwin, whom the defendants considered 'bottom-sucking' and 'evil,' there is no indication that the defendants disliked Erwin because of his protected speech.").

circumstances." Bello-Reyes, 985 F.3d at 702 (internal quotation marks and citations omitted). Here, the record is replete with evidence of Kissner's errors in judgment, refusals to abide by school policy, and insubordination, escalating in late 2020 and early 2021. See, e.g., Opp'n Ex. 2 (October 18, 2018 letter from Fraser); Opp'n Ex. 21 (3/31/20 Warning of Unprofessional Conduct); Opp'n Ex. 22 (4/2/20 Warning of Unsatisfactory Performance); Opp'n Ex. 23 (letter from Kissner counsel addressing charges of unsatisfactory performance in connection with failure to file grades in a timely manner or communicate with parents, failure to attend all synchronous classes on Zoom, and failure to attend required office hours); id. at PL000953 (8/27/2020 letter from Fraser to Kissner about trips in conflict with school hours); id. at PL000955 (letter from Fraser re same: "You responded that you do not share details of your private life with school administrators"); id. at PL958 (9/8/20 email from parent re concern about email from Kissner to 11-year-old son's account advertising afterschool homework center); id. at 961– 62 (9/14/20 email from Martin to Kissner detailing recent parent complaints); id. at 964 (email from Martin to Kissner complaining that Kissner had not provided requested list of students who received email solicitation); id. at PL000965–66 (email from Kissner to Martin: "If you would like to clarify how YOUR specific alternative algebra assignments are ok for these kids, but MINE somehow are not, please put that in writing as well. . . . If you would like to continue this conversation, I proposed that we have a meeting. I will be represented by an attorney. . . . Your email below lists a lot of things. . . but you know what is conspicuously missing? Any mention of what is actually good for these kids. It's clearly not even a consideration. If you want to make any headway with me. . . ."); id. at PL000969 (email from Kissner to Martin: "YES I have an ideas of how to best meet the educational needs of these students. I am currently doing just that. With absolutely no thanks at all to district leadership."); id. at PL000974 (unhappy email 10/18/20 from parent re son's grade dropping from an A-/B+ to a C- on the last day of the quarter due to Kissner's tardy grading); id. at PL000976 (10/27/20 email from Martin to Kissner "I'd like to meet to discuss your reasons for being unable to stay on top of [grading]"); id. at

PL000986 (email from parent 11/3/20 expressing disappointment with canceled zoom meetings); id. at PL000992–97 (11/5/20 letter from Fraser expressing concern about remote wilderness camp and asking Kissner a number of questions; "Thus far, you have not been responsive to the District's concerns raised in the past under similar circumstances . . . but it is critically important that you understand the gravity of the situation since your anticipated course of conduct potentially creates a serious risk of harm to students and perhaps even yourself"); id. at PL000999 (11/7/20 dismissive email from Kissner in response to 11/5/20 letter); 12/11/20 (email from parent to Martin: "I find myself once again in the uncomfortable position of not knowing what [redacted] math grade will be for the end of semester."); id. at PL001003 (same); id. at PL001005 (12/14/20 email from parent to Martin: "I am actually now VERY UNHAPPY and I am formally making a [complaint] about grading"); id. at PL001007 (12/14/20 email from parent to Martin: "It turns out, though, that the math grade was not only NOT current, but Mr. Kissner hasn't even been grading or checking his homework ALL quarter.'); id. at PL001009–1010 (12/16/20 letter of reprimand from Martin to Kissner re recent incidents); id. at PL001012 (12/17/20 email from Martin to Kissner: "It was recently brought to my attention that you may be hosting an unapproved Algebra course of a select group of students during the time designated as 'office hours and student support'"); id. at PL001014 (1/28/21 email from military parent to Martin, Fraser, Kissner re asking Kissner in October to stop sharing stories of combat fatalities in son's class); id. at PL001018 (1/29/21 email from parent disclosing after school math class with Kissner); id. at PL001021 (1/29/21 email from Martin to Fraser re 1pm math class, Kissner communicating with student through personal email).

Given the evidence in the record, the Court concludes that Defendants have met their burden of establishing that they would have terminated Kissner even in the absence of his political activities.  The Court therefore GRANTS the motion as to the First Amendment retaliation claim.

