

*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101    Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Dr. Billy Martin, Principal*

## <u>NOTICE OF PROPOSED INTENT TO DISMISS WITH STATEMENT OF CHARGES</u>

February 12, 2021

**VIA PERSONAL DELIVERY AND REGISTERED U.S. MAIL**
**(RETURN RECEIPT REQUESTED)**

David Kissner
25059 Skyland Road
Los Gatos, CA 95033

Dear Mr. Kissner:

You are hereby given notice of your dismissal, based upon the enclosed Statement of Charges ("Charges"). The proposed dismissal is under the authority of Education Code section 44932. Enclosed are copies of these Education Code sections, as well as documents upon which the Charges are based upon.

Before the Loma Prieta Joint Union School District ("District") administration makes a recommendation to the Governing School Board of Trustees concerning your dismissal, you have the right to respond to the Charges. For that purpose, I have scheduled a meeting on Monday, February 22, 2021 at 1:00 p.m. to be conducted via Zoom teleconference, at such time you will be provided an opportunity to respond to the Charges. You are advised that you may have a representative of your choice at the meeting. After the meeting, the administration will make a decision whether to proceed forward with this disciplinary action or otherwise, based upon the information available, including your response to the Charges.

During the pendency of this action, the District has determined to place you on paid administrative leave pending further notice. As such, you will remain on payroll and you will continue to receive full pay and benefits.

Until further notice, you are directed not to perform any duties for the District or District schools. You are to remain away from all District facilities, schools, and property unless you first obtain a written authorization from me, the District Superintendent. You are directed to return all District property in your possession immediately to Principal Billy Martin, including, but not limited to,

**Kissner 6-9-23**
**EX. 13**

*Board of Trustees:*
*Deana A. Arnold, President    Ron Bourque, Vice-President*
*Ben Abeln, Member    Erin Asheghian, Member*

**PL000778**

keys, files and other documents, supplies and security codes. Please plan to meet with Principal Martin at 12:00 p.m. on Tuesday, February 16, 2021 in order to surrender those items. In the event that you need to retrieve any personal items from your worksite, please let me or Principal Martin know, and we will make arrangements for you to retrieve those items.

You are also directed not to discuss this matter with co-workers, students, parents, and others, except that this directive does not affect your right to discuss this matter, your employment, or any related matter with an attorney or representative of your choice. If you need to contact a District employee regarding a matter unrelated to this action (e.g., benefits questions and the like), you may do so by first contacting my office so that I may schedule a meeting on your behalf.

Please understand that during your administrative leave, you are required to remain available to the District for telephone calls and meetings during normal working hours (if requested to attend by my office or your Principal). Otherwise, you will be notified subsequently if your status with the District changes.

Pursuant to Education Code section 44031, this document and its attachments will be placed in your personnel file within ten (10) days or shortly thereafter. You have a right to submit a written response, which will be included in your personnel file.

Sincerely,

Lisa Fraser
Superintendent
Enclosures:    Statement of Charges
Education Code sections 44031, 44932, and 44939
Exhibits 1-34

## ACKNOWLEDGEMENT OF RECEIPT

_____          _____
Signature of David Kissner                         Date

Employee's signature does not signify agreement with the contents of this Notice, but merely confirms receipt of this Notice.   You are hereby informed that pursuant to Education Code section 44031, a copy of this Notice will be placed in your personnel file.   You have the right to prepare a written response to this Notice that will be attached hereto before placement in your file.

PL000780

## STATEMENT OF CHARGES AGAINST DAVID KISSNER

I, Lisa Fraser, Superintendent, for the Loma Prieta Joint Union School District ("District"), hereby charge that there exists cause to dismiss David Kissner as a permanent certificated employee of the District.

## CAUSES FOR DISMISSAL

The specific causes for your dismissal are:

1. Immoral Conduct [Ed. Code § 44932(a)(1);
2. Unprofessional Conduct [Ed. Code, § 44932, subd. (a)(2)];
3. Unsatisfactory Performance [Ed. Code § 44932, subd. (a)(5)];
4. Evident Unfitness for Service [Ed. Code, § 44932, subd. (a)(6)]; and
5. Persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools by the state board or by the governing board of the school district employing him or her [Ed. Code, § 44932, subd. (a)(8)].

## SPECIFIC ACTS OR OMISSIONS

The specific acts or omissions that constitute this Statement of Charges include, but are not limited to, the following:

1. As a certificated employee of the District, you are required to maintain the highest ethical standards, exhibit professional behavior, and follow District policies and regulations. You are further expected to exercise good judgment and maintain professional standards and boundaries when interacting with students. (BP/E 4119.21.)

See Board Policy 4119.21, attached as Exhibit 1.

2. As an employee of the District, you are expected to exhibit professional and appropriate conduct.

3. As you are aware, in 2018, very serious allegations of misconduct on your part were brought to the District's administration's attention via an anonymous complaint, which necessitated a formal investigation. As such, an outside professional investigation firm was brought in to conduct the investigation. The independent investigator, who interviewed multiple witnesses, reviewed documentation and other evidence, ultimately determined that you engaged in very serious misconduct. These findings were carefully reviewed by the District and resulted in your receiving a formal letter of reprimand from the Superintendent.

See Letter of Reprimand dated October 18, 2018, attached as Exhibit 2.

4

PL000781

4. Among the findings, which were made by the Investigator as part of the October 2018 allegations, by a preponderance of evidence, were the following:

   a. It was determined that you knowingly provided an alcohol beverage to a minor(s) (District student, likely Grade 9 or 10) during a non-District activity organized and/or conducted by you.

   b. Not only was it concluded that you knowingly provided an alcoholic beverage to a minor District student, but the Investigator also found that you ultimately admitted to this egregious conduct, claiming that you only gave the boy a "toast" and just a "sip of an alcoholic beverage", claiming it was "after a significant outdoor achievement." You also claimed that this involved a "high school age person." Despite admitting to this egregious and unlawful misconduct, you incredibly tried to justify your actions by claiming that the "offense in question is the legal equivalent of a traffic ticket...."

   See October 18, 2018 D. Kissner Response, attached as Exhibit 3.

   c. Contrary to your claims in defense of your egregious misconduct, the Investigator uncovered evidence that you:
      i. You poured the minor a glass of whiskey in a "red cup";
      ii. The minor was 15-years old;
      iii. This incident occurred while others had gone on a walk and you remained alone with the minor back at the campsite;
      iv. The minor did not go on the walk claiming he was tired;
      v. Instead of going on the walk, you and the minor listened to the others on a walkie-talkie type device;
      vi. You and the minor laughed at the others who went on the walk;
      vii. You were confronted by the minor's parents and Pastor Haak in a later meeting also attended by the Pastor's wife and your wife as well. Once again, you admitted to serving the alcohol, specifically whiskey. In fact, you also claimed you "sinned in front of [ ] God," among other statements.
      viii. The minor's family was extremely upset with you, and that you potentially exposed their son to a "potential addiction", given that their family has a history of alcoholism killing several relatives.
      ix. In this encounter, you insisted you only had "one glass of whiskey" with the minor.
      x. Additionally, it was discussed that you had "guns" on the campsite premises at that same time.

   d. Further, the Investigator noted that you were involved in a prior incident also involving another minor and alcohol. This incident was reported to the Investigator by Sheriff's Deputy Koenig.

PL000782

See Investigation Report of Patricia Elliott, Attorney At Law, attached as Exhibit 4.

e.  As a result of these astonishing findings, the investigator determined that you have a history of improperly providing alcohol to minors and persons under the age of 21, since it was also determined that you had been disciplined during your military service for giving alcohol to underage troop members. In fact, you <u>admitted</u> such past misconduct in a student interview you gave as part of a school assignment and have also told others of this incident, including Pastor Haak.

f.  In addition, there were reports of other incidents involving you providing alcohol to minors on the same and other student trips. Interestingly, in your interview with the Investigator, when discussing the whiskey incident, you also claimed:
    - The minor was a "co-leader" on a backpacking trip;
    - You gave him "some extra responsibility to lead the kids";
    - At the "end of the hike, I gave him a sip of whiskey as a toast, kind of like 'good job on your accomplishments'";
    - "There were no incidents of anything beyond that";
    - You also claimed that "I was just trying to treat him as an adult…";
    - You have a tradition on these trips to have a "100 ML [of alcohol] in the evening," to enjoy your evening;
    - When you gave the minor the whiskey, you and he were "alone", and the younger kids "went on a night hike";
    - Had the younger ones been there, you would "obviously not have offered" the minor the whiskey. "It was meant to be discreet"; and
    - You did not know at the time of the incident that the minor was suffering from mental health issues, but the minor's mother did inform you of that in the meeting with Pastor Haak and others after the incident occurred.

g.  In addition to the alcohol incident(s) and other related findings, the Investigator determined there were other serious infractions on your part, which were also reviewed by the Superintendent and included in the October 18, 2018 reprimand. It was determined that there were other instances of misconduct by you with children that represent and compound the finding of a lack of professional boundaries and/or questionable teaching practices on your part. These include:

    - Failing to maintain professional boundaries, including via technology and sharing private texts/messages with minors/students.
    - Sharing personal information that could offend/frighten students.
    - Telling students inappropriate comments of a sexual nature, including informing male student that you could give him a "small binder clip" he could use on his penis to stop his need to go to the

6

bathroom, after you denied him the ability to leave class to go to the restroom.

- Potential grooming behavior, such as: singling out a minor and being alone with a minor; offering alcohol; asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet.

5. As part of her investigation, the Investigator made the following specific findings by a preponderance of evidence with respect to additional incidents beyond the alcohol incident[s]):

    a. You have made inappropriate personal comments to students/minors about death/violence, including, stories in class (6th and 8th grades) about serving in Iraq and traveling thereafter such as:

- A soldier being blown up while in a porta-potty;
- Others being "blown up by terrorists";
- "Bodies littering the road";
- People being "completely blown up";
- People being blow up so that only "their boot is left of them";
- Telling 6th graders that your troops had to "kill individual people";
- How you were "almost blown up by a rocket missile";
- Held at "gunpoint" with a "gun to [your] throat" during a biking trip;
- Setting up a bomb that "killed a bunch of terrorists"
- Troops were laughing watching "like twenty people being blown up";
- You thought it was funny since just before a dog was blown up and troops were very upset; and
- Telling violent stories.

    b. Telling students that you liked the video(s) of Bambi (Disney character) being killed - even as a child - since you hated Disney.

    c. You often showed video clips to students depicting death and violence.

    d. Inappropriate classroom exercises/instruction included math "word problems" involving violence/death including:

- "Kids falling off cliffs" to find velocity;
- "Time to impact" using same example above;
- People dying;
- People falling out of buses;
- Children drowning;
- Children dying;

7

- Being thrown off a cliff;
- Around Christmas, using Santa Claus, as being "Hung, dying" by rope to figure out the concept of force;
- Using names of actual students and being killed/harmed, such as: Student "gets punched in the face", where guns are involved, "getting eaten by bears";
- Students being "sacrificed" (oftentimes these are students that are perceived to be disliked by you previously, or who may wear glasses, or be short, or other characteristics).

e. When interviewed by the investigator regarding these incidents, you did not deny these actions, and instead admitted that you have a "morbid sense of humor"; "kids love [your] math tests"; the word problems are "humorous" - and "I have got child labor and kids eaten by bears."

f. Also, the Investigator found that you inappropriately physically wrestled with boys on the classroom floor.

See Exhibit 4.

6. Further, the investigator noted that when you were placed on paid administrative leave on or about May 1, 2018 you were given specific written directives including an obligation of confidentiality/protection of the confidentiality of information. Specifically, you were informed that you had "an obligation to maintain the confidentiality of both the fact of and information concerning the investigation, and to not disclose such information to others, including employees, parents, and students of the District." Moreover, you were provided notice that "violations of this policy may result in appropriate disciplinary action."

7. Despite these strict directives and mandate of confidentiality, the Investigator found that you *failed* to comply and, in fact, disclosed information about the investigation to others, including District parents. When interviewed in 2018, you <u>admitted</u> to the Investigator that you *failed* to comply with the confidentiality directives, but claimed it was "to a very limited degree"; then claimed to parents, you were on leave "related to the Walkout". Also, despite telling the Investigator that your communication with District parents regarding the investigation was person-to-person, not via email; the Investigator found evidence to show that you were, in fact, communicating with numerous parents via email regarding your leave and pending investigation and lobbying them to pressure the District to bring you back from leave. Among such was a mass email from your personal email account to undisclosed persons entitled: "Support Mr. Kissner - Our voices are stronger together!"

See April 30, 2018 Letter, attached as Exhibit 5, Investigation Report of Patricia Elliott, Attorney At Law (Exhibit 4), and email entitled "Support Mr. Kissner-Our voices are stronger together!", attached as Exhibit 6.

PL000785

8. Thereafter, on March 31, 2020, you received a formal Warning of Unprofessional Conduct, following the receipt and review of concerns raised by a parent related to your treatment of her son in a discriminatory and derogatory manner in the presence of other students during an 8th grade science class. Specifically, it was found that when the student professed to you that another student was "bullying" him, you responded, "You should make fun of his slitty eyes". It was determined that this Warning of Unprofessional Conduct was necessary and placed into your personnel file to ensure that you understood the serious nature of the concerns and refrained from such misconduct in the future.

9. Moreover, you were also given an opportunity to meet and respond to the allegations contained in the March 31, 2020 Warning of Unprofessional Conduct, but instead refused to meet and/or provide any factual information to refute the claims. Your refusal to meet and discuss the allegations and findings was in violation of your duty as a District employee to cooperate with the fact-finding process. Ultimately, you provided a written statement which did not provide any factual response, but instead focused on other irrelevant matters related to another personnel matter from 2018.

   See March 31, 2020 Warning of Unprofessional Conduct (and Response), attached as Exhibit 7.

10. Thereafter, on April 2, 2020, you received an additional formal Warning of Unsatisfactory Performance following another student incident. In this case, it was found that after a student arrived late to a lunch detention, instead of handling this additional infraction in a civil and professional manner as the teacher, you became very angry and slammed your fist on the table. When the student attempted to explain why she was late, you loudly stated, "No shit, Claire." Not only was this uncalled for, it upset the student and the rest of the students present. It was determined that this Warning was necessary and placed into your personnel file to ensure that you understood the serious nature of the concerns and refrained from such unsatisfactory misconduct in the future.

11. Once again, you were given an opportunity to meet and respond to the allegations, but refused to meet and/or provide any factual information to refute the claims. Your refusal to meet and/or respond to the allegations was in violation of your duty as a District employee to cooperate with the fact-finding process. Ultimately, you provided a written statement which did not provide any factual response, but instead again focused on other irrelevant matters related to another personnel matter from 2018.

   See April 2, 2020 Warning of Unsatisfactory Performance (and Response), attached as Exhibit 8.

12. On August 27, 2020, you were sent a Request for Information (regarding Remote Wilderness School Camps), from the Superintendent based on the District's receipt of concerns raised by a community member with respect to the Remote Wilderness School Camps ("Camps"). The Camps were referencing trips conducted by you and in apparent conflict with regular school days/hours for District students, as well as contracted work hours for you as a teacher. As a result, you were directed to provide by the next day,

9

August 28, 2020, a description of the Camps proposed activities planned during school hours. The purpose was to ensure legality for the District and protection for you from potential liability as well related to the Camps. You *failed* to comply with the directive and provide the District with the requested relevant information.

See August 27, 2020 Request for Information, attached as Exhibit 9.

13. Following your failure to comply with the prior directive/request for information, it was then necessary for the District to follow-up with you for more specific information to ensure the Camps were appropriate for District students and for you as an employee to attend. As such, on August 28, 2020, you were provided with a detailed written questionnaire, which you also ignored and *failed* to provide a response. By failing to respond to the questionnaire you once again ignored specific directives given to you by the District. Each of the questions contained in the questionnaire were necessary for the District to determine the appropriateness and legality of your participation and administration of these Camps trips involving District students potentially during school hours and/or your duty time.

See August 28, 2020 Remote Wilderness School Camps memo, attached as Exhibit 10.

14. Following the above-described incidents, shortly thereafter, the District received a new further concern related to you sending emails to District student(s) directly on their personal/school accounts, as well as to many parents in the community as well. In one instance, you sent an email to an 11-year old student's school email account. Your email to the 11-year old student concerned student grading and providing extra math help through an "online after school homework center" with a direct link to your personal website(s), included the En Gedi Project and an opportunity to donate money. Sending personal emails to students and parents advertising your own online personal website and soliciting donations is inappropriate.

See September 8, 2020 emails, attached as Exhibit 11.

15. As a result of the concerns received from community members about your September 8, 2020 emails, your site Principal, Billy Martin, contacted you on September 14, 2020 to inquire about the matters as they related to your promotion of Mountain Math Initiative ("MMI") and other non-District activities. Specifically, Mr. Martin requested to know whether you were emailing students directly and/or mass emailing students; whether the MMI class was taking place during your District duty time; whether you informed a student/parent that MMI attendance would qualify for school credit or replace missing credits; and whether you recommended MMI to the family of a special-needs student as an alternative resource.

16. Rather than simply providing Principal Martin with the information he requested from you, you requested a meeting with him expressing that you were "getting a bit frustrated with how this is playing out." In response, Mr. Martin offered you several times to meet that day and the next. You then disrespectfully responded that you would meet with him

PL000787

the next day and "sit on my frustrated and sarcastic email reply for now (said frustration and sarcasm not at all directed towards you)."

See September 14, 2020 emails, attached as Exhibit 12.

17. In October of 2020, the District received a complaint from a parent regarding your teaching practices. Specifically, the parent mentioned that her son was a former student of yours and that you chastised her son and physically tore up her son's math work in front of the class because he used a pen (instead of pencil) on a math assignment. She went on to request that her daughter not be placed in your class for the current school year.

18. In the fall of 2020, due to parent concerns and confusion over whether some students in Math 7 were allowed to receive class attendance credit for alternatively attending your MMI outside Math program, Principal Martin and Superintendent Fraser met with parents to discuss such concerns. Following that meeting, on October 8, 2020, Principal Martin emailed you with a summary of the meeting, which included specific parameters for Math 7 and requirements for participation. Parents were also informed and assured that MMI is an outside enrichment program - not supplanting/replacing any District Math course/coursework; and confirming that attendance in MMI did not count as attendance in any District Math course/class, including CTE, etc.

In closing to his October 8, 2020 email, Principal Martin directed you to provide a "list of students with whom attendance at CTE may have been communicated as optional or who believe participation in Mountain Math Initiative counts as attendance/participation for their CTE classes. I want to make sure those families get the same message as the ones with whom I met today."

See October 8, 2020 emails, attached as Exhibit 13.

19. Despite the October 8, 2020 email directive from Principal Martin in which you were clearly directed to provide the list of students who were misinformed by you that attendance at CTE was optional or who participated in MMI program; as of October 13, 2020, you had *failed* to adhere to said request. As such, on October 13, 2020, Principal Martin emailed you again with his request and further stated, "I am unable to tell from your previous response if you are refusing to provide me the requested information or if you need additional time to do so." The previous response he referenced was a three-page email you wrote which clearly disagreed with the District's approach and directives, but also *failed* to include the student list required of you on October 8th.

See October 13, 2020 (and related) emails, attached as Exhibit 14.

20. Although on October 13, 2020, you finally provide a student list to Mr. Martin, the list was in fact just an entire class roster and was not in compliance with the prior and specific directive to provide a list of students that were informed by you that MMI would count towards attendance credit for District Math courses; you also informed Principal

PL000788

Martin that you incorrectly communicated to students/parents that "any interaction whatsoever with a teacher during the day qualifies as being present in class for attendance purposes." As a result of your statements, on October 14th, Principal Martin informed you that several parents still conveyed that they understood that students are "not required to attend their CT math course if they are participating in Mountain Math Initiative and that the work done and the grade earned for that after school enrichment course will be applied to their CT math course." Principal Martin reiterated to you "[t]his clearly indicates an intention of supplanting that after school activity for their CT math course." Principal Martin went on to reemphasize to you, "This is an action I need to make clear is not [an] acceptable practice." He also re-emphasized that "a qualifying attendance event must be completed by the end of the school day for the day the attendance to count. A qualifying attendance event must happen within the school day; after school hours do not count toward positive attendance."

In closing, Principal Martin re-directed you to provide the actual list of students (names of families who have been explicitly told their child does not have to attend your CT math course and instead can attend Mountain Math for District math credit/attendance).

See October 13, 2020 and October 14, 2020 emails, attached as Exhibit 15.

21. On October 18, 2020, the District learned from a disgruntled parent(s) that you were very late with your Math grading, and as a result they were uninformed that their child's grade had dropped from an "A/B" to a "C" on the last day of the quarter. Further, the late grade report showed the parent that their son had low marks on several assignments from a full month prior. The parent expressed great concern and frustration since he/she frequently checked the online system (PowerSchool) and saw no signs of problems prior to the low grade being given - which indicated that you *failed* to enter such relevant information until the very end of the period. Not only had you not properly/timely entered the information, but you also neglected to otherwise communicate concerns with the parent during the quarter. The parent closed their email to you (copied to your Principal) declaring, "Poorly done!"

See October 14, 2020 emails, attached as Exhibit 16.

22. Although that same day you responded to the parent in an email seemingly to apologize for your failures, you then inappropriately went on attempt to excuse your behavior by claiming, "I can assure that this is not for lack of time spent lesson planning, delivering instruction, meeting with students who need help, answering insane amounts of emails, and other time-consuming admin tasks like attendance that take all day." Not only was this additional information uncalled for in an "apology" to a parent, but much of it was untrue and frankly embarrassing to you and the District. Further, you then continued on for an additional two paragraphs, placing the blame on the student/parents for the problems with the student's grades, before apologizing again for your failures to timely update and grade the student's assignments.

See October 18, 2020 email, attached as Exhibit 17.

12

23. Besides inappropriately emailing that parent, you also proceeded to mass-email each family in your 7th grade Math class to seemingly update and explain grading and other class activities on October 18th (then other classes on October 22nd [8th Grade Physical Science] and 26th [6th Grade Math]). In virtually identical letters, although you attempted to apologize for being "behind" on PowerSchool, you also used poor judgment in stating: "this has been a 'try to keep my head above water' type of quarter." You further made a proofing/typographical error in *each* (almost identical) letter by stating: "I am foregoing [sp] the normal labs...". Moreover, the October 22nd letter to 8th Grade "Physical Science" families incorrectly addresses "7th grade math classes." That letter was also sent to families at 1:49 a.m. – which may explain the apparent "cut and paste" error.

See October 18, 22, 26, 2020 emails, attached as Exhibit 18.

24. Subsequently, you were contacted by various District administrators/staff to help you with PowerSchool, to allow you to improve your updating of grades and to facilitate IEP goal updates as well. In an effort to assist you, Staci Ljepava, Director of Student Services and Special Education and Randy Cohen, RSP Teacher/Case Manager, each reached out to you with respect to assist you with properly utilizing PowerSchool. Nevertheless, as of October 27, 2020, according to the Director Ljepava, you had still *failed* to enter the necessary IEP goal information into Power School. In fact, you had not done so by October 23rd despite Dr. Cohen's efforts to help you gather such data. Further, it was discovered that you had not updated 6th grade Math scores since September 11, 2020 (42 days prior). As a result, in an October 27th email from Director Ljepava, she informed you that this required "immediate action" and she added that "[i]n the future, if you need more time please communicate this with the case manager...to remain in IEP compliance." She then directed you to "Please update myself and the case manager on the status of your grade updates, so I can respond accordingly to the [IEP] team with next steps."

See October 27, 2020 email, attached hereto as Exhibit 19.

25. On November 3, 2020, the District received a further complaint from a 6th Grade parent, who was upset with your teaching her child's class. Specifically, the parent stated that there were several Zoom class sessions recently (while you were apparently "away in Tahoe") "ending after just a few minutes or just canceled out right". Additionally, the parent was upset that you instructed students to grade their own tests. The parent felt that students self-grading their own tests neglected the student's need to learn from mistakes - rather than just check for the "right answer". The parent was also put off by your prior mass email on October 26th updating parents on the late grading/PowerSchool concerns but stating that you were "trying to keep my head above water" - as part of your excuse/apology. Of particular note, the parent remarked in closing, "I know he has been providing education assistance for kids during his camping trips, but it seems this is causing him issues in keeping up with his teaching position at CT."

PL000790

The parent went on to note, "He is planning another lengthy (3 week) trip in November - is there a way to have someone in the administration join [Student] classes to make sure he is providing the lessons for kids in his CT classes?"

See November 3, 2020 and related emails, attached as Exhibit 20.

26. As a result of the November 3rd complaint, your Principal informed you of the concerns, and provided you with an email (at 10:21 a.m. - November 12, 2020) containing specific requests for information in order to commence a proper review. These included the following:

> "To date, have you canceled any synchronous Zoom classes that are regularly planned for Mondays, Tuesday, Thursdays. Or Fridays?
> If yes, what days and/or what classes were canceled?
> If a class was canceled what was the reason for the cancellation?
> How far in advance are notified of cancellations?
> How do you notify students of the cancellation?
> Did you assign to students of any canceled classes work or other instruction equal to 35 minutes?"

In response to these simple and specific requests which were necessary to make sure that you were complying with proper remote learning attendance and credit requirements, you responded in the evening at 9:36 p.m. that, "In general, I do not participate in any investigation or inquiry being conducted by the school district because of previous experiences."

You went on to add, "I have never skipped or canceled a Zoom meeting." Further, you stated that, "The only time that I have not utilized near the full scheduled Zoom time were the few days where there were power outages on the mountain or evacuations."

See November 12, 2020 email, Correspondence attached as Exhibit 21.

27. As a further result of the November 3rd complaint and information brought to the District's attention as to your Remote Wilderness School Camps trip planned for November, on November 5, 2020, the Superintendent provided you with a letter requesting important and necessary information (similar to the directive you received in August of 2020- to which you *failed* to respond) to better assess the situation and provide assurances that your planned activities were appropriate and within the state and federal education law confines and mandates for a District teacher and its students involved.

In sum, this letter reminded you of recent Covid-19 restrictions and related State and local policies and mandates. It also cautioned you to adhere to other state mandates based on your intended destination(s) since you were to be transporting and otherwise supervising District students.

PL000791

Furthermore, the letter specifically directed you "as part of the District's responsibilities owed to all students and staff" to "promptly provide us with information concerning [20 listed areas of concern: ranging from names of each student; Covid-19 preparations and appropriate distance learning/teaching methods; insurance information; parent permission slips; methods of transport/safety; adult supervision/precautions, and activities beyond teaching/learning etc.].

Additionally, this letter referenced and re-incorporated the prior August 28, 2020 notice/directives for your response as well.

In closing, the Superintendent's notice made it abundantly clear that, "If you are unable or unwilling to [provide the information] promptly, completely, and in writing, before you depart", you must "advise the [Superintendent] immediately and appropriately action will be taken as permitted by the circumstances." You were also cautioned that "We all have an obligation to comply with existing health and safety laws during this time, along with longstanding standards for remote learning opportunities and education law requirements. It is trusted that you understand the importance of meeting our respective obligations." You were also reminded that your failure to comply could result in disciplinary action.

See November 5, 2020 Letter from Superintendent, attached as Exhibit 22.

28. Despite the very clear, comprehensive, and imperative directives/information requests given to you in the aforementioned November 5th Superintendent's letter, on November 7, 2020, you responded in a short email to the Superintendent as follows:

"Dear Lisa,

Thank you for your email outlining your concerns. I am confident that: I have been - and will continue to - fully meet (and exceed) my professional obligations equitably to all of my students; Nothing about my physical location or the people that happen to be in my vicinity have any impact on my performance of my professional duties; There is nothing about my physical location or the people that happen to be in my vicinity that has anything to do with the District; and I am not in violation of any laws or District policies.

Sincerely,
David Kissner"

To date, you have *failed* to comply with the specific requested information from the November 5th letter and/or the August 28th letter.

See November 7, 2020 email to Superintendent, attached as Exhibit 23.

29. Thereafter, on December 11, 2020, you received email correspondence from a parent of a student in one of your math classes regarding his child's math grade. Mr. Martin was carbon copied on the email. The parent detailed that he once again found himself in the

15

"uncomfortable potion of not knowing what [his child's] math grade will be for the end of the semester." The parent complained that no homework grades have been posted by you to Powerschool since before Halloween. The parent went on to complain that no grades have been posted by you to google classroom either. The parent noted the importance of parent involvement in the remote schooling process and stated that he is "not able to do [his] job to make sure [his child] lives up to school requirements unless his performance is visible to [him]." The parent asked that grades be updated by you to be current.

See December 11, 2020 email to you from I. Ollmann, attached as Exhibit 24.

30. That same day, you also received email correspondence from another parent in one of your classes regarding her child's grade. Mr. Martin was copied on this email. The parent noted that she was emailing you again about the lack of parental knowledge of student progress in your class. The parent noted that Powerschool has only one grade posted since October 28, 2020, a test taken on November 16, 2020. She went on to detail that not one assignment prior or after the November 16, 2020 test has been posted. The parent also detailed that Google classroom does not have her child's progress updated either. She noted in Google classroom she can only see that one assignment has been submitted by her child. The parent related that that you have *failed* to provide viable feedback on either platform about her daughter's progress. She related that she is unable to get her child the help that she will need to succeed without feedback from you as her teacher.

Further, the parent mentioned that when she expressed her concerns about your failure to provide feedback or update grades via PowerSchool or Google classroom last quarter, you assured her that her child was doing fine and said that you would be more vigilant about posting grades in PowerSchool for parents to access and see the progress of their child. The parents stated, "this has not happen." The parent then noted that since it is almost the end of the quarter, it would be very difficult to improve the grade. The parent stated that she: "is thoroughly disappointed in the lack of information from you and [she] know[s] of many other families that have expressed the same frustrations and concerns."

See December 11, 2020 email from C. Norquist, attached as Exhibit 25.

31. Thereafter, on December 14, 2020, Mr. Martin, your supervising Principal at CT English Middle School, received email correspondence from another parent whose child is enrolled in your math class. The parent provided feedback to Mr. Martin that you had *failed* to grade old assignments. He noted that a few assignments, four, had been graded from November 16, 2020 and December 1-4, 2020; but that no assignments had been graded since December 4, 2020. The parent stated that he is "VERY UNHAPPY and . . . formally making a complaint." (emphasis in the original) The parent also detailed that other parents are complaining about your failures to update and post grades in a timely fashion to allow parents and students to track their progress and allow for improvement.

See December 14, 2020 email correspondence to B. Martin, attached as Exhibit 26.

16

32. That same day, the Superintendent and Mr. Martin received email correspondence from another parent whose student is enrolled in your math class. The parent related that their child's math grade was not only "NOT current", but that you had not "even been grading or checking" homework "ALL quarter." The parent went on to note that it looked like you had started grading "the kid's papers now-at the END of the quarter." The parent stated that he had been checking Google classroom and at no point had you given his child feedback on progress. The parent questioned how his child can be expected to improve his/her math skills, or course correct throughout the quarter, if he/she does not know when his/her homework is correct. The parent expressed frustration that because you had not provided feedback or updated grades throughout the quarter, there is now no way to turn things around.

The parent went on to note that while they are trying to be patient with distant learning, some accountability from the teachers is required and based on his communications with you, their family has not found you to be accountable. The parent then inquired as to how your failures will be fixed moving forward.

See December 14, 2020 email correspondence to B. Martin and L. Fraser, attached as Exhibit 27.

33. Appropriately, on December 16, 2020, you received a Letter of Reprimand from Mr. Martin regarding your failure of duties and unprofessional email response. Mr. Martin detailed that on December 11, 2020 he was made aware of your continued inability to provide timely progress reports regarding grades to your students and families. Mr. Martin noted that you were contacted via email, with him being cc'd, on December 11, 2020 by a parent concerned that there had not been adequate information provided to determine his child's math grade. Mr. Martin also noted that he had received an additional parent complaint along the same vein reporting that you had not made updates to grades since mid-October 2020. Lastly, Mr. Martin detailed that he was in receipt of two additional complaints via email on December 14, 2020 by another family indicating this behavior is a dis-service to students and families.

Mr. Martin provided that upon review of PowerSchool, it was confirmed that you had not fulfilled your professional obligation of reporting student grades and progress. For example, during the period of October 30, 2020 to November 30, 2020, only one grade had been posted for your students in your period 2 Math 6 course. Mr. Martin informed you that "this negatively impacts the learning of students in that they are not provided accurate and timely feedback related to their completed assignments. This failure on your part hinders the ability of students to take corrective measures to seek assistance when needed."

Mr. Martin proceeded to note that this behavior had also previously occurred during the first quarter of the 2020 school year and at that time, you noted you were behind, trying to keep your head above water, and that it was something you were committed to working on. During a phone conversation with Mr. Martin on October 28, 2020, he

PL000794

discussed with you the topic of grading and feedback and you indicated that you were aware of this being an issue and believed you would rectify the situation for quarter 2. Appropriately, at that time, Mr. Martin encouraged you to reach out to him if you needed additional support to be able to report grades and provide feedback in a timely manner.

Mr. Martin then reminded and reprimanded you that "providing feedback, grades, and progress reports is a basic and important function of teaching." He noted that "your inability to clearly and regularly communicate student progress and grades to students and families demonstrates a failure to perform the functions of your position as a classroom teacher. This behavior negatively impacts student performance and the ability of families to provide adequate support for their child."

Mr. Martin further reprimanded you regarding an inappropriate, disrespectful, and unprofessional email response you sent to a parent on December 12, 2020, after she provided you her recurring concerns about your ongoing failure to properly and in a timely manner communicate grades and performance with students and families. Incredibly, your December 12th response to this parent did not address her concern(s), and instead was laced with sarcasm and disrespect for her issues. Mr. Martin admonished you that "responding in this manner adversely affects the professional relationship with the parent that is necessary for student success - and frankly makes a bad situation even worse." Mr. Martin went on to detail that this is not the type of professional communication expected of you in the performance of your duties. He reminded you that you are expected to respond to parent inquiries in a professional, courteous and supportive manner. He detailed that your responses should directly address the question or concern only, without the inclusion of sarcasm, excuses, or other inappropriate discussion.

Accordingly, Mr. Martin advised you that effective immediately, and until further notice, you are required to:

    a. Update PowerTeacher Pro at least one time each week in a manner that clearly communicates student grade progress; and otherwise not allow yourself to continue to fall behind on PowerSchool and/or timely providing parents/students with grades and progress.

    b. Send responses to parent complaints and/or concerns to me, as your Principal, for review and approval *prior* to sending the response to any parent/student.

    c. Always communicate with parents/students and others in a professional manner.

See December 16, 2020 Letter of Reprimand, attached hereto as Exhibit 28.

34. The next day, December 17, 2020, Mr. Martin sent you an email correspondence entitled "Response Requested-Alleged Algebra Course". In this email Mr. Martin informed you that it had recently been brought to his attention that you may be hosting an unapproved Algebra course for a select group of students during the time designated as "office hours and student support" from 1:00 p.m. to 2:30 p.m. Appropriately, to help him understand

the situation and so that he could determine what, if anything needs to be done further, he asked that you provide answers to each of the following questions by December 18 at 3 p.m.:

    a. Are you currently conducting a class on Mondays, Tuesdays, and Thursdays at 1p.m. for algebra instruction?

    b. Are you hosting this class using a non-school provided platform or a personal Zoom account?

    c. Are the students attending the course currently enrolled in any of your CT math courses?

    d. How have the students participating in this class been chosen?

    e. Is this class open to any student at any grade who wishes to participate?

    f. What arrangements have you made for students enrolled in your CT courses to access you for help and support during the office hours that are impacted by this class?

    g. What arrangements have you made for students participating in this class to access office hours and supports offered by other teachers?

    h. The students participating in this class are receiving an additional 90+ minutes of instruction per week. What plans have you made to provide supplemental instructional minutes to other students, particularly any students in your 1-6 period classes who struggle?

    i. How have you communicated the logistics of this class to participants and parents?

    j. Did you seek parent permission for students to participate in this class?

To date, you have *failed* to provide a response to Mr. Martin's questions in violation of his directives to do so.

See December 17, 2020 email correspondence entitled "Response Requested-Alleged Algebra Course", attached hereto as Exhibit 29.

35. Recently, on January 28, 2021, the District received a note of concern from a parent, who wanted to bring attention to the fact that you previously (in or about October 2020) shared graphic stories with his son and other classmates related to your military experience in Afghanistan, and specifically "combat fatalities." This parent, currently serving overseas, felt your stories were highly inappropriate for youth, but specifically, his son, while he was away serving - and facing the peril(s) of military action.

See January 28, 2021 email correspondence entitled "Class Discussions", attached hereto as Exhibit 30.

36. Not only does this email concern the District in that it comes from a military parent about your inappropriate discussions, but further it shows that - almost two (2) years after the 2018 investigation and aftermath, including specific reprimand and counseling, you continued to engage in this inappropriate conduct and flatly refused to follow prior directives.

19

37. In addition, in the January 28th Email forwards, you mentioned to that parent (in an October 19, 2020 email) that you could not meet in person - since you have "been out of state since March - taking remote teaching to new levels of remote." This statement is not only inappropriate to provide to a parent, but, if true, would indicate - by your admission - that you were neglecting your duties and using your "remote" teaching as an excuse.

38. On or about January 28-29, 2021, the District, through the office at CT English Middle School, received a parent inquiry about student attendance the prior week. Specifically, the parent inquired about her daughter possibly missing a "1PM Math class" and was concerned. This inquiry caused some confusion in the office, since there was no such class, so the office asked the parent to clarify and she then confirmed after talking to her child that it was "the after school math class with Mr. Kissner at 1 p.m." The parent apologized for the "confusion." Most concerning to the District, this exchange shows that you - as recently as January 25th - continued to ignore prior directives to cease this activity during school and duty hours.

See January 28-29, 2021 Email correspondence entitled "Power outage 1/25", attached hereto as Exhibit 31.

39. Similarly, on January 29th, the District received additional information showing that you continued to violate its directives, after another student informed Principal Martin that he could not move math classes (Math 7 to 8) because he already attends a "1pm advanced math class with Mr. Kissner."

See January 29, 2021 email correspondence entitled "dk algebra class", attached as Exhibit 32.

40. Among other instances, the District also has determined that back in November, you also appear to have violated these directives as well. Specifically, in this email exchange between you and a student, after the student informed you that he could not make it to "math" that day, you responded by asking if he was "planning to continue to meet at 1 Mon, Tue, Thur for algebra separately."

See November 9, 2021 Zoom chat correspondence (snapshot), attached as Exhibit 33.

41. To compound your failures and misconduct in Charges 38-40, your actions directly evidence insubordination after you had been repeatedly directed to not conduct the "after school math class."

42. Also, upon a recent review of District Zoom records (applicable to you and during your required duty time for "office hours" this past school year), it appears that you *failed* to conduct and/or attend required "office hours" on numerous occasions (approximately 29 days) from August 2020-January 2021. Incredibly, it appears that many of these were shortly after your Principal made a formal directive(s) for information and confirmation

PL000797

in November/December to which you ignored and *failed* to respond. (matters discussed in Charges 26 and 34 above).

See Zoom usage log (account:dkissner@loma.k12.ca.us), attached as Exhibit 34.

43. Moreover, it now also appears that you were dishonest to the District in November when, in response to your Principal, you specifically stated in your November 12th email (Charge 26 - Exhibit 21) that:

    a. "I have never skipped or canceled a Zoom meeting"; and
    b. "The only time that I have not utilized near the full scheduled Zoom time were the few days where there were power outages on the mountain or evacuations."

See Exhibit 21 (Charge 26).

44. In sum, your misconduct as identified herein is contrary to the District's expectations that our teachers, and frankly all staff, create and maintain a productive, safe, inclusive, and effective learning environment in our schools.  Furthermore, your actions demonstrate your inability and/or failure to comply with the District's policies, administrative regulations, school rules, management directives, and the duties and responsibilities of your position as a certificated teacher, as previously described above.  Specifically:

    a. You have repeatedly chosen to ignore District directives and counseling regarding remote instruction and instead have chosen to operate as you "want" without authorization to do so.

    b. By meeting, traveling, and/or providing instruction with select District students and conducting "in person" instruction during the current COVID 19 pandemic while at the time the District itself had only been authorized to conduct "remote" instruction due to state and public health orders and restrictions, you are in violation of District policies, directives, intent, and local/state mandates.

    c. Failing to seek prior authorization for these non-sanctioned "in person" instruction classes that are/were taking place off-District premises during the school day and duty time, is insubordinate and unacceptable conduct, as well as further evidence that you are unable and unwilling to follow state, local and District instructional and operation protocols and rules.

    d. By conducting un-sanctioned "in person" instruction in violation of current COVID restrictions in place for the District and its students, staff and families, you also have potentially exposed students to physical danger, as well as the District to liability and government sanction.

45. Your overall conduct as detailed herein negatively impacts your working relationships with students and your colleagues, your job effectiveness, the efficiency of operations, overall staff and student/parents morale, and has compromised the safety and welfare of

PL000798

students.  Moreover, your actions have had a detrimental effect on your students/parents and the operations of the District.

The foregoing causes and specific charges stated herein, individually and collectively, are sufficient grounds for your dismissal from the position of a certificated employee.  Subsequent to the service of this Statement of Charges, amended or supplemental charges may be served upon you.  If the amended or supplemental charges present new information, the District will assume that you deny such charges, and you will be afforded an opportunity to respond to the amended or supplemental charges.

Please be advised that retaliation in any form is unacceptable.  Any such retaliation against anyone who participated in the investigation of this matter will not be tolerated and may result in further disciplinary action against you.

Pursuant to Education Code section 44031, a copy of this letter and its attachments will be placed in your personnel file shortly.  A copy of Education Code section 44031 is attached to this letter.  You may prepare a response and have that response attached to this document to be placed in your personnel file.

The undersigned declares that, under penalty of perjury and the laws of the State of California, the foregoing is true and correct to the best of my information and belief.

Dated:  February 12, 2021

Lisa Fraser
Superintendent

22

CALIFORNIA EDUCATION CODE

## § 44031

(a) Every employee has the right to inspect personnel records pursuant to Section 1198.5 of the Labor Code.

(b) In addition to subdivision (a), all of the following shall apply to an employee of a school district:

(1) Information of a derogatory nature shall not be entered into an employee's personnel records unless and until the employee is given notice and an opportunity to review and comment on that information. The employee shall have the right to enter, and have attached to any derogatory statement, his or her own comments. The review shall take place during normal business hours and the employee shall be released from duties for this purpose without salary reduction.

(2) The employee shall not have the right to inspect personnel records at a time when the employee is actually required to render services to the district.

(3) A noncredentialed employee shall have access to his or her numerical scores obtained as a result of a written examination.

(4) Except as provided in paragraph (3), nothing in this section shall entitle an employee to review ratings, reports, or records that

(A) were obtained prior to the employment of the person involved,

(B) were prepared by identifiable examination committee members, or

(C) were obtained in connection with a promotional examination.

## § 44932

(a) A permanent employee shall not be dismissed except for one or more of the following causes:

(1) Immoral conduct, including, but not limited to, egregious misconduct. For purposes of this chapter, "egregious misconduct" is defined exclusively as immoral conduct that is the basis for an offense described in Section 44010 or 44011 of this code, or in Sections 11165.2 to 11165.6, inclusive, of the Penal Code.

(2) Unprofessional conduct.

(3) Commission, aiding, or advocating the commission of acts of criminal syndicalism, as prohibited by Chapter 188 of the Statutes of 1919, or in any amendment to that chapter.

(4) Dishonesty.

(5) Unsatisfactory performance.

(6) Evident unfitness for service.

(7) Physical or mental condition unfitting him or her to instruct or associate with children.

(8) Persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools by the state board or by the governing board of the school district employing him or her.

23

PL000800

(9) Conviction of a felony or of any crime involving moral turpitude.

(10) Violation of Section 51530 or conduct specified in Section 1028 of the Government Code, added by Chapter 1418 of the Statutes of 1947.

(11) Alcoholism or other drug abuse that makes the employee unfit to instruct or associate with children.

(b) The governing board of a school district may suspend without pay for a specific period of time on grounds of unprofessional conduct a permanent certificated employee or, in a school district with an average daily attendance of less than 250 pupils, a probationary employee, pursuant to the procedures specified in Sections 44933, 44934, 44934.1, 44935, 44936, 44937, 44943, and 44944. This authorization does not apply to a school district that has adopted a collective bargaining agreement pursuant to subdivision (b) of Section 3543.2 of the Government Code.

(Amended by Stats. 2015, Ch. 303, Sec. 86. Effective January 1, 2016.)


## § 44939

(a) This section applies only to dismissal or suspension proceedings initiated pursuant to Section 44934.

(b) Upon the filing of written charges, duly signed and verified by the person filing them with the governing board of a school district, or upon a written statement of charges formulated by the governing board of a school district, charging a permanent employee of the school district with immoral conduct, conviction of a felony or of any crime involving moral turpitude, with incompetency due to mental disability, with willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing school district, or with violation of Section 51530, the governing board of the school district may, if it deems that action necessary, immediately suspend the employee from his or her duties and give notice to him or her of his or her suspension, and that 30 days after service of the notice of dismissal, he or she will be dismissed, unless he or she demands a hearing.

(c) (1) An employee who has been placed on suspension pursuant to this section may serve and file with the Office of Administrative Hearings a motion for immediate reversal of suspension. Review of a motion filed pursuant to this section shall be limited to a determination as to whether the facts as alleged in the statement of charges, if true, are sufficient to constitute a basis for immediate suspension under this section. The motion shall include a memorandum of points and authorities setting forth law and argument supporting the employee's contention that the statement of charges does not set forth a sufficient basis for immediate suspension.

(2) The motion shall be served upon the governing board of the school district and filed with the Office of Administrative Hearings within 30 days after service upon the employee of the initial pleading in the matter. The governing board of the school district has the right to serve and file a written response to the motion before or at the time of hearing.

(3) The hearing on the motion for immediate reversal of suspension shall be held no later than 30 days after the motion is filed with the Office of Administrative Hearings.

24

(4) The administrative law judge shall, no later than 15 days after the hearing, issue an order denying or granting the motion. The order shall be in writing, and a copy of the order shall be served by the Office of Administrative Hearings upon the parties. The grant or denial of the motion shall be without prejudice to consideration by the Commission on Professional Competence, based upon the full evidentiary record before it, of the validity of the grounds for

dismissal. The ruling shall not be considered by the commission in determining the validity of the grounds for dismissal and shall not have any bearing on the commission's determination regarding the grounds for dismissal.

(5) An order granting a motion for immediate reversal of suspension shall become effective within five days of service of the order. The school district shall make the employee whole for any lost wages, benefits, and compensation within 14 days after service of an order granting the motion.

(6) A motion made pursuant to this section shall be the exclusive means of obtaining interlocutory review of suspension pending dismissal. The grant or denial of the motion is not subject to interlocutory judicial review.

(d) A motion for immediate reversal of suspension pursuant to this section does not affect the authority of a governing board of a school district to determine the physical placement and assignment of an employee who is suspended or placed on administrative leave during the review of the motion or while dismissal charges are pending.

PL000802

EXHIBIT 1

PL000803

PL000804

Loma Prieta Jt Un SD | BP 4119.21 Personnel

**Professional Standards**

The Board of Trustees expects district employees to maintain the highest ethical standards, exhibit professional behavior, follow district policies and regulations, and abide by state and federal laws. Employee conduct should enhance the integrity of the district and advance the goals of the district's educational programs. Each employee should make a commitment to acquire the knowledge and skills necessary to fulfill his/her responsibilities and should focus on his/her contribution to the learning and achievement of district students.

(cf. 0200 - Goals for the School District)

(cf. 4112.2 - Certification)

(cf. 4119.1/4219.1/4319.1 - Civil and Legal Rights)

(cf. 4131 - Staff Development)

(cf. 4231 - Staff Development)

(cf. 4331 - Staff Development)

The Board encourages district employees to accept as guiding principles the professional standards and codes of ethics adopted by educational or professional associations to which they may belong.

(cf. 2111 - Superintendent Governance Standards)

(cf. 9005 - Governance Standards)

Staff Conduct with Students

The Board expects all employees to exercise good judgment and maintain professional standards and boundaries when interacting with students both on and off school property. Inappropriate employee conduct shall include, but not be limited to, engaging in harassing or discriminatory behavior; engaging in inappropriate socialization or fraternization with a student; soliciting, encouraging, or establishing an inappropriate written, verbal, or physical relationship with a student; furnishing tobacco, alcohol, or other illegal or unauthorized substances to a student; or engaging in child abuse.

(cf. 0410 - Nondiscrimination in District Programs and Activities)

(cf. 4040 - Employee Use of Technology)

(cf. 5131 - Conduct)

(cf. 6163.4 - Student Use of Technology)

An employee who observes or has evidence of inappropriate conduct between another employee and a

PL000805

student shall immediately report such conduct to the principal or Superintendent or designee. An employee who has knowledge of or suspects child abuse shall file a report pursuant to the district's child abuse reporting procedures as detailed in AR 5141.4 - Child Abuse Prevention and Reporting.

(cf. 5141.4 - Child Abuse Prevention and Reporting)

Any employee who is found to have engaged in inappropriate conduct with a student in violation of the law or this policy shall be subject to disciplinary action.

(cf. 4118 - Suspension/Disciplinary Action)

(cf. 4218 - Dismissal/Suspension/Disciplinary Action)

Legal Reference:

EDUCATION CODE

200-262.4 Prohibition of discrimination on the basis of sex

PENAL CODE

11164-11174.4 Child Abuse and Neglect Reporting Act

CODE OF REGULATIONS, TITLE 5

80331-80338 Rules of conduct for professional educators

Management Resources:

COUNCIL OF CHIEF STATE SCHOOL OFFICERS PUBLICATIONS

Standards for School Leaders, 1996

NATIONAL EDUCATION ASSOCIATION PUBLICATIONS

Code of Ethics of the Education Profession, 1975

WEB SITES

CSBA: http://www.csba.org

Association of California School Administrators: http://www.acsa.org

California Department of Education: http://www.cde.ca.gov

California Federation of Teachers: http://www.cft.org

California School Employees Association: http://www.csea.com

California Teachers Association: http://www.cta.org

PL000806

Commission on Teacher Credentialing: http://www.ctc.ca.gov

Council of Chief State School Officers: http://www.ccsso.org

Policy LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT

adopted: May 9, 2012 Los Gatos, California

PL000807

PL000808

EXHIBIT 2

PL000809

PL000810

Loma Prieta Joint Union School District
23800 Summit Road
Los Gatos, CA. 95033

October 18, 2018

Dear David Kissner,

In a letter dated April 30, 2018, the District formally notified you that they had received an anonymous letter with allegations that you may have engaged in conduct that violates the District's policies and/or procedures with respect to your interactions with minors.

The District referred the issues noted in the anonymous letter to the Santa Cruz County Deputy Sheriff's Department for criminal investigation, which prompted the District to place you on paid administrative leave effective May 1, 2018.

The District further informed you that the anonymous letter allegations would be included as a separate issue in the Student Walkout Investigation already underway. The independent investigator interviewed several witnesses, reviewed relevant documentation, and determined that there are facts that support some of the allegations in the anonymous letter. In addition, other significant concerns regarding your conduct with children arose through the investigative process.

The following represents a summary of the relevant investigative findings provided.

1]      It was determined that you knowingly, and admittedly, provided alcohol to a minor during a non-school sponsored camping trip.

*Though no criminal charges have been filed, and your employment status is not in jeopardy at this stage, your conduct, whether intended or not, has had a significant negative impact on students. Please be advised that any further report of providing alcohol to a minor will result in further corrective action up to and including criminal charges and/or possible termination of your employment.*

2)      It was determined that there are instances of your conduct with children that represent either a lack of professional boundaries or questionable teaching practices, as noted below.
   - Maintaining professional boundaries in all forms of communication, technology-related or not, is vital to maintaining the public trust and appropriate professional relationships with students. Contacting students via private text message late in the evening is ill-advised.

   - While it is true that sharing personal stories can help to establish connections with students, the content must be age-appropriate and must not cause any student to feel uncomfortable. Please be aware that stories and/or word problems of a graphic, gory, and/or violent nature may appeal to some students but may offend and frighten others and thus should be used judiciously.

   - When a male student asked to use the restroom in your classroom, you admittedly stated that he would not be able to go to the bathroom but that you would give him a "small

Board of Trustees:
Deana A. Arnold, President   Shannon Hickok, Vice-President
Ron Bourque, Member    Marco V. Menéndez, Member    Kerrie Mills, Member

binder clip" he could use on his penis instead, inferring that the boy had a small penis. This type of humor is inappropriate and has no place in a school setting. Generally speaking, the use of sarcasm with middle school age students can have significant, negative repercussions and is therefore ill-advised.

- In addition to the findings above, the anonymous letter referenced parental concerns described as "grooming" behavior on your part. Specifically, singling out a young person and taking him somewhere alone and away from the group and offering alcohol, asking youth about sex and/or sexual encounters, and posting images of youth on your personal website. Though you have acknowledged the above to be true, you offered that your actions have been misperceived by those reporting. The National Education Association (NEA) has published a list of common-sense pointers for avoiding false allegations which you may be wise to review and consider in your future interactions with youth to avoid similar issues in the future. (See attached)

*Please be advised that should there be future incidents wherein students are negatively impacted by your use of ill-advised classroom practices and/or protocols, further corrective action may result, up to and including possible termination of your employment.*

In addition, as you are aware, the investigation in this matter involved discussions with a number of members of our community, staff, and students, including yourself.  Please be aware that the District will not tolerate any retaliation against you by any person for your participation in this investigation. Similarly, the District will not tolerate any retaliation by you against any person who also participated in this investigation.

With all of this said, the school year appears to be off to a good start and I remain committed to supporting you in seeing that this trend continues. If I can be of assistance to you in better understanding any of the areas discussed above, please let me know. In addition to the one source noted above, there are other publications that I can provide as a resource to you should you need additional information. Further, if you have any questions regarding any of these matters, feel free to ask me directly.

Sincerely,

*Lisa Fraser*

Lisa Fraser
Superintendent

I have read and discussed the contents of this memo with my immediate supervisor.

_____     _____
Employee's Signature                              Date

*Employee did not sign @ mtg. Pending - L. Fraser*
*11/6/18*

This document will be placed in your personnel file after ten days. You may prepare a response which will be attached to this memo.

EXHIBIT 3

PL000813

PL000814

28 October, 2018

From:   David Kissner, Teacher, CT English Middle School
To:     Lisa Fraser, Superintendent, Loma Prieta Joint Union School District
CC:     Board of Trustees, Loma Prieta Joint Union School District

Subject:   RESPONSE TO LETTER DATED 18 OCTOBER, 2018

Encl:     (1) Detailed response to letter, by paragraph

1.  The following is submitted as a response to the letter which is to be placed in my file, dated 18 October, 2018, and as discussed with Lisa Fraser and Deana Arnold on October 3, and during a follow up conversation with Lisa on October 23rd.

2.  The contents of this disciplinary letter are the result of a personal character attack perpetrated by anonymous cowards who sought retribution for my stance in the March 14th, 2018 walkout. I am surprised that the district would like to go on record here that it is giving credence to an anonymous letter full of false and unsubstantiated accusations. Does the timing of such allegations, the unprincipled broadening of the district's investigation, and now this disciplinary letter not show evidence of retaliation for my position during the school-sponsored political walkout?

    This investigation was conducted without any regard to the stated scope (the walkout and the anonymous letter), and pursued lines of questioning that were completely irrelevant to the matters at hand. These issues included my classroom bathroom procedures, personal stories I have shared in class for years, and math and science problems I have used for years. In addition, the school district investigated recreational activities I conduct with youth and families outside of school, my faith and science-based beliefs about the origins of life, my Marine Corps career, and other completely irrelevant subjects.

    This free-wheeling investigation of every aspect of my personal life and how I perform my professional responsibilities is the very definition of a witch-hunt – a campaign against a person holding unpopular views. It is both unethical and illegal to retaliate against an employee in this way.

    It is telling that an investigation of this breadth failed to discover any noteworthy evidence of wrong-doing. As such, this letter makes note of a number of "significant concerns" which lack specific detail and describe situations that are completely innocuous, while implying that something nefarious is going on. It is disingenuous, and betrays an effort to lay the groundwork for future disciplinary action, seeing as none is possible from the walkout controversy.

3.  I am saddened by the fact that the district leadership has apparently joined in the same nasty, personal, divisive political fray that consumes our nation in this era. A different view in a political discourse does not merit an invasive assault on a person's character and life. To use baseless accusations leveled by anonymous cowards in the heat of a political conflict as a pretense for a limitless investigation into a person's life and work is shameful. To then take the empty results of said investigation and craft a disciplinary letter that insinuates that there is some merit to the accusations is all the more shameful. To direct these attacks against someone who has proven over years to be a tireless servant of kids and families in the community is reprehensible.

David Kissner
Teacher, CT English Middle School

PL000815

PL000816

Enclosure (1):   Detailed response to letter, by paragraph

1.  Paragraph 1.  *"It was determined that you knowingly, and admittedly, provided alcohol to a minor during a non-school sponsored camping trip."*  This is true.  It is worth noting that this took place some years ago, and that when brought up at the time, I acknowledged it openly and honestly and it was dealt with appropriately.  The matter was considered closed by all parties at the time.  It is also worth noting that the incident involved a single sip of an alcoholic beverage as a toast after a significant outdoor achievement, with a high school aged person. It is also worth noting that these allegations were brought forward anonymously, over two years after the fact, in the immediate aftermath of a huge political conflict on campus and in our community where I was a central figure.  It is further worth noting that the offense in question is the legal equivalent of a traffic ticket – at most - but that law enforcement agencies would generally decline to pursue such a minor issue.

    While I acknowledge that my decision years ago to share a toast with a teenager was poorly considered, I must point out that this most certainly does not make me a villain or a threat to children.  Emphatically, it does not make me a sexual predator as is implied elsewhere in this letter.

2.  Paragraph 2.  *"Maintaining professional boundaries."*  As is well known, I wear many hats in the community.  I am not simply a teacher and coach for some students.  I am active in the church and in youth ministry.  I lead outdoor adventures for kids and families all the time.  My family vacations with other families in the community who have or have had students in my class or at school.  We go to each other's homes for meals.  We worship and recreate together.  There are appropriate boundaries and relationships in all of these contexts, which – while certainly outside of the norm for a simple classroom teacher – can be tough to define.  Nonetheless, I can say with confidence that I work within these appropriate boundaries in these contexts.

    This letter does not cite any specific conversation or instance of supposed failure to maintain appropriate boundaries, and so it is difficult to defend myself or to know exactly what is being referred to.  However, the letter states that *"Contacting students via private text message late in the evening is ill-advised."*  I am not in the habit of contacting students via text message.  If the student is someone where I have a relationship established outside of school, it is possible that we would communicate via text message.  If I were to be contacted in the late evening by a young person with a need, I may engage in conversation, depending on the context.  I go out of my way to be a trusted adult that can be contacted in times of need, and aim to continue to do so.  That is part of ministry.  There is nothing wrong with this, and I intend to continue to be an ally for young people or their parents when they are struggling.

    *"While it is true that sharing personal stories can help establish connections with students, the content must be age-appropriate and must not cause any student to feel uncomfortable."*  I have shared the same set of stories, generally in the same order, every year that I have been employed by the district.  My stories have been much shared by students to their families and siblings and have been the subject of overwhelming positive feedback. Yes, they help to establish connections with students.  Yes, that connection results in greater engagement with the content and with school in general.  My stories are age-appropriate and educational in themselves and I do not believe that they make any student feel overly uncomfortable.  It is worth noting here again that this complaint comes from anonymous detractors in the immediate aftermath of a huge political conflict on campus and in our community where I was a central figure.  It is further worth noting that the directive *"must not make any student feel uncomfortable"* is incredibly subjective and cannot be measured on any scale.  It is also a sad reflection of our educational system, where educational leaders apparently want to avoid any topics that might make a student "uncomfortable."  Topics in literature, history, pop-culture, science, government, current events, and politics cannot be touched without making some students uncomfortable.  I cannot imagine that

PL000817

PL000818

educators, passionate about a rich, meaningful, and relevant education for their students, would ever insist that students be always "comfortable."

*"Word Problems."* I often write word problems for math and science classes that are uniquely edgy. They are not graphic. I have used many of the same problems for seven years. They are posted on my website publicly every day. They go home to parents on the tests and homework assignments. Board member's kids have been in my classes and taken the same assignments home. They are talked about often and have been mentioned in valedictorian addresses at graduation. They have also been the subject of much positive feedback from parents, who have commented about how their kids (and they) love the problems and that they engage with the math in a deeper and more enthusiastic way. I have never received a complaint. It is worth noting here again that this complaint comes from anonymous detractors in the immediate aftermath of a huge political conflict on campus and in our community where I was a central figure. Here again, there is no specific word problem described in this letter, and the broad suggestions could be interpreted very subjectively, making them of little value. I intend to use the same word problems that I have used for years now – quite openly – in my classes.

*"Inappropriate Humor."* The letter references a single instance in which a student asked to use the restroom and I offered him a small binder clip. There were no words – just subtle innuendo. It is worth noting that this student is someone who I have an extensive relationship with outside of class and was not intended – nor taken – personally. It is also worth noting that this student did not complain, but that the complaint was brought anonymously by non-involved detractors in the immediate aftermath of a huge political conflict on campus and in our community where I was a central figure. This one event most certainly does not establish a pattern of humor. Further, this subtle joke does not make me a villain, nor does it make me a sexual predator as is implied elsewhere in this letter. I would absolutely use this line again in a different context (not in the classroom) with any number of people, young or old. It is not a remarkable or particularly offensive joke.

*"The use of sarcasm with middle school aged students can have significant negative repercussions and is therefore ill-advised."* I am unclear in this letter if this comment is directly connected to the joke referenced above, or is general corrective guidance. Since sarcasm is generally defined as being a "sharp, bitter, or cutting expression or remark," and is "largely context dependent," I would say that the above humor was not sarcastic and that I am not sarcastic. I would not engage with a student in a sharp or bitter way. Perhaps ironic or witty would be a better way to describe my humor. Because there are no specific examples here of my inappropriate use of sarcasm, and since sarcasm is hard to define, this note is of limited value.

*"Grooming Behavior."* This is the most offensive paragraph in this letter. First of all, I find it to be insulting, cowardly, and dishonorable to verbally state that *the district* is not accusing me of anything, but to then refer in this letter to completely unsubstantiated "parental concerns" that accuse me of such. Any allegations of the sort are false and slanderous, and should not be mentioned or alluded to in this letter. If there is evidence to this point, it needs to be included here. Instead of evidence, this letter takes great pains to take completely innocuous behavior and throw a shadow of doubt on them.

I have never asked a youth about sex and/or sexual encounters. There have been many times when a young person has broached the subject with me, and I am happy to engage with them on that topic. I am in youth ministry - it comes up. It is worth noting that the curriculum that our own district uses to teach sex education encourages students to find a trusted adult – which explicitly might include a teacher – to discuss these difficult topics with. I have been that trusted adult for many, and I aim to continue to be just that. There is nothing here, and it should not be used in a paragraph about "grooming behavior" to "substantiate" that concern.

PL000819

PL000820

The comment referencing that I post images of youth on our ministry website is laughable and ridiculous, and has no place here. I have taken many hundreds of young people and families on trips all over the western US over the last 11 years. Multiple kids and parents take pictures and video. I compile and edit them into videos that commemorate the trips and are the central event for celebratory gatherings for families after trips and are available on youtube for the participants. There could not be anything more innocent about it. The fact that teenage boys are in the videos swimming without shirts on is the most normal thing you would expect from a video about a camping trip at lakes and hot springs. It is worth noting that our middle school makes twice annual trips to the beach, where almost all the middle school boys run around with their shirts off and the year book team takes pictures which are included in our year book. It is absurd to make an issue of this. The original version of this letter also mentioned that there was video of me "bracing" children who were shooting firearms, as potential evidence of "grooming behavior." This is equally absurd, as it is a common-sense safety issue to physically brace a young, new shooter handling a lethal weapon. This example, while removed from the current version of the letter after my objections, shows the lengths that are being gone through to paint a misleading picture of ill-intent.

The original letter says that *"While these examples have not risen to the level of criminal activity, they certainly have the potential of becoming problematic should these behaviors continue."* This is outrageous. Of course they have not risen to the level of criminal activity. They haven't risen to anything. But by framing this statement this way, it implies that somehow these examples are on a spectrum on the way toward criminal or unethical behavior. They are not. There will be other camping trips. I fully intend to create videos for the participants and their families. There will be water and swimming and there will be boys with shirts off. I fully intend to continue to introduce young people to firearms safety and marksmanship, as I have been trained professionally to do. I will absolutely brace them from behind when they shoot for the first time, because it is the safe and right thing to do. And there will be video – because there is nothing to hide. I absolutely intend to continue to be a safe, trusted adult that young people can talk with about any challenging topic, including sex. I make no apologies for it, and point to the district's own curriculum that advocates for it.

It is completely inappropriate for this letter to reference, in any way, completely unsubstantiated allegations of "grooming behavior." It also begs the question: If the district is concerned that I may be a threat to children and potentially engaging in "grooming behavior," why did the district bring me back to the classroom in May, with an investigation into said allegations still outstanding? Why does the district currently have me in the classroom? More to the point, why does the district have me employed as the wrestling coach, if they are concerned about me being a safety threat to kids? Coaching wrestling is physical, it involves physical contact with kids, and sometimes, I am the only adult in the gym. It would be reckless and grossly negligent for the district to have a person in that position where they have documented concerns of potential "grooming behavior." Just having that coach in place would be a lawsuit waiting to happen.

I cannot believe that anyone in a leadership role at this school district would allow me to continue in that role if there were real concerns that I was grooming children for inappropriate relationships. So then, why is this a subject of this disciplinary letter? It is a character smear and a set-up for future disciplinary action and should be removed in its entirety.

PL000821

PL000822

EXHIBIT 4

PL000823

PL000824





# Attorney-Client Privileged
# Confidential Investigation Report

## Loma Prieta Union School District

### David Kissner's Conduct with Children

August 13, 2018

Patricia Elliot
Attorney at Law
15466 Los Gatos Boulevard
Suite 109- PMB 365
Los Gatos, CA  95032
Telephone  (408) 358-4455
Facsimile   (408) 358-4494



PL000825

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

## TABLE OF CONTENTS

STATEMENT OF INVESTIGATION...................................................................................... 1

STATEMENT OF THE ISSUES ........................................................................................... 2

INVESTIGATION PROCEDURE......................................................................................... 2

RELEVANT FACTUAL FINDINGS OF THE INVESTIGATION ..................................... 6

   Background ...................................................................................................................... 6

Criminal Investigation .......................................................................................................... 8

   Deputy Koenig's Telephone Interview With Pastor Haak................................................. 9

   Deputy Koenig's Telephone Interview With Mr. Kissner ............................................... 10

   Deputy Koenig's Interview With Student Five's Mother ................................................ 10

   Deputy Koenig's Report ................................................................................................. 11

The District's Anonymous Letter Investigation.................................................................. 12

   Ms. Kidwell's Report ...................................................................................................... 12

   Mr. Arias' Report............................................................................................................ 12

   Ms. Grant-Richards' Report............................................................................................ 13

   Ms. Denues' Report ........................................................................................................ 14

   Mr. Cohen's Report ........................................................................................................ 15

   Mr. Kissner's Camping/Biking Trips ............................................................................. 16

   Mr. Kissner's Report....................................................................................................... 17

Allegations of Providing Alcohol to Minors ..................................................................... 18

   Student One's Mother's Report ....................................................................................... 18

   Parent C's Report............................................................................................................ 19

i.

CONFIDENTIAL Investigation Report        David Kissner's Conduct with Children

ATTORNEY-CLIENT PRIVILEGED

Student Five's Parents' Reports ................................................................... 19

    Camping Trips with Mr. Kissner ............................................................. 19

    Student Five's Parents' Communications with Pastor Haak ................................. 21

Parent A's Report ................................................................................. 26

Student Eight's Father's Report .................................................................. 29

Parent B's Report ................................................................................. 30

Student Seven's Mother's Report ................................................................. 31

Mr. Kissner's Report ............................................................................. 32

Other Allegations in the Anonymous Letter ....................................................... 35

    Parent B's Report ............................................................................ 35

    Mr. Kissner's Report ......................................................................... 36

    Conversations About Boys' Sexual Encounters ............................................. 37

    Texting with Boys Late at Night .......................................................... 37

Factual Conclusions Regarding the Anonymous Letter ............................................. 38

Concerns About Mr. Kissner's Classroom and After School Conduct ............................... 42

    Mr. Kissner's Afterschool Bike Rides With Students ...................................... 42

    Mr. Arias' Report .......................................................................... 42

    Mr. Cohen's Report ........................................................................ 43

    Mr. Kissner's Report ...................................................................... 43

Comments about Death or Violence ............................................................... 45

    Student One's Report ...................................................................... 45

    Student Two's Report ...................................................................... 45

    Student Four's Report ..................................................................... 46

ii.

PL000827

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Mr. Arias' Report ................................................................................ 47

Mr. Cohen's Report .............................................................................. 47

Mr. Kissner's Report ............................................................................ 48

Mr. Kissner's Word Problems ............................................................. 49

    Student One's Report ..................................................................... 49

    Student Two's Report ..................................................................... 50

    Student Three's Report ................................................................... 50

    Student Four's Report .................................................................... 51

    Mr. Kissner's Report ...................................................................... 51

Mr. Kissner's Treatment Of Boys Versus Girls .................................. 52

    Ms. Kidwell's Report ..................................................................... 52

    Mr. Arias' Report .......................................................................... 52

    Mr. Cohen's Report ....................................................................... 53

    Student One's Mother's Report ...................................................... 54

    Parent C's Report .......................................................................... 54

    Student One's Report ..................................................................... 55

    Student Three's Report ................................................................... 56

    Student Four's Report .................................................................... 56

Mr. Kissner's Classroom Management ............................................... 57

    Mr. Arias' Report .......................................................................... 57

    Student One's Report ..................................................................... 58

    Student Two's Report ..................................................................... 58

    Student Four's Report .................................................................... 59

iii.

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Student Five's Father's Report ................................................................ 61

Mr. Kissner's Report.............................................................................. 61

Mr. Kissner's Comments About Evolution and Sex Education ..................................... 62

Mr. Arias' Report................................................................................ 62

Mr. Cohen's Report .............................................................................. 62

Student Two's Report ............................................................................ 62

Mr. Thompson's Report........................................................................... 63

Mr. Kissner's Report............................................................................. 63

Factual Conclusions Regarding Mr. Kissner's Classroom and After School Conduct .... 64

Mountain Biking After School..................................................................... 64

Comments about Death or Violence ................................................................. 64

Mr. Kissner's Word Problems ...................................................................... 66

Mr. Kissner's Treatment Of Boys Versus Girls..................................................... 67

Mr. Kissner's Classroom Management................................................................ 68

Mr. Kissner's Comments About Evolution and Sex Education ......................................... 68

Mr. Kissner's Communications with Parents During his Administrative Leave ............. 69

iv.

PL000829

**CONFIDENTIAL Investigation Report        David Kissner's Conduct with Children**

### ATTORNEY-CLIENT PRIVILEGED

## STATEMENT OF INVESTIGATION

This Investigation Report addresses concerns raised about Mr. Kissner's conduct with children in a typewritten undated anonymous letter received by the District in an envelope postmarked March 20, 2018 ("Anonymous Letter"). Exhibit A.

The Anonymous Letter was addressed to "Loma Prieta Board of Education," with a copy to District Superintendent and CT English Principal Ms. Corey Kidwell ("Ms. Kidwell"). It was delivered to the District office. The District has a practice not to accept complaints that are unsigned. Ms. Kidwell felt that the Anonymous Letter "feels a little different than that." Ms. Kidwell shared the letter with President of the Board, Ms. Deana Arnold ("Ms. Arnold") and with Vice President Ms. Shannon Hickock.

Ms. Kidwell thought the Anonymous Letter came out of the whole Walkout situation and the consternation around Mr. Kissner's behavior in that. As a result, Ms. Kidwell did not know what to make of the Anonymous Letter. Nothing official had been done until on or about April 27, 2018, when I was asked to add the Anonymous Letter allegations to the investigation already begun into the Walkout issues. The Walkout issues are addressed in a separate Investigation Report. The Anonymous Letter states:

*You must be informed of the following information regarding a teacher in your District, David Kissner. The following events have occurred and have been repeated with at least 4 different under age boys (most under age 15):*

1. *Kissner runs camps through a mountain church and through CT English in the summers. He frequently will single out one boy and take him somewhere alone, away from the group.*

2. *Kissner has provided alcohol to boys that he is alone and talking to. I know of at least 3 occasions where this has occurred. He has admitted to doing it one time.*

3. *Kissner has asked boys about sex and sexual encounters*

4. *Kissner has phone numbers for some of the boys and texts them late at night.*

*I have never heard of Kissner physically touching a boy, but the acts that he has done are clearly 'grooming'. I believe that he still runs camps and he is also in charge of the boys wrestling, where I am sure he gets close physical contacts with many boys.*

*The church where he provided alcohol to boys has been apprised of his illegally providing young boys with alcohol, and he has admitted to it. I am not sure if they continue to allow this man to be alone with children, but he seems unfit to do so. Now that you have been put on notice of this person in your employ, you must do your due diligence to protect your students from a potential predator.*

*-Anonymous*

1.

PL000830

**CONFIDENTIAL Investigation Report      David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

In the course of witness interviews, reports were made of conduct by Mr. Kissner in the classroom and after school that some witnesses felt was inappropriate and potentially in violation of District policy. Those reports were included in the investigation.


## STATEMENT OF THE ISSUES

The issues investigated are as follows:

1. Are there any facts that support the allegations in the Anonymous Letter?

2. What are the facts regarding other concerns about Mr. Kissner's conduct with children?

This investigation does not address whether or not the alleged incidents, if they occurred, violate either District policy or state or federal law.


## INVESTIGATION PROCEDURE

Ms. Arnold and the Board of Trustees determined that a full, formal outside investigation was warranted.

I began the Walkout aspect of my investigation on April 19, 2108. I received background information and documents from Ms. Arnold.

Ms. Arnold referred the Anonymous Letter to the Santa Cruz County Sheriff's office for investigation because it contained allegations of possible criminal acts. Deputy Sheriff Christopher Koenig ("Deputy Koenig") handled the investigation for the Sheriff's Department. Deputy Koenig asked that I wait until the criminal investigation was complete before I interview Mr. Kissner.

By letter dated April 30, 2018, the District formally notified Mr. Kissner that it had been made aware that Mr. Kissner may have engaged in conduct that violates the District's policies and procedures with respect to his interactions with minors. The District informed Mr. Kissner that the Anonymous Letter allegations would be included as a separate issue in the Walkout Investigation already under way.

In a meeting between Mr. Kissner, Ms. Arnold and Ms. Kidwell on April 30, 2018, Ms. Arnold and Ms. Kidwell notified Mr. Kissner that the District referred the issues in the Anonymous Letter to the Santa Cruz County Deputy Sheriff's Department for criminal investigation. Ms. Arnold and Ms. Kidwell informed Mr. Kissner that while the criminal investigation was pending, he would be placed on paid administrative leave effective May 1, 2018.

PL000831

**CONFIDENTIAL Investigation Report       David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Deputy Koenig completed his investigation on or about May 8, 2018, and although he discovered information supportive of some of the allegations, he was unable to bring criminal charges because the alleged criminal activity did not take place in Santa Cruz County's jurisdiction.

After the criminal investigation was closed, the District notified Mr. Kissner and the school community that Mr. Kissner would return to work on May 10, 2018. At the same time, Ms. Arnold and Ms. Kidwell notified Mr. Kissner that the District's independent investigation into the Anonymous Letter issues would continue.

On April 25, 2018, I interviewed Ms. Kidwell via Skype for approximately two hours.[1] I conducted a follow-up in person interview with Ms. Kidwell on May 10, 2018, for approximately one hour in the conference room at Loma Elementary School.

Unless otherwise noted, all witness interviews were recorded with the witnesses' permission with a Digital Voice Recorder.

On May 1, 2018, I interviewed Teacher Rodica Nefian ("Ms. Nefian") for approximately 40 minutes; Teacher Randy Cohen ("Mr. Cohen") for approximately one hour; Lead Teacher Tony Arias ("Mr. Arias") for approximately 1¼ hours; and Teacher Kris Denues ("Ms. Denues") for approximately 1¼ hours, in the Superintendent's office. Ms. Denues was accompanied by her husband, Guy.

On May 1, 2018, I interviewed CTA Regional UniServ Staff Lisa Vieler ("Ms. Vieler") by telephone for approximately one hour. Ms. Vieler's interview was not voice recorded.

On May 2, 2018, I had a follow up interview with Mr. Arias for approximately 1¼ hours; I also interviewed a parent ("Student One's Mother") and her daughter, a CT English student ("Student One"). Those two interviews combined lasted approximately 1¼ hours. I interviewed another District parent ("Parent C") for approximately 50 minutes regarding her children's experiences. All of those interviews were conducted in the Superintendent's Office.

On May 9, 2018, I interviewed a parent ("Student Two's Mother") and her son, a CT English student ("Student Two") for a total of approximately 1½ hours; a District parent ("Student One's Father") for approximately 30 minutes; Teacher Wayne Thompson ("Mr. Thompson") for approximately 1¼ hours; Teacher Wendy Grant-Richards ("Ms. Grant-Richards") for approximately 1¼ hours and Daytime Custodian April Fulton ("Ms. Fulton") for approximately one hour. Ms. Fulton was accompanied by her union

---

[1] Ms. Kidwell was out the state and unavailable for an in-person interview.

PL000832

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

representative, Nathan Jennings. Those interviews were conducted in the Loma Elementary School conference room.

On May 10, 2018, I interviewed a District parent ("Student Five's Mother")[2] for approximately two hours; Teacher's Assistant Ann Harrington ("Ms. Harrington") for approximately 30 minutes and CT English student ("Student Four") and, separately, her mother ("Parent A") for a total of approximately two hours, all in the Loma Elementary School conference room.

On May 11, 2018, I interviewed a District parent ("Student Five's Father) for approximately one hour at Panera Bread in Los Gatos.

On May 14, 2018, I interviewed a parent ("Student Three's Mother") and her daughter, a CT English student ("Student Three") for approximately 40 minutes. That interview was conducted at Panera Bread in Los Gatos.

On May 31, 2018, I interviewed a District parent ("Student Seven's Mother") for approximately 45 minutes at Panera Bread in Los Gatos.[3]

On June 2, 2018, I received a voice message from an unidentified caller, asking that I represent her in connection with the investigation I was conducting for the District. I returned the call on June 3, 2018 and explained that I could not represent this person because I was conducting an independent investigation on behalf of the District and was not able to provide counsel or advice to anyone associated with the District or the investigation. The person indicated that she was a parent of two former students at CT English ("Parent B") and that she was the Anonymous Letter writer.

I spoke with Parent B for approximately one hour on June 3, 2018. That telephone call was not voice recorded. She insists on remaining anonymous. Parent B provided additional information via email on June 5, 2018.

On June 5, 2018, I interviewed Mr. Kissner in a conference room in the Doubletree Hotel in San Jose for approximately four hours. Mr. Kissner's interview was originally scheduled for May 16, 2018. That interview was postponed at Mr. Kissner's request, so his attorney based in Los Angeles, CA could attend. The attorney later determined that he could not be present. Mr. Kissner's attorney, Bill Becker, Esq., President, CEO and Chief Counsel of Freedom X, a nonprofit public benefit corporation established to "advocate for freedom of expression," was on speaker phone throughout the majority of the

---

[2] Student Five's parents are also Student Six's parents.

[3] Students Five, Six and Seven was not interviewed.

PL000833

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

**ATTORNEY-CLIENT PRIVILEGED**

interview.[4] The District agreed with Mr. Kissner's counsel to limit that interview to the facts relating to the Walkouts.

On June 22, 2018, I interviewed Mr. Kissner by telephone about the issues raised in the Anonymous Letter for approximately 1¼ hours. Mr. Kissner previously said he would be away for the "entire summer" and was not available for an in-person interview regarding the Anonymous Letter allegations.[5] Mr. Kissner's attorney was on the phone for the interview from his office in southern CA.

During his June 22nd witness interview, Mr. Kissner identified two boys, Student Five, and Student Eight, both former CT English students, who attended camping trips Mr. Kissner led and whom Mr. Kissner thought may be related to some of the allegations in the Anonymous Letter.

On June 22, 2018, I had a telephone call with Student Eight's Father and explained that Mr. Kissner identified his son as a potential witness. Student Eight's Father was very hesitant to speak with me and said he would think about whether he would provide information in the investigation. The telephone call with Student Eight's Father was not voice recorded.

During the phone call, Student Eight's Father confirmed some of the information I had received from Parent A and Mr. Kissner. Student Eight's Father was very concerned about repercussions to his son and the family if the community learned that they made a negative report about Mr. Kissner. After several attempts to reconnect with Student Eight's Father, on July 30, 2018, Student Eight's Father notified me that he would not participate in the investigation and would not allow his son to be interviewed.

The parent and student witnesses currently associated with the District received a Notice of Interview from Ms. Arnold in which she requested that the parent and/or their child participate in a witness interview, answer questions truthfully and thoroughly and to maintain confidentiality. They were also informed that no retaliation would be tolerated.

All District employee witnesses received a Notice of Interview from Ms. Arnold in which each witness was instructed to answer questions truthfully and thoroughly, to maintain confidentiality, that they could have representation at the interview, and informed that no retaliation would be tolerated. All employee witnesses signed an acknowledgment of

---

[4] https://freedomxlaw.com/

[5] At the end of Mr. Kissner's telephone interview, I asked Mr. Kissner where he was so I could note that in my report. Mr. Kissner said that he was in "South San Jose," in between camping trips. Mr. Kissner misled me about his availability for an in-person interview on June 22, 2018.

5.

PL000834

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

memorandum and verbally confirmed during their witness interviews that they understood and would follow the instructions in Ms. Arnold's memorandum.

I received documents I requested from Ms. Kidwell, Mr. Arias, Ms. Denues, Student Two's Mother, Student Five's Mother, Ms. Vieler and Mr. Kissner. Administrative Assistant to the Superintendent Ms. Eileen Bevans-Franks supplied me with logistics support, documents and other materials I requested.

## RELEVANT FACTUAL FINDINGS OF THE INVESTIGATION

The following facts were determined in the course of the investigation. Where significant disputes of fact exist, the dispute is identified and then examined and resolved based on the available information, including facts bearing on credibility.

This Investigation Report contains factual conclusions based on the information available in the course of the investigation. It does not draw any legal conclusions. Facts are determined based on the preponderance of the evidence standard. A finding that an incident or circumstance more likely than not occurred is not a judgment as to whether or not that incident or circumstance amounts to a violation of the District's policies or state or federal law.

In addition, while numerous hours were spent reviewing documents and interviewing witnesses, this report does not purport to include every detail provided by all of the witnesses interviewed or documents reviewed.

### BACKGROUND

Ms. Kidwell recently completed her fifth and final year as Superintendent-Principal at CT English and Loma Prieta Elementary School. Ms. Kidwell retired at the end of the school year. Ms. Kidwell was just Superintendent for one year prior to that. For five years prior to that, Ms. Kidwell was Principal at both Loma Prieta Elementary School and CT English Middle School. Before coming to the District, Ms. Kidwell was a Community College Dean for approximately ten years.

Mr. Kissner was initially hired as a temporary teacher at CT English in or about November 2012. Mr. Kissner has taught Math and Science at CT English since then.

Ms. Vieler is on the CTA Regional UniServ Staff. Although Mr. Kissner has declined to join the union, Ms. Vieler has worked with him on a number of issues both in his prior employment and at times during his employment at CT English.

6.

PL000835

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Mr. Kissner came to CT English just after two of their Math teachers left the District in a short period of time. Ms. Vieler knew that CT English was desperate to find a Math teacher and she recommended Mr. Kissner as a temporary teacher to help them finish out the year.

Mr. Arias teaches 6th-8th Grade Social Studies and 6th Grade Boot Camp at CT English. He has been employed for approximately 15 years. Mr. Arias is also the Teacher Leader responsible for day-to-day issues that come up at school. Issues typically come to Mr. Arias first and then when necessary, he brings them up to Ms. Kidwell or Rebecca Carino, Assistant Principal ("Ms. Carino").

Ms. Denues has been a teacher at CT English for the past 28 years. She teaches Language Arts and Social Studies. Ms. Denues and her husband have been members of the Mountain Bible Church where Mr. Kissner and his wife attend. Ms. Denues' attendance at church has been infrequent in the last year.

Ms. Nefian has taught Math at CT English for approximately 11 years.

Ms. Grant-Richards is in her tenth-year teaching at CT English. She teaches Spanish, Social Studies and English. Prior to that, Ms. Grant-Richards taught at Loma Elementary School for one year. Ms. Grant-Richards has a son who graduated from CT English and when he was a student there he went on two backpacking trips with Mr. Kissner.

Mr. Thompson is in his tenth-year teaching Science and elective courses at CT English.

Mr. Cohen has been a Special Education Teacher at CT English for eight years. Prior to that, Mr. Cohen taught Special Education for five years in the Lakeside Joint School District.

Ms. Harrington has been employed at CT English as a Teaching Assistant for approximately 22 years. She assists in Mr. Kissner's and Ms. Nefian's Math classes and in Mr. Cohen's Special Education classes.

Ms. Fulton has been employed by the District as the Day Custodian for approximately 13 years. She also had two children in the District who are now in high school.

Student Five's Mother has two sons who attended CT English and who went on camping and backpacking trips with Mr. Kissner.

Parent C is the parent of a 7th Grade boy who had Mr. Kissner for 6th Grade Math and a daughter who also had Mr. Kissner for 6th Grade Math.

Student One recently graduated from CT English after attending from 6-8th Grade. She recently had Mr. Kissner for Science.

PL000836

**CONFIDENTIAL Investigation Report      David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Student Two was in Mr. Kissner's 8th Grade Science class and his 6th Grade Math class. Student Two recently graduated from CT English.

Student Three attended CT English from the 6-8th Grades. She had Mr. Kissner in 8th Grade for Science and in 6th Grade for Math. She recently graduated.

Student Four was in Mr. Kissner's 6th Grade Math class this past year. Her older sister, now in High School, also had Mr. Kissner.

Student Five is a former CT English student who had gone on several camping trips with Mr. Kissner. Student Five's parents did not permit me to interview Student Five.

Student Six is a former CT English student who had gone on one camping trip with Mr. Kissner. Student Six's parents did not permit me to interview Student Six.

Student Seven is a former CT English student who has gone on several camping trips with Mr. Kissner. I did not interview Student Seven.

Student Eight is a former CT English student who had gone on several camping trips with Mr. Kissner. Student Eight's parents did not permit me to interview him.

Student Nine is a former CT English student. I did not interview Student Nine.

Student Ten is a CT English student who was in Mr. Kissner's class this past year. I did not interview Student Ten.

Student Eleven is a CT English student who was in Mr. Kissner's class this past year. I did not interview Student Eleven.

Student Twelve is a CT English student who was in Mr. Kissner's class this past year. I did not interview Student Twelve.

Student Thirteen is a CT English student who was in Mr. Kissner's class this past year. I did not interview Student Thirteen.

Student Fourteen is a CT English student who was in Mr. Kissner's class this past year. I did not interview Student Fourteen.

**CRIMINAL INVESTIGATION**

On May 4, 2018, I had a telephone call with Deputy Koenig, who shared the results of telephone interviews he conducted with the Pastor of the Mountain Bible Church, John Haak ("Pastor Haak") and Mr. Kissner. The calls with Deputy Koenig were not voice recorded.

PL000837

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

DEPUTY KOENIG'S TELEPHONE INTERVIEW WITH PASTOR HAAK

Deputy Koenig spoke by telephone on May 4, 2018 with Pastor Haak. Pastor Haak was out of town for two weeks and they were unable to meet in person.

Pastor Haak said that he was not permitted to divulge much information to Deputy Koenig because much of the information was provided to him as a member of the clergy and he was not at liberty to disclose it unless Mr. Kissner allows him to.

Pastor Haak said that he came to learn that there was a report that "something might have happened" in June 2016 in Nevada County involving two children. Pastor Haak met with Mr. Kissner, his wife and two families about the situation.

Pastor Haak informed Deputy Koenig that after meetings between Pastor Haak, Mr. Kissner and the two families, it was agreed that Mr. Kissner could continue to volunteer at the church. Pastor Haak told Deputy Koenig that Mr. Kissner lived in Pastor Haak's home for approximately one year after he first moved to the area.

After learning of the situation, Pastor Haak made a referral to Child Protective Services ("CPS") regarding Mr. Kissner. Pastor Haak told Deputy Koenig that CPS declined to investigate, saying the situation is not a CPS matter, but is a law enforcement matter. The family was referred to the Nevada County Sheriff.

Pastor Haak told Deputy Koenig that one family reported "something" to the Nevada County Sheriff. Deputy Koenig did not know if any criminal charges were brought against Mr. Kissner by the Nevada County Sheriff.

Deputy Koenig later called the Nevada County Sheriff's Department who informed him that there was a report called into the Sheriff's Department in July 2016, regarding an incident in which Mr. Kissner allegedly provided alcohol to a minor.[6]

The Nevada County Sheriff's Department did not have the name of the person who called in the report. The Sheriff told Deputy Koenig that person said they wanted a report to be made, but they did not want to press charges against Mr. Kissner. There was no investigation and no action taken on the report.

Pastor Haak said he was not able to provide any further details unless Mr. Kissner waives the priest-penitent privilege and allows him to speak about it.

---

[6] I obtained this information in a May 7, 2018 follow up telephone call with Deputy Koenig. That call was not voice recorded.

9.

PL000838

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

DEPUTY KOENIG'S TELEPHONE INTERVIEW WITH MR. KISSNER

Deputy Koenig called Mr. Kissner on May 4, 2018, and they spoke for approximately 11 minutes. The telephone call was relatively brief because Mr. Kissner declined to answer most of Deputy Koenig's questions.

Deputy Koenig did not ask Mr. Kissner if he would waive the priest-penitent privilege, but Deputy Koenig was pretty sure, based on Mr. Kissner's tone of voice and attitude toward him, that he would not.

Deputy Koenig noted that Mr. Kissner seemed worried about why he was placed on administrative leave. Deputy Koenig informed Mr. Kissner that he was investigating allegations contained in an Anonymous Letter, including that Mr. Kissner had supplied alcohol to minors.

Mr. Kissner asked Deputy Koenig to supply him with the Anonymous Letter and Deputy Koenig declined. Mr. Kissner did not admit or deny any of the allegations.

Mr. Kissner said that he was concerned that someone would say something like that about him. Mr. Kissner also said that he knew that there were people who were against him because of the Walkout incident and he wanted to be able to clear his name.


DEPUTY KOENIG'S INTERVIEW WITH STUDENT FIVE'S MOTHER

On May 7, 2018, Deputy Koenig spoke with Ms. Kidwell, who gave him the name of a District parent, Student Five's Mother, whose son went on a trip with Mr. Kissner. Deputy Koenig spoke with Student Five's Mother by phone on May 7th.

Deputy Koenig informed Student Five's Mother that he was investigating allegations in an Anonymous Letter that Mr. Kissner had given minors alcohol while on a trip with Mr. Kissner in July 2016.

Student Five's Mother told Deputy Koenig that her son was directly involved in such a situation. Mr. Kissner had given her son, Student Five, alcohol while they were on a trip in July 2016. Student Five's Mother told Deputy Koenig that she found out about the incident when she received a call from Pastor Haak. Student Five did not tell his parents about the situation until after they heard about it from Pastor Haak.

Student Five's Mother was very hesitant to speak with Deputy Koenig and wants to make sure that there is no information released about her son. Student Five's Mother is worried that someone will find out that her son was involved and will confront her son about the incident. Student Five's Mother also indicated that she was concerned that people in the school community would accuse her of being against Mr. Kissner if they found out that she disclosed the incident involving her son and Mr. Kissner.

PL000839

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

### ATTORNEY-CLIENT PRIVILEGED

Student Five's Mother's main concern is protecting her son. Student Five's Mother reported that her son was suicidal in 2016 and she decided not to report the incident because she did not think her son's mental health could withstand it. Student Five's mental health seems better now, but she does not want to dredge it up again for fear that it will be overwhelming for him. Student Five's Mother said that she would speak to her husband and her son's counselor about the situation.

Student Five's Mother told Deputy Koenig that he was welcome to call Pastor Haak to get information about the situation from him. Student Five's Mother said that Pastor Haak is not her pastor and has never been her pastor. Student Five's Mother said that anything Pastor Haak told her could be shared with Deputy Koenig.

Student Five's Mother did not call the Nevada County Sheriff in 2016. She seemed surprised when Deputy Koenig told her that there was another child involved. Student Five's Mother was not aware that there was another family involved in a similar situation involving Mr. Kissner.

Pastor Haak had called Student Five's Mother to tell her that Mr. Kissner had provided alcohol to her son. Student Five's Mother did not know that Mr. Kissner provided alcohol to any other children. Student Five's Mother did not know that there was another family involved at the time. Pastor Haak told Student Five's Mother in 2016 that he was going to make a report to CPS about the incident.

Student Five's Mother was told that after the incident involving her son, Mr. Kissner has not given alcohol to minors. She did not know how that was determined.

Since Student Five's family did not make a report to law enforcement about the incident when it occurred in July 2016, they could do so now. Deputy Koenig indicated that the one-year statue limitations runs from the time law enforcement is notified about the situation.

Deputy Koenig offered that he could take the initial statement from Student Five and then refer the incident to the Nevada County Sheriff's Department. Student Five's Mother did not indicate that she was willing to make a report to the Sheriff's Department. She said she would discuss it with her husband.

### DEPUTY KOENIG'S REPORT

Deputy Koenig surmised that if the issue Pastor Haak reported to CPS was that Mr. Kissner had given alcohol to minors, it would make sense that CPS told him it was a criminal issue rather than a CPS matter. CPS deals with abuse and neglect by caregivers. However, Pastor Haak would not say what conduct he reported.

11.

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

### ATTORNEY-CLIENT PRIVILEGED

Deputy Koenig mentioned that if the issue did relate to providing alcohol to minors, the statute of limitations for that type of misdemeanor is one year from the first report to law enforcement. If no charges were brought within a year after the report was made, then the statue limitations will have expired.

Deputy Koenig indicated that his investigation would end at this point. Since nobody was making a complaint, there was no further investigation to be done. Deputy Koenig does not plan to speak with Pastor Haak regarding the information he received from Student Five's Mother. Unless Student Five and his family want to make a report, Deputy Koenig's investigation is complete.

Deputy Koenig did not discuss with Student Five's Mother if she had any understanding of where the Anonymous Letter came from or who else might be involved.

### THE DISTRICT'S ANONYMOUS LETTER INVESTIGATION

#### Ms. Kidwell's Report

Ms. Kidwell was not aware of any of the incidents or concerns referred to in the Anonymous Letter.

#### Mr. Arias' Report

Before his witness interview, Mr. Arias had not seen the Anonymous Letter and did not know what it entailed. Mr. Arias was told there was an Anonymous Letter, and that it had nothing to do with the Walkout.

Mr. Arias read the Anonymous Letter during his witness interview. Mr. Arias has no knowledge of any of the allegations in the Anonymous Letter. He assumes that it would have come from one of the parents whose child attended one of Mr. Kissner's camping trips.

A few former students told Mr. Arias that while they were away on trips with Mr. Kissner when they were students at CT English, he allowed them to drive vehicles, including, according to one student, a car. The comment was "he let us drive."

A parent who is also a teacher at CT, Ms. Grant-Richards, recently told Mr. Arias that her child was allowed to drive a car and shoot a gun on one of the trips he attended with Mr. Kissner four or five years ago. Ms. Grant-Richards told Mr. Arias that she did not know ahead of time that her child would be shooting weapons or allowed to drive while on the trip with Mr. Kissner. The child was 11 or 12 at the time.

PL000841

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Mr. Arias asked if anybody else was there while the children were shooting guns. Ms. Grant-Richards said there was an off-duty sheriff with Mr. Kissner or someone else who was trained in guns while students were shooting. Ms. Grant-Richards told Mr. Arias that the parents did not know their children would to be handling firearms and Ms. Grant-Richards had not given permission for that. Ms. Grant-Richards did not say whether or not she ever addressed these issues with Mr. Kissner.

Mr. Arias does not know about the financial arrangements of the trips or whether they are run through a company. Mr. Arias has never heard that there was alcohol served on any of the trips.

None of the former students who spoke with Mr. Arias about Mr. Kissner after the Walkouts mentioned any inappropriate conduct by Mr. Kissner, other than in the classroom in which he made up word problems some thought were inappropriate and that he spoke about his military experience in graphic terms.

Mr. Arias does not understand the comment in the Anonymous Letter that Mr. Kissner's camps were run "through CT English in the summers." Mr. Arias runs a few summer camps at CT English and knows that Mr. Kissner did not run any camps "through CT English" in the summer.

Mr. Kissner has told Mr. Arias that when school is over, Mr. Kissner and his wife and child go somewhere in in the Sierra Nevada mountains and stay there the entire summer. He then has groups of people come visit for camping trips.

Mr. Arias knows Pastor Haak. Mr. Arias and Pastor Haak have never spoken about Mr. Kissner. Mr. Arias does not know who at CT English attends the Mountain Bible Church.

## Ms. Grant-Richards' Report

Ms. Grant-Richards' son attended CT English from 6th-8th Grades. Last school year, he was in 9th Grade in high school. Ms. Grant-Richards' son had Mr. Kissner as a teacher and they also know each other as neighbors. Ms. Grant-Richards' son went on two backpacking trips with Mr. Kissner; one approximately three years ago in the spring and a summer trip two or three years ago to Blue Lake. He was in 6th Grade at the time. Ms. Grant-Richards did not attend those camping trips. Ms. Grant-Richards understood that the camps were run through the Mountain Bible Church.

When Ms. Grant-Richards' son returned from the first trip, he told her that Mr. Kissner allowed them to drive cars and shoot guns. Ms. Grant-Richards was surprised and somewhat upset by that. She was not aware that Mr. Kissner would allow her child to engage in what she considered dangerous activities. Ms. Grant-Richards had not attended the parent information meeting in advance of the trip. She later spoke with Mr. Kissner

PL000842

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

**ATTORNEY-CLIENT PRIVILEGED**

about her concern. Mr. Kissner told Ms. Grant-Richards that he is a gun instructor and that he made sure the children handled the firearms safely.

Ms. Grant-Richards told Mr. Kissner that if he was going to allow children to handle firearms, he should have been upfront about that with parents in advance. Ms. Grant-Richards signed a permission slip for her son's attendance on the trip, but it did not mention anything about firearms. Ms. Grant-Richards believes there were some parents on the trip and they were aware that firearms would be a part of the experience.

Ms. Grant-Richards is good friends with Student Five's Mother. Approximately two years ago, Student Five's Mother told Ms. Grant-Richards that Mr. Kissner had given Student Five alcohol during a camping trip Student Five attended with Mr. Kissner. Ms. Grant-Richards' son was not on that trip. Student Five's Mother told Ms. Grant-Richards that she was very upset with Mr. Kissner at the time.

Ms. Grant-Richards understands that Pastor Haak, Mr. Kissner and Student Five's parents met and came to an understanding of what happened. Ms. Grant-Richards next heard about the situation, recently, when Student Five's Mother told her she had received a telephone call from a Deputy Sheriff about the incident.

Ms. Grant-Richards believes that Mr. Kissner makes himself available to troubled kids and gets involved with their families. It seems he has a mission to help troubled kids. Except for what she heard about the incident with Student Five, Ms. Grant-Richards never suspected that Mr. Kissner was engaging in any inappropriate conduct with the children. Ms. Grant-Richards understands that one of the troubled children Mr. Kissner has become very close to is Student Nine.

**MS. DENUES' REPORT**

Ms. Denues and her husband attend the same church as Mr. Kissner and his wife-Mountain Bible Church. "We are the Christians on Campus, along with [Ms. Nefian]." Ms. Denues had a relationship with Mr. Kissner outside of school, through the church. The church is nondenominational. Ms. Denues understands that Mr. Kissner is "born again."

Ms. Denues has not been to church in "a long time" and has been out of the loop at church for over a year. Even if she was active, Ms. Denues would not have been in the loop regarding any issues brought to the Pastor's attention. The Church Elders would have dealt with those issues.

After Ms. Denues read the Anonymous Letter, she reported that she is aware that Mr. Kissner takes students and some parents on camping trips in the summers. Ms. Denues believes that Mr. Kissner, his wife and son go on the trips. Mr. Kissner's son is two years old. Ms. Denues does not think the Mountain Bible Church sponsors the trips.

14.

PL000843

**CONFIDENTIAL Investigation Report      David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Ms. Denues believes Mr. Kissner was conducting the trips before he came to Mountain Bible Church. He had some kind of mission work he was doing. Mr. Kissner was "doing spiritual outreach. He makes it clear that he is going to share his faith on the trips."

Ms. Denues has not heard anything from anyone about the issues raised in the Anonymous Letter. Ms. Denues believes that Pastor Haak would never condone anything like what was in the letter. "If this was happening, he didn't know about it, in my opinion."

Ms. Denues is not aware of anything Mr. Kissner said or did that relates in any way to the allegations in the Anonymous Letter. "Nothing weird." "I just can't imagine that any of that would be true."

Mr. Denues reported that the Mountain Bible Church may not have sponsored the camping trips, but they have supported them. Mr. Denues has cooked breakfast for the groups of kids and families who met at the church before heading off for the camping trips. Mr. Denues has never seen any issues or suspected any problems with Mr. Kissner's interactions with children. Mr. Denues has always been impressed with and admired "that he gave up all this time to go do these things with the kids. He coached the wrestling team and he is always helping out. So I had no reason to think that there is anything…"

Other than complaints about homework, Ms. Denues is not aware of any student or parent complaints about Mr. Kissner's conduct before the Walkout incidents.

Ms. Denues is not aware of anyone in the community who would make up something like that about Mr. Kissner because they have an ax to grind against him.

## MR. COHEN'S REPORT

Mr. Cohen was not notified about an Anonymous Letter. He was asked whether he was aware of anyone in the community who might be so angry with Mr. Kissner for his conduct around the Walkout, that they would lash out against him with an angry complaint. Mr. Cohen replied that he did not know of anyone and that he thought it was more so the teachers who were angry with Mr. Kissner over his actions regarding the Walkout.

Except for his conduct in relation to the Walkout, Mr. Cohen is not aware of any unprofessional or inappropriate conduct by Mr. Kissner toward children.

Mr. Cohen has heard that Mr. Kissner has taken camping trips with students to Death Valley and he lets them drive his truck. Several students have told Mr. Cohen that Mr. Kissner lets them drive his truck, off road. Mr. Cohen believes parents are also on the trips.

PL000844

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Mr. Cohen believes the trips are organized just by Mr. Kissner, not by an outside agency. Mr. Cohen believes the trips are advertised by word-of-mouth. Mr. Cohen has never heard of another teacher going on one of Mr. Kissner's trips.

When Mr. Cohen has spoken with other teachers about Mr. Kissner's trips, the consensus has always been that "it doesn't feel professional."

Mr. Cohen has not observed or heard about anything sexual involving Mr. Kissner's interactions with students. Mr. Cohen has not heard about any after-hours texting or communication between Mr. Kissner and any of the students.

MR. KISSNER'S CAMPING/BIKING TRIPS

I obtained documents relating to Mr. Kissner's camping trips dating back to summer 2016. One such flyer refers to the Grouse Ridge and Sierra Buttes Summer 2016 Camping" trip. Exhibit B. The flyer associates the camping trip with "Mountain Bible and Christ Child Catholic Church" "Guided by David and Stacy Kissner and Quest Ministries."

In that flyer, Mr. Kissner is described as "Guide, Quest Ministries" and "Teacher, CT English Middle School." At the bottom of the flyer is a notation, "These activities are NOT supported by Loma Prieta Joint Union Elementary School District."

Another flyer relates to "Downieville Downhill Camping/ Mountain Biking 21-26 July, 2016" "Quest Ministries Mountain Biking Club." Exhibit C. That flyer contains the same reference to Mr. Kissner as a Teacher at CT English and the statement that the activity is not sponsored by the District. The 2016 documents instruct participants to make checks payable to the "Mountain Bible Church."

There are no records in the Secretary of State's office relating to "Quest Ministries" involving Mr. Kissner or outdoor trips. There is a nonprofit organization called "Quest Ministries" listed in the Secretary of State's records that appears to have no relation to Mr. Kissner. That Quest Ministries provides workshops and seminars as well as printed materials. There is no mention of trips for children or Mr. Kissner on the website.

In materials I obtained about various trips Mr. Kissner hosted in 2018, Mr. Kissner no longer identifies himself as a Teacher at CT English. Some of the paperwork includes the statement that the activity is not sponsored by the District. Other documents do not contain that statement. The 2018 flyers also no longer reference "Quest Ministries" or "the Mountain Bible Church" and instruct participants to make checks payable to "Stacy Kissner," not the Mountain Bible Church. Exhibit D. The 2018 documents refer to participants as "Student."

16.

PL000845

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

**Mr. Kissner's Report**

"Quest Ministries "does not exist anymore." For approximately ten years, Mr. Kissner worked with "unchurched" underprivileged kids in the San Jose, and Gilroy communities. Mr. Kissner, along with other "caring adults from a number of different churches, would engage in outdoor activities with young people, share some of the good news of Jesus with and interact with their families. Build relationships with families, provide meals at Thanksgiving, stuff like that."

"Quest Ministries was under the umbrella of a couple of different churches. The churches had the 501(c) (3) status; Quest Ministries would fall under that." Quest Ministries was never a separate legal entity and never had nonprofit status. "It was just kind of a name that we referred to some of the activities that we do." Mr. Kissner and his wife were the main participants in Quest Ministries. They managed Quest Ministries. The donations solicited on behalf of Quest Ministries "went to a church." The churches Mr. Kissner's camping trips were associated with were first Crossroads Bible Church (San Jose) and then Mountain Bible Church (Los Gatos). Mr. Kissner was never an employee of either church.

Approximately two years ago, Mr. Kissner "informalized" the camping trips. The Mountain Bible Church used to sponsor Mr. Kissner's camping trips. The Mountain Bible Church is no longer involved in any formal capacity in Mr. Kissner's camping trips. Mr. Kissner and his wife still attend the Mountain Bible Church. Mr. Kissner described the change as "having to do with the birth of our son." They took the name of the church off of the trip materials and they are now just trying to do it "more as a family."

Mr. Kissner's camping trips are "primarily an outreach ministry" so most of the participants are not connected to the Mountain Bible Church or any particular church. During the evenings on the camping trips, they share stories from the Bible and they "share a bit of God's word."

Children who attend school in the District have attended many of Mr. Kissner's trips. Mr. Kissner's camping trips "have no connection whatsoever to the District." "Every flyer that we have says very clearly 'this is not connected with Loma Prieta School District.'" Mr. Kissner was "not sure" if he is identified in his camping trip promotional materials as a teacher at the District. People at the District, including the superintendent "have been very well aware of it." Mr. Kissner "makes every effort to distance himself from the District in his flyers." He puts in red print on his flyers that this is not at all connected with the District.

Mr. Kissner currently maintains a website at: https://dmkissner.wixsite.com/adventure

17.

PL000846

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

ALLEGATIONS OF PROVIDING ALCOHOL TO MINORS

The Anonymous Letter stated that:

*"with at least 4 different under age boys (most under age 15):*

1. *Kissner runs camps through a mountain church and through CT English in the summers. He frequently will single out one boy and take him somewhere alone, away from the group.*

2. *Kissner has provided alcohol to boys that he is alone and talking to. I know of at least 3 occasions where this has occurred. He has admitted to doing it one time.*

*I have never heard of Kissner physically touching a boy, but the acts that he has done are clearly 'grooming'. I believe that he still runs camps and he is also in charge of the boys wrestling, where I am sure he gets close physical contacts with many boys.*

*The church where he provided alcohol to boys has been apprised of his illegally providing young boys with alcohol, and he has admitted to it. I am not sure if they continue to allow this man to be alone with children, but he seems unfit to do so. Now that you have been put on notice of this person in your employ, you must do your due diligence to protect your students from a potential predator.*

**Student One's Mother's Report**

A lot of parents are upset and concerned about the way Mr. Kissner's camping website looks. There are many photographs and videos in which it appears that Mr. Kissner is very physically close and touching the boys.[7] There are many photographs or videos of boys shirtless in their bathing suits. Parents thought it was odd that there were so many photographs of boys' bare chests. "It looks inappropriate." "I would never send my child away with him. It's just weird."

Student One's Mother is not sure how old the video was. She recognized two of the boys in the video. There was one girl who was in the video, but only briefly.

---

[7] On or about May 2, 2018, I watched the video Mr. Kissner had posted on his website about the camping trips. The video mainly depicted middle school age boys in their bathing suits, sometimes with close-ups of their bare chests. The video also showed young teenage children shooting guns. Mr. Kissner or another adult was standing behind the children bracing them. When I looked at Mr. Kissner's website a few days later, that video had been taken down and replaced with a different video in which all of the children were fully clothed and there were no images of guns.

18.

PL000847

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

When Student One's Mother was looking at the website, her 8th Grade daughter came up next to her and started looking at it too. Her daughter commented that, "It's really creepy that he's filming these boys without shirts on."

Student One's Mother has not heard anything about what goes on the trips. One odd thing she heard about happened on one of Mr. Kissner's trips that a family won at an auction. A mom took her three daughters on a three or four-day camping trip with Mr. Kissner over the summer. The awkward thing was that Mr. Kissner took his three-month-old baby with them on the backpacking trip and Mr. Kissner's wife was not with them. The baby was screaming the whole time and it was awkward.

**Parent C's Report**

Parent C's husband looked at the website Mr. Kissner maintains in connection with his camping trips. There were a lot of pictures of boys in swimsuits and pictures and videos of boys shooting guns. Mr. Kissner was very physically close to the boys in the shooting pictures. Parent C's husband noted that he was very uncomfortable with the physicality of Mr. Kissner's interactions with the boys. He was standing behind them, "holding them by the waist and pressing up to them, like in every single shot." There was another man "who seemed to be shooting with the two girls who were there and he was not nearly as physical."

Parent C's husband looked at the itinerary for a few Mr. Kissner's trips and there were three items listed, "eating, shooting and showers." Parent C's husband questioned, "why does someone slot in showers?" Exhibit D, Ashland Ore. itinerary.

There is a "cult of personality" around Mr. Kissner at CT English. The boys call Mr. Kissner "DK." Another parent, Student Sixteen's Mother, mentioned that Mr. Kissner had really helped her son through a hard time. Student Sixteen has a difficult family situation and seems vulnerable.

**Student Five's Parents' Reports**

Camping Trips with Mr. Kissner

In February 2014, Student Five went on Mr. Kissner's Death Valley Trip when he was in 7th Grade and was 13 years old. He had a great time and Student Five had no concerns about anything that happened there.

PL000848

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Student Five's Mother did have concerns about Mr. Kissner's lack of consideration for safety that she only discovered after the fact. Mr. Kissner had allowed the kids to go down an old mine shaft that had a sign clearly stating, "Do not enter." When Student Five's Mother found out about that, she was angry. Mr. Kissner seemed lax in terms of the boundaries he set for the kids.

Student Five's Mother had a stern conversation with her son telling him that he was not to do that in the future. Student Five also told his mother that Mr. Kissner allowed him to drive Mr. Kissner's truck with a bunch of kids in the back. Mr. Kissner let each of the kids take a turn driving his truck.

At first, Student Five's Mother was upset by that. When she thought about it later, she realized it probably was not a big deal. The boys were on a flat dirt road or dirt track. Student Five's Mother thinks other parents might have concerns about that. Student Five's Mother wrote that off as part of the "young boys'" adventure. Student Five's Mother believes that a few parents went on that trip. Her son thought it was all very exciting.

Looking back now, Student Five's Mother can see that her son was having mental health issues, including social anxiety, at the time. He had begun withdrawing from his friends. He was always the odd man out when it came to group activities or selecting partners at school.

Student Five strongly encouraged his younger brother (Student Six now a freshman in high school) go on one of Mr. Kissner's trips. Student Six also went on one of Mr. Kissner's trips when Student Six was in 8th Grade.[8]

In April 2016, Student Five was suicidal. He was 15 years old and was suffering from social anxiety and depression. He had attended CT English in sixth and seventh grade and he was then a freshman at Los Gatos High School.

By the end of that school year (2015-16) the social isolation and social anxiety issues had returned and escalated and Student Five became depressed. His parents thought another hiking trip would be good for him. They trusted Mr. Kissner.

In June 2016, Student Five went on another camping trip with Mr. Kissner. He was 15 years old. It was a five-day hiking trip that took place from June 28 - July 2, 2016.

---

[8] Student Five's Father reported that their older son also went on a camping trip with Mr. Kissner in 2015 to Blue Lake. Student Five's Father believes Student Five went on two camping trips with Mr. Kissner in 2016, the last one being in June-July 2016.

PL000849

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Student Five's Mother did not inform Mr. Kissner of the mental health challenges Student Five was experiencing at the time. However, it was obvious from Student Five's appearance that he was struggling. Student Five's Mother was frightened by how bad Student Five looked at the time. Student Five's younger brother Student Six went on the same trip.

When Student Five returned from the trip, it scared Student Five's Mother how bad he looked. However, both Student Five and Student Six said they had a great time.

In August, 2016, Student Five's Mother asked that Student Six be placed in Mr. Kissner's Science class. Student Six was also on the wrestling team. Student Five's Mother had a lot of confidence in Mr. Kissner and how he dealt with the boys. He seemed like a great wrestling coach.

<u>Student Five's Parents' Communications with Pastor Haak</u>

The first Student Five's Mother learned that something had happened on the camping trip was the following September or October 2016, when she received a telephone call from Pastor Haak. Both Student Five and Student Six had attended preschool at the Mountain Bible Church, although the family does not attend the church.

Pastor Haak informed Student Five's Mother that he had received information that "someone may have given Student Five alcohol on the camping trip." Pastor Haak said he had some questions for Student Five about whether someone had given him alcohol on the camping trip. Student Five's Mother asked Student Five and Student Six whether there was alcohol on the trip. Student Six mentioned that there were some chocolate liqueurs, but he did not think any of the kids got them. Student Five denied he was given alcohol on the trip.

After a few more conversations, Pastor Haak told Student Five's Mother that he knew that Mr. Kissner had given Student Five alcohol while on the camping trip. Student Five's Mother spoke with Student Five again, and he then admitted that Mr. Kissner did give him alcohol.

Initially, Student Five told his mother that Mr. Kissner had given him "a sip" of alcohol. Student Five's Mother asked Student Five who he told about Mr. Kissner giving him alcohol. Student Five said he told no one. Student Five also told his mother that it was just Student Five and Mr. Kissner who were there when Mr. Kissner gave him alcohol. Student Five's parents do not know how Pastor Haak learned about the situation.

Student Five later told his parents that Mr. Kissner "poured him a glass of whiskey" (in a plastic red cup). Student Five's parents think that it was about a half cup of whiskey. Student Five's Mother asked Student Five if anything else happened with Mr. Kissner and he said "No." "[Student Five] was offended I even asked." At that time, Student Five was not talking much. He was very closed off.

21.

PL000850

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

At that point, Student Five's Mother was very angry with Mr. Kissner. "You do not offer whiskey to a 15-year-old." Student Five was vulnerable at the time.

Eventually, Student Five told his mother that the other boys had gone for a walk around the lake near the campsite. They took walkie-talkies with them. Just Student Five and Mr. Kissner were at the campsite. Student Five said he did not go on the walk with the other kids because he was really tired. Student Five reported that he and Mr. Kissner were listening to the walkie-talkie conversation the other kids were having and were laughing about it. He said the conversation he and Mr. Kissner had was innocent.

Student Five told his mother that there was no physical touching and no talk about sex with Mr. Kissner. There were no parents at the campsite that night. When Student Five's Mother picked up her boys at the end of the trip, Mr. Kissner's wife was there.

There was another young boy on the trip (not a District student) whom Student Five's Mother understands comes from a very broken family in San Jose. Student Five's Mother understands that the young boy spent several weeks with Mr. Kissner at the camp, and that just before her sons arrived, this young boy had been alone with Mr. Kissner at the camp for a few days. Student Five's Mother recalls commenting to her husband, "that does not sound right."

Student Five's Mother understands that the young boy was someone Mr. Kissner was looking out for, as a part of his pastoral ministry. Student Five's Mother feels that it is important that somebody follow up with that young boy to determine whether or not Mr. Kissner behaved inappropriately with him.

In September or October 2016, Pastor Haak invited Student Five's parents to his home to discuss the situation. Pastor Haak, Pastor Haak's wife, Mr. Kissner and Mr. Kissner's wife were also present. David was very apologetic and he admitted he gave [Student Five] whiskey." "We were furious."

Mr. Kissner repeatedly "apologized to his God." Mr. Kissner said, "Oh, I have sinned in front of my God." Student Five's Mother told him, "You need to apologize to the parents of this child." Student Five's Mother told Mr. Kissner, "Keep your God out of this. He has nothing to do with the fact that you gave a 15-year-old child alcohol."

That night, Mr. Kissner, "sounded so sincere." However, he was missing the point, he made no reference to the damage he had done to Student Five, and the fact that he had broken the trust that Student Five's parents had placed in him.

If anyone was going to be giving her children alcohol, Student Five's Mother felt it should be within the family and under strict supervision. Student Five's Mother's grandfather and two uncles died of alcoholism. She was furious that Mr. Kissner would give her young son alcohol and expose him to a potential addiction.

22.

PL000851

**CONFIDENTIAL Investigation Report**   **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Her parents gave her a glass of beer when she was 17 years old, and her parents and older siblings all watched her closely. Student Five's parents had spoken about that and said that they wanted to be the ones to introduce their sons to alcohol, at the appropriate time in the appropriate circumstances.

Student Five's Mother was also furious because she knew Mr. Kissner had guns at the camp. If Mr. Kissner had gotten drunk and fallen asleep, Student Five could have had access to Mr. Kissner's gun and in his depressed state, might have done something terrible. That night at Pastor Haak's home, Mr. Kissner insisted that he had only had one glass of whiskey.

Student Five's Mother never found out how Pastor Haak learned that Mr. Kissner had given Student Five alcohol. Student Five's Mother only found out about an incident with a second family when Deputy Koenig called her in May 2018 and told her there was another child Mr. Kissner had given alcohol to. That really upset Student Five's Mother. Student Five's Mother was "freaked out" when she learned in the past few weeks that Mr. Kissner had done this with at least one other boy.

Pastor Haak and Mr. Kissner never told her that there was another child who claimed Mr. Kissner had given him alcohol. They led Student Five's Mother to believe that the situation with her son was an isolated incident and that maybe it was not that bad. Student Five's Mother had no reason to suspect it was a pattern or that anything else had happened.

At the end of that meeting, Pastor Haak told Student Five's parents that he would be taking control of the situation. Student Five's Mother was given assurances that there "would be no more alcohol on any of these trips."

Over the past few years, Student Five's Mother learned to get past what Mr. Kissner had done with her son. Student Five's Father even let Mr. Kissner borrow their bear barrels to use on his camping trips. Student Five's Mother has never brought this up at school and did not notify the principal of the situation. Student Five's Mother thought it was her child that Mr. Kissner had wronged and that they dealt with it. Student Five did not spend any more time with Mr. Kissner after that trip.

When Student Six was in 6th or 7th Grade, he interviewed Mr. Kissner for an English class essay. During that interview, Mr. Kissner told Student Six that he got in trouble when he was in the military because he had given alcohol to his troops. Mr. Kissner told Student Six that was part of the reason he left the military, because he had a record that would prevent him from getting promotions. Student Five's Mother does not believe that situation came up during the conversation with Pastor Haak.

Mr. Kissner likes to speak about his Marine experiences a lot to the young boys. Mr. Kissner has told other people that he got in trouble in the past for having given alcohol to his troops.

PL000852

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Student Five's Mother cannot understand how Mr. Kissner could have decided again to give a young 15-year-old boy alcohol when they were alone together on a mountain. As a teacher, Mr. Kissner should know that he should never be alone with a child.

Recently, when Student Five's Mother got a call from Deputy Koenig and the issue of the camping trip with Mr. Kissner was raised again, she was shell shocked. She was worried about how dealing with the situation again might affect her son's mental health. Student Five's Mother and her son had not spoken about the situation in two years.

Student Five's Mother spoke with her son about it. She was relieved that as opposed to two years ago when the incident occurred, Student Five seemed to be in a stronger place. He is fragile, but Student Five's Mother thinks he can handle the situation. Student Five is a very private individual. He does not speak very much with his parents and has not been very open about situations that occurred.

Student Five's Mother realizes that if this becomes a part of the investigation, she will not be able to protect him from that. Student Five's Mother is very concerned about community retaliation if those in the community who strongly support Mr. Kissner think that Student Five or Student Five's Mother are responsible for any repercussions to Mr. Kissner.

Student Five's Mother is concerned that Mr. Kissner might feel compelled to confess his sins in front of his church and identify Student Five as the boy he gave alcohol to. Student Five's Mother thinks that Mr. Kissner will make it seem like he is apologizing to Student Five and his family, but at the same time, he will be subjecting them to recriminations from the community for divulging this information. Mr. Kissner will make it known that Student Five's family is "persecuting" him. He will do it in a "very subtle, very religious, very sorrowful way." Mr. Kissner "is manipulative."

Student Five's Mother feels that it is important that the issues are investigated, for the greater good. However, Student Five's Mother is not willing to be the only ones to make a complaint against Mr. Kissner, due to fears about community backlash.

Just recently, after Student Five's Mother was contacted by the Deputy Sheriff, she asked Student Five again if anything else had happened with Mr. Kissner. Student Five is now 17 years old. Student Five's Mother asked him, "Do you have any reason to suspect that [Mr. Kissner] is a danger to any kids?" Student Five responded, "No. God no. Absolutely not." Even now, as a 17-year-old, Student Five said that he would have no concerns with Mr. Kissner spending time with a young boy. Student Five's Mother felt that was reassuring.

In a follow up message from Student Five's Mother on June 2, 2018, Student Five's Mother reported that "[Student Five's] mental health has spiraled terrifyingly downwards. We will not permit this investigation to put additional stress on him." She

24.

PL000853

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

determined that they will not make a police report about Mr. Kissner's behavior with her son because his mental health is too fragile.

Student Seven's Mother is a good friend of Student Five's Mother. Student Seven went on a number of Mr. Kissner's camping trips. Before Student Seven started going on trips with Mr. Kissner, Student Five's Mother told Student Seven's Mother "off the record" that Mr. Kissner had given Student Five alcohol.

Student Seven's Mother felt that Student Five's Mother was completely overreacting. She just totally shut it down saying, "that is ridiculous." Student Seven's Mother said that she thought it was probably no big deal, "he probably gave him a sip." Student Seven's Mother dismissed Student Five's Mother's report.

Since then, Student Seven has been on a number of Mr. Kissner's trips. In thinking about it again, Student Five's Mother is "not sure [Student Seven] would tell the truth." Student Seven is Student Six's age, and is now a freshman in high school. Student Five's Mother believes that if Student Seven were given alcohol and was asked about it, he would say "No."

Neither of Student Five's parents made any criminal report to Nevada County. Nor did they send the Anonymous Letter.

When Student Five's Mother read the Anonymous Letter, she became quite concerned. She recalled that on a Wednesday afternoon earlier this year there was a young boy, (Student Twelve or Student Ten, both of whom are 6th Grade boys and are friends) who was left at school. One of them was supposed to bring the other boy home, but they did not and the boy was left at school. Student Five's Mother asked Ms. Bevans-Franks to contact the boy's parents to let them know he needed to be picked up.

Student Five's Mother went to Mr. Kissner's room and there she found Mr. Kissner and a bunch of boys. "There are always boys around David." Student Five's Mother was concerned about how the boy would get home.

Mr. Kissner said, "worst case I will give him a ride." Student Five's Mother told Mr. Kissner, "I do not think you should be driving kids home." Student Five's Mother had the impression that Mr. Kissner may have driven this young boy home previously. This is "another one of our more fragile kids on the mountain." As a teacher, you should know that you are not supposed to take a child in your car alone.

Student Five's Father reported that he knows that Mr. Kissner has a "fan club" among the boys in Student Five's class. Mr. Kissner lives four houses away from Student Five's home. One week, Student Six was taking care of Mr. Kissner's dog when he was away. When Student Six went over to Mr. Kissner's house for Mr. Kissner to show him what to do with the dog, his father went with him.

25.

PL000854

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Parent A recently learned from Jane Doe that the other boy Student Eight was talking to about what he had done with Mr. Kissner, is Student Five. Student Five is the child who was sent back to the campground while Mr. Kissner and Student Eight drank the alcohol. He is the same child Student Eight told that he had gotten drunk when they got back to the campground. Parent A heard that Student Five later denied that this had happened.

Parent A got all of this information from Jane Doe, not from Student Five's Mother. Student Five's Mother has no idea that Parent A knows any of this information.

Student Eight was very upset about the situation and told his mother. Like many other students, Student Eight "adores Mr. Kissner." Mr. Kissner is seen as a very positive, influential role model. Student Eight was most concerned about the prospect of the incident with Mr. Kissner getting Mr. Kissner in trouble.

When Jane Doe learned about the situation, she was shocked. When Jane Doe told Parent A about the situation, two other adults were present. The other two adults were not parents of children in CT English. The only other person Parent A told about the incident was her husband. At the time of the incident with Student Eight, Student Eight's family was going through a very challenging time.

Jane Doe told Parent A that Student Eight told her that Mr. Kissner had not touched him in any sexual way. Jane Doe and her husband ("Student Eight's Father") hired an investigator and they gave Student Eight a lie detector test about the situation. The lie detector test indicated that Student Eight was being honest about his report that Mr. Kissner had given him alcohol.

Jane Doe and her husband took that information to the Mountain Bible Church and spoke with Pastor Haak about it. Parent A believes that Student Eight's parents met with Pastor Haak and Mr. Kissner to discuss the situation. "At that point it got turned over for an investigation, by the Church Elders." Parent A understands from Jane Doe that Mr. Kissner refused to submit to a lie detector test. Mr. Kissner also denied having provided alcohol to Student Eight, but he admitted having given alcohol to another boy.

Student Eight's father tried to make a police report about the incident in Santa Cruz County. He was told that they do not have jurisdiction because the incident took place elsewhere. Student Eight's father then made a report to the police in Nevada County where the incident occurred. [10]

---

[10] Nevada County is a county in the Sierra Nevada of California.

27.

PL000855

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Student Five's Father noted that there was a "gang of Student Five's classmates [high school aged boys] hanging out at" Mr. Kissner's house. That happened approximately 18 months ago.

**Parent A's Report**

In July 2016, Parent A's good friend, who is the mother of a student who has since graduated from CT English, shared information with Parent A on the condition that she maintain it as confidential. Parent A first heard about the incident on July 16, 2016 and believes the incident occurred the previous week. She is coming forward with the information now because she thinks it is important. Parent A refused to disclose the names of the student involved or his mother.

In the summer of 2016, Parent A's friend, "Jane Doe" sent her son on a backpacking trip with Mr. Kissner. [9]

Jane Doe told Parent A that at Mr. Kissner's campsite, every morning they put a flag up and then take it down at the end of the day. The flagpole is a bit of a hike from the campsite, up a hill. Earlier in the trip, Mr. Kissner had taken Student Eight and another student to a convenience store. Mr. Kissner asked Student Eight to pick out a bottle of alcohol he wanted. Student Eight did that.

That evening when Mr. Kissner and two boys were going up the hill to take the flag down, Student Eight reminded Mr. Kissner that Mr. Kissner had said that they would drink alcohol that night. Student Eight said to Mr. Kissner, "Hey, what about that thing we got today?" Mr. Kissner said, "Oh yeah," and told the other boy to go back to the campsite. The other boy returned to the campsite and Mr. Kissner and Student Eight remained on the hill where the flagpole was.

Student Eight later told his mother that he and Mr. Kissner "drank a whole bottle of alcohol" that night when they were at the flagpole. When Student Eight and Mr. Kissner returned to the campsite, Student Eight was acting weird. The other boy who Student Eight had been with said something to Student Eight about the fact that he was acting weird. Student Eight told the other boy that he had been with Mr. Kissner. The other kid replied, "Oh yeah, I know what you were doing, I have done that before with him too."

---

[9] I subsequently learned during my June 22nd witness interview with Mr. Kissner, that Parent A's friend "Jane Doe" is the Mother of Student Eight. I spoke briefly with Student Eight's Father, but he declined to participate in a full interview in the investigation. Student Eight was 13 years old at the time and was a student at CT English. Student Eight will be starting 11th Grade at Los Gatos High School in August 2018.

26.

PL000856

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Parent A believes that a police report was filed. The police did not act on the report. Parent A said that the county police believed it was not a big deal and made a comment to Student Eight's Father that this was nothing compared to what they deal with. The lawyer advising Student Eight's parents encouraged them not to discuss it further. Jane Doe vented to Parent A about the situation, but also said that she wanted to put the whole thing behind them.

Parent A did not send the Anonymous Letter to the District and she does not know any other adults who sent a letter to the District about this situation. Jane Doe did say that "a lot of people know" about Mr. Kissner giving alcohol to minors and that Mr. Kissner communicates with kids "on a very personal level."

Student Eight was a typical teen concerned about what others thought about him in middle school. His parents were very fearful that their son's name would be associated with this report about "the beloved Mr. Kissner." Student Eight also did not want to be associated with what had happened and pleaded with his parents not to take any action against Mr. Kissner. Student Eight's parents decided to wait until the Church Elders did their investigation in 2016.

When the incident came up involving the Walkout with Mr. Kissner appearing on the news, Parent A called Jane Doe and asked her if she was ready to come forward with the information she had about Mr. Kissner. Jane Doe said she would think about it. After the "Keep Kissner" signs went up around CT English, Jane Doe told Parent A that she and her family will not discuss the incident with anyone.

Parent A is not a part of the church. She learned from Jane Doe that the elder counsel at the Mountain Bible Church said they did not know that Mr. Kissner was allowing alcohol on his camping trips. Parent A understands that the church immediately required Mr. Kissner to stop allowing alcohol on his camping trips and that the church stopped sponsoring Mr. Kissner's camping trips.

A few weeks after Parent A learned of the incident with Mr. Kissner in 2016, she called Pastor Haak and discussed the situation with him. Pastor Haak shared with Parent A that there was an ongoing investigation within the church. Parent A cannot remember the rest of the detail of what Pastor Haak told her was happening as a result of the report.

Soon after the Walkout incident, Parent A informed Ms. Kidwell of what she knew, without divulging the identities of Jane Doe or Student Eight. Ms. Kidwell said that Pastor Haak never informed her of what had happened with Mr. Kissner on the camping trips.

When Parent A was told of an Anonymous Letter the District received and the information it contained, she initially said that Jane Doe must have sent the letter, because it contained many details that Parent A had learned from Jane Doe.

PL000857

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Jane Doe later told Parent A that neither she nor her husband sent the Anonymous Letter. She said that several of the points made in the letter were "commonly known (like texting with former students)" and that since she didn't have firsthand experience with that, she would not have included that in a letter.

Jane Doe did tell Parent A that Mr. Kissner engaged in conversations with some of the boys about sex and their sexual encounters, and that Mr. Kissner engages in text messaging with some of the boys at night. Jane Doe recently told Parent A that Mr. Kissner has befriended some of these boys and talks with them informally, including about their sex lives.

Parent A understands that Student Eight is not one of the boys with whom Mr. Kissner texts. Jane Doe gave Parent A the name of one of the boys she said Mr. Kissner has been texting with. Parent A thinks the boy is Student Nine, or possibly Student Fifteen.

**Student Eight's Father's Report**

In my witness interview with Mr. Kissner on June 22, 2018, Mr. Kissner identified Student Eight as having been on the same camping trip that Mr. Kissner gave Student Five alcohol. Mr. Kissner identified Student Eight as a boy whom Mr. Kissner said falsely accused him of providing him alcohol during that camping trip.

Student Eight is also the boy Parent A would not identify. On June 22, 2017, I contacted Student Eight's Father and informed him that Mr. Kissner identified his son as someone who had accused Mr. Kissner of providing him alcohol.

Student Eight's Father was extremely hesitant to speak with me about the situation, but he did confirm that Student Eight was involved. He also confirmed that his son took and passed a lie detector test about the situation. Student Eight's Father also confirmed that he did not write the Anonymous Letter and said he did not know who did.

Student Eight's Father was very concerned about repercussions to his son and his family from those in the mountain community who were highly supportive of Mr. Kissner. Student Eight's Father indicated that he would consider speaking with me to provide additional information about the situation with his son, but he needed to think about it and speak with his wife and son before agreeing to participate in the investigation.

After several weeks, on or about July 30, 2018, Student Eight's Father informed me that due to some health issues he was dealing with, he was not able to participate in the investigation and he would not involve his family in the investigation.

29.

PL000858

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

**Parent B's Report**

Parent B is the Anonymous Letter writer. She insists on remaining anonymous. Parent B
reported that she is "incidental to this" in that she does not currently have children at CT
English. She has two children at Los Gatos High School, both of whom graduated from
CT English. Throughout her association with CT English, Parent B had the sense that Mr.
Kissner was "a great guy." Her son had him for Math and loved him.

It was only after Parent B's children left CT English that Parent B began to hear troubling
reports about Mr. Kissner's conduct. When Mr. Kissner inserted himself into the Walkout
issue and made himself a news story, Parent B felt compelled to notify the District of the
troubling information she came to learn about Mr. Kissner. It struck Parent B that Mr.
Kissner's behavior toward students and the District in the Walkout scenario, including his
insistence on making the story about him and his beliefs, to the detriment of students,
meant to Parent B that it was more likely that Mr. Kissner is capable of selfish and
harmful conduct toward children.

Parent B has spoken with Student Nine about Student Nine's interactions with Mr.
Kissner. Student Nine said he knows of a couple of other boys whom Mr. Kissner has
gotten drunk. Student Nine said, "It happens to everybody."

Parent B understands that Mr. Kissner is alone with kids frequently. He tends to separate
one child from the group and have alone time with them.

Parent B heard that Student Sixteen went on a camping trip with Mr. Kissner in 2016.
Student Sixteen reported that everybody who goes on the camping trips knows that Mr.
Kissner, "gets everybody drunk." He mostly does it with the younger boys.

Parent B spoke to Student Sixteen's Mother. She had her two boys go on a campout with
Mr. Kissner in April for spring break. They were 9 and 11 or 10 and 12 at the time.
Student Sixteen's Mother warned them before they went to keep an eye out for anything
funny. Student Sixteen's Mother told Parent B that sometimes there were 3-4 adults
present, but most of the time, Parent B understands, it was just Mr. Kissner, his wife and
young child and a 26-year-old man whom Mr. Kissner recruited from the church to go
with them.

Obviously, Mrs. Kissner will have been busy looking after her two-year-old. Student
Sixteen told his mother that Mr. Kissner and this 26-year-old were drinking beers in front
of the kids and may have offered him some, but Student Sixteen just biked off.

Both her boys reported to Student Sixteen's Mother that the 26-year-old was making
inappropriate sexual remarks and advances toward the girls on the trip. That came from

30.

PL000859

**CONFIDENTIAL Investigation Report**        **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

boys who are quite young. They also said that they felt it was their duty to keep this man away from the girls, especially once he had started drinking.[11]

There was a very troubled kid, Student Seventeen, who went on the last campout. He did not have any money and might have been homeless. Parent B thinks Mr. Kissner may have been providing him with financial assistance or helping his family. He is part of the church where Mr. Kissner attends.

Parent B followed up on June 6th via email, saying, "I have been persuaded by my family to let go of this endeavor to find out about the campouts and Mr. Kissner's activities. My son, who had Mr. Kissner as a teacher, made me see it from Kissner's side. He said that I may be wrong and that Mr. Kissner may be really helping a lot of kids. I do not agree with him giving alcohol to kids, but I have gone out of my way to try to protect the kids in our community. I already feel as if I might be personally targeted for speaking to people about the reports made about Mr. Kissner."

"People all want to protect our kids and their innocence. Perhaps it is the case that Mr. Kissner did nothing other than what was reported. That is my hope. But even in doing that, he broke the law and should not be working with kids in my opinion."

**Student Seven's Mother's Report**

Student Seven attended CT English for one year in 6th Grade and had Mr. Kissner. Student Seven's Mother moved her son to a charter school after 6th Grade. Student Seven is now 15 years old.

Student Seven's Mother has only good things to say about Mr. Kissner. Her son has gone on several trips camping and backpacking with Mr. Kissner in the past three years. He has gone both in the summer and on the spring break trips. Student Seven is going on Mr. Kissner's summer trip for longer this summer.

Student Seven has always had a great time on Mr. Kissner's trips and Student Seven's Mother has not heard of anything improper happening on the trips. She is aware that Mr. Kissner sometimes lets the kids drive his truck and shoot guns. That is to be expected. Student Seven's Mother said Mr. Kissner tries to relate to the kids on their level. He also mentors a lot of kids who come from difficult circumstances.

---

[11] Parent B commented that she has not spoken with Parent A, but that she knows that Parent A has some information about the situation because her "friend mentioned her name as someone who knew about this controversy."

PL000860

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Student Seven's Mother heard from Student Five's Mother some years ago that Mr.
Kissner had given Student Five alcohol when they were on a camping trip. Student
Seven's Mother thinks it was not that big a deal. Student Seven's Mother thinks that Mr.
Kissner was trying to build a rapport to better relate to Student Five.

Student Seven's Mother believes that Student Five's Mother thought there was something
more suspicious or nefarious about the incident, and Student Five's Mother commented
to Student Seven's Mother, "that is how predators work." Student Seven's Mother does
not think that is what happened.

Student Seven's Mother believes that her son would have told her if Mr. Kissner gave
him or other boys alcohol in his presence. Student Seven's Mother and her son have a
very open relationship. Student Seven's Mother has had no inkling of anything like that
happening.

Student Seven's Mother heard about Mr. Kissner getting in trouble in the military for
giving his troops alcohol. She heard that there was an edict from the command that the
troops were not to have alcohol because they had been drinking too much. Mr. Kissner
gave his troops shot of alcohol when they were low on morale. He told the students that
he got in trouble for that. Student Seven's Mother knows Mr. Kissner's character and
trusts him. She has not heard anything bad about Mr. Kissner except from Student Five's
Mother.


**Mr. Kissner's Report**

In early May, Mr. Kissner received a telephone call from Deputy Koenig, during which
Deputy Koenig read Mr. Kissner the Anonymous Letter. As soon as he heard that an
Anonymous Letter had been sent, Mr. Kissner "pretty much knew who was behind the
letter." He believes it was Student Five's Mother.

Two summers ago, Student Five was on a trip with Mr. Kissner. He was in High School.
"He was like a co-leader on a backpacking trip. I gave him some extra responsibility to
lead the kids. At the end of the hike, I gave him a sip of whiskey as a toast, kind of like
'good job on your accomplishments.' There were no incidents or anything beyond that."

In the fall of 2016, Mr. Kissner had a meeting with Pastor Haak from Mountain Bible
Church, the pastor's wife, Mr. Kissner's wife and Student Five's parents. During the
meeting, the parents asked Mr. Kissner if he gave their son alcohol and he acknowledged
immediately that, "Yes, I had done that." Mr. Kissner acknowledged that he had "given
him a sip and he meant no harm by it. I was just trying to treat him as an adult there, but
that it was a mistake. It was dumb."

Mr. Kissner brings alcohol with him on his camping trips. "I have a tradition... and it is
not like out getting drunk in the wilderness but, and I measure it out even, I have 100 mL

PL000861

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

in the evening, because every ounce counts when you are backpacking.... but no, it is like a very low-key way that I like to enjoy my evening and enjoy the accomplishments of the day and the scenery I am looking at. I do it when I am in the outdoors all the time."

When Mr. Kissner gave alcohol to Student Five, the two were alone. When they arrived at camp [the first night], everything was set up. The younger kids on the trip wanted to go on a night hike, which was fine. The younger campers went off on a night hike with radios back to Mr. Kissner. If the younger campers were around, Mr. Kissner would "obviously not have offered" Student Five alcohol. "It was meant to be discreet, obviously."

Mr. Kissner acknowledged that, "It was not my prerogative to do that. It was the parents' prerogative." "We talked it out and it was settled. They accepted the apology and [Mr. Kissner] moved on."

Mr. Kissner does not remember if during the conversation they had with Student Five's parents anyone referred to the allegation Student Eight had made against Mr. Kissner. "It was not really relevant." During the trip, Mr. Kissner was not aware that Student Five was suffering from a mental health issues. Student Five's Mother divulged that to Mr. Kissner only when they met with the pastor.

It was the line in the letter that "he has admitted to this" that led Mr. Kissner to believe that the Anonymous Letter was sent by Student Five's Mother or father. Student Five's Mother has "been extremely oppositional throughout this whole Walkout thing." That is what led Mr. Kissner to believe that Student Five's Mother was involved in or "behind" the Anonymous Letter.[12]

The meeting between the pastor and Student Five's parents came about because there was another young man, Student Eight, on the same trip. Mr. Kissner understands that Student Five told Student Eight that Mr. Kissner had given him a sip of whiskey.

"There was a lot of drama with Student Eight on that trip. The end result was that Student Eight went home and told his dad that Mr. Kissner had given Student Eight alcohol, "which was not true." Student Eight's parents made a complaint to Pastor Haak claiming that Mr. Kissner gave their son alcohol. "[Student Eight] later told his own parents that he had been lying about that." Then Student Eight "went back-and-forth with his parents about whether or not he was lying about that."

---

[12] I informed Mr. Kissner that Student Five's parents denied any involvement with the Anonymous Letter and that the investigation has confirmed that they were not involved and were not aware that the Anonymous Letter had been sent.

PL000862

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

When the pastor received the report from Student Eight's parents, he did his due diligence and notified Student Five's Mother because Student Eight said that Mr. Kissner had given their son alcohol too.

Mr. Kissner met with Student Eight's parents, Pastor Haak, the pastor's wife and Mr. Kissner's wife. Student Eight's Father told Mr. Kissner that Student Eight had taken and passed a lie detector test. Student Eight's family asked Mr. Kissner to also take a lie detector test about the situation and Mr. Kissner refused.

Mr. Kissner refused because he does not have any confidence in lie detector tests. When he was in the military, Mr. Kissner had to deal with lie detector tests for their security clearances. It was "extremely unpleasant." "They are also notoriously unreliable, which is why they are not admissible in court." "[Student Eight's Father] had some guy in a van, some hack lie detector guy, show up at their house who was driving around in a van, and there was no way I was going to participate in that."

During the conversation with Student Eight's parents, Mr. Kissner said that, "I need to confess that there is this other high school kid that I gave alcohol to. Because Student Eight had said this had happened and there was truth to that, and so I wanted to come clean on that. I also wanted to explain to Student Eight's Father what the background was with his son on this trip."

Student Eight was with Mr. Kissner "for quite some time that summer." Mr. Kissner believes it was more than a week. Mr. Kissner told Student Eight's Father that for the first week and a half, Student Eight "had been making repeated suicidal comments. He had also been making a lot of drug references." Anything that was powdered, like hot cocoa, Student Eight would pretend to snort.

Mr. Kissner repeatedly told Student Eight to stop. Mr. Kissner could not have a serious conversation with Student Eight until he told him that he would have to tell his parents about the comments Student Eight was making. At that point, "[Student Eight] kind of flipped out and begged" Mr. Kissner not tell his parents. Student Eight and Mr. Kissner had a serious conversation during which Student Eight told Mr. Kissner he is not suicidal. It was a very emotional conversation, in which Student Eight told Mr. Kissner about Student Eight's father's problem with drug and alcohol abuse and that "his parents fight all the time."

Mr. Kissner thinks that Student Eight later regretted opening up to Mr. Kissner and telling him those things about his family. Mr. Kissner shared that information with Student Eight's Father so that he would understand that "there was some drama involved here." Even after Student Eight's Father accused Mr. Kissner of giving his kid alcohol, the dad sent the child on another trip with Mr. Kissner.

Pastor Haak told Mr. Kissner that Student Eight's Father contacted the Sheriff in Santa Cruz and Nevada counties to report the situation, and that they declined to investigate.

PL000863

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Mr. Kissner was not interviewed by any Sheriff's department until he heard from Deputy Koenig in early May 2018.

Other than Student Five and Student Eight, Mr. Kissner is not aware of any other boys who have accused him of giving them alcohol. No other parents have accused Mr. Kissner of providing alcohol to their children. The only minor Mr. Kissner ever gave alcohol to is Student Five.

The youth pastor from the Mountain Bible Church has gone on some of Mr. Kissner's camping trips over the past year. He is a friend of Mr. Kissner's [Gabe]. He is not sponsored by the church at all. By 2016, Mountain Bible Church was not an official sponsor of Mr. Kissner's trips. The youth pastor is 26 or 27 years old. Mr. Kissner does not think Gabe drank beer on any of the trips.

Two years ago, there was a different youth pastor at the Mountain Bible Church [Joey]. Joey is no longer associated with the Mountain Bible Church. Mr. Kissner does not remember if Joey drank beer on the trips. Mr. Kissner does not believe he saw Joey with alcohol at all on the trip. Joey attended a spring break trip two years ago.

Mr. Kissner observed Joey being "inappropriate with an 18-year-old girl" who was on the trip. Joey and the 18-year-old girl were being "romantic" on the trip. They sat too close and he allowed her to put her legs on his lap. Mr. Kissner found the two alone talking more than once. Mr. Kissner spoke with Joey "multiple times" on the trip and with Pastor Haak soon as they got back. "He was fired."

OTHER ALLEGATIONS IN THE ANONYMOUS LETTER

The Anonymous Letter stated that in addition to providing alcohol to young teen boys, Mr. Kissner has "asked boys about sex and sexual encounters" and "[Mr. Kissner] has phone numbers for some of the boys and texts them late at night."

**Parent B's Report**

Parent B's son recently told her that Mr. Kissner got Student Nine "stoned (on marijuana)" when Student Nine was 11 years old. Student Nine is now 15. Parent B described Student Nine as being very troubled and having very difficult family circumstances.[13] Parent B reported that Student Nine's parents are close friends with Mr.

---

[13] Other witnesses identified Student Nine as someone who has had a lot of family and personal problems, and with whom Mr. Kissner seems to be very close.

35.

PL000864

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

### ATTORNEY-CLIENT PRIVILEGED

Kissner and they go camping together often. Student Nine's mother is a drug addict and his father is destitute. Mr. Kissner took them into his home and they were all living together in Mr. Kissner's home. There is an inappropriate amount of intimacy between Student Nine and Mr. Kissner.

Student Nine is a very good-looking, gay young man. Student Nine is known for being with older men. Student Nine also told Parent B's daughter that Mr. Kissner texts Student Nine late at night and asks Student Nine about his sexuality and "weird stuff like that."

Parent B understands that Mr. Kissner shares a "confidentiality" with the kids. Parent B believes that if Mr. Kissner's text messages were subpoenaed, they would show inappropriate communications and perhaps conduct between Mr. Kissner and Student Nine.

## Mr. Kissner's Report

Mr. Kissner has heard that there was an accusation that he "had smoked pot with a kid." Mr. Kissner stated that some of the people who were interviewed in the investigation contacted Mr. Kissner to tell him about the accusations. He heard that witnesses were being asked if Mr. Kissner smoked pot with kids. "I am pretty consistently and vocally against any kind of a drug."

Mr. Kissner did not know of any specific allegation that he gave an eleven-year-old boy pot. Mr. Kissner "absolutely denies" that he ever smoked pot with or gave pot to an eleven-year-old boy.

Mr. Kissner does not smoke marijuana. He never has. Mr. Kissner has strong feelings against marijuana.[14] Mr. Kissner attended an all-boys catholic school and then spent nine years in the military. You cannot use pot when you are in the military.

Mr. Kissner has worked with a "lot of troubled kids" within the District and outside of the District. Mr. Kissner does not know of any particular kids with whom he has built relationships who might make a false allegation against him about drugs, alcohol or conversations about sex.

---

[14] When this subject was raised, his attorney commented that he felt this allegation was "politically motivated by someone to kill this gentleman's job."

PL000865

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

**ATTORNEY-CLIENT PRIVILEGED**

<u>Conversations About Boys' Sexual Encounters</u>

Mr. Kissner "doesn't think" he had a conversation with a boy about sexual encounters. Mr. Kissner denies that he has asked boys about their sexual encounters. However, "certainly, in a trusted adult role, but, kids talk to me about things like sex and things like that. Mr. Kissner has told kids that he is a trusted adult with whom they can talk about sex, "either in a ministry or that kind of a role, I would have a conversation about that with young people, but I am not initiating that type of thing." Mr. Kissner acknowledges that he has engaged in conversations about sexual encounters with boys associated with the District.

When asked if he teaches sex education at the District, Mr. Kissner replied, "I did this year, unfortunately." This was the first year Mr. Kissner was required to teach sex education. Mr. Kissner is a Math teacher. Sex education is not what he really wanted to teach.

The sex education curriculum was scheduled at the very end of the year. Mr. Kissner took a health-related leave of absence and was only present for part of the sex education curriculum. Mr. Kissner's leave of absence was not connected to the sex education curriculum.

Mr. Kissner did not have conversations with boys about sexual encounters this year in connection with the sex education curriculum. The conversations Mr. Kissner had with boys about their sexual encounters was "not in relation to the sex ed curriculum at all."

Throughout the school year, "we teach kids that they need to have a trusted adult. It could be a school person, it could be a schoolteacher, it could be a pastor, it could be a parent, an uncle, a grandma, it does not matter. They need to find a trusted adult where they can have a real conversation about real topics like that." Mr. Kissner is "always as a teacher in that role."

Mr. Kissner does "absolutely provide counsel" on those topics. The kids "know what they are going to get [from Mr. Kissner]. They know I am a Christian. They are going to get a biblical perspective and I think that is why some people ask me. Because they are not going to get the same thing they would get, maybe from their uncle."

<u>Texting with Boys Late at Night</u>

Mr. Kissner acknowledges that "I have been texted late at night." There have been boys who text Mr. Kissner late at night, and he has responded, "and that is definitely in a counseling type of role. When a teenager gets depressed and wants to talk to somebody, it is usually late at night." That has happened, "over 10 years of being involved in ministry." Mr. Kissner has texted with boys who were in the District throughout his tenure there.

PL000866

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Mr. Kissner is Facebook friends with some of his former District students. He is not Facebook friends with current District students. Mr. Kissner is not aware that the District has any policy about that.

Mr. Kissner has not had any District students living with him, "not since I have lived in this District."

## FACTUAL CONCLUSIONS REGARDING THE ANONYMOUS LETTER

It was very difficult to get information from relevant witnesses on these issues. Witnesses were and continue to be highly reluctant to provide information detrimental to Mr. Kissner for fear of harsh community backlash. That concern was exacerbated after Mr. Kissner was placed on leave during the criminal investigation and there was a forceful outcry to "Bring Kissner Back."

Mr. Kissner's supporters on the Walkout issues assumed the District had placed him on leave because of his Second Amendment stance. The District maintained confidentiality regarding the Anonymous Letter and the reason for Mr. Kissner's leave. Although he knew the true reason for his leave, Mr. Kissner led his supporters to believe that he was put on leave because of his stance against the District on the Walkouts. That issue became particularly contentious in the community with Mr. Kissner's supporters believing that he was being targeted for his conservative political beliefs.

Despite his knowledge of the Anonymous Letter allegations, Mr. Kissner believes that the only reason concerns were raised about his interactions with children is because he vocally opposed the District's handling of the first Walkout. He believes the Anonymous Letter writer wanted to punish him for his political beliefs. He convinced himself that he knew it was Student Five's parents who sent the Anonymous Letter, and assumed the timing was designed to punish him for his Walkout stance.

Although Student Five's parents did not send the Anonymous Letter and had nothing to do with it, Mr. Kissner is, in part, correct. It is likely that Parent B, the Anonymous Letter writer, would not have sent the Anonymous Letter when she did if Mr. Kissner did not foist himself into a public dispute with the District over the Walkouts.

However, Parent B did not raise the concerns as a way to punish Mr. Kissner for expressing his political beliefs. Parent B perceived Mr. Kissner's behavior in the Walkout as placing his own beliefs and desires over those of his students. That realization lent credence to what Parent B had heard about how Mr. Kissner treated some of the young boys he got close to. Parent B felt an obligation to notify the District of those concerns.

Mr. Kissner admits that he gave Student Five alcohol while they were alone together during a camping trip in late June or early July 2016. Student Five was then 15 years old,

38.

PL000867

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

That aspect of the Anonymous Letter, involving one boy, is confirmed. Mr. Kissner acknowledges that it was a "dumb mistake."

During his military service, Mr. Kissner also acknowledges that he was disciplined for providing alcohol to his troops when he knew it was against his superiors' orders. The fact that Mr. Kissner made that "dumb mistake" on more than one occasion, gives weight to the allegations of other incidents of similar misconduct.

Also confirmed is the statement in the Anonymous Letter that, "The church where he provided alcohol to boys has been apprised of his illegally providing young boys with alcohol, and he has admitted to it." Pastor Haak informed Deputy Koenig that he and Mr. Kissner, along with their wives, met with two families about concerns raised about Mr. Kissner's conduct with their young teenage boys. Pastor Haak made a report to CPS, which indicates that he felt Mr. Kissner had engaged in abuse or neglect of the children involved.[15]

Student Five's parents, Student Eight's Father and Mr. Kissner all reported that Pastor Haak participated in meetings to address (separately) reports about Mr. Kissner providing alcohol to Student Five and allegedly to Student Eight.

Although they were aware of Student Eight's report that Mr. Kissner had given him alcohol too, when Pastor Haak and Mr. Kissner met with Student Five's parents, they did not inform Student Five's parents of Student Eight's report. Student Five's parents were led to believe that the incident with Student Five was an isolated incident.

There is a dispute in the facts as to whether or not Mr. Kissner provided alcohol to Student Eight. Mr. Kissner denies that he gave Student Eight alcohol and claims that Student Eight made up the report. The lack of access to witnesses on this issue significantly impairs the investigation. I was not able to interview either Student Five or Student Eight about Student Eight's report.

There is also a dispute in the facts as to whether or not Student Five told Student Eight that Mr. Kissner gave him alcohol. Parent A's report from Student Eight's mother was that Student Eight told Student Five that Mr. Kissner "got him drunk" and that in response, Student Five told Student Eight that Mr. Kissner had done the same with him.

Student Five's parents insist that Student Five told them that he did not tell anyone that Mr. Kissner had given him alcohol. If that was true, Student Eight would not have known that Mr. Kissner in fact gave Student Five alcohol. Student Five's credibility is also

---

[15] I did not interview Pastor Haak because based on his conversation with Deputy Koenig, it was not likely that he would provide additional information.

PL000868

ATTORNEY-CLIENT PRIVILEGED

impaired by his initial denials to his parents that Mr. Kissner had given him alcohol, when in fact he had.

There is evidence that Mr. Kissner's "cult of personality" among the boys he gets close to is very strong. Student Eight's Father reported that Student Eight was very hesitant "to get Mr. Kissner in trouble." Student Five initially lied to his parents about Mr. Kissner's conduct when asked if Mr. Kissner had given him alcohol. It is more likely than not that Student Five did tell Student Eight that Mr. Kissner gave him alcohol. That also lends credence to Student Eight's report that he and Student Five had that discussion after Mr. Kissner had given Student Eight alcohol.

Student Eight's Father and Mr. Kissner both reported that Student Eight accused Mr. Kissner of providing him alcohol. Those reports are consistent with Parent A's report that soon after Student Eight returned from the camping trip with Mr. Kissner he informed his parents that Mr. Kissner had given him alcohol.

Mr. Kissner contends that Student Eight made up the allegation because he was worried Mr. Kissner would tell his parents that he was making statements about being suicidal and making drug references while on a camping trip.

The fact that Student Eight informed his parents of the incident soon after he returned from the trip, could be viewed either way. Either Student Eight was upset by the incident and wanted to confide in his parents, or he was concerned that Mr. Kissner might make good on his threat to tell Student Eight's parents about his behavior on the trip and he wanted to preempt that report.

However, Student Eight's Father confirmed that Student Eight took and passed a polygraph test confirming his allegations against Mr. Kissner. Parent A's report also corroborates that.

Mr. Kissner acknowledged that Student Eight's Father informed him that Student Eight had taken and passed a polygraph test on whether or not Mr. Kissner gave him alcohol. Mr. Kissner also acknowledges that he was asked to take a polygraph test on the issue and that he refused. Mr. Kissner claims that his refusal was based on his belief that polygraph tests in general are not reliable and that the polygraph examiner "was some guy who drove up in a van."

I had no ability to assess the degree of reliability of the polygraph test Student Eight took because Student Eight's Father declined to provide any further information. However, that fact that Student Eight took and passed a polygraph about the incident weighs in favor of his credibility.

Mr. Kissner contends that his denial that he gave Student Eight alcohol is credible, in part, because he admitted that he gave Student Five alcohol. That also cuts both ways. Student Eight was only 13 years old. Student Five was 15. Mr. Kissner would have known that admitting to giving two boys alcohol on two separate occasions when Mr.

PL000869

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Kissner was alone with the boys, would be far worse than admitting to one incident with a slightly older boy. In addition, Mr. Kissner may have viewed Student Five as appearing more credible than Student Eight, and he likely did not anticipate that Student Eight would initially lie and say that he was not given alcohol.

Moreover, Mr. Kissner did not make his admission until several weeks later and only after Student Eight's parents brought the information to Pastor Haak. The preponderance of the evidence weighs in favor of Student Eight's report that Mr. Kissner gave him alcohol.[16]

There is evidence, unconfirmed, that Mr. Kissner may have given alcohol to other boys during other camping trips. These are second or third hand reports from other students about Mr. Kissner drinking alcohol with young teenage boys. I was not able to gather sufficient facts in this investigation to confirm or refute those reports.

Parent B and other witnesses described Student Nine as being very troubled and having very difficult family circumstances. Student Nine's mother reportedly is a drug addict and his father is destitute. Parent B has spoken with Student Nine about Student Nine's interactions with Mr. Kissner. Student Nine said he knows a couple of other boys whom Mr. Kissner "has gotten drunk." Student Nine said, "It happens to everybody." I was not able to determine who these other boys were or the factual basis for the statements.

Parent B understands that Mr. Kissner is alone with kids frequently. He tends to separate one child from the group and have alone time with them. That is consistent with Student Five's parents' reports, which Mr. Kissner admitted to, and the report about the situation involving Student Eight.

Parent B heard that Student Sixteen went on a camping trip with Mr. Kissner in 2016. Student Sixteen reported that everybody who goes on the camping trips knows that Mr. Kissner, "gets everybody drunk." "He mostly does it with the younger boys." If those reports are accurate, there does seem to be a pattern of Mr. Kissner engaging in such behavior with vulnerable young boys.

There is evidence, unconfirmed, that there is an inappropriate amount of intimacy between Student Nine and Mr. Kissner. Parent B's son recently told her that Mr. Kissner got Student Nine "stoned (on marijuana)" when Student Nine was 11 years old. Student Nine is now 15. Mr. Kissner denies that.

Student Nine also told Parent B's daughter that Mr. Kissner texts Student Nine late at night and asks Student Nine about his sexuality and "weird stuff like that." The reports

---

[16] Mr. Kissner's credibility is also impaired by findings in the Walkout investigation in which he was untruthful. Walkout Investigation Report, p. 106.

41.

PL000870

**CONFIDENTIAL Investigation Report        David Kissner's Conduct with Children**

**ATTORNEY-CLIENT PRIVILEGED**

about Mr. Kissner's interactions with Student Nine warrant further evaluation, which is beyond the scope of this investigation

Mr. Kissner acknowledges that he does text late at night on occasion with former District students. He also acknowledges that he has discussed sexuality and sexual encounters with some of those boys. Mr. Kissner has not had those conversations in the context of the Sex Education curriculum, which he only taught, begrudgingly, this year. He says he engaged in those conversations acting as "a trusted adult" and in the context of his role as a teacher and counselor to the boys.

Although Parent B believes Mr. Kissner's text messages, if they were subpoenaed, would show inappropriate communications and perhaps conduct between Mr. Kissner and Student Nine, I had no ability to obtain those in the context of this investigation.

A video on Mr. Kissner's website as of May 2, 2018, showed several boys bare chested in their bathing suits and shorts. The video also depicted young teenage boys shooting guns, while Mr. Kissner stood behind them with his hands on or around their waists. Soon after the investigation began, Mr. Kissner removed that video from his website.

It is more likely than not that Mr. Kissner removed the video after learning that witnesses had reported its existence and their concern about the content in the context of the investigation.

## CONCERNS ABOUT MR. KISSNER'S CLASSROOM AND AFTER SCHOOL CONDUCT

### MR. KISSNER'S AFTERSCHOOL BIKE RIDES WITH STUDENTS

**Mr. Arias' Report**

The kids bring their bikes to school in the morning and store them in Mr. Kissner's classroom during the day. After school, Mr. Kissner loads all of the bikes into his truck, and takes the kids somewhere to mountain bike. Mr. Kissner has been doing that with kids for years. There are usually a handful of kids who go with Mr. Kissner on the bike rides, and it is usually the same kids.

Mr. Arias does not know if the school sanctions Mr. Kissner's afterschool bike rides with students. He does not believe there any permission slips required. Mr. Arias does not believe that parents go on the afterschool bike rides. Mr. Arias does not know how the kids get home. To Mr. Arias' knowledge, no one has raised any concerns about the bike rides.

PL000871

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

**Mr. Cohen's Report**

Students bring their bikes to school and store them in Mr. Kissner's classroom during the day. They then go off on bike rides after school. Mr. Cohen thinks the administration is aware that Mr. Kissner takes kids for bike rides after school, but Mr. Cohen does not know what the administration knows or doesn't know about that. It is not an organized afterschool activity as far as Mr. Cohen knows.

Mr. Cohen does not know where Mr. Kissner takes the students when they go bike riding. Mr. Cohen does not know if there are permission slips permitting the kids to go bike riding or if the trips are documented in any way. Mr. Cohen assumes that the parents are aware of the fact that Mr. Kissner is taking their kids off on their bikes because the parents have to bring the bikes to school in the morning.

The students who typically go on the bike rides are also on the wrestling team and in Mr. Kissner's classes. Each year there is a group of boys who spend a lot of time with Mr. Kissner. Mr. Cohen does not know the frequency with which the bike rides occur, but his guess is about once a month.

There currently are and have been in past years, certain students with whom Mr. Kissner seems particularly close. He has coached wrestling for the last three or four years. A lot of the people on the wrestling team have "especially close ties to Mr. Kissner."

Mr. Kissner also organizes weekend activities with students that are not wrestling related. He conducts weekend bike rides and hiking trips during the school year. Mr. Kissner also takes some of the students on bike rides during the week after school.

Mr. Cohen does not know if anyone in the District has spoken with Mr. Kissner about whether or not those activities are professional or appropriate. "It doesn't feel professional" to Mr. Cohen. Mr. Cohen feels that teachers should have a "certain amount of professional distance" from their students.

**Mr. Kissner's Report**

Mr. Kissner has gone on bike rides afterschool, leaving from school with District students. He refers to that as his Mountain Bike Club. He typically organizes one ride a week after school, "when practical" and not during wrestling season. Mr. Kissner tells students they are welcome to come. He will take as many students as he has room for. It depends on how many parents are willing to drive.

43.

PL000872

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Mr. Kissner uses a permission slip for "the whole mountain bike season." There is not an individual permission slip for children to go with Mr. Kissner on his afterschool bike rides.[17] Mr. Kissner leaves with students from CT English on school days to go on afterschool bike rides. "That is just practical." Mr. Kissner often takes District students with him from school in his vehicle with their bikes. That happens "routinely."

Sometimes there are adults in other vehicles with students, but there are no other adults in Mr. Kissner's vehicle when he takes students from campus.[18] "Sometimes" Mr. Kissner leaves directly from school with students, with no other adults or parents involved.

Mr. Kissner understands that "if it is a school function, it is not permissible to take students in his personal vehicle, but these are not school functions at all, so it is permissible." The District is not at all involved in Mr. Kissner's afterschool bike rides.

Mr. Kissner has not had any communication with anyone in the administration about the bike rides and whether or not the District approves of Mr. Kissner taking students from campus on bike rides. "We are not secretive about it. There are kids right in the courtyard with bikes after school. It is pretty obvious."

There are three or four trails in the mountains where Mr. Kissner takes the students on the afterschool bike rides. They park, go off on their bikes and then often get a meal out somewhere if that is convenient. The parents will either pick up the kids at Summit and 17 or back at the church or the school. On the occasions when there are no other adults on the bike rides, Mr. Kissner is with "no more than five" students. That is how many students he can fit in his vehicle.

Mr. Kissner is not concerned, as a teacher, about being alone with students without other adults around. He "is careful to make sure that it is not just one kid." Mr. Kissner has been doing that for 10 years. "Part of what we are doing is to try to build relationships. That is connected with what my wife and I are trying to do. In terms of building relationships and modeling what it looks like to live your life for Jesus." "Relationships tend to happen, one-on-one, and things like that."

---

[17] I obtained a "Mountain Biking Club" flyer from Mr. Kissner's website. Exhibit E. It included a permission slip for "Mountain Biking Activities September 2017 through May 2018." Mr. Kissner does not identify himself in that flyer as a teacher at CT English. Nor is there a statement that the Mountain Biking Club is not an activity associated with the District. The flyer states, "Throughout the year, there will also be numerous less formal rides on weekends or after school. Details to be provided as those up opportunities arise."

[18] Some parents who have gone on the afterschool bike rides with Mr. Kissner are Kristoff Pla, Aaron Watson, Mark Jeffries and Jason Vansciver.

PL000873

**CONFIDENTIAL Investigation Report       David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Mr. Kissner is aware that there are "risks involved" but he believes that if it was not for the political situation around the Walkouts, none of these concerns would have been raised.

COMMENTS ABOUT DEATH OR VIOLENCE

**Student One's Report**

Mr. Kissner told lot of stories about his friends in the military and how they died. Mr. Kissner talked about how "stupid they were because they died from that." Mr. Kissner told the class that one of his friends "died in a Porta potty where he was on the toilet and a bomb went off or something like that." "He's told us a lot of stories about his fellow Marine friends who have passed away in a weird way. Or they passed away in a very violent way that he told us about."

In 6th Grade, Mr. Kissner told a lot of those stories. Student One was only in Mr. Kissner's class for one semester this year, so it didn't seem like as many stories.

Mr. Kissner also told stories about when he worked in juvenile hall. He said the kids would throw desks at him and they wouldn't really listen.

When Mr. Kissner showed videos before a holiday, he would usually show something super violent. One time, Mr. Kissner showed a video clip from Star Wars where they ripped out somebody's heart.

Before another holiday, he showed a video of Bambi dying. He just shows the video clip of the death scenes. Mr. Kissner said that he doesn't like Disney (even when he was a kid) so he liked showing the video of Bambi being killed.

Student One thought all of these things were "weird." They didn't make her feel "super uncomfortable" but she thinks they could make some people feel uncomfortable.

**Student Two's Report**

Mr. Kissner told stories about his war experiences. He told one story in which a bunch of people he was traveling with "got blown up by terrorists." Mr. Kissner went into a fair amount of detail about that. The stories Mr. Kissner told about his Marine experiences could be quite gory.

Mr. Kissner would tell us stories whenever he had free time in class. During the school year, Mr. Kissner probably mentioned the gory war stories five or six times. Student Two was not uncomfortable with the stories Mr. Kissner told about his war experiences, but he

45.

PL000874

**CONFIDENTIAL Investigation Report**        **David Kissner's Conduct with Children**

### ATTORNEY-CLIENT PRIVILEGED

thinks that other people "definitely could have been upset" by the stories. Mr. Kissner told the same stories when Student Two was in Mr. Kissner's Math class in 6th Grade.

Student Two is at times fearful of Mr. Kissner. Mr. Kissner had his Marine sword in his closet. Student Two thinks other students are sometimes fearful of Mr. Kissner too. This year, Mr. Kissner was talking about the Marine Corps' birthday. Mr. Kissner said that day is the one day that he lets himself mourn and lets himself "lose himself." Mr. Kissner has said that on that day, he allows himself to go back and relive what he experienced in Iraq.

Student Two found Mr. Kissner's description of that "kind of scary" that he can bring himself back to those moments of shocking or gruesome events. Student Two has worried that with Mr. Kissner reliving one shocking event after another, "what could that lead to with his mental stability." Student Two is not saying that Mr. Kissner is "mentally unstable." Student Two worries that, "if enough bad things happen to Mr. Kissner, he could experience posttraumatic stress symptoms. On the Marine Corps' birthday, Mr. Kissner mentioned posttraumatic stress syndrome.

**Student Four's Report**

In his 6th Grade Math class, Mr. Kissner sometimes talks about his time spent in the Marine Corp and the year he spent after that biking around the world. "It is just Mr. Kissner's story time. It is not related to the Math content." At the beginning of the year, Mr. Kissner spoke a lot more about his Marine experiences. "Some of the stories are quite interesting. Others are quite gory."

He sometimes makes gruesome comments about what he saw, referring to "bodies littering the road" and people being "completely blown up." Mr. Kissner has told the class about people getting blown up such that only their boot is left of them. Mr. Kissner has told Student Four's class about how his troops had to kill individual people.

Student Four knows that some of the other students are uncomfortable with Mr. Kissner's gruesome stories. "It is mostly the boys who really enjoy them." They laugh and encourage Mr. Kissner to continue on with his stories. Mr. Kissner has been telling his war stories for many years.

Mr. Kissner also tells a story about how he was almost blown up by a rocket missile. One time, Mr. Kissner told the class about how he and his troops set up a bomb that "killed a whole bunch of terrorists." Mr. Kissner talked about how the troops were laughing watching "like twenty people being blown up." Mr. Kissner said he thought it was funny because just a little while before that, when they saw a dog die, his troops were very upset.

46.

PL000875

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

### ATTORNEY-CLIENT PRIVILEGED

One of the stories Mr. Kissner has told in great detail was of how he was held at gunpoint with a "gun held to his throat" when he was in a town during his biking travels. Mr. Kissner described how he escaped by running away and hiding and by dragging his bike through the sand.

Parent A has heard many of the stories before from her older daughter. Student Four's older sister told Parent A that Mr. Kissner also talked about how he had to kill people. Parent A feels it is very inappropriate during Math to expose children to these kinds of combat stories.

Parent A did not feel the stories were egregious enough to address them with the administration. Student Four's older sister now has reoccurring nightmares about war involving Mr. Kissner. Student Four's older sister began to have the nightmares in 6th Grade when she had Mr. Kissner. Parent A now wishes that she had addressed her concerns with the administration about what Mr. Kissner was saying in class. Student Four has not experienced nightmares or fears about Mr. Kissner.

**Mr. Arias' Report**

After the Walkout situation at CT English was publicized, former students who are now in high school came to visit Mr. Arias. The former students told Mr. Arias that Mr. Kissner spoke a lot during his Math and Science classes about his service in the Marine Corps and his belief system about the military. Mr. Arias has seen eight to ten of Mr. Kissner's former students since the Walkout controversy became public. All of the students are now at Los Gatos High School.

Four of the former students (three girls and one boy) told Mr. Arias that when they were in Mr. Kissner's middle school classroom, they were uncomfortable with the details Mr. Kissner shared with them about his war experiences and stories. This was the first indication Mr. Arias had that Mr. Kissner was speaking in detail about his war experiences with students.

The students did not tell Mr. Arias specifically what Mr. Kissner had said, but indicated that it was the level of the gore or gruesome details he shared that made the students feel uncomfortable. Mr. Arias has not heard Mr. Kissner describe his war experiences. Mr. Kissner has talked about his time in the military in the staff room before, but not his war experiences.

**Mr. Cohen's Report**

Mr. Cohen recently heard from Mr. Kissner's students that Mr. Kissner tells "violent stories from when he was in combat." One or two months ago, a student told Mr. Cohen

PL000876

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

that Mr. Kissner mentioned "having a bat in his classroom and not being afraid to use it." Students have mentioned that type of comment to Mr. Cohen more than once. Mr. Cohen does not know if Mr. Kissner has a bat in his classroom. Mr. Cohen has never seen it.

Mr. Cohen does not know who Mr. Kissner was referring to when he said he is not afraid to use the bat. Mr. Cohen would be surprised if Mr. Kissner had ever threatened to hit a student with his bat. However, the way the comment was related to Mr. Cohen, it was clear that Mr. Kissner told students he would not hesitate to use the bat on another human being. Mr. Cohen would not be surprised if Mr. Kissner made the comment in the context of if an intruder came into the classroom, he would not hesitate to use the bat. However, Mr. Cohen does not know the context of Mr. Kissner's statement.

Approximately two months ago, one of Mr. Cohen's students asked Mr. Cohen if he had a sword. Mr. Cohen said that he did, but he would never bring it to school. The student told Mr. Cohen that Mr. Kissner has a sword in his classroom. Other students have also said that Mr. Kissner has a sword in his classroom. Mr. Cohen has never seen that either.

When one student told Mr. Cohen about the bat and the sword, other kids chimed in corroborating the student's comments as well. During those conversations, it did not appear as if the students seemed concerned about the bat or the sword. Mr. Cohen did not ask Mr. Kissner about either the bat or the sword.

A lot of the kids at school think Mr. Kissner is "cool." There are also some kids who "feel a little resistant to him as well." There are some kids who "adore him and other kids who are very frightened of him." Mr. Cohen does not know what frightens the kids about Mr. Kissner.

**Mr. Kissner's Report**

Mr. Kissner has "shared military stories" with his classes. "That is one of the things I am known for, actually; the kids always want a story. I share stories about the military, or a prolonged bike trip, I took around the world." "I do not share great graphic detail. No." Mr. Kissner believes his stories are "grade and age appropriate."

Mr. Kissner tells those same two stories every year. It is not like he is talking about his military experience "every day." No parent or child has ever complained to Mr. Kissner directly about any of his comments in the classroom about his military experience. There are only two stories that involve anything with death, directly. "I do not talk about any details, with bodies strewn all over the road or describing it."

Mr. Kissner acknowledges that he tells a story about a soldier being blown up while he was in a Porta potty. Mr. Kissner commented that it is "this kind of thing that really makes it feel like a witch hunt." To Mr. Kissner, "it just feels like they are looking for stuff." "There is a story where somebody gets hit in the Porta potty, and the end of the

48.

PL000877

**CONFIDENTIAL Investigation Report        David Kissner's Conduct with Children**

**ATTORNEY-CLIENT PRIVILEGED**

story is that the gunnery sergeant fortifies the Porta potty, so that it is a bunker. It is a humorous story. I do not spend time talking about anything gruesome."

Mr. Kissner tells another story in which an "insurgent is trying to set up a car bomb and it blows up on him, and I do say that, yes, his body was all over the place. The whole point of that story is that in the same day, I saw my Marines, and they had to bury their pet dog and they cried, and that at the other scene, they laughed." Mr. Kissner tells the class, "it is just something to think about. It is a contradiction."

The "vast majority of the parents" of the kids he teaches have expressed to Mr. Kissner their appreciation that he shares some of his experiences because it brings "the real world into the classroom and it helps their kids to learn about something that they may not ever have a chance to hear about." "I am very well known for sharing stories in my classroom."

Mr. Kissner has told students and parents that he was disciplined in the military for providing alcohol to his troops. "That is a true story, yeah." As a morale builder on Christmas Eve, Mr. Kissner was the leader of 142 men out in Iraq and he had alcohol sent out to the troops. Mr. Kissner thought "that would be something to do on Christmas Eve." It was against the rules because they were in a Muslim country, they were in a war zone and it was "frowned upon." "The wrong person heard about it, so I got a letter in my file about that." Mr. Kissner was not dishonorably discharged. He has an honorable discharge from the military. Mr. Kissner did tell students that because he was disciplined, that was partly why he left the military.

### MR. KISSNER'S WORD PROBLEMS

**Student One's Report**

Mr. Kissner sometimes gives tests where he uses, "inappropriate questions, like buses of kids falling off cliffs and finding the velocity." Student One was "not really" uncomfortable in Mr. Kissner's class, but "he makes weird questions. He makes it a joke, like everybody takes it as, but it's still kind of violent."

Mr. Kissner also creates Word problems in which he uses the names of the kids in the class. He makes weird comments about kids in the class in his Word problems. Usually he makes up word problems where something violent is happening to the person. Sometimes there are guns involved and other times he says things like, "[name of the student] gets punched in the face," or "something else that is very violent and not appropriate."

During Christmas time, Mr. Kissner made up a word problem where Santa Claus was "being hung, like, Santa was dying and you had to solve the function." The problem is

PL000878

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

about a rope that was in a mechanism that was hanging Santa and the students had to figure out how much force it would take or how much time they had to save his life.


## Student Two's Report

"A lot of his word problems are like, 'find the velocity of a child being thrown off a cliff.'" "Sometimes they are disturbing." The examples of throwing a child off a cliff and finding the time to impact "are disturbing."

Sometimes Mr. Kissner uses the names of actual students in his word problems. In those situations, usually, the students are being killed or injured somehow. Mr. Kissner has not put Student Two's name into those disturbing word problems. He usually uses the names of kids who "liked to stand out" in class. Mr. Kissner often uses the names of the kids who want attention in class.

Student Two thinks most people think it's funny, but some people could be upset by it, especially the kids whose names he is using. Mr. Kissner has been doing that since Student Two was in 6th Grade. He thinks it's probably just "his way of teaching." Student Two would not speak up about that, because he would not want to "get on his bad side."


## Student Three's Report

Mr. Kissner often created word problems or examples that included people dying or falling out of buses, or children drowning. When he was explaining something, Mr. Kissner would often use examples like that of children dying. Student Three did not feel comfortable with Mr. Kissner's word problems and examples.

Some of the boys found it funny. Student Three is more sensitive and it made her feel a little uncomfortable. She told her mother about it. Student Three did not speak with Mr. Kissner about that. That was one of the reasons Student Three wanted to leave Mr. Kissner's class.

Student Three knows that some people really enjoy Mr. Kissner's class, even though it is hard. He goes really fast when he explains things and takes shortcuts that leave a lot of students behind. When he simplifies, he does not show the work. Mr. Kissner is not patient about explaining things. For the kids who struggle in Mr. Kissner's class, he does not really help them.

PL000879

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

<div align="center">

ATTORNEY-CLIENT PRIVILEGED

</div>

**Student Four's Report**

Student Four sometimes feels uncomfortable when Mr. Kissner makes up word problems that involve some of the students' names. Mr. Kissner makes fun of some of the students by putting them in ridiculous situations and sometimes violent situations. For example, Mr. Kissner has made word problems about some of the students in class "getting eaten by bears." Mr. Kissner "uses dark humor." Mr. Kissner has never used Student Four's name. He uses the names of the students he is "more friendly with."

In some situations, Mr. Kissner is making fun of the students in the word problem. It is usually more in a "playful way." Usually it is the kids who are on the wrestling team who he puts in the word problems. "Often times, they are not really the best students."

Sometimes in his word problems, Mr. Kissner also makes fun of students based on their height. Student Four thinks that Mr. Kissner is "sort of" making fun of people for their height." Mr. Kissner will refer to the smallest student and explain "that is why the class will sacrifice you to the Bears."

Mr. Kissner also focuses on students who other teachers and some students do not like and say that they will sacrifice them to the bears. Student Four thinks that sometimes Mr. Kissner likes to highlight the fact that some of the students are not liked.

**Mr. Kissner's Report**

Mr. Kissner has heard "an awful lot of feedback from parents and kids saying, 'I love your math problems.'" "They are entertaining.  I have a morbid sense of humor, but it is a sense of humor. I have a very high value for life that I believe I model and communicate to my kids. But I also think that we can take things kind of lightly. Quite frankly, my kids love my math tests." "The word problems are humorous. I have got child labor and kids being eaten by bears."

Mr. Kissner does put the names of some of his students into his word problems. They are the students who Mr. Kissner "knows well and he is comfortable with and that know Mr. Kissner well." Kids sometimes complain that Mr. Kissner has not used their names in a word problem yet and tell him, "Use me! Use me in a word problem!" "It is something that adds a lot of value to the curriculum and I get a lot of positive feedback about it."

Mr. Kissner has never received any negative feedback from either parents or students about using the students' names in his word problems.

A student supplied some examples of some Mr. Kissner's handouts. Exhibit F.

<div align="center">

51.

</div>

PL000880

**CONFIDENTIAL Investigation Report**        **David Kissner's Conduct with Children**

### ATTORNEY-CLIENT PRIVILEGED

#### MR. KISSNER'S TREATMENT OF BOYS VERSUS GIRLS

#### Ms. Kidwell's Report

Mr. Kissner was initially hired as a temporary employee at CT English approximately five years ago, during Ms. Kidwell's first year as Superintendent-Principal. Mr. Kissner came to CT English just after they lost two of their Math teachers in a short period of time. It was very difficult to find a Math teacher.

Ms. Kidwell knew that Mr. Kissner had a very rocky end of his teaching assignment at the Santa Clara County Office of Education. He was not reelected. Ms. Vieler knew that CT English was desperate to find a Math teacher and she recommended Mr. Kissner as a temporary teacher to help them finish out the year.

Ms. Kidwell hired Mr. Kissner the following year, but she required that Mr. Kissner go through a three-year tenure process. If Ms. Kidwell had been required to give Mr. Kissner a tenure decision at the end of his second year, she would have declined to give Mr. Kissner tenure. Ms. Kidwell worked with the union to give Mr. Kissner a third-year.

While Mr. Kissner was very good at reaching boys, he was not good at reaching and connecting with girls. Lots of his students were failing in those early months in the first few years. Ms. Vieler did a lot of work with Mr. Kissner. They drafted a workaround.

Mr. Kissner signed a letter of resignation that Ms. Kidwell had the option to accept at any time during Mr. Kissner's third year. The aim was to give Mr. Kissner the opportunity to improve his performance as a teacher for all students. If Mr. Kissner successfully completed his third year, their agreement was that he would obtain tenure.

Mr. Kissner's performance did improve and he was tenured. There had been some earlier concerns about fit, but Ms. Kidwell and Mr. Kissner worked through that. Ms. Kidwell is not aware that there have been any continuing concerns about how Mr. Kissner treats girls.

#### Mr. Arias' Report

Early on in his tenure, Mr. Kissner was accused of treating boys and girls in his classroom differently. There was a discrepancy in the grades he awarded, giving higher grades to boys and lower grades to girls. There were more girls who were getting low grades in Mr. Kissner's classes than they were getting in other classes. That situation was addressed within the first two years of Mr. Kissner's employment.

Ms. Kidwell and Mr. Arias worked with Mr. Kissner on that. Mr. Arias believes that it started to turn around, but Mr. Arias "is not 100% sure." No one has raised the concern with Mr. Arias since it was addressed early on in Mr. Kissner's employment. Mr. Arias

52.

PL000881

CONFIDENTIAL Investigation Report      David Kissner's Conduct with Children

ATTORNEY-CLIENT PRIVILEGED

does not know whether the problem has gone away or whether he simply has not been notified of it reoccurring.

At the time the issue was discussed, Mr. Kissner's explanation was that it just so happened that those kids were getting lower grades at the time. Mr. Kissner did not believe he was treating boys and girls differently.

Mr. Arias gets "poor work" notices every week. Mr. Kissner does have a "large number of students" who get the poor work notices. However, Mr. Arias has not noticed "a major discrepancy" between the amount of poor work notices Mr. Kissner gives girls versus boys.

Mr. Arias has had a concern about how personally close Mr. Kissner gets to some students. Mr. Kissner engages in a lot of activities outside of school with students, particularly with boys. That can be a very positive thing. However, Mr. Arias sometimes worries that those strong connections Mr. Kissner builds with some students could supersede his connections with other students with whom he does not engage outside of school.

Mr. Arias coached sports at CT English for 11 years. He knows that through his coach/student interactions with students, he got to know some students much better than others. You do have a different relationship with those whom you coach.

Mr. Kissner is the wrestling coach and he conducts a lot of additional outside activities with some of the students. He leads camping and mountain biking trips that are not school sponsored, in which many of the same boys who are on the wrestling team participate. Some of the same kids have gone away with Mr. Kissner over and over again on the trips. Most of the students who go on the trips with Mr. Kissner are boys, although a few girls have gone as well.

Mr. Arias' concern is for the kids who do not engage with Mr. Kissner in these extracurricular activities. Mr. Arias is concerned that Mr. Kissner does not have the same type of relationship in the classroom with the kids who do not know him outside of class. Mr. Arias has not had any specific complaints about students feeling left out, but he is concerned that Mr. Kissner may express favoritism or preference toward the students he spends a lot of time with.

Mr. Arias has not addressed that issue with Mr. Kissner and he does not believe he directly raised his concern about Mr. Kissner with Ms. Kidwell.

**Mr. Cohen's Report**

Two girls who are currently at Los Gatos High School have told Mr. Cohen that they are fearful of Mr. Kissner. Both girls are sensitive and emotional. When the girls were in Mr.

PL000882

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

<p align="center">ATTORNEY-CLIENT PRIVILEGED</p>

Kissner's class, they were uncomfortable with going to talk to him to ask how they could do better in his class. They were fearful that he might get angry.

Mr. Cohen has not heard that any of the boys are fearful of Mr. Kissner. One student who is frightened of Mr. Kissner comes into Mr. Cohen's classroom to do work instead of being in Mr. Kissner's class. Mr. Cohen believes that this student is fearful of Mr. Kissner and the way the students behave in Mr. Kissner's classroom. That student needs fewer distractions and finds it difficult to concentrate in Mr. Kissner's classroom. Mr. Kissner's classroom tends to be loud and Mr. Kissner lacks control over his classroom.

**Student One's Mother's Report**

Student One had Mr. Kissner in 6th Grade for Math and again in 8th Grade for Science. Student One informed her parents that Mr. Kissner prefers the boys over the girls in class. Mr. Kissner gives positive compliments to the boys and either says negative things to the girls or ignores the girls. He calls on the boys and doesn't call on the girls.

Mr. Kissner treated the girls in 6th Grade the same way he now treats the girls in 8th Grade. Mr. Kissner is "buddy buddy" with many of the boys and does not behave that way toward the girls. Mr. Kissner comes to the dances with his wife and baby and talks with the boys.

Mr. Kissner is also the wrestling coach of the team consisting mostly of boys. The boys hang out with Mr. Kissner around campus, including helping him carry things from his car and hanging out in his classroom.

Student One's Mother did not notify the administration of any of these issues, because it is so obvious to anyone who spends time around campus. It is such a small school that the administration must have observed Mr. Kissner's interactions with the boys. Student One's Mother is certain that the administration is aware of how Mr. Kissner interacts with the boys. Student One's Mother has heard from many other parents that they have had similar concerns about Mr. Kissner.

**Parent C's Report**

Parent C's daughter attended CT English two years ago and had Mr. Kissner for Math. Parent C's son also had Mr. Kissner for Math in 6th Grade. Parent C's son really liked Mr. Kissner and Parent C was satisfied with Mr. Kissner's teaching approach with her son.

Parent C and her daughter were very displeased with Mr. Kissner's teaching. Mr. Kissner treated the boys and the girls very differently in the classroom. According to Parent C's

<p align="center">54.</p>

PL000883

**CONFIDENTIAL Investigation Report**        **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

daughter, all of the girls received the same comments on their written work from Mr. Kissner. It was as if Mr. Kissner cut and pasted the same comments on all the girls' papers. For the boys, Mr. Kissner gave more detailed constructive comments. Mr. Kissner tends to have a "slight cult of personality with the boys in the class." That does not happen with the girls in the class.

Mr. Kissner tends to "over focus on boys" and "ignore the girls." Parent C did not notify the superintendent that Mr. Kissner was ignoring the girls and focusing his attention on the boys.

**Student One's Report**

Student One feels like Mr. Kissner gives more attention to the boys than he gives the girls in his classes. There are some boys in the class who are very goofy, but they are very smart, so when they goof off, he does not punish them. Usually, if a girl does something wrong, Mr. Kissner will put them on the board for detention. Student One has never been put on the board for detention.

The boys will sometimes play pranks on Mr. Kissner and he won't give them detention for that. Sometimes the boys steal one of his things and Mr. Kissner just says, "give that back." The boys don't get in trouble.

If somebody else ever did that, Mr. Kissner would put them on the board immediately. Mr. Kissner is kind of like the "jokester teacher of the school." But he mostly just jokes around with the boys.

There are some kids that Student One thinks Mr. Kissner gives preference to. They are smart, but he lets them act up. They wander around the classroom and goof off and copy off other people's papers. But they don't get in trouble. During projects, those boys just goof around and they don't get in trouble.

Mr. Kissner did not fairly grade Student One's Science Fair project. Mr. Kissner gave Student One and her female Science Fair partner "not very good grades for blending their sentences. He took 30 points off of the 50 points because of how they blended their sentences." Mr. Kissner also said that Student One and her partner's board was "not attractive." Student One and her partner ended up getting first place overall in the Science Fair, even though Mr. Kissner gave them a poor grade.

PL000884

CONFIDENTIAL Investigation Report        David Kissner's Conduct with Children

ATTORNEY-CLIENT PRIVILEGED

### Student Three's Report

Mr. Kissner seems more comfortable around the boys than he is around girls. Student Three thinks that might be because Mr. Kissner is the wrestling coach and he has a lot of boys on the wrestling team.

Student Three's older sister was on the wrestling team. Student Three's Mother loved Mr. Kissner's approach to coaching the wrestling team. Her daughter really enjoyed it. Mr. Kissner was tough on the kids, but was also supportive.

Student Three's Mother said that Mr. Kissner does appear to be a "great asset to the community," even if his teaching skills leave a bit to be desired sometimes.

### Student Four's Report

Mr. Kissner gives much more attention to the boys than he does to the girls in class. Mr. Kissner is much more in a goofing around mode and "being mean" to the boys than he is to the girls. Most of his word problems are also directed at the boys. The word problem scenarios he uses are also more related to things the boys are involved in. Mr. Kissner's class stories are things that interest the boys more.

Mr. Kissner tends to single out the boys for rude comments. Mr. Kissner does not really say positive things to kids who are struggling in his class.

Mr. Kissner is very "anti-fancy." He makes comments about how girls "like to shop." Mr. Kissner comments about how the females "like to go to the mall." Mr. Kissner talks about how 90% of people go to the mall so many times a week. He also mentions that women go to the mall much more than men.

Mr. Kissner injected his own political views into the classroom when he made the class work on a packet about the "gender wage gap." Mr. Kissner used one of the math labs from Scholastic News, which is used in the Social Studies class. [19]

The Scholastic News lab addressed the gender wage gap. Mr. Kissner used that lab to challenge the concept that there is a gender wage gap. Mr. Kissner was saying that he did not believe there is a real gender wage gap and insisted that he could prove it through the math problems he gave the class.

---

[19] I located what appears to be the Math Lab answer key in Mr. Kissner's email file. Exhibit G.

PL000885

**CONFIDENTIAL Investigation Report**    **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

Mr. Kissner had the class spend two weeks on the gender wage gap math lab. He was being critical of and disputed the facts being provided in the Scholastic News social studies packet. Throughout the whole math lab, Mr. Kissner was telling the class not to believe that the gender wage gap exists. Mr. Kissner insisted that his math lab proved that no gender wage gap exists. Mr. Kissner was telling the students that the Scholastic News magazine social studies packet was "lying to your face."

Student Four feels awkward about the fact that one of her teachers provides the Scholastic News packet as valid information and Mr. Kissner says that it is a lie. Student Four thinks that "maybe the figures were a bit far-fetched, but [Mr. Kissner's] were too." Mr. Kissner was bringing in information from other sources that he said were reliable pieces of information.

According to Parent A, the way Mr. Kissner approached the gender wage gap issue, was more than just that you should question what you read. It was much more political than that. Mr. Kissner made the issue more political than statistical.

Mr. Kissner said that there were a number of reasons why the gender wage gap "was not real." One of them is that "women choose lower paying jobs." Mr. Kissner did talk about how it would be good for women to go for higher paying jobs and for men to also work in the lower paying jobs.

Mr. Kissner made a comment about a female student's make up (Student Thirteen). Student Thirteen was trying to ask Mr. Kissner a question about a Math problem and he interrupted her and said, "Wow, I am sorry. That makeup is really distracting." Student Thirteen was embarrassed and just sat down. Mr. Kissner did not answer the question.

MR. KISSNER'S CLASSROOM MANAGEMENT

**Mr. Arias' Report**

Some of the now high school students who visited Mr. Arias recently told Mr. Arias that they believed Mr. Kissner's "classroom management was unfair and it was not handled very well." The whole class would be punished for problems with just one or two students or that students would be sent out of the classroom to sit outside. The students found that odd because that is not something that happens in most classrooms at CT English.

Mr. Arias is aware that Mr. Kissner would sometimes send kids out of the classroom. He worked with Mr. Kissner on that a few years back. At that time, Mr. Arias told Mr. Kissner that if he needed to send a kid out of the classroom, Mr. Kissner should send the

57.

PL000886

**CONFIDENTIAL Investigation Report**        **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

student to Mr. Arias' classroom for a referral. Mr. Arias told Mr. Kissner that he could not simply send kids out of the classroom for a minor infraction.

Mr. Arias has noticed that a couple of times a week, Mr. Kissner sends a student outside the classroom at least for short period of time. Mr. Arias believes that most other teachers deal with discipline issues inside the classroom. However, from where his classroom is located, Mr. Arias can only see two other classrooms, one of which is Mr. Kissner's.

### Student One's Report

Mr. Kissner teaches some very advanced aspects of science. Student One has a math and science tutor who told her that the things Mr. Kissner is teaching them are for juniors in high school. Mr. Kissner "goes through things really fast. You can't really understand it. That's what every single kid in the grade feels like. He goes really, really, really fast. He doesn't really explain it and then he gives us papers and we just have to understand it."

Student One did not tell Mr. Kissner that she felt he was moving too quickly and that he was not explaining things. Mr. Kissner is kind of intimidating. Student One would not talk to him about things like that. Student One has seen Mr. Kissner get mad when somebody has done something "bad." "He does try to intimidate you in front of all of your fellow classmates if you do something wrong."

There was a kid (Student Fourteen) in the class. Whenever Student Fourteen would do something wrong, Mr. Kissner would say out loud to the whole class and to Student Fourteen, "Well that's why you don't have a good grade in Science Fair."

### Student Two's Report

After class, or during lunch, Mr. Kissner often has students in his classroom. Mr. Kissner wrestles with kids in the classroom sometimes. He wrestles with the students who "kind of annoy him" but whom he likes. The wrestling seems playful, but Student Two is not sure if some kids might be hurt. They are on the ground wrestling.

Mr. Kissner has a drawer where he keeps candy. Some of the students try to steal the candy from him and he wrestles them to get it back. Student Two does not know if any of the students Mr. Kissner wrestles with in his classroom are uncomfortable with that.

58.

PL000887

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

## Student Four's Report

Student Four has been uncomfortable at various times in Mr. Kissner's class. There are two categories of situations that make Student Four uncomfortable in Mr. Kissner's class.

The first is that Mr. Kissner tries to, "indoctrinate his political views" into the students. "every once in a while, an incident pops up in class that makes Student Four feel uncomfortable. It feels like a line has been crossed, slightly."

Mr. Kissner talks a lot about how he feels about the government and that he thinks the government "is corrupt." Usually he gets on that line of conversation when there is a minimum day or when the kids get rowdy. Usually, it is once or twice a month that Mr. Kissner raises that as a topic. Mr. Kissner works into some of the math lessons the fact that he thinks the government has some of these "really ridiculous taxes." Students are not really comfortable speaking up to question Mr. Kissner's statements.

Mr. Kissner makes statements about how there is no reason for the government. Oftentimes students will make comments that follow on to Mr. Kissner's statements and then he will go on from there talking about how corrupt the government is.

Last year, Mr. Kissner forced his 8th Grade Science class to watch the Trump inauguration. Student Four knows that many of the students were uncomfortable watching the inauguration in Science class. Student Four does not know if anybody complained to the principal about that.

The second situation in which Student Four feels uncomfortable is when Mr. Kissner targets certain students in ways that Student Four feels are inappropriate and makes those students feel uncomfortable. Mr. Kissner has a way of trying to embarrass certain students.

In Mr. Kissner's class, in order to use the bathroom during class, the student has to accept a detention. Mr. Kissner sometimes treats different students differently in regard to their requests to use the bathroom. He doesn't always require students to accept detention. For certain students he does. Student Four believes that if she asked to go to the bathroom, Mr. Kissner probably would have let her go without giving her detention.

Mr. Kissner usually issues detentions to students who are more disruptive in class. There are many students in Mr. Kissner's class who he requires to take detention if they use the bathroom. It is a pretty normal thing.

For example, about two months ago, Student Ten asked to go to the bathroom during class. Mr. Kissner said no, unless it's an emergency. The student sat back down. A few minutes later, Student Ten asked to go to the bathroom again. Again, Mr. Kissner said no, Mr. Kissner then said, "but you can have a binder clip. I'll make it an extra small one for you." Mr. Kissner was speaking to a male student.

PL000888

ATTORNEY-CLIENT PRIVILEGED

Student Four believes Mr. Kissner was referring to the size of the boy's penis. Student Four thought that was embarrassing and inappropriate to say to a student. The whole class was laughing. It was clear that the boy was embarrassed. The boy didn't say anything. He just sat down. He was not allowed to use the bathroom.

With another student, Student Eleven, when that student had to start wearing glasses, Mr. Kissner remarked, "Wow they look good. They almost make you look smart. You could almost actually fool someone." Student Four thought that might be "sort of okay if that was a student who did really well in Math." However, Student Eleven struggles in Math. It felt like Mr. Kissner was bullying the student, and that made Student Four feel uncomfortable.

Student Twelve falls asleep in class and Mr. Kissner makes fun of him for that. After about five classes in which Student Twelve fell asleep, Mr. Kissner just gave up on trying to help him. Mr. Kissner would say, "as long as [Student Twelve] does not disrupt the class, just let him sleep." Student Four knows that Student Twelve has a bad family situation and she feels awkward when Mr. Kissner makes fun of him for falling asleep. Student Twelve recently moved out of Mr. Kissner's class.

Sometimes Mr. Kissner makes videos of his teaching where he is making the notes. If there is a student at detention after class when Mr. Kissner is making the video, sometimes he will unexpectedly ask that person a question on the video and the student will not know the answer. Mr. Kissner will say that student's name on the video and then everybody will know that the student did not know the answer. That seems embarrassing to the student. Sometimes that student will make a really "bad mistake that the whole class talks about the next day."

One-time Mr. Kissner asked on the video, "[Student Ten], how many minutes are in an hour?" Student Ten took a really long time to respond. The next day, everybody in class was asking, "[Student Ten], how many minutes are in an hour?"

Student Four would never talk to Mr. Kissner about the fact that he makes her feel uncomfortable. Mr. Kissner has never said anything directly to Student Four that she thought was mean. In general, Mr. Kissner can be mean and sarcastic. Most of time, the kids laugh.

Whenever a student "dabs" Mr. Kissner gives them detention.[20] He does not like it. One time a student came in to Mr. Kissner's class wearing a T-shirt with a picture of a unicorn

---

[20] https://en.wikipedia.org/wiki/Dab_(dance) Dabbing, or the *dab*, is a simple dance move in which a person drops the head into the bent crook of a slanted arm, typically while raising the opposite arm in a parallel direction but out straight; both arms are pointed to the side and at an upward angle. https://www.urbandictionary.com/define.php?term=dab Atlanta term used to describe dance move (bowing head into elbow) which represents confidence, accomplishment, and pride.

PL000889

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

dabbing. Mr. Kissner gave that student detention for that student's T-shirt even though it was not a violation of the dress code. Mr. Kissner just does not like dabbing, so he gave the student detention.

When Mr. Kissner issues detentions, students have to come to his classroom during lunch. Mr. Kissner usually has "quite a few groups of students having detention in his classroom."

A lot of kids talk and act up in Mr. Kissner's class. Sometimes Mr. Kissner issues detention to the entire class because some number of students were acting up. Usually, that means students have to go to Mr. Kissner's class for about 10 minutes during lunch time. That has happened in Student Four's class five or six times this year.

In those situations, Mr. Kissner usually makes the kids who were not misbehaving only stay five or 10 minutes, but the rest of the class he makes stay the entire lunch time.

**Student Five's Father's Report**

Student Five was in Mr. Kissner's class when Student Five was in 6th Grade, during Mr. Kissner's first year at CT English. Mr. Kissner had a major challenge with classroom management because he had difficulty with the boundaries between being a friend and a teacher.

**Mr. Kissner's Report**

Mr. Kissner, as a standard practice, assigns detention to students who ask to use the bathroom during class time. Mr. Kissner believes that is standard practice among many of the teachers. "We encourage kids across the school to use the bathrooms before class and during breaks." Mr. Kissner's practice is that if a kid asks to use the bathroom right after school starts or right after a break, he will assign them detention. "If they did not take care of business and they need to go to the bathroom, then they will have to stay in at lunch to make up the time." Mr. Kissner becomes more lenient the farther away they get from the start of school. That accusation "seems silly" to Mr. Kissner.

Mr. Kissner acknowledges that he did tell a male student who asked to use the bathroom that he would not be allowed to, and that Mr. Kissner would give him a "binder clip" he could use on his penis instead. "He is a student I have a positive rapport with. He did get to use the bathroom. It was just a joke." Mr. Kissner acknowledges that he referred to a "small binder clip" inferring that the boy had a small penis. Mr. Kissner now says that joke was "borderline."

PL000890

**CONFIDENTIAL Investigation Report**      **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

MR. KISSNER'S COMMENTS ABOUT EVOLUTION AND SEX EDUCATION

**Mr. Arias' Report**

After the student Walkout situation at CT English was publicized, former students who are now in high school came to visit Mr. Arias and told Mr. Arias that they were "never taught evolution" in Mr. Kissner's classroom because it was "against his belief system." The students indicated that they disagreed with Mr. Kissner's position to not teach them evolution.

**Mr. Cohen's Report**

Mr. Thompson, the lead Science teacher, mentioned that Mr. Kissner has said that if he was asked to teach evolution, it would be a very difficult thing for him and he didn't think he would be able to do it. Mr. Kissner has not been asked to teach evolution because he is not a Life Science teacher. Evolution is a required piece of the Life Science curriculum. Mr. Kissner said that his objection to teaching evolution would preclude him from teaching the Life Science curriculum.

Mr. Kissner went to the training to teach sex education, which is mandated curriculum. However, Mr. Kissner said he is "not going to teach it." Sex education is a part of the curriculum in Mr. Kissner's Science classes. Mr. Kissner has said that he is "not going to be able to teach sex education."

Very recently, Mr. Cohen heard that they built-in a leave of absence for Mr. Kissner during that timeframe because he doesn't feel comfortable teaching sex education. Mr. Kissner is doing something of a "sex education walkout."

Ms. Lanovaz is slated to teach sex education in Mr. Kissner's place. Mr. Cohen heard that there was something about the way the training was given or the way he was expected to teach the curriculum that Mr. Kissner "didn't agree with." Mr. Cohen heard that Mr. Kissner "opted out" of teaching sex education.

**Student Two's Report**

Mr. Kissner has posters on his wall with religious quotes, like "Everything can be achieved with god." Those make Student Two feel uncomfortable. Mr. Kissner "has been pretty open about his religion."

In the beginning of the year they were doing a unit about Earth, Space Science. Mr. Kissner mentioned that the way the Earth was formed "wasn't a coincidence but was something caused by God." Mr. Kissner was talking about all the factors that caused the

PL000891

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

earth to form the way that it did. Mr. Kissner said he thought "those factors were caused by God."

### Mr. Thompson's Report

Mr. Thompson has tried to work closely with Mr. Kissner over the years on the Science curriculum. Mr. Kissner is not at all collaborative. Mr. Kissner often does not attend the Science Department weekly meetings at which they discussed the design of the curriculum. He frequently just blows off the meetings and then excuses his absences. When he did show up, Mr. Kissner would not actively participate. He would be typing on his laptop during the meetings.

Mr. Kissner made it clear that he was not comfortable teaching Life Science, including evolution. He said he did not have experience teaching Life Science and he made it clear that he had no desire to learn the curriculum.

Over the past few years, the CT English Science Department has gone back and forth on how to structure the curriculum. They vacillated between an integrated approach and a discipline specific model. Mr. Kissner made it clear that he did not approve of the integrated approach and that he did not want to teach Life Science. Mr. Kissner has insisted that he only wants to teach 6th and 8th Grade Science. Mr. Thompson highly suspects that it has to do with Mr. Kissner's objection to teaching evolution because of his religious views.

In November 2017, because of switching between the integrated and discipline specific approaches, the Science Department determined that the 8th Graders that year had missed out on their unit on evolution. Mr. Thompson told Mr. Kissner that he needed to roll out an evolution unit with his 8th Graders. Mr. Kissner told Mr. Thompson, "I'm not going to do that." The 8th Graders took their state test without having had the evolution unit.

Mr. Thompson did not hear Mr. Kissner flat out refuse to teach sex education. He believes Mr. Kissner indicated reluctance to teach sex education. Mr. Thompson feels the same way.

### Mr. Kissner's Report

Mr. Kissner denies that he made comments about not wanting to or that he would not teach evolution. Evolution has never been a part of Mr. Kissner's curriculum, "so it hasn't come up." A colleague [Mr. Cohen] did write Mr. Kissner a letter telling him that he was not being collaborative because Mr. Kissner did not want to teach evolution. However, Mr. Kissner teaches Physical Science with Physics and Math. Evolution is not in his curriculum, "so it would not come up."

PL000892

**CONFIDENTIAL Investigation Report      David Kissner's Conduct with Children**

### ATTORNEY-CLIENT PRIVILEGED

Mr. Kissner went to the sex education training this year. He did not want to have to teach sex education. "I'm a Math teacher." He went out on a medical leave of absence just as the sex education curriculum was being rolled out and he did not end up teaching it.

## FACTUAL CONCLUSIONS REGARDING MR. KISSNER'S CLASSROOM AND AFTER SCHOOL CONDUCT

### MOUNTAIN BIKING AFTER SCHOOL

Mr. Kissner runs a "Mountain Biking Club," throughout the year. He organizes a once monthly Saturday bike ride to various area biking trails. In addition, during the school year, Mr. Kissner invites District students to join him on afterschool bike rides. Mr. Kissner takes District students from CT English afterschool in his personal vehicle with their bikes in the back. They drive to a mountain biking trail in the area and then will often have a meal together. Mr. Kissner then brings students to a prearranged location to meet their parents. Parents sometimes come on the bike rides, but not always.

Although Mr. Kissner stated that he is careful to make sure he is not alone with just one child, the evidence suggests otherwise. Mr. Kissner was alone with Student Five and Student Eight on that camping trip and he indicated that he would drive Student Ten or Twelve home by himself when he missed his ride home from school.

Mr. Kissner uses a permission slip for his Mountain Biking Club that covers all activities throughout the year. He does not require a specific permission slip for the afterschool bike rides. The Mountain Biking Club flyer Mr. Kissner uses does not identify him as a CT English teacher. The flyer does not include a statement that the biking activities are not sanctioned by the District.

Some teachers expressed concern about the amount of time Mr. Kissner spends with some students outside of school and have wondered whether he keeps it professional and or whether he gives more attention or preference to those students he gets to know better through his outside activities with them.

### COMMENTS ABOUT DEATH OR VIOLENCE

Students reported that Mr. Kissner periodically tells stories in his 6th Grade and 8th Grade classes about some of his experiences while he was serving in Iraq and later when he biked in parts of the world. Students reported that, Mr. Kissner "went into a fair amount of detail about that" and that the stories "could be quite gory."

64.

PL000893

ATTORNEY-CLIENT PRIVILEGED

Mr. Kissner acknowledges that he has "shared military stories" with his classes, but claims that he does "not share great graphic detail." Mr. Kissner believes his stories are "grade and age appropriate."

The credible evidence reflects that Mr. Kissner tells a story about a soldier being blown up when he was in a Porta potty; a story in which people he was traveling with "got blown up by terrorists;" that "he sometimes makes gruesome comments" about what he saw, referring to "bodies littering the road" and people being "completely blown up." Mr. Kissner told his classes about people getting blown up such that only their boot is left of them. Mr. Kissner told Student Four's 6th Grade class about how his troops had to kill individual people.

Mr. Kissner also tells a story about how he was almost blown up by a rocket missile and "told in great detail" was of how he was held at gunpoint with a "gun held to his throat" during his biking travels.

Mr. Kissner also told the class about how he and his troops set up a bomb that "killed a whole bunch of terrorists," and that the troops were laughing watching "like twenty people being blown up." Mr. Kissner said he thought it was funny because just a little while before that, when they saw a dog die, his troops were very upset.

Some students are uncomfortable with Mr. Kissner's gruesome stories. "It is mostly the boys who really enjoy them." They laugh and encourage Mr. Kissner to continue on with his stories. Mr. Kissner has been telling his war stories for many years. Student Four's older sister who also had Mr. Kissner, has had nightmares involving Mr. Kissner's war stories.

When Mr. Kissner shows videos just before a holiday, he "usually shows something super violent." One time, Mr. Kissner showed a video clip from Star Wars where they ripped out somebody's heart. During another holiday, he showed a video of Bambi dying. He just shows the video clip of the death scenes. Mr. Kissner said that he doesn't like Disney (even when he was a kid) so he liked showing the video of Bambi being killed.

Student One thought all of these things were "weird." They didn't make her feel "super uncomfortable," but she thinks they could make some people feel uncomfortable.

Student Two is at times fearful of Mr. Kissner. Student Two thinks other students are sometimes fearful of Mr. Kissner too. This year, Mr. Kissner was talking about the Marine Corps' birthday. Mr. Kissner said that day is the one day that he lets himself mourn and lets himself "lose himself." Mr. Kissner has said that on that day, he allows himself to go back and relive what he experienced in Iraq.

65.

PL000894

**CONFIDENTIAL Investigation Report**     **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

MR. KISSNER'S WORD PROBLEMS

Students reported that Mr. Kissner sometimes makes up word problems in which he uses, "inappropriate questions, like buses of kids falling off cliffs and finding the velocity." Mr. Kissner often created word problems or examples that included people dying or falling out of buses, or children drowning. When he was explaining something, Mr. Kissner would often use examples like that of children dying. "A lot of his word problems are like, 'find the velocity of a child being thrown off a cliff.'" "Sometimes they are disturbing." The examples of throwing a child off a cliff and finding the time to impact "are disturbing."

During Christmas time, Mr. Kissner made up a word problem where Santa Claus was "being hung, like, Santa was dying and you had to solve the function. The problem is about a rope that was in a mechanism that was hanging Santa and the students had to figure out how much force it would take or how much time they had to save his life.

Mr. Kissner also creates Word problems in which he uses the names of students in the class, usually having something violent happening to those students. The students are being killed or injured somehow. Sometimes there are guns involved and other times he says things like, "[name of the student] gets punched in the face," or "something else that is very violent and not appropriate."

Mr. Kissner usually uses the names of kids who "like to stand out" in class. Student Two thinks most people think it's funny, but some people could be upset by it, especially the kids whose names he is using. Mr. Kissner has been doing that since Student Two was in 6th Grade. Student Two would not speak up about that, because he would not want to "get on his bad side."

Student One was "not really" uncomfortable in Mr. Kissner's class, but "he makes weird questions. He makes it a joke, like everybody takes it as, but it's still kind of violent." Student Three did not feel comfortable with Mr. Kissner's word problems and examples. Some of the boys found it funny. Student Three is more sensitive and it made her feel a little uncomfortable.

Student Four sometimes feels uncomfortable when Mr. Kissner makes up word problems that involve some of the students' names. Mr. Kissner makes fun of some of the students by putting them in ridiculous and sometimes violent situations, like "getting eaten by bears." Mr. Kissner also makes fun of people for their height. Mr. Kissner will refer to the smallest student and explain "that is why the class will sacrifice you to the Bears." Mr. Kissner "uses dark humor."

Usually it is the kids who are on the wrestling team who he puts in the word problems. "Often times, they are not really the best students."

Mr. Kissner also made derogatory comments about a student's intelligence when he had to get glasses. Mr. Kissner also focuses on students who other teachers and some students

66.

PL000895

**CONFIDENTIAL Investigation Report      David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

do not like and say that they will sacrifice them to the bears. Student Four thinks that sometimes Mr. Kissner likes to highlight the fact that some of the students are not liked.

Mr. Kissner has heard that students and parents "love" his math problems. Mr. Kissner has never received any negative feedback from either parents or students about using the students' names in his word problems.He acknowledges that he has "a morbid sense of humor" and he likes to "take things kind of lightly." He believes the kids "love my math tests." "The word problems are humorous. I have got child labor and kids being eaten by bears."

Mr. Kissner puts the names of some of his students into his word problems. They are the students who Mr. Kissner "knows well and he is comfortable with and that know Mr. Kissner well." "It is something that adds a lot of value to the curriculum and I get a lot of positive feedback about it."

Examples of some of Mr. Kissner's word problems are at Exhibit F.

Mr. Kissner's Treatment Of Boys Versus Girls

In the first few years Mr. Kissner was at CT English, Ms. Kidwell and Mr. Arias recognized that Mr. Kissner had a better rapport with male students than he had with the female students. He also had a pattern of grading female students more harshly. Ms. Kidwell, Mr. Arias and Ms. Vieler all worked with Mr. Kissner on that issue. At the time, although Ms. Kidwell and Mr. Arias saw improvement, Mr. Kissner did not acknowledge that he had this problem.

There is evidence that, once again, female students feel that Mr. Kissner treats them differently from the male students. Female students feel ignored by Mr. Kissner, as compared to how he treats the male students. Although there is no evidence that any parent or student raised a concern about the disparity recently, it appears that there is the continuing perception that Mr. Kissner does not afford his female students an equal amount of positive attention or feedback as he does to the male students.

Parents more likely than not did not voice their concerns to the superintendent because they assumed she was aware of the situation and did not have concern about it. Mr. Arias also had concerns, in general, about how Mr. Kissner's close relationships with some students may adversely impact his relationships with other students, but he did not voice that concern with Mr. Kissner or Ms. Kidwell.

Mr. Kissner devotes a significant amount of time into developing relationships with many male students (through the wrestling team, camping and bike trips, in which few girls participate), which he does not invest with most female students.

PL000896

CONFIDENTIAL Investigation Report        David Kissner's Conduct with Children

ATTORNEY-CLIENT PRIVILEGED

Mr. Kissner has also expressed stereotypical opinions about girls, that they like to shop and go to the mall, and called one girl out for her "distracting" makeup. Mr. Kissner went to great lengths to prove to students that there is no gender wage gap.

## MR. KISSNER'S CLASSROOM MANAGEMENT

Mr. Kissner has a rule in his classroom, in many cases, that if a student wants to use the restroom, they must accept detention.  Mr. Kissner also assigns detention, at times, to the entire class, in order to punish certain students who are acting out.

Mr. Kissner admits that he told one boy that he would give him a "small binder clip" to use instead of allowing him to go to the bathroom.  Mr. Kissner knowledges that he was making a joke about the size of the boy's penis and that his comment was "borderline."

Some students expressed concern that Mr. Kissner makes fun of or bullies students he does not like.

There is also evidence that Mr. Kissner physically wrestles with some boys on the floor in the classroom during the school day.

## MR. KISSNER'S COMMENTS ABOUT EVOLUTION AND SEX EDUCATION

There is evidence that due to the CT English Science Department's shifting between integrated and discipline specific curriculum models over the years, some students missed out on the unit on evolution.  Mr. Kissner objected to the integrated curriculum model because he did not want to have to teach Life Science.  Mr. Thompson's report that he asked Mr. Kissner to fill that gap with the unit on evolution for his 8th Graders in 2017 and that Mr. Kissner refused, is credible.  Mr. Thompson's report is corroborated by students who recently informed Mr. Arias that they had not been taught evolution. Mr. Kissner's claim that he was never required to teach evolution because he does not teach Life Science, is not credible.

Mr. Kissner acknowledges that he prefers not to teach sex education, but he has never refused to do so.  This was the first year at Mr. Kissner was required to teach sex education and he went out on a medical leave just as that unit was getting under way. According to Mr. Kissner, his medical leave was due to stress he experienced after staff backlash against him for the way he handled the Walkout.

68.

PL000897

**CONFIDENTIAL Investigation Report**       **David Kissner's Conduct with Children**

ATTORNEY-CLIENT PRIVILEGED

## MR. KISSNER'S COMMUNICATIONS WITH PARENTS DURING HIS ADMINISTRATIVE LEAVE

In a letter dated April 30, 2018, from Assistant Principal/Curriculum Coordinator Rebecca Carino, the District notified Mr. Kissner that he was being placed on paid administrative leave effective May 1.  Mr. Kissner was informed that, "You have an obligation to maintain the confidentiality of both the fact of and information concerning an investigation, and to not disclose such information to others, including employees, parents, and students of the District....  Violations of this policy may result in appropriate disciplinary action."

Thereafter, Mr. Kissner acknowledges that he did communicate with various parents "to a very limited degree" about the investigation while he was on leave of absence.  Mr. Kissner "kept it as vague as possible, just saying, 'Well, I do not know, we'll have to figure out what happens."

At first, Mr. Kissner said that did not communicate with parents about why he was on leave.  A short time later in his interview, Mr. Kissner acknowledged that he told parents that he had been put on leave, "related to the Walkout." "You have to keep in mind, we are a small community. They go to my church, we mountain bike ride together, we have dinner at each other's houses, they are my friends. So I kept it vague." Mr. Kissner just said, "They are looking into things and we will figure it out."

Mr. Kissner first reported that he spoke with parents from CT English, person-to-person, not via e-mail. Mr. Kissner said that he did not have any substantive communications with any parent about the investigation. Mr. Kissner was just meeting with parents "about the Walkout related stuff in general."

On May 7, 2018, Ms. Arnold received a forwarded e-mail that appears to reflect that Mr. Kissner was communicating via e-mail from his personal e-mail account with numerous parents who were supportive of Mr. Kissner and lobbying to pressure the District to bring him back from leave. Exhibit _. Mr. Kissner stated that he "did not encourage anyone" to lobby the District on his behalf.

There is evidence that Mr. Kissner did not comply with Ms. Carino's instructions to maintain confidentiality and not to disclose information about the investigation to parents in the District.

PL000898

# Exhibit A

PL000899

Loma Prieta Board of Education
23800 Summit Rd
Los Gatos, CA 95033

Sir/Madam:

You must be informed of the following information regarding a teacher in your district, David Kissner. The following events have occurred and have been repeated with at least 4 different under age boys (most under age 15):

1. Kissner runs camps through a mountain church and through CT English in the summers. He frequently will single out one boy and take him somewhere alone, away from the group.
2. Kissner has provided alcohol to boys that he is alone and talking to. I know of at least 3 occasions where this has occurred. He has admitted to doing it one time.
3. Kissner has asked boys about sex and sexual encounters
4. Kissner has phone numbers for some of the boys and texts them late at night.

I have never heard of Kissner physically touching a boy, but the acts that he has done are clearly 'grooming'. I believe that he still runs camps and he is also in charge of the boys wrestling, where I am sure he gets close physical contacts with many boys.

The church where he provided alcohol to boys has been apprised of his illegally providing young boys with alcohol, and he has admitted to it. I am not sure if they continue to allow this man to be alone with children, but he seems unfit to do so. Now that you have been put on notice of this person in your employ, you must do your due diligence to protect your students from a potential predator.

-Anonymous

cc: Corey Kidwell

PL000900

# Exhibit B

PL000901

# GROUSE RIDGE and SIERRA BUTTES
## Summer 2016 Camping

## Mountain Bible and Christ Child Catholic Church
### *Guided by David and Stacy Kissner and Quest Ministries*



Join us this Summer for a camping and backpacking adventure in the Sierra Nevada Mountains! Open to students and their families, we are heading to this amazing high sierra location to experience God's magnificent creation, learn about God through the hearing of His Word, to have fun, to learn about ourselves through adventure and challenge, and to build lasting relationships and memories!

### Activities
- Remote hiking through spectacular mountain scenery
- Swimming
- Canoeing
- Peak scrambling and bouldering
- Exploring unmapped routes, mines, lakes, and peaks
- Campfires and sleeping under the stars
- Learning about God through the hearing of His Word



**Details:** This summer, we have options for the whole family and a variety of interests. Base camp is planned at a beautiful and remote lake in the high sierras. Bring the whole family - parents and younger siblings can relax at the lake while the more adventurous parents and older kids take packs into the backcountry for a couple nights. Backpacking trips are designed for the inexeperienced backpacker or camper. Moderate physical fitness will be needed to carry packs on the terrain for the distances covered here. Hiking days are roughly 6 miles or less each day, and there is some hiking without packs. Elevations range from 5000' to 8000'. These trips are also designed to be educational in nature with regards to how to prepare and pack for a backpacking adventure, survive in the wilderness, practice good stewardship of our natural resources, navigation, etc. There is no expectation that a participant has this knowledge or experience ahead of time. While weather is usually very pleasant here at this time of year, the possibility always exists for extreme weather in the mountains. Weather events can significantly alter our plans. There is limited or no cell phone coverage in the area we are hiking in. A trip itinerary will be filed with a party who can coordinate any emergency needs.

Base camp is relatively comfortable and established considering its remote and completely undeveloped location. Parents or siblings not interested in backpacking are welcome to stay in the base camp, where there are plenty of activities to do during the day. Note that trip E (12-16 July) is not a backpacking trip, but will include day activities out of the base camp.

PL000902

**Cost:**  The $200 (checks payable to Mountain Bible Church) is used to cover the expenses associated with the trip (fuel, food, supplies, equipment repair, replacement, and upgrade, etc.) and also includes a small contribution to a scholarship fund for those who may not have the means on their own.  Please let us know of any financial needs — we do not want cost to be a reason that anyone does not go!

**Dates:**
  **Trip B:** 21 - 25 June (includes two nights of **backpacking**)
  **Trip C:** 28 June – 2 July (includes two nights of **backpacking**)
  **Trip E:** 12 - 16 July (no backpacking – day activities out of **base camp**)
  **Trip F:** 21 - 26 July (**Mountain Biking** / Camping trip in the Downieville / Sierra Buttes area.  Riding the epic "Downieville Downhill" and surrounding cross-country trails.  This is not a beginner mountain bike trip — must have participated successfully in at least 2 of the Quest Mountain Biking Club rides.
  **Trip G:** 29 Aug – 2 July (includes 2 to 4 nights of **backpacking**).  Based out of our camp on the ridge-top of the Sierra Buttes.
  **Set-up and Tear Down.**  Come for no charge (and earn community service hours) to help set up and tear down our Blue Lake base camp (and for fun times as well!) 9-13 June and 17-20 July)

*Space is limited - backpacking groups are limited to 12 (base camp can accommodate larger numbers).*



**Packing List (for backpacking — wear or carry):**

| | | |
|---|---|---|
| -Backpack (internal or external frame) | -swim trunks | -3 liter water carrying capacity |
| -Sleeping bag (packable) | -towel (small hand towel or packable) | -toothbrush |
| -sleeping pad | -t-shirts (2) | -deodorant |
| -sturdy shoes or hiking boots | -long sleeve shirt (1) | -other personal hygiene /health items |
| -thick hiking socks (2 pr) | -insulating layer (jacket or sweater, wind proof or wind resistant | -energy bars (2) (emergency rations) |
| -thin sock liners (optional) (2 pr) | -ltwt gloves | -absorbent paper towels in a ziplock bag (15) |
| -light shorts (1 pr) | -ltwt warm hat | -gallon sized ziplock bags (2) |
| -lightweight long pants (1 pr) | -brimmed hat (sun protection) | |
| -web belt | -1 lg plastic garbage bag | Separate Bag for base camp (clean set of comfortable clothes, full sized towel, shoes, sandals, etc) |
| -underwear (2 pr) | -small headlamp or flashlight w/ extra batteries | |

| |
|---|
| Optional: sandals, sunglasses, fishing gear, camera, tent, backpacking stove/cookware, pack pillow, cards, book, etc. |
| Not to Bring: valuables or things that cannot get dirty, music players or headphones |
| Mandatory:  Positive, flexible attitude!  Adventurous Spirit! |
| *Please let us know of any equipment needs — we have any of the above equipment to loan where there is a need.* |

**Contact:**  For questions, further details, or to reserve a spot, please contact the trip coordinator:

| |
|---|
| **David Kissner**   Guide, Quest Ministries   Teacher, CT English Middle School |
| 760.214.7144   DMKissner@hotmail.com |
| These activities are *NOT sponsored by Loma Prieta Joint Union Elementary School District.* |

PL000903

# Exhibit C

PL000904

# DOWNIEVILLE DOWNHILL

### CAMPING / MOUNTAIN BIKING
### 21 -26 July, 2016

## Quest Ministries Mountain Biking Club

### Mountain Bible Church and Christ Child Catholic Church



17 miles of downhill.  Over 5000 feet of descent.  Rocky, steep, technical terrain atop ridges and peaks followed by sweeping single-track along dramatic canyons in true backcountry wilderness.  Creek crossings.  Incredible views.  Great swimming holes.  Four days of riding some of the most epic trails and terrain in California.  Physical and mental challenges.  Building lasting relationships.  Getting to know God better through experiencing His Creation and His Word.

Map of Trails

## *Tentative Itinerary*

| DATE | EVENTS |
| --- | --- |
| *Wednesday, 20 July* | *Set up Mountain Bike Base Camp on the Packer Saddle in the vicinity of Sierra Buttes.  Early arrivals are welcome to come today and help set up!* |
| Thursday, 21 July | Riders/Campers arrive.  Meet / get dropped off at Sand Pond between 2pm and 4pm for a swim in the pond.  Directions from Summit Store.  Proceed to base camp for evening. |
| Friday, 22 July | Warm up downhill ride on Mill's Peak near Graeagle (we will be shuttling).  3000ft descent.  Possible second ride in Quincy area.  Afternoon swim.  Ice cream in town. |
| Saturday, 23 July | Downieville Downhill (classic route).  Sunrise Trail, Butcher Ranch Trail, Third Divide, First Divide.  Shuttling from Downieville back to camp.  Pizza in town.  Afternoon swim. |
| Sunday, 24 July | Downieville Downhill (cross-country route).  Sunrise Trail, Pauly Creek, Butcher Ranch Trail, Gold Valley, Big Boulder Trail, Third Divide, First Divide.  Swimming/jumping in Yuba near Downieville.  Dinner out in town.  Shuttling back to base camp. |
| Monday, 25 July | Group decides on ride, hike, swim plan for today.  Options of climbing the lookout tower at the Sierra Buttes, swimming in any number of lakes, a challenging ride from the Buttes to Sand Pond (Tamarack trails), or the North Yuba Trail. |
| *Tuesday, 26 July* | *Pack up camp.  Quick dip in Sand Pond before return trip home.  Pick-ups from 10:30-12:30.  ALTERNATE POSSIBILITY – A final downhill run for those up for it to Downieville and head home from there.* |

## COST: $275 Checks made payable to Mountain Bible Church

PL000905

# PACKING LISTS

| BIKE |
|---|
| **Cross-Country Mountain Bike.** While our riding will be predominantly downhill, there is plenty of pedaling and climbing involved in our planned routes and our transportation from camp to swimming holes, etc. **A downhill-specific mountain bike is not appropriate for this trip.** Bike must be in good working order – our planned routes are in very remote and rugged wilderness – this is adventure riding. Mechanical issues could result in a **very** long hike and can significantly affect the entire group. Strongly recommend a full suspension bike with disc brakes and quick release adjustable seatpost. No rigid bikes or cantilever brakes. No bikes with wheel size smaller than 26 inches. |
| **Backpack.** Comfortable to ride with. Highly recommend a Camelback style hydration pack with storage space for snacks/tubes/light jacket. Waist and sternum straps are helpful. |
| **Hydration.** 3 liters (hydration system bladder or individual water bottles). |
| **(2) Spare Tubes.** Appropriate size for your rims/tires. Carry one on bike/in pack. Keep one in camp. |
| **Cycling Shorts.** Highly recommend padded shorts for our 4 consecutive days in the saddle. One pair is sufficient, as we will end each ride with a swim and can clean them that way. A second pair is an optional nicety. |

| Helmet (Might consider a convertible full face helmet for this extreme terrain) | | |
|---|---|---|
| Knee pads | Shoes for cycling (ensure shoe/ pedal combination provides good traction) | Socks for cycling (4 pair) |
| Cycling gloves (recommend full finger) | Lightweight windbreaker/jacket in case of inclement weather | Small headlamp for handlebars or helmet |

| CAMP | | |
|---|---|---|
| Sleeping bag | Shoes for short hikes/scrambles | Shorts (2 pr) |
| Long pants for camp (1 pr) | Sweater/sweatshirt | Underwear (4 pr) |
| Swim trunks | Towel | T-shirts (4) |
| Hat (sun protection) | Headlamp or flashlight (bike light ok) | Extra batteries for light |
| Toothbrush | Deodorant | Other personal hygiene needs |
| Camera (optional) | Pillow (optional) | $20 for dinner out |
| Camping cup (suggest insulated commuter style with lid) | | |

| OPTIONAL | | |
|---|---|---|
| Sunglasses / clear glasses | Cash for any unexpected bike repairs/parts in town, souvenirs | Tools or parts specific to your bike |
| Trail size bike pump | Patch kit | Personal sleeping pad |
| Personal tent | Sandals | Additional protective gear |

**Contact:** For questions, further details, or to reserve a spot, please contact the trip coordinator:

**David Kissner**
Guide, Quest Ministries
Teacher, CT English Middle School
760.214.7144   DMKissner@hotmail.com

These activities are *NOT sponsored by Loma Prieta Joint Union Elementary School District.*



PL000906

# Exhibit D

PL000907

# Black Rock Desert Camping Trip

## 8-13 APRIL 2018



Join us this Spring Break for a camping adventure in Nevada's Black Rock Desert! We are heading to this amazing desert to experience God's magnificent creation, learn about God through the hearing of His Word, to have fun, and to build lasting relationships and memories!

**Activities**
- A summit attempt on the 8594' Pahute Peak (Big Mountain) in the Black Rock Range (4000 foot climb).
- Exploring High Rock Canyon and the History of the Lassen-Applegate Emigrant Trail.
- Enjoying natural hot springs under the stars.
- Glow-in-the-dark games at night on the Blackrock Playa.
- Sleeping under the stars and evenings around a campfire.
- Overcoming the hostility of the desert environment.

**Trip Dates:**
Sunday, 8 April to Friday, 13 April

**Informational meeting at Mountain Bible Church** on *Tuesday, 27 Feb, 6pm (this is a new date!)  Further details on reverse*

THE HEAVENS PROCLAIM THE GLORY OF GOD.
  THE SKIES DISPLAY HIS CRAFTSMANSHIP.
DAY AFTER DAY THEY CONTINUE TO SPEAK;
  NIGHT AFTER NIGHT THEY MAKE HIM KNOWN.
THEY SPEAK WITHOUT A SOUND OR WORD;
  THEIR VOICE IS NEVER HEARD.
YET THEIR MESSAGE HAS GONE THROUGHOUT THE EARTH,
  AND THEIR WORDS TO ALL THE WORLD.
--PSALM 19:1-4

*This trip is NOT sponsored by Loma Prieta Joint Union School District.*





PL000908

**The not-so-fine print:** This trip is not a cushy guided tour! It is a camping adventure where every participant is a member of a team and helps out with setting up camp, cooking, clean-up, etc. Black Rock Desert is a notoriously harsh environment, and potential for excitement is high! Our remote backcountry campsites typically do not have toilets, water, or any amenities other than what we carry with us. We sleep on the ground under the stars or in tents with the wildlife. Temperatures in April can vary wildly – we have had temperatures over 100 degrees and also had snow storms and below freezing conditions. Wind and sand storms can come up unexpectedly, which can make camp functions like cooking, eating, setting up tents, taking the shovel into the desert for a bathroom visit, and sleeping very difficult. There are limited opportunities for bathing during the trip. Vehicle problems or flat tires could alter plans, and Black Rock is note easy on vehicles. That being said, we have always had a blast, even with the challenges. The one thing that is guaranteed is lasting memories! An adventurous spirit and a flexible attitude are required items on the packing list!



**Cost:** The cost for this 6 day trip is $320. A $50 deposit holds your spot. Costs cover food, fuel, supplies, eating out, replacing, repairing, and upgrading equipment, and a small portion towards a scholarship fund to help those who are unable to afford the full trip cost. We do not want financial hardship to be a reason anyone does not go – please contact the trip coordinator to ask about financial aid if there is a need.

**Who:** We ask that any child under the age of 10 be accompanied by an older responsible person. All participants will require a signed permission slip, release of liability, and a medical release form.

**Equipment:** The packing list is attached. Minimal camping specific gear required. Warm clothing will be a must.

**Contact:** For questions, details, or to reserve a spot, please contact: **David Kissner** 760.214.7144   DMKissner@hotmail.com

*Space is limited! Please contact us as soon as possible if interested.*

*We (Stacy, David, Ittai, and Truckee) love to spend our free time camping and adventuring as a family enjoying God's great Creation. We are so blessed to live in such a remarkable and diverse natural area! We gain even greater joy by being able to share these remarkable experiences with others, and we hope that your child – or your whole family - will be able to join us. This is my 10th year organizing and leading trips for youth and families into the deserts, mountains, national parks, and mountain biking trails of the Western U.S. We hope to reflect, in some small way, the love that God has shown to us through organizing these adventures. A highlight for me is having the opportunity to share the Good News of Jesus through engaging stories from the Bible in a setting of some of God's most magnificent creation. Hope to see you on the trail!*

This trip is NOT sponsored by Loma Prieta Joint Union School District.

PL000909

# Black Rock Desert
## 8-13 April, 2018

Student Name: _____ Parent Phone Number: _____

Address: _____ City: _____ State: _____ Zip: _____

Grade: _____ School: _____ Parent email: _____

Adult family members participating: _____

Deposit of **$50.00**, Total Cost - **$320.00** per person (Ask about scholarships if needed!  Make checks payable to Stacy Kissner)

$_____        ☐ Cash        ☐ Check #_____

☐  I would like to make an additional donation to support scholarships and equipment repair and replacement _____

While we make every effort to provide a safe and pleasant environment for your child, we do require that this participation agreement be read, filled out, signed and dated by the parent or legal guardian of each child under 18 years of age who wishes to participate in the activities which occur with us. I, the undersigned, give permission for my son or daughter to participate in the activities occurring on the **dates and locations listed above**. These activities include, but are not limited to, **vehicle transit to and from recreation areas, hiking, backcountry wilderness camping, water recreation, wildlife, terrain and climate hazards, off-road vehicle travel and driving, firearms safety and marksmanship, and more.** I grant this permission with full knowledge that I accept full responsibility for any injury or accident that may occur. I, on behalf of myself, my children, my assigns and my estate, agree to release and hold harmless David and Stacy Kissner and other volunteers or parent participants, for any and all claims for injuries, causes of action, or liability related to my child's participation in any activity associated with this trip.  By signing this document, I acknowledge that if anyone is hurt or property damaged during my child's participation in this activity, I and/or my child may be found by a court of law to have waived any right to maintain a lawsuit against on the basis of any claim which has been released herein. I have had sufficient opportunity to read this entire document. I have read and understood it, and agree to be bound by its terms.

Parent Name _____ Signature_____ Date ____ / ____ / _____

Alternate Emergency Contact name and number: _____

Does your child need us to provide any items from the packing list?  Please list any of these items here with sizes, if relevant:

Is your child carrying prescription medications?  If so, please list them and the prescribed use.  Is it necessary for an adult to maintain and administer the medications?

Does your child have any allergies or medical conditions that we should be aware of on this trip?

PL000910

# SUMMER 2018
# Camping, Backpacking, and Mountain Biking





**Ashland, OR**
**Yuba Gap, CA**
**Kings Canyon NP, CA**
**British Columbia, Canada**

Student Name: _____ Home Phone Number: _____

Address: _____ City: _____ State: _____ Zip: _____

Grade: _____ School: _____

Payment $_____     ☐ Cash     ☐ Check #_____     ☐ Paypal

☐ I would like to make an additional donation to support scholarships and equipment repair and replacement _____

☐ I would like to request a scholarship to assist with the participation cost (requested scholarship amt: _____)

Dates (circle one or write in):

| | |
|---|---|
| **A: 16 - 21 June,** Mountain Biking, Ashland, OR | **E: 23 July – 11 August,** Mountain Bike-Packing Tour, British Columbia, Canada |
| **B: 25 June – 29 June,** Basecamp, Grouse Ridge | **Other Dates (write-in):** |
| **C: 1 - 10 July,** Hike-in Backcountry Camp, Five Lakes, Grouse Ridge | |
| **D: 12 - 20 July,** Backpacking, High Sierra | |

## RELEASE OF LIABILITY

While we make every effort to provide a safe and pleasant environment for your child, we do require that this participation agreement be read, filled out, signed and dated by the parent or legal guardian of each child under 18 years of age who wishes to participate in the activities which occur with us. I, the undersigned, give permission for my son or daughter to participate in the activities occurring on the **dates and locations listed above.** These activities include, but are not limited to, **vehicle transit to and from recreation areas, hiking, backcountry wilderness camping, water recreation, wildlife, terrain and climate hazards, off-road vehicle travel and driving, mountain biking, firearms safety and marksmanship, and more. I understand that all of these activities, and mountain biking in particular, have certain inherent risks.** I grant this permission with full knowledge that I accept full responsibility for any injury or accident that may occur. I, on behalf of myself, my children, my assigns and my estate, agree to release and hold harmless David and Stacy Kissner and other volunteers or parent participants, for any and all claims for injuries, causes of action, or liability related to my child's participation in any activity associated with this trip. By signing this document, I acknowledge that if anyone is hurt or property damaged during my child's participation in this activity, I and/or my child may be found by a court of law to have waived any right to maintain a lawsuit against on the basis of any claim which has been released herein. I have had sufficient opportunity to read this entire document. I have read and understood it, and agree to be bound by its terms.

Parent Name _____ Signature _____ Date ___ / ___ / ___

Parent Phone Number(s): _____

Alternate Emergency Contact name and number: _____

Does your child need us to provide any items from the packing list?  Please list any of these items here with sizes, if relevant:

Is your child carrying prescription medications?  If so, please list them and the prescribed use.  Is it necessary for an adult to maintain and administer the medications?

Does your child have any allergies or medical conditions that we should be aware of on this trip?

# ASHLAND, OREGON

### CAMPING / MOUNTAIN BIKING
### 16 - 21 June, 2018



Long, sweeping, smooth single-track trails. Fast, rolling, steep terrain. Refreshing swimming holes. Taking in the local culture of the town of Ashland, Oregon. Camping in the Rogue River National Forest. Four days of riding some of Oregon's most famous trail systems. Physical and mental challenges. Building lasting relationships. Getting to know God better through experiencing His Creation and His Word.

Map of Trails and Regional Info

## *Tentative Itinerary*

| DATE | EVENTS |
|---|---|
| Saturday, 16 June | Caravan from Summit Road (Mountain Bible Church) at 9:00 am. Establish base camp at ridge top overlooking Mt. Shasta. |
| Sunday, 17 June | Riding Day 1 (Old Man's and Chuck's Chips, Cook and Green Trail). Swim/bathe in Applegate Lake. |
| Monday, 18 June | Riding Day 2 (Mt Ashland, Bull Gap, Lithia Park). Pool/showers. Meal Out. |
| Tuesday, 19 June | Riding Day 3 (Old Man's/Chuck's Chips, Forest Park – Jacksonville). Pool or River swim/bathe. |
| Wednesday, 20 June | Riding Day 4 (Mt Ashland, Time Warp, Lithia Park). Pool/showers. Meal Out. |
| Thursday, 21 June | Pack up base camp. Caravan home. |

**COST: $300** (for unaccompanied minors).

# PACKING LISTS

| BIKE |
|---|
| **Cross-Country Mountain Bike.**  While some of our riding will be predominantly downhill, there is plenty of pedaling and climbing involved in our planned routes and our transportation from camp to swimming holes, etc.  **A downhill-specific mountain bike is not appropriate for this trip.**  Bike must be in good working order – our planned routes are in remote and rugged forestland.  Mechanical issues could result in a **very** long hike and can significantly affect the entire group.  Recommend a full suspension bike with disc brakes and quick release adjustable seat-post.  Generally recommend against rigid bikes, cantilever brakes, or wheel sizes smaller than 26 inches. |
| **Backpack.**  Comfortable to ride with.  Highly recommend a Camelback style hydration pack with storage space for snacks/tubes/light jacket.  Waist and sternum straps are helpful. |
| **Hydration.**  2 liters (hydration system bladder or individual water bottles). |
| **(2) Spare Tubes.**  Appropriate size for your rims/tires.  Carry one on bike/in pack.  Keep one in camp. |
| **Cycling Shorts.**  Highly recommend padded shorts for our 4 consecutive days in the saddle.  One pair is sufficient, as we will end each ride with a swim and can clean them that way.  A second pair is an optional nicety. |
| Helmet (Might consider a convertible full face helmet for this terrain) |

| | | |
|---|---|---|
| Knee pads (encouraged) | Shoes for cycling (ensure shoe/ pedal combination provides good traction) | Socks for cycling (4 pair) |
| Cycling gloves (recommend full finger) | Lightweight windbreaker/jacket in case of inclement weather | Small headlamp for handlebars or helmet |

| CAMP | | |
|---|---|---|
| Sleeping bag | Shoes for short hikes/scrambles | Shorts (2 pr) |
| Long pants for camp (1 pr) | Sweater/sweatshirt | Underwear (4 pr) |
| Swim trunks | Towel | T-shirts (4) |
| Hat (sun protection) | Headlamp or flashlight (bike light ok) | Extra batteries for light |
| Toothbrush | Deodorant | Other personal hygiene needs |
| Camera (optional) | Pillow (optional) | $40 for two dinners out |
| Camping cup (suggest insulated commuter style with lid) | Camp Chair | |

| OPTIONAL | | |
|---|---|---|
| Sunglasses / clear glasses | Cash for any unexpected bike repairs/parts in town, souvenirs | Tools or parts specific to your bike |
| Trail size bike pump | Patch kit | Personal sleeping pad |
| Personal tent | Sandals | Additional protective gear |

**Contact:**  For questions, further details, or to reserve a spot, please contact the trip coordinator:

**David Kissner**
760.214.7144    DMKissner@hotmail.com
https://dmkissner.wixsite.com/adventure

These activities are *NOT sponsored by Loma Prieta Joint Union Elementary School District.*



PL000914

# Exhibit E

PL000915

# Mountain Biking Club *2017-2018*

RSVP to David Kissner at 760.214.7144 or DMKissner@hotmail.com



Carpools meeting at Mountain Bible Church
on Summit Rd at 8:15 on Saturdays. Meet at ride start at 9am.
Coordinating instructions to be provided by email the week
before the ride.  Please RSVP whether carpooling or not.

| | |
|---|---|
| 16 September | **UC Santa Cruz Loop**<br>(Lunch in town afterwards) |
| 21 October | **Skyline / Saratoga Gap**<br>(Nachos and root-beer floats at the Gap afterwards) |
| 4 November | **Wilder Ranch**<br>(Lunch in town afterwards) |
| 9 December | **Demonstration Forest**<br>(Flow Trail Loop – pack a lunch) |
| 20 January | **UC Santa Cruz Loop (with possible Wilder extension)**<br>(Lunch in town afterwards) |
| 10 February | **Demonstration Forest**<br>(Flow Trail Loop – pack a lunch) |
| 17 March | **Skeggs Point (Skyline Rd, Corte de Madera Open Space)**<br>(Pack a Lunch) |
| 21 April | **Saratoga Gap to Lakeside Elementary**<br>(Shuttled Ride) |
| 19 May | **Demonstration Forest to Aptos**<br>(Shuttled Ride, Lunch in town afterwards) |
| TBD Summer 2018 | **Ashland, Oregon**<br>(6 Night Camping / Mountain Biking Trip) |

*Throughout the year, there will also be numerous less formal rides on weekends or after school.  Details to be provided as those opportunities arise.*

*We (Stacy, David, Ittai, and Truckee) love to spend our free time camping and adventuring as a family enjoying God's great Creation.  We are so blessed to live in such a remarkable and diverse natural area!  We gain even greater joy by being able to share these remarkable experiences with others, and we hope that your child – or your whole family - will be able to join us.  This is my 10th year organizing and leading trips for youth and families into the deserts, mountains, national parks, and mountain biking trails of the Western U.S.  We hope to reflect, in some small way, the love that God has shown to us through organizing these adventures.  A highlight for me is having the opportunity to share the Good News of Jesus through engaging stories from the Bible in a setting of some of God's most magnificent creation.  Hope to see you on the trail!*

## BRING:

MOUNTAIN BIKE IN GOOD WORKING CONDITION, HELMET, SPARE TUBE, WATER (2l), SNACK, CLOTHING FOR EXPECTED WEATHER, MONEY FOR LUNCH (AS REQUIRED), GREAT ATTITUDE!

"So we are Christ's ambassadors; God is making his appeal through us. We speak for Christ when we plead, "Come back to God!" For God made Christ, who never sinned, to be the offering for our sin, so that we could be made right with God through Christ."  2 Corinthians 5:20 (NLT)

PL000916

# Mountain Biking Club Permission Slip

## Mountain Biking Activities September 2017 through May 2018

Child's Name: _____ Parent Phone Number: _____

Address: _____ City: _____ State: _____ Zip: _____

Grade:_____ School: _____ Parent email: _____

While we makes every effort to provide a safe and pleasant environment for your child, we do require that this participation agreement be read, filled out, signed and dated by the parent or legal guardian of each child under 18 years of age who wishes to participate unaccompanied in these activities.

I, the undersigned, give permission for my son or daughter to participate in the mountain biking activities occurring specifically on 16 September, 21 October, 4 November, 9 December, 20 January, 10 February, 17 March, 21 April, and 19 May, during the 2017 - 2018 school year, as well as any additionally scheduled mountain biking activities.  These activities include, but are not limited to, car ride to and from recreation areas, mountain biking, wildlife, terrain, traffic, and climate hazards, and more.  I understand that mountain biking has significant inherent risks and I grant this permission with full knowledge that I accept full responsibility for any injury or accident that may occur.  I, on behalf of myself, my children, my assigns and my estate, agree to release and hold harmless David and Stacy Kissner and other volunteers or parent participants, for any and all claims for injuries, causes of action, or liability related to my child's participation in any of these activities.

By signing this document, I acknowledge that if anyone is hurt or property damaged during my child's participation in this activity, I and/or my child may be found by a court of law to have waived any right to maintain a lawsuit against any party on the basis of any claim which has been released herein. I have had sufficient opportunity to read this entire document. I have read and understood it, and agree to be bound by its terms.

Parent Name _____ Signature_____ Date ___ / ___ / ____

Alternate Emergency Contact name and number:_____

Does your child have any severe allergies or medical conditions that may affect him or her during these activities? _____

_____

_____

PL000917

# Exhibit F

PL000918

This bus broke through the guard rail and is plummeting straight off of the bridge towards the ocean below.  It has a mass of 2000kg and falls for 3.4 seconds before hitting the water.  What is the velocity of the bus just before hitting the water?  How much kinetic energy does it have?



PL000919



PL000920



Sam and Ethan are in a small life boat 100 miles off the coast of British Columbia. ... trying to reach shore before the massive storm reaches them. ... are discussing which one should be thrown overboard to save ...

...r of the following describes the correlation between the gas that remained and the hours that ...ssed?

PL000921



PL000922

# Exhibit G

PL000923

Name: _____    Period: _____  Date: _____

# Investigating the Gender Wage Gap

## DATA ANALYSIS AND INTERPRETATION - CRITICAL THINKING ACTIVITY

In this activity, we will take a look at oft-quoted figures from studies that relate to the gender wage gap in the United States and analyze them critically. We will use what we have learned about the scientific method and controlled experiments from labs and science fair, and we will make connections to our data analysis unit earlier this year.

This activity supports the following NGSS (Next Generation Science Standards) Practices:

| | |
|---|---|
| Asking Questions and Defining Problems | Using Mathematics and Computational Thinking |
| Developing and Using Models | Constructing Explanations and Designing Solutions |
| Planning and Carrying Out Investigations | Engaging in Argument from Evidence |
| Analyzing and Interpreting Data | Obtaining, Evaluating, and Communicating Information |

**ASSESSING EXISTING KNOWLEDGE**
1. What is a gender wage gap?
   answers will vary_____
   _____

2. Approximately what is the current wage gap (in cents to the dollar)? answers will vary

3. How do you know?
   _____ answers will vary
   _____

4. Read the attached article, which was provided to 6th grade students nationwide on the topic of the gender wage gap (Scholastic Reader, March 5, 2018) and complete the graphing questions that go along with the article.

5. What does the author clearly identify as the cause of the gender wage gap?
   _____none given_____

6. What strategy does the author note that other countries have used to address the gender pay gap?
   Passing legislation that will obligate employers to prove that they pay males and females the same. Make it easier for women to sue their employers. Paycheck Fairness Act attempted since 1997.

7. By suggesting that this strategy would help address the gender pay gap in the United States, what does the author imply is the cause of the gender pay gap?
   the author implies that the gender pay gap is caused by systemic sexism and discrimination
   _____

PL000924

Various studies have found that the gender wage gap is between 77 and 80 cents to the dollar.  One statistic used frequently comes from 2012 US Census Bureau data that compares the earnings of men and women who are full-time, year-round workers (all people in the US who are 16 years old and over who usually worked 35 hours or more per week for 50 to 52 weeks in the reference period).  They found that the **median income for men was $49,398 and for women was $37,791.**

8.  Find the percent (cents to the dollar) that women made for every dollar that men made in 2012 to the nearest tenth of a percent.

_____76.5%_____

For those who are studying the gender wage gap and use these figures to support their findings,

9.  What is their Manipulated variable (MV)? _____Gender_____

10. What is their Responding Variable (RV)? _____Income_____

11. What are their Controlled Variables (CVs)? All people in the US (sample), age (16 and over), full time (35 hrs or more per week), year-round (50-52 weeks per year)
_____
_____

12. Do you feel as though this is a well-controlled study?  Why or why not?
answers will vary.  This is not well controlled based on failing to control for a wide number of variables.
_____

13. What other controlled variables would you suggest be included to make for more accurate results?
OCCUPATION CHOICE, EDUCATION LEVEL, POSITION, HOURS PER WEEK, LONGEVITY IN POSITION, WILLINGNESS TO RELOCATE TO HIGHER PAYING CITIES, WHETHER OR NOT THEY SEEK HIGHER PAYING SPECIALTIES, GRADES/AGE TAUGHT (TEACHERS), FLEXIBLE HOURS, OVERTIME, HOURS WORKED, SINGLE/MARRIED, CHILDREN, INTERRUPTIONS IN CAREER, DANGER OF JOB, ETC


In President Barack Obama's re-election campaign in 2012, he claimed that "Women (are) paid 77 cents on the dollar for doing the same work as men." Politifact rated that statement as "Mostly False." (Politifact, 15 July, 2015).  Let's find out why.

PL000925

Not everyone believes that research has provided any evidence for a gender wage gap based on discrimination or sexism. In fact, many studies have been able to show that when factors of individual career choices that men and women take are accounted for, the gender wage gap all but disappears. While it is impossible to control for every possible variable in career choice, employment, and income, some studies have attempted to use a lot more than the US Census Bureau Data mentioned previously.

Payscale, a website providing data on salary, benefits, and compensation information, provides these two graphics, showing the uncontrolled wage gap and an additional controlled wage gap, which accounts for job type, education level, and longevity in a specific job, among other factors.



Payscale also breaks down data for some specific professions, controlling for a number of additional variables:



A 2009 U.S. Department of Labor paper that examined more than 50 peer-reviewed studies came to the "unambiguous conclusion that the differences in the compensation of men and women are the result of a multitude of factors and that the raw wage gap should not be used as the basis to justify corrective action. Indeed, there may be nothing to correct. The differences in raw wages may be almost entirely the result of the individual choices being made by both male and female workers." Now that we have seen how controlling for a number of variables has all but eliminated the gender pay gap, let's investigate some of these choices individually.

PL000926

**Career Choice.** Georgetown University completed a study that compiled data on the best and worst paying college majors and the percent of men and women choosing to major in each of those fields. (The Economic Value of College Majors, 2015).

Below is a table of the best paying college majors, along with the number of men out of a group of 500 graduates in those majors. Complete the table by finding the missing percentages.

| CHOICE OF MAJOR | # MEN OUT OF EVERY 500 GRADUATES | % MEN |
|---|---|---|
| Petroleum Engineering | 435 | 87 |
| Pharmaceutical Science | 240 | 48 |
| Math / Computer Science | 335 | 67 |
| Aerospace Engineering | 440 | 88 |
| Chemical Engineering | 360 | 72 |

Calculate the average representation of men in the five highest paying college choices: _____72.4_____

Below is a table of the worst paying college majors, along with the number of women out of a group of 500 graduates in those majors. Complete the table by finding the missing percentages.

| CHOICE OF MAJOR | # WOMEN OUT OF EVERY 500 GRADUATES | % WOMEN |
|---|---|---|
| Counseling / Psychology | 370 | 74 |
| Early Childhood Education | 485 | 97 |
| Theology / Religious Vocations | 330 | 66 |
| Human Services / Community Organization | 405 | 81 |
| Social Work | 440 | 88 |

Calculate the average representation of women in the five lowest paying college choices: _____81.2_____

What do you notice about the career choices that men and women make in their college majors? How might this contribute to the uncontrolled gender wage gap?

Men are significantly overrepresented in higher paying career choices.
Women are significantly overrepresented in lower paying career choices.
The career choices that men and women make lead to a gender wage gap.

What are some things that you think might lead men and women to make these different career choices?

_____Answers will vary_____

_____

_____

_____

_____

**PL000927**

We can also see that the pay in some professions grows at different rates. Here are several common careers that men and women choose and their wages and growth rates (under 5 yrs experience and 20-25 yrs experience) (Payscale):





What do you notice about the growth rate for pay in the various careers that men and women commonly pick? How might these factors affect the uncontrolled gender wage gap?

Women disproportionally choose careers that have slower income growth rates, which will add to the gender wage gap.

**Flexibility.** "The highest-paying jobs disproportionately reward those who can work the longest, least flexible hours" (Vox, Sept8, 2017). Many jobs require that the employee work certain hours, be on call in evenings and weekends, and be personally responsive to clients or patients at specific and sometimes unpredictable times. These types of jobs are difficult for someone who has caretaker responsibilities at home – for a child, elderly or ill family member.

In 2015, the PEW Research Center surveyed households where both parents work. They asked the following three questions. Complete the percent bar model to graphically depict how responsibilities are shared in these households.

A.  **Who does the work of managing your children's schedules and activities?**

Mother does more: 54%      Father does more: 6%      Share Equally: 40%

B.  **Who takes care of the kids when they're sick?**

Mother does more: 47%      Father does more: 6%      Share Equally: 47%

C.  **Who is responsible for the majority of chores and household responsibilities?**

Mother does more: 31%      Father does more: 9%      Share Equally: 60%

Why do you think that women take on the majority of the child-rearing and household managing responsibilities?

_____Answers will Vary_____

Do you think that there is a connection between performance and wages in certain jobs with inflexible hours and having caretaker responsibilities? Why or why not? If so, how might this affect the overall uncontrolled gender wage gap?

Workers with inflexible hours will not be as successful in higher paying jobs that require rigid or unpredictable hours. Women are disproportionally responsible for the care of children.

PL000929

Scientists tend to have small wage gaps. Lawyers have big ones. Why do you think that might be?

> Scientists tend to have very flexible hours — lab work, etc can be done on flexible hours. Lawyers have demanding hours mostly during the 9-5 work day and must meet personally with specific clients and sometimes with irregular hours. Caretakers will be better suited for the flexible scientist job.

**Interruptions to Career.** It has been shown that interruptions to a career can have lasting impacts on income. For example, a lawyer taking one year off could make 8.4% less over the course of their career. The wage gap between college educated men and women tends to increase significantly in their 30s and 40s, before narrowing in their 50s and 60s. Why do you think this is?

> College educated women start to have and raise children in their 30s.

CBS Moneywatch Steve Tobak summarized "highly acclaimed career expert and best-selling author," Marty Nemko in the following article (March 8, 2011).

"The data is clear that for the same work men and women are paid roughly the same.

**Men are far more likely to choose careers that are more dangerous,** so they naturally pay more. Top 10 most dangerous jobs (from the U.S. Bureau of Labor Statistics): Fishers, loggers, aircraft pilots, farmers and ranchers, roofers, iron and steel workers, refuse and recyclable material collectors, industrial machinery installation and repair, truck drivers, construction laborers. They're all male-dominated jobs.

**Men are far more likely to work in higher-paying fields and occupations (by choice).** According to the White House report, "In 2009, only 7 percent of female professionals were employed in the relatively high paying computer and engineering fields, compared with 38 percent of male professionals." Professional women, on the other hand, are far more prevalent "in the relatively low-paying education and health care occupations."

**Men are far more likely to take work in uncomfortable, isolated, and undesirable locations** that pay more.

**Men work longer hours than women do.** The average fulltime working man works 6 hours per week or 15 percent *longer* than the average fulltime working woman.

**Men are more likely to take jobs that require work on weekends and evenings** and therefore pay more.

**Even within the same career category, men are more likely to pursue high-stress and higher-paid areas of specialization.** For example, within the medical profession, men gravitate to relatively high-stress and high-paying areas of specialization, like surgery, while women are more likely to pursue relatively lower-paid areas of specialization like pediatrician or dentist.

**Despite all of the above, unmarried women who've never had a child actually *earn more* than unmarried men,** according to Nemko and data compiled from the Census Bureau.

**Women business owners make less than half of what male business owners make,** which, since they have no boss, means it's independent of discrimination. The reason for the disparity, according to a Rochester Institute of Technology study, is that money is the primary motivator for 76% of men versus only 29% of women. Women place a higher premium on shorter work weeks, proximity to home, fulfillment, autonomy, and safety, according to Nemko.

It's hard to argue with Nemko's position which, simply put, is this: When women make the same career choices as men, they earn the same amount as men.

PL000930

How would you describe the gender wage gap, as you see it, in the U.S. at this time?

_____ answers will vary _____

_____

_____

The topic of a gender wage gap is a politically loaded one.  Who do you think are the people who are most interested in describing the gender wage gap as a large one based on discrimination and sexism, and what might be their motive?

_____ answers will vary _____

_____

_____

Who are the people who are interested in describing the gender wage gap as being a myth, and what might be their motive?

_____ answers will vary _____

_____

_____

Earlier this year, we learned about types of false correlation, including reverse correlation, random correlation, and 3rd factor correlation.  What type of false correlation might make a person conclude that the wage gap is based on gender?  Explain.

_____ 3rd Factor Correlation.  Multiple external factors cause the wage disparity _____

_____

_____

References and for more reading:

https://www.vox.com/2017/9/8/16268362/gender-wage-gap-explained

http://www.politifact.com/truth-o-meter/article/2015/jul/15/politifact-sheet-gender-pay-gap/

https://cdn-payscale.com/content/PS_Gender_Infographic_972.png

https://cew.georgetown.edu/cew-reports/valueofcollegemajors/

https://www.nationalreview.com/2017/04/equal-pay-day-feminist-rhetoric-women-high-pressure-jobs/

https://www.cbsnews.com/news/the-gender-pay-gap-is-a-complete-myth/

https://www.payscale.com/data-packages/gender-pay-gap

https://www.census.gov/prod/2013pubs/p60-245.pdf

# Exhibit H

PL000932

██████████

| | |
|---|---|
| **From:** | d.arnold@loma.k12.ca.us |
| **Sent:** | Monday, May 14, 2018 11:10 AM |
| **To:** | Patricia Elliot |
| **Subject:** | Fw: Confidential email |

Hi Patti,

Below is an email I received on my personal account. █████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

Thanks,
Deana

---

**From:** Deana Arnold <darnold@mac.com>
**Sent:** Monday, May 7, 2018 6:42 AM
**To:** d.arnold@loma.k12.ca.us
**Subject:** Fwd:

Begin forwarded message:

**From:** Ruth Van Sciver <ruthvansciver@gmail.com>
**Subject:** Re:
**Date:** May 6, 2018 at 10:56:39 PM PDT
**To:** "Camilla Van Voorhees, MD" <cvanvoorhees@2pi.org>, Vanessa Weiss
<vw1869@dexyp.com>, Anne Moelgaard <anne.molgaard@gmail.com>, Susan Cox
<susan@scox.com>, Doniell Hillegas <1doniell08@gmail.com>, Jason Van Sciver
<urthrmr@gmail.com>, Kerstin Nelson <zayantemom@yahoo.com>, Deana Arnold
<darnold@mac.com>, Tony Arias <t.arias@loma.k12.ca.us>, Crickett Stephens
<stephens_family@verizon.net>

Here are email addresses that I used
darnold@mac.com
stephens_family@verizon.net
c.kidwell@loma.k12.ca.us
r.carino@loma.k12.ca.us
t.arias@loma.k12.ca.us
board@loma.k12.ca.us

bcc.

1.

PL000933

dmkissner@hotmail.com

On Sun, May 6, 2018 at 9:54 PM, Ruth Van Sciver <ruthvansciver@gmail.com> wrote:

---------- Forwarded message ----------
From: David Kissner <dmkissner@hotmail.com>
Date: Sun, May 6, 2018 at 9:44 PM
Subject: Fwd:
To: David Kissner <dmkissner@hotmail.com>

**Subject:** Support Mr. Kissner--Our voices are stronger together!

Hi Everyone,

This email group is intended to bring together the families who support Mr. Kissner **so we can act together** to get our children's teacher back. You are included here as you have expressed interest in supporting Mr. Kissner. If you do not want to be included, please let me know and I will remove you from any further communications. If you know of additional families that would like to be included, let me know and/or forward. Please do not "Reply All" unnecessarily:-)

**Mr. Kissner was involuntarily placed on leave on May 1.** It is generally understood that Mr. Kissner did not choose take a leave of absence but rather the leave was imposed on him by the District. There is a lot of concern that his removal is a direct result of the March walkout debacle. For those of you unfamiliar with the full scope of the events related to the March walkout, there are links below to the news articles and related events.

**Without question, our children have been greatly impacted by his removal from the classroom.** Last week, our kids had multiple *unqualified* substitutes coming in to teach their math and science classes (art teacher teaching science, english teacher teaching math, subs coming late and unprepared to teach these difficult subjects). As it stands now, the district has secured 2 substitute teachers to cover Mr. Kissner's classes through the end of the year. These substitutes will be alternating days so that our kids will not have continuity in the classroom. I do not know the qualifications of one of the teachers (Ms. Samaan) to teach math and science, but I do know that the other substitute, Ms. Nora Kim (a well-respected CTE parent with an engineering background), is not a trained educator but rather is coming in with an "emergency credential" that anyone with a college degree can get. She has no training to teach math and science. Clearly, this is not "quality education" as promised by our soon to be departed Superintendent in her May 2 email.

**The Board of Trustees won't give us answers.** Yesterday about 10 families attended the public comment session of the Board of Trustees meeting to express their concerns about Mr. Kissner's unexplained removal. The Board President made it very clear that there is an ongoing investigation and they can't provide answers at this time. A reporter from the SJ Mercury News was present and published the following article: https://bayareane.ws/2rsTQEH

2

PL000934

**The Superintendent is AWOL.** By all accounts, Corey is nowhere to be seen, believed to be in Colorado. Mr. Arias is supervising/coordinating the substitutes.

**We need to take action and get Mr. Kissner back!** If you haven't done so already, please send emails expressing your concerns to all of the following: Cory (c.kidwell@loma.k12.ca.us), Rebecca (r.carino@loma.k12.ca.us), Tony (t.arias@loma.k12.ca.us), Board of Trustees (board@loma.k12.ca.us). My kids have written letters as well so if yours have something to say, please have them write as well!

We have not formulated a specific plan of action but we know we need to act together to make a greater impact. My family is planning to make**signs** tomorrow afternoon with the Jones/Turkalj family. These signs will be placed along Summit Road for Monday morning (Keep Kissner; Excellent Education Requires Excellent Teachers--Bring Kissner Back). If you are interested in coming over to help in the effort, let me know and we will get enough supplies. We would encourage you to make your own signs at home as well.

**Student Voices Matter!** On Monday, Marcella Jones (8th grade) and Rachel Stephens (6th grade) will have stickers available for the kids to wear requesting the return of their teacher. This is intended as a quiet yet powerful protest by the people most affected and cannot result in any repercussions from the administration so long as they do not disrupt class. We would like to also get a 7th grader involved in distributing the stickers so let me know if your 7th grader can help.

**Messages to Mr. Kissner** If you or your child would like to contact Mr. Kissner, he can be reached at his personal email address: dmkissner@hotmail.com He no longer has access to his Loma email address.

There are a lot of rumors swirling through our community about what's happening and why. If you want to share your personal comments, thoughts, stories, fact-based rumors or reliable hearsay, please go here: https://bit.ly/2FMvxyi . You will receive a separate email granting access. I know most of you have a lot to say and we all want to hear it but I think everyone will better appreciate the comments at their leisure and not in their inbox:-) If you have problems accessing, please contact Malaina at creativemalaina@gmail.com.

We are hopeful that together we can bring back this outstanding teacher, mentor, coach, and overall valued member of our community.

Sincerely,
Mike and Crickett Stephens

Links:
News article and video regarding walkout where Richard Gerwe complains to media about his daughter getting an F after leaving class during Pi quiz to participate in walkout:
https://bit.ly/2rI2VI6

Mr. Kissner's response to Richard Gerwe's accusations and District's inconsistent policy concerning the walkout:
http://disq.us/p/1rk3mtl

PL000935

Letter written to Corey by attorney about how the District acted illegally in supporting walkout:
https://bit.ly/2FKpXws

--
Regards,

Ruth Van Sciver

--
Regards,

Ruth Van Sciver

PL000936

EXHIBIT 5

PL000937



**Loma Prieta**

JOINT UNION SCHOOL DISTRICT

*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101    Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Corey Q. Kidwell, Superintendent/Principal*
*Rebecca Carino, Assistant Principal/Curriculum Coordinator*

PERSONAL AND CONFIDENTIAL

April 30, 2018

David Kissner
25059 Skyland Road
Los Gatos, CA  95033

Dear David:

I am writing to provide you with formal notice that the District has been made aware that you may have engaged in conduct that violates the District's policies and procedures with respect to your interactions with minors. The District takes such allegations seriously and is adding these issues into the already pending investigation. The investigator will be contacting you shortly to schedule a time to meet to allow you to respond to the allegations.

In conducting investigations the District will, to the extent reasonably possible, protect the confidentiality of information provided to the District. The District cannot guarantee complete confidentiality, because it cannot conduct an effective investigation without revealing certain information to the alleged victim(s) and potential witnesses. This obligation of confidentiality applies to you, as well. You have an obligation to maintain the confidentiality of both the fact of and information concerning an investigation, and to not disclose such information to others, including employees, parents, and students of the District (with the exception of Patricia Elliott, Board President Deana Arnold, and your representative should you elect to have one). Violations of this policy may result in appropriate disciplinary action.

While these concerns are being investigated, the District is placing you on paid administrative leave effective May 1, pending the completion of the investigation. You will continue to receive full pay and benefits during this time; however, you have been relieved of your duties during this period unless otherwise notified by Corey Kidwell, Superintendent, or me.  Furthermore, effective immediately, unless otherwise directed by me or Mrs. Kidwell, you are directed not to go to the District or any other District site. Although you are on administrative leave, you are to remain available to be contacted by

*Board of Trustees:*
*Deana A. Arnold, President    Shannon Hickok, Vice-President*
*Ron Bourque, Member    Marco V. Menéndez, Member    Kerrie Mills, Member*

David Kissner letter
Dated April 30, 2018
Page 2 of 2

the District during regular work hours, which is between 8 a.m. and 4 p.m., Monday through Friday, and must be available to meet in person within two hours of phone contact. To that end, please provide me with a telephone number either at home or cellular where you may be reached.

As we move through this process, please understand the District prohibits and will not tolerate retaliation against individuals for filing a complaint or participating in the investigation of a complaint. Failure to comply with this policy will result in the District taking appropriate disciplinary action.

Sincerely,

Rebecca Carino
Assistant Principal/Curriculum Coordinator

EXHIBIT 6

PL000940

On Sun, May 6, 2018 at 9:54 PM, Ruth Van Sciver <ruthvansciver@gmail.com> wrote:

---------- Forwarded message ----------
From: David Kissner <dmkissner@hotmail.com>
Date: Sun, May 6, 2018 at 9:44 PM
Subject: Fwd:
To: David Kissner <djmkissner@hotmail.com>

**Subject:** Support Mr. Kissner--Our voices are stronger together!

Hi Everyone,

This email group is intended to bring together the families who support Mr. Kissner so we can act together to get our children's teacher back. You are included here as you have expressed interest in supporting Mr. Kissner. If you do not want to be included, please let me know and I will remove you from any further communications. If you know of additional families that would like to be included, let me know and/or forward. Please do not "Reply All" unnecessarily:-)

**Mr. Kissner was involuntarily placed on leave on May 1.** It is generally understood that Mr. Kissner did not choose take a leave of absence but rather the leave was imposed on him by the District. There is a lot of concern that his removal is a direct result of the March walkout debacle. For those of you unfamiliar with the full scope of the events related to the March walkout, there are links below to the news articles and related events.

**Without question, our children have been greatly impacted by his removal from the classroom.** Last week, our kids had multiple *unqualified* substitutes coming in to teach their math and science classes (art teacher teaching science, english teacher teaching math, subs coming late and unprepared to teach these difficult subjects). As it stands now, the district has secured 2 substitute teachers to cover Mr. Kissner's classes through the end of the year. These substitutes will be alternating days so that our kids will not have continuity in the classroom. I do not know the qualifications of one of the teachers (Ms. Samaan) to teach math and science, but I do know that the other substitute, Ms. Nora Kim (a well-respected CTE parent with an engineering background), is not a trained educator but rather is coming in with an "emergency credential" that anyone with a college degree can get. She has no training to teach math and science. Clearly, this is not "quality education" as promised by our soon to be departed Superintendent in her May 2 email.

**The Board of Trustees won't give us answers.** Yesterday about 10 families attended the public comment session of the Board of Trustees meeting to express their concerns about Mr. Kissner's unexplained removal. The Board President made it very clear that there is an ongoing investigation and they can't provide answers at this time. A reporter from the SJ Mercury News was present and published the following article:  https://bayareane.ws/2r8T9QEH

2

dmkissner@hotmail.com

**The Superintendent is AWOL.** By all accounts, Corey is nowhere to be seen, believed to be in Colorado. Mr. Arias is supervising/coordinating the substitutes.

**We need to take action and get Mr. Klassner back!** If you haven't done so already, please send emails expressing your concerns to all of the following: Cory (c.kidwell@loma.k12.ca.us), Rebecca (r.castano@loma.k12.ca.us), Tony (.arias@loma.k12.ca.us), Board of Trustees (board@loma.k12.ca.us). My kids have written letters as well so if yours have something to say, please have them write them as well!

We have not formulated a specific plan of action but we know we need to act together to make a greater impact. My family is planning to make signs tomorrow afternoon with the Jones/Turkali family. These signs will be placed along Summit Road for Monday morning (Keep Klassner! Excellent Education Requires Excellent Teachers--Bring Klassner Back). If you are interested in coming over to help in the effort, let me know and we will get enough supplies. We would encourage you to make your own signs at home as well.

**Student Voices Matter!** On Monday, Marcella Jones (8th grade) and Rachel Stephens (6th grade) will have stickers available for the kids to wear requesting the return of their teacher. This is intended as a quiet yet powerful protest by the people most affected and cannot result in any repercussions from the administration so long as they do not disrupt class. We would like to also get a 7th grader involved in distributing the stickers so let me know if your 7th grader can help.

**Messages to Mr. Klassner:** If you or your child would like to contact Mr. Klassner, he can be reached at his personal email address: dmklassner@hotmail.com He no longer has access to his Loma email address.

There are a lot of rumors swirling through our community about what's happening and why. If you want to share your personal comments, thoughts, stories, fact-based rumors or reliable hearsay, please go here: https://bit.ly/2FMvxyl . You will receive a separate email granting access. I know most of you have a lot to say and we all want to hear it but I think everyone will better appreciate the comments at their leisure and not in their inbox :-) If you have problems accessing, please contact Malaina at creativemalaina@gmail.com.

We are hopeful that together we can bring back this outstanding teacher, mentor, coach, and overall valued member of our community.

Sincerely,
Mike and Cricket Stephens

Links:
News article and video regarding walkout where Richard Gerwe complains to media about his daughter getting an F after leaving class during PI quiz to participate in walkout:
https://bit.ly/2If2VI6

Mr. Klassner's response to Richard Gerwe's accusations and District's inconsistent policy concerning the walkout:
http://cdes.us/p/TrK8mtl

3

PL000942

Letter written to Corey by attorney about how the District acted illegally in supporting walkout:
https://bit.ly/2FKpXws

--
Regards,

Ruth Van Sciver

--
Regards,

Ruth Van Sciver

EXHIBIT 7

PL000944



*Loma Prieta*
JOINT UNION SCHOOL DISTRICT

*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101     Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Karren Zook, Principal*

To:     David Kissner
From:   Lisa Fraser, Superintendent  *L. Fraser*
Date:   March 31, 2020
Subj:   Warning of Unprofessional Conduct

On November 8, 2019, I was contacted by a parent of a student in your 8th grade Science class concerned about a discriminatory comment you allegedly made in the presence of several students in your classroom. The two students were joking with one another. Student A was laughing at Student B's skinny arms in a lighthearted fashion. Student B then turned to you, again joking around, and stated that "Student A is bullying me," to which you replied, "You should make fun of his slitty eyes." It should be noted that Student A is of Asian descent.

By request, I met with Student B's Mom the following week, wherein she recounted the incident above and expressed concern for the impact your discriminatory comment may have had on both her son and his friend. She indicated she had shared this information with Student A's parent who acknowledged that the comment was inappropriate but was concerned about possible negative repercussions for her son should she make a formal complaint.

In accordance with BP 1312.3 – Uniform Complaint Procedures, and given the complaint included allegations of discrimination, I met with Student A's parent on December 2, 2019 to discuss the complaint, the complaint process, and to ascertain the well-being of the student. The parent acknowledged the inappropriateness of your discriminatory comment but expressed that she was not sure she wanted to make waves or file a formal complaint due to the very close relationship her son has with you, his teacher and coach. She indicated she would discuss the situation with her husband and her son and would get back to me promptly.

I met with Student A's parent again on December 3, 2019. She said her husband was unwilling to make a complaint and did not want his son talked to, but she confirmed that the discriminatory comment had been made. Student A's parents agreed it shouldn't have been said, but they did not wish to make a formal complaint. As such, I indicated I would proceed with the fact-finding process absent their participation. She understood that I would still be meeting with you based upon Student B's parent's

*Board of Trustees:*
*Deana A. Arnold, President     Kerrie Mills, Vice-President*
*Ben Abeln, Member     Ron Bourque, Member     Alex Hall, Member*

PL000945

complaint. A follow-up meeting with Student B and his parent(s) was scheduled for December 10, 2019. The meeting was cancelled by the parent(s) due to extenuating circumstances within the family.

On December 20, 2019, I requested an opportunity to meet with you regarding the complaint noted above such that I could hear your accounting of the events. In an email sent on January 6, 2020, you stated that you were not willing to meet with me for this purpose. I shared that as an employee of the district, you have a duty to cooperate with the fact-finding process and I scheduled a time for you, Staci Ljepava and I to meet on Thursday, February 13, 2020 at 2:00 p.m. You were additionally advised of your right to bring representation with you if you preferred. On February 11, 2020, you stated via email that you would not be attending this meeting.

Due to extenuating family circumstances, student privacy issues, and the employee's unwillingness to fully cooperate with the fact-finding process, it has not been practicable to complete the fact-finding process within customary timelines.

Nevertheless, based upon the information provided by both Student A and Student B, on November 4, 2019, which has not been refuted by you, I have concluded that you made a discriminatory comment in the presence of two students during your 8th grade science class. Your conduct violates the provisions of BP 4119.21 -- Professional Standards, which states that engaging in discriminatory behavior towards students represents inappropriate professional conduct.

Your conduct negatively impacted the safety and well-being of students inasmuch as the students were subjected to unprofessional, discriminatory comments within the classroom setting. You have an obligation to model professional behavior and to maintain a positive classroom learning environment at all times.

Effective immediately, you are directed to stop this conduct. Failure to do so will result in further corrective action up to and including a second letter of reprimand. It should also be noted that acts of discrimination are a violation of state and federal law and may be subject to more formal Uniform Complaint procedures. If you have any questions about these directives, please contact me.

A copy of this document will be placed in your personnel file after 10 days. You may prepare a response and have that response attached to this document.

3 April, 2020

From:   David Kissner, Teacher, CT English Middle School
To:     Lisa Fraser, Superintendent, Loma Prieta Joint Union School District
CC:     Board of Trustees, Loma Prieta Joint Union School District

Subject: RESPONSE TO LETTER DATED 31 MARCH, 2020

1. The following is submitted as a response to the letter which is to be placed in my file, dated 31 March, 2020.

2. The description of the incident in question is factually inaccurate.

3. As noted separately, Superintendent Fraser demonstrated a lack of regard for our Collective Bargaining Agreement in that she received a parent complaint and did not notify me for over 6 weeks while she secretly investigated the matter. This is not the first time this has happened.

4. Superintendent Fraser did not have the benefit of hearing from me on this matter because I refused to participate in her inquiry. I will not participate in any inquiry of any sort conducted by this district because of how the last inquiry was handled, and until the following issues are addressed:

   a. Following the walkout controversy of 2018, I was lied to about the nature of the "facilitation" that I agreed to. *(The district instead launched a secretive and invasive investigation).*

   b. The underlying premise for agreeing to the facilitation/investigation turned out to have been a lie *(student grades were supposed to be "no-grade," instead, they were secretly and artificially inflated).*

   c. I was lied to about the investigation concluding. *(I, the community, and the media were all told that the investigation had concluded – this was a lie. I was brought back into the classroom whilst still being investigated secretly).*

   d. I was lied to about the scope of the investigation. *(The district-hired investigator investigated irrelevant and inappropriate lines of questioning, such as my religious beliefs).*

   e. I was lied to about the district's willingness to share results of the investigation. *(The results of what was supposed to be a "facilitation" has been kept in complete secrecy).*

   f. I was lied to about the impartiality of the investigation.

PL000947

EXHIBIT 8

PL000948





**Loma Prieta**
JOINT UNION SCHOOL DISTRICT
*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101   Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Karren Zook, Principal*

To:     David Kissner
From:   Karren Zook, Principal
Date:   April 2, 2020
Subj:   Warning of Unsatisfactory Performance

On Friday, March 6, 2020, you were engaged in the following conduct:

> During lunchtime, a student arrived late to a lunch detention assigned by you.
> Upon reporting, she stated that you were angry and "slammed your fist on the
> table." When the student exclaimed that "it was going to be a waste of time to
> come to your room first," she reports that you said, "No shit, Claire." This
> statement was made with several other students in the room.

On Friday, March 9, 2020, I received notice of the above incident. On Tuesday, March
10, 2020, I requested to meet with you on Friday, March 13, 2020 at 2:00 p.m. to discuss
the incident. On Thursday, March 12, 2020, you replied via email, "Hi Karren, I'm sorry,
but I will not be able to meet. Thanks, David."

On Friday, March 13, 2020, I sent the following clarifying email: "Please clarify, are you
unable to make this meeting time, if so, I can reschedule, or are you unwilling to meet
regarding this topic?" You responded the same day stating, "Hi Karen, I am not willing to
meet regarding this topic. Thanks, David."

On Monday, March 9, 2020, a student present during the March 6, 2020 lunchtime
interaction, was interviewed and confirmed that you used profanity directed at the student
assigned detention.

Your conduct lacked good professional judgement, which requires that you refrain from
using profane language in conversations with students. Your conduct caused
embarrassment to the student and had a negative impact on the student's sense of safety
in your classroom.

Effective immediately, you are to refrain from using profanity as a method of managing
student behavior. Failure to do so will result in further corrective action up to and
including a formal letter of reprimand. If you have any questions about this directive,
please contact me.

A copy of this document will be placed in your personnel file after 10 days. You may
prepare a response and have that response attached to this document.

*Board of Trustees:*
*Deana A. Arnold, President    Kerrie Mills, Vice-President*
*Ben Abeln, Member    Ron Bourque, Member    Alex Hall, Member*

**PL000949**

3 April, 2020

From:   David Kissner, Teacher, CT English Middle School
To:     Karren Zook, Loma Prieta Joint Union School District
CC:     Lisa Fraser, Superintendent, Loma Prieta Joint Union School District

Subject: RESPONSE TO LETTER DATED 2 APRIL, 2020

1. The following is submitted as a response to the letter (Warning of Unsatisfactory Performance) which is to be placed in my file, dated 2 April, 2020.

2. The description of the incident in question is factually inaccurate and lacks context.

3. Principal Zook did not have the benefit of hearing from me on this matter because I refused to meet with her to discuss it. I will not participate in any inquiry of any sort conducted by this district because of how the last inquiry was handled, and until the following issues are addressed:

    a. Following the walkout controversy of 2018, I was lied to about the nature of the "facilitation" that I agreed to. *(The district instead launched a secretive and invasive investigation).*

    b. The underlying premise for agreeing to the facilitation/investigation turned out to have been a lie (*student grades were supposed to be "no-grade," instead, they were secretly and artificially inflated*).

    c. I was lied to about the investigation concluding. (*I, the community, and the media were all told that the investigation had concluded – this was a lie. I was brought back into the classroom whilst still being investigated secretly*).

    d. I was lied to about the scope of the investigation. (*The district-hired investigator investigated irrelevant and inappropriate lines of questioning, such as my religious beliefs*).

    e. I was lied to about the district's willingness to share results of the investigation. (*The results of what was supposed to be a "facilitation" has been kept in complete secrecy*).

    f. I was lied to about the impartiality of the investigation.
        i. (*The investigator, chosen and hired by the district leadership without my input, had access to all of my emails, but no others*).
        ii. (*Pages of the investigation that I was allowed to view concluded that I was wrong and Superintendent Kidwell was in the right. Yet the district has been forced to concede that all of my concerns will be corrected for next time, completely vindicating my position in the walkout mess. This*

PL000950

*indicates a flawed, worthless, and skewed investigation.  I still have no answer as to why the report that costs tens of thousands of dollars concluded that I was in the wrong, but the superintendent has indicated that every one of my concerns will be corrected for next time.)*

g.  District leadership has made it clear on numerous occasions that they are looking for damaging information on me and will twist innocuous situations to make them appear problematic.  The district is also clearly trying to create a document trail to be used against me in the future.

h.  The district refuses to communicate directly with me about any of those issues.  *(The board and superintendent have refused multiple attempts at communication at various levels).*

David M. Kissner

EXHIBIT 9

PL000952

Thursday, February 11, 2021 at 11:15:25 AM Pacific Standard Time

**Subject:** Request for Information regarding Remote Wilderness School Camps
**Date:** Thursday, August 27, 2020 at 1:47:52 PM Pacific Daylight Time
**From:** Lisa Fraser
**To:** d.kissner@loma.k12.ca.us
**Priority:** High

Dear David,

I have been contacted by a member of our school community who expressed concern about three proposed trip(s) you may be planning for the fall. The trips were referred to as "Remote Wilderness School Camps" and the associated dates noted appear to be in conflict with regular school hours for kids and contracted hours of employment for you, which could pose a variety of complex issues if this is accurate.

Without a full description of what is being proposed, it is difficult for me to fully assess the potential liability risks involved for you personally, and for the district. At first glance, without having the benefit of specific details, your alleged activities could be unlawful and/or a violation of Public Health regulations. No later than Friday at 12:30 p.m. I am requesting that you provide a description of the proposed activities you have planned during school hours such that we can properly evaluate the legality of your proposition from a district standpoint and to provide you with advice and counsel such that you are protected from personal liability as well.

Thank you for your cooperation.

Sincerely,
Lisa Fraser
Superintendent
Loma Prieta Joint Union School District
23800 Summit Road
Los Gatos, CA 95033
408/353-1101 – p
408/353-8051 – f

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

EXHIBIT 10

PL000954

August 28, 2020

To:     David Kissner

From:  Lisa Fraser, Superintendent

Re:     Remote Wilderness School Camps

On August 27, 2020, I requested that you provide a description of your plans to conduct Remote Wilderness School Camps during your contracted work day. You responded that you do not share details of your private life with school administrators and requested clarity as to district concerns. Based upon your response please consider the following:

1]   If your planned activities during contracted  hours are "private" and/or of a personal nature then you will need to request an unpaid leave of absence for any school days impacted.

2]   If you have messaged your planned activities as being school-sponsored and supervised by you as a district employee, please note that the district has not approved nor authorized a school-sponsored trip as required in Board Policy 6153. The district will not assume liability for an unsanctioned trip. According to ASCIP, our school insurance group, you may be held personally liable for an unsanctioned trip that violates board policy.

3]   Based upon Santa Clara County Public Health Guidance and Governor Newsom's Executive Order, Santa Clara County schools are **mandated** to adhere to a full distance learning model until removed from the state's watch list. Accordingly, the LPJUSD Board of Trustees approved a School Reopening Plan for full distance learning in July. As an employee of the district, you must comply with this plan. You have no permission nor the authority to conduct an out-of-area, in-person learning cohort which violates state and public health department regulations.

4]   LPJUSD teachers were given the option of teaching from their classroom or teaching from their **home** if the home setting is an appropriate classroom setting. Teachers and staff are expected to remain in the vicinity of the school campus during remote learning, as he/she may be needed on campus for a variety of reasons during contracted hours and must be able to report to school, if requested. In a memo to all staff dated 3-17-20, teachers were directed to work remotely, but the directive also stated that **you may be asked to report at any time**. That being said, if an employee has a personal emergency that requires them to leave the area, a request for an exemption can be made. A wilderness trip during school hours would not constitute a personal emergency. As such, please be advised that you are expected to be in the vicinity of the school campus when being paid to teach remotely from home. As an aside, public school employees are declared by law to be disaster service workers and could be called

PL000955

to service at any time during this pandemic or during any other emergency. (Government Code 3100-3102)

5]      As a district teacher, you are obligated to provide an equitable learning experience for **all** of the students under your charge while employed by the district. Taking **some** students out of the state during school hours for unsanctioned learning activities that are clearly inaccessible to your other students creates a whole host of instructional inequities that the district will not endorse.

6]      If there is any fee being charged to a student, or indeed, any cost associated with any unsanctioned learning activities, then BP 4136 would come into play, as well as other potential conflict of interest laws or regulations.


In summary, please be advised that any violation(s) of LPJUSD Board Policy, regulations, and/or CA State Executive Orders could result in disciplinary action. Feel free to contact me if you have questions or need any further clarification.

PL000956

EXHIBIT 11

PL000957

From: ███████████████████████████
Subject: Concern
Date: September 8, 2020 at 7:42 PM
To: Billy Martin b.martin@loma.k12.ca.us

Hi Dr. Martin,

I attended your Cohort 1 CTE call today. Thank you for hosting this.  I asked the question about this Math Support help sent today by David Kissner  (full email below) " B) There is a new community initiative with volunteers ready and anxious to help your child in math with an <u>online after school homework center</u>.  Starts at 4 today and offers grade-specific help 1-4 times per week, depending on the grade/subject. Students can complete their homework there – live – while support is on hand, they can check-in briefly for a quick question, or they can get remedial help on missing skill-sets."

While I appreciate the sentiment and support, I am concerned by your response to my question as principal that this is not a school sanctioned group.  This email from Kissner went out not only to me as a parent,  but it also went directly to my 11 year old son on his school gmail account.  I don't know anything about this group, who it is run by, and even if these people are vetted.  I don't want my child being invited to a non-sanctioned school outlet via their school account, however well intended.

I am concerned about this as school policy.

Thanks for clarifying or changing this.

Thanks- ████

████████████████████████

"*We cannot play ostrich. Democracy cannot flourish amid fear. Liberty cannot bloom amid hate. Justice cannot take root amid rage. America must get to work...We must dissent from the poverty of vision and the absence of moral leadership. We must dissent because America CAN DO BETTER...Take a chance, won't you? Knock down the fences that divide. Tear apart the walls that imprison. Reach out; freedom lies just on the other side. We should have liberty for ALL.*"

*—Supreme Court Justice, Thurgood Marshall, 1992 in his acceptance of the Liberty Medal.*

Begin forwarded message:

**From:** "d.kissner@loma.ca.us" <d.kissner@loma.k12.ca.us>
**Date:** September 8, 2020 at 2:49:11 PM PDT
**To:** "d.kissner@loma.k12.ca.us" <d.kissner@loma.k12.ca.us>
**Subject: A note on grades and extra math help**

Hi All!  While I will address grading practices at this week's Back to School Night, a few questions have come up repeatedly and I want to provide some clarity on.

1. Powerschool is the actual grade record for your child, not Google Classroom.  Because certain situations have required students to submit work via email, Google Classroom will not always reflect what I currently have (although it should be close if your child is using google classroom correctly).

2. I never assign a zero unless the assignment is completely missing.  Even partial incorrect work will get some points, so as to have a record of it being submitted.

3. When you look at google classroom and see that assignments have been "submitted," please also look to see that there is something attached. It is possible (and not uncommon) for students to "submit" blank assignments into Google Classroom, and they look complete until I go and grade them and have no work to review.

4. Powerschool will always lag behind Google Classroom, because I allow time for assignments to come in before I enter grades into powerschool.

5. All assignments assigned prior to Back to School Night (this Thursday) can be made up at any time with no penalty. Beginning on Friday, there will be a ~30% penalty for unexcused late work.

Hope this is helpful from the grading perspective.

Extra help:
A) I am always willing to meet with your child in the afternoon to go over any math assignments. They can contact me to set up a time. I will also occasionally set aside Wednesdays during their class period just for this purpose.

B) There is a new community initiative with volunteers ready and anxious to help your child in math with an online after school homework center. Starts at 4 today and offers grade-specific help 1-4 times per week, depending on the grade/subject. Students can complete their homework there - live - while support is on hand, they can check-in briefly for a quick question, or they can get remedial help on missing skill-sets.

David Kissner

EXHIBIT 12

PL000960

From: d.kissner@loma.k12.ca.us
Subject: Re: MMI Clarification
Date: September 14, 2020 at 1:29 PM
To: Billy Martin b.martin@loma.k12.ca.us

**Thanks Billy,**

**Tomorrow afternoon anytime works for me - let me know.  I will sit on my overly frustrated and
sarcastic email reply for now (said frustration and sarcasm not at all directed towards you).** 😊
**David**

---

**From:** Billy Martin <b.martin@loma.k12.ca.us>
**Sent:** Monday, September 14, 2020 12:48 PM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Subject:** Re: MMI Clarification

Thanks David,

I hear and agree with your frustration. Am always happy for a phone call or zoom meet. I am tightly packed today with 1pm, 2pm, 3pm, 5:30 and
6:30 meetings already planned. Will sometime tomorrow work for you? The only time I am not available tomorrow is 1-3.

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1106—p

CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed. It
may contain information that is privileged, confidential and exempt
from disclosure under applicable law.  Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission.  If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

On Sep 14, 2020, at 12:13 PM, d.kissner@loma.k12.ca.us wrote:

Hi Billy,

I am happy to email you back with answers to your questions.  I would like to have a short meeting or
phone call at your earliest convenience - I am getting a bit frustrated now with how this is playing
out.
David

---

**From:** Billy Martin <b.martin@loma.k12.ca.us>
**Sent:** Monday, September 14, 2020 9:43 AM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Subject:** MMI Clarification

Morning David,

More MMI questions found their way to my inbox last week. Sorry to bombard you with these, but need your help so I know
how to proceed. Thanks for the help clarifying the following:

1. A parent contacted me upset that notification/advertisement was emailed to her child's school email address. Are school
provided student email addresses being shared with MMI to solicit participation in MMI? Were students notified by you or
other MMI employees/volunteers using school provided student email addresses? If so, were these targeted to specific

PL000961

students or sent out as a mass emailing to solicit participation?

2. A different parent contacted me last week concerned that promotion of MMI was being done with students during their CT class time. Is MMI being promoted by you to students during CT work day and class time? Is it announced to whole classes or to specific students?

3. A parent contacted me concerned that their student was told they do not have to attend their CT class if they are participating in the MMI program. You and I talked in person about this. I just wanted to make sure this isn't a reoccurring issue.

4. It was brought to my attention that you suggested MMI to the family of a special needs student during a recent meeting. Can you give me some details about this meeting and how it came up to suggest MMI as the support/resource for the student? In what context was it suggested? Was it suggested to the student directly or to their parents?

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1106—p

CONFIDENTIALITY NOTICE:  This electronic message is intended to be viewed only by the individual or entity to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.  Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

PL000962

EXHIBIT 13

PL000963

David,

In my previous email I requested a list of students with whom attendance at CTE has been communicated as optional or who believe participation in Mountain Math Initiative counts as attendance/participation for their CTE classes. I am unable to tell from your previous response if you are refusing to provide me the requested information or if you need additional time to do so.

Additionally, I sent a message regarding continuing our conversation about differentiation for your Math 7 students and to get your thoughts on Edgenuity as a possible solution. I am available to dialogue further about this and invite you to send me some day/time options to meet to discuss.

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1106—p

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

On Oct 8, 2020, at 4:52 PM, d.kissner@loma.k12.ca.us wrote:

Billy,

I was previously brought up to speed by the parents you met with. I might suggest that a smoother way to address any concerns would be directly with the teacher who works at the school and is the teacher of record for these students. But by continuing to avoid meeting with me to discuss how we can best serve these students, and then to be upset when I find a way to serve their needs – completely within CDE and school guidelines – is a backwards way to deal with this. Billy, as I mentioned to you the other day, a history of leaving me out of the team means that I will make some decisions in a vacuum. But those decisions will always be in the interest of what is best for kids.

1. Your email today – just four hours before this one – where you ask if I have any ideas to serve these kids, and after not addressing the needs of these students all school year, most certainly does not qualify as district leadership seeking to meet the needs of these students. To answer your previous email, YES I have an idea of how to best meet the educational needs of these students. I am currently doing just that. With absolutely no thanks at all to district leadership. Parents let me know that in your meeting earlier today you represented that you have been actively engaged in discussion with me about using different resources to serve these kids. That is not the case. To send this email "engaging with me" on the subject just 4 hours prior to this one (and after your meeting with these parents), is silly and disingenuous.

2. CDE Guidelines have been made clear to us. You have told us what the attendance policy is. I have on record several detailed emails to you and to Julie for clarification on attendance policy, without written response. We all had an attendance meeting with the entire CT staff where it was obvious that the staff was unclear on attendance. You made clear that ANY interaction with a student during the day qualifies as being present. You specifically acknowledged that this goes to the point of a student just emailing "hi" later in the day after missing a zoom meeting and completing no work. My students – ALL of my students – are accounted for in the same way. If they interact in any way, they are marked present, whether they are in the zoom meeting or not. That is the guidance you gave to the entire school. Now in this particular case, these

students are not just saying hi — they are engaging in almost 3 times as much live instruction and work than their peers. And I am most certainly marking them present.

If you would like to change how you presented your attendance policy to the entire CT staff, please feel free to do so, as long as it is within CDE guidelines as communicated and as long as it applies to everyone. And be sure that any appearance that you are changing policies to single out these kids and their parents and me, will be met with a great deal of resistance. Can you explain why you think that this particular group of kids has to abide by different attendance policies than everyone else?

3.   I am the teacher of record for these students. I am assigning them coursework that is different from the regular class. This is normal. It is the precedent at our school. It is good educational practice. It serves kids.

The school district did exactly this with this same group of kids in their 5th grade year — they attended a different class (with me), had completely different assignments, and their 5th grade teacher gave them a grade in 5th grade math. I did this last year with them. In class, they had different assignments and were graded on those, but I assigned them a grade as their 6th grade math teacher of record. Once we went to distance learning, I created an entire new section for them, and taught an additional class ON MY OWN TIME to meet the special needs of these students. And gave them a grade as their 6th grade math teacher of record.

To be very clear, the math work that these students are doing is what I AM ASSIGNING TO THEM AS THEIR 7TH GRADE CT TEACHER OF RECORD. You had brainstormed before school started that they do edgenuity. Or Khan. Or some extension activities. That is still assignments different from their peers, and I would still be grading them on their work and assigning a grade for their 7th grade math class. In this case, I have assigned them coursework that is being covered in an organized fashion following an Algebra 1 curriculum — which is appropriate for them. I am accounting for their work AS THEIR CT 7TH GRADE MATH TEACHER OF RECORD. I will give them a grade as their CT 7th grade math teacher of record.

Every student has been clearly told that they are welcome to complete the grade level classwork as well, if they so choose. But they do not have to so long as they complete the more challenging content that I have assigned. Some do. Some don't.

4.   I believe edcode is pretty straight forward: The classroom teacher assigns the grade for a student, and the administration does not get to change that grade. If you want to change the grade for a student in my class, there must be a hearing convened with parents and a principal. Parents and/or teacher can appeal to the superintendent and the board. This pretty much only happens when a parent feels that their child's grade is too low. If my students complete the work that I have assigned them and do it well, I will give them an A. You are welcome to challenge that in an edcode hearing, knowing that it will be appealed to the board — but... why would you do that?

To threaten parents that their child's coursework — which I assigned to them as their CT math teacher of record — won't count towards their 7th grade transcripts, and that the school would consider them then unqualified for a geometry course is
a) a disregard for edcode.
b) a disregard for established practices at our own district.
c) a disregard for accepted educational practices.
d) an attempt to bully and harass.
e) completely divorced from what is good for these kids.

I get that the superintendent is upset with me and the parents about the math initiative. She said no to Algebra 1 in 7th grade — even though kids from Fisher (where she was the principal) have access to this - and the community and one of her teachers found a solution, and she isn't happy. Seems to me like a pride thing, rather than a "what's good for kids" thing. She said in a previous meeting with attorneys that I was "circumventing" the algebra program. I don't understand. But how could I? I'm not included in any math-related programmatic planning meetings or discussions... So, I don't know what is going on.

If you would like to reply in writing with how anything that I am currently doing with my math students is a violation of CDE attendance policy as you have communicated clearly to the entire school, please do so. If you would like to clarify how YOUR specific alternative algebra assignments

PL000965

are ok for these kids, but MINE somehow are not, please put that into writing as well.  And definitely please explain how you think that I have somehow lost my right as a teacher – under California Law – to assign a grade to the students in my class.

If you would like to continue this conversation, I propose that we have a meeting.  I will be represented by an attorney, and I suspect that parents will be represented as well.

Your email below lists lots of things... but you know what is conspicuously missing?  Any mention of what is actually good for these kids.  It's clearly not even a consideration.  If you want to make any headway with me, maybe you could start with an explanation of how we are best serving the needs of my actual students.


David


---

**From:** Billy Martin <b.martin@loma.k12.ca.us>
**Sent:** Thursday, October 8, 2020 3:37 PM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Subject:** Update & Action Needed

Afternoon David,

I wanted to update you on a recent meeting regarding math pathways with some of the Math 7 parents. Lisa Fraser and I met with parents of Math 7 students as a continuation of the dialogue we started at the beginning of the year. This meeting was to also provide clarity regarding current attendance/participation concerns. You and I have already spoken about most of these, but want to keep you in the loop as a few new topics were brought up by parents today.

As a result of today's meeting, I made clear the following topics with parents today:
1. All students are required to attend the CTE courses in which they are enrolled following current CDE guidelines;
2. All students are required to complete the work assigned to them by their CTE teachers during the course of their CTE classes;
3. Only work and assessments assigned through the course of CTE classes may count toward grades received at CTE;
4. Students intending to enroll in Geometry 8 are still required to receive an A/A- in Math 7 as a prerequisite;
5. Mountain Math Initiative is enrichment and cannot in any way supplant/replace CTE math courses;
6. Attendance in Mountain Math Initiative does not count as attendance for a student's CTE courses;

What I need from you is a list of students with whom attendance at CTE may have been communicated as optional or who believe participation in Mountain Math Initiative counts as attendance/participation for their CTE classes. I want to make sure those families get the same message as the ones with whom I met today.

Hope all is well and thanks for the help with this,

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1106—p


CONFIDENTIALITY NOTICE:  This electronic message is intended to be viewed only by the individual or entity to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.  Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

PL000967

.

EXHIBIT 14

PL000968

David,

In my previous email I requested a list of students with whom attendance at CTE has been communicated as optional or who believe participation in Mountain Math Initiative counts as attendance/participation for their CTE classes. I am unable to tell from your previous response if you are refusing to provide me the requested information or if you need additional time to do so.

Additionally, I sent a message regarding continuing our conversation about differentiation for your Math 7 students and to get your thoughts on Edgenuity as a possible solution. I am available to dialogue further about this and invite you to send me some day/time options to meet to discuss.

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1106—p

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

On Oct 8, 2020, at 4:52 PM, d.kissner@loma.k12.ca.us wrote:

Billy,

I was previously brought up to speed by the parents you met with. I might suggest that a smoother way to address any concerns would be directly with the teacher who works at the school and is the teacher of record for these students. But by continuing to avoid meeting with me to discuss how we can best serve these students, and then to be upset when I find a way to serve their needs – completely within CDE and school guidelines – is a backwards way to deal with this. Billy, as I mentioned to you the other day, a history of leaving me out of the team means that I will make some decisions in a vacuum. But those decisions will always be in the interest of what is best for kids.

1.  Your email today – just four hours before this one – where you ask if I have any ideas to serve these kids, and after not addressing the needs of these students all school year, most certainly does not qualify as district leadership seeking to meet the needs of these students. To answer your previous email, YES I have an idea of how to best meet the educational needs of these students. I am currently doing just that. With absolutely no thanks at all to district leadership. Parents let me know that in your meeting earlier today you represented that you have been actively engaged in discussion with me about using different resources to serve these kids. That is not the case. To send this email "engaging with me" on the subject just 4 hours prior to this one (and after your meeting with these parents), is silly and disingenuous.

2.  CDE Guidelines have been made clear to us. You have told us what the attendance policy is. I have on record several detailed emails to you and to Julie for clarification on attendance policy, without written response. We all had an attendance meeting with the entire CT staff where it was obvious that the staff was unclear on attendance. You made clear that ANY interaction with a student during the day qualifies as being present. You specifically acknowledged that this goes to the point of a student just emailing "hi" later in the day after missing a zoom meeting and completing no work. My students – ALL of my students – are accounted for in the same way. If they interact in any way, they are marked present, whether they are in the zoom meeting or not. That is the guidance you gave to the entire school. Now in this particular case, these

EXHIBIT 15

PL000970

From: d.kissner@loma.k12.ca.us
Subject: Re: Update & Action Needed
Date: October 14, 2020 at 2:39 PM
To: Billy Martin  b.martin@loma.k12.ca.us

Hi Billy,

Thank you for the genuine and frank conversation today.  On further reflection, there are three proposed solutions that make the most sense to me - in order of my preference:

1. Rearranging the scheduling to group the accelerated students and the grade-level students so that they can receive instruction at a level appropriate to them within the regular school schedule.
2. Placing the 7th grade algebra students in the current 8th grade algebra classes during the same periods.
3. Adding a 6th period "elective" for students to receive algebra instruction.  They could then use the grade level math class period to complete assignments from that 6th period instruction the day before.  They should not be required to complete the grade level class also - it is not common practice to ask students to complete two math classes at one time (and is not helpful to kids), and the 7th grade pre-algebra course is completely covered by the algebra class.

A main concern that I have with the "algebra club" idea, is that it does not fit within the school schedule.  That would seem to work now, during covid distance learning.  I wonder where in the day that would fit in once school resumes?  When school or outside sports and after school activities resume (including my own volunteer wrestling coaching responsibilities), this would be problematic.

I did let the affected parents of the 20+ kids know that you and I had a constructive conversation today and that you asked me to not share any details of ideas - which I have committed to for now.  And that you are not ready to commit to a timeframe for a solution, but that you understand that it is time sensitive.  I also let them know that I passed along their pressing concerns that their children have been unjustly threatened, and that they are anxious to know that their child's grades and opportunities for geometry will not be impacted.

David

**From:** Billy Martin <b.martin@loma.k12.ca.us>
**Sent:** Wednesday, October 14, 2020 11:46 AM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Cc:** Lisa Fraser <l.fraser@loma.k12.ca.us>
**Subject:** Re: Update & Action Needed

David,

Yes, you are missing something. As was clearly communicated in the Monday Memo dated 9/31/2020, a qualifying attendance event must be completed by the end of the school day for the day the attendance is to count. A qualifying attendance event must happen within the school day; after school hours do not count toward positive attendance. The text of the Monday Memo communication is below:

# Attendance,
## Engagement & Participation
The first news on
this front is that you will continue to take attendance in PowerSchool attendance codes you always have.  You must complete your attendance for all classes, cohorts, and periods no later than 3pm each school day. Remember that positive attendance is given
to students if they meet any one of these criteria:

- Are present for any portion of a synchronous

Zoom;

- Complete any work by the end of the
  school day (2:30) on the day the work is assigned;

- Student or his/her family engage in
  any communication with any school employee (including email, phone, text, or direct
  messaging through a school learning management system).

Furthermore, I have been informed by several parents that their child has been told by you that they are not required to attend their CT math course if they are participating in Mountain Math initiative and that the work done and the grade earned for that after school enrichment course will be applied to their CT math course. This clearly indicates an intention of supplanting that after school activity for their CT math course. This is the action I need to make clear is not acceptable practice. Simply providing me your complete student roster does not provide me with the names of families who have been explicitly told their child does not have to attend your CT math course and instead can attend Mountain Math.

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1106—p

CONFIDENTIALITY NOTICE:  This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed. It
may contain information that is privileged, confidential and exempt
from disclosure under applicable law.  Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission.  If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

On Oct 13, 2020, at 11:57 AM, d.kissner@loma.k12.ca.us wrote:

Hi Billy,

I have attached a list of all of the students with whom it has been communicated that any interaction whatsoever with a teacher during that day qualifies as being present in class for attendance purposes.  This was your message to the entire CT staff at our staff meeting, 9/17.  I take attendance for all of my students in the same way.  Please let me know if I am missing something.

As you and I have discussed, I have not yet had the time to figure out edgenuity.  Happy to dialogue further with you about ways to best serve these 7th grade students.  To be clear, differentiation is a method I use to serve students at various levels and with various learning styles - within a specific set of standards.  These students are working with different standards altogether, so we will need strategies other than differentiation.

Do you have any ideas to share with me about how you think we might do this best for these motivated and talented math students?  Thanks so much in advance.

David

---

**From:** Billy Martin <b.martin@loma.k12.ca.us>
**Sent:** Tuesday, October 13, 2020 9:53 AM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Cc:** Lisa Fraser <l.fraser@loma.k12.ca.us>
**Subject:** Re: Update & Action Needed

EXHIBIT 16

PL000973

From: ███████████
Subject: **Powerschool and timely feedback is important**
Date: October 18, 2020 at 3:42 PM
To: d.kissner@loma.k12.ca.us
Cc: **Billy Martin** b.martin@loma.k12.ca.us

Mr. Kissner,

I was quite alarmed today to find my Son, █████ math grade dropping from A-/B+ all the way through C- today, on what looks to be the very last day of the quarter.  On review he has now received low marks for several assignments a full month ago because he did not show his work.  I can't be sure if the grade was previously high and was lowered today, or these were not  graded until close of quarter. I can tell you that I have been reviewing his work on powerschool every few days to make sure he kept on top of his work, and there was no sign of problems until now.

I would like to express my deepest frustration with your tardy grading efforts. Simply put, I can not do my job of making sure that ██ work is satisfactory, if you do not report problems soon enough in powerschool that I have time to do something about it.  Normally, I would not hesitate to have ██████ repeat an assignment, and I may yet still, but since it is now "too late" he will view it as a punishment rather than a honest learning effort.  Please work harder on communicating with students and parents in a timely fashion when you do not believe their work to be satisfactory.  As it stands my reluctant student will find that his policy of stall and fib to be well rewarded this quarter with as many as 5 math assignments on which he could avoid doing his best work.

Poorly donell





PL000975

EXHIBIT 17

PL000976

From: **Billy Martin** b.martin@loma.k12.ca.us
Subject: Re: Powerschool and timely feedback is important
Date: October 27, 2020 at 8:59 AM
To: d.kissner@loma.k12.ca.us

David,

I'd like to meet to discuss your reasons for being unable to stay on top of this, see what I can do to support you in your commitment to "endeavor to do better", and touch base on challenges in responding to IEP input requests that have been reported to me. Let me know when you are next available to talk.

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1106—p

CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed. It
may contain information that is privileged, confidential and exempt
from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

On Oct 18, 2020, at 3:53 PM, d.kissner@loma.k12.ca.us wrote:

Dear Ian,

I readily confess that I am tardy in migrating the work from google classroom over to powerschool. I can assure you that this is not for lack of time spent lesson planning, delivering instruction, meeting with students who need help, answering insane amounts of emails, and other time-consuming admin tasks like attendance that take all day.

That being said, Ross's low scores are consistently due to not showing work at all. He knows better. I had him in class last year, where that was the expectation. I have reiterated that expectation over and over this year as well - both verbally and in written instructions in assignments. Every math teacher expects work to be shown, and that will be expected of him all the way through high school and beyond. Truly, I reiterate it 2 to 3 times per week. All of his assignments are visible on google classroom and have been. He has access to that and the feedback, as do you.

On many of these assignments, I include an answer key, so that a student can check their work - after they work through the steps. He is just writing down the answers, presumably directly off of the key or a calculator (some assignments need worked out arithmetic, percent problems and such are fine with a calculator). I often say in my class, "no work, no credit." Ross knows this very well.

I apologize for the tardy nature of moving grades over to powerschool - I will certainly endeavor to do better in that regard.

PL000977

Sincerely,
David Kissner

---

**From:** Ian Ollmann <iano@apple.com>
**Sent:** Sunday, October 18, 2020 3:42 PM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Cc:** Billy Martin <b.martin@loma.k12.ca.us>
**Subject:** Powerschool and timely feedback is important

Mr. Kissner,

I was quite alarmed today to find my Son, Ross', math grade dropping from A-/B+ all the way through C-today, on what looks to be the very last day of the quarter.  On review he has now received low marks for several assignments a full month ago because he did not show his work.  I can't be sure if the grade was previously high and was lowered today, or these were not  graded until close of quarter. I can tell you that I have been reviewing his work on powerschool every few days to make sure he kept on top of his work, and there was no sign of problems until now.

I would like to express my deepest frustration with your tardy grading efforts. Simply put, I can not do my job of making sure that Ross' work is satisfactory, if you do not report problems soon enough in powerschool that I have time to do something about it.  Normally, I would not hesitate to have Ross repeat an assignment, and I may yet still, but since it is now "too late" he will view it as a punishment rather than a honest learning effort.  Please work harder on communicating with students and parents in a timely fashion when you do not believe their work to be satisfactory.  As it stands my reluctant student will find that his policy of stall and fib to be well rewarded this quarter with as many as 5 math assignments on which he could avoid doing his best work.

Poorly done!!

Ian Ollmann, Ph.D.

<Screenshot 2020-10-18 at 3.09.43 PM.png>
<Screenshot 2020-10-18 at 3.40.12 PM.png>

EXHIBIT 18

PL000979

From: dkissner@siera-k-12.org
Subject: 7th Grade Math End of Quarter 1 Update
Date: October 18, 2020 at 7:07 PM
To: classname.family@hotmail.com

Dear 7th Grade Students and Parents,

I have completed migrating the data from Google Classroom over to powerschool for quarter 1 for 7th grade math classes. I apologize for being behind on that this quarter - this has been a "try to keep my head above water" type of quarter. I will accept late work through Friday, which is when I finalize my grades. Students should communicate with me directly if they intend to complete any further late work.

We are on track right now in our curriculum to address all of the 7th grade standards by the end of the year, even if we stay in this learning format. Because of our reduced instructional time, we are moving quickly in order to keep this pace. I am foregoing the normal labs and multi-day hands-on learning activities that I ordinarily use - partly for time reasons - but also because the distance learning format is not as conducive to those types of learning activities.

At the end of quarter 1, our median score is a 94% and our mean score is an 88%, which I am pleased with. That being said, we are asking a lot from our students in terms of being independent learners and taking responsibility for their own learning in this format. Assignments are often self-corrected, and assessments are on the honor system. Students are responsible to a greater degree than normal for taking the initiative to get help. But the work I see on a regular basis and the students' interaction in class bodes well going forward.

We are getting now into linear equations and solving multi-step equations - the central component of pre-algebra. Fun!

A fresh start for quarter 2 - an opportunity for each student to reassess their student habits, and make some changes if needed. Please let me know of any feedback, concerns, or questions as we head into quarter 2. Have a great week!

Sincerely,
David Kissner

8th Grade Physical Science End of Quarter Update
October 22, 2020 at 1:49 AM

Dear 8th Grade Physical Science Students and Parents,

I have completed migrating the data from Google Classroom over to powerschool for quarter 1 for 7th grade math classes. I apologize for being behind on that this quarter - this has been a "try to keep my head above water" type of quarter. I will accept late work through Sunday 5pm, which is when I will finalize my grades. Students should communicate with me directly if they intend to complete any further late work.

We are on track right now in our curriculum to address all of the 8th grade Physical Science standards by the end of the year, even if we stay in this learning format. Because of our reduced instructional time, we are moving quickly in order to keep this pace. I am foregoing the normal labs and multi-day hands-on learning activities that I ordinarily use - partly for time reasons - but also because the distance learning format is not as conducive to those types of learning activities.

At the end of quarter 1, our median score is a 91% and our mean score is an 86%, which I am pleased with. That being said, we are asking a lot from our students in terms of being independent learners and taking responsibility for their own learning in this format. Assignments are often self-corrected, and assessments are on the honor system. Students are responsible to a greater degree than normal for taking the initiative to ask for help. But the work I see on a regular basis and the students' interaction in class bodes well going forward.

We have just started a short chemistry unit on atomic structure, the periodic table, and an introduction to chemical bonding. This will be followed by a short unit on matter, states of matter, and the gas laws. 2nd semester will be dedicated to Energy, Forces, and Motion.

A fresh start for quarter 2 - an opportunity for each student to reassess their student habits, and make some changes if needed. Please let me know of any feedback, concerns, or questions as we head into quarter 2. Have a great week!

Sincerely,
David Kissner

PL000981

6th Grade Math End of Quarter Update
October 26, 2020 at 12:39 AM

Dear 6th Grade Students and Parents,

I have completed migrating the data from Google Classroom over to powerschool for quarter 1 for 6th grade math classes. I apologize for being behind on that this quarter - this has been a "try to keep my head above water" type of quarter. I will accept late work through Tuesday, which is when I finalize my grades. Students should communicate with me directly if they intend to complete any further late work. I will do my best to update powerschool weekly moving forward. But please remember that google classroom is your best real-time view of any missing assignments.

We are on track right now in our curriculum to address all of the 6th grade standards by the end of the year, even if we stay in this learning format. Because of our reduced instructional time, we are moving quickly in order to keep this pace. I am foregoing the normal labs and multi-day hands-on learning activities that I ordinarily use - partly for time reasons - but also because the distance learning format is not as conducive to those types of learning activities.

At the end of quarter 1, our median score is a 96% and our mean score is an 88%, which I am pleased with. That being said, we are asking a lot from our students in terms of being independent learners and taking responsibility for their own learning in this format. Assignments are often self-corrected, and assessments are on the honor system. Quarter 1 grades reflect student skills as much as they do math skills. Students are responsible to a greater degree than normal for taking the initiative to make sure that they understand the content and seek help when they need it. But the work I see on a regular basis and the students' interaction in class bodes well going forward.

We are getting now into integer operations (working with negative numbers) - a notoriously difficult topic for many 6th graders. But it is also an essential skill moving forward. On the horizon: order of operations and number properties and then we get into some algebra! Basic expressions, solving one and two step equations, and then solving equations with many steps. Fun!

A fresh start for quarter 2 - an opportunity for each student to reassess their student habits and to make some changes if needed. Please let me know of any feedback, concerns, or questions as we head into quarter 2. Have a great week!

Sincerely,
David Kissner

PL000982

EXHIBIT 19

PL000983

I hope this helps.  Let me know what further questions I can help with.


David


**From:** Staci Ljepava <s.ljepava@loma.k12.ca.us>
**Sent:** Tuesday, October 27, 2020 5:16 PM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Cc:** Billy Martin <b.martin@loma.k12.ca.us>
**Subject:** Goal Report Progress Update

Hello David,

Re: Goal Progress Reporting Compliance

I was contacting you to see if you have been able to update the grades in Power School as requested by Randy Cohen on 10/19/20 for the purposes of him providing IEP goal updates that are due at grade reports for IEP students.  It is my understanding that you had indicated that the information would be entered in Power School the following day.  Randy had allotted time to complete the necessary grade reports on Friday 10/23/20, in the hopes that all teachers would have up to date grades in Power School so he could gather his necessary data.  As of Friday, 10/23/20 the 6th grade Math scores had not been updated since 9/11, 42 days ago.  This is insufficient data for a current progress update for this reporting period and requires immediate action.  In the future, if you need more time please communicate this with the case manager so they can plan accordingly to try and accommodate your and their schedule in an effort to remain in IEP compliance.  This effort requires a tremendous amount of collaboration.  Please update myself and the case manager on the status of your grade updates, so I can respond accordingly to the team with next steps.

Thank you in advance for your cooperation,


Staci Ljepava
Director of Student Services and Special Education
Loma Prieta Joint Union School District
408-353-1106 x 5504
Email: s.ljepava@loma.k12.ca.us
Website: https://www.loma.k12.ca.us/

CONFIDENTIALITY NOTICE:  This electronic message is intended to be viewed only by the individual or entity to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.  Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission.  If the reader of

EXHIBIT 20

PL000985

From: **Cristina Werdebaugh**
Subject: Fwd: 6th Grade Math End of Quarter Update
Date: November 3, 2020 at 10:15 AM
To: Lisa Fraser, Billy Martin
Cc: Chris Werdebaugh

Hi Lisa and Billy,

I debated writing to you for the last several weeks as I don't want to get in the middle of some of the politics that are happening. We've been really disappointed with Kissner's approach with his 6th grade class. There were several zoom meetings the last couple of weeks (while he was away in Tahoe) ending after just a few minutes or just cancelled out right. He has also had the kids grade their own tests, which doesn't sit well with us because we'd rather have the kids understand and learn what steps were wrong/missing rather than just check for the 'right answer.' He sent this note to parents saying he is "trying to keep my head above water."

I know he has been providing educational sessions for kids during his camping trips, but it seems this is causing him issues in keeping up with his teaching position at CT. He is planning another lengthy (3 week) trip in November - is there a way to have someone in the administration join Shyla's classes to make sure he is providing the lessons for kids in his CT classes?

Thanks,
Cristina

---------- Forwarded message ----------
From: d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
Date: Mon, Oct 26, 2020 at 12:39 AM
Subject: 6th Grade Math End of Quarter Update
To: d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>

Dear 6th Grade Students and Parents,

I have completed migrating the data from Google Classroom over to powerschool for quarter 1 for 6th grade math classes. I apologize for being behind on that this quarter - this has been a "try to keep my head above water" type of quarter. I will accept late work through Tuesday, which is when I finalize my grades. Students should communicate with me directly if they intend to complete any further late work. I will do my best to update powerschool weekly moving forward. But please remember that google classroom is your best real-time view of any missing assignments.

We are on track right now in our curriculum to address all of the 6th grade standards by the end of the year, even if we stay in this learning format. Because of our reduced instructional time, we are moving quickly in order to keep this pace. I am foregoing the normal labs and multi-day hands-on learning activities that I ordinarily use – partly for time reasons - but also because the distance learning format is not as conducive to those types of learning activities.

At the end of quarter 1, our median score is a 96% and our mean score is an 88%, which I am pleased with. That being said, we are asking a lot from our students in terms of being independent learners and taking responsibility for their own learning in this format. Assignments are often self-corrected, and assessments are on the honor system. Quarter 1 grades reflect student skills as much as they do math skills. Students are responsible to a greater degree than normal for taking the initiative to make sure that they understand the content and seek help when they need it. But the work I see on a regular basis and the students' interaction in class bodes well going forward.

We are getting now into integer operations (working with negative numbers) - a notoriously

PL000986

difficult topic for many 6th graders.  But it is also an essential skill moving forward.  On the horizon: order of operations and number properties and then we get into some algebra! Basic expressions, solving one and two step equations, and then solving equations with many steps.  Fun!

A fresh start for quarter 2 - an opportunity for each student to reassess their student habits and to make some changes if needed.  Please let me know of any feedback, concerns, or questions as we head into quarter 2.  Have a great week!

Sincerely,
David Kissner

PL000987

EXHIBIT 21

PL000988

From: David Kissner <d.kissner@loma.ca.us>
Subject: **Re: Information Needed**
Date: November 19, 2020 at 2:14 PM
To: Billy Martin <b.martin@loma.ca.us>

Thank you, Billy,

The description you provided of the parent complaint was not very detailed. I am left to assume from your questions that a parent believes that I cancelled a scheduled zoom meeting? Could you please provide me with the specific complaint as to what the concern is and any specific times/dates/incidents are alleged? Of course, I would appreciate a summary of your findings regardless of the outcome.

Thank you,
David

**From:** Billy Martin <b.martin@loma.k12.ca.us>
**Sent:** Thursday, November 19, 2020 1:18 PM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Subject: Re: Information Needed**

Thanks David,

I appreciate your prompt and willing response to my inquiry. This is helpful information in addressing the parent concern that was raised. As previously communicated, please keep me informed of any alterations needed to your Monday, Tuesday, Thursday, & Friday schedules.

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1100—p

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

> On Nov 12, 2020, at 9:36 PM, d.kissner@loma.k12.ca.us wrote:

Hi Billy,

In general, I do not participate in any investigation or inquiry being conducted by the school district because of previous experiences. In this case, however, I can let you know that I have never skipped or cancelled a zoom meeting. I have started every single zoom meeting on time since the first day of school. The only time that I have not utilized near the full scheduled zoom time were the few days where there were power outages on the mountain or evacuations and I kept our classes brief and mostly asynchronous so as to not adversely affect the students who were unable to attend my class. Appropriate assignments were posted however.

David

**From:** Billy Martin <b.martin@loma.k12.ca.us>
**Sent:** Thursday, November 12, 2020 10:21 AM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Subject: Information Needed**

David,

To follow up on the recently received parent complaint, I need some information from you:

1. To date, have you canceled any synchronous Zoom classes that are regularly planned for Mondays, Tuesday, Thursdays, or Fridays?
2. If yes, what days and/or what classes were canceled?
3. If a class was canceled what was the reason for the cancellation?

PL000989

4. How far in advance are students notified of cancellations?
5. How do you notify students of the cancellation?
6. Did you assign to students of any canceled classes work or other instruction equal to 35 minutes?

Thanks,

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1106 ···p

CONFIDENTIALITY NOTICE:  This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed.  It
may contain information that is privileged, confidential and exempt
from disclosure under applicable law.  Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission.  If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

PL000990

EXHIBIT 22

PL000991



**Loma Prieta**
JOINT UNION SCHOOL DISTRICT

*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101    Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Dr. Billy Martin, Principal*

November 5, 2020

**To:**  David Kissner
**From:**  Lisa Fraser, Superintendent
**Re:**  Remote Wilderness School Camps

As a result of a recent parent complaint we received which you've been made aware of earlier this week under separate cover as required by the collective bargaining agreement, it has come to the District's attention that you will be hosting another Remote Wilderness School Camp (or similar type of event) on or about November 7, 2020 or otherwise in the near future. It is our further understanding that, once again, you will be taking a number of District students with you and that you will be conducting distance learning classes for District students that are not physically present with you while you are away on the trip. In addition, the District students present with you will be attending their own classes remotely as well. Although the District has challenges and concerns with this approach, at present under law and as we have expressed in the past, we are not requiring you to cease such activities, but rather to closely review and provide written responses to the issues raised herein and otherwise follow all applicable local, State and Federal laws, District policies, procedures, and other requirements, including internal directives discussed herein and previously provided, during these events. Moreover, because you will be conducting official District business during, at least part of, the time that you are away at the camp, and District students will be accompanying you during this time, you must comply with all applicable laws and regulations which would apply to the District, as well as to you/the attendees individually.

As you may or may not be aware, the California Department of Public Health issued new mandates on October 9, 2020, with regard to Covid-19 restrictions on group gatherings for Californians. The County of Santa Clara has adopted these policies as law per County Ordinances A1-28 and NS-9.291 (Order Dated October 5, 2020). These policies apply to all activities of the District and are applicable to student and teacher activities carried out during the school day by teaching staff.

*Board of Trustees:*
*Deana A. Arnold, President    Kerrie Mills, Vice-President*
*Ben Abeln, Member    Ron Bourque, Member    Alex Hall, Member*

**PL000992**

The mandates of the State of California can be found at:
https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPH-Guidance-for-the-Prevention-of-COVID-19-Transmission-for-Gatherings-10-09.aspx

In addition, we now believe you are traveling to another state, including the state of Utah, and as such you and your attendees must be compliant with any other state's rules and regulations as well.

As part of the District's responsibilities owed to all students, and for the safety and security of all students and staff, we are directing you to promptly provide us with information concerning the following areas of concern:

1. Please identify all District students who will be joining you at the wilderness camp.

2. What efforts are being made to demonstrate that you will comply with the latest California mandates (CDE. Cal-OSHA, Ca Department of Public Health, and Santa Clara County) for multi-household and District academic (whether hybrid or in-person) activities while you are away at the camp?

3. When was the last time that you were tested for Covid-19 and what were the results?  Will you be tested before leaving for the remote camp along with District students?

4. Will students, who will be coming into extended close proximity or contact with each other, be tested prior to the camp for Covid-19 exposure?  If so, how will test results be communicated in the event of a positive result for any student or yourself?  Will you be advising the District in the event of the need for self-quarantine?  What social distancing policies will be in place for any indoor and outdoor activities during the camp?

5. What testing regimens will be in place while you are participating in in-person activities with District students or otherwise in close proximity to them? How will you be reporting any test results to the District?

6. How will any remote learning student cohorts meet any out-of-state Covid-19 safety requirements for in-person learning activities which may take place (i.e. students present while you are providing distance learning to students at home or otherwise not with you)?  Please provide us with any regulations applicable to the locale where you intend on conducting official teaching activities in your capacity as a District employee and where District students will be in attendance.

7. If the State of California has more restrictive safety regulations and guidelines concerning possible Covid-19 exposure, will you be abiding by those while engaged in any activities affecting in-person activities with District students?  If not, why not?

8. What efforts are being undertaken with regard to CDE-compliant attendance requirements and documentation of attendance for in-person student learning experiences being offered through your camp program?

9. What insurance coverage is provided for students and yourself for general liability, travel, workers' compensation, or other possible insurance coverage, since any such potential claims or losses are not covered by the District's existing protection. This is an issue that was previously raised with you back in August and we have not received a sufficient response.  Please provide proof of coverage, policy limits information, declaration pages, and any other information which shows that the nature and scope of activities taking place at the wilderness camp are fully covered for any potential losses which may occur during camp activities, including travel to and from the same.

10. Are permission slips required for student participation in any in-person learning activities while you are conducting official teaching activities on behalf of the District?  What efforts have you made to comply with any existing district policies and regulations concerning permission slips and parental consent for such activities?

11. How are students being transported to the wilderness camp? What efforts have you made to comply with any existing district policies and regulations concerning parental consent for student travel overnight and out-of-state?

12. How will you make yourself physically available to any parent, student or supervisor who requests your attendance for an in-person meeting, for official District business, while you are attending to the remote camp?

13. What efforts have you taken to ensure that any privacy requirements are being met with regard to FERPA compliance during any camp activities?

14. What methods of advertisement or solicitation did you use for inviting District students or parents to participate in your remote wilderness camp experience (which is to involve time where you will be providing distance learning for District students)?  Please provide copies of all e-mails, informational materials, or communications made to students, parents, district personnel about participation in the wilderness camp.

PL000994

15. Will you be using any District issued equipment during the course and scope of your camp activities? If so, which equipment? Does this include any District-approved PPE for use during the school day?

16. Which other District staff have you collaborated with in terms of ensuring that your distance learning pedagogy is consistent with the learning objectives, goals, uniform standards, feedback opportunities, and other measures of fair and equal education for all students being served in similar classes or learning environments?

17. Will you be available by phone as necessary each day of instruction in the event that the District needs to reach you during normal office hours?

18. In the event that you become ill or unable to attend to your duties, what, if any, policy do you have in place to provide for a substitute to provide instruction to all students in your classes during the days that the remote camp activities are taking place?

19. Are any other adults acting in participation or sponsorship of the wilderness camp? Are they trained in mandatory abuse reporting laws, basic first aid, and CPR? Have they been finger-printed and cleared to work with district students?

20. What methods do you have in place to ensure that at all times, the students, are properly supervised and not allowed to partake or otherwise be exposed to any unsafe, hazardous, unlawful, or otherwise inappropriate activities for minors, such as, but not exclusively, alcohol being served.

Thus far, you have not been responsive to the District's concerns raised in the past under similar circumstances (see prior Memo from Superintendent dated August 28, 2020, attached), but it is critically important that you understand the gravity of the situation since your anticipated course of conduct potentially creates a serious risk of harm to students and perhaps even yourself – and can thereby subject the District to tremendous liability exposure, among other repercussions.

The District will be placed in a situation whereby it has no practical ability to supervise academic activities taking place during the school day, whether the learning is taking place in person or remotely. You have been advised of the applicable state law, county mandates, District rules and regulations concerning your responsibilities under the present circumstances as well as those that applied to your previous activities.

Please understand that following directives, previously provided to you in writing on August 28, 2020, remain in full force and effect:

1. If your planned activities during contracted hours are "private" and/or of a personal nature, then you will need to request an unpaid leave of absence for any school days impacted.

2. If you have messaged your planned activities as being school-sponsored and supervised by you as a district employee, please note that the district has not approved nor authorized a school-sponsored trip as required in Board Policy 6153. The district will not assume liability for an unsanctioned trip. According to ASCIP, our school insurance group, you may be held personally liable for an unsanctioned trip that violates board policy.

3. Based upon Santa Clara County Public Health Guidance and Governor Newsom's Executive Order, Santa Clara County schools are mandated to adhere to a full distance learning model until removed from the state's watch list. Accordingly, the LPJUSD Board of Trustees approved a School Reopening Plan for full distance learning in July. As an employee of the district, you must comply with this plan. You have no permission nor the authority to conduct an out-of-area, in-person learning cohort which violates state and public health department regulations.

4. LPJUSD teachers were given the option of teaching from their classroom or teaching from their home if the home setting is an appropriate classroom setting. Teachers and staff are expected to remain in the vicinity of the school campus during remote learning, as he/she may be needed on campus for a variety of reasons during contracted hours and must be able to report to school, if requested. In a memo to all staff dated 3-17-20, teachers were directed to work remotely, but the directive also stated that you may be asked to report at any time. That being said, if an employee has a personal emergency that requires them to leave the area, a request for an exemption can be made. A wilderness trip during school hours would not constitute a personal emergency. As such, please be advised that you are expected to be in the vicinity of the school campus when being paid to teach remotely from home. As an aside, public school employees are declared by law to be disaster service workers and could be called to service at any time during this pandemic or during any other emergency. (Government Code 3100-3102).

5. As a district teacher, you are obligated to provide an equitable learning experience for all of the students under your charge while employed by the district. Taking some students out of the state during school hours for unsanctioned learning activities that are clearly inaccessible to your other students creates a whole host of instructional inequities that the district will not endorse.

6. If there is any fee being charged to a student, or indeed, any cost associated with any unsanctioned learning activities, then BP 4136 would come into play, as well as other potential conflict of interest laws or regulations.

We are respectfully instructing you to carefully consider your responsibilities to the District, to its students, and the community we all serve together, and provide the information that the District needs in order to fulfill its obligations to the community. If

you are unable or unwilling to do so promptly, completely, and in writing, before you depart, please advise the undersigned immediately and appropriate action will be taken as permitted by the circumstances.  This may include appropriate disciplinary and/or other actions based on the circumstances.  We all have an obligation to comply with existing health and safety laws during this time, along with longstanding standards for remote learning opportunities and education law requirements.  It is trusted that you understand the importance of meeting our respective obligations.

Thank you, in advance, for your anticipated cooperation and proper response forthwith. If you have any questions, please contact my office immediately.

PL000997

EXHIBIT 23

PL000998

**From:** d.kissner@loma.k12.ca.us
**Date:** November 7, 2020 at 8:00:31 AM PST
**To:** Lisa Fraser <l.fraser@loma.k12.ca.us>
**Subject: Fw: Important Time-Sensitive Information**


Dear Lisa,

Thank you for your email outlining your concerns.  I am confident that

- I have been - and will continue to - fully meet (and exceed) my professional obligations equitably to all of my students.
- Nothing about my physical location or the people that happen to be in my vicinity have any impact on my performance of my professional duties.
- There is nothing about my physical location or the people that happen to be in my vicinity that has anything to do with the district.
- I am not in violation of any laws or district policies.


Sincerely,

David Kissner


**From:** e.bevans@loma.k12.ca.us <e.bevans@loma.k12.ca.us>
**Sent:** Thursday, November 5, 2020 12:36 PM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Subject:** Important Time-Sensitive Information

Dear David,

I am sending the attached time-sensitive correspondence to you on behalf of Lisa Fraser.

Sincerely,
Eileen Bevans-Franks
Administrative Assistant to the Superintendent
Loma Prieta Joint Union School District
23800 Summit Road
Los Gatos, CA  95033

PL000999

EXHIBIT 24

PL001000

To: ██████████████████
Subject: Grading backlog
Date: December 11, 2020 at 9:22 AM
Cc: ████████████████████
To: Billy Martin ██████████████████

Mr Kissner,

I find myself once again in the uncomfortable position of not knowing what ███ math grade will be for end of semester.  We have not had any homework grades posted to powerschool since before Halloween. I looked at the note of apology regarding the grades delay for last semester, wherein it was indicated that the grades were in Google classroom. However, there appear to be no grades posted in google classroom either.

I would like to remind you once again of the importance of parent involvement in the remote schooling process. I am not able to do my job to make sure ███ lives up to school requirements unless his performance is visible to me.  Please do see that grades are current. I am not looking forward to another anguished week wherein ███ must do a dozen or more missing math assignments to become current.

Best Regards,

████████

PL001001

EXHIBIT 25

PL001002

**From:** ███████████████████████
**Sent:** Friday, December 11, 2020 7:38 PM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Cc:** Billy Martin <b.martin@loma.k12.ca.us>
**Subject:** ███ 2nd quarter grade

Good evening,
I am emailing again this quarter as I am concerned again, about the lack of knowledge we as parents are getting regarding the progress our student is doing in your class. Powerschool has none, but one grade/assignment posted since 10/28. This one assignment is a test from 11/16 in which ███ received a D. No assignments just prior or even after have been posted. When I emailed about this last quarter, I was told that we can look up our childs progress in Google Classroom, however all I can see in Google classroom is that she submitted an assignment. It does not list how well she is doing with her assignments. I see no feedback or grades there. With no viable feedback, I am unable to get ███ the help she will need to succeed in her class. I expressed my concerns about this last quarter, was assured that ███ was doing fine (which she was at the time), and was told that you would be more vigilant in posting grades in Powerschool for parents to access and see progress of their child. Thus far, this has not happened. At this point in the 2nd quarter, seeing the minimal amount of grades posted, I can only assume that ███ is struggling based on the D she received on the test posted. We are very near the end of the quarter and at this point, it would be very difficult to improve this grade (assuming it is still a C overall grade). I am thoroughly disappointed in the lack of information from you and I know of many other families that have expressed the same frustrations and concerns.
I am hoping that we can get some more up to date feedback regarding our childs progress and grade in your class.
Sincerely,
███████████████████

EXHIBIT 26

PL001004

**From:**
**Subject:** Math Assignments
**Date:** December 14, 2020 at 11:04 AM
**To:** Billy Martin b.martin@loma.k12.ca.us
**Cc:**

Billy,

Here is feedback after we spoke 2 weeks ago, regarding Math assignment grading.

You can see photo showing that the old assignments are still not graded and posted. A few (4) assignments were graded from 11/16 and 12/1-4. No assignments graded since 12/4.

I am actually now VERY UNHAPPY and I am formally making a compliant. This is entirely unacceptable, and must be fixed. This is a complete dis-service to his students and our children.

I am hearing many parents complaining about this.

Our friends son has an F. He has worked hard per his parents, and is waiting for his grades to see his improvement. Of course he is still waiting. Imagine what can occur if grades come back and he still has not done well, and still has a low grade. He has fewer assignments left, to rebound his grade. You know this, but this is why teachers should keep up with grading.

What will be done?

Thank you.

EXHIBIT 27

PL001006

From:
Subject: Problems with Math Teacher
Date: December 14, 2020 at 11:44 AM
To: h martin@loma.k12.ca.us,  l.fraser@loma.k12.ca.us
Cc:

Hello,

We have been hesitant to interfere with the teacher/student dynamic with our          in the spirit of        learning to do more of      own outreach to       teachers, and problem solving. In that spirit, we have been monitoring            overall grades in PowerSchool, not individual assignment grades, and verifying            turns in      assignments on time.  Other than that, we have been encouraging        to be an independent learner.

Throughout the quarter,      has been maintaining A's and B's in      class grades.      turns in assignments on time, and does what is asked of him.  Including Math.

It turns out, though, that the math grade was not only NOT current, but Mr. Kissner hasn't even been grading or checking his homework ALL quarter.

It looks like David is starting to grade the kid's papers now – at the END of the quarter. I've checked in Google Classroom, and at NO point has      gotten ANY feedback on      progress. How in the world has      been expected to improve      math skills, or course correct throughout the quarter, if      doesn't know when      homework is right or wrong?  We are at the end of the quarter, and there doesn't seem to be a way to turn this around.

We have been very patient giving consideration to the 'new norm' of distance learning, but it seems that grading the kids homework AS THEY GO would be at least the bare minimum requirement.  We are all trying to work in this new distance format, myself included, but at some point personal accountability is still required. In our communications with David, we have not found that.

     has worked hard this quarter to be an independent learner, but      teacher is not putting the same effort forward.  All of our children deserve more than that.

We are willing to put in the effort to come up with a solution, how are we going to fix this moving forward?

Sincerely,

| Course | Teacher | Expression | Final Grade |
|--------|---------|-----------|-------------|
|        | Kissner, David |    | B- 67.5% |

Teacher Comments:

Section Description:

Assignments

PL001007

EXHIBIT 28

PL001008



*Loma Prieta*
*JOINT UNION SCHOOL DISTRICT*

*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101    Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Dr. Billy Martin, Principal*

To: David Kissner
From: Dr. Billy Martin, Principal
Date: December 16, 2020
Subject: Letter of Reprimand-Failure of duties & unprofessional email response

On December 11, 2020 I was made aware of your continued inability to provide timely progress reports regarding grades to your students and families. You were contacted via email, with me being cc'd, on December 11, 2020 by a parent concerned that there had not been adequate information provided to determine her child's math grade. Furthermore, I received an additional parent complaint along the same vein reporting that you had not made updates to grades since mid-October 2020. Lastly, I am in receipt of two additional complaints via email on December 14, 2020 by two other families indicating this behavior is a disservice to students and families. Upon review of PowerSchool and of your Google Classroom on December 14, 2020 at 11:30am it is confirmed that you have not fulfilled your professional obligation of reporting student grades and progress. For example, during the period of October 30, 2020 to November 30, 2020 only one grade had been posted for your students in your period 2 Math 6 course. This negatively impacts the learning of students in that they are not provided accurate and timely feedback related to their completed assignments.  This failure on your part hinders the ability of students to take corrective measures to seek assistance when needed.

This behavior occurred during the first quarter of the 2020 school year wherein you received at least one email from a parent concerned by the lack of clear progress and grade reporting. At that time, you noted you were behind, trying to keep your head above water, and that it was something you were committed to working on. During a phone conversation with me on October 28, 2020 we discussed the topic of grading and feedback. You indicated to me that you were aware of this being an issue and stated you would rectify the situation for quarter 2. At that time, I encouraged you to reach out to me if you needed additional support to be able to report grades and provide feedback in a timely manner.

Providing feedback, grades, and progress reports is a basic and important function of teaching.  Your inability to clearly and regularly communicate student progress and grades to students and families demonstrates a failure to perform the functions of your position as a classroom teacher. This behavior negatively impacts student performance and the ability of families to provide adequate support for their child.

Furthermore, on December 12, 2020 you sent an inappropriate, disrespectful, and unprofessional email response to a parent after she provided to you her recurring concern about your ongoing failure to properly and in a timely manner communicate

*Board of Trustees:*
*Deana A. Arnold, President    Kerrie Mills, Vice-President*
*Ben Abeln, Member    Ron Bourque, Member    Alex Hall, Member*

grades and performance with students and families. Incredibly, your response did not address her concerns, and instead was laced with sarcasm and disrespect for her issues. Responding in this manner adversely affects the professional relationship with the parent that is necessary for student success - and frankly makes a bad situation even worse.

This is not the type of professional communication expected of you in the performance of your duties. You are expected to respond to parent inquiries in a professional, courteous and supportive manner. Your responses should directly address the question or concern only, without the inclusion of sarcasm, excuses, or other inappropriate discussion.

Please be advised that effective immediately, and until further notice you are required to:
1. Update PowerTeacher Pro at least one time each week in a manner that clearly communicates student grade progress; and otherwise not allow yourself to continue to fall behind on PowerSchool and/or timely providing parents/students with grades and progress.
2. Send responses to parent complaints and/or concerns to me, as your Principal, for review and approval *prior* to sending the response to any parent/student.
3. Always communicate with parents/students and others in a professional manner.

Per Article 15 of the collective bargaining agreement, a copy of this document will be placed in your personnel file after 10 days. Within these 10 days, you may prepare a response and have that response attached to this document.


Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School

EXHIBIT 29

PL001011

**From:** Billy Martin <b.martin@loma.k12.ca.us>
**Subject: Response Requested-Alleged Algebra Course**
**Date:** December 17, 2020 at 3:00:02 PM PST
**To:** "d.kissner@loma.k12.ca.us" <d.kissner@loma.k12.ca.us>

David,

It was recently brought to my attention that you may be hosting an unapproved Algebra course for a select group of students during the time designated as "office hours and student support" from 1pm to 2:30. To help me better understand this situation so I can also determine what, if anything needs to be done further, please provide answers to the each of the questions below, in writing, to me by Friday December 18, 2020 at 3 p.m..

1. Are you currently conducting a class on Mondays, Tuesdays, and Thursdays at 1pm for algebra instruction?

2. Are you hosting this class using a non-school provided platform or a personal Zoom account?

3. If this class is occurring, are the students attending the course currently enrolled in any of your CT math courses?

4. If you are conducting this class, how have the students participating in this class been chosen?

5. If this class is occurring, is it open to any student at any grade who wishes to participate?

6. If this class is occurring, what arrangements have you made for students enrolled in your CT courses to access you for help and support during the office hours that are impacted by this class?

7. If this class is occurring, what arrangements have you made for students participating in this class to access office hours and supports offered by other teachers?

8. If this class is occurring, the students participating are receiving an additional 90+ minutes of instruction per week. What plans have you made to provide supplemental instructional minutes to other students, particularly any students in your 1-6 period classes who are struggling?

9. If this class is occurring, how have you communicated the logistics of this class to participants and parents?

10. If this class is occurring, what steps did you take to seek parent permission for students to participate in this class?

Billy J Martin, Ed.D.
Principal
CT English Middle School
Loma Prieta Elementary School
23800 Summit Road
Los Gatos, CA 95033
408.353.1106—p

PL001012

EXHIBIT 30

PL001013

**From:** ██████████████████████████████
**Date:** Thursday, January 28, 2021 at 8:18 PM
**To:** Billy Martin <b.martin@loma.k12.ca.us>, "d.kissner@loma.k12.ca.us"
<d.kissner@loma.k12.ca.us>, Lisa Fraser <l.fraser@loma.k12.ca.us>
**Subject:** Fwd: Class Discussions


Ms. Fraser, Dr. Martin, Mr. Kissner,

Hope this finds you all well among the steady chaos!  At risk of adding to your
unbelievably full plates I wanted to just make sure you were aware that ██████████,
my son, is now coping with saying goodbye to his dad for the 6th time in his life as I
head to Afghanistan again.  I just wanted to make sure that the applicable staff/faculty
mitigated any unnecessary stress for ████ during my time away.  As I'm sure Mr. Kissner
can imagine, it's our families that end up serving far more than the troops they say
goodbye to...

I had a great conversation with Mr. Kissner back in October requesting that he stop
sharing stories of his personal experience with Afghanistan combat fatalities in the
classroom (████ had shared some examples that concerned me).  Mr. Kissner was very
receptive and shared that he had never had a student from a military family so it was the
first time he had heard the feedback.  He agreed to not use any further combat fatality
stories during the school year.  We ended the phone call on agreeable terms.

But, I know sometimes it's easier to mitigate risk when all echelons have identified it.  So
I am sending this to all three of you now that the deployment is under way:

I do not want any discussions about Afghanistan, combat, or the military to occur
between Mr. Kissner and my son.

I have no reason to believe Mr. Kissner would do so after our talk in October, but this
message is the best chance I have of guaranteeing that any of his engagement as a fellow
veteran (albeit well intentioned) is not inadvertently harmful to my son.  My wife and I
will help ████ navigate through the stress of growing up in a military family.

On that final note, ████████ is an amazing woman.  You guys know this!  I specifically
left her out of the traffic here for a variety of reasons, the most important of which being
that she wants to remain objective as a teacher and teammate at Loma.  She is aware of
my intent to engage this issue but is hands off the details.

Conversely, I want to remain objective as a father that is not motivated by parent
politics.  I am aware of general friction surrounding Mr. Kissner and the district over the
last couple years but I have none of the details (largely because ████████ avoids

involvement with it).  I apologize to all three of you in advance if this message may add friction to an already strained relationship.

I am engaging this issue on behalf of our family, for the mental well being of my son.  ███ is my only motive.

Thank you for your time.  I may not be immediately available for any replies as I'm currently traveling and pop in and out of wifi but I should be back up with reliable comms in a few days.  All the best.  ████

v/r
████████████, Lt Col, USAF
Commander, ███ RQS

---------- Forwarded message ---------
From: ████████████████████████████>
Date: Tue, Oct 20, 2020 at 00:20
Subject: Re: Class Discussions
To: d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>

Thanks again for taking the time today to talk it through.  All the best on your continuous covid adventure.  ████

On Mon, Oct 19, 2020 at 09:14 ███████████████████> wrote:

Great.  I'm available today after 1600.

On Mon, Oct 19, 2020 at 08:55 d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us> wrote:

Hi ████

We are doing well - thank you!  It would be great to talk together.  I wish I could in person, but I've been out of state since March - taking remote teaching to new levels of remote ☺  But it would be nice to sit down together at some point and get to know each other better.  Always good to connect with another vet - not many in our age range on the mountain...  I'll give you a phone call this week - looking forward to it.  Any preferred days/times?


David

---

**From:** ███████████████████████████ >
**Sent:** Monday, October 19, 2020 6:39 AM
**To:** d.kissner@loma.k12.ca.us <d.kissner@loma.k12.ca.us>
**Subject:** Class Discussions


Mr. Kissner


Hope you and your family are doing well.


I was hoping to talk to you about some combat stories you're sharing in class.  Just looking for some clarification and context so that I can better understand what's being said. I also have some concerns that I'd like to share as we move forward through the school year ref ███ and his service as the oldest child in a military family.


Happy to meet in person, this week if possible, my cell is below.  If nothing else it would be good to spend some time with another vet on the mountain...


███████████

███████████


--

EXHIBIT 31

**PL001017**

From: j.bourque@loma.k12.ca.us
Subject: Fwd: Power outage 1/25
Date: January 29, 2021 at 10:27 AM
To: Billy Martin  b.martin@loma.k12.ca.us

Julie Bourque
Secretary
CT English Middle School
408-353-1123
j.bourque@loma.k12.ca.us

Begin forwarded message:

**From:** Julie Bourque <j.bourque@loma.k12.ca.us>
**Subject: Re: Power outage 1/25**
**Date:** Januar   29, 2021 at 8:52:16 AM PST
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>

Thank you ▮▮▮▮▮

Julie Bourque
Secretary
CT English Middle School
408-353-1123
j.bourque@loma.k12.ca.us

On Jan 28, 2021, at 4:53 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮> wrote:

Hi Julie,

Sorry, for my confusion. I just spoke with ▮▮▮▮▮ and she told me that it was the after school math class with Mr Kissner at 1 pm.

Best,

▮▮▮▮

Sent from my iPhone

On Jan 28, 2021, at 2:59 PM, j.bourque@loma.k12.ca.us wrote:

Hi ▮▮▮▮,

I'm just sorting out attendance for this week and re-read your email. CT English does not have a 1pm Math class for 7th graders? Was this Mr. Kissner's After School Math Class or his office hours?
Which class did ▮▮▮▮▮ miss at 1pm on Monday 1/25/2021?

Thank you,

Julie Bourque
Secretary
CT English Middle School
408-353-1123
j.bourque@loma.k12.ca.us



**PL001018**

On Jan 25, 2021, at 3:10 PM, ████████████████████ > wrote:

Hi Julie,

PL001019

EXHIBIT 32

PL001020

**From:** Billy Martin <b.martin@loma.k12.ca.us>
**Date:** Friday, January 29, 2021 at 1:54 PM
**To:** Lisa Fraser <l.fraser@loma.k12.ca.us>
**Subject:** dk algebra class

One more update on the DK algebra class. I just met with ████████████████ to discuss moving from math 7 to math 8 now that there is room. ████ stated that he attends a 1pm advanced math class with Mr. Kissner.  He also asked if Mrs. Nefian would be sending the connection information for the math 8 class to his school email or personal email address. He said that Mr. Kissner communicates with him about the after school advanced class through ████ s personal email address.

Seems a bit inappropriate and shady to me.

Billy J Martin, Ed.D.
Principal
CT English Middle School

Loma Prieta Elementary School
23800 Summit Road

Los Gatos, CA 95033

408.353.1106—p

CONFIDENTIALITY NOTICE:  This electronic message is intended to be viewed only by the individual or entity to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.  Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

EXHIBIT 33

PL001022



EXHIBIT 34

PL001024

| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 14, 2020 10:11 AM | 11:01 AM | 00:50:02 |
|------|---------------|--------------------------|----------|---------|------------------------|----------|----------|
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 14, 2020 09:29 AM | 10:11 AM | 00:41:35 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 14, 2020 08:59 AM | 09:29 AM | 00:29:42 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 14, 2020 08:25 AM | 08:57 AM | 00:32:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 17, 2020 10:56 AM | 11:47 AM | 00:50:40 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 17, 2020 10:13 AM | 10:56 AM | 00:43:00 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 17, 2020 09:42 AM | 10:08 AM | 00:26:46 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 17, 2020 09:05 AM | 09:42 AM | 00:36:42 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 17, 2020 08:27 AM | 08:53 AM | 00:25:26 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 18, 2020 11:04 AM | 11:56 AM | 00:51:46 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 18, 2020 10:27 AM | 11:03 AM | 00:36:04 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 18, 2020 09:40 AM | 10:08 AM | 00:28:27 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 18, 2020 09:02 AM | 09:40 AM | 00:37:57 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 18, 2020 08:23 AM | 09:00 AM | 00:36:31 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 19, 2020 11:10 AM | 11:31 AM | 00:21:18 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 20, 2020 01:16 PM | 01:29 PM | 00:12:43 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 20, 2020 12:59 PM | 01:02 PM | 00:02:15 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 20, 2020 11:07 AM | 11:26 AM | 00:18:35 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 20, 2020 10:28 AM | 10:51 AM | 00:22:42 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 20, 2020 09:40 AM | 10:04 AM | 00:23:33 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 20, 2020 09:04 AM | 09:22 AM | 00:17:43 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 20, 2020 08:24 AM | 08:45 AM | 00:20:26 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 21, 2020 11:10 AM | 11:33 AM | 00:23:18 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 21, 2020 10:32 AM | 10:53 AM | 00:20:22 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 21, 2020 09:37 AM | 10:04 AM | 00:27:49 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 21, 2020 09:06 AM | 09:28 AM | 00:21:52 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 21, 2020 08:20 AM | 08:46 AM | 00:25:53 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 24, 2020 12:35 PM | 12:44 PM | 00:08:54 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 24, 2020 11:13 AM | 11:51 AM | 00:38:51 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 24, 2020 10:27 AM | 11:04 AM | 00:37:02 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 24, 2020 09:46 AM | 10:15 AM | 00:29:03 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 24, 2020 09:07 AM | 09:42 AM | 00:35:35 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 24, 2020 08:23 AM | 09:05 AM | 00:42:02 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 25, 2020 11:12 AM | 11:51 AM | 00:39:23 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 25, 2020 10:26 AM | 11:02 AM | 00:36:10 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 25, 2020 09:44 AM | 10:16 AM | 00:32:43 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 25, 2020 09:06 AM | 09:41 AM | 00:35:55 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Aug 25, 2020 08:17 AM | 09:05 AM | 00:48:07 |

PL001025

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 01, 2020 10:27 AM | 11:02 AM | 00:34:30 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 01, 2020 09:46 AM | 10:16 AM | 00:30:11 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 01, 2020 09:05 AM | 09:39 AM | 00:34:05 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 01, 2020 08:24 AM | 09:04 AM | 00:40:28 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 02, 2020 11:16 AM | 12:04 PM | 00:47:48 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 02, 2020 09:47 AM | 11:11 AM | 01:23:46 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 02, 2020 09:02 AM | 09:47 AM | 00:44:44 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 02, 2020 08:23 AM | 09:02 AM | 00:38:57 |
| Meeting | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 03, 2020 12:25 PM | 12:46 PM | 00:20:33 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 03, 2020 11:14 AM | 11:53 AM | 00:39:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 03, 2020 10:25 AM | 11:14 AM | 00:48:46 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 03, 2020 09:48 AM | 10:23 AM | 00:34:59 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 03, 2020 08:59 AM | 09:50 AM | 00:50:51 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 03, 2020 08:18 AM | 08:57 AM | 00:38:58 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 04, 2020 11:09 AM | 11:31 AM | 00:22:24 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 04, 2020 10:28 AM | 10:40 AM | 00:11:19 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 04, 2020 09:44 AM | 09:54 AM | 00:10:00 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 04, 2020 09:03 AM | 09:15 AM | 00:12:03 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 04, 2020 08:28 AM | 08:35 AM | 00:06:25 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 08, 2020 11:10 AM | 11:52 AM | 00:42:04 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 08, 2020 10:33 AM | 11:08 AM | 00:35:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 08, 2020 09:48 AM | 10:19 AM | 00:31:22 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 08, 2020 09:06 AM | 09:48 AM | 00:41:23 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 08, 2020 08:29 AM | 08:49 AM | 00:19:18 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 09, 2020 02:58 PM | 03:22 PM | 00:23:56 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 09, 2020 01:24 PM | 01:48 PM | 00:23:58 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 09, 2020 12:37 PM | 12:53 PM | 00:15:51 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 09, 2020 11:04 AM | 11:54 AM | 00:49:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 09, 2020 08:58 AM | 09:51 AM | 00:52:11 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 09, 2020 08:20 AM | 08:46 AM | 00:25:58 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 10, 2020 01:01 PM | 01:28 PM | 00:26:59 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 10, 2020 11:14 AM | 11:41 AM | 00:27:08 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 10, 2020 10:21 AM | 11:14 AM | 00:53:22 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 10, 2020 09:40 AM | 10:23 AM | 00:42:51 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 10, 2020 09:05 AM | 09:30 AM | 00:25:13 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 10, 2020 08:22 AM | 08:43 AM | 00:20:18 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 11, 2020 11:12 AM | 11:48 AM | 00:36:26 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 11, 2020 10:24 AM | 11:11 AM | 00:47:28 |

PL001026

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 17, 2020 08:26 AM | 09:04 AM | 00:38:36 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 18, 2020 12:28 PM | 12:42 PM | 00:14:07 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 18, 2020 11:11 AM | 11:42 AM | 00:31:02 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 18, 2020 10:23 AM | 11:11 AM | 00:47:49 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 18, 2020 09:36 AM | 10:22 AM | 00:45:19 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 18, 2020 09:09 AM | 09:36 AM | 00:27:16 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 18, 2020 08:24 AM | 09:08 AM | 00:43:59 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 21, 2020 10:59 AM | 11:53 AM | 00:53:35 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 21, 2020 10:32 AM | 10:58 AM | 00:26:06 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 21, 2020 09:44 AM | 10:16 AM | 00:31:22 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 21, 2020 09:08 AM | 09:44 AM | 00:36:21 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 21, 2020 08:29 AM | 09:05 AM | 00:35:42 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 22, 2020 10:58 AM | 11:53 AM | 00:54:40 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 22, 2020 10:32 AM | 10:58 AM | 00:25:42 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 22, 2020 09:47 AM | 10:11 AM | 00:23:27 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 22, 2020 09:05 AM | 09:47 AM | 00:42:04 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 22, 2020 08:27 AM | 09:05 AM | 00:38:24 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 23, 2020 08:27 AM | 09:09 AM | 00:42:21 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 24, 2020 12:27 PM | 12:44 PM | 00:17:17 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 24, 2020 11:02 AM | 11:38 AM | 00:36:02 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 24, 2020 10:27 AM | 11:02 AM | 00:35:26 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 24, 2020 09:33 AM | 10:21 AM | 00:47:26 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 24, 2020 09:04 AM | 09:36 AM | 00:31:42 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 24, 2020 08:24 AM | 09:07 AM | 00:43:01 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 25, 2020 11:10 AM | 11:41 AM | 00:31:29 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 25, 2020 10:16 AM | 11:04 AM | 00:47:15 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 25, 2020 09:47 AM | 10:16 AM | 00:29:03 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 25, 2020 09:06 AM | 09:33 AM | 00:27:28 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 25, 2020 08:28 AM | 09:03 AM | 00:35:06 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 28, 2020 11:11 AM | 11:41 AM | 00:30:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 28, 2020 10:20 AM | 11:11 AM | 00:51:15 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 28, 2020 09:35 AM | 10:19 AM | 00:44:02 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 28, 2020 09:08 AM | 09:35 AM | 00:26:52 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 28, 2020 08:29 AM | 09:02 AM | 00:32:40 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 29, 2020 11:09 AM | 11:38 AM | 00:29:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 29, 2020 10:21 AM | 11:09 AM | 00:48:08 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 29, 2020 09:34 AM | 10:20 AM | 00:46:56 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Sep 29, 2020 09:02 AM | 09:36 AM | 00:33:18 |

PL001027

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 08, 2020 09:49 AM | 10:20 AM | 00:30:42 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 08, 2020 09:09 AM | 09:51 AM | 00:41:23 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 08, 2020 08:25 AM | 09:09 AM | 00:43:43 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 09, 2020 11:08 AM | 11:37 AM | 00:29:04 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 09, 2020 10:32 AM | 11:01 AM | 00:29:47 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 09, 2020 09:47 AM | 10:14 AM | 00:27:31 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 09, 2020 09:01 AM | 09:29 AM | 00:28:16 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 09, 2020 08:26 AM | 08:59 AM | 00:33:28 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 12, 2020 11:07 AM | 11:49 AM | 00:42:30 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 12, 2020 10:23 AM | 11:07 AM | 00:43:47 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 12, 2020 09:50 AM | 10:23 AM | 00:32:38 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 12, 2020 08:58 AM | 09:50 AM | 00:51:32 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 12, 2020 08:27 AM | 08:58 AM | 00:31:09 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 13, 2020 11:05 AM | 11:49 AM | 00:44:08 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 13, 2020 10:14 AM | 11:02 AM | 00:47:51 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 13, 2020 09:44 AM | 10:14 AM | 00:30:21 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 13, 2020 09:03 AM | 09:46 AM | 00:43:21 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 13, 2020 08:26 AM | 09:03 AM | 00:36:34 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 14, 2020 10:59 AM | 11:55 AM | 00:55:50 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 14, 2020 10:31 AM | 10:59 AM | 00:27:18 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 14, 2020 09:47 AM | 10:12 AM | 00:25:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 14, 2020 09:06 AM | 09:47 AM | 00:41:21 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 14, 2020 08:26 AM | 09:06 AM | 00:40:06 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 15, 2020 09:46 AM | 09:54 AM | 00:08:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 15, 2020 09:07 AM | 09:17 AM | 00:10:36 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 15, 2020 08:27 AM | 08:34 AM | 00:06:52 |
| | | | | | | | |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 16, 2020 11:13 AM | 11:30 AM | 00:17:20 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 16, 2020 10:31 AM | 10:39 AM | 00:08:24 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 16, 2020 09:19 AM | 09:54 AM | 00:34:46 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 16, 2020 09:08 AM | 09:19 AM | 00:11:20 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 16, 2020 08:22 AM | 08:39 AM | 00:16:23 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 19, 2020 11:14 AM | 11:54 AM | 00:40:00 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 19, 2020 10:35 AM | 11:02 AM | 00:26:25 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 19, 2020 09:50 AM | 10:06 AM | 00:16:12 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 19, 2020 08:51 AM | 09:52 AM | 01:00:54 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 19, 2020 08:24 AM | 08:51 AM | 00:26:45 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 20, 2020 11:01 AM | 11:54 AM | 00:52:53 |

| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 27, 2020 10:28 AM | 10:50 AM | 00:21:23 |
|---|---|---|---|---|---|---|---|
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 27, 2020 09:47 AM | 10:04 AM | 00:16:59 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 27, 2020 08:57 AM | 09:31 AM | 00:33:54 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 27, 2020 08:25 AM | 08:57 AM | 00:31:38 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 29, 2020 11:07 AM | 11:54 AM | 00:46:27 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 29, 2020 10:34 AM | 11:10 AM | 00:35:57 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 29, 2020 09:45 AM | 10:22 AM | 00:37:17 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 29, 2020 08:55 AM | 09:42 AM | 00:47:01 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 29, 2020 08:27 AM | 08:55 AM | 00:28:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 30, 2020 01:27 PM | 01:57 PM | 00:30:46 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 30, 2020 11:07 AM | 11:35 AM | 00:27:49 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 30, 2020 10:34 AM | 11:07 AM | 00:32:54 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 30, 2020 09:25 AM | 10:19 AM | 00:53:28 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 30, 2020 09:08 AM | 09:28 AM | 00:20:28 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Oct 30, 2020 08:28 AM | 08:58 AM | 00:30:01 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 02, 2020 11:00 AM | 11:51 AM | 00:51:09 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 02, 2020 10:14 AM | 11:00 AM | 00:45:35 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 02, 2020 09:48 AM | 10:14 AM | 00:26:38 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 02, 2020 09:11 AM | 09:47 AM | 00:35:48 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 02, 2020 08:28 AM | 08:51 AM | 00:22:32 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 03, 2020 11:00 AM | 11:52 AM | 00:52:26 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 03, 2020 10:31 AM | 11:00 AM | 00:29:31 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 03, 2020 09:48 AM | 10:13 AM | 00:25:11 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 03, 2020 09:08 AM | 09:43 AM | 00:34:50 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 03, 2020 08:23 AM | 08:57 AM | 00:34:09 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 04, 2020 12:28 PM | 12:37 PM | 00:09:22 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 05, 2020 11:13 AM | 11:53 AM | 00:39:15 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 05, 2020 10:20 AM | 11:03 AM | 00:42:49 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 05, 2020 09:50 AM | 10:23 AM | 00:33:02 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 05, 2020 09:01 AM | 09:46 AM | 00:44:25 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 05, 2020 08:28 AM | 09:01 AM | 00:32:30 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 06, 2020 10:58 AM | 11:54 AM | 00:56:24 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 06, 2020 10:34 AM | 10:58 AM | 00:24:05 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 06, 2020 09:43 AM | 10:14 AM | 00:30:35 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 06, 2020 09:06 AM | 09:43 AM | 00:37:00 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 06, 2020 08:30 AM | 09:06 AM | 00:35:33 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 09, 2020 11:09 AM | 11:50 AM | 00:40:29 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 09, 2020 11:09 AM | 11:09 AM | 00:37:22 |

PL001029

| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 16, 2020 09:46 AM | 10:26 AM | 00:40:23 |
|---|---|---|---|---|---|---|---|
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 16, 2020 09:09 AM | 09:50 AM | 00:40:48 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 16, 2020 08:29 AM | 08:53 AM | 00:24:31 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 17, 2020 11:10 AM | 11:22 AM | 00:11:29 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 17, 2020 10:34 AM | 11:10 AM | 00:36:06 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 17, 2020 09:45 AM | 10:25 AM | 00:39:46 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 17, 2020 09:09 AM | 09:17 AM | 00:07:26 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 17, 2020 08:29 AM | 08:49 AM | 00:19:56 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 18, 2020 12:59 PM | 01:09 PM | 00:10:12 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 19, 2020 11:08 AM | 11:51 AM | 00:42:50 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 19, 2020 10:33 AM | 11:08 AM | 00:35:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 19, 2020 09:50 AM | 10:20 AM | 00:30:04 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 19, 2020 09:05 AM | 09:47 AM | 00:42:43 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 19, 2020 08:27 AM | 09:04 AM | 00:37:18 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 20, 2020 12:58 PM | 01:17 PM | 00:19:00 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 20, 2020 11:10 AM | 11:56 AM | 00:45:37 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 20, 2020 10:33 AM | 11:10 AM | 00:36:51 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 20, 2020 09:48 AM | 10:23 AM | 00:34:58 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 20, 2020 09:00 AM | 09:50 AM | 00:50:39 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 20, 2020 08:27 AM | 09:02 AM | 00:35:05 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 30, 2020 11:03 AM | 11:55 AM | 00:51:17 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 30, 2020 10:32 AM | 11:03 AM | 00:31:10 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 30, 2020 09:44 AM | 10:14 AM | 00:29:42 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 30, 2020 08:57 AM | 09:44 AM | 00:46:52 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Nov 30, 2020 08:25 AM | 08:57 AM | 00:31:50 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 01, 2020 10:57 AM | 11:52 AM | 00:54:12 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 01, 2020 10:33 AM | 10:57 AM | 00:23:53 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 01, 2020 09:45 AM | 10:08 AM | 00:23:00 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 01, 2020 09:09 AM | 09:45 AM | 00:35:27 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 01, 2020 08:28 AM | 08:57 AM | 00:29:43 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 03, 2020 11:07 AM | 11:52 AM | 00:45:29 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 03, 2020 10:23 AM | 11:06 AM | 00:43:13 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 03, 2020 09:51 AM | 10:18 AM | 00:27:42 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 03, 2020 08:58 AM | 09:52 AM | 00:53:23 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 03, 2020 08:28 AM | 08:57 AM | 00:28:58 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 04, 2020 11:14 AM | 11:54 AM | 00:39:16 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 04, 2020 10:32 AM | 11:00 AM | 00:28:24 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 04, 2020 09:46 AM | 10:18 AM | 00:20:16 |

PL001030

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 10, 2020 09:49 AM | 10:24 AM | 00:34:55 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 10, 2020 09:10 AM | 09:52 AM | 00:41:36 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 10, 2020 08:29 AM | 09:01 AM | 00:32:05 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 11, 2020 11:13 AM | 11:53 AM | 00:40:36 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 11, 2020 10:34 AM | 11:11 AM | 00:36:51 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 11, 2020 09:47 AM | 10:28 AM | 00:40:47 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 11, 2020 09:07 AM | 09:47 AM | 00:39:20 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 11, 2020 08:30 AM | 09:07 AM | 00:37:33 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 14, 2020 11:14 AM | 11:53 AM | 00:38:28 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 14, 2020 10:35 AM | 11:09 AM | 00:34:31 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 14, 2020 09:50 AM | 10:27 AM | 00:36:55 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 14, 2020 09:09 AM | 09:48 AM | 00:38:29 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 14, 2020 08:29 AM | 08:58 AM | 00:28:46 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 15, 2020 11:13 AM | 11:53 AM | 00:40:08 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 15, 2020 10:34 AM | 11:13 AM | 00:38:46 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 15, 2020 09:45 AM | 10:26 AM | 00:40:36 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 15, 2020 09:09 AM | 09:45 AM | 00:35:48 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 15, 2020 08:29 AM | 09:01 AM | 00:31:56 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 16, 2020 02:28 PM | 02:53 PM | 00:25:07 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 16, 2020 10:29 AM | 10:54 AM | 00:24:33 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 17, 2020 11:14 AM | 11:52 AM | 00:38:03 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 17, 2020 10:35 AM | 11:08 AM | 00:33:35 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 17, 2020 09:48 AM | 10:23 AM | 00:34:59 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 17, 2020 09:10 AM | 09:48 AM | 00:38:01 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 17, 2020 08:29 AM | 08:54 AM | 00:25:17 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 18, 2020 11:14 AM | 11:46 AM | 00:32:12 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 18, 2020 10:36 AM | 11:12 AM | 00:36:37 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 18, 2020 09:09 AM | 09:45 AM | 00:35:54 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Dec 18, 2020 08:29 AM | 09:03 AM | 00:34:25 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 04, 2021 11:14 AM | 11:48 AM | 00:34:14 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 04, 2021 10:35 AM | 11:10 AM | 00:35:38 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 04, 2021 09:44 AM | 10:26 AM | 00:41:55 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 04, 2021 09:09 AM | 09:44 AM | 00:34:57 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 04, 2021 08:29 AM | 09:02 AM | 00:32:18 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 05, 2021 11:09 AM | 11:51 AM | 00:42:30 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 05, 2021 10:34 AM | 11:09 AM | 00:35:03 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 05, 2021 09:47 AM | 10:24 AM | 00:36:50 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 05, 2021 09:1 AM | | 00:35:00 |

PL001031

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 11, 2021 09:10 AM | 09:47 AM | 00:37:14 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 11, 2021 08:28 AM | 09:03 AM | 00:35:15 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 12, 2021 11:08 AM | 11:54 AM | 00:45:58 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 12, 2021 10:34 AM | 11:08 AM | 00:33:55 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 12, 2021 09:50 AM | 10:22 AM | 00:32:04 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 12, 2021 09:10 AM | 09:45 AM | 00:35:00 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 12, 2021 08:28 AM | 09:03 AM | 00:34:44 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 13, 2021 12:58 PM | 01:59 PM | 01:00:17 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 14, 2021 11:14 AM | 11:50 AM | 00:35:26 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 14, 2021 10:35 AM | 11:10 AM | 00:35:38 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 14, 2021 09:50 AM | 10:27 AM | 00:37:38 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 14, 2021 09:09 AM | 09:50 AM | 00:41:22 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 14, 2021 08:27 AM | 09:04 AM | 00:37:02 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 13, 2021 04:58 PM | 05:13 PM | 00:15:36 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 15, 2021 11:14 AM | 11:48 AM | 00:33:19 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 15, 2021 10:35 AM | 11:08 AM | 00:33:00 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 15, 2021 09:49 AM | 10:24 AM | 00:34:27 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 15, 2021 09:09 AM | 09:42 AM | 00:33:13 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 15, 2021 08:29 AM | 09:03 AM | 00:34:19 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 19, 2021 11:13 AM | 11:56 AM | 00:42:13 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 19, 2021 10:32 AM | 11:13 AM | 00:40:47 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 19, 2021 09:52 AM | 10:34 AM | 00:41:20 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 19, 2021 09:07 AM | 09:52 AM | 00:44:22 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 19, 2021 07:47 AM | 09:07 AM | 01:19:55 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 21, 2021 11:15 AM | 11:50 AM | 00:34:44 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 21, 2021 10:34 AM | 11:10 AM | 00:35:29 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 21, 2021 09:50 AM | 10:26 AM | 00:36:22 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 21, 2021 09:04 AM | 09:43 AM | 00:39:00 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 21, 2021 08:29 AM | 08:56 AM | 00:27:24 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 22, 2021 12:59 PM | 01:45 PM | 00:45:43 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 22, 2021 11:14 AM | 11:52 AM | 00:37:20 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 22, 2021 10:34 AM | 11:08 AM | 00:34:35 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 22, 2021 09:50 AM | 10:26 AM | 00:36:00 |
| Math | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 22, 2021 09:09 AM | 09:43 AM | 00:34:26 |
| Physical Science | David Kissner | d.kissner@loma.k12.ca.us | Licensed | teacher | Jan 22, 2021 08:30 AM | 09:06 AM | 00:35:45 |

PL001032