BECKER DECL. EXHIBIT 3

```
 1         BEFORE A COMMISSION ON PROFESSIONAL COMPETENCE

 2            LOMA PRIETA JOINT UNION SCHOOL DISTRICT

 3                     COUNTY OF SANTA CLARA

 4                       STATE OF CALIFORNIA

 5    _____

 6    In the Matter of:

 7    DAVID KISSNER,

 8    A permanent certificated employee,     Case No.

 9         v.                                2021050291

10              Respondent.

11    _____

12              VIDEOCONFERENCE DEPOSITION OF

13                        LISA FRASER

14    DATE:           Monday, August 9, 2021

15    TIME:           9:29 a.m.

16    LOCATION:       Remote Proceeding

17                    Los Angeles, California 90017

18    REPORTED BY:    Nicole Beaudoin, Notary Public

19    JOB No.:        4729499

20

21

22

23

24

25

                                              Page 1
```

```
 1        Q    Can you let me know when you have that exhibit
 2   pulled up?
 3        A    Yes, I have that exhibit pulled up.
 4        Q    Okay.  And can you let me know if you signed
 5   this document?
 6        A    Yes, I did.
 7        Q    And did you sign it under penalty of perjury?
 8        A    Yes.
 9        Q    And did you prepare this document?
10             MS. GEORGINO:  I'm going to object to the
11   extent it calls for attorney-client privilege
12   disclosure.
13   BY MR. GRAHAM:
14        Q    Ms. Fraser, did you prepare this document?
15        A    I conferred with counsel on the document.
16        Q    How much of it did you write?
17        A    I didn't write the document directly.  I
18   conferred and signed the document, with legal counsel.
19        Q    So this document was drafted for you to
20   review?
21        A    Yes.
22        Q    Are you familiar with what's in it?
23        A    Yes.
24        Q    I assume, but I'm going to ask, did you read
25   it before you signed it?
```

Page 33

```
 1        A    Yes.
 2        Q    Did you read it closely?
 3        A    Yes.
 4        Q    Now, I'm going to introduce here as Exhibit
 5   No. 20, the Amended Notice to Dismiss and Statement of
 6   Charges.
 7             (Exhibit 20 was marked for
 8              identification.)
 9        Q    Let me know when you have that pulled up.
10        A    There it comes.  It's not coming --
11             MS. GEORGINO:  Can we hold on a second?
12   Mine's not pulling up.
13             THE WITNESS:  I found it.  It just popped
14   up.
15             MS. GEORGINO:  Okay, mine did too.
16   Sorry.  Thanks, Jeremiah.
17   BY MR. GRAHAM:
18        Q    Did you write this document?
19        A    No.
20        Q    Did you sign this document?
21        A    Yes.
22        Q    And you signed it under penalty of perjury?
23        A    Yes.
24        Q    Can you tell me what's different between this
25   document and Exhibit 19?
```

Page 34

```
 1          Q    And you weren't presented with any evidence.
 2   Well, you'd have personal knowledge, if you were
 3   presented, but you weren't presented with any evidence
 4   that those text messages were improper, because they
 5   contained something of a sexual nature; isn't that true?
 6          A    Only what's based in the investigative report.
 7          Q    Okay.  But you don't remember what the report
 8   says; correct?
 9          A    I would have to go back and re-read the
10   specifics, as I just said.
11          Q    Don't you think if there was something in the
12   report that said that it involved sexual misconduct, or
13   sexual text messaging, that you would have remembered
14   that?
15          A    Again, I did not -- I'm sorry, I misunderstood
16   your question.  I did not -- don't have any copies of
17   those text messages, nor do I have knowledge of there
18   being anything about sexual misconduct, but the
19   investigative report does mention some things about
20   inappropriate texting, and that's what I was
21   referencing.
22          Q    I'm going to skip to G-18.  What is grooming?
23          A    Well, I mean, I don't have a specific
24   definition right in front of me, but there's a lot of
25   literature and guidance out there around what grooming
```

