1

2

3

4

5                          IN THE UNITED STATES DISTRICT COURT

6                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    DAVID M. KISSNER,                          Case No. 22-cv-00949-CRB

9                    Plaintiff,

10           v.                                  **ORDER GRANTING SECOND**
                                                **MOTION FOR SUMMARY**
11   LOMA PRIETA JOINT UNION                     **JUDGMENT**
     SCHOOL DISTRICT, et al.,
12
                    Defendants.
13

14

15          This lawsuit stems from Plaintiff David Kissner's dismissal from his position as a

16   6th grade math and science teacher at CT English Middle School, in the Loma Prieta Joint

17   Union School District ("District").  See Second Amended Complaint ("SAC") (dkt. 16).

18   Initially, there were nineteen claims and thirteen named defendants and Does in the case.

19   See Compl. (dkt. 1).  Now all that remains is the "stigma-plus" defamation claim, which

20   Kissner brings against former District superintendents Lisa Fraser and Kevin Grier in

21   connection with their disclosure of the charges against Kissner prior to his termination.

22   See Order on MSJ (dkt. 106) at 34–35.  Fraser and Grier move for summary judgment on

23   that claim, arguing that they are entitled to qualified immunity.  MSJ (dkt. 115).  Because

24   it was not clearly established that disclosure alone would violate Kissner's rights, or that

25   the process Kissner received was inadequate, the Court GRANTS the motion.

26

27

28

*United States District Court*
*Northern District of California*

## I.     BACKGROUND[1]

### A.     Relevant Factual History

On February 12, 2021, Fraser, then superintendent, issued Kissner a Notice of Proposed Intent to Dismiss.  Kissner Depo. Ex. 13 (dkt. 115-10).  The Notice attached a nineteen-page "Statement of Charges," which charged Kissner with Immoral Conduct, Unprofessional Conduct, Unsatisfactory Performance, Evident Unfitness for Service, and "Persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools by the state board or by the governing board of the school district employing him or her," in violation of the Education Code.  Id. at 4.  The Statement of Charges included the allegation that Kissner engaged in "Potential grooming behavior, such as: singling out a minor and being alone with a minor; offering alcohol; asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet."  Id. at 7.  Attached to the Statement of Charges was a 200-plus-page "Confidential Investigation Report" prepared by an attorney.  Id. at 48–255.

On March 22, 2021, counsel for Kissner wrote to the District, demanding removal of the grooming allegation.  Becker Decl. Ex. 5 (dkt. 117-7) at 4 ("These slanderous charges lack any substance and are shamelessly based on nothing more than anonymous inadmissible hearsay.").  He added that "Should these accusations remain in these proceedings or otherwise find their way toward republication, we will not hesitate to hold the District and each person involved accountable."  Id.  Defendants did not respond to this demand.  Becker Decl. (dkt. 117-1) ¶ 7.

On March 25, 2021, the Board met in a closed session to determine whether to proceed with termination proceedings against Kissner.  RJN Ex. C (dkt. 97-4) ("the Board approved by a 5–0 vote to authorize moving forward with the dismissal of a certificated employee").  Kissner and his counsel appeared at the Board meeting and presented their

---

[1] The Court included a lengthy background section in its earlier order on summary judgment.  See Order on MSJ at 2–12.  The pending motion involves a narrower set of facts, and so this background section is shorter.

United States District Court
Northern District of California

reasons why the Board should not move forward with the termination.  MSJ Ex. N at 70–71.  The Board voted to move forward with termination proceedings.  Id. at 71.

On April 16, 2021, the District received a California Public Records Act ("PRA") request from an individual named Dan Dale, seeking a copy of the Statement of Charges.  Fraser Depo. Ex. 30 (dkt. 115-6) at 1.  The District's response that same day, signed by Fraser, stated that the request for "the charges for Mr. Kissner's dismissal" did "not meet the requirement for a proper PRA request in that it fail[ed] to identify records with reasonable particularity."  Fraser Depo. Ex. 31 (dkt. 115-7) at 1–2.  The response continued that the District was "not able to produce records that are exempt from disclosure under the PRA and/or state and federal law," and that "the California Court of Appeals held that records of complaints or investigations against a public employee can be disclosed only if 'the complaint is of a substantial nature and there is reasonable cause to believe the complaint or charge of misconduct is well-founded.'"  Id. at 2.  The response nonetheless enclosed the Notice of Proposed Intent to Dismiss with Statement of Charges.  Id. at 3.[2]  The grooming allegation was not redacted.  Becker Decl. Ex. 3 (dkt. 117-5) (Fraser Depo.) at 173 ("I presented the report as it was written.").  Fraser subsequently testified that she had no independent basis for including the grooming allegation in the Statement of Charges but had relied on the attorney's report.  Id. at 110.

That same day, Dale posted the Statement of Charges online.  Kissner Decl. (dkt. 117-2) ¶ 3; Becker Decl. Ex. 6 (dkt. 117-8).  The post received critical attention from the community.  Kissner Decl. ¶ 3; Ex. 1 (dkt. 117-15).  An individual named Allan Hessenflow posted the Statement of Charges to Facebook.  Kissner Decl. ¶ 3; Ex. 2 (dkt. 117-16).

On May 26, 2021, counsel for Kissner wrote to the District with a settlement demand.  See Becker Decl. Ex. 8 (dkt. 117-10).  Among Kissner's demands was a name-clearing hearing.  Id. at 2.  Kissner's counsel wrote: "the right to a name-clearing hearing

---

[2] It is not clear whether the Confidential Investigation Report was part of the disclosure; Kissner has not asserted that it was.

may be triggered if the employee is disciplined based on a charge of misconduct that stigmatizes the employee's reputation or seriously impairs the employee's reputation to earn a living, or might seriously damage the employee's standing or association in the community." Id. He added, "[a]t minimum, notice and an opportunity to be heard prior to the termination must be provided." Id.

The District amended the Statement of Charges on June 11, 2021. Kissner Depo. (dkt. 115-8) at 59.

On June 17, 2021, the District received a PRA request from Hessenflow, seeking a copy of the amended Statement of Charges. Becker Decl. Ex. 9 (dkt. 117-11). The District's July 6, 2021 response, this time signed by Grier, again noted the limitations under the law. See id. at 2–3. That response also had an enclosure, though its contents are not part of the record. See id. at 3 ("Enclosure").[3] It is Kissner's understanding that the District disclosed the Amended Statement of Charges in the enclosure. Kissner Depo. at 59–60.