20

United States District Court
Northern District of California

### B.    Claim 3: "Stigma Plus" Defamation

Defendants next move for summary judgment on Kissner's third claim, for "stigma plus" defamation.  MSJ at 7–10.  Garden variety defamation "is a tort actionable under the laws of most States, but not a constitutional deprivation."  Siegert v. Gilley, 500 U.S. 226, 233 (1991).  However, if a government official's act of defamation results in a plaintiff being deprived of a previously held constitutionally protected right, a plaintiff can bring a claim of defamation under Section 1983, arguing that he has been deprived of a constitutionally protected right without the procedural guarantees of the Fourteenth Amendment.  Paul v. Davis, 424 U.S. 693, 708–09 (1976).  To establish "stigma-plus" defamation, "a plaintiff must show: (1) the public disclosure of a stigmatizing statement by the government; (2) the accuracy of which is contested; (3) plus the denial of some more tangible interest such as employment."  Chaudhry v. Aragon, 68 F.4th 1161, 1170 (9th Cir. 2023) (cleaned up).

The SAC alleges that the "pretextual, unsubstantiated, and retaliatory reasons for dismissing Kissner were sufficiently serious to stigmatize or otherwise burden him," SAC ¶ 263, and that "[t]he unsubstantiated stigmatizing charges were improperly disclosed and published to the public when the District/Individual District Defendants released them in response to a public records request," id. ¶ 264.  It further alleges that "[t]he charges of immoral conduct, including 'grooming' of minors, [have] impaired Kissner's reputation for honesty and morality," id. ¶ 265, that he "contested the accuracy of the charges," and that the Commission did not uphold those charges, id. ¶ 266.  It alleges the deprivation of a liberty interest, because the manner of termination imposed a stigma, and a property interest, because it divested him of his right to continued employment in public education.  Id. ¶¶ 257, 258.

### 1.    Arguments in the Briefing

Because he does not oppose dismissal of Martin, Arnold, Abeln, Bourque, Khandelwal, or Asheghian as to this claim, see Opp'n at 25, the only defendants Kissner still accuses of "stigma-plus" defamation are Fraser and Grier.  As to those two defendants,

1    Defendants argued in their motion that even if Kissner "can establish that [they]

2    participated in the disclosure of the statement of charges," his "claim fails, because he

3    cannot meet his burden to establish that he was deprived of his right to public employment

4    <u>without procedural due process</u>." MSJ at 24 (emphasis in original). Defendants relied on

5    the undisputed fact that Kissner "received notice, hearings, the right to counsel, the right to

6    conduct discovery, the right to call witnesses, and the right to appeal, in connection with

7    the termination and layoff proceedings against him." <u>Id.</u> at 24–25.

8        Kissner, in his opposition brief, focused on something different: the lack of process

9    he received[23] when Defendants released the Statement of Charges to the public in

10   connection with the two public record requests in April and July of 2021.[24] <u>See</u> Opp'n at

11   18–19; Opp'n Exs. 6, 7 (PRA responses). Kissner pointed to his counsel's demand that the

12   District remove the unfounded grooming allegations, and the District's failure to respond.

13   Opp'n at 18–19 (citing Opp'n Ex. 23). He asserted that because the District did not alert

14   him when the PRA requests came in, he was unable to do anything to enjoin disclosure

15   before the District responded. <u>Id.</u> He explained: "once the allegations were made public, a

16   reverse PRA lawsuit would have been futile" and so there were "no procedural safeguards

17   [that] protected [him] from the release of the allegations to the public." <u>Id.</u> at 19. Kissner

18   noted that the District even understood "the danger of releasing unfounded allegations,"

19   because its letters responding to the PRA requests (Opposition Exhibits 6 and 7) stated that

20   certain categories of records were exempt from disclosure, an agency can withhold records

21   if "the public interest served by withholding the records clearly outweighs the public

22   interest served by disclosure," the requests themselves did "not meet the requirement for a

23   proper PRA request," and "the California Court of Appeals held that records of complaints

24

25   _____

     [23] Kissner also argued, briefly, that he "properly alleged substantive due process claims"
26   for "stigma-plus" defamation, <u>see</u> Opp'n at 17–18, but the Court agrees with Defendants
     that there is no reason to believe that "stigma-plus" defamation encompasses substantive
27   due process. <u>See</u> Reply (dkt. 102) at 8–9 (citing <u>Fikre v. FBI</u>, 35 F.4th 762, 776 (9th Cir.
     2022) (referring to claim as "Stigma-plus procedural due process claim")).
28   [24] Fraser signed the District's response to the first PRA request, <u>see</u> Opp'n Ex. 6, and Grier
     signed the District's response to the second PRA request, <u>see</u> Opp'n Ex. 7.