Veritext Legal Solutions
866 299-5127

```
 1   behaviors are, but generally speaking they are behaviors
 2   that sometimes adults engage in, relative to minors, and
 3   they can be very well documented in terms of, you know,
 4   these are the behaviors you might see if an adult was
 5   trying to groom a minor.
 6        Q    Ms. Fraser, my client has already been laid
 7   off.  The district is trying to terminate him
 8   permanently for behavior that you are accusing him of.
 9   And accusing a human being, especially a Christian like
10   Mr. Kissner, of grooming children, is a very, very
11   serious allegation.  You know that; right?  And you knew
12   that, when you signed these charges under penalty of
13   perjury.  True?
14        A    I'm aware that grooming behavior is harmful to
15   children, yes, I am.
16        Q    So whether you use the term --
17        A    And that it's serious.  Yes, I understand
18   that.
19        Q    When you used the term "grooming," what did
20   you mean?
21        A    The term "grooming" was used in the
22   investigative report and when I spoke with Mr. Kissner
23   about this topic, and he explained that he didn't feel
24   like, you know, that words, somehow that he wasn't sure
25   whether that was accurate or not accurate, I based it on
```

```
 1     what was in the report.  I provided him with information
 2     regarding how to avoid people making assumptions about
 3     grooming behavior, so I did provide him with that
 4     information, but I didn't use the word "grooming" and
 5     the word "grooming" was used in the investigative
 6     report, and it was included as such.
 7          Q    Ms. Fraser, do you not understand that when
 8     you sign charges against somebody, accusing them of
 9     improper behavior, that that's on you, not some
10     investigator?  That's you alleging those charges.  And
11     when you accused David Kissner of grooming, are you
12     testifying here today that you had no specific
13     understanding of the meaning of the word "grooming"?
14              MS. GEORGINO:  I object.  That misstates
15     her testimony.  She didn't say she didn't understand
16     what grooming behavior means, Bill.
17              THE WITNESS:  I completely understand
18     what grooming behavior is.
19     BY MR. BECKER:
20          Q    Okay.  You refer to potential grooming, not
21     actual grooming.  So, you're not accusing him of
22     actually grooming minor children, are you?
23              MS. GEORGINO:  With respect to G-18, are
24     you referring, or just in general, Bill?
25              MR. BECKER:  G-18.
```

```
 1    referenced here as a potential grooming behavior.
 2        Q    The fact is, you don't have any factual basis
 3    for making these allegations.  You were completely
 4    dependent on whatever Ms. Elliot said in her report;
 5    isn't that true?
 6        A    Those are the facts that I have, yes.
 7        Q    Those are all the facts, and you didn't bother
 8    to question Ms. Elliot.  When somebody accuses you of
 9    engaging in such a scurrilous act as sexual exploitation
10    of children, which is what grooming is, you never
11    bothered to ask her, where's the evidence for that, I
12    feel uncomfortable signing a charging statement on that?
13        A    No, I did not talk to the investigator, nor
14    would I equate grooming behavior with sexual
15    exploitation.  I think those are different terms, but
16    that's beside the point.  But no, I did not talk with
17    Patricia Elliot, the investigator.
18        Q    If I went down to the police department right
19    now -- this is hypothetical -- I went down to the police
20    station, I filed a report against you for rape, wouldn't
21    you want to know where the evidence is?
22        A    Of course.
23        Q    And wouldn't you be just a little ticked off
24    that somebody made that allegation against you with no
25    evidence?
```

Page 110

1    A    I don't know.  I never met her.  I based it on
2    the investigative report.  I was not in the district at
3    the time that the report was being conducted.  I
4    received the report when I was hired.  I read through
5    it, and I assume it was a factual report, based on the
6    evidence that she collected.  So, that's what I know.
7         Q    Now, 4-G-18, on Bates stamp 36, does not
8    specify the statutory cause for dismissal that it
9    purportedly corresponds to; isn't that right?
10        A    That's correct.
11        Q    And isn't it true that Mr. Kissner was,
12   therefore, not on notice as to which of the statutory
13   causes for dismissal you were alleging he violated?
14        A    Not which, but any one of the five, based on
15   the statute of dismissal charges.
16        Q    He could just pick or choose any of the five;
17   right, whatever he assumed it was?
18        A    That would be his prerogative.
19        Q    Now, you're aware, aren't you, that the charge
20   of grooming actually began with an anonymous letter sent
21   to the district; right?
22        A    That's referenced in the investigative charge,
23   yes.
24        Q    And, in fact, that's the only reference to
25   grooming in the investigative report to the anonymous