The District voluntarily dropped the allegation of grooming and associated conduct before Kissner's dismissal proceedings began, and the allegation did not appear in the heavily redacted Statement of Charges presented to the Commission on Professional

---

[3] Defendants assert that "the record does not clearly establish what, if anything, was disclosed in response to the second PRA request. Defendants do not concede that plaintiff can meet his burden of proof to establish that defamatory material was contained in the disclosure." MSJ at 8 n.1; see also Reply (dkt. 119) at 4 ("as detailed in the moving papers, plaintiff has no evidence as to what, if anything, was disclosed in the July 2021 PRA response."). Kissner does not address this point, though his counsel declares that Hessenflow "appears to be the creator of a website featuring a link to the unredacted amended statement of charges." Becker Decl. ¶ 13. If true, that assertion would support the inference that Hessenflow received the amended Statement of Charges. But Defendants properly oppose this assertion as lacking foundation. See Reply at 2. Although Hessenflow appears to have commented, on August 20, 2021, on the website Kissner's counsel references, it is not clear whether Hessenflow was "the creator of" the website. See https://davidmichaelkissner.wordpress.com/ (last viewed 1/13/2024). In addition, while Hessenflow posted the Statement of Charges to Facebook, Kissner Decl. ¶ 3, that posting apparently occurred on April 16, before Hessenflow's own PRA request, see Kissner Decl. Ex. 2 (Allan Hessenflow April 16 post: "Here are the David Kissner dismissal charges. They were obtained with a public records act request by Dan Dale."). Accordingly, Defendants are correct that the record is unclear about what Grier enclosed in the second PRA response.

Competence.  <u>See</u> Becker Decl. ¶ 12, Ex. 10.[4]

To prepare for the hearing before the Commission, Kissner had the right to conduct discovery, subpoena witnesses, depose witnesses, request documents, and be represented by counsel throughout.  MSJ (dkt. 97) Ex. N at 71.  In front of the three-member administrative panel, Kissner had the right to call witnesses and present evidence, and the right to be represented by counsel.  <u>Id.</u> at 71–72.  The hearing before the Commission took place on October 4, 5, 6, 8, 11, 12, 13, 14, 15, 25, and 28, 2021, and the matter was submitted for decision on November 10, 2021.  RJN Ex. E (dkt. 97-6) (Termination Decision) at 1–2.  Kissner's termination became effective when the Commission made its decision.  MSJ Ex. N at 68–69.  The Commission issued a lengthy written decision on December 7, 2021, detailing the alleged grounds for dismissal, making a series of legal conclusions, and ultimately directing the District to terminate Kissner's employment due to his evident unfitness for service.  RJN Ex. E.  The Commission concluded, however, that Kissner had not engaged in "immoral conduct."  <u>Id.</u> at 31.  And it made no findings about grooming.  <u>Id.</u>

Kissner declares that in the time since his termination, it has been difficult to find suitable employment opportunities.  Kissner Decl. ¶ 5.  He attests that he was hired in September of 2022 by a company called Elevate to teach online math in the Liberty Elementary School District, but that he was asked about "newspaper or internet articles about Loma Prieta District's allegations against [him]," and was then terminated.  <u>Id.</u> ¶¶ 4–6.  He further asserts that he has "applied for work with numerous online and in-person education employers, both with private companies and public school districts, and [has] had limited success, even in a climate of extreme teacher shortage."  <u>Id.</u> ¶ 8.  Kissner

---

[4] Defendants object to this assertion in Kissner's counsel's declaration, and to this exhibit, <u>see</u> Reply at 2, but the Court already included this fact in its previous summary judgment order, <u>see</u> Order on MSJ at 11.  Moreover, Defendants themselves discuss the fact that "the District moved to strike the charges that referenced 'potential grooming behavior' prior to the administrative hearing," and the fact that "plaintiff actively sought to exclude from the hearing any and all evidence that even referenced the stricken charges," and do so without including a record citation to either fact.  <u>See</u> Reply at 9.

1    conceded in his deposition, however, that this federal lawsuit had already been filed at the

2    time of the Elevate incident.  Kissner Ex. 6 (dkt. 117-20) at 30.  He stated that he did not

3    know what information the students in Liberty knew about his termination from Loma

4    Prieta, and that he could not say "whether they saw a copy of [his] complaint from this

5    lawsuit or . . . various online comments from individuals unaffiliated with the [D]istrict or .

6    . . actual communications from Loma Prieta."  Id. at 31.  Kissner testified that an "Elevate

7    HR person" said that they would not be able to place him, and mentioned the grooming

8    allegation.  Id. at 34.  But Kissner acknowledged that the complaint in this case—filed in

9    February of 2022—also mentioned the grooming allegation.  Id.[5]

### B.    Relevant Procedural History

10       In September of 2023, this Court granted summary judgment to Defendants as to

11   Claim 1 in the Second Amended Complaint, for First Amendment retaliation, and all

12   claims in connection with Kissner's layoff.  See Order on MSJ.  The Court denied

13   summary judgment to Defendants as to Claim 3, for "stigma-plus" defamation.  Id.  As to

14   that claim, the Court noted that the parties had argued past each other quite a bit: Kissner

15   argued that he had received a lack of process when Defendants released the Statement of

16   Charges to the public in response to the two PRA requests, and Defendants argued that

17   Kissner had received all of the process he was due in connection with his termination.  See

18   id. at 22–23.  The Court observed: "Defendants are correct that Kissner received a lot of

19   process in connection with his layoff and termination. . . . But . . . Kissner seems to have

20   gotten no process in connection with the PRA disclosures by Fraser and Grier."  Id. at 23.

21   The Court observed that Defendants had not persuaded the Court that they should prevail

22   on the "stigma-plus" defamation claim, though noted that "the Court has not determined

23   that Kissner should prevail on that claim either."  Id. at 24, n.25.