United States District Court
Northern District of California

or investigations against a public employee can be disclosed only if 'the complaint is of a substantial nature and there is reasonable cause to believe the complaint or charge of misconduct is well-founded.'" See Opp'n Ex. 6 at 4301. The District's letters further stated that the District would "segregate and/or redact privileged and/or exempt information as needed." Id. at 4302. Notwithstanding all of that language in the District's letters, Kissner argued, the District released the entire document in full with no redactions. Opp'n at 19. And Kissner asserted that the PRA releases implicated his liberty interest. Id. at 20–23.

Defendants' reply brief again focused on Kissner's termination and layoff. Defendants asserted first that Defendants "did not argue that [Kissner] had not been deprived of a protected interest." Reply at 10 (referring to property interest in his position). Then Defendants insisted that what they "argued was, even assuming [Kissner] was deprived of constitutionally protected interests when his employment was terminated, plaintiff cannot maintain a procedural due process claim, because he was afforded all process reasonably due." Id. (emphasis in original). Defendants' reply brief therefore failed to address the argument Kissner actually made in his briefing—that he was denied adequate process when the PRA disclosures took place.

### 2.    Analysis of Arguments in the Briefing

Defendants are correct that Kissner received a lot of process in connection with his layoff and termination. See supra § I.A.3, 4. But however much process he got in connection with his layoff and termination, Kissner seems to have gotten no process in connection with the PRA disclosures by Fraser and Grier. Some process would have been possible. The District could have redacted the grooming allegations from the Statement of Charges, or at the very least it could have notified Kissner's counsel of the PRA requests in time for him to file a reverse-PRA lawsuit. Instead, Defendants released the Statement of Charges in their entirety (and, in the first instance, within an hour of the request). See Opp'n Ex. 6. Once the Statement of Charges was released to the public, the genie was out of the bottle: the stigmatizing grooming allegations that Kissner's counsel had earlier

United States District Court
Northern District of California

demanded the District remove were public.  That satisfies the first requirement of a

"stigma-plus" defamation claim.  See Chaudry, 68 F.4th at 1170.  The accuracy of those

allegations was contested.  See id.; SAC ¶ 32 (referring to grooming allegations as false

and unfounded); Opp'n Ex. 23 at 3 of 6 (referring to grooming allegations as "slanderous"

and lacking "any substance").  And the Court need not reach the third requirement of a

"stigma-plus" defamation claim—the denial of some more tangible interest such as

employment—see Chaudry, 68 F.4th at 1170—because the Defendants concede this point

in their reply brief, see Reply at 10.

This is Defendants' motion, and Defendants' briefing did not persuade the Court

that Defendants have prevailed on Kissner's "stigma-plus" defamation claim.[25]

### 3.    New Argument at the Hearing

At the motion hearing, Defendants made a new argument that was not in their

briefing: that Kissner cannot prevail on a claim based on the PRA disclosures, because if

documents responsive to a PRA request are the grounds for a government employee's

discipline, their immediate disclosure is mandatory.[26]  Defendants cited to two cases in

support of this new argument: Marken v. Santa Monica-Malibu Unified School District,

202 Cal. App. 4th 1250, 1276 (2012) and American Federation of State, County and

Municipal Employees (AFSCME), Local 1650 v. Regents of the University of California,

80 Cal. App. 3d  913, 918 (1978) ("American Federation").[27]  The Court need not consider

Defendants' new, unbriefed argument.  See California River Watch v. Fluor Corp., No. 10-

cv-5105-WHO, 2015 WL 5139341, at *2 (N.D. Cal. Sept. 1, 2015) (citing Makaeff v.

Trump Univ., LLC, No. 20-cv-940 GPC (WVG), 2014 WL 2743244, at *4 n.2 (S.D. Cal.