Page 114

1      letter; isn't that right?
2          A    I believe that's accurate.
3          Q    And you did read the investigative report?
4          A    Yes, I did.
5          Q    Front to back; right?
6          A    Yes, I did.
7          Q    And one of the issues in that report, and I
8     should probably bring it in and have it admitted as
9     evidence --
10                  MR. BECKER:  Jeremiah, would you mind
11    doing that, and once you have the number of the exhibit,
12    we'll identify it.
13                  MS. GEORGINO:  It's 12:30 now, so do you
14    anticipate being able to break for lunch at some point.
15    I'm getting a little, sorry, hungry.
16                  MR. BECKER:  It is 12:30.  Give me some
17    questions here, we'll break for -- Madam Reporter, we've
18    got a lot to go through, and we started late.  Can we
19    make a short lunch, like I mean, 15 minutes even?
20                  REPORTER:  I'm good for whatever you guys
21    need.
22                  MR. BECKER:  Let me finish this line of
23    questions, and then we'll take a 15-minute lunch break.
24                  MS. GEORGINO:  I need more than 15.
25    Sorry.

```
 1   behavior, your answer is yes, regardless of whether
 2   alcohol is involved; right?
 3        A    It could be, yes.
 4        Q    And Mr. Kissner, you're aware, has these
 5   mountain retreats, these Christian mountain retreats,
 6   where he and other adults host young children during the
 7   summer months.  You're aware of that; correct?
 8        A    Yes.
 9        Q    All right.  So, taking out the alcohol issue,
10   is it your contention that Mr. Kissner, if he's alone
11   with a minor at any time, is committing an act of
12   grooming?
13        A    Well, first of all, it's potential grooming,
14   and no, I wouldn't say that that in and of itself would
15   -- would be potential grooming behavior, but coupled
16   with the other things, I would definitely say it would
17   be ill-advised, which is exactly what I wrote in his
18   letter of corrective action, that these behaviors are
19   ill-advised.  So, that you can avoid -- such that you
20   can avoid any allegations in the future of quote,
21   unquote, potential grooming, so I did have that
22   conversation and did provide that information to Mr.
23   Kissner.
24        Q    Are you familiar of any other time that Mr.
25   Kissner singled out a minor and was alone with a minor
```

Page 135

```
1    before filing the Statement of Charges?
2         A    I don't have evidence that I'm prepared to
3    offer, no.
4         Q    Do you know who Ann Harrington is?
5         A    Yes.
6         Q    Who is she?
7         A    She was a paraeducator that -- formerly
8    employed by the district.
9         Q    Did she have anything to do with sitting in
10   Mr. Kissner's classes?
11        A    I don't know.  Potentially she could have been
12   sitting in there to assist a student, in one of Mr.
13   Kissner's classes.  That wouldn't be uncommon.
14        Q    And you're not aware of the fact that she
15   regularly sat in his classes; correct?
16        A    I don't know what level of regularity, but I
17   know that it's probably not -- there probably were
18   occasions, when she was assigned to his classroom, yes.
19        Q    Are you aware that the investigator
20   interviewed her?
21        A    I don't recall.
22        Q    Well, it says so in the report.
23        A    Okay, but I don't recall.
24        Q    And last night she produced an audio tape of
25   her interview with Ann Harrington.  You don't have any
```