24       Following the denial of summary judgment on the "stigma-plus" defamation claim,

25   the Court permitted "Defendants to file a second motion for summary judgment on the

26

United States District Court
Northern District of California

_____

[5] Defendants assert in their reply brief that Kissner "is employed in public education at the present time," but provide no record citation in support of that assertion.  Reply at 7.

limited question of whether they are entitled to qualified immunity" on that claim.  See Order Granting Ex Parte Application for Leave to File a Second Motion for Summary Judgment (dkt. 113) at 1–2.  The Court asked the parties to "focus on qualified immunity as it pertains to Kissner's claim that he was entitled to due process in connection with, and at the time of, the PRA disclosures."  Id. at 2.  The Court specified that it wished "to hear from the parties whether the PRA disclosures, which took place in April and July of 2021, in advance of the December 2021 termination, could themselves have worked 'the denial of some more tangible interest,' see [Chaudhry] v. Aragon, 68 F.4th 1161, 1170 (9th Cir. 2023), and if so, whether Defendants are entitled to qualified immunity for causing any such harm."  Id.

The parties' briefing is complete, see MSJ; Opp'n (dkt. 118); Reply, and the Court held a motion hearing on Friday, January 26, 2024, see Motion Hearing (dkt. 121).

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the [moving] party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  Id. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the moving party meets its initial burden, the nonmoving party must go

United States District Court
Northern District of California

beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific parts of material in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).  A triable dispute of fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party.  Anderson, 477 U.S. at 249.  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

It is not a court's task "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (internal citation omitted).  Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment."  See id.  When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  Anderson, 477 U.S. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

Defendants move for summary judgment, arguing that they are entitled to qualified immunity on the "stigma-plus" defamation claim because it was not clearly established that disclosing the charges against Kissner constituted a deprivation of some constitutionally protected interest separate from his interest in his job at the District, and that even if Kissner had a constitutionally protected interest, it was not clearly established that the process Kissner received in connection with that interest was inadequate.  See MSJ.  This order therefore discusses (A) qualified immunity law; (B) whether it was clearly established that disclosure would deprive Kissner of a constitutionally protected interest; and (C) whether it was clearly established that the process Kissner received was inadequate.

### A.   Qualified Immunity

Defendants' motion turns on whether qualified immunity applies to the April 2021 (Fraser) and July 2021 (Grier) PRA disclosures.  A quick review of qualified immunity

1  law follows.

2      "A government official is entitled to qualified immunity from a claim for damages

3  unless the plaintiff raises a genuine issue of fact showing (1) 'a violation of a constitutional

4  right,' and (2) that the right was 'clearly established at the time of [the] defendant's alleged

5  misconduct.'" Evans v. Skolnik, 997 F.3d 1060, 1064 (9th Cir. 2021) (quoting Pearson v.

6  Callahan, 555 U.S. 223, 232 (2009)).  Courts may address the two prongs of qualified

7  immunity analysis in either order.  Id. (citing Sandoval v. Las Vegas Metro. Police Dep't,

8  756 F.3d 1154, 1160 (9th Cir. 2014)).

9      "In considering what constitutes 'clearly established' law for purposes of qualified

10  immunity, the Supreme Court has taken a narrow approach." Id. at 1066.  Accordingly, "A

11  government official 'violates clearly established law when, at the time of the challenged

12  conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official

13  would [have understood] that what he is doing violates that right.'" Id. (quoting Ashcroft

14  v. al-Kidd, 563 U.S. 731, 742 (2011)).  "Although the Supreme Court 'does not require a

15  case directly on point for a right to be clearly established, existing precedent must have

16  placed the statutory or constitutional question beyond debate.'" Id. (quoting Kisela v.

17  Hughes, – U.S. –, 138 S.Ct. 1148, 1152 (2018)).  "'This demanding standard protects all

18  but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting District

19  of Columbia v. Wesby, 583 U.S. 48, 56 (2018)).  If public employees "of reasonable

20  competence could disagree . . . , immunity should be recognized." Malley v. Briggs, 475

21  U.S. 335, 341 (1986).

22      As to the sources of clearly established law, the Ninth Circuit has explained that

23

24      [The] analysis is straightforward if "the right is clearly
        established by decisional authority of the Supreme Court or
25      this Circuit." Boyd v. Benton County, 374 F.3d 773, 781 (9th
        Cir. 2004).  Where such binding precedent exists, "our inquiry
26      should come to an end." Id.  If such binding precedent is
        lacking, we have considered other sources "including decisions
        of state courts, other circuits, and district courts." Id. (cleaned
27      up). The Supreme Court has not clarified when state and
        district court decisions could place a "statutory or
28      constitutional question beyond debate." al-Kidd, 563 U.S. at

9

> 741, 131 S.Ct. 2074.  Rather, as the Supreme Court has pointed out, "district court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards," because "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."  Camreta v. Greene, 563 U.S. 692, 709 n.7, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011); see also Wilson, 526 U.S. at 616, 119 S.Ct. 1692 (finding no clearly established law where the only cases cited were a state intermediate court decision and two unpublished district court decisions).

Evans, 997 F.3d at 1066–67.  "The lack of 'any cases of controlling authority' or a 'consensus of cases of persuasive authority' on the constitutional question compels the conclusion that the law was not clearly established at the time of the incident."  Jessop v. City of Fresno, 936 F.3d 937, 942 (9th Cir. 2019) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).  The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular []—not to define clearly established law at a high level of generality."  al-Kidd, 563 U.S. at 742.

### B.    "Other" Constitutionally Protected Right

Defendants argue that it was not clearly established that disclosing the Statement of Charges against Kissner in response to the PRA requests would violate his rights.  MSJ at 13–16.  The Court agrees.

### 1.    Defining the "Plus" at Issue

As the Court explained in its last summary judgment order,

> Garden variety defamation "is a tort actionable under the laws of most States, but not a constitutional deprivation."  Siegert v. Gilley, 500 U.S. 226, 233 (1991).  However, if a government official's act of defamation results in a plaintiff being deprived of a previously held constitutionally protected right, a plaintiff can bring a claim of defamation under Section 1983, arguing that he has been deprived of a constitutionally protected right without the procedural guarantees of the Fourteenth Amendment.  Paul v. Davis, 424 U.S. 693, 708–09 (1976).  "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."  Id. at 708 (internal quotation marks omitted).  To establish "stigma-plus" defamation, "a plaintiff must show: (1) the public disclosure of a stigmatizing statement by the government; (2) the accuracy of which is contested; (3) plus the denial of some more tangible interest such as employment.  Chaudhry v. Aragon, 68 F.4th 1161, 1170 (9th Cir. 2023) (cleaned up).