June 17, 2014) ("the Court need not consider issues raised for the first time during oral

---

[25] To be clear, the Court has not determined that Kissner should prevail on that claim either.  That question is not presently before the Court.
[26] Kissner raised this issue in a single paragraph of his opposition brief, noting that the District had argued in its anti-SLAPP motion earlier in the case that it had no choice but to make responsive records available.  Opp'n at 23.  Defendants did not respond to that paragraph in their reply brief or otherwise make the argument in their briefing.  See Reply.
[27] Neither of these cases are cited in Defendants' briefing.  See Mot., Reply.

1    argument.")).

2    But even if the Court did consider Defendants' new argument, that argument would

3    not persuade the Court that Defendants have prevailed on the "stigma-plus" defamation

4    claim.  Marken involved a parent's request for disclosure, under the PRA, of records

5    concerning a school district's investigation of a teacher after a student complaint.  202 Cal.

6    App. 4th at 1254.  The procedural posture of that case is notable: the District did not

7    immediately release the records of the investigation—instead, it advised the teacher that "it

8    intended to release certain of the records" and the teacher then "filed a verified complaint

9    for injunctive and declaratory relief/petition for writ of mandate, alleging disclosure of his

10   personal records was not authorized under the [PRA] and would violate his constitutional

11   and statutory rights of privacy."  Id. at 1255.  The trial court denied the teacher's request

12   for a preliminary injunction, and the appellate court affirmed.  Id. at 1255, 1279.  But it did

13   so after recognizing that the teacher had a "significant privacy interest in the information at

14   issue" that had to be balanced against a competing public interest in disclosure.  Id. at

15   1271.  Examining California Government Code § 6254(c)[28] and the controlling case law,

16   the court explained that the records of the investigation reflected "substantial or well

17   founded" claims of misconduct, based on reliable information—because an independent

18   investigator had prepared a report based on interviews, including of the teacher, had

19   identified "substantial credible corroborating evidence," and had concluded that "a number

20   of specifically described acts or comments" by the teacher "more likely than not did

21   occur."  Id. at 1275.  The District had also found that the teacher's conduct violated its

22   board policy prohibiting sexual harassment of students.  Id.  Because of the substantial

23   evidence of misconduct, the exemption in section 6254(c) was inapplicable and disclosure

24   of the records, as redacted by the trial court, was required.  Id. at 1276.

25   In contrast to Marken, the District here did not alert Kissner to its plan to disclose

26

27   ───────────────

28   [28] That section states that the PRA does not require the disclosure of "Personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy."

United States District Court
Northern District of California

the Statement of Charges before it disclosed them.  So rather than this issue first arising in a "reverse-PRA" suit in the state court, before the document was disclosed, it is here, in this suit, with the document already public.  The court in <u>Marken</u> also approved of redacting some of the records—something the District recognized that it could do here, <u>see</u> Opp'n Ex. 6 at 4302 ("District would "segregate and/or redact privileged and/or exempt information as needed."), but did not do.  And <u>Marken</u> described a careful balancing process governed in part by whether the allegations against the teacher were "substantial or well founded"—again something that the District recognized that it should do here, <u>see</u> Opp'n Ex. 6 at 4301 ("the California Court of Appeals held that records or complaints or investigations against a public employee can be disclosed only if 'the complaint is of a substantial nature and there is reasonable cause to believe the complaint or charge of misconduct is well-founded.'") (quoting <u>Bakersfield City School Dist. v. Superior Court</u>, 118 Cal. App. 4th 1041, 1044 (2004) and <u>BRV, Inc. v. Superior Court</u>, 143 Cal. App. 4th 742 (2006)), but seems not to have done.  <u>Marken</u>, while relevant, does not persuade the Court of the correctness of Defendants' position.

> <u>American Federation</u>, an earlier case, involved a University of California employee and union seeking the disclosure of an audit report that followed an investigation into an employee's report of financial irregularities.  80 Cal. App. 3d at 916.  The university's chancellor denied the request as constituting an unwarranted invasion of personal privacy pursuant to sections 6254(c) and 6255,[29] and the employee and union filed suit in state court.  <u>Id.</u> at 916, 917.  The trial court examined the audit report in camera and ruled that disclosure of the exhibits was appropriate, while disclosure of the report itself was not.  <u>Id.</u> at 917.  The appellate court affirmed in large part, citing <u>Chronicle Publishing Co. v. Superior Court</u>, 54 Cal.2d 548 (1960) for the proposition that "trivial or groundless charges" would not justify disclosure.[30]  <u>Id.</u> at 918.  The court in <u>American Federation</u>

---

[29] That section states that the PRA does not require the disclosure where "on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record."