Page 136

```
 1    questions, please, Bill.  Let's move on with questions,
 2    please.  Thank you.
 3                THE WITNESS:  I just don't care to
 4    speculate.
 5                MR. BECKER:  Mm-hmm.
 6                THE WITNESS:  Thank you.
 7    BY MR. BECKER:
 8         Q    So we'll skip past offering alcohol.  We know
 9    that you think that's potential grooming.  Asking about
10    sex and sexual encounters, what evidence do you have
11    that Mr. Kissner engaged at any time in asking minors
12    about sex or sexual encounters?
13         A    Just the evidence that has been provided in
14    the investigation, as I said.
15         Q    What evidence?
16         A    The investigative report.
17         Q    What evidence?  I know there's a report but
18    there's no evidence in the report.
19         A    Whatever is included in the investigative
20    report is what I base that statement on.
21         Q    You don't remember whether there's evidence of
22    asking about sex or sexual encounters anywhere in the
23    report, do you?
24         A    I believe there was commentary about that in
25    the investigative report.  I also had a conversation
```

Page 140

```
 1        Q    And posting images of youth partially
 2   unclothed on the internet, what's your evidence that Mr.
 3   Kissner engaged in potential grooming behavior by
 4   posting images of youth partially unclothed, on the
 5   internet?
 6        A    I believe that the images that were referenced
 7   during that time of the investigative report or with the
 8   anonymous letter, had to do with images of kids who -- I
 9   don't know if they were in bathing suits or whatever
10   they were in, and being taught how to shoot a gun or
11   something, and they were posted on an internet page, and
12   thought that was inappropriate, and subsequently Mr.
13   Kissner took them down.
14        Q    Did you ever see those pictures?
15        A    No, I did not.
16        Q    Did you ever see any evidence of those
17   pictures?
18        A    I can't recall.
19        Q    Did you -- being aware that Mr. Kissner hosts
20   minors on Mountain Retreats over the summer months,
21   where children swim in lakes in their bathing suits, and
22   that's what those pictures or images were on the
23   internet, you believe that the posting of children
24   swimming in their swimming wear is potential grooming
25   behavior; is that right?
```

Page 142

```
 1        Q    Okay.  Now, you understand in the three years
 2   between the conduct report, the issuance of the conduct
 3   report, and the filing of the dismissal notice, that Mr.
 4   Kissner had physical contact with boys as a wrestling
 5   coach at the school; isn't that right?
 6        A    I'm not -- I don't know if he had physical
 7   contact with boys.  I know he coached them.
 8        Q    Well, do you know anything about coaching
 9   wrestling?
10        A    Yeah, I do.  I was actually a high school
11   athletic director.
12        Q    So, you would expect him to have physical
13   contact with boys in order to show them wrestling moves;
14   right?
15        A    Potentially, but I do know of other coaches
16   for whom they, you know, demonstrate in other ways but,
17   yeah, potentially he could have had contact with boys in
18   a wrestling situation.
19        Q    Since potentially he could have had contact
20   with boys, and you were concerned about him grooming,
21   were you ever concerned about him having contact while
22   coaching wrestling?
23        A    No, I assumed that he would abide by the
24   guidance that other athletic coaches would abide by,
25   with regard to coaching wrestling.
```

Page 174

```
1        A    She was when I was employed, yes.
2        Q    The subject is "Request for public records
3   pursuant to PTA."  And the message is, "Hello, Eileen.
4   Pursuant to the California Public Requests Act, I am
5   requesting the charges for Mr. Kissner's dismissal.  I
6   understand you can share with me non-exempt, non-
7   privileged disclosable records."  And you see that that
8   is date stamped April 16, 2021, at 9:49 a.m.  You see
9   that?
10       A    Yes.
11       Q    Please scroll up to Bates stamp 317, the page
12  above it.
13       A    Mm-hmm.
14       Q    And towards the center of it there is an email
15  from Ms. Bevans-Franks to Dan Dale at 10:43 a.m., which
16  would have been less than an hour after the request was
17  made, stating, "Attached please find the response to
18  your Public Record Request.  Please do not hesitate to
19  contact me with any questions you may have."  You see
20  that?
21       A    Yes.
22       Q    Did you authorize Ms. Bevans-Franks to release
23  the response to that request?
24       A    Yes, she conferred with me before sending it.
25       Q    Did you review the Statement of Charges to
```