United States District Court
Northern District of California

Order on MSJ at 21.  There is no dispute here that the grooming allegation, which was part of the Statement of Charges disclosed by Fraser and Grier, was stigmatizing and contested.[6]  The issue is the "plus" element—specifically, whether it was clearly established that disclosure of the Statement of Charges denied Kissner a "more tangible interest such as employment."  See Chaudhry, 68 F.4th at 1170; see also Endy v. County of L.A., 975 F.3d 757, 766 (9th Cir. 2020) ("Even if we assume that the County's [action] is stigmatizing, Endy must also show that it altered or extinguished one of his known rights under the 'stigma-plus' test.").

To be clear: while termination of employment could satisfy the "plus" element of a "stigma-plus" defamation claim, see Chaudhry, 68 F.4th at 1170, Kissner's termination from the District does not satisfy that element here.  For one thing, no one argues that the PRA disclosures, which took place in April and July of 2021, effectuated the termination of Kissner's employment.  See, e.g., Kissner Depo. (dkt. 97-16) at 68–69 (Kissner testifying that his termination "did not become effective" until the Commission on Professional Competence made its decision in December of 2021).[7]  For another, there is no dispute that Kissner received "a lot of process in connection with his layoff and termination."  See Order on MSJ at 23.

The question, both parties agree, is therefore whether the disclosures altered or extinguished some other constitutionally cognizable interest held by Kissner.  See MSJ at 14[8]; Opp'n at 1–2; see also Wenger v. Monroe, 282 F.3d 1068, 1074 (9th Cir. 2002)

---

[6] This is not to gloss over the real harm that being wrongly viewed as a groomer poses to anyone, and particularly to anyone who works with children.  The Court simply recognizes that, as they reiterated at the motion hearing, Defendants do not contest this point. Kissner's counsel's assertion at the motion hearing that "I wouldn't want to be called a groomer," is therefore at once totally understandable and legally insufficient—at least for a "stigma-plus" defamation claim.  As Defendants suggest in their motion, "state defamation law" might be a different story.  See MSJ at 7.

[7] Moreover, while the Ninth Circuit has held that there need not be "a strict temporal link between the defamation and the nonrenewal or discharge," such that a defamatory statement one week after an employee resigned might still imply a stigmatizing reason for the resignation, see Ulrich v. City & Cnty. of S.F., 308 F.3d 968, 983 (9th Cir. 2002), here, the time between the stigmatizing disclosures and the termination was five or more months, and the grooming allegation ultimately was not a basis for Kissner's dismissal.

[8] Kissner is incorrect when he argues that "Defendants have . . , limited their argument

(requiring, for "stigma-plus" defamation claim, the public disclosure of a stigmatizing, contested charge "made in connection with the termination of employment <u>or the alteration of some right or status recognized by . . . law</u>") (emphasis added) (citing <u>Llamas v. Butte Community College Dist.</u>, 238 F.3d 1123, 1129 (9th Cir. 2001)).  Kissner argues that the relevant interest is his liberty interest in future employment opportunities.  <u>See</u> Opp'n at 7 (citing <u>Paul</u>, 424 U.S. at 705).

### 2. Case Analysis

The problem for Kissner is that damage to one's reputation is insufficient to alter or extinguish a constitutionally cognizable interest.

In <u>Paul</u>, which Kissner cites in his brief[9] and cited repeatedly in the motion hearing, the respondent's name and photo appeared on a flyer about active shoplifters that two police chiefs in Louisville, Kentucky distributed to hundreds of merchants "so that [the merchants could] inform [their] security personnel to watch for these subjects."  424 U.S. at 694–95.  The respondent had been charged with shoplifting but not yet convicted.  <u>Id.</u> at 695–96.  The flyer "soon came to the attention of" the respondent's supervisor, who warned but did not fire him.  <u>Id.</u> at 696.  The respondent brought suit under 42 U.S.C. § 1983.  <u>Id.</u>  The Supreme Court reviewed its earlier "stigma-plus" defamation cases,[10] and

---

solely to the scope of Kissner's property interest in his employment with the Loma Prieta Joint Union School District."  Opp'n at 1.  While Defendants discuss Kissner's termination, they do so only to say, accurately, that "it is undisputed that [Kissner] received constitutionally adequate process in relation to the termination."  <u>See</u> MSJ at 13.  They then move onto other possible liberty/property interests.  <u>See</u> <u>id.</u> at 14–16.

[9] <u>See</u> Opp'n at iii.

[10] One of these cases, <u>Wisconsin v. Constantineau</u>, 400 U.S. 433 (1971) is particularly notable.  In <u>Constantineau</u>, the police, without notice or an opportunity to be heard, posted a notice to all retail liquor stores in a city "that sales or gifts of liquors to appellee were forbidden for one year."  400 U.S. at 435.  The Court recognized that such a posting would subject the appellee to "public embarrassment and ridicule."  <u>Id.</u> at 436.  And it held the Wisconsin Act unconstitutional because the "requirements of procedural due process must be met."  <u>Id.</u>  As the Court explained later in <u>Paul</u>, the posting of the notice in <u>Constantineau</u> "significantly altered [the appellee's] status as a matter of state law, and <u>it was that alteration of legal status</u> which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards."  424 U.S. at 708–09 (emphasis added); <u>see also</u> <u>id.</u> at 709 ("The 'stigma' resulting from the defamatory character of the posting was doubtless an important factor in evaluating the extent of harm worked by that act, but we do not think that such defamation, standing alone, deprived [appellee] of any 'liberty' protected by the procedural guarantees of the Fourteenth

concluded that "[i]n each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was <u>distinctly altered or extinguished</u>." <u>Id.</u> at 711 (emphasis added).  The Court observed that "Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioners' actions." <u>Id.</u> at 711–12.  The respondent had not asserted the "denial of any right vouchsafed by the State and thereby protected under the Fourteenth Amendment." <u>Id.</u> at 712.  Accordingly, while the flyer might have seriously "harmed respondent's reputation," it "did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause."  <u>Id.</u>

Here, the disclosures of the grooming allegation against Kissner were harmful to his reputation, but they did not alter or extinguish Kissner's right to future employment.  A pair of child abuse cases is instructive.

In <u>Miller v. California</u>, 355 F.3d 1172, 1173, 1177 (9th Cir. 2004), a noncustodial grandfather argued, among other things, that his placement on the California Child Abuse Central Index (CACI) was "stigma-plus" defamation.  The Ninth Circuit disagreed, explaining that while being falsely named a child abuser could be defamatory, "the Millers must show that the stigma was accompanied by some additional deprivation of liberty or property." <u>Id.</u> at 1178.  The court discussed <u>Paul</u> and <u>Constantineau</u>, and concluded that "[t]he Millers have suffered no . . . change of legal status." <u>Id.</u> at 1178–79.  It explained: "Whereas once listed, Constantineau legally could not do something that she could otherwise do—buy alcoholic beverages—the Millers are not <u>legally disabled by the listing alone</u> from doing anything they otherwise could do." <u>Id.</u> at 1179 (emphasis added).

Five years later, the Ninth Circuit held that plaintiffs in <u>Humphries v. County of L.A.</u>, 554 F.3d 1170 (9th Cir. 2009), as amended (Jan. 30, 2009), rev'd and remanded sub nom. on other grounds by <u>Los Angeles Cnty., Cal. v. Humphries</u>, 562 U.S. 29 (2010), had made out a "stigma-plus" defamation claim.  There, parents whom two California courts

Amendment.").

had found "factually innocent" of abuse nonetheless "were identified as 'substantiated' child abusers and placed on [the CACI]." Id. at 1175. The CACI "offer[ed] no procedure to remove their listing on the database as suspected child abusers, and thus no opportunity to clear their names." Id. California also made the CACI "available to a broad array of government agencies, employers, and law enforcement entities and even require[d] some public and private groups to consult the database before making hiring, licensing, and custody decisions." Id. at 1175–76. The court discussed Paul and Constantineau, noting that "[i]n contrast to the mandatory nature of the statute in Constantineau, the flyer [in Paul] merely 'came to the attention' of Davis' supervisor"—"no law had required the Chief of Police [in Paul] to distribute this flyer, nor did any law require employers to check the list." Id. at 1186–87. The court then discussed Miller, noting that that case had "declined to address whether the mere presence of Miller's name on the CACI denied him due process." Id. at 1187.

In contrast to Miller, "[t]he Humphries allege[d] more than mere reputational harm" but that "being listed on the CACI alter[ed] their rights in two general ways." Id. First, the challenged Act required licensing agencies to search the CACI and do an additional investigation of individuals on it before "granting a number of rights and benefits." Id. at 1187–88. And second, California made the CACI available to other agencies, including state licensing agencies that oversaw employment positions with children, and some of those agencies' own regulations or practices required them to consult the CACI. Id. at 1188. The court held that these requirements "place[d] a tangible burden on a legal right that satisfies the 'plus' test." Id. It explained that the decision was "limited to those 'stigma-plus' situations where both the defamatory statement and the tangible burden on a legal right are statutorily created." Id. at 1189; see also id. at 1189–90 ("the burdens on the Humphries' abilities to obtain various licenses and other legal rights from the state of California are the result of state statutes creating the CACI, instructing state officers to put certain information on the CACI, and effectively mandating that various entities consult the CACI."). The court observed that "[t]he CACI is not just haphazard, second-hand

United States District Court
Northern District of California

information that happens to reach the ears of an employer" as in Paul. Id. at 1190. The court also distinguished an Eleventh Circuit case denying a "stigma-plus" defamation claim as to an Alabama child abuse registry, explaining that "Alabama did not mandate that potential employers consult the Registry." Id. at 1191 (discussing Smith v. Siegelman, 322 F.3d 1290 (11th Cir. 2003)). The court reiterated: "the CACI is more than a registry that an employer 'may' consult. By law, licensing agencies must consult the CACI, investigate, and use the CACI information in making their licensing decisions." Id.

Here, Defendants did not put Kissner's name on a registry that future employers were required to consult. Defendants disclosed the stigmatizing grooming allegation to two different individuals in the course of responding to those individuals' PRA requests. See Fraser Depo. Ex. 30; Becker Decl. Ex. 9. When Defendants did so, no statutes or regulations were triggered that altered Kissner's rights in any way. While news of the grooming allegation had the potential to reach Kissner's prospective employers—and did[11]—it was the same "haphazard, second-hand information that happens to reach the ears of an employer" as in Paul, rather than the required reporting at issue in Humphries. See 554 F.3d at 1190; cf. Ooley v. Citrus Heights Police Dept., 603 Fed. Appx. 628, 629 (9th Cir. 2015) ("defamation [must] be accompanied by an injury directly caused by the Government, rather than an injury caused by the act of some third party.") (internal quotation marks omitted); Chaudhry v. Angell, No. 1:16-cv-01243-SAB, 2021 WL 4461667, at *34 (E.D. Cal. Sept. 29, 2021) ("The Ninth Circuit has held in unpublished cases that the stigma-plus test requires that the defamation be accompanied by an injury directly caused by the state, rather than an injury caused by the act of some third party in reaction to the state's defamatory statements.") (collecting cases).

It is not lost on the Court that the Paul opinion is from 1976 (pre-internet), and involved the distribution of flyers. See Paul, 424 U.S. at 695. Once Defendants disclosed

---

[11] Again, it is not clear whether news of the grooming allegation reached Elevate, the company that hired and then terminated Kissner in late 2022, because of the PRA disclosures or because of Kissner's lawsuit. See Kissner Ex. 6 at 31, 34.

the Statement of Charges against Kissner in response to the two PRA requests, individuals (not Defendants) promptly posted it online, see Kissner Decl. ¶ 3; Becker Decl. Ex. 6; Kissner Decl. ¶ 3; Ex. 2, which presumably means that a larger audience could access it than could see the flyers in Paul.  But Kissner has not addressed this point and cites to no authority clearly establishing that this distinction makes a difference.

Accordingly, the Court is not persuaded that it was clearly established that disclosing the Statement of Charges in response to the PRA requests would violate Kissner's right to future employment.

### 3. Kissner's Authority

Kissner argues, though, that other cases recognize a clearly established right to procedural due process in connection with the impairment of his future employment opportunities.  See Opp'n at 7 (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 575 (1972)).  But Roth, 408 U.S. at 575, which predates Paul, held that there was no right to due process where the respondent was "simply . . . not rehired in one job but remains as free as before to seek another."  The Court explained that if the state had declined to rehire the respondent based on a stigmatizing charge, then he might have been entitled to notice and an opportunity to be heard.  Id. at 573.  Roth is not helpful to Kissner because Kissner did receive notice and an opportunity to be heard in connection with his termination.  See Order on MSJ at 23.

Kissner also relies a great deal on Justice Marshall's dissent[12] in Siegert, 500 U.S. at 236–47 (Marshall, J., dissenting).  See Opp'n at 7–8.  In it, Justice Marshall wrote, citing Paul, that an individual has a liberty interest where the state imposes a stigma that forecloses a plaintiff's freedom to pursue future employment.  500 U.S. at 241–42 (Marshall, J., dissenting).  He went on to write that the respondent in that case—the petitioner's supervisor, who wrote a disparaging letter to the petitioner's new employer, causing the petitioner to lose his job and "render[ing] him unable to obtain other

---

[12] Kissner incorrectly attributes this dissent to Justice Kennedy.  See Opp'n at 8.

United States District Court
Northern District of California

1   appropriate employment in the field," see id. at 228–29—"should have known that his

2   alleged conduct deprived [the petitioner] of a liberty interest," id. at 242 (Marshall, J.,

3   dissenting).  This dissent would help Kissner, because it would hold that a stigmatizing

4   disclosure to one individual could violate the right to pursue future employment.  But it is

5   merely a dissent, and therefore not controlling authority.

6           Moreover, the majority opinion in Siegert held, relying on Paul, that "[the

7   petitioner] failed not only to allege the violation of a constitutional right that was clearly

8   established at the time of [the respondent's] actions, but also to establish the violation of

9   any constitutional right at all."  Id. at 233.  The Court explained that "[t]he alleged

10  defamation was not uttered incident to the termination of [the petitioner's] employment by

11  the hospital," but "several weeks later."  Id. at 234.  The Court noted that while the

12  statements in the letter were damaging to the petitioner's reputation and would

13  undoubtedly "impair his future employment prospects," the plaintiff in Paul had alleged

14  the impairment of his future employment opportunities too.  Id.  The Court concluded that

15  the respondent's conduct might support a state defamation claim, but reiterated that there is

16  no "constitutional protection for the interest in reputation."  Id.  The Siegert majority

17  opinion therefore undercuts Kissner's efforts to identify a clearly established right to

18  procedural due process for conduct analogous to the respondent's letter.

19          Finally, Kissner relies on Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1506

20  (D.C. Cir. 1995), Silva v. City of Los Gatos, No. 21-cv-2639-EJD, 2021 WL 5847885, at

21  *2 (N.D. Cal. Dec. 9, 2021), aff'd, No. 22-15017, 2023 WL 1989771 (9th Cir. Feb. 14,

22  2023), and Collier v. Windsor Fire. Prot. Dist. Bd. of Directors, No. C 08-2582 PJH, 2011

23  WL 4635036, at *9 (N.D. Cal. Oct. 6, 2011).  Opp'n at 8–9.  But Taylor, an out-of-circuit

24  case, held, citing Siegert, that "[t]o prove constitutional injury, the plaintiff must show not

25  only that the government has imposed some stigma upon him, but also that it has worked

26  some change in his status under law."  56 F.3d at 1506 (emphasis added).  Silva, which is

27  only persuasive authority, was not a "stigma-plus" defamation case, but involved a

28  substantive due process claim based on occupational liberty.  2012 WL 5847885, at *2.

17

The claim failed because plaintiff "[did] not allege that Defendants took any stigmatizing action, much less action akin to 'blacklisting' him from working as a police officer." Id. Collier, which is also only persuasive authority, involved a claim for deprivation of liberty without due process by a terminated fire captain, and is also no help to Kissner. See 2011 WL 4635036, at *1. Judge Hamilton assumed in that case "that the accusations of workplace violence and sexual battery could impose a stigma on plaintiff's reputation so as to implicate a liberty interest," and noted that the allegations had been published in a local paper. Id. at *10. But the defendants were still entitled to summary judgment because the fire captain had been given notice and an opportunity to clear his name in a series of hearings connected to his termination. Id. Collier did not hold that separate process is due in connection with the mere publication of stigmatizing charges. It therefore does not clearly establish a right to notice and an opportunity to be heard in connection with disclosures that are not a part of (or that are only at the very beginning of the process of) termination.

Accordingly, while many cases recognize a liberty interest in connection with future employment, they do not clearly establish that the disclosures here—which did not alter or extinguish Kissner's status under the law—would violate Kissner's liberty interest in future employment such that he was entitled to due process. Instead, the disclosures damaged Kissner's reputation, which is not enough for a "stigma plus" defamation claim. See Paul, 424 U.S. at 712.[13]

_____

[13] At the motion hearing, Kissner argued that Mathews v. Eldridge, 424 U.S. 319 (1976) and the cases cited in the District's cover letters disclosing the Statement of Charges clearly established his right to due process in connection with the PRA disclosures. But to seize upon Mathews, which involved the termination of social security benefits, would be to "define clearly established law at" an excessively "high level of generality." See al-Kidd, 563 U.S. at 742. The state law cases cited in the District's cover letters—Bakersfield City School District v. Superior Court, 118 Cal. App. 4th 1041 (2004); BRV, Inc. v. Superior Court, 143 Cal. App. 4th 742 (2006); and Marken v. Santa Monica-Malibu Unified School District, 202 Cal. App. 4th 1250 (2012), see Becker Decl. Ex. 6 (dkt. 99-7)—do illustrate a balancing of public and private interests, and a concern with not harming a public employee by disclosing unfounded allegations in his personnel records. Nevertheless, those cases all involve state appellate courts interpreting the PRA, not federal "stigma-plus" defamation or procedural due process claims. As such, they do not represent a "'consensus of cases of persuasive authority' on the constitutional question,"

United States District Court
Northern District of California

C.    **Adequacy of Process**

Kissner maintains that it was clearly established that the District was obligated to provide some form of due process prior to and after the disclosures, but he did not receive any.  Opp'n at 9.  Conversely, Defendants argue that even if Kissner had established a right to due process, it is not clearly established that the termination procedures provided under the Education Code were inadequate.  MSJ at 16–18.  The Court again agrees with Defendants.

"Once it is determined that due process applies, the question remains what process is due."  Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  As discussed above, Kissner has not established that due process applies.  Kissner asserts, though, that Defendants could have removed or redacted the grooming allegation, or could have given him the opportunity to file a reverse-PRA lawsuit.  See Opp'n at 10–12.[14]  He even says at one point: "Whether compelled or not is beside the point.  It was a process available to them to provide."  Id. at 12.  The question is not what process was available—the Court has already agreed that various processes were available.  See Order on MSJ at 23.  The question is "what process is due," see Morrissey, 408 U.S. at 481; see also Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy, 367 U.S. 886 (1961) ("The very nature of due process negates any concept of inflexible procedures applicable to every imaginable situation."), and—because of Defendants' claim to qualified immunity—is really better framed as: "what process was it clearly established was due."

1.    **Name Clearing**

Kissner does cite to California authority holding that an "at-will public employee's liberty interests are deprived when his discharge is accompanied by charges 'that might seriously damage his standing and associations in his community' or 'impose [] on him a

---

see Jessop, 936 F.3d at 942, particularly giving the relevant controlling authority, such as Paul, pointing the other way.

[14] At the motion hearing, Kissner added that the "perfect time to redact" the grooming allegation was not before his three-person Commission hearing but earlier.  The Court is sympathetic to that position, having stated in the last summary judgment order that "[o]nce the Statement of Charges was released to the public, the genie was out of the bottle." Order on MSJ at 23.  But the Court's task is not to identify the perfect process.

stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities,'" and when that happens, he "has a right to a 'name-clearing hearing.'"  Opp'n at 12–13 (emphasis in original; cleaned up; quoting Kreutzer v. City & Cnty. of S.F., 166 Cal. App. 4th 306, 320 (2008)).  Plenty of federal cases hold the same thing.  See, e.g., Mustafa v. Clark Cnty. School Dist., 157 F.3d 1169, 1179 (9th Cir. 1998) ("The termination of a public employee which includes publication of stigmatizing charges triggers due process protections.") (citing Roth, 408 U.S. at 573); Bollow v. Federal Reserve Bank of S.F., 650 F.2d 1093 (9th Cir. 1981) ("when the government dismisses an individual for reasons that might seriously damage his standing in the community, he is entitled to notice and a hearing to clear his name.") (citing Roth, 408 U.S. at 573 & n.12).

For an employee to be entitled to a name-clearing hearing, though, the defamation must have occurred in the course of his termination.  See, e.g., Stiesberg v. State of Cal., 80 F.3d 353, 356 (9th Cir. 1996) ("Nearly all reported decisions dealing with section 1983 in the context of disciplinary proceedings against public employees arise out of discharges from public employment, and not mere disciplinary actions.") (emphasis in original); Moody v. County of Santa Clara, No. 15-cv-4378-EJD, 2018 WL 646686, at *4 (N.D. Cal. 2018) ("Additionally, to be actionable, an allegedly stigmatizing statement must be substantially false and must occur in conjunction with the termination of employment.") (internal quotation marks omitted); Lopez v. City & Cnty. of S.F., No. 12-cv-6523-MEJ, 2014 WL 2943417, at *8 (N.D. Cal. June 30, 2014) ("It is unclear whether discipline short of termination may be sufficient to constitute a deprivation of property interest.") (citing Gilbert v. Homar, 520 U.S. 924, 929 (1997)); Turner v. City & Cnty. of S.F., No. C-11-1427 EMC, 2012 WL 6631490, at *6 (N.D. Cal. Dec. 19, 2012), aff'd sub nom. Turner v. City & Cty. of S.F., 788 F.3d 1206 (9th Cir. 2015) ("If the tangible interest deprived is public employment, the stigmatizing statement must occur in connection with the termination of employment.") (citing Siegert, 500 U.S. at 234).

Here, again, the disclosures were in April and July of 2021, eight and five months before Kissner was terminated in December of 2021.  See Fraser Depo. Ex. 31; Becker

Decl. Ex. 9.  The Ninth Circuit in <u>Campanelli v. Bockrath</u>, 100 F.3d 1476, 1483 (9th Cir. 1996), explained that "[c]ommon sense and the reasoning of <u>Paul</u> dictate that there must be some temporal nexus between the employer's statements and the termination" and so "a seven- to nine-day interval between the termination and the publication of the defendant's statements did not attenuate the temporal connection.").  That case differs from ours in that, in <u>Campanelli</u>, the termination came first and the defamatory statement came second. <u>See</u> <u>id.</u> at 1477–78.  Even so, the time between disclosure and termination in our case is too far attenuated to treat the disclosures as the termination.  <u>See also</u> <u>Ulrich</u>, 308 F.3d at 983 (defamatory statement one week after an employee resigned might still imply a stigmatizing reason for the resignation).

### 2.    Adequacy of Name Clearing

Even if the Court concluded that, because the Statement of Charges were a part of the Education Code's lengthy termination process, their disclosure triggers the right to the same "name-clearing" process as if Defendants defamed Kissner at the moment of termination, Defendants would still prevail.  That is because even Kissner's demand for a name-clearing hearing stated that "[a]t minimum, <u>notice and an opportunity to be heard prior to the termination</u> must be provided."  <u>See</u> Becker Decl. Ex. 8 at 3 (emphasis added). And, as the Court has already held, "Kissner received a lot of process in connection with his . . . termination."  Order on MSJ at 23.  Kissner had the right to conduct discovery, subpoena witnesses, depose witnesses, request documents, and be represented by counsel as he prepared for a hearing before the Commission.  MSJ Ex. N at 71.  He had the right to call witnesses, present evidence, and be represented by counsel at the hearing before the Commission.  <u>Id.</u> at 71–72.  The hearing took place over eleven days.  <u>See</u> RJN Ex. E at 1. And the Commission issued a lengthy written decision with its conclusions.  <u>Id.</u>

The process Kissner received appears to have been more extensive than that received by the plaintiff in <u>Mustafa</u>, 157 F.3d 1169.  Mustafa was a math and science teacher accused of sexual misconduct.  <u>Id.</u> at 1172.  He had a January 19, 1994 meeting with the school's principal and the district's legal counsel in which they presented him

with a notice of intended disciplinary action and informed him that there would be a hearing. Id.  "Mustafa denied the charges." Id.  On January 24, 1994, there was a pre-termination hearing where "Mustafa gave his version of events." Id.  The district's legal counsel "held a brief closed-door meeting," and then announced "that the issue would go to arbitration" and that the district recommended dismissal. Id. at 1172–73.  There was then a one-day arbitration hearing at which the arbitrator ruled that the allegations "could not be substantiated by clear and convincing evidence and ordered that Mustafa be reinstated." Id. at 1173.  The district transferred Mustafa to another location, and Mustafa sued. Id.  The Ninth Circuit noted that "harm to reputation alone is insufficient" under Paul, and held that "Mustafa by virtue of his arbitration hearing if not the January 19th and 24th hearings, was afforded the opportunity to clear his name." Id. at 1179 (citing Komlosi v. New York State Office of Mental Retardation & Dev. Disabilities, 64 F.3d 810, 817–18 (2d Cir. 1995)).  It so held even though it is unclear if Mustafa had the right to representation by counsel, the right to conduct discovery, or the right to call witnesses, and his arbitration hearing was a single day. See id. at 1172–73.  As Defendants state, Kissner received "formal, written notice of the charges against him, the right to representation by counsel, a formal hearing before the school board, and the right to conduct discovery" before the PRA disclosures, and a "formal, multi-day, evidentiary hearing before a three-member administrative panel" after the PRA disclosures. See MSJ at 17.

The process Kissner received also compares favorably to that received by the plaintiff in Moody, 2018 WL 646686.  Moody was the Public Guardian for Santa Clara County for six years. Id. at *1–*2.  He participated in a meeting, at which he was placed on administrative leave; he received a termination letter that provided the reason for recommending his termination and outlined the available procedures to respond. Id. at *2.  He was entitled to a Skelly hearing which was "not a formal hearing with the examination of witnesses," and without "a right to a court reporter," and if he was not satisfied with the outcome of the Skelly hearing, "he could appeal the decision and have a public hearing before the Santa Clara County Personnel Board." Id.  Judge Davila discussed the concept

United States District Court
Northern District of California

1   of a "name-clearing hearing," noting that "[d]ue process imposes no hard and fast

2   requirements on this 'name-clearing' hearing, including, for example, whether it must be

3   public, evidentiary in nature, or held prior to deprivation of the liberty or property

4   interest." Id. at *7 (citing Shinault v. Hawks, 782 F.3d 1053, 1057 (9th Cir. 2015)).  He

5   concluded that Moody had not plausibly alleged insufficient process because "[t]here is no

6   indication that the Termination Letter and Moody's Skelly hearing were not sufficient

7   opportunities for Moody to clear his name." Id. at *8.  He further rejected Moody's

8   argument that an appeal to the Personnel Board would be inadequate because it would

9   occur 18 months after the stigmatizing action. See id. (18 months not "so unreasonably

10  long so as to effectively deny Moody the opportunity to clear his name").  The process

11  Kissner received both before and after the PRA disclosures was more extensive and

12  included more protections. See MSJ at 17.  Moreover, Kissner's hearing before the

13  Commission in October/November of 2021 was eight and five months (not 18) after the

14  stigmatizing actions in April and July of 2021.

15      Accordingly, the process Kissner received appears adequate. See Mathews, 424

16  U.S. at 334–35.

17      The only wrinkle is that Kissner did not actually get to litigate the grooming

18  allegation in his hearing before the Commission because the District was no longer

19  pursuing the grooming allegation as a basis for Kissner's dismissal by that time.  The

20  District had voluntarily dropped the allegation of grooming and it did not appear in the

21  Statement of Charges presented to the Commission. See Becker Decl. ¶ 12, Ex. 10.

22  Kissner argues, then, that Defendants "denied [him] a hearing by redacting the

23  stigmatizing allegations, leaving the issue of immoral conduct a moot issue before the

24  Commission yet failing to affirmatively clear Kissner's name." Opp'n at 13.

25      Defendants respond to that argument in a number of ways, some of which lack

26  record cites, so the Court cannot evaluate them. See, e.g., Reply at 9 (asserting that

27  Kissner "failed to oppose" the striking of the grooming allegation at the administrative

28  hearing stage, and that Kissner "actively sought to exclude from the hearing any and all

1   evidence that even referenced the stricken charges"). Defendants also argue that because

2   the grooming allegation was removed from the Statement of Charges, Kissner was

3   essentially cleared of that charge—or at a minimum, that no one could believe that

4   grooming was "a basis for his termination." Id. at 10. Certainly, because grooming was

5   not a basis for the Commission's Termination Decision, then grooming was not a basis for

6   Kissner's termination. See RJN Ex. E. But Kissner may not feel as though his name has

7   been satisfactorily "cleared" in the same way that it would have been had the Commission

8   considered the District's evidence of grooming and judged it false.[15] Defendants' more

9   persuasive argument is that, given the striking of the grooming allegation, and Kissner's

10   failure to point to any authority holding that the District was required to go through the

11   motions of a name-clearing hearing as to a charge that it had voluntarily withdrawn, it was

12   not clearly established that the process Kissner received was inadequate. See Reply at 10.

### IV.   CONCLUSION

14        For the foregoing reasons, the Court holds that (1) it was not clearly established that

15   Kissner was entitled to due process in connection with the PRA disclosures; and (2) even if

16   Kissner was entitled to due process in connection with the PRA disclosures, it was not

17   clearly established that the process the District provided was inadequate. The Court

18   therefore GRANTS Defendants' motion based on qualified immunity.

19        **IT IS SO ORDERED.**

20        Dated: January  30 , 2024

CHARLES R. BREYER
United States District Judge

---

[15] Defendants are correct that the Commission concluded that Kissner did not engage in "immoral conduct." See Reply at 10; RJN Ex. E at 31. But that conclusion was premised on the Commission's finding that the charged conduct did "not constitute immoral conduct within the meaning of the Education Code," see RJN Ex. E at 31, not an adjudication of the stricken grooming allegation.