[30] That case involved a request for records of complaints of wrongdoing against attorneys;

concluded that where the complaint was "of a substantial nature" and "there is reasonable cause to believe the complaint to be well founded," there was a right of public access that would be thwarted by nondisclosure.  Id. at 918.  And so, following review of the audit report, the court held that "disclosure should have been allowed," except for several "portions" of the audit report, at specified page ranges, that need not be disclosed.  Id. at 919.

American Federation, like Marken, varies from the present case.  American Federation reflects a careful balancing process conducted in the state court, governed by the "substantial" and "well founded" standard—a process that, while perhaps contemplated here, see Opp'n Ex. 6 at 4301, does not seem to have happened.  American Federation also allowed for the withholding of portions of the report that did not meet that standard—an option that Defendants recognized, see id., but did not do.[31]  American Federation also does not persuade the Court of the correctness of Defendants' position.  If there is other authority supporting Defendants' position, Defendants did not cite it.

Defendants' new argument therefore does not change the Court's view of Kissner's "stigma-plus" defamation claim.  The Court DENIES Defendants' motion as to this claim.[32]

### C.     All Claims: Layoff Liability

Finally, Defendants argue that they are entitled to summary judgment on all claims in connection with the decision to lay Kissner off—in some cases (1) because the individuals played no role, and in others (2) because they are entitled to absolute legislative immunity.  See MSJ at 19–23 (adding that each of Kissner's claims related in whole or in part to the layoff).[33]  The Court agrees with Defendants as to both.

---

the court held that trivial or groundless charges against attorneys, "no matter how guiltless the attorney might be, if generally known, would do the attorney irreparable harm even though he be cleared by the State Bar."  54 Cal.2d at 569.

[31] Redacting also took place in BRV, Inc., 143 Cal. App. 4th at 760.

[32] Again, the Court does not hereby hold that Kissner has prevailed, or would prevail, on this claim.  It holds only that Defendants did not persuade the Court either in their briefing or in their oral argument that they are entitled to summary judgment on this claim.

[33] In responding to this argument, Kissner repeatedly lumps the termination and layoff

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### 1.      Defendants Not Involved in Layoff

Defendants argue that Grier, Khandelwal, Martin and Fraser are not liable for any claims in connection with the layoff decision because they were not involved with the layoff.  MSJ at 19–21.  This is correct.

#### a.      Grier

Grier was not employed by the District when the layoff occurred: he took over as superintendent after June 30, 2021, when Fraser retired.  See MSJ Ex. F at 8:9–20.  The Board had already adopted Resolution No. 21-XII on February 10, 2021, involving the "reduction or elimination of particular kinds of service, resulting in a reduction of the number of certificated employees for the 2021–2022 school year," and approving the procedure for determining the order of seniority.  See RJN Ex. A.  And the Board had already adopted Resolution No 21-XIV on March 10, 2021, involving the reduction or elimination of particular kinds of service, and specifically retaining "mild to moderate to severe special education services," "language, speech and hearing special education services," "resource specialist special education services," and "multiple subject teaching credential."  RJN Ex. B at Z8.  Kissner even admitted that Grier was not employed at the District at any time between when Kissner was hired and when he was laid off.  See MSJ Ex. G at 4.

Kissner's only response as to Grier is that Grier "released the response to the PRA request on July 6, 2021" and "failed to reappoint Kissner as required by law."  Opp'n at 23 (citing Cal. Educ. Code Ann. § 44956(a)).  But Grier's involvement in the PRA release and his decision not to reappoint Kissner following the layoff[34] are beside the point.  They do not justify holding Grier liable for the layoff itself.

#### b.      Khandewal

---

together.  See, e.g., Opp'n at 9 ("The question before the Court is whether the school Board Defendants' layoff and dismissal resolutions, when 'stripped of all considerations of intent and motive,' were legislative rather than administrative or executive.").  Defendants respond that this argument relates to the layoff only.  See Reply at 10; see also MSJ at 19 (only arguing as to liability in connection with layoff).

[34] Defendants argue that Kissner was not eligible to be rehired because he had also been terminated.  Reply at 11.  The Court need not reach this issue.

United States District Court
Northern District of California

Khandewal is on the School Board now, see SAC ¶ 22, but did not join the Board until after the layoff resolutions, see MSJ Ex. N at 49 (agreeing that Khandewal was not on the Board at the time "the board voted to approve your layoff in March of 2021"). Kissner's response, as with Grier, is that Khandewal has "failed to reappoint Kissner to his rightful position."  Opp'n at  24.  He also argues that Khandewal had voted to dismiss him. Id. (citing Opp'n Ex 26).  But again, Defendants are only moving for summary judgment as to liability in connection with the layoff.  See MSJ at 19 (only arguing as to liability in connection with layoff).  Kissner has pointed to nothing that justifies holding Khandewal liable for the layoff.

### c.      Martin and Fraser

Martin is the former principal and Fraser is the former Superintendent, and neither was ever on the Board.  SAC at 5–6.  Kissner's layoff was the result of two legislative actions by the Board.  See RJN Exs. A, B.  Therefore, neither Martin nor Fraser is responsible for Kissner's layoff.

Kissner argues, though, that "Fraser and Martin were in fact the architects of Kissner's layoff."  Opp'n at 25.  But the only evidence he points to in support of that assertion fall short.

Kissner cites to testimony from Fraser's deposition in which Fraser stated that, in terms of layoff procedures and process, "My job would be to make sure that we follow process with the assistance of clerical assistance, but yes, that would be my responsibility." Id. (citing Opp'n Ex. 8 at 16).  But ensuring that everyone follows the process does not make Fraser the "architect" of Kissner's layoff.  It does not even suggest that Fraser had any voice in deciding which particular kinds of service to eliminate.  Nor does it mean that Fraser had a vote in passing the relevant resolutions.  As Kissner identifies no evidence that Fraser was responsible for Kissner's layoff, the Court does not hold her liable.

Kissner's evidence as to Martin is even weaker.  He argues that "Martin affirmed his role in the layoff process when he testified that Kissner was qualified and able to continue to teach in the 6th-grade core math and science block, but having Kissner in that

role wouldn't fit <u>his</u> 'core vision' of the 6th-grade model."  Opp'n at 25 (citing Opp'n Ex. 9 at 53).  Right before the quoted portion of his deposition, Martin was explaining "there's many things that the multiple subject expert can teach that a single subject person cannot."  Opp'n Ex. 9 at 53.  When asked if Kissner could teach a 6th grade math class, Martin agreed but said that "it would not support my core vision of the 6th grade model," <u>id.</u> meaning one in which teachers had multiple subject credentials.  As Defendants reason, "Regardless of how Martin answered this hypothetical question . . . it did not change the fact that <u>plaintiff was laid off as a result of the Board's adoption of the layoff resolutions.</u>"  Reply at 12.  Whatever Martin believed or desired as to the layoffs, it was the Board that adopted the two resolutions that effectuated the layoffs.  Kissner points to no evidence that it did so to realize Martin's "core vision."  Because Kissner identifies no evidence that Martin was responsible for Kissner's layoff, the Court does not hold him liable.

The Court therefore GRANTS the motion as to Grier, Khandewal, Martin and Fraser's liability for the layoff.

### 2.  Defendants Involved in Layoff

Finally, Defendants argue that even the Defendants who were actually involved in the layoff decision[35] should not be held liable for it because they are entitled to absolute legislative immunity.  MSJ at 21–23.  "Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'"  <u>Bogan v. Scott-Harris</u>, 523 US. 44, 54 (1998) (quoting <u>Tenney v. Brandhove</u>, 341 U.S. 367, 376 (1951)).  "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  <u>Id.</u>  In <u>Bogan</u>, the Court held that "voting for an ordinance" was "quintessentially legislative" and "introduc[ing] . . . a budget and signing into law an ordinance" were also formally legislative.  <u>Id.</u> at 55.  The ordinance there "bore all the hallmarks of traditional legislation," reflecting "a discretionary, policymaking decision

---

[35] Counsel confirmed at the motion hearing that this is Arnold, Abeln, Borque, and Asheghian,  <u>See also</u> SAC ¶¶ 19, 20, 21, 23 (all four are identified in the SAC as board members).

United States District Court
Northern District of California

United States District Court
Northern District of California

implicating the budgetary priorities of the city" and "the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office." Id. at 55–56.

Kissner argues that our case is distinguishable from Bogan, because the Board member defendants here were not engaged in legislative activity. See Opp'n at 8 (citing Ahearn v. City of Palos Verdes, No. CV-07-2029-AHS-RNB, 2008 WL 1330461, at *9 (C.D. Cal. Apr. 9, 2008)). "[L]egislators performing administrative or executive functions involving decisions directed at one or a few individuals are not entitled to legislative immunity." Ahearn, 2008 WL 1330461, at *9 (citing Trevino v. Gates, 23 F.3d 1480, 1481 (9th Cir. 1994)). Ahearn cited to Kaahumanu v. County of Maui, 315 F.3d 1215, 1220 (9th Cir. 2003), which set out the four somewhat overlapping factors courts should consider in determining whether an act was legislative: "(1) whether the act involves ad hoc decisionmaking, or the formulation of policy[36]; (2) whether the act applies to a few individuals, or to the public at large[37]; (3) whether the act is formally legislative in character[38]; and (4) whether it bears all the hallmarks of traditional legislation."[39] Id. at 9–10 (quoting Kaahumanu, 315 F.3d at 1220).

Applying the Kaahumanu factors here favors Defendants.

### a.    First Factor

First, the two ordinances that effectuated the layoff were not ad hoc. Resolution No. 21-XII set forth the Board of Trustees' criteria for determining which employees to prioritize in implementing a reduction in force. RJN Ex. A ("1. Multiple Authorization Credentials; 2. Experience teaching different subjects; 3. Possession of a preliminary,

---

[36] A decision is ad hoc when it is "taken based on the circumstances of the particular case and did not effectuate policy of create a binding rule of conduct." 315 F.3d at 1220.

[37] "When the act in question applies to a few individuals rather than the public at large, legislative immunity is disfavored." Id. at 1222.

[38] The act of voting is "quintessentially legislative" but courts are to "look beyond the formal character of the act" in making this determination. Id. at 1223 (quoting Cinevision Corp. v. City of Burbank, 745 F.2d 560, 580 (9th Cir. 1984)).

[39] An act bears all the hallmarks of traditional legislation where it reflects "'a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents.'" Id. (quoting Bogan, 523 U.S. at 56).

clear, standard, or life teaching credential; 4. Possession of a CLAD/BCLAD/CTEL certificate; 5. Experience teaching at different grade levels. . . .").  Resolution No. 21-XIV stated that "WHEREAS, the Superintendent . . . recommended . . . that the District reduce or eliminate particular kinds of service(s) no later than the beginning of the 2021–22 school year; and WHEREAS, the Board of Trustees is required by law under California Education Code . . . to take action and give notice to all certificated employees affected," the Board "hereby determines to reduce or eliminate the following particular kinds of service," and identified 4.0 FTE grades K-8 Classroom Teaching.  RJN Ex. B.  That same resolution stated that the Board "has determined to retain the following particular kinds of service," listing "1. Mild to Moderate and Moderate to Severe Special Education Services; 2, Language, Speech and Hearing Special Education Services; 3. Resource Specialist Special Education Services; 4. Multiple Subject Teaching Credential."  Id.  Unlike the ordinance affecting "only a single permit and a single parcel of land" in Kaahumanu, 315 F.3d at 1220, or the vote "to approve or deny plaintiff's individual request for approval of a Project at her private residence" at issue in Ahearn, 2008 WL 1330461, at *10, the ordinances here involved a District-wide reduction to "particular kinds of service" at the K-8 level.  See RJN Exs. A, B.

### b.  Second Factor

Second, the actions at issue did not only apply to a few individuals.  The ordinances, while felt most acutely by the impacted teachers, impacted all of the students and families in the school district.  Id.  Neither ordinance even mentions Kissner.  The ordinances therefore vary greatly from the decision by city council members in Bateson v. Geisse, 857 F.2d 1300, 1304 (9th Cir. 1988), to withhold Bateson's building permit, which "was directed specifically and solely at a single individual" and therefore did not entitle the city council members to immunity.

### c.  Third Factor

Third, the acts here—voting for two ordinances—are formally legislative in character.  See Borgan, 523 U.S. at 55 ("voting for an ordinance" was "quintessentially

legislative" and "introduc[ing] . . . a budget and signing into law an ordinance" were also
formally legislative). While the Court must look beyond the formal character of the act,
see Kaahumanu, 315 F.3d at 1223, even Kissner recognizes that eliminating a position is
"clearly a legislative act" as opposed to "'the hiring and firing of a particular employee,'"
Opp'n at 9 (quoting Bogan, 523 U.S. at 55–56). Kissner makes this concession because
(1) he seems to believe that Defendants are arguing for immunity on the termination
decision as well as the layoff decision, see id. at 9, which is not true, see Reply at 10, and
(2) he thinks it is significant that the Board did not eliminate the position of 6th-grade math
and science teacher, see Opp'n at 9–10 ("There is no indication in the Board minutes that
Kissner was dismissed or laid off because the Board no longer needed or wanted a 6th-
grade math and science teacher"; "the layoff decision fairs [sic] no better because
Kissner's position—teaching 6th-grade math and science—was not eliminated, only his
employment"). This is also not true.

As Defendants explain, the Education Code allows a school district to reduce its
certificated staff because of a decision by the Board to reduce or discontinue a particular
kind of service (PKS). Reply at 13 (citing Cal. Ed. Code § 44955(b)); see also Zalac v.
Governing Bd. of Ferndale Unified Sch. Dist., 98 Cal. App. 4th 838, 853–54 (2002) ("a
school district facing an anticipated unbalanced budget has a variety of means of meeting
its financial problems: it may, for example, reduce the number of permanent and
probationary teachers pursuant to [44955]"). The Board did not have to eliminate the
specific position of "6th-grade math and science teacher"; rather, "classroom teaching" is a
"particular kind of service." See id. at 854. Resolution 21-XII anticipated a "reduction or
elimination of particular kinds of service," and Resolution No. 21-XIV identified 4.0 FTE
grades K-8 Classroom Teaching. RJN Exs. A and B. Passing those ordinances is the kind
of legislative act the Education Code envisioned. See Zalac, 98 Cal. App 4th at 854.

### d.     Fourth Factor

Fourth, the two ordinances bear all the hallmarks of traditional legislation because
they reflect a discretionary decision of the Board implicating the city's budget and

33

services.  See Kaahumanu, 315 F.3d at 1220 (quoting Bogan, 523 U.S. at 56).  The Board

was explicitly trying to effectuate a "reduction of the number of certificated employees

for" the upcoming school year, "solely on the basis of the needs of the District and the

students."  See RJN Ex. A.  The record reflects that the District was facing a budget

shortfall and that the layoff resulted from it.  See, e.g., MSJ Ex. 12 at Z11 (layoff letter: ". .

. given the economic realities of the District") RJN Ex. E (layoff decision: "District is

facing a budget shortfall"); Opp'n Ex. 8 at 16 (Fraser testimony: "we've been experiencing

issues with declining enrollment and also issues with budget – need for budget

reductions."), 17–18 (discussing need to make a FTE reduction for 2021–22 school year,

Measure N contingencies).[40]  Moreover, schooling is one of the quintessential services a

city "provides to its constituents."  See Kaahumanu, 315 F.3d at 1220 (quoting Bogan, 523

U.S. at 56).

Because the applicable Defendants' actions in connection with the layoff were not

ad hoc, affected more than just Kissner, were formally legislative in character, and bore the

hallmarks of traditional legislation, those Defendants are entitled to legislative immunity.

The Court therefore GRANTS the motion as to all claims in connection with the decision

to lay Kissner off.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the motion for summary judgment

as to Claim 1, the First Amendment Retaliation claim, and as to all claims as they pertain

to the layoff decision.  The Court DENIES the motion for summary judgment as to Claim

//

//

//

---

[40] Although Kissner argues that his job "was neither targeted for budgetary reductions nor resulted in any," Opp'n at 10, and his SAC is even more incendiary on this point, see SAC at 49 ("Dismissing Kissner Would Not Be Enough, Belt and Suspenders Were Needed So The District Simultaneously Eliminated Kissner Through An Unlawful Reduction In Force"), he point to no evidence that the Board was not truly motivated by budgetary concerns.

United States District Court
Northern District of California

3, the "Stigma Plus" Defamation claim.

**IT IS SO ORDERED.**

Dated: September 8, 2023



CHARLES R. BREYER
United States District Judge