Page 169

```
 1      determine whether there was any information that needed
 2      to be redacted before releasing it?
 3          A    I had looked at whether or not they were
 4      disclosable records before giving her the authority to
 5      do that, yes.
 6          Q    All right.  Let's look at Exhibit 31.
 7          A    Yes.
 8          Q    At Bates stamp 321.
 9          A    Yes.
10          Q    Is that your signature?
11          A    Yes.
12          Q    Is this a document that you authorized to be
13      issued?
14          A    If this was the response to the PRA, then yes.
15          Q    It says, "Dear Mr. Dale.  This
16      correspondence."  Right?
17          A    So yes.
18          Q    Now, look down at the highlighted area on
19      Bates stamp 320.
20          A    Uh-huh.
21          Q    Is it your content -- and I'll read it into
22      the record.  "The California Court of Appeals held that
23      records of complaints or investigations against a public
24      employee can be disclosed only if 'the complaint is of a
25      substantial nature and there is reasonable cause to
```

Page 170

```
1    believe the complaint or charge of misconduct is well-
2    founded.'  However, in such instances," under that, "a
3    public agency's decision to release confidential
4    documents under the PRA is reviewable by petition for
5    writ of mandate in a 'reverse-PRA' lawsuit."  Did you
6    see that?
7         A    Yes.
8         Q    What do you understand that to mean?
9              MS. GEORGINO:  I object on the grounds it
10   calls for a legal conclusion.  Additionally, I'm going
11   to object that we're going outside of the scope of
12   evidence reasonably calculated to lead to the discovery
13   of admissible evidence here.
14             MR. BECKER:  She wrote the letter.  This
15   is her language.
16             MS. GEORGINO:  It's not relevant to the
17   dismissal charges.  This is just the charges --
18             MR. BECKER:  Relevance is not an --
19             MS. GEORGINO:  Yes, it is, if it's not --
20             MR. BECKER:  No, it isn't.
21             MS. GEORGINO:  -- if it's not reasonably
22   calculated to lead to the discovery of admissible
23   evidence, then it is a relevant objection, by bond,
24   Bill, so I'd like you to provide me with authority that
25   says that is not a reasonable objection, because it is.
```

```
 1                   MR. BECKER:  Not during the deposition.
 2      It also goes --
 3                   MS. GEORGINO:  It's not reasonably
 4      calculated to lead to discovery of admissible evidence.
 5      Tell me how you're going to get evidence from here that
 6      relates to dismissal charges.
 7                   MR. GRAHAM:  If we're going to have an
 8      argument about this, we should do it off the record.
 9                   MR. BECKER:  No, the objection is on the
10      record, and a response is required on the record.  But I
11      don't have to make an offer of proof, but I will.
12      There's a retaliation defense in this case, and this
13      witness released information that was unfounded and that
14      goes to the heart of her motive for retaliate, so --
15                   MS. GEORGINO:  She released these
16      dismissal charges.  How is that retaliation?  He's
17      already been served with them.  So how was that
18      retaliation?
19                   MR. BECKER:  Let's just answer the
20      question and move on, because I've got other questions I
21      need to ask.  My question is --
22                   MS. GEORGINO:  I just think that we're
23      being outside the scope.  If we want to go a couple more
24      questions, but outside of that, I'm going to continue to
25      raise this objection.
```

Page 172

```
 1                    MR. BECKER:  Okay.  We'll ask the Judge
 2      to exclude any evidence from it.
 3      BY MR. BECKER:
 4          Q    But the fact is is that you wrote this
 5      paragraph; correct?
 6          A    Yes.
 7          Q    Ms. --
 8          A    I didn't write it.  I conferred on the letter,
 9      yes.
10          Q    Are you in the habit of sending letters under
11      your name that you don't understand?
12          A    No, I'm not.  Thank you.
13          Q    So when you signed this letter, you understood
14      what you were writing; right?
15          A    Yes, for the most part, yes.  There was legal
16      language in here that is sometimes harder to understand,
17      but yes, I knew that when I was sending it, that I
18      believed I was appropriately sending a disclosable
19      document, but I'm not a lawyer.
20          Q    And you felt the charge of grooming was well
21      founded, sufficient to not redact that portion of the
22      report; is that true?
23          A    I presented the report as it was written.  I
24      didn't redact any portions of the report.  I presented
25      it as it was presented to Mr. Kissner.
```

Page